## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Woodstone Limited Partnership;<br>Lofts at Farmers Market LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>City of Saint Paul, Minnesota, a Minnesota<br>Charter City; City Council of the City of<br>Saint Paul; Angie Wiese, in her official<br>capacity as the Director of the Department of<br>Safety and Inspections of the City of<br>Saint Paul; Mayor Melvin Carter, in his official<br>capacity as Mayor of the City of Saint Paul;<br>and John Doe,<br><br>    Defendants. | Case No. _____<br><br><br>**COMPLAINT AND PETITION FOR A<br>WRIT OF MANDAMUS**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     In November 2021 a group of activists convinced a narrow majority of Saint Paul voters to approve a law (the "Ordinance") that is now considered the most stringent rent regulation in the United States.  That Ordinance unconstitutionally interferes with property owners' rights by prohibiting owners of rental housing in Saint Paul, like Plaintiffs Woodstone Limited Partnership ("Woodstone") and Lofts at Farmers Market LLC (the "Lofts" and both plaintiffs collectively "Plaintiffs"), from raising rents more than 3% per year without undertaking a complex and futile process to obtain an "exception" to the law.  Unique among such laws in America, the Ordinance has no exception for newly constructed buildings, no ability to return a rental unit to market rate when a tenant vacates, and does not account for inflation, which is at a historic high.

2.      The Ordinance, drafted by the activists and passed without legislative debate, was promoted by supporters as a way to increase housing stability.

3.      Property owners predicted that its enactment would lead to the loss of billions of dollars in property value, a substantial decline in real estate tax revenue, an increase in the transfer of wealth to more affluent city residents, and a decline in the amount of affordable housing in Saint Paul.

4.      On May 1, 2022, the law went into effect. In the months since the law was passed the dire predictions of the law's opponents have been coming true.

5.       Developers have been withdrawing from the market at an unprecedented pace. More than a billion dollars of investments are estimated to have fled Saint Paul and are unlikely to return.

6.      Preliminary economic analysis indicates that property values in Saint Paul have already decreased 6-7% for all property, and as much as 12% for rental properties, representing a net loss of more than $1.6 billion in value through just the first quarter of 2022 alone.

7.      Moreover, the sudden depreciation in property values, coupled with the withdrawal from the market of many significant developments that would have included affordable housing, is predicted to significantly worsen, rather than alleviate, the affordable housing crisis plaguing Saint Paul.

8.      In short, the net effect of the Ordinance is already the opposite of what its proponents said they hoped to accomplish.

9.      Exacerbating the harm to property owners, the process to request an "exception" to the limits of the Ordinance is convoluted and requires that real estate owners make public disclosures of confidential, competitive financial information.

10.     In addition to making the exceptions process hopelessly complex, if a property owner fails to fully comply with that process, or a tenant or the city disagrees with the property owner's own assessment of their anticipated costs and expenses, the owner could be subject to both a criminal charge and a civil lawsuit.

11.     The City has also established an anonymous online "complaint" form allowing any person—whether a tenant or not—to allege that a property owner improperly sought or *received* an exception, thus making even the approval for an exception no comfort to a property owner that hopes to avoid being sued by a tenant.

12.     The enactment and enforcement of the Ordinance causes further constitutional harm by depriving Plaintiffs of their reasonable investment backed expectations formed when they purchased properties within Saint Paul. At the time those expectations were formed Plaintiffs could not have reasonably anticipated that their properties would be subject to rent regulation, because Minnesota had existed for more than a century without rent control and a law specifically prohibiting rent control in all but one narrow circumstance had been in effect for nearly 40 years.

13.     Yet now with the passage of the Ordinance, each Plaintiff, along with every other property owner in Saint Paul, has already been harmed, and that harm will continue as long as the Ordinance remains the law in Saint Paul.

14.     This Court should enter a declaratory judgment finding that the Ordinance violates Plaintiffs' constitutional rights and barring enforcement of the Ordinance.  The Court should also award Plaintiffs judgment in an amount sufficient to compensate them for their losses and issue a writ of mandamus ordering the City to initiate inverse condemnation proceedings relating thereto.

**JURISDICTION AND VENUE**

15.     This Court has personal jurisdiction over each Defendant in Minnesota because they each reside or are located in Minnesota and because they each regularly transact business within this district.

16.     Jurisdiction in the District of Minnesota is proper under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 2201 (declaratory-judgment jurisdiction), 42 U.S.C. § 1983 (civil rights statute), and 28 U.S.C. § 1387 (supplemental jurisdiction).

17.     Venue is proper in this Court under 28 U.S.C. § 1391 because the defendants are a Minnesota entity and public officials and reside within this district, and because the events or omissions giving rise to the claims presented occurred within this district.

**THE PARTIES**

18.     Plaintiff Woodstone Limited Partnership is a Minnesota limited partnership located at 1000 W 80th Street, Bloomington, MN 55420.  Woodstone owns an interest in property (the "Woodstone building") operated as apartments for rent located at 2335 Stewart Avenue, Saint Paul, MN 55116.

19.     Woodstone has standing because the Ordinance has caused financial and other harm to Woodstone by, among other things, preventing Woodstone from adjusting rent to account for changed circumstances and market conditions such as inflation without engaging in an unduly burdensome, inefficient, and ultimately futile process, otherwise forcing Woodstone to offer renewal leases to stabilized tenants at rental rates below the relevant rental market for such units.

20.     The value of Woodstone's property has been substantially diminished by the Ordinance.

21.     A court declaring the Ordinance unconstitutional and setting aside its 3% cap on rental increases would redress Woodstone's injury because it could raise the rents on its Saint Paul residential property to realize a return on its investment in that property.

22.     Plaintiff Lofts at Farmer's Market LLC is a Minnesota limited liability corporation with a registered office at 130 Cheshire Lane, Suite 175, Minnetonka, MN 55305. The Lofts at Farmers Market LLC owns a building (the "Lofts building") in the City of Saint Paul called the Lofts at Farmers Market, which it operates to provide rental housing to individuals in Saint Paul.

23.     Lofts has standing because the Ordinance has caused financial and other harm to the Lofts by, among other things, preventing the Lofts from adjusting rent to account for changed circumstances and market conditions such as inflation without engaging in unduly burdensome, inefficient, and complex processes, otherwise forcing the Lofts to offer renewal leases to stabilized tenants at rental rates below the relevant rental market for such units.

24.     The value of the Lofts' property has been substantially diminished by the Ordinance.

25.      A court declaring the Ordinance unconstitutional and setting aside its 3% cap on rental increases would redress the Lofts' injury because the Lofts could raise the rents on its Saint Paul residential property to realize a return on its investment in that property.

26.     Defendant City of Saint Paul ("City" or "Saint Paul") is a municipal corporation formed under the laws of the State of Minnesota and is located within Ramsey County.

27.     Defendant City Council of the City of Saint Paul ("City Council") is the legislative body of the City of Saint Paul and is responsible for setting City policy and law through ordinances and resolutions. Defendant City Council is located in the City of Saint Paul.

28.     Defendant Angie Wiese is a resident of the State of Minnesota, and in her official capacity is the Director of the Department of Safety and Inspections ("DSI") of the City of Saint Paul. She is sued in her official capacity.

29.     Defendant Melvin Carter is a resident of the State of Minnesota, and in his official capacity, is the Mayor for the City of Saint Paul. He is sued in his official capacity.

30.     Defendant John Doe is a pseudonymous defendant representing the various city and county officials, or private individuals or law firms, to whom the City of Saint Paul or the State of Minnesota has delegated the authority to prosecute misdemeanor offenses, and whose identities cannot be ascertained at this time. John Doe is sued in that capacity.

## BACKGROUND

**I.     GOVERNMENT POLICIES TO CONTROL RENT GREW OUT OF POST-WAR NECESSITY AND HAVE BEEN LARGELY DISFAVORED FOR THE LAST 40 YEARS**

31.     The first rent regulations in the United States were created during and just after World War I.  At that time a limited number of U.S. cities, including in particular New York, created emergency laws to prevent returning veterans from being charged high rates for rental housing.

32.     Those laws were largely invalidated in the 1920s as the housing "emergencies" precipitating the laws ended.

33.     The second iteration of rent control laws were developed during World War II. Those laws were again intended to prevent large rent increases and to assist in developing stable housing pricing.  Both initial phases of rent control created price "ceilings," essentially limits on the actual dollar amounts that could be charged as rent.

34.     While these versions of rent control laws were largely phased out by the 1960s, in the 1970s several additional such laws came into effect.

35.     Several major metropolitan cities, including San Francisco, Los Angeles, and Washington, D.C., adopted rent control policies, as did cities in the Northeastern United States, including Massachusetts, New York, and New Jersey.

36.     The new laws, sometimes referred to as rent "stabilization" rather than rent "control," allowed defined annual increases, along with certain other modifications such as indexing rent limits to inflation.

37.     Following the 1970s iterations of rent control laws, there was a backlash from regulators, as well as from rental housing owners/operators, and many states passed laws entirely prohibiting, or significantly limiting, rent control at the local level.

38.     Between 1984 and 1997 such laws were passed in Minnesota, Massachusetts, California, and Illinois.

39.     Between 1997 and 2018 numerous other states subsequently adopted some form of rent control prohibition, including Colorado, Georgia, Mississippi, Indiana, Iowa, and Florida.

40.     Today it is believed that more than 30 states have passed state-wide laws barring rent control in whole or in part.

## II.     A TINY MINORITY OF CITIES IN THE UNITED STATES HAVE ANY FORM OF RENT CONTROL OR RENT STABILIZATION

41.     Rent control laws are still limited primarily to a handful of states, including New York, New Jersey, and California.

42.     Today, only approximately 200 U.S. municipalities—out of more than 35,000 general purpose local governments—have some form of rent control or rent stabilization policies.

43.     By comparison, nearly every state in the Midwest—including Minnesota—has some form of law preempting rent stabilization or rent control.

III.     **TODAY "RENT CONTROL" COMMONLY REFERS TO A GROUP OF POLICIES LIMITING WHAT A PROPERTY OWNER CAN CHARGE FOR A RENTAL PROPERTY, AND VARIOUS METHODS TO ADJUST THOSE LIMITS**

44.     While in the immediate post-World War I and II periods "rent control" typically referred to literal ceilings on the amount that could be charged in rent, later iterations introduced a suite of policies that today comprise what is broadly referred to as "rent control" or "rent stabilization."

