## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Woodstone Limited Partnership;<br>Lofts at Farmers Market LLC, | Case No. 22-CV-1589 NEB-JFD |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| City of Saint Paul, Minnesota, a Minnesota Charter City; City Council of the City of Saint Paul; Angie Wiese, in her official capacity as the Director of the Department of Safety and Inspections of the City of Saint Paul; Mayor Melvin Carter, in his official capacity as Mayor of the City of Saint Paul; and John Doe, | |
| Defendants. | |

### INTRODUCTION

The recently enacted Saint Paul Residential Rent Stabilization Ordinance (the "Ordinance") is unconstitutional and should be stricken. The Ordinance imposes an extremely restrictive 3% cap on rent increases within a 12-month period for rental units in the City of Saint Paul, except in narrow circumstances. The processes by which landlords—like Plaintiffs—may seek an exception to the 3% cap are unpredictable, complex, burdensome, and futile in many cases. Landlords who seek to increase rents through these confusing and unpredictable processes expose themselves to criminal and civil liability for any failures to comply with the Ordinance. Under the Ordinance, a landlord faces <u>jail time</u> (up to 90 days) simply for raising rents in a way that does not

satisfy a City employee's after-the-fact, arbitrary determination of an inappropriate increase. While the Ordinance deprives landlords of their contractual and property rights, with draconian penalties for failure to comply, the Ordinance fails to advance its stated goals. The Ordinance actually leads to less affordable housing and provides no protection at all to the lowest income tenants. As a result, the Ordinance violates the Due Process Clauses of the United States and Minnesota Constitutions. The Ordinance also violates the Contract Clauses of both Constitutions by substantially interfering with Plaintiffs' rights to freely negotiate lease terms such as rent, late fees, and lease duration.

In addition, the Ordinance violates Minnesota's general prohibition on rent control. Minn. Stat. § 471.9996 allows a city to impose rent control only to the extent it is approved by voters in a general election. But the City of Saint Paul enacted a 15% hard cap on rent increases, which was not approved by the City's voters. At a minimum, this violation of Minnesota law should be corrected by removing the 15% cap from the Ordinance and rules promulgated under it.

Because there is no genuine dispute of material fact on these issues, Plaintiffs are entitled to summary judgment in their favor on Counts I (Violation of the Due Process Clauses of the United States and Minnesota Constitutions), IV (Violation of the Contract Clauses of the United States and Minnesota Constitutions), V (Violation of Minn. Stat. § 471.9996), and VI (42 U.S.C. § 1983) of the Complaint.  The Court should (1) grant partial summary judgment in Plaintiffs' favor on these claims; (2) declare the Ordinance unconstitutional; (3) enjoin Defendants from enforcing the Ordinance; and (4) award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1983.

## BACKGROUND

**I.**     **The City of Saint Paul became the first city in the Midwest to approve rent control.**

Since 1984, Minnesota has prohibited the institution of rent control in any city within the state. *See generally* Minn. Stat. § 471.9996 subd. 1. However, the statute contemplates one narrow exception to this broad prohibition: voters can approve a rent control ordinance in a general election. *Id.* subd. 2. The City of Saint Paul, Minnesota, falls within the parameters of Minn. Stat. § 471.9996 because it is a home rule charter city, with its rules of governance enumerated in its Home Rule Charter. *See generally* St. Paul City Charter §§ 1–18.

On November 2, 2021, a narrow margin of 52.8% of Saint Paul voters who voted in the general election[1] approved the rent control Ordinance by voting "yes" on the following question:

> Should the City adopt the proposed Ordinance limiting rent increases? The Ordinance limits residential rent increases to no more than 3% in a 12-month period, regardless of whether there is a change of occupancy. The Ordinance also directs the City to create a process for landlords to request an exception to the 3% limit based on the right to a reasonable return on investment. A "yes" vote is a vote in favor of limiting rent increases. A "no" vote is a vote against limiting rent increases.

---

[1] Of the 173,124 registered Saint Paul voters, only 59,943 voters voted in the 2021 general election; of that number, only 58,546 voters voted with respect to the Ordinance ballot question, with 30,965 voters voting in favor of the Ordinance. (*See* Declaration of Kathryn E. Campbell, submitted herewith ("Campbell Dec."), Ex. 1, at STP00224; Ex. 2.) Thus, the Ordinance was approved by less than 20% of registered voters in Saint Paul.

(Campbell Dec. Ex. 2; Ex. 3.) By its terms, the Ordinance went into effect on May 1, 2022. (*Id.* Ex. 4, at STP00001; Ex. 5.) As a result, Saint Paul became the only city in the Midwest with rent control legislation. (*Id.* Ex. 6.)

## II.    The Saint Paul City Council granted administrative and enforcement powers with respect to the Ordinance to the Saint Paul Department of Safety and Inspections.

The Ordinance, as originally passed, established a 3% limitation on rent increases within a 12-month period on any residential rental property. St. Paul Leg. Code § 193A.04.[2] Landlords who violated the Ordinance would be subject to criminal or civil penalties as well as being exposed to a private right of action in which tenants could sue landlords for non-compliance with the Ordinance. *Id.* § 193A.08(a)-(c). The Ordinance tasked the City with establishing the process by which landlords could seek an exception to the 3% cap "based on a right to a reasonable return on investment," and included several factors which needed to be considered. *Id.* § 193A.06.

In the spring of 2022, the City Council amended Section 13.02 of the Saint Paul Legislative Code. In doing so, it placed the duties and responsibilities for implementing, administering and enforcing the Ordinance with the Saint Paul Department of Safety and Inspections ("DSI"). (Campbell Dec. Ex. 10.) Currently, only three DSI employees are responsible for granting or denying exceptions to the 3% cap on rent increases: Angie

---

[2] The Ordinance was first amended on April 6, 2022, to "define certain terms contained therein and ensure consistency of language used throughout." (Campbell Dec. Ex. 7, at STP00178; Ex. 8.) Citations to this iteration of the Ordinance, which is currently in effect, will be labeled as "St. Paul Leg. Code § [193A.01 *et seq.*]" Citations to the September 21, 2022 Amended Ordinance, set to go into effect on January 1, 2023, will be labeled as "Amended Ordinance § [193A.01 *et seq.*]" (*Id.* Ex. 9.)

Wiese, Director of DSI; Lynne Ferkinhoff, Assistant IV; and Demetrius Sass, Management Assistant I. (*Id.* Ex. 11, at 3.) None of these employees has any apparent experience in the residential leasing industry. (*See id.*) Training for these employees has included being "provided with written materials and hands on training, using the ordinance, the Rules, procedures, and forms created for processing exceptions." (*Id.* at 4.) As of March 2022, Defendants had allocated approximately only $635,000 for rent control implementation.[3] (*Id.* Ex. 12.)