45.     Those policies are often divided into the following categories or features:

a.     <u>Rent cap</u>.  While each policy varies slightly, nearly all modern rent control policies feature some limit to how much rent can increase over a given period.  Many policies link the cap to the Consumer Price Index.  The most restrictive programs create a cap by identifying a certain percentage of CPI by which rent can increase.  The Ordinance is even more strict and does not itself expressly tie limits on rent increases to CPI, instead capping rent increases at 3% per year.  Other policies create a cap based on a percentage of CPI in conjunction with additional percent increases.

b.     <u>Exceptions</u>.  Many rent control policies permit owners to pass costs on to tenants for certain items.  Those include property tax increases, along with certain amounts for capital improvements and adjustments to costs such as heat, water, and electricity.  Many policies allow owners to seek to add certain costs to existing rent in order to be permitted to obtain a "reasonable return" on their investments, though that standard is difficult to pin down and has in practice been a challenge to implement nearly everywhere it has been utilized.

c.     <u>Exemptions</u>.  Some cities permit exemptions—in addition to exceptions—to rent control policies.  These policies exempt entire categories of rental units from certain aspects of the rent control policies.  A common exemption is for new

construction.  Some cities also have exemptions for buildings with fewer than a set

number of units, or if an owner moves into the unit.  For example, New York exempts

buildings with six or fewer units.

       d.    <u>Vacancy decontrol</u>.  Though tenants are incentivized to remain in rent-

controlled apartments for many years, particularly in cities where the average rent

increases exceed the rent control limits, many cities permit property owners to return a

unit's rent to the market rate when a tenant vacates the unit.  This is known as

"decontrol."  In some cities this assists property owners in realizing a reasonable return

on their investments.  Though the precise form of decontrol differs by city—for example

some cities allow "total" decontrol where a landlord has no restrictions on rent after a

rent-controlled tenant moves out, versus "partial" decontrol, also known as a "vacancy

bonus," where rent can be increased by a certain percentage when a rent-controlled

tenants moves out—most cities with rent regulation allow for some form of decontrol.

       e.    <u>Varying compliance mechanisms and educational programs</u>.  Different

rent control schemes employ a variety of compliance mechanisms, including fines and

other forms of penalty for failures to comply.  Some laws include tenant notification

requirements regarding rent adjustments.

## IV.   THE MINNESOTA LEGISLATURE PROHIBITED RENT CONTROL EXCEPT WITHIN A SINGLE NARROW CIRCUMSTANCE THAT HAS NEVER OCCURRED BEFORE

46.    Since 1984, Minnesota has prohibited the institution of rent control in any city in

the state.

47.    Specifically, Minn. Stat. § 471.9996 says: "No statutory or home rule charter city,

county, or town may adopt or renew by ordinance or otherwise any law to control rents on

private residential property."

48.     The law creates one limited exception to this broad prohibition:

[The rent control prohibition] does not preclude a statutory or home rule charter city, county, or town from controlling rents on private residential property to the extent that the city, county, or town has the power to adopt an ordinance, charter amendment, or law to control these rents if the ordinance, charter amendment, or law that controls rents is approved in a general election.

Minn. Stat. § 471.9996, subd. 2.  Saint Paul is a home rule charter city.

49.     Over Minnesota's 164-year history, and in the 38 years since the Minnesota Legislature chose to prohibit rent control, rent control has not existed in the state.

50.     Upon information and belief, no court in this or any other state has ever cited Minnesota's rent control prohibition in any reported decision.

51.      In short, there was no reason for any property owner in Minnesota—or person or entity that was considering purchasing property for rent—to believe that there would ever be rent control in Minnesota up until the moment it happened.

52.     The Minnesota Legislature recently considered legislation that would preempt the imposition of rent control or stabilization in Minnesota.

## V.     A SIGNIFICANT BODY OF SCHOLARLY RESEARCH HAS FOUND THAT RENT CONTROL LAWS TYPICALLY DO NOT ACHIEVE THE GOALS THEY ARE ENACTED FOR

53.     Rent control policies have been the subject of scholarly economic research for nearly as long as such policies have existed.

54.     Over that period, economists from a wide range of institutions and backgrounds have concluded that while rent control policies appear to assist current tenants over the short term, in the long run such policies "decrease affordability, fuel[] gentrification, and create[] negative spillovers on the surrounding neighborhood." Rebecca Diamond, *What does economic evidence tell us about the effects of rent control?*, Brookings Inst. (Oct. 18, 2018), https://www.brookings.edu/research/what-does-economic-evidence-tell-us-about-the-effects-of-rent-control.

55.     The broad agreement of economists from across the political spectrum that rent control policies lead to negative outcomes and fail to achieve most of their intended effects has itself been the subject of scholarly research.  *See generally* Blair Jenkins, *Rent Control: Do Economists Agree?*, 6 Econ. J. Watch 73, 73 (2009) ("[T]he preponderance of the literature points toward the conclusion that rent control introduces inefficiencies in housing markets. Moreover, the literature on the whole does not sustain any plausible redemption in terms of redistribution.").

56.      Thus, rent control tends to benefit those who can immediately take advantage of it, to the detriment of nearly all future renters.

57.     A seminal recent analysis on rent control noted that

A substantial body of economic research has warned about potential negative efficiency consequences of limiting rent increases below market rates, including over-consumption of housing by tenants of rent-controlled apartments (Olsen (1972), Gyourko and Linneman (1989)), misallocation of heterogeneous housing to heterogeneous tenants (Suen (1989), Glaeser and Luttmer (2003), Sims (2011), Bulow and Klemperer (2012)), negative spillovers onto neighboring housing (Sims (2007), Autor, Palmer and Pathak (2014)) and neglect of required maintenance (Downs (1988)).

Rebecca Diamond, Tim McQuade, & Franklin Qian, *The Effects of Rent Control Expansion on Tenants, Landlords, and Inequality: Evidence from San Francisco*, 109 Am. Econ. Rev. 3365, 3365 (2019).

58.     In that study, the researchers noted there was previously "little well-identified empirical evidence evaluating how introducing local rent controls affects tenants, landlords, and the broader housing market," but that "our paper uses a different natural experiment which has the nice feature of generating quasi-random assignment of rent control within narrowly defined neighborhoods [and] by bringing to bear a unique, rich, and previously unused dataset, our paper is the first in this literature to be able to study how rent control impacts the behavior of the actual tenant beneficiaries." *Id.* at 3366.

11

59.     The researchers concluded that:

In the long run, landlords' substitution toward owner-occupied and newly constructed
rental housing not only lowered the supply of rental housing in the city, but also shifted the
city's housing supply towards less affordable types of housing that likely cater to the tastes
of higher income individuals.  Ultimately, endogenous shifts in the housing supply likely
drove up citywide rents, damaging housing affordability for future renters*, and
counteracting the stated claims of the law*.

*Id.* (emphasis added).

60.     The authors further concluded that "rent control has actually contributed to the

gentrification of San Francisco, the exact opposite of the policy's intended goal. Indeed, by

simultaneously bringing in higher income residents and preventing displacement of minorities,

rent control has contributed to widening income inequality of the city." *Id.* at 3368; *see also*

Rebecca Diamond, *What does economic evidence tell us about the effects of rent control?*,

Brookings (Oct. 18, 2018), https://www.brookings.edu/research/what-does-economic-evidence-

tell-us-about-the-effects-of-rent-control ("The economic magnitude of the effect of rent control

removal on the value of Cambridge's [MA] housing stock is large, boosting property values by

$2.0 billion between 1994 and 2004 . . . . In short, the  policy imposed $2.0 billion in costs to

local property owners, but only $300 million of that cost was transferred to renters in rent-

controlled apartments.")

61.     Other organizations researching this issue have reached similar conclusions,

noting that there is "mixed evidence that rent control contributes to broader socioeconomic goals,

such as limiting gentrification, creating mixed-income neighborhoods, or decreasing racial

disparities."  Prasanna Rajasekaran, Mark Treskon, & Solomon Greene, *Rent Control – What*

*Does the Research Tell Us about the Effectiveness of Local Action?*, Urban Inst. (2019),

https://www.urban.org/sites/default/files/publication/99646/rent_control._what_does_the_

research_tell_us_about_the_effectiveness_of_local_action_1.pdf.

## VI.   PLAINTIFFS PURCHASED RENTAL PROPERTIES YEARS BEFORE THE ORDINANCE WAS ENACTED EXPECTING TO OBTAIN A REASONABLE RETURN ON THEIR INVESTMENTS TAKING INTO ACCOUNT INCREASES IN EXPENSES, TAXES, AND INFLATION

62.     Woodstone purchased the property and developed the building it now operates as rental units more than 30 years ago.  At the time of that initial investment, Woodstone expected to be able to adjust rent to account for changing market conditions, including increases in property taxes, the cost of maintenance and repair, and to account for inflation.  The Woodstone building has 154 rental units.

63.     Since developing and operating Woodstone, and in particular over the last several years, the building has experienced significant increases in both property taxes and operating expenses, with a double-digit year-over-year increase in property taxes over the last several years.

64.     The leases between Woodstone and its tenants contain a number of provisions giving the contracting parties the ability to adjust the terms of the relationship at various points over the term of the rental.

65.     For example, a standard lease agreement that Woodstone enters into with its residents provides that for bi-monthly leases, Woodstone can change any of the terms of the lease, including the amount of rent, by giving appropriate notice.  There are no limits that the parties agree to regarding the amount of rent that can be charged for a bi-monthly lease.

66.     Such bi-monthly leases benefit both Woodstone and Woodstone's tenants, as the tenants are able to obtain flexibility otherwise not realized with a full-term lease.

67.     To account for increased operating expenses, taxes, and other costs, Woodstone has needed to raise rents each year to ensure that it can continue to generate sufficient revenue to maintain the building and operate Woodstone's business.  Woodstone made its investment expecting it would be able to do so without the limits imposed by the Ordinance.

13

68.     The Lofts building, which is composed of 57 rental units as well as commercial space, was developed and built in approximately 2011-2012.  The Lofts building was owned and operated by the City of Saint Paul, which caused the property to be exempt from property tax assessments for the years leading up to The Lofts' purchase of the building from the City.

69.     In 2015, the Lofts acquired the Lofts building after being provided with actual and projected financial information by the City of Saint Paul.

70.     The actual and projected financial information provided by the City, formed, in part, the basis for the Lofts' investment backed expectations in purchasing the Lofts building.

71.     Material differences in those projections provided by the City have made the Lofts building far more costly to operate than was disclosed in the financial materials.

72.     In particular, the actual property taxes assessed to the Lofts building have been nearly double those estimated by the City and have increased by double digit percentages in three of the last four years.

73.     To account for increased operating expenses, taxes, and other costs, the Lofts has needed to raise rents each year to ensure that it can continue to generate sufficient revenue to maintain the building and operate the Lofts' business.  Lofts made its investment expecting it would be able to do so without the limits imposed by the Ordinance.

74.     In various years it has been necessary for both Woodstone and the Lofts to raise rent more than 3% per year on some units.

75.     It is necessary for Woodstone and the Lofts to be able to raise rent at or above 3% per year for a number of their units to account for changes to the business and economic environment, including dramatic increases in property taxes, the costs of materials and services, and inflation, and to meet Woodstone's and the Lofts' reasonable investment backed expectations.

## VII.   IN 2021 A GROUP OF ACTIVISTS INITIATED A PETITION TO BRING RENT CONTROL TO SAINT PAUL

76.    Saint Paul is a home rule charter city, with its rules of governance enumerated in its Home Rule Charter. *See generally* St. Paul Code Ord. §§ 1–18.