### III.   DSI published rules addressing the processes by which landlords may seek an exception to the 3% cap.

In late March 2022, DSI published a set of proposed rules (the "Rules") setting out how landlords could seek an exception to the 3% increase. (Campbell Dec. Ex. 13.) The Rules adopted several standards corresponding to the factors for evaluating a landlord's application for an exception, including: the Maintenance of Net Operating Income ("MNOI") Reasonable Return Standard; the Planned or Completed Capital Improvements Standard; the Changes in the Number of Tenants Standard; the Changes in Space or Services Standard; and the Pattern of Increases or Decreases in Rent Standard. (*Id.*) Each of these factors requires a complicated review of a variety of financial details. (*See generally id.*) The Rules do not inform applicants as to the weight to be given to the

---

[3] Comparatively, Richmond, California (whose rent control rules and regulations were used as a model for the Saint Paul Rules and MNOI Worksheet) budgeted over $3.6 million to rent control oversight for the 2022-2023 fiscal year. (Campbell Dec. Ex. 14.) Richmond has budgeted almost 500% more money for this effort than Saint Paul, despite the fact that Richmond (116,000 residents) has a fraction of the population of Saint Paul (311,000 residents). (*Id.* Ex.15; 16.)

myriad factors that might be considered in evaluating a particular request. (*See id.*) The Rules do not identify any objective threshold at which a landlord's application will be accepted or denied or provide any guidance to help landlords predict the outcome of a given application. (*See id.*) There is no way for a landlord to guarantee, or even predict, that its application will obtain final approval after all audit and appeal rights have been exhausted. (*See id.*)

The Rules set forth two separate processes by which a landlord may apply for an exception to the 3% cap: (1) self-certification application; and (2) staff-determination application. Self-certification applications allow landlords to increase their rents between 3% and 8%. (Campbell Dec. Ex. 4, at STP00003-04.) While approval of the application occurs upon receipt of the application by DSI, such applications are subject to City audit. (*Id.* at STP00004-05.) For rent increases above 8%, a landlord must request a staff determination. (*Id.* at STP00005.) Once submitted, DSI makes a decision to grant or deny the request for an exception. (*Id.* at STP00007.)

Both a self-certification request and a staff-determination request require completion of a Rent Increase Exception Request Form and a Maintenance of Net Operating Income ("MNOI") Worksheet. (*Id.* at STP00006-00007.) The MNOI Worksheet is 22 pages long, and it requires a complex unit-by-unit analysis and documentation to support the requested increases. (*Id.* Ex. 17.) The Rent Increase Exception Request Form requires detailed (and often proprietary) landlord and property information, the percent increase requested, the specific portions of the building affected, the factors impacting the increase, the fair net annual operating income, the fair net

annual operating income minus current net operating income, the allowable rent increase per unit per month, and the condition of the habitability of the property. (Campbell Dec. Ex. 18; Ex. 19.) All information provided in these forms is governed by state, local and federal laws concerning data privacy and disclosure, including the Minnesota Government Data Practices Act, Minn. Stat. §§ 13.01 *et seq.*, and therefore may be available to the public. Amended Ordinance § 193A.07(b).

If the City makes a determination on a rent increase application, the Rules allow landlords *and* tenants to appeal that determination. (Campbell Dec. Ex. 4, at STP00006.) Appeals are conducted by a Legislative Hearing Officer, who is tasked with making recommendations to the City Council about whether to grant or deny the rent increase. (*Id.*) Individual tenants can also submit complaints for a landlord's alleged failure to comply with the Ordinance. (*Id.* at STP00007.)

From the time the original Ordinance took effect on May 1, 2022, through August 23, 2022, the City of Saint Paul received 152 total requests for rent increases above 3%. (Campbell Dec. Ex. 11, at 4.) Of those 152 requests, 31 were staff-determination applications; only 3 of those 31 requests were granted by the City. (*Id.* at 4-5.) In that same time period, 3 tenants have appealed self-certifications and staff-determinations, and the City has received 21 tenant complaints. (*Id.* at 5.)

Publicly available data has indicated that appeals of rent stabilization determinations can take several weeks, if not months, before a final determination is issued by the City Council. The appeal of two landlords with relatively small buildings, for example, took approximately 50 days, with the parties, Defendants, and the

Legislative Hearing Officer repeatedly expressing the confusion and complexity associated with the Ordinance's exception processes. (Campbell Dec. Ex. 20.) Another appeal brought by a landlord took over 35 days. (*Id.* Ex. 21.) An appeal brought by tenants represented by Housing Justice Center has been pending before the City Council since August 8, 2022, and has essentially devolved into a judicial hearing. (*Id.* Ex. 22.)

## IV. The Ordinance has detrimental impacts on affordable housing in Saint Paul.

In the months following the passage of the Ordinance, Saint Paul began to feel the adverse impacts of the Ordinance on its housing market. Multifamily building permits decreased by over 80% as compared the previous year, in large part due to the struggle to obtain investment and financing for new developments. (Campbell Dec. Ex. 23, at STP00288-90; Ex. 24.) Investments and financing dried up because developers "view rent inflexibility as increasing risks[.]" (*Id.* Ex. 23, at STP00291.) Additionally, developers who had planned projects in Saint Paul halted their projects due to investment and financing concerns. (*Id.* at STP00293; Declaration of Cecil Smith, submitted herewith ("Smith Dec."), ¶¶ 2-7.)

One developer that halted a large, ongoing project in Saint Paul told Defendants that:

> [W]e need both debt from banks and equity from investors beyond [Ryan Companies] to advance projects in development. If our lender partners are evaluating various lending opportunities in their credit committees, they will be inclined to advance the opportunity with the least amount of risk to them. If there is rent control there will be concerns about the ability to sell the asset (and therefore pay off the mortgage) or refinance favorably to a permanent loan when we move beyond the construction financing stage.

(Campbell Dec. Ex. 25, at STP00299.)

8

That same developer also expressed concerns about its ability to build the number of affordable housing units that it had originally planned due to the lack of debt and equity investments. (*Id.* at STP00298.) The developer also provided a detailed overview of how investments with respect to developments worked and the impacts the Ordinance would have on such investments. (*Id.* Ex. 26.)

Another developer told Defendants about a buyer who had backed out of a new 162-unit project. The buyer's reason for withdrawing was "directly related to the uncertainty of the long- and short-term impacts of the ordinance on the financial performance of the property and the desire for future capital to want to invest in the City of Saint Paul." (Campbell Dec. Ex. 27.) The developer also provided a list of affected properties and comments thereto. (*Id.* Ex. 28.)

A non-profit affordable housing developer expressed concerns about the impact the Ordinance would have on affordable housing units. The developer told Defendants that "[w]e are already seeing the negative impacts of a rent control policy that does not exempt new construction play out locally," and that:

> [The negative impact of the Ordinance] raises two important concerns: 1) decreases in new housing development will exacerbate our existing shortage of housing, resulting in increased pressure on rents and/or further limiting the availability of housing for those who need it most; and 2) market-rate development can provide tax increment financing (TIF) resources that may be directed to the construction of affordable housing. The availability of capital for affordable housing is in extremely short supply, and TIF is an important resource to support new affordable development.

(Campbell Dec. Ex. 29.)

9

Investors expressed their concerns directly to the City of Saint Paul. Sunrise Bank told Defendants that they had one naturally occurring affordable housing project that would "not proceed" because of the Ordinance. (Campbell Dec. Ex. 30.) The investor also told them:

> The affordable housing non-profit, who works in partnership with Sunrise, estimated [the Ordinance] caused a reduction in value of approximately $1.1 million. The parties attempted to negotiate a combination of price reduction, bargain sale, and a tax-exempt seller not, however it was more than the seller could handle. Further, the non-profit has indicated they are not in the position to take any additional risk right now on uncertainty in rent control.