77.    The Saint Paul Home Rule Charter provides: "Initiative . . . shall be initiated by a person . . . signed by registered voters of the city equal in number to eight (8) percent of those who voted for the office of mayor in the last preceding city election in the case of initiative[.]" St. Paul City Charter § 8.02(1).

78.    On or around March 2021, a coalition of community groups called Housing Equity Now Saint Paul ("HENS"), announced a drive to put rent control on the November 2021 general elections ballot in Saint Paul—the only way for rent control to be passed in Minnesota.

79.    HENS carefully designed its rent control policies to not include what it characterized as "loopholes" found in most other rent control legislation, including exemptions for new construction and vacancy decontrol.

80.    For example, HENS proposed to cap rent increases on all residential properties in Saint Paul to 3% each year, with the purpose of improving housing equity for low-income families and people of color.

81.    The proposed Ordinance was not indexed to inflation, did not include an exemption for new construction, and explicitly provided that the 3% cap would remain regardless of a change in occupancy.  These features made the Ordinance unique among nearly all rent control laws in the United States.

82.    HENS reportedly chose the 3% cap based on research from the University of Minnesota finding that over the previous 20 years, median rent increases did not surpass 3%. *See* Solomon Gustavo, *The push for rent control in St. Paul, explained*, MinnPost (Aug. 5, 2021), https://www.minnpost.com/metro/2021/08/the-push-for-rent-control-in-st-paul-explained.  In

explaining this reasoning, HENS did not address the historically low rate of inflation that has persisted for years, and which is now a fading memory as the United States economy faces the highest inflation it has experienced in nearly 40 years.

83.    For example, the Star Tribune recently reported that inflation in the Minneapolis-Saint Paul region has increased over 8.7% from the previous year, which is higher than the United States consumer price index, which rose by 8.6%. *See* Kavita Kumar, *Inflation in Twin Cities soared 8.7% since a year ago, a step faster than in the U.S. overall*, Star Trib. (June 10, 2022 4:12 PM), https://www.startribune.com/inflation-in-twin-cities-soared-8-7-in-may-a-step-faster-than-in-the-u-s-overall/600180958.

84.    Further, housing prices in the Twin Cities increased by 8.4%, as compared to 6.9% in the United States generally. *Id.*

85.    The "loopholes" that HENS' proposed ordinance specifically excluded are in fact features of rent control laws adopted in nearly every other rent control or stabilization scheme in the United States. *See* Max Nesterak, *St. Paul voters could pass one of the country's most stringent rent control policies*, Minn. Reformer (Oct. 26, 2021 10:22 AM), https://minnesotareformer.com/2021/10/26/st-paul-voters-could-pass-one-of-the-countrys-most-stringent-rent-control-policies.

86.    The draconian nature of the Ordinance was baked into the language of the Ordinance by design.

## VIII.   NUMEROUS GROUPS WITHIN MINNESOTA WARNED OF THE NEGATIVE CONSEQUENCES OF PASSING THE ORDINANCE

87.    In response to HENS' proposal, a number of commentators, along with business and political leaders, identified likely consequences for Saint Paul if the proposed ordinance became law.

88.     The anticipated consequences were largely well-known outcomes of rent control policies and were supported by empirical research demonstrating a practical certainty that the predicted negative consequences would occur.

89.     For example, numerous groups observed that, nearly unique among rent control measures nationwide, the proposed ordinance was not indexed to inflation, did not contain any exemption for new construction, and did not allow vacancy decontrol. *See* Jon Collins, *Coalition forms to oppose rent control measures proposed for Minneapolis and St. Paul*, MPR News (Oct. 6, 2021 2:52 PM), https://www.mprnews.org/story/2021/10/06/coalition-forms-to-oppose-rent-control-measures-proposed-for-minneapolis-and-st-paul.

90.     The failure to include any one of those measures would have made the Ordinance a significant outlier among rent control policies nationwide.

91.     The absence of *any* of those features makes the Ordinance uniquely stringent and damaging to Saint Paul property owners.

92.     Another criticism was that the proposed ordinance may drive away national developers who would bring projects and jobs to the region, and that landlords would be disincentivized to maintain buildings.

93.     Certain Saint Paul City Council members described the Ordinance as a "very blunt instrument" that was not well targeted to assisting those that HENS claimed would be the recipients of any purported benefits.  *See* Max Nesterak, *St. Paul voters could pass one of the country's most stringent rent control policies*, Minn. Reformer (Oct. 26, 2021 10:22 AM), https://minnesotareformer.com/2021/10/26/st-paul-voters-could-pass-one-of-the-countrys-most-stringent-rent-control-policies.

94.     Other common consequences of rent control laws are that property owners remove units from the rental market, converting them to single family homes or condominiums.

95.     This creates a variety of downstream impacts, from creating a more competitive—and therefore more costly—housing market, to reducing affordable housing as buildings that would have had such housing are converted to condos.

96.     Ryan Companies—a major developer of rental housing, including the large development known as the Highland Bridge project—warned that the Ordinance could prevent it from finding investors for affordable housing units the city pledged to bring to the Highland Bridge site. *See* Katie Galioto and Shannon Prather, *Developers pause St. Paul projects after rent control vote*, Star Trib. (Nov. 6, 2021 4:29 PM), https://www.startribune.com/developers-pause-st-paul-projects-after-rent-control-vote/600113731.

97.     A coalition of business groups, real estate professionals, and trade unions expressed concerns that the Ordinance would deter national developers from bringing projects and jobs to Saint Paul, noting in particular the restrictive nature of the Ordinance. *See* Jon Collins, *Coalition forms to oppose rent control measures proposed for Minneapolis and St. Paul*, MPR News (Oct. 6, 2021 2:52 PM), https://www.mprnews.org/story/2021/10/06/coalition-forms-to-oppose-rent-control-measures-proposed-for-minneapolis-and-st-paul.

## IX.     RENT CONTROL APPEARS ON THE NOVEMBER 2021 BALLOT AND IS APPROVED BY SAINT PAUL VOTERS

98.     On or around June 2021, HENS submitted a petition containing the necessary number of signatures, which required that the City put the issue of rent control on the 2021 ballot. The City Attorney developed the language for the ballot question, which was:

> Should the City adopt the proposed Ordinance limiting rent increases? The Ordinance limits residential rent increases to no more than 3% in a 12-month period, regardless of whether there is a change of occupancy. The Ordinance also directs the City to create a process for landlords to request an exception to the 3% limit based on the right to a reasonable return on investment. A "yes" vote is a vote in favor of limiting rent increases. A "no" vote is a vote against limiting rent increases.

99.     On November 2, 2021, 53% of Saint Paul voters approved the Ordinance, which by its terms took effect on May 1, 2022.

100.    As a result, Saint Paul became the first city in Minnesota, and the only city in the Midwest, to approve rent control legislation.

X.      **THE ORDINANCE CAPS RENTAL INCREASES AT 3%, GRANTS SAINT PAUL AUTHORITY TO CREATE A PROCESS BY WHICH LANDLORDS MAY SEEK AN EXCEPTION TO THE RENTAL INCREASE CAP, AND ESTABLISHES CRIMINAL AND CIVIL PENALTIES FOR NON-COMPLIANCE.**

101.    The Ordinance, codified at Chapter 193A of the Saint Paul Legislative Code, Title XIX, provides: "No landlord shall demand, charge, or accept from a tenant a rent increase within a 12 month period that is in excess of 3% of the existing monthly rent for any residential rental property except as otherwise allowed under section 193A.06 or 193A.07." St. Paul Leg. Code, Title XIX, § 193A.04 (the code citations used herein are those found in the Ordinance as it was amended by the City on or about April 2022 in Ordinance 22-16, which is available at https://stpaul.legistar.com/LegislationDetail.aspx?ID=5521256&GUID=21E0C0A8-CCC4-443D-919B-7B1B044E5F40.  The current published version of the Ordinance in the Saint Paul Municipal Code has not yet been updated to reflect the amendments).

102.    The limitation on the amount of annual rental increase "shall apply regardless of change of occupancy in a residential rent unit except as otherwise allowed under section 193A.05 or 193A.06." *Id.* § 193A.05.

103.    Pursuant to the Ordinance, "[t]he city shall establish a process by which landlord[s] can request exceptions to the limitation on rent increases based on the right to a reasonable return on investment." *Id.* § 193A.06(a).

104.     While the Ordinance failed to create a process for exceptions, it suggested seven factors to be considered in whatever exception process was eventually created, including:

a.      Increases or decreases in property taxes;

b.      Unavoidable increases or any decreases in operating expenses;

c.      The cost of planned or completed capital improvements to the rental unit, where such improvements are necessary to bring the property into or maintain compliance with local codes;

d.      Increases or decreases in the number of tenants, living space, furniture, furnishings, equipment, or other housing services provided;

e.      Substantial deterioration of the rental unit;

f.      Failure on the part of the landlord to provide adequate housing services or apply with rental housing laws; and

g.      The pattern of recent rent increases or decreases.

*Id.* Exceptions may made "only when the Landlord demonstrates that such adjustments are necessary to provide the landlord with a fair return on investment." *Id.* § 193A.06(b). The landlord must maintain compliance with the implied warranty of habitability to obtain an exception. *Id.* § 193A.06(c).

105.    The Ordinance further provides that failure to comply with the provisions of Chapter 193A "may result in criminal prosecution and/or administrative fines as provided by Sec. 1.05 of the Legislative Code." *Id.* § 193A.08(a).

106.    Section 1.05 makes it a misdemeanor to violate a Saint Paul ordinance, punishable by a fine of up to $1000, up to 90 days in jail, or both. *Id.* § 1.05.

107.    The Ordinance also creates a private right of action for tenants, whereby a tenant "aggrieved by a landlord's noncompliance with this Chapter may seek equitable relief in any court of competent jurisdiction to the extent permitted by law." *Id.* § 193A.08(b).

108.    The effective date of the Ordinance was May 1, 2022. *Id.* § 193A.11.

109.    The stated purpose of the Ordinance is to provide safe and affordable housing to Saint Paul residents, in particular persons with low to moderate incomes. *Id.* § 193A.01.

110.    In addition to the criminal and civil penalties and the private right of action for

tenants afforded by the Ordinance, the DSI has also provided a complaint form available to any

individual to "[s]ubmit a complaint for failure to comply with [the Ordinance]." *See* St. Paul

Dep't of Safety and Inspections, *Submit a Complaint*, https://www.stpaul.gov/departments/

safety-inspections/rent-buy-sell-property/rent-stabilization/rulemaking-implementation#submit-

a-complaint (last updated May 13, 2022).

111.    The complaint form allows any individual to submit a complaint anonymously.

Specifically, the form does not require the name, email, or telephone number of the complainant.

*See* St. Paul Dep't of Safety and Inspections, *Rent Stabilization Ordinance Complaint Form*,

*https://forms.office.com/Pages/ResponsePage.aspx?id=5um_2dUkQ0SXFFRogaxp1SatfQQosRx*

*PoGo0wHCQiMdUQTNDSUFCMEJDWTEzTDVTQzZNTzgzUkJDWCQlQCN0PWcu*.