(*Id.*)

In short, the passage of the Ordinance caused a financial squeeze on a housing market already suffering from a shortage of supply. To date, some developers and investors continue to refuse to build in Saint Paul, even with the recent amendments to the Ordinance, which are discussed below. (Campbell Dec. Ex. 31.)

## V.   The St. Paul City Council amends the rent control measures.

Following the passage of the Ordinance, Saint Paul leaders quickly recognized the need for amendments. The City Council proceeded to adopt amendments without undertaking any objective analyses—such as a data-driven study—to determine whether the amendments would meet the Ordinance's stated purposes.

In August 2022, City Councilperson Christopher Tolbert presented a series of amendments to the City Council. Tolbert's proposed amendments explicitly conceded that the Ordinance, as originally passed, did the opposite of what was intended. (Campbell Dec. Ex. 32.) The recitals to the proposed amendment stated, among other

things, that: only 200 residential building permits were issued in Saint Paul for the first four months of 2022, as compared to 1,391 permits issued in the same period of 2021; "prior to adoption, city partners expressed that passage of rent stabilization . . . could lead to developers pulling out of existing executed redevelopment agreements"; "a decrease in development of new housing will decrease the availability of TIF [Tax Increment Financing] and thus decrease the development of new affordable housing"; "city partners have forecasted a loss of capital investment, relocation of developers and builders to more predictable locations and asset types, negative impacts on housing supply, and long term increases to housing costs due to the rent stabilization ordinance"; affordable housing developments in Saint Paul were being cancelled; and the implementation of the Ordinance had proven difficult. (*Id.*) The facts cited by Councilperson Tolbert make clear that the Ordinance, as originally passed by the voters and implemented by the City Council, actually undermined the stated purposes of the Ordinance.

On September 21, 2022, the Saint Paul City Council, on a 5-2 vote, approved amendments to the Ordinance (the "Amended Ordinance") that will go into effect on January 1, 2023. (Campbell Dec. Ex. 9.) The Amended Ordinance retains the 3% presumed cap on rental increases, as well as provisions that subject landlords to criminal or civil penalties for non-compliance with the Ordinance. Amended Ordinance §§ 193A.04, -.09. The Amended Ordinance also adds the following provisions, among others, that have no rational relation to the purposes of the Ordinance (including increased affordable housing) and that continue to restrict landlords' rights:

- Any rent increases above the 3% cap will not take effect until a Final Determination regarding such increase is issued by DSI, which, at a minimum, will take 45 days from Defendant's original determination.[4] Amended Ordinance §§ 193A.04.

- The 3% limitation does not apply to changes in tenancy where vacancy is supported by "just cause."[5] Amended Ordinance § 193A.05.

- Landlords must inform tenants if their rental units are subject to rent control, and tenants must be notified when their landlords apply for exemptions in order to give the tenants time to appeal the increase. Amended Ordinance §§ 193A.07(c); 193A.08(b).

- The Amended Ordinance includes a detailed description of the processes for landlords to apply for exceptions and for tenants to complain or appeal, including an amendment that allows for a tenant appeal within 45 days of DSI's original determination, as opposed to the original 21 days. Amended Ordinance § 193A.07.

- All information landlords provide in the application forms are governed by state, local, and federal laws concerning data privacy, including the Minnesota Government Data Practices Act, Minn. Stat. §§ 13.01 *et seq.*, indicating that such information (including proprietary data) could be made available to the public. Amended Ordinance § 193A.07(b).

- None of the rent controls in the Ordinance apply to housing that is designated "as affordable housing for persons and families of very low, low, or moderate

---

[4] A "Final Determination" is defined as a determination "follow[ing] a Department Determination on [a self-certification or staff-determination application] or Complaint once the time has elapsed for the Tenant or Landlord to appeal to the Legislative Hearing Officer, or the Council has issued a decision following a recommendation from the Legislative Hearing Officer." Amended Ordinance § 193A.03(k). The right to appeal exists within 45 days of Defendants' original Determination. *Id.* § 193A.07(g)(1).

[5] Just-cause evictions have previously been a legal issue for the City of Saint Paul. In *Lamplighter Village Apartments LLP v. City of Saint Paul,* Judge Magnuson granted a preliminary injunction preventing enforcement of a Saint Paul ordinance with a "just cause" eviction standard, concluding there was a likelihood the ordinance was unconstitutional under the Takings Clauses and Due Process Clauses of the United States and Minnesota Constitutions, in part because it was not clear whether the just-cause evictions would apply "to the wider rental population," and not just targeted individuals. 534 F.Supp.3d 1029, 1036 (D. Minn. 2021).

income, as defined by State or federal law, or subject to an agreement that
provides housing subsidies for affordable housing for persons and families of
very low, low, or moderate income, as defined in State and federal law."
Amended Ordinance § 193A.08(a)(2).

Although the Amended Ordinance provides a 20-year exemption for new
construction, the City knew when it passed this amendment that there were no facts to
support any finding that a 20-year exemption would produce more affordable housing. In
addition, to the extent that the views of housing developers meant anything to the
Council, multiple housing developers requested a 30-year exemption. (*See, e.g.*,
Campbell Dec. Ex. 33, at STP00133.) Ryan Companies told the City that the Amended
Ordinance does not "go far enough to lure them back to Saint Paul," in particular because
lenders and investors are less inclined to provide funding to cities with rent control
legislation. (*Id.* Ex. 31.) The City has identified no evidence that the Amended
Ordinance, including the new construction exemption, is likely to encourage the
development of more affordable housing.

**VI.    Plaintiffs are Saint Paul property owners who purchased property years
before the Ordinance was enacted and with the expectation that they would
obtain a reasonable return on their investments.**

Plaintiff Woodstone Limited Partnership ("Woodstone") is a rental property owner
in Saint Paul. (Declaration of Lisa Moe, submitted herewith ("Moe Dec."), ¶ 3.) More
than 30 years ago, Woodstone bought its property in Saint Paul and developed a
residential rental building that it continues to own and operate (the "Woodstone
property"). (*Id.*) At the time Woodstone made its initial investment in the Woodstone
property, it fully expected to be able to adjust rents to accurately reflect market

conditions like increased property taxes, increased operating expenses, and inflation. (*Id.* ¶ 4.) Woodstone did not expect to be encumbered by any rent control legislation, because such legislation is expressly preempted in Minnesota (*see* Minn. Stat. § 471.9996) and had never been passed in the Midwest. (*Id.*) Woodstone's leases reflect its expectation to freely adjust rents, including through the provision of bi-monthly leases, late fees, and the ability to change the rental rate by giving appropriate notice. (*Id.* ¶¶ 10-11, Ex. A.) These leases benefit both Woodstone and its tenants, as they provide both parties with clarity and flexibility to negotiate rent and lease duration as needed. (*Id.* Ex. 12.) Before the Ordinance was passed, Woodstone repeatedly needed to raise its rents, sometimes by greater than 3%, to reflect changing market conditions and costs and expenses affiliated with the Woodstone property. *(Id.* ¶¶ 5-6*.)*

Plaintiff The Lofts at Farmers Market LLC (the "Lofts") also owns rental property in Saint Paul. (Declaration of Greg Cerbana, submitted herewith ("Cerbana Dec."), ¶ 3.) The Lofts owns the Lofts building, which provides rental housing to individuals in Saint Paul. (*Id.*) The Lofts building was developed as a rental housing complex in Saint Paul in approximately 2012. (*Id.* ¶ 4.) The Lofts building was previously owned and operated by Saint Paul, which caused the property to be exempt from property tax assessments for the years leading up to the Loft's purchase of the building. (*Id.* ¶.) In 2015, the Lofts acquired the building after being provided with actual and projected financial information from the City, which established the basis for the Loft's expectations about the property's returns on investments. (*Id.* ¶ 5.) The Lofts building has turned out to be more costly to operate than was disclosed because actual property taxes assessed have been double the amounts

estimated by the City and have increased by double-digit percentages in three of the last four years. (*Id.* ¶¶ 6-7; Ex. A.) To accommodate the increased and unexpected tax burdens, as well as other operating and maintenance expenses, the Lofts needed to raise its rents each year to ensure it could continue to generate sufficient revenue. (*Id.* ¶ 8.)