112.    The form also provides four factors a complainant may select as the "Nature of

the Complaint":

5. Nature of the Complaint *

○ Landlord increased over 3% annually without an exception granted by the city

○ Landlord increased rent with a city granted exception but complainant believes the information
provided by landlord contained errors or omissions

○ Landlord is charging fees which should be included in rent per the ordinance (repairs,
maintenance, painting, light, hot and cold water, elevator service, window shades and screens,
storage units, kitchen, bath, and laundry facilities and privileges, janitorial services, utilities that
are paid by the landlord, refuse removal, furnishings, telephone services, vehicle parking spaces
the right to have a specified number of occupants, and any other benefit, privilege, or facility
connected with the use or occupancy of any rental unit.)

○ General question/inquiry/complaint

113.    The form indicates that it is "the first step in having city staff investigate potential violations to the [Ordinance]," but does not provide any details about what such investigation may entail.

114.    Thus, a Saint Paul landlord may simultaneously face civil and/or criminal liability from the City, a civil lawsuit brought by a tenant under the tenant's private right of action, and an anonymous complaint that may lead to an undefined investigation and/or penalty, even after approval of the exception by the DSI.

## XI.   IMMEDIATELY AFTER THE ORDINANCE WAS ENACTED, SAINT PAUL'S LEADERS SOUGHT TO REFORM THE ORDINANCE IN RECOGNITION OF THE SEVERE CONSEQUENCES OF THE NEW LAW

115.    Almost as soon as the Ordinance went into effect, Saint Paul's leaders began efforts to mitigate some of the harm that had been long predicted would arise.

116.    Those efforts have so far not led to any changes to the existing law, other than the addition of a "definitions" section.

117.    In seeking to make the effects of the Ordinance appear less dire, Mayor Carter advocated for an amendment exempting new construction from the rent limits.  Carter said that "[t]urning off our supply of new housing would be disastrous for us as a community." *See* Theo Keith, *Minneapolis activists seek rent limits; St. Paul's mayor tries to roll brand-new policy back*, Fox 9 (Nov. 9, 2021), https://www.fox9.com/news/minneapolis-activists-seek-rent-limits-st-pauls-mayor-tries-to-roll-brand-new-policy-back.

118.    Deputy Mayor Jaime Tincher further criticized the law, noting that "virtually every other rent control ordinance in effect today exempts new construction."  *See* Danny Spewak, *Mayor Carter asks St. Paul Council to exempt new construction from rent control* (Nov. 8, 2021 10:09 PM), https://www.kare11.com/article/news/politics/carter-asks-st-paul-

council-to-exempt-new-construction-from-rent-control/89-67af4db0-dccc-4db6-8cb2-bbf8ba29407c.

119.   Yet Saint Paul's ability to amend a law created by citizen petition is uncertain.

120.   Saint Paul City Charter § 8.06 says "No ordinance adopted by the voters on initiative or ordinance or resolution approved by referendum shall be repealed within one year after its approval."  Because the rent stabilization ordinance was adopted by voters on initiative, it cannot be "repealed" within a year.

121.   Thus, Mayor Carter's proposed solution to the problems with the existing ordinance—an amendment to the law—may not be available as an option.

122.   The Saint Paul City Attorney acknowledged as much, noting that it is not clear how far the city could go in amending the Ordinance before it would run afoul of the "repeal" provision.  The City Attorney also stated that the more the city tried to change the Ordinance the more subject to a successful legal challenge any amendment would be.  *See* Zoë Jackson, *'Substantive' changes in first year unlikely if St. Paul voters approve rent control policy*, Star Trib. (Oct. 27, 2021 2:06 PM), https://www.startribune.com/substantive-changes-in-first-year-unlikely-if-st-paul-voters-approve-rent-control-policy/600110532.

123.   In February 2022, nearly four months *after* the Ordinance became law, Mayor Carter announced the formation of a 41-member group, convened by the University of Minnesota's Center for Urban & Regional Affairs, to identify recommendations toward improving and enhancing the Ordinance.  *See* Kamal Baker, *Mayor Carter Announces 41-Member Rent Stabilization Stakeholder Group*, Office of Mayor Melvin Carter (Feb. 18, 2022), https://www.stpaul.gov/news/mayor-carter-announces-41-member-rent-stabilization-stakeholder-group.

124.    The group has vaguely defined goals, no firm deadlines to provide recommendations, and no authority to create any law or ordinance. While the group is expected to issue a report some time "in the summer," by that point the Ordinance will have been in effect for months, property owners will have already begun seeking exceptions, and any changes to whatever process exists at that point will further exacerbate the unfair and damaging effects of the Ordinance on property owners in Saint Paul.

125.    In addition to creating a 41-member group with an ill-defined purpose, Mayor Carter also tasked Saint Paul staff with researching factors necessary to implement the Ordinance.

126.    Conducted by the Saint Paul Office of Financial Empowerment, the preliminary assessment "research[ed] and considered several areas, ranging from the development of rules, policies and procedures for governance and enforcement, to the systems that jurisdictions across the country have in place related to rent ordinances." St. Paul Dep't of Safety and Inspections, *Rent Stabilization*, https://www.stpaul.gov/departments/safety-inspections/rent-buy-sell-property/rent-stabilization (last updated Apr. 30, 2022).

127.    Finally, Mayor Carter tasked the Department of Safety and Inspections "to lead a cross-departmental group focused on implementation, which was charged with proposing rules and processes based on ordinance language and overseeing the production of educational materials." *Id.*

## XII.   THE CITY COPIED NEARLY WHOLESALE AN EXCEPTIONS PROCESS FROM RICHMOND, CALIFORNIA TO ADDRESS REQUESTS FOR EXCEPTIONS FROM THE ANNUAL RENT INCREASE CAP

128.    On or around April 2022, Saint Paul published proposed rules (the "Rules") setting out how landlords could request an exception to the 3% cap on rental increases and some

of the standards that would be applied to those requests. A true and correct copy of the finalized Rules are attached hereto as Exhibit A.

129.     Under the Rules, Saint Paul identified two methods by which a landlord could seek an exception to the 3% cap: self-certification and staff determination (the "Processes").

130.     Self-certification is available to landlords for increases between 3% and 8%.

131.     To self-certify, a landlord must submit the Rent Increase Exception Request Form, which requires detailed landlord and property information, the percent increase requested, the specific portions of the building affected, the factors impacting the increase, the fair net annual operating income, the fair net annual operating income minus current net operating income, the allowable rent increase per unit per month, and the condition of the habitability of the property.

132.      While not mandatory for self-certification, the Rules strongly encourage landlords to complete the Maintenance of Net Operating Income ("MNOI") worksheet, which requires disclosure of complete income and expense records related to the property. However, certain elements of the Rent Increase Exception Request Form require completion of the MNOI worksheet, notably, the fair net annual operating income, the fair net annual operating income

minus current net operating income, and the allowable rent increase per unit per month:

15. Are you self-certifying the increase or requesting a city staff determination?  *

   ⦿ Self-certifying: available for increases between 3 and 8 percent

   ◯ Requesting City staff determination

16. Fair net annual operating income (Item 6 of the MNOI Worksheet, page 15) *

   [ Enter your answer ]

17. Fair net annual operating income minus current net operating income (Item 7 of the MNOI Worksheet, page 15) *

   [ Enter your answer ]

18. Allowable rent increase/unit/month (Item 8 of the MNOI Worksheet, page 15) *

   [ Enter your answer ]

19. Self-certification attestation: As the author of this submission form, I certify that (1) the information provided is voluntary, truthful and accurate, (2) I believe, through self-evaluation, the request for exception is justified, and (3) understand that fraudulent applications are potentially subject to civil and criminal penalties. (4) I have the completed worksheets to justify this increase. (5) I am responsible for retaining the worksheets for at least 3 years and produce them to the City of Saint Paul upon request. *

   ◯ I understand and agree to the above statement

133.    Upon completion of a self-certification request, the landlord receives a document entitled "Request for Exception to 3% Cap – Notice of Approval through Self-Certification." A true and correct copy of an example of that document is attached hereto as Exhibit B.

134.    The landlord also receives a template for a letter that the landlord may send to the tenant notifying the tenant of the rental increase and the tenant's right to appeal the determination. A true and correct copy of the tenant's letter is attached hereto as Exhibit C.

135.    All self-certification requests are subject to city audit.

136.    The Rules do not identify any standards or criteria for when an audit will be conducted, the statute of limitations for the audit, who will conduct the audit, what information will be reviewed, or the consequences of a negative outcome for the audit, including what impacts, if any, an audit may have on the sale of the property that is the subject matter of the audit.

137.    Staff determination, while available as an option for landlords seeking an increase between 3% and 8%, is mandatory for increases above 8%.

138.     Landlords seeking staff determination are required to complete the MNOI worksheet and must submit the Rent Increase Exception Request.

139.    The Rules, without authorization in the Ordinance, also restrict increases based on staff determinations to no more than 15% as the "Maximum Allowable Rent" (an undefined term under the Rules), with any amounts exceeding that limit deferred into subsequent years.

140.    The MNOI worksheet is twenty-two pages and extremely complex. The MNOI worksheet appears to require a unit-by-unit analysis and documentation to support the requested increases.  A property owner will almost certainly require the assistance of an accountant to prepare the analysis necessary to apply for an exception given the complexity of the worksheet and the criminal consequences for any errors. A true and correct copy of the MNOI worksheet is attached hereto as Exhibit D.

141.    DSI has also produced a "Documentation of Increases in Tenants" worksheet and a "Unit by Unit Percent Increase Requested" worksheet. True and correct copies of these worksheets are attached hereto as Exhibits E and F, respectively.

142.    Neither the Rules nor any other guidelines clearly indicate whether these additional worksheets are mandatory, or what impact completing or not completing them will have on receiving approval for an exception. The landlord worksheets for increases in tenants and for unit-by-unit increases state that for self-certification the worksheets must be completed and retained for at least three years:

> If requesting an exception by *self-certification*, the landlord must retain this completed worksheet for at least 3 years.

However, the DSI website guidelines state that the worksheets are permissive instead of mandatory:

> # Fill out the Maintenance of Net Operating Income Worksheet
>
> All self-certification requests are subject to city audit. The worksheet provides a convenient way to capture  and save the  required income and expense records related to the property and may be used to document reasons for the exception request. The worksheet, and any other forms related to the factors selected in the Exception Request form, will not be sent to the City. Keep the worksheet and any completed forms for your records and any possible city audit. Find the worksheets and forms at the bottom of this page.

143.    There is no provision in the Rules for maintaining the confidentiality of the highly sensitive competitive business information that Saint Paul is requesting.

144.     Such information would likely be subject to a Minnesota Government Data Practices Act request, further increasing the risk of harm to property owners.

145.     As noted above, there are seven factors that Saint Paul is required to consider in determining whether to grant a landlord's exception request.  *See* Saint Paul Leg. Code § 193A.06(a).  The relative weight to be given to each factor is not specified.