Before the Ordinance was passed, it was periodically necessary for both Plaintiffs to raise their rents by more than 3% to reflect changes in the business and economic environments. (*Id.* ¶ 8; Moe Decl. ¶ 5.) The need to raise rents has become even more necessary as inflation has increased by over 8% in the last 12 months, raising the costs to maintain rental units. (Campbell Dec. Ex. 34.) Thus, the 3% cap on rental increases set forth in the Ordinance injures Plaintiffs.

On June 16, 2022, in order to remedy the harms caused by the Ordinance, Plaintiffs initiated this lawsuit, alleging the Ordinance violates numerous constitutional provisions as well as Minnesota state law. (*See generally* Dkt. 1.) The parties stipulated to an early summary judgment procedure, which the Court approved on August 25, 2022. (*See* Dkt. 23.) The parties conducted minimal discovery per the stipulation. Plaintiffs now move for summary judgment on Counts I (Violation of the Due Process Clauses of the United States and Minnesota Constitutions), IV (Violation of the Contract Clauses of the United States and Minnesota Constitutions), V (Violation of Minn. Stat. § 471.9996), and VI (42 U.S.C. § 1983) of the Complaint.

## ARGUMENT

### I.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment [on all or any part of a claim] if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which, based on the applicable substantive law, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* When the parties submit cross motions for summary judgment, the summary judgment standard is slightly modified: when considering the plaintiff's motion, the court views the record in the light most favorable to defendant, and when considering the defendant's motion, the court views the record in the light most favorable to the plaintiff.  *See Fjelstad v. Stat Farm Ins. Co.*, 845 F.Supp.2d 981, 984 (D. Minn. 2012).

### II.   The Ordinance violates Plaintiffs' Due Process rights by depriving them of use and control over their property.

The Court should grant summary judgment on Count I of Plaintiffs' Complaint and declare the Ordinance unconstitutional under the Due Process Clauses of both the United States and Minnesota Constitutions.  The Ordinance, as originally enacted and as implemented and amended by Defendants, violates the Due Process Clauses by arbitrarily and irrationally depriving Plaintiffs of their property rights.

The Due Process Clauses provide that no person shall be deprived or "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV; Minn. Const. art.

I, §7. "The due process protection provided under the Minnesota Constitution is identical to the due process guaranteed under the Constitution of the United States." *Sartori v. Harnischfeger Corp.*, 432 N.W.2d 448, 453 (Minn. 1988) (citing *Anderson v. City of Saint* Paul, 32 N.W.2d 538, 541 (Minn. 1948)).

Rent control legislation is considered a price control regulation. *See Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988). The Supreme Court has held that "[p]rice control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." *Nebbia v. New York*, 291 U.S. 502, 539 (1934); *Pennell v. City of San Jose*, 485 U.S. at 11. The question is whether the Ordinance "substantially advances" or is "rationally related" to its stated purpose. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 541-42 (2005) (noting that the "substantially advances" formulation applies to due process claims that asks "whether a regulation of private property is effective in achieving some legitimate public purpose"); *Birchansky v. Clabaugh*, 955 F.3d 751, 757 (8th Cir. 2020).

Applying these constitutional standards, the Ordinance deprives Plaintiffs of their rights to use and control their rental properties without "substantially advancing" or being "rationally related" to the purposes for which the Ordinance was enacted. The Ordinance does not meet any of its stated goals, and the procedures for landlords to seek an exception to the 3% cap under the Ordinance are prohibitively burdensome and confiscatory. For either or both reasons, the Ordinance fails to satisfy the Due Process requirements of the United States and Minnesota Constitutions.

### a. The Ordinance does not substantially advance its stated purposes.

The Ordinance does not substantially advance its goals, as needed to meet the Due Process requirements of the United States and Minnesota Constitutions. According to the City of Saint Paul, the purposes of the Ordinance are to "ensure affordability of rental housing in Saint Paul; address detrimental health, safety and welfare impacts resulting from a shortage of residential units; address the hardship tenants face when being forced to move from their homes; and stabilize rents in Saint Paul where rents outpace incomes." Amended Ordinance, Section 1, Findings; *see also* St. Paul Leg. Code § 193A.01. The City Council has not identified any evidence that the Ordinance will accomplish these purposes. To the contrary, the Ordinance has the effect of decreasing rather than increasing affordable housing, the Ordinance does not prevent tenants from being evicted or help them when they need to move, and the Ordinance does nothing at all for low-income tenants.

In November 2021, Saint Paul signed into law the original Ordinance as approved by Saint Paul voters. (Campbell Dec. Ex. 2.) When asked to identify the documents and information the City used to determine that the Ordinance advanced its public policy purposes, Defendants stated only that the Ordinance was a voter-initiated ordinance, indicating that the Ordinance itself was outside their control. (Campbell Dec. Ex. 11, at 6.) Stated differently, Defendants had no policy justification or facts that supported passing or implementing the Ordinance in the first place. The fact that an Ordinance is a "voter-initiated ordinance" does not, in and of itself, make the Ordinance constitutional.

18

Whether the Ordinance was voter- or City Council-initiated, it must still pass constitutional muster under the Due Process Clause.

Almost immediately following the passage of the original Ordinance, and even before the Ordinance took effect, Saint Paul began to suffer the consequences of the restrictive and arcane legislation. The Ordinance imposed a financial risk on landlords and developers by capping their revenues while their costs increased and other uncertainties arose. As a result, developers began to withdraw projects and proposals from Saint Paul, while those who had already begun their projects, such as Ryan Companies and their Highland Park development, immediately halted operations. (Campbell Dec. Ex. 23, at STP00293; Smith Dec., ¶¶ 2-7.)

Development in Saint Paul is critical in addressing the lack of affordable housing. For example, affordable housing providers and developers rely on large-scale developers' projects to provide tax increment financing ("TIF") subsidies for affordable housing. (Campbell Dec. Ex. 29, at STP00344.) Large-scale developers and property owners are also incentivized to provide affordable units within their properties. (*Id.* Ex. 35.) Increased housing development generally will lead to increased supply of affordable housing specifically. *See* Amended Ordinance, Section 1, Findings.

The impact on Saint Paul's housing supply, as a result of the Ordinance-induced stoppage in development, is significant. The affordable housing crisis, which Defendants maintain is one of the reasons for the Ordinance, is largely the result of the lack of supply of affordable housing. For example, in 2021, the White House issued a report asserting that the United States has "an inadequate supply of housing for renters." (Campbell Dec.