146.     The Rules adopted standards corresponding to the factors enumerated in the Ordinance, which are:

> a.     Maintenance of Net Operating Income (MNOI) Reasonable Return Standard
>
> b.     Planned or Completed Capital Improvements
>
> c.     Changes in the Number of Tenants
>
> d.     Changes in Space or Services
>
> e.     Pattern of Increases or Decreases in Rent

147.     These standards create myriad issues that, taken together, further deprive Plaintiffs of their constitutional rights.

**a.     MNOI Reasonable Return Standard**

148.     The MNOI Reasonable Return Standard creates a presumption that the operating income received by the landlord in the Base Year provided a reasonable return, and that the landlord "has the right to obtain a net operating income equal to the Base Year net operating income adjusted by 100% of the percentage increase in the Consumer Price Index (CPI), since the Base Year." Rules at 2.

149.     The Rules established 2019 as the Base Year without explanation, concluding that "[i]t shall be presumed that [the MNOI Reasonable Return Standard] provided a reasonable return." *Id.* at 1-2.

150.     To rebut the presumption that the Base Year net operating income provided the landlord with a reasonable return, landlords may present evidence of exceptional operating expenses or exceptional circumstances in the Base Year.  *Id.* at 2-3.

151.    What would be considered "exceptional" is not defined in the Ordinance or the Rules.

152.    Under the MNOI Reasonable Return Standard, net operating income is calculated by subtracting operating expenses from gross rental income. *Id.* at 3.

153.    Authorized rental increases under the MNOI Reasonable Return Standard are either allocated individually to the unit (such as rent increase for unit-specific capital improvements) or equally among all units (such as for building-wide or common area capital improvements, or for increases resulting from the net operating income analysis). *Id.* at 6-7.

154.    The Rules note that the City retains the right to apportion rental increases in a manner and to the degree necessary "to ensure fairness."  *Id.* at 7.

155.    In other words, it is Saint Paul, not the property owner, who gets to decide how to "fairly" apportion any rental increases that it authorizes.

156.    There is nothing in the Ordinance giving Saint Paul that power.

157.    Notably, and seemingly without any authorization from the Ordinance, the Rules also create a maximum allowable rent increase per year of 15% for the purpose of "protect[ing] Tenants from substantial rent increases which are not affordable."  *Id.* at 7.

158.    There does not appear to be any basis in law for this limitation.

**b.     Planned or Completed Capital Improvements**

159.    The Rules establish the Capital Improvement Standard, which provides that "[o]perating expenses include the amortized costs of capital improvements plus an interest allowance to cover the amortization of those costs." *Id.* at 8.

160.    The Capital Improvement Standard defines "capital improvement" as "any improvement to a unit or property which materially adds to the value of the property, appreciably

prolongs its useful life or adapts it to new use and has a useful life of more than one year and a direct cost of $250.00 or more per unit affected." *Id.*

161.     Confusingly, the Rules also state that "[t]he improvement is not an ordinary repair, replacement, and/or maintenance, and is necessary to bring the property into compliance or maintain compliance with applicable local code requirements affecting health and safety in accordance with Saint Paul Legislative Code Chapter 34." *Id.*

162.     The Rules provided an amortization schedule of certain capital improvements and/or expenses. *Id.* at 9-12.

163.     An interest allowance is also allowed on the cost of the amortized expenses. *Id.* at 12.

164.     Notably, the Rules exclude certain common operating expenses from the Capital Improvement Standard, including but not limited to:

      a.     Mortgage principal or interest payments or other debt service costs and costs of obtaining financing;

      b.     Land lease expenses;

      c.     Depreciation; and

      d.     Expenses attributable to "unreasonable delays" in performing necessary maintenance repair work or the failure to complete necessary replacements not caused by the Tenant.

*Id.* at 12-13.

165.     The Capital Improvement Standard also provides that certain operating expenses may be adjusted, and that if a landlord does not have Base Year operating expense data, it is presumed that operating expenses increased by the percentage increase of CPI between the Base Year and the current year. *Id.* at 13.

166.    As with the MNOI Reasonable Return Standard, the Capital Improvement Standard provides for the same allocation of rental increases based on the improvement. *Id.* at 13-14.

167.    Finally, the Capital Improvement Standard provides that a landlord may petition for an upward rent adjustment based on anticipated future expenses for capital improvements in the 12-month period following the decision regarding the petition. *Id.* at 14.

168.    However, the rent increase is postponed "until such time as the capital improvements are made and an Addendum authorizing the increases is issued." *Id.*

169.    The Capital Improvement Standard does not indicate how or where a petition may be made and makes vague reference to an undefined "Rent Administrator." *Id.*

**c.    Changes in the Number of Tenants**

170.    The Changes in the Number of Tenants Standard established the "Base Occupancy Level" as the "number of Tenants allowed by the Rental Agreement as defined in 193A of the Ordinance for the unit effective May 1, 2022, or at the beginning of any tenancy established after May 1, 2022 (ie a new rental unit)." *Id.* at 14-15.

171.    Thus, under the Rules, a landlord may increase rent where the number of tenants allowed by the parties' rental agreement has increased above the Base Occupancy of that unit. *Id.* at 14.

172.     However, and paradoxically, this does not include family, relatives, or caretakers as required for reasonable accommodation for a person with disability, unless the tenant specifically agrees in writing to a rental increase, which logically would likely never happen. *Id.*

173.    Additionally, where there is a decrease in the number of tenants occupying the unit subsequent to the rental increase, the rental price is automatically decreased by that same amount that is no longer "justified." *Id.*

174.     It is unclear if the landowner has to re-apply to DSI for a downward adjustment and whether the failure to do so would be a violation of the statute thereby leading to a risk of criminal charges.

175.     The Changes in the Number of Tenants Standard also provides for a mandatory decrease in rental price where "any policy or policies imposed by the Landlord unreasonably prevent the Tenant from maintaining the Base Occupancy Level for that unit[.]" *Id.* Essentially, this is a subjective, punitive measure to be applied without defined standards

176.     Finally, the Changes in the Number of Tenants Standard provides a mechanism for tenants to object to petitions requesting a rental increase based on a change in the number of tenants. *Id.* at 16.

177.      Such objections are anticipated to be heard by DSI, further adding to the burden that department will be facing as it also deals with an expected surge in exception requests.  The process for opposing objections and resolving disputes is also presently unknown.

### d.     Changes in Space or Services

178.     The Rules also provided for the Changes in Spaces or Services Standard, under which rent may be increased when, with the written agreement of the tenants, there is an increase in the usable space or in services beyond that which was provided to a unit on May 1, 2022, or when the Base Rent was first established. *Id.* at 16.

179.     The increase in rent may be denied, however, if the increased space or services do not "clearly benefit" a majority of the affected tenants and a tenant objects, or if the increased space or services do "clearly benefit" a majority of the affected tenants and a majority of tenants object. *Id.* at 17.

180.     This provision appears to give control over decisions that would normally be made by Plaintiffs and other landlords with respect to changes in spaces or services to the tenants.

181.     In other words, Plaintiffs have effectively been forced to cede control of these issues to tenants thereby limiting the landlord's use of its property.

182.     The Changes in Spaces or Services Standard also, and again without authorization from the Ordinance, mandates a decrease in rent where the landlord is aware of and has caused the tenant "to suffer a decrease in housing services or living space from the services and space that were provided on May 1, 2022, or from any services or space provided at the beginning of the tenancy." *Id.* at 17.

183.     In instances of "inadequate services [and] substantial deterioration," the rent "must be adjusted downward[.]" *Id.* at 18.

184.     The Changes in Spaces or Services Standard provides the mechanism by which tenants may request a decrease in their rent pursuant to this provision. *Id.* at 18-19.

**e.     Pattern of Increases or Decreases in Rent**

185.     Under the Pattern of Increases or Decreases in Rent Standard, the pattern is determined by the CPI "for the twelve-month period ending as of March of the current year for All Urban Consumers for the Minneapolis-St. Paul-Bloomington area (All Items) provided by the U.S. Bureau of Labor Statistics." *Id.* at 19.

186.     CPI is a standard measure of inflation that is recalculated on monthly basis by the U.S. Bureau of Labor Statistics.

187.     Thus, the CPI applied to an exception request submitted in the latter part of a year may have little bearing on the current rate of inflation that a given property owner is facing when trying to obtain a reasonable return on their investment.

**f.      The Rules were copied nearly verbatim from Richmond, California's rent control legislation**

188.    The Rules were very similar to those adopted by the City of Richmond, California, establishing the standards for individual maximum adjustments to the rental price cap.

189.    However, Richmond, California, and Saint Paul are markedly different, both with respect to their rental property markets and their rent control ordinances.

190.    Other than an unwillingness to develop rules unique to Saint Paul, there was no rational basis for DSI to adopt nearly wholesale Richmond's rules for Saint Paul.

191.    For example, the Richmond ordinance establishes a Rent Board and specifically delegates certain tasks to the Board, including establishing the Base Rent, making adjustments in rent increases and decreases, setting rents at fair and equitable levels, and reporting regularly to the City Council of the City of Richmond on the status of rental housing. Richmond Code Ord. § 11.100.060(e).

192.     No such board is contemplated by the Saint Paul Ordinance.

193.    Additionally, Richmond has a population of approximately 110,000 residents, as compared to approximately 311,000 residents of Saint Paul.

194.    According to a 2016 census, there are approximately 18,910 renter households in Richmond. *See* Report from Barry Konkin, Manager, on Policy Planning to Planning Committee (Aug. 20, 2019), available at https://www.richmond.ca/__shared/assets/_4__Market_Rental_ Housing_Policy54436.pdf.

195.    By comparison Saint Paul has approximately 85,000 rental units. *See* HousingLink, *St. Paul Rental Housing Brief*, at 6 (Apr. 2022), https://www.housinglink.org/ Research/st-paul-rental-housing-brief.

196.    Perhaps most strikingly, while as of March 2022 Saint Paul had allocated only $635,000 for rent control implementation, Richmond budgeted over $2.8 million for the 2021-2022 fiscal year, and more than $3.6 million for the 2022-2023 fiscal year. *Compare* Katie Galioto, *St. Paul budgets $635K for rent control staff*, Star Trib. (Mar. 16, 2022 6:53 PM), https://www.startribune.com/rent-control-stabilization-st-paul-minnesota-ordinance-policy-landlords-tenants-developers/600169468 *with* City of Richmond Rent Program, *FY 2021-2022 Budget* (Mar. 9, 2021), http://www.ci.richmond.ca.us/DocumentCenter/View/57275/Adopted-FY-21-22-Budget; Memorandum from Nicholas Traylor, Executive Director, and Fred Tran, Deputy Director, to Virginia Finlay, Chairman, and Members of the Rent Board, on Fiscal Year 2022-23 Budget and Fee Study Update (Apr. 20, 2022), https://www.ci.richmond.ca.us/DocumentCenter/View/61123/COMPILED-ITEM-H-1_-4202022.

197.    Richmond has allocated over four times the amount of funding than has been allocated in Saint Paul for a program serving approximately one-third the number of residents and one fourth the number of rental units.