Ex. 36, at 4.) The report indicated that national supply constraints caused increases in rent. (*Id.*) In turn, "[t]hese supply constraints in the housing market have an impact on long-term economic growth and inequality." (*Id.* at 5.)

The original Ordinance neither substantially advanced nor had a rational relationship to Saint Paul's interest in providing safe and affordable housing to Saint Paul residents. The restrictive nature of the Ordinance disincentivized developers from continuing to build in Saint Paul, which has an adverse impact on the supply of housing in Saint Paul, including affordable housing. There is a total absence of any facts to support a contrary conclusion. If there were, they would have been reflected in the deliberations of the City Council. In fact, the Council's deliberations make clear that the Ordinance was undermining the City's stated goal of increasing affordable housing.

When amending the Ordinance, Defendants were fully aware of the adverse impacts of rent control legislation, having witnessed the effects of the Ordinance on the Saint Paul housing market. The City even cited these negative consequences as reasons for amending the Ordinance. *See* Amended Ordinance, Section 1, Findings. Despite the amendments, the Ordinance still falls flat in substantially advancing its goals, and therefore remains arbitrary and irrational.

The Amended Ordinance does not "ensure affordability of rental housing in Saint Paul," the first stated purpose of the Ordinance. The Ordinance, as amended, does nothing to increase affordable housing in the City of St. Paul. In fact, it has the opposite effect. And the City offers no facts, studies or even anecdotal evidence that would support the idea that more affordable housing is created by limiting rent increases. Saying

20

something is so does not make it so. As the City knew when it passed the amendments, developers of new housing advocated for a 30-year construction exemption.  But rather than listening to the developers that the City was hoping to motivate, the City passed an exemption that was 10 years shorter than the developers requested. Amended Ordinance § 193A.08(a)(3). The City Council also ignored Ryan Companies' warning that the Amended Ordinance does not "go far enough to lure them back to Saint Paul," in particular because lenders and investors are less inclined to provide funding to cities with rent control legislation. (Campbell Dec. Ex. 31, at 3.) Defendants pushed forward with the Amended Ordinance despite having no evidence that it would spur an increase in the development of affordable housing.

The Amended Ordinance fails to address the "detrimental health, safety and welfare impacts resulting from a shortage of residential units," the second stated purpose of the Ordinance.  The Ordinance, as amended, provides nothing related to "health, safety and welfare." If the Council's idea is that more affordable housing will address the health, safety and welfare of renters, then the Ordinance fails because there is absolutely no evidence in any City Council minutes to support the idea that the Ordinance will solve any perceived housing shortage in Saint Paul. The evidence available to the City Council shows the opposite.

The Amended Ordinance does not "address the hardship tenants face when being forced to move from their homes," the third stated purpose of the Ordinance. There are no objective facts, on which the City Council can rely, that establish that property owners, by raising rents, are forcing renters to vacate their rental units and causing

21

hardship as a result. Moreover, the Ordinance, as amended, does not limit eviction actions or provide relief to tenants who are forced to move. To the extent this policy statement is just another way to say the City needs an increased supply of affordable housing, the Ordinance fails to advance this policy for the reasons summarized above.

The Amended Ordinance is not rationally related to "stabiliz[ing] rents in Saint Paul where rents outpace incomes," the last stated purpose of the Ordinance.  In fact, the Ordinance irrationally <u>exempts</u> low- and moderate-income housing from its rent control provisions. Amended Ordinance § 193A.08(a)(2). The decision to exempt low- and moderate-income housing from the rent control provisions of the Ordinance is one of the more bizarre decisions made by the City Council. The stated purpose of the Ordinance is to "stabilize rents in Saint Paul where rents outpace incomes." Logically, the tenants most in need of stabilizing rents are low- and moderate-income tenants. But due to the exemption for low- and moderate-income rental units, the most vulnerable tenants have no protection under the Ordinance. On the other hand, tenants with middle class or high incomes, who can afford market rent increases, receive the benefit of rent control for no apparent reason.

In short, there is no evidence the Ordinance, even as amended, will lead to an increase in affordable housing or help low income or transient tenants. The evidence actually shows the Ordinance will lead to a <u>decrease</u> in affordable housing and helps only the <u>higher income</u> individuals who do not need it. Thus, the Ordinance is arbitrary and violates Plaintiffs' due process rights.

**b.** **The procedures Defendants established to request an exception to the 3% cap is burdensome and causes unnecessary delay.**

The Ordinance also violates Plaintiffs' due process rights vis-à-vis the prohibitively burdensome procedures for requesting an exception to the 3% cap. In *Smith v. Illinois Bell Telephone Co.*, the Supreme Court found that "[p]roperty may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them." 270 U.S. 587, 591 (1926). For a rent control ordinance to be constitutional, it must be "capable of providing adjustments in maximum rents without a substantially greater incidence and degree of delay than is practically necessary." *Birkenfeld v. City of Berkeley*, 550 P.2d 1001, 1030 (Cal. 1976) (citing *Illinois Bell*, 270 U.S. at 591.)) Where rent control legislation places a "procedural strait jacket" on the government entity responsible for adjustments to rent control caps, including by building in inherent delays to that entity's resolution of requested adjustments, the legislation makes it "inevitable" that unreasonably low rent ceilings will be arbitrarily imposed. *Id.* at 1030-31.

A "procedural strait jacket" is a perfect description for the Ordinance. (*See, e.g.*, Moe Dec. ¶¶ 4-5, 8.) Plaintiffs, along with all other residential landlords in Saint Paul, are subject to a complex, burdensome process that deprives them of control over rent charged at their properties. The undisputed evidence shows that the process for landlords seeking a rent increase above 8% can take several weeks, if not months, and is not guaranteed to lead to a determination that they are allowed to increase rent as requested. Indeed, approximately only 1 in 10 staff-determination applications are being granted by

Defendants. (Campbell Dec. Ex. 11 [Defs' Answers to Pltfs' Interrogs.] at 4-5.) The
Amended Ordinance also provides that a Department Determination may be appealed
within 45 days of receipt of such Determination. Amended Ordinance § 193A.07(g).
This provides tenants with the opportunity to cause additional delay on top of the already
lengthy appeals process. While the landlord waits, it cannot increase rent: the Ordinance
provides that rent increases above 3% "shall not take effect until a Final Determination is
issued." *See* Amended Ordinance § 193A.04. All this delay can result in up to 3 or 4
months of lost revenues to the landlord, even if the City later determines that the landlord
needed those revenues to make a reasonable rate of return.

Seeking self-certification for rent increases between 3% and 8% does not lessen
the administrative burden. The Amended Ordinance explicitly requires that landlords,
when seeking self-certification, must complete and submit the MNOI Worksheet and the
Rent Increase Exception Form. Amended Ordinance § 193A.07(c)(1). The information
supplied in these forms, including any proprietary information, may then become subject
to public availability, which in turns impairs Plaintiffs' abilities to compete in the market.
Moreover, both under the original and the Amended Ordinance, Plaintiffs, by seeking any
type of increase above 3%, face the risk of criminal and civil penalties, as well as private
suits brought by tenants, for any mistakes they may make that may be translated as failure
to comply with the Ordinance. Amended Ordinance § 193A.09(a)-(b). And again, if a
tenant chooses to appeal DSI's Determination sometime within that 45-day appeal
window, then the landlord is precluded from raising their rent above 3% until a Final
Determination, which could take weeks or months to issue.