**g.  DSI provides limited responses to selected public comments on the Rules while making nearly no changes to those Rules**

198.    Between April 7 and April 22, 2022, Saint Paul invited public comments on the Rules. While Saint Paul received approximately 200 responses to the Rules, the "director's response" comprised less than 5 pages of written feedback.

199.    The comments identified a wide variety of problems with the Rules including the exclusion of certain expenses such as property taxes and mortgage payments as operating expenses, and the lack of clarity with respect to audits, overall timelines, and appeals.

200.    The comments emphasized the impact that the Ordinance would have on property owners' rental properties and the greater Saint Paul community.  For example, Weidner Apartment Homes, a group involved in the Highland Bridge project wrote:

> Advocates of rent control have publicly claimed that the developer community is overstating the potential impacts to the current and future housing stock of St Paul and will eventually learn to live with the new situation, in the hopes of winning changes to the new ordinance.  Speaking from the perspective of an owner and operator of market rate rental housing, that is simply not true.  When looking at the changing nature of the regulatory landscape in St Paul, and evaluating the significantly heightened risk of either owning and operating existing apartment communities, or pursuing new development opportunities in the city – Weidner Apartment Homes, like many others in the industry— believes that beginning new projects will be economically infeasible under the ordinance as written.

201.    Weidner Apartment Homes noted that because the allowable costs of property-wide capital improvements may not be less than $250 per unit affected, landlords would have to fully bear the costs of certain projects.

202.    Another rental property owner/operator, StuartCo, noted that the Ordinance is not indexed for inflation, and that the only way landlords in Saint Paul may index their rental increases for inflation are through the exceptions processes—a complex and uncertain path that is subject to tenant challenge and potential criminal penalties.

203.    StuartCo also expressed concerns regarding the lack of clarity whether landlords who self-certify in good faith but are found to be non-compliant with the Ordinance would be subject to criminal prosecutions and/or administrative fines.

204.    Other commenters shared similar concerns. For example, the Saint Paul Rent Control Working Group at Mahoney CPAs and Advisors noted that the Processes omitted certain operating expenses inherent in calculating net operating income, the Processes themselves are complex, and engaging in the Processes would be difficult for landlords to track and would require additional sets of books:

> The term "Self-Certification" suggests a relatively streamlined way for property owners to seek an increase above 3% to cover expense increases. The proposed process instead is quite complex, and it is unlikely to provide a straight-forward way for owners to seek relief when needed.
> a.  In general, the Self-Certification process being proposed is subjective and complex, and it will present a significant obstacle for property owners to complete and qualify for an increase above 3%. In addition, these proposed rules will place additional compliance requirements on property owners and city staff.

205.   The Macalester Groveland Community Council identified concerns about the exclusion of property taxes and city-mandated costs and fees associated with owning rental properties:

> There are concerns from community and committee members that while these proposed rules address increased rent costs, there are no such rules for capping or limiting expenses from the City of Saint Paul on property owners, including utilities and property taxes. How is the city intending to better support rent stabilization by helping to ensure reasonable ROI with caps on these expenses to landlords?

206.   Affordable housing developers such as Twin Cities Housing Development Corporation, Common Bond Communities, and Aeon submitted comments expressing their concerns with not only the complexity of the Processes but also with issues unique to affordable housing developers, such as the exclusion of support services from operating expenses (a funding requirement for affordable housing); the impracticality of equal allocation of rental increases for affordable housing units subject to different requirements under federal, state, and local law; and the lack of a vacancy exception that would allow affordable housing landlords to maintain older units with the intention that the units operate for a longer period of time.

207.   Despite the number of objections and comments to the Rules, DSI made minimal changes, instead primarily fixing a number of typos left over from copy/pasting the rules from the City of Richmond's website.

208.   A five-page report accompanying the final Rules and published by DSI summarized and provided limited answers to some of the comments. A true and correct copy of DSI's report is attached hereto as Exhibit G.

209.   In its report, DSI did not address many of the concerns raised during the public comment period, including:

        a.      The complexity, inefficiency, and lack of timeline for the Processes;

b.      The fact that large numbers of Saint Paul landlords may request an exception to the 3% cap because the Ordinance is not indexed for inflation;

c.      That allocating only $635,000 for five staff members to enforce the Ordinance and the Rules will result in a backlog of petitions, unduly burdening landlords;

d.      The concerns of market-rate and affordable housing developers regarding funding for new and ongoing projects, as well as the costs of maintaining existing housing in compliance with state and local laws;

e.      The difficulties of small landlords in completing the complex and confusing MNOI worksheet, and the legal consequences to those landlords if they fail to complete the worksheet in whatever manner a DSI employee or tenant may believe is proper.

f.      The failure of the Ordinance and Rules to account for the increase in property taxes, special fees and assessments, utility costs, and property insurance, all of which are outside the landlords' control and are required to be paid under state and local laws;

g.      The differences between Richmond, California, and concerns regarding the use of Richmond's rent control legislation and administrative rules as a model for Saint Paul; and

h.      The negative impact the Ordinance will have on housing developers and, subsequently, the Saint Paul community as such developers leave the Saint Paul housing market, as well as evidence indicating the adverse impacts rent control legislation such as the Ordinance has on the housing market.

210.    The Rules were finalized and published on April 29, 2022, less than one month after the Rules were made available to the general public for comment.

XIII.   **NEW DEVELOPMENT AND CONSTRUCTION FINANCING HAS BEEN FLEEING SAINT PAUL AND IS UNLIKELY TO RETURN, FURTHER DIMINISHING THE VALUE OF EXISTING PROPERTIES, AND EXACERBATING THE AFFORDABLE HOUSING CRISIS IN THE CITY.**

211.    The Star Tribune reported that within 24 hours of the Ordinance becoming law, developers were in a "frenzy," pausing projects and reconsidering sites for future housing. *See* Katie Galioto and Shannon Prather, *Developers pause St. Paul projects after rent control vote*, Star Trib. (Nov. 6, 2021 4:29 PM), https://www.startribune.com/developers-pause-st-paul-projects-after-rent-control-vote/600113731.

212.    Immediately after passage of the Ordinance a number of large-scale developments were paused or shuttered entirely.

213.    For example, Ryan Companies, which was developing nearly 4,000 housing units as part of the Highland Bridge project, confirmed on November 8, 2021 that it had pulled applications for three buildings at that site, representing millions in development dollars.

214.    The steep decline in construction and development is in part reflected in the decrease in applications for construction permits.  Between December 2021 and March 2022, companies applied for permits for only 231 Saint Paul housing units in mixed-use or multi-family buildings, a decline of more than 80 percent from the same period a year before. *See* Frederick Melo, *Apartment construction slows by nearly 85 percent in St. Paul*, Pioneer Press (Apr. 4, 2022),  https://www.twincities.com/2022/04/04/multi-family-apartment-construction-slows-by-nearly-85-percent-in-st-paul.  That slowdown is in direct contrast to the record-breaking pace of multi-family housing construction nationwide that has already been seen in 2022.  *See* Frederick Melo, *Developer: If apartments aren't built in St. Paul, who pays for city services? Homeowners*, Pioneer Press (Dec. 12, 2021), https://www.twincities.com/2021/12/12/developer-if-apartments-arent-built-in-st-paul-who-pays-for-city-services-homeowners.

**XIV.   THE ONGOING CONSEQUENCES OF THE ORDINANCE ARE BEING STUDIED AND THE OUTCOME IS BLEAK FOR TENANTS, RENTAL PROPERTY OWNERS, AND THE CITY**

215.   Numerous developers and property owners have already indicated that they are or will be withdrawing their rental units from the Saint Paul housing market.

216.   Recent reporting bears out the increased problems that the City will be facing soon.

217.   With mortgage interest rates rising to levels not seen in more than a decade, more renters are staying in their rental housing, leading to an even further decreased stock of rental units.

218.    The President of Housing Link, a Twin Cities-based non-profit, noted that increased mortgage rates "keep[] people in the rental market. If you don't have people moving out of rentals into homeownership, there's not as much room within the rental market to house everyone . . . We just don't have enough housing." Jim Buchata, *Rising mortgage rates help boost demand for Twin Cities apartments*, Star Trib. (May 6, 2022 9:25 AM)*,* https://www.startribune.com/rising-mortgage-rates-help-boost-demand-for-twin-cities-apartments/600171018.

219.   A pre-publication paper submitted in March 2022 by two respected economists at the University of Southern California has provided the first objective, empirical evidence regarding the effects of the Ordinance. *See* Kenneth R. Ahern, *Robbing Peter to Pay Paul? The Redistribution of Wealth Caused by Rent Control* (Nat'l Bureau of Econ. Research, Working Paper No. 30083 May 2022), https://www.nber.org/system/files/working_papers/w30083/w30083.pdf.

220.   First, the authors determined that the Ordinance presented an "ideal setting" to study the effects of rent control because "there was little anticipation of the law and no other confounding laws were passed at the same time." *Id.* at 1.

221.    In addition, "relative to existing rent control laws in other cities, Saint Paul's new law has extreme provisions: annual rental growth is capped at 3% year-over-year, with no inflation-adjustment and no provision to allow rental prices to be reset to market prices upon vacancy, and all residential property are covered by the law, with very few exceptions." *Id.*

222.    The authors also noted that real estate outside of Saint Paul's city limits provided a similar control sample for comparison, and that Saint Paul's size and diversity allowed for a broad study of the effect of rent control across property type and locations. *Id.* at 2.

223.    To put this work into perspective, they note that "[t]he central contribution of this paper is to provide new evidence that rent control substantially reduces property values and that the transfer of wealth caused by rent control is poorly targeted." *Id.* at 4-5.

224.    The authors' primary conclusions are that:

a.    The Ordinance caused property values to fall by 6–7%, with losses of up to 12% for rental properties, for an aggregate loss of $1.6 billion.

b.     Both owner-occupied and rental properties lost value, but the losses were larger for rental properties, and in neighborhoods with a higher concentration of rentals;

c.    Tenants who gained the most from rent control had higher incomes and were more likely to be white, while the owners who lost the most had lower incomes and were more likely to be minorities; and

d.    Property tax revenue will fall by 4%, which, given that property taxes are the main form of revenue for the city and for the school district, is likely to have a meaningful impact on city services and public schools.

*Id.* at 2-3.

225.    Critically, given that the stated purpose of the Ordinance was to increase affordable housing and promote equality, the authors conclude that "[t]o the extent that rent

control is intended to transfer wealth from high-income to low-income households, the realized impact of the law was the opposite of its intention." *Id.* at Abstract.

226.    These stark results, based on data for just the first quarter of 2022, dramatically illustrate the unfortunate, and predictable, failings of the Ordinance.

227.    The Ordinance has, and will continue, to infringe on the constitutional rights of Plaintiffs, and will wreak further devastation on Saint Paul if it is allowed to remain in effect.