24

In the meantime, the economic bases for the landlord's application may become stale, requiring the landlord to file *another* application for an increase that will take even more time to run its course. The application process creates the potential for a never-ending downward spiral, where a landlord must continuously seek permission for *future* rent increases in order to cover losses from delayed processing of its *past* applications. By the time the City issues its Final Determination, a landlord's pending application may no longer represent its present financial circumstances. The application and appeal processes are, therefore, arbitrary and do not serve the stated purposes of the Ordinance.

The Ordinance deprives Plaintiffs of property without due process in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Minnesota Constitution. The Ordinance should be stricken down and Defendants should be permanently enjoined from enforcing it.

## III.   The Ordinance impermissibly interferes with Plaintiffs' contracts in violation of the Contract Clauses.

The Court should also enter summary judgment on Count IV of Plaintiffs' Complaint and declare the Ordinance unconstitutional under the Contract Clauses of the United States and Minnesota Constitutions. The Contract Clauses forbid states from interfering with contractual obligations. U.S. Const. Art. I, § 10, cl. 1. ("No state shall . . . pass any . . . Law impairing the Obligation of Contracts."); Minn. Const. art. I, § 11 (same). "Minnesota Contract Clause challenges are analyzed using the same . . . test [as federal Contract Clause challenges]." *State ex rel. Hatch v. Employers Ins. Of Wausau*, 644 N.W.2d 820, 833 (Minn. Ct. App. 2002).

On its face, the Contract Clause imposes an absolute prohibition on impairing contractual obligations. *See Sveen v. Melin*, 138 S. Ct. 1815, 1826 (2018) (Gorsuch, J., dissenting) (noting that in the Contract Clause "the framers were absolute" and treated existing contracts as "inviolable"). Although Plaintiffs recognize that the United States Supreme Court has interpreted the Contract Clause more narrowly, Plaintiffs advocate for a more literal interpretation of the clause that would require the Ordinance to be stricken without such a detailed analysis. *See id.* Plaintiffs reserve the right to ask the Supreme Court to overturn prior cases that have defined the Contract Clause to be more limited than its plain language states.

Nevertheless, the Ordinance does not even satisfy the Contract Clause standard articulated in existing Supreme Court jurisprudence. Under the current state of the law, the prohibition on impairment of contracts is considered "not an absolute one and is not to be read with literal exactness like a mathematical formula." *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 21 (1977) (citing *Home Building & Loan Assoc. v. Blaisdell*, 290 U.S. 398, 428 (1934)). To determine whether a state has impermissibly interfered with a contract, courts apply a two-prong test:

1. Whether the state law substantially impairs a contractual relationship, which takes into consideration the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights; and

2. If the first prong is met, whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

*Heights Apartments, LLC v. Walz*, 30 F.4th 720, 728 (8th Cir. 2022) (internal citations and quotations omitted). The Saint Paul rent control Ordinance fails this test.

### a. The Ordinance substantially impairs Plaintiffs' ability to negotiate leases, particularly with respect to rent.

As to the first prong, the Ordinance substantially impairs Plaintiffs' contractual relationships with tenants. While "a state's interference with a minor contractual provision is not a substantial impairment under the Contract Clause," an interference with a "crucial contractual right may constitute a substantial impairment." *Heights Apartments*, 30 F.4th at 728. "The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them." *Blaisdell*, 290 U.S. at 431.

To measure the severity of an impairment of a contractual obligation, courts may look to factors "that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978).

The governing rule for substantial impairment is "akin to a question of reasonable foreseeability: if the party to the contract who is complaining could have seen it coming, it cannot claim that its expectations were disappointed." *Assoc. of Equip. Manufs. v. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019). In other words, "if a law completely destroys contractual expectations, a severe impairment exists, but if a law only restricts a party to gains it reasonably expected from a contract, no substantial impairment exists." *HRPT Props. Trust v. Lingle*, 715 F.Supp.2d 1115, 1137 (D. Haw. 2010) 1137 (citing *Energy Reserves Grp., Inc. v. Kansas Power & Light*, 495 U.S. 400, 411 (1983)). Reasonable

notice may turn on factors such as the duration of the legislation. *Heights Apartments*, 30

F.4th at 729-30; *Blaisdell*, 290 U.S. at 447 (noting that the legislation at issue was

temporary in duration); *see also Lipscomb v. Columbus Mun. Sep. Sch. Dist.*, 269 F.3d

494, 504 (5th Cir. 2001) ("The court should also consider what terms of the contract are

affected and the duration of the effects.")

    In this case, the Ordinance unconstitutionally impairs Plaintiffs' lease agreements

in multiple ways.  First, the Ordinance obviously inhibits Plaintiffs' ability to negotiate

rent. Courts have long recognized that rent is a fundamental lease term, as it establishes

the financial obligation of the parties and the very basis of the lease. *See Heights

Apartments*, 30 F.4th at 731 ("We acknowledge that the particular harms the [executive

orders] allegedly imposed on Heights affected its ability to collect rent[.]"); *HRPT

Props.*, 715 F.Supp.2d at 1137 (describing "determination of rent and the financial

obligations of both parties" as a "central provision of the lease," and noting that "the

establishing of rent is always an important term in a lease; rent sets the financial

obligations of the parties"); *Crowley v. Potts Estate*, 230 N.W. 645, 648 (Minn. 1930)

("Rent is something to be paid for the use and enjoyment of real estate."); *Silver v. Moe's

Pizza, Inc.*, 121 A.D.2d 376, 377 (N.Y. App. Div. 1986) (recognizing payment of rent as

a tenant's "fundamental obligation" under a lease); *San Jose Parking, Inc. v. Superior

Court*, 110 Cal. App. 4th 1321, 1328 (Cal. Ct. App. 2003) (recognizing payment of rent

as a "fundamental attribute of a lease"). Courts have also found that legislation impacting

a contracting party's ability to negotiate a financial obligation—such as rent— "greatly

diminishes" that party's contractual and legal rights, such that the contract becomes

substantially impaired by that legislation. *See HRPT Props.*, 715 F.Supp.2d at 1137

("Adjustments in financial terms are substantial impairments."); *LL Liquor, Inc. v.*

*Montana*, 649 Fed. App'x 627, 629 (9th Cir. 2016) (citing *S. Cal. Gas Co. v. City of*

*Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003)) ("A substantial impairment 'deprives a

party of an important right, thwarts performance of an essential term, defeats the

expectation of the parties, or alters a financial term.'").

Like the laws criticized in these cases, the Ordinance at issue here prevents

Plaintiffs from freely dictating rent. Plaintiffs can increase rent above the 3% cap only by

going through a costly, complicated, time-consuming and unpredictable process that is

not guaranteed to result in the increase Plaintiffs want or need. This, alone, constitutes

substantial impairment of the lease.

Second, the Ordinance limits Plaintiffs' ability to contract for periodic, month-to-

month or other short-term tenancies. Courts have previously recognized the inherent

instability and risk in short-term leases, such as increased turnover rates and expenses,

advertising and marketing costs, and other market risks. *See, e.g.*, *Velez Cuyahoga Met.*

*Housing Auth.*, 795 F.3d 578, 581 (6th Cir. 2015). To accommodate the risks of short-

term leasing, landlords typically subsume the risk into increased rents or charge

independent line-item costs that are then borne by the tenant. *Id.*

Plaintiffs follow this industry standard. For example, Woodstone's lease provides:

> If Resident, with the approval of Management, stays in the Unit after the date
> this Lease ends and Resident and Management have not renewed the Lease
> or entered into a new Lease, this Lease shall be extended under its original
> terms except a) the duration shall be changed to two (2) months with two (2)

full calendar months' notice required for termination . . . and b) Management
may raise the rent.