## XV.   DSI PROVIDES A ONE-MONTH UPDATE ON THE ORDINANCE

228.    On June 1, 2022, Director Wiese participated in a webinar hosted by Home Line, during which she provided the following information:

a.      DSI had not filled the two positions that were approved by the City Council to administer the Ordinance by the Ordinance's effective date, and, at the time of the webinar, only one position had been filled, with that individual's start date set for June 21, 2022;

b.      DSI had received 25 applications for exceptions to the 3% cap and over 157 inquiries regarding the Ordinance:



c.      Completion of the MNOI worksheet is necessary for self-certification applications, although the Rules state otherwise;

d.      Concerns had been expressed about the Ordinance's effects on month-to-month and short-term leases; and

e.      Staff determination applications take longer to process than self-certification applications.

*See* HOME Line, *6/1/22 tenant/landlord webinar: St. Paul Rent Stabilization ordinance, with guest speakers from city* (June 1, 2022), https://www.youtube.com/watch?v=WfdMIl6QPkU.

229.    Director Wiese stated that in her view the language of the Ordinance is "very landlord focused," and indicated that steps were being taken by DSI to make the Ordinance more favorable to tenants, including by encouraging tenant notification of exception applications and approvals. *Id.*

230.    Director Wiese also discussed DSI's plans to make the data related to rental units publicly available, including the addresses of units that had received exceptions to the 3% cap, which will facilitate further tenant objections and complaints about the exceptions. *Id.*

## XVI.  DSI'S DENIAL OF AN EXCEPTION REQUEST HIGHLIGHTS THE FUTILITY OF THE PROCESS

231.    Upon information and belief, in the short time since the Ordinance's effective date DSI has denied at least one or more staff determination exception requests, including on grounds that because the previous detailed income and expenditure data was not available to the property owner, DSI was prevented from making a staff determination.

232.    While the property owners have appealed that denial, the legislative hearing date is scheduled for approximately one month after the filing of the appeal. No indication was given for when a decision would be issued on the appeal.

233.   DSI's denial of the exception request highlights some of the issues landlords like Plaintiffs face in requesting exceptions to the 3% cap. For example, landlords who have recently purchased property may not have access to past income and expenditure data, which DSI has indicated necessarily precludes a staff determination.

234.   Further, the appeal demonstrates the futile and onerous nature of seeking an exception by any landlord in Saint Paul. The legislative hearing for the appeal was scheduled approximately one month after the appeal was made, and such hearings are only available on one day of the week at a certain time. Additionally, there is no clarity on how long a decision by the Legislative Hearing Officer may take.

235.   The appeal included recent financial data that was made available for download on a public website, highlighting that financial and other proprietary and confidential information will be made public if property owners like Plaintiffs seek exceptions.

## COUNT I
### Declaratory Judgment – 28 U.S.C. § 2201
### Due Process Clause of the
### United States Constitution and Minnesota Constitutions
### Against All Defendants

236.   Plaintiffs repeat the allegations in the preceding paragraphs as if fully restated herein.

237.   An actual and live controversy exists between the parties as to the constitutionality of the Ordinance.

238.   The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV; *see also* U.S. Const. amend. V.

239.   Article I, Section 7 of the Minnesota Constitution provides that "[n]o person shall . . . be deprived of life, liberty or property without due process of law." Minn. Const. art. I, § 7.

240.    Defendants, acting under color of Minnesota law, have caused, and will continue to cause, Plaintiffs to be deprived of their property without due process of law in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and Article I, Section 7 of the Minnesota Constitution.

241.    The Ordinance is not rationally related to a legitimate government interest and thus cannot serve a legitimate government purpose.

242.    Economic research accumulated over decades demonstrates that the Ordinance cannot be rationally related to the effects it was passed to achieve, including "ensuring that Saint Paul residents have access to affordable housing."

243.    Among other things, the Ordinance does not provide safe, affordable housing to those in need and is not a rational means of increasing the supply of affordable housing.

244.    The Ordinance also has a deleterious impact on the community at large as developers, whose projects provide tax increment financing ("TIF") subsidies for affordable housing, indefinitely delay or eliminate the construction of new rental housing.

245.    Alternatives to the Ordinance are available that are more narrowly tailored to achieving the underlying goals of the Ordinance.

246.    The processes by which Plaintiffs may seek an exception to the 3% cap on rental increases under Section 193A.05 and the Rules is arbitrary because it is not capable of providing adjustments in maximum rents without substantially greater incidences and degrees of delay than is practically necessary.

247.    To meet minimum constitutional requirements an adjustment mechanism must provide for changes in circumstances and also provide for situations in which the base rent cannot reasonably be determined to reflect general market conditions.

248. The 3% cap mandated by the Ordinance is not indexed for inflation and therefore does not and cannot reflect general market conditions.

249. The Ordinance is therefore on its face unconstitutional.

250. Any landlord, including Plaintiffs, needing to increase the rental price of their units to account for inflation must apply for an exception using the MNOI formulation under Section 193A.06.

251. The exception may be obtained through self-certification for a rental increase between 3% to 8%, or through "staff determination" for any rental increase exceeding 8%.

252. To begin the process of obtaining an exception, which is not guaranteed to be granted, landlords like Plaintiffs are required to complete a burdensome and complex 22-page worksheet for a self-determination exception.

253. Neither the Rules nor any additional guidelines provided by DSI make clear whether completing the various supplementary worksheets are also necessary.  Statements from DSI officials further confuse this issue for Plaintiffs.

254. The MNOI formulation requires the DSI to conduct either audits for self-certified rental increases or staff determinations.

255. Saint Paul has over 85,000 rental units, all of which are now subject to rent control.

256. Landlords will seek to raise rents above the 3% cap to account for, among other things, increases in inflation and property taxes.

257. Upon information and belief, Saint Paul has employed only limited staff members, has not yet even hired all staff necessary to administer the exceptions program, and has allocated only $635,000 to conduct these audits and staff determinations.

258.    The ratio of city employee to landlords seeking an exception will result in a backlog of exception requests.

259.    In addition to the backlog of exception requests and tenant complaints that will exist from the inadequately staffed department, the Ordinance does not provide a timeframe under which Saint Paul must hear and make decisions on applications, or under which Plaintiffs may expect to receive the results of their audits or staff determinations.

260.    The Ordinance also does not make clear whether Plaintiffs are restricted from increasing rents while approval from Saint Paul remains pending.

261.    Accordingly, it could be weeks, months, or longer, before Plaintiffs are able to raise rents in compliance with the Ordinance, at which point they will have to begin the process over again to account for additional changes in market conditions.

262.    Pursuing the exceptions process, even through a single application, is therefore futile, and any property will remain subject to rent control even if an exception is granted in a particular year.

263.    Section 193A.08(a) of the Ordinance provides that any failure to comply with the provisions of the Ordinance "may result in criminal prosecution and/or administrative fines[.]"

264.    The Ordinance, and enforcement thereof, amounts to a deprivation of property without due process in violation of the Fourteenth Amendment and Article I, Section 7 of the United States and Minnesota Constitutions, respectively.

265.    Pursuant to 28 U.S.C. § 2201, the Court should issue a binding declaration that the Ordinance is an unconstitutional violation of the Due Process Clause of the United States Constitution and Minnesota Constitution and enjoin Defendants from enforcing the Ordinance.

266.    Absent injunctive and declaratory relief, Plaintiffs will suffer irreparable harm caused by the deprivation of their constitutional rights.

**COUNT II**
**Declaratory Judgment – 28 U.S.C. § 2201**
**Violation of the Fifth Amendment Takings Clause of the**
**United States Constitution**
**Against All Defendants**

267.    Plaintiffs repeats the allegations in the preceding paragraphs as if fully restated herein.

268.    An actual and live controversy exists between the parties as to the constitutionality of the Ordinance.

269.    The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

270.    The Takings Clause applies to the states through the Fourteenth Amendment to the United States Constitution. *See Chicago, B & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897).

271.    Defendants, acting under color of Minnesota law, have caused, and will continue to cause, Plaintiffs to be deprived of their real property without just compensation in violation of the Takings Clause of the United States Constitution.

272.    The Ordinance constitutes a taking under the Fifth Amendment.

273.    The Ordinance seeks to "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

274.    The Ordinance imposes significant and unconstitutional regulatory restrictions on Plaintiffs.

275.    The Ordinance unfairly imposes a burden on the Plaintiffs, and others similarly situated, to address the costs of affordable housing.

276.    Affordable housing is a community-wide problem that property owners, like Plaintiffs, as opposed to the community at large, are being forced to subsidize and remedy.

277.    As such, it is the equivalent of a tax being imposed on Plaintiffs by virtue of their ownership of rental properties that is not being imposed equally on all other property owners in Saint Paul.

278.    The Ordinance forces Plaintiffs to rent their property at rates below present market-based rates, while simultaneously placing burdensome restrictions on rent increases and the ability to fulfill a property owner's reasonable investment-backed expectations.

279.    Plaintiffs, who are subject to the Ordinance's restrictions and its burdens, have not been provided any offsetting financial benefits or any other benefits to compensate them for the additional costs and burdens that are being imposed on them.

280.    The Ordinance takes Plaintiffs' property and converts it for the benefit of tenants without compensating Plaintiffs for that conversion.

281.    If Saint Paul wants to convert Plaintiffs' properties for the greater good of the community, under the view that doing so enhances the greater good, Saint Paul needs to provide just compensation to Plaintiffs to comply with the United States Constitution.

282.    The economic impact of the Ordinance has led to Plaintiffs' loss of rent, development projects, and property value.

283.    The Ordinance's interference with Plaintiffs' investment-backed expectations regarding their ability to collect rent on their properties is substantial.

284.    Although Plaintiffs operate in a regulated industry, they could not have expected their properties to be subjected to the most restrictive rent control law in the country.

285.    Plaintiffs' property, along with all Saint Paul properties, have already experienced a substantial decline in value since the proposal and enactment of the Ordinance.

286.     The character of the governmental action fails to satisfy the purpose of the Ordinance.

287.     Accordingly, the Ordinance constitutes a regulatory taking of Plaintiffs' property, for which Plaintiffs are entitled to just compensation.

288.     The inefficient and unduly burdensome process contemplated in Section 193A.06 and the accompanying Rules violate the federal and state constitutions by depriving Plaintiffs and others similarly situated of their ability to mitigate their damages.

289.     Pursuing that process, even through a single application, is therefore futile.

290.     Pursuant to 28 U.S.C. § 2201, the Court should issue a binding declaration that the Ordinance constitutes an unconstitutional taking in violation of the Takings Clause of the United States Constitution and enjoin the Ordinance.

291.     Plaintiffs are also entitled to "just compensation" for past takings and prospective injunctive relief to avoid future takings without due process of law.

## COUNT III
### Alternative Writ of Mandamus – Minn. Stat. §§ 586 et seq.
### Violation of Fifth Amendment Takings Clause
### of the Minnesota Constitution
### Against All Defendants

292.     Plaintiffs repeats the allegations in the preceding paragraphs as if fully restated herein.

293.     An actual and live controversy exists between the parties as to the constitutionality of the Ordinance.

294.     Article I, Section 13 of the Minnesota Constitution provides that "private property shall not be taken, destroyed or damaged for public use without just compensation therefore, first paid or secured." Minn. Const. art. I, § 13.