(Moe Dec. ¶ 15; Ex. A § 14; *see also* Cerbana Dec. ¶ 13; Ex. B.) Under normal

circumstances, and in line with the reasoning of the Sixth Circuit, Woodstone would raise

the rents pursuant to the parties' lease agreement to account for the risks and costs

associated with a tenant leasing a unit on a short-term basis. (Moe Dec. ¶¶ 16-17; *see also*

Cerbana Dec. ¶¶ 15-16.) This ensures that Woodstone has the finances to cover the costs

of increased turnovers, marketing and advertising, and any additional repairs and

maintenance required to show and rent the unit on short notice. (Moe Dec. ¶ 16; *see also*

Cerbana Dec. ¶ 16.) Such rent increases typically range from $100 to $150 above the

typical base rent. (Moe Dec. ¶ 17; *see also* Cerbana Dec. ¶ 17.)

The Ordinance, however, eradicates Plaintiffs' ability to account for the risk of

short-term tenancies. The Ordinance explicitly prevents a landlord from seeking more

than one rent increase above 3% in a 12-month period. *See* St. Paul Leg. Code

§ 193A.04; Amended Ordinance § 193A.04. That means Plaintiffs cannot increase rent

multiple times in a year to account for short-term leases. Moreover, as discussed in

greater detail above, Plaintiffs cannot raise rents until they have received a Final

Determination from the City—a process which has been shown to take weeks or months,

depending on whether Plaintiffs have sought an increase above 8% (as would be justified

to address market risks associated with monthly tenancies) or if Plaintiffs' tenants have

sought an appeal of the City's Determination. In the case of an application to increase

rent on a short-term lease, the lease may have already ended by the time Plaintiffs receive

30

a Final Determination, mooting the application to raise the rent. Thus, where a lease converts to a bi-monthly lease following the expiration of a definite term lease, or where the parties contract for a short-term lease, landlords such as Plaintiffs are effectively precluded from raising rents to account for the economic risk of such periodic tenancies.

Third, the Ordinance substantially impairs Plaintiffs' abilities to negotiate and collect certain fees already agreed upon in the existing lease agreements. As previously mentioned, the Amended Ordinance caps rent increases at 3% within a 12-month period, barring approval from Defendants. *See* St. Paul Leg. Code § 193A.04; Amended Ordinance § 193A.04. The Amended Ordinance defines "rent" as "[a]ll monetary consideration charged or received by a Landlord concerning the use or occupancy of a Rental Unit pursuant to a Rental Agreement, except for Pass Through Expenses authorized by this chapter." Amended Ordinance § 193A.03(v); *see also* St. Paul Leg. Code § 193A.03(g). While the Amended Ordinance does not define "monetary consideration," Director Wiese has previously stated that "fees collected for the use of the rental unit for housing services" constitute rent for purposes of the Ordinance, and they "cannot go over the three percent cap unless there's . . . an approved request for exception." HomeLine, *tenant/landlord webinar: St. Paul Rent Stabilization ordinance, with guest speakers from city*, YouTube (June 1, 2022), https://www.youtube.com/watch?v=WfdMIl6QPkU&t=810s.

One such fee that falls under the umbrella of "rent" is late fees. Woodstone's standard lease agreement contemplates late fees for untimely payment of rent, as expressly allowed by Minn. Stat. § 504B.177, providing:

> **LATE CHARGES:** If total rent (total monthly lease charges) is not received in full by 11:59 p.m. on the 3rd day of the month, Management may charge a fee up to $50 on the 4th day of the month. Thereafter, Management may charge an additional fee up to $75.00 if the rent remains unpaid by 11:59 p.m. on the 7th day of the month in which it is due. Total late fees not to exceed 8% of monthly lease charges.

(Moe Dec. ¶ 19; Ex. A, at 1; *see also* Cerbana Dec. ¶ 18.) An untimely payment of rent may be subject to late fees up to $125.00, depending on the tenants' overall rental rate. (Moe Dec. ¶ 19; Ex. A, at 1.)

The Ordinance, under which these late fees are subsumed as rent, prevents Plaintiffs from enforcing their late fees provisions. For units where Plaintiffs have already increased their rents up to 3%, or above 3% with Defendants' approval, Plaintiffs are restricted from further increasing rents for 12 months. Thus, once the rental rate is approved, Plaintiffs are unable to impose *any* late fees for non-payment of rent.

The purpose of late fees is to protect Plaintiffs from the consequences of untimely payment of rent. Delayed rental payments create administrative costs for landlords (e.g., time and money spent by property managers to send default notices to tenants and take collection actions). Delayed rental payments also deprive landlords of the time value of money. Late fees compensate landlords for these costs of delay. Without late fees, tenants can pay rent late with impunity, and landlords receive no compensation for being forced to wait indefinitely for payment. Moreover, Plaintiffs are businesses and are therefore subject to business-related debts and expenses, such as taxes, mortgages, utilities payments, and payroll. Plaintiffs have structured their leases to include rent payment deadlines to ensure that Plaintiffs can comply with their *own* financial obligations. The

lack of late fees jeopardizes Plaintiffs' ability to stay afloat. This is yet another way that the Ordinance substantially impairs Plaintiffs' contracts.

Plaintiffs could not have reasonably foreseen the devastating impact of the Ordinance when they bought their properties in Saint Paul. *See Heights Apartments*, 30 F.4th at 729. Although other states and cities—primarily on the East and West Coast, where rents have historically been high—have imposed rent control legislation, Minnesota law preempts any state legislation imposing rent control, except in narrow circumstances. *See* Minn. Stat. § 471.9996. Saint Paul is the first and only city in the Midwest with any rent control legislation. (Campbell Dec. Ex. 6.).) Not even the City of Chicago, Illinois—with a population over eight times the size of Saint Paul, and with rents that have exceeded those in Saint Paul—has imposed rent control legislation, due in part to preemptive state law. *See* 50 Ill. Comp. Stat. Ann. § 825/5. Thus, Plaintiffs cannot be said to have had "fair and appreciable warning of an impending intervention into their agreements." *Burgum*, 932 F.3d at 730 (noting that the regulations at issue "are new additions" to the code "or significantly expand existing protections). Moreover, the Ordinance is infinite in duration, which the Eighth Circuit recently decided is a factor in finding a law to be a substantial impairment that was not reasonably foreseeable. *Heights Apartments*, 30 F.4th at 730 (noting instances where courts found substantial impairment because the legislation had "no definite termination dates"). Thus, the Ordinance substantially impairs Plaintiffs' lease agreements with their tenants, and such substantial impairment was not reasonably foreseeable to Plaintiffs.

    **b. The Ordinance is not reasonably or appropriately drawn to advance a significant and legitimate public purpose.**

Because the Ordinance substantially impairs Plaintiffs' lease agreement, thus satisfying the first prong of the Contract Clause analysis, the matter now turns to the second prong, "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance a significant and legitimate public purpose." *Heights Apartments*, 30 F.4th at 728 (internal citations and quotations omitted). The Ordinance does not meet this constitutional requirement.