295.    The equivalent provision of the Minnesota Constitution has been interpreted to provide broader protections than the Takings Clause of the Fifth Amendment of the United State Constitution.

296.    Defendants, acting under color of Minnesota law, have caused, and will continue to cause, Plaintiffs to be deprived of their real property without just compensation in violation of Article I, Section 13 of the Minnesota Constitution.

297.    The Ordinance imposes significant and unconstitutional regulatory restrictions on Plaintiffs.

298.    The Ordinance constitutes a taking under Article I, Section 13.

299.    The Ordinance unequally and disproportionately affects the Plaintiffs' (and other Saint Paul landlords') properties, as the Plaintiffs have suffered a substantial decline in the value of their property.

300.    The inefficient and unduly burdensome process contemplated in Section 193A.06 and the accompanying Rules violate the Minnesota Constitution by depriving Plaintiffs and others similarly situated of their ability to mitigate their damages.  Pursuing that process, even through a single application, is therefore futile.

301.    Thus, a taking has occurred under the Minnesota Constitution for which Plaintiffs are entitled to just compensation.

302.    The Ordinance also amounts to a taking under the Minnesota Constitution because it has destroyed or damaged the Plaintiffs' property.

303.    This cause of action is brought pursuant to Minn. Stat. §§ 586.01 et seq. for an order from this Court directing Defendants to commence inverse condemnation proceedings on Plaintiffs' property in accordance with the requirements set forth in Chapter 117 of the Minnesota Statutes.

304.    Despite their taking of and damage to the Property, Defendants have not instituted eminent domain proceedings and setting the amounts to which Plaintiffs are entitled to as damages resulting from the taking.

305.    Defendants have not paid just compensation, will not now pay just compensation, and do not intend to pay just compensation in the future.

306.    As such, Defendants have failed to perform their duty as imposed by law.

307.    The failure of Defendants to comply with their legal duties constitutes a public wrong specifically injurious to Plaintiffs. As there is no other plain, speedy, and adequate remedy for inverse condemnation claims pursuant to Article I, Section 13 of the Minnesota Constitution, Plaintiffs are entitled to an alternative writ of mandamus ordering the City to commence condemnation proceedings.

308.    Pursuant to Minn. Stat. §§ 586 et seq., Plaintiffs seek an alternative writ of mandamus from the Court ordering and directing Defendants to initiate inverse condemnation proceedings and to provide Plaintiffs with just compensation for takings effectuated by the Ordinance.

**COUNT IV**
**Declaratory Judgment – 28 U.S.C. § 2201**
**Violation of the Contracts Clause of the**
**United States Constitution and Minnesota Constitution**
**Against All Defendants**

309.    Plaintiffs repeat the allegations in the preceding paragraphs as if fully restated herein.

310.    An actual and live controversy exists between the parties as to the constitutionality of the Ordinance.

311.    Article I, Section 10 of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]" U.S. Const. art. I, § 10, cl. 1.

312.    Article I, Section 11 of the Minnesota Constitution also provides that "No . . . law impairing the obligation of contracts shall be passed." Minn. Const. art. I, § 11.

313.    The Ordinance unconstitutionally impairs Plaintiffs' and their tenants' lease agreements by restricting, without any time limitation, Plaintiffs' ability to receive the benefit of their bargain through rental increases.

314.    Plaintiffs' and their renters' current leases permit renters to shift their leases to a month-to-month lease with the understanding that rent may be increased by an amount that may be more than 3%.

315.    The Ordinance effectively removes that contract right from Plaintiffs' current leases with their tenants.

316.    The Ordinance caps rental increases at 3% while failing to allow for rental increases for improvements necessary to bring the property into compliance with applicable local health and safety requirements.

317.    Such interference amounts to a substantial impairment because the ability to modify rent under a lease agreement—particularly to reflect market conditions—is a core contractual right under a lease agreement and is recognized as an industry standard.

318.    Impairing the ability to raise rents to reflect market conditions interferes with the right of Plaintiffs and renters to receive the benefit of their bargain.

319.    The Ordinance is not drawn in an appropriate or reasonable way to advance the purpose of the Ordinance.

320.    Through enforcement of the Ordinance Defendants inhibit Plaintiffs' and other landlords' abilities to raise rents to provide sufficient revenue streams required to maintain a safe and habitable abode does not satisfy the Ordinance's purpose to promote the health and welfare of Saint Paul residents through safe, affordable housing.

321.    Further, through Defendants' limiting the ability to raise rents to reflect market conditions, developers have had to halt and even withdraw housing projects in Saint Paul that would have resulted in affordable housing due to lenders refusing to provide financing for such projects.

322.    The tailoring of the Ordinance, therefore, is unreasonable and does not advance the purpose of the Ordinance in a reasonable way.

323.    Accordingly, the Ordinance violates the Contracts Clause and Article I, Section 11 of the United States and Minnesota Constitutions, respectively.

324.    Pursuant to 28 U.S.C. § 2201, the Court should issue a binding declaration that the Ordinance is an unconstitutional violation of the Contracts Clause of the United States Constitution and Article I, Section 11 of the Minnesota Constitution, respectively, and enjoin enforcement of the Ordinance.

**COUNT V**
**Declaratory Judgment – 28 U.S.C. § 2201**
**The Maximum Allowable Rent Increase violates**
**Article XII, § 5 of the Minnesota Constitution and Minn. Stat. § 471.9996**

325.    Plaintiffs repeat allegations in the preceding paragraphs as if fully restated herein.

326.    Article XII, Section 5 of the Minnesota Constitution provides that "[h]ome rule charter amendments may be proposed by a charter commission or by a petition of five percent of the voters of the local government unit as determined by law and shall not become effective until approved by the voters by the majority required by law. Amendments may be proposed and adopted in any other manner provided by law."

327.    Minn. Stat. § 471.9996 preempts rent control legislation in the State of Minnesota.

328.    Minn. Stat. § 471.9996 says: "No statutory or home rule charter city, county, or town may adopt or renew by ordinance or otherwise any law to control rents on private residential property."

329.    The law creates one limited exception to this broad prohibition:

[The rent control prohibition] does not preclude a statutory or home rule charter city, county, or town from controlling rents on private residential property to the extent that the city, county, or town has the power to adopt an ordinance, charter amendment, or law to control these rents if the ordinance, charter amendment, or law that controls rents is approved in a general election"

Minn. Stat. § 471.9996, subd. 2

330.    The City of Saint Paul is a home charter city.

331.    The Saint Paul Home Rule Charter provides: "Initiative . . . shall be initiated by a person . . . signed by registered voters of the city equal in number to eight (8) percent of those who voted for the office of mayor in the last preceding city election in the case of initiative[.]" St. Paul Code City Charter § 8.02.

332.    On November 2, 2021, a slight majority of Saint Paul voters approved legislation limiting residential rent increases to no more than 3% in a 12-month period and directing the City to create a process by which landlords may seek an exception to the 3% limit based on the right to a reasonable return on investment.

333.    The Rules, as published by DSI on April 29, 2022, and having taken effect on May 1, 2022, provide that "[t]he implementation of a Maximum Allowable Rent increase must be limited each year to fifteen percent (15%) of the Maximum Allowable Rent on the date the petition is filed."

334.    By implementing a maximum 15% cap on rental increases, DSI has exceeded its authority under the Ordinance.

335.    The Ordinance expressly limits DSI's authority to "establish[ing] a process by which landlords can request exceptions to the limitation on rent increases based on the right to a reasonable return on investment."

336. The Ordinance does not provide that the City may impose a Maximum Allowable Rent of 15%.

337. Voters in Saint Paul did not agree to authorize the City to impose a Maximum Allowable Rent of 15%.

338. Accordingly, the Defendants' actions in approving the Maximum Allowable Rent of 15% without a petition signed by 8% of the Saint Paul voters who voted for the office of mayor in the last city election, and subsequent approval by a majority of those voting on the ordinance, constitutes an impermissible amendment of the Saint Paul Home Rule Charter in violation of Article XII, Section 5 of the Minnesota Constitution.

339. The Defendants' actions are also preempted by Minn. Stat. § 471.9996, which expressly prohibits rent control legislation absent approval by Saint Paul voters pursuant to the Saint Paul Home Rule Charter.

340. Pursuant to 28 U.S.C. § 2201, the Court should issue a binding declaration that the provision establishing a Maximum Allowable Rent Increase of 15% is an unconstitutional violation of the Minnesota Constitution, preempted by Minnesota state law under Minn. Stat. § 471.9996, and enjoin enforcement of the provision.

**<u>COUNT VI</u>**
**Claims under 42 U.S.C. § 1983**
**The Ordinance violates Plaintiffs' Constitutional Rights**
**Against All Defendants**

341. Plaintiffs repeat the allegations in the preceding paragraphs as if fully restated herein.

342. Defendants in their official capacities as public officials of the State of Minnesota have taken the above actions complained of under color of state law.

343. As stated above, the actions have deprived Plaintiffs of their rights under the Fifth and Fourteenth Amendments and Article I, Section 10, Clause 1 of the United States Constitution.

344. As a result of the actions complained of above, Plaintiffs have suffered harm, including but not limited to, the loss of revenue, inability to enforce statutory and contractual lease covenants, the loss of use and enjoyment of their property (including the right to exclude others from their property) without compensation, and the loss of their ability to seek redress in the courts.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1. A declaration, under 28 U.S.C. § 2201 and pursuant to each respective Count above, that the Ordinance is unconstitutional because it violates the Due Process Clause, the Takings Clause, and the Contracts Clause of the United States Constitution, and the Due Process and Contracts Clauses of the Minnesota Constitution;

2. A declaration under 28 U.S.C. § 2201 pursuant to Count V that the Maximum Allowable Rent Increase violates Article XII, Section 5 of the Minnesota Constitution and Minn. Stat. § 471.9996.

3. A writ of alternative mandamus under Minn. Stat. §§ 586.01 *et seq*. ordering and directing Defendants to initiate inverse condemnation proceedings and to provide Plaintiffs with just compensation for takings effectuated by the Ordinance;

4. Pursuant to all Counts, and in accordance with Fed. R. Civ. P. 65, that the Court enjoin the enforcement and application of the Ordinance;

5. Pursuant to all Counts, and in accordance with Fed. R. Civ. P. 65, that the Court issue a preliminary and permanent injunction, enjoining Defendants—and all agencies,

departments, and/or employees under their control, either collectively or individually—from enforcing the Ordinance;

6.     An order awarding Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1983 or any other applicable statute, law, or principle; and

7.     Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated:  June 16, 2022

**ANTHONY OSTLUND LOUWAGIE DRESSEN & BOYLAN P.A.**

  _s/ Joseph W. Anthony_
Joseph W. Anthony (#2872)
janthony@anthonyostlund.com
Norman H. Pentelovitch (#399055)
npentelovitch@anthonyostlund.com
Kathryn E. Campbell (#402631)
kcampbell@anthonyostlund.com
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone:  (612) 349-6969

**ATTORNEYS FOR PLAINTIFFS**