While courts "typically give deference to state executive who are tasked with the responsibility of taking care of the health and safety of their citizens," this authority is not absolute and "does not mean wholesale judicial abdication." *Id.* at 730 (internal citations and quotations omitted). "State authorities are not vested with unlimited police power to modify contracts." *Id.* (citing *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 21-23 (1977)). Courts have also made clear that the Contract Clause provides "greater protection for contractual rights" than the "less searching" rational basis review standard applied under the Due Process Clauses. *Burgum*, 932 F.3d at 734. It is the state's responsibility to demonstrate "more than a conceivable or incidental public purpose for impairing the obligation of contracts." *Id.*

As detailed in Section II above, the Ordinance is not drawn in a way that survives rational basis review, much less the higher standard required by the Contract Clause for government interference with contracts. In *Heights Apartments*, the Eighth Circuit found that while combatting COVID-19 furthered an important public purpose, Governor

34

Walz's Executive Orders did not advance that interest in an "appropriate" or "reasonable" way. *Heights Apartments*, 30 F.4th at 728. The court reasoned that the impact of the Executive Orders on landlords' rights was overbroad, and the eviction moratorium set forth in those Orders encompassed behaviors unrelated to the non-payment of rent, which was the focus of Governor Walz's action. *Id.* at 731.

Here, restricting Plaintiffs' abilities to negotiate rent, particularly with respect to the imposition of late fees and short-term leases, has nothing to do with the Ordinance's purported purpose of "ensur[ing] affordability of rental housing in Saint Paul," "address[ing] detrimental health, safety, and welfare impacts resulting from a shortage of residential rental units," and "ensuring access to affordable housing." Amended Ordinance, Section 1, Findings; *see also* St. Paul Leg. Code § 193A.01. As demonstrated above, by restricting late fees and short-term housing, the Ordinance results in consequences that end up harming tenants, including by decreasing the supply of affordable short-term housing and by increasing the risk of financial hardship of landlords in Saint Paul that would, in turn, adversely impact tenants. Moreover, the Ordinance has had and will continue to have an adverse impact on the housing market; the inability to freely adjust rents has resulted in investors and developers leaving the Saint Paul housing market, as they "view rent inflexibility as increasing risks." (*See* Campbell Dec. Ex. 23, at STP00287-91.) Even the recent amendments, such as the 20-year construction exemption, have been deemed insufficient by developers to resume halted development projects or to pursue new opportunities in Saint Paul. (*Id*. Ex. 38.)

At worst, the Ordinance does nothing to address the declining supply of affordable housing or spur new affordable housing in Saint Paul. At best, the Ordinance overreaches by limiting rent increases for tenants who have middle or high incomes and do not have a problem affording rent. The Ordinance also includes provisions and processes that inhibit landlords in ways that are wholly unnecessary to its stated purposes. No matter what, the Ordinance has not been drawn in a reasonable or appropriate way to meet its goals. Thus, the Ordinance violates Plaintiffs' rights under the Contract Clauses of the United States and Minnesota Constitutions. The Court should grant summary judgment and declare the Ordinance unconstitutional on these grounds as well.

**IV.    Defendants are subject to Section 1983 claims because they each have participated in the deprivation of Plaintiffs' constitutional rights.**

In addition to declaring the Ordinance unconstitutional, the Court should enter summary judgment on Count VI of Plaintiffs' Complaint, and award them relief under 42 U.S.C. § 1983. Section 1983 provides a cause of action against any "person who, under the color of any statute, ordinance, regulation, custom, or usage, of any state" causes the deprivation of a right protected by federal law or the United States Constitution. "[M]unicipalities and other local government units" are considered "persons" to whom Section 1983 applies. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). Defendants are municipalities and government agents acting in their official capacities and may therefore be sued for declaratory relief under Section 1983. *Id.*; *see also Rollins by Agosta v. Farmer*, 731 F.2d 533, 535 (8th Cir. 1984) (noting that the *Monello* rule

applies "when individuals are sued solely in their official governmental capacities because such unit is served against the governmental unit").

"To recover under § 1983, a plaintiff must prove (1) a violation of a constitutional right; (2) committed by a state actor; (3) who acted with the requisite culpability and causation to violate the constitutional right." *McDonald v. City of Saint Paul*, 679 F.3d 698, 704 (8th Cir. 2012) (internal citations and quotations omitted.) For violations of Section 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fees as part of the costs." 42 U.S.C. § 1988(b).

As explained above, Plaintiffs had protectable Due Process and Contract Clause rights with respect to their private rental properties and their lease agreements with their tenants, respectively. *See Heights Apartments*, 30 F.4th at 727 (assuming a cause of action for a Contract Clause violation may be bought under 42 U.S.C. § 1983 and citing cases related thereto). Defendants, as state actors acting under the color of law, have violated these rights by enacting and implementing the Ordinance. Accordingly, the Court should find Defendants liable under 42 U.S.C. § 1983, and award Plaintiffs attorney's fees pursuant to Section 1983 and 42 U.S.C. § 1988.

## V.    Plaintiffs are entitled to summary judgment on Count V of the Complaint pursuant to Minn. Stat. § 471.9996.

Another defect in the Ordinance is that it imposes a hard 15% cap on rent increases that violates the plain language of Minnesota Statute § 471.9996.  The statute strictly preempts Saint Paul from enacting rent control legislation, except as approved by the voters in a general election. Minn. Stat. § 471.9996, subd. 1.

The original Ordinance at issue here was passed through voters' approval of the following ballot question:

> Should the City adopt the proposed Ordinance limiting rent increases? The Ordinance limits residential rent increases to no more than 3% in a 12-month period, regardless of whether there is a change of occupancy. The Ordinance also directs the City to create a process for landlords to request an exception to the 3% limit based on the right to a reasonable return on investment. A "yes" vote is a vote in favor of limiting rent increases. A "no" vote is a vote against limiting rent increases.

(Campbell Dec. Ex. 3 [STP00214-215].) The ballot question says nothing about a 15% hard cap on rent increases.  But the DSI's Final Rules impose such a cap.  Since the 15% cap was not approved by the voters, it is illegal under Minn. Stat. § 471.9996.  Thus, setting aside the constitutional issues that run through the entire Ordinance, the Court should at least grant summary judgment on Count V of Plaintiffs' Complaint and strike down the 15% cap on rent increases.

## CONCLUSION

The Ordinance, as originally written and as amended, violates Plaintiffs' constitutional rights under the Due Process Clauses and Contract Clauses of the United States and Minnesota Constitutions. The Court should remedy these constitutional violations by entering partial summary judgment striking down the Ordinance and awarding Plaintiffs their reasonable attorneys' fees and costs.  At a minimum, the Court should strike down the 15% cap on rent as a violation of Minnesota Statute § 471.9996.

Dated:  October 17, 2022

**ANTHONY OSTLUND LOUWAGIE DRESSEN & BOYLAN P.A.**

 *s/ Joseph W. Anthony*

Joseph W. Anthony (#2872)
janthony@anthonyostlund.com
Philip J. Kaplan (#389351)
pkaplan@anthonyostlund.com
Kathryn E. Campbell (#402631)
kcampbell@anthonyostund.com
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone:  (612) 349-6969

**ATTORNEYS FOR PLAINTIFFS**