UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

WOODSTONE LIMITED
PARTNERSHIP, LOFTS AT
FARMERS MARKET,

               Plaintiffs

Vs.

CITY OF ST. PAUL,
MINNESOTA, A MINNESOTA
CHARTER CITY; CITY COUNCIL
OF THE CITY OF SAINT PAUL;
ANGIE WIESE, IN HER OFFICIAL
CAPACITY AS THE DIRECTOR OF
THE DEPARTMENT OF SAFETY
AND INSPECTIONS OF THE CITY
OF SAINT PAUL; MAYOR
MELVIN CARTER, IN HIS
OFFICIAL CAPACITY AS MAYOR
OF THE CITY OF SAINT PAUL;
AND JOHN DOE,

               Defendants

Court File No. 22-cv-1589 NEB-JFD

MEMORANDUM IN SUPPORT OF
MOTION TO INTERVENE BY
KATHERINE BANBURY, ANGELA
WILHIGHT, WESTSIDE
COMMUNITY ORGANIZATION,
ALLIANCE FOR METROPOLITAN
STABILITY, HOME LINE

_____

INTRODUCTION

In the November 2021 general election, St. Paul voters adopted a rent stabilization

ordinance (the "Ordinance") through the initiative process permitted by the St. Paul City Charter.

The Ordinance generally limits annual rent increases to 3%, but also guarantees landlords a

reasonable return on their investment. Rules adopted by the City implement that guarantee by

permitting rent increases sufficient to assure that the net operating income generated, and

therefore the market value of the property, can increase at the same rate of inflation as the local

Consumer Price Index. The Rules permit landlords to self-certify their entitlement to rent

1

increases up to 8% with only a brief, non-substantive submission to the City.  Owners may receive City approval for larger increases, or respond to appeals of the self-certifications, by submitting readily available information on two years of operating income and expenses.

Plaintiffs here have apparently never taken advantage of the reasonable return guarantee but have nevertheless challenged the Ordinance as substantive due process, regulatory taking, and contracts clause violations of the U.S. and Minnesota constitutions.  Prospective intervenors are two St. Paul renters whose rents were increased in violation of the Ordinance and who are challenging those increases using an administrative appeal procedure provided by the City and three non-profit organizations, focused on assuring stable, affordable, housing to tenants.  These were heavily involved in adoption of the Ordinance and are working to see that it is enforced and remains effective. The prospective intervenors seek the right to intervene pursuant to Rule 24(a), or alternatively, permissive intervention pursuant to Rule 24(b), in order to protect their affordable housing interests as well as the interests of the majority of voters who supported the initiative.  Due to the fact that the City has recently abandoned other tenant protection litigation in response to similar court challenges, the prospective intervenors seek to assure that their interests and the interests of the majority of the St. Paul electorate are represented in any appeal process.

## STATEMENTS OF FACTS AND BACKGROUND

### The proposed intervenors

In March 2020 several housing advocacy organizations formed a coalition, Housing Equity Now St. Paul (HENS), to support tenant protections policies in the city of Saint Paul. Beginning in August of 2020 HENS decided to focus efforts on creating a St. Paul rent stabilization Ordinance. All of these groups are focused on housing justice and on low-wealth,

communities with large populations of color. The groups spent over six months researching rent

stabilization laws and academic research on various forms of rent stabilization, researching  the

St. Paul initiative process, and developing a draft Ordinance which was circulated among other

community groups.  In March of 2021, the HENS coalition concluded the drafting process and

began the initiative process as set out in Chapter 8 of the St. Pasul City Charter.  The groups

organized petitioning door to door and at public gatherings and on  June 15, 2021, submitted a

petition with over 9000 names to the City Clerk.  After certification of the proper number of

signatures, the Ordinance was placed on the ballot for the general election on Nov. 2, 2021.  The

initiative was adopted by Saint Paul voters and passed with 30,965 votes, 53 % of 58,546 total

votes.

Two of the proposed intervenors, the West Side Community Organization (WSCO) and

the Alliance, were founding members of the HENS coalition. The HENS website describes itself

as a:

> coalition of groups representing St. Paul neighborhoods and residents focused on
> housing justice.  We are rooted in community – specifically low-wealth and
> Black, Indigenous, People of Color (BIPOC) communities most affected by
> economic inequality.

https://www.housingequitystp.org/about.

WSCO is a non-profit community organization with a long history of advocating for the

rights of residents living on St. Paul's West Side.  This is a racially and economically diverse

community where about half the residents are renters and half of them are cost burdened.  A core

mission of WSCO is to advocate for and organize renters who are suffering from exploitation,

discrimination, and displacement from their homes.[1]  WSCO staff and volunteers played a

---

[1] https://www.wsco.org/housingjustice

significant role in drafting the Ordinance, gathering petition signatures,[2] and campaigning for adoption of the Ordinance. WSCO spent approximately $6,777 in support these efforts.  WSCO has also continued to play an active role in educating renters on the West Side of Saint Paul about their rights under the Ordinance, supporting renters who have received noticed on increases in excess of the amount allowed under the Ordinance in filing complaints to the city and accessing resources to assert their rights under the Ordinance. WSCO members also actively participated in the Saint Paul Rent Stabilization working group convened by the city of Saint Paul and were active participants in public hearings regarding the implementation of the rent stabilization Ordinance and were strong advocates against proposed amendments that would weaken the Ordinance.

The Alliance for Metropolitan Stability (the Alliance) is a coalition of community-based organizations and advocacy groups building shared power to advance strategic campaigns around the intersections of racial justice, economic justice, environmental justice, and health equity. The Alliance's mission is to advance justice and equity in economic growth and land development in the Twin Cities region.  Alliance staff played a major role in HENS and the development of the draft Ordinance and the campaign for adoption beginning in August of 2020. The Alliance spent approximately $12,532 on these efforts.  Staff member Tram Hoang convened the HENS collaborative before leaving the Alliance to become the manager of  the "Keep Saint Paul Home" campaign; a 501(c)4 organization created to support passage of the Saint Paul rent stabilization ballot measure. The Alliance has continued to work for equitable implementation of the rent stabilization Ordinance and advocated against amendments that would weaken the Ordinance.

---

[2] https://www.wsco.org/renters_belong_in_st_paul_petition_to_put_rent_stabilization_on_the_2021_ballot

HOME Line is a non-profit organization providing free legal, educational, and organizing services to tenants throughout the state. Its primary program is a free and confidential legal hotline (via telephone or web https://homelinemn.org/email) that tenants throughout the state can contact to speak to a housing attorney or tenant advocate about their specific rental situation. It has served St. Paul since 2006, advising over 32,600 households in the city.

HOME Line tenant organizing staff were actively involved in the HENS coalition that worked to advocate for the ballot initiative, including actively participating in the Steering Committee for the initiative and doing door knocking and outreach to Saint Paul renters about issues related to rent stabilization. Two HOME Line staff spent about 320 hours in these efforts.

In the time period since the 2021 election when St. Paul voters enacted the Ordinance, the hotline fielded 201 separate inquiries from St. Paul renter households relating to rent increase questions. This is a 179% increase in these types of inquiries over the same time period the prior year (11/3/2020 to 10/12/2021). Its hotline staff have been advising these clients with information about the Ordinance, answering questions and guiding them through the City's complaint process, and working with tenants in buildings experiencing rent increases over the 3% maximum set out in the Ordinance. Prior to the date the Ordinance became effective (5/1/2022), the hotline advised many clients about the legality of rent increases that were set to occur before or around the effective date of the Ordinance. The confusing mix of information about the passage of the ballot initiative, the effective date of the Ordinance, the promulgation of rules, and the public debate around changes to the Ordinance resulted in this substantial increase in renters contacting the hotline and a need for the organization to put more capacity towards this issue specifically.

HOME Line organized a free, 90-minute public webinar for a variety of audiences on June 1, 2022, one month after the St. Paul rent stabilization Ordinance went into effect on May 1, 2022, to share information about the policy, enforcement, and other related details. Staff from the St. Paul Department of Safety & Inspections and the Office of the City Attorney presented and answered questions from over 25 attendees (tenants, landlords, attorneys, social service providers, and more).

In September, HOME Line hired Katherine Banbury on a part time basis to organize tenants around issues related to rent stabilization, with a focus on one major landlord.

Katherine Banbury and Angela Wilhight live in buildings in which the owners went through the self-certification process, described below, which provides for an automatic approval by City staff of an increase of up to 8%. Both have instituted administrative appeals of this approval.  Ms. Banbury lives in the Cambric, 720 E. Seventh St., St. Paul, which is funded with federal Low Income Housing Tax Credits (LIHTC).  Rents in this program are limited based on area median income.  Ms. Banbury's landlord owns eight LIHTC buildings in St. Paul and many more throughout the metro area.  In the rest of the metro area, the landlord raised rents 11.9%, as was permitted by the LIHTC rules.  Ms. Banbury, and all of the tenants of the landlord's other seven LIHTC buildings in St. Paul have benefitted from the Ordinance as the landlord is permitted not more than an 8% rent increase using the self-certification provision.  Ms. Banbury is further protected by the Ordinance as City rules prevent the increase from going into effect until the appeal is resolved and because the City staff and Hearing Officer have issued reports indicating the permitted increase for her apartment is only 6.1%.  The City Council adopted the Hearing Officers recommendation at its October 19, 20220, meeting..

Ms. Willhight lives in the Rayette Lofts apartments, 261 5th St. E., St. Paul.  Her landlord increased her rent 3% in September but also shifted an allocated portion of the landlord's utility payments to her, estimated by management to add an additional 8.3%-9.5 to the cost of her occupancy.  She is protected by the Ordinance, again because of the 8% limit, but also because the city staff have rejected the landlord's position that the utility allocation is not protected by the Ordinance and have testified that their position is that any utility costs formerly paid by the landlord constitute a rent increase subject to the Ordinance's limits if shifted to the tenants.

**The Ordinance.**

There is good reason why organizations with a major concern for racial justice were founders of HENS and pushed for rent stabilization.  The most recent HUD data[3] show about 12,800 St. Paul renter households, about 23% of all renter households, as severely cost burdened, paying more than half of income for housing. Housing affordability is thus a desperate problem for nearly a quarter of St. Paul renter households. Virtually all of the severely cost burdened households have incomes at or below 50% of area median income (AMI).  This is not simply a serious social problem; it is a serious fair housing problem.  The HUD data show households of color about 2.5 times more likely than white, non-Hispanic households to be severely cost burdened.

The Ordinance, limiting substantial and unnecessary rent increases, serves a critical public function.  The findings portion of the Ordinance adopted through the initiative provides, in part:

> … the present shortage of residential Rental Units and the prevailing Rent levels
> have a detrimental effect on the health, safety, and welfare of a substantial
> number of Saint Paul residents, particularly persons in low and moderate income
> households, and persons on fixed incomes who reside in the City; that residential

---

[3] https://www.huduser.gov/portal/datasets/cp.html#2006-2018_data; for data using renter income only' use "/Query Tool" tab; for data with race/ethnicity, use "Data" tab.

Tenants constitute over 50% of the residents in Saint Paul; that residential Tenants suffer great and serious hardship when forced to move from their homes; that the community is impacted by housing instability when rent increases outpace incomes;

§ 983A.01

The University of Minnesota's Center for Urban and Regional Affairs (CURA) was commissioned by the City of Minneapolis to provide a background study of rent stabilization efforts around the Country. The CURA report, Minneapolis Rent Stabilization Study, dated February 2021 found:

The empirical evidence indicates that rent regulations have been effective in achieving two of its primary goals, maintaining below-market rent levels and moderating price appreciation. Generally, places with stronger rent control programs have had more success preventing large prices appreciation than weaker programs.

*Id*. at ii and 30. Adoption of a strong rent stabilization program was a thus major advance for fair, affordable, housing in St. Paul. Loss of that tool will be a major setback with major fair housing implications.

The academic study of a San Francisco rent control Ordinance cited repeatedly by Plaintiffs **at** paragraphs 54, 57-60 of the Complaint actually supports CURA's conclusion and provides results in San Francisco that reflect the findings in the Ordinance:

We find that, on average, in the medium to long term the beneficiaries of rent control are between 10 and 20 percent more likely to remain at their 1994 address relative to the control group and, moreover, are more likely to remain in San Francisco. Further, we find the effects of rent control on tenants are stronger for racial minorities, suggesting rent control helped prevent minority displacement from San Francisco. All our estimated effects are significantly stronger among older households…:

Diamond et al, "The Effect of Rent Control Expansion on Tenants, Landlords, and Inequality Evidence From San Francisco," American Economic Review, 2019, 3393. The study went on to

find that a major cause of adverse effects was the conversion of rentals to condominiums. *Id.* But that is a loophole in that Ordinance rather than an inherent effect of rent control.

While providing strong protections for tenants, the Ordinance is not at all the threat which the Plaintiffs seek to portray. It requires the City to "establish a process by which landlords can request exceptions to the limitation on rent increases based on the right to a reasonable return on investment." The City has done so using the Maintenance of Net Operating Income (MNOI) principle employed by several California cities with extensive experience with rent stabilization policies.

Net Operating Income (NOI) is calculated as all of the landlord's sources of income minus operating expenses. Most of NOI typically is used to cover debt service on the building, with the rest paying cash profits or fees to the owners. The NOI is also the basis for determining the project's market value, typically calculated by dividing the NOI by a "capitalization rate" which is empirically derived from comparable recent sales.

The MNOI rule provides for a reasonable return by permitting rent increases sufficient so that the resulting NOI, and thus the project's market value, increases at the same inflation rate as the local Consumer Price Index (CPI). The rule assumes that the NOI in a base year, which is typically 2019, provided a reasonable return. It then permits rent increases sufficient result in an NOI equal to that in the base year increased by the percentage increase since the base year in the local CPI. Owners may be permitted to select a different base year, e.g., if the building was not owned or was not fully occupied in the base year. They may also have the base year adjusted to compensate for unusual circumstances in the base year.

There are three important consequences of the MNOI policy which make the plaintiffs complaints about the burdens of operating cost inflation misleading. First, a substantial portion,

typically around 50%, of most owners' costs are fixed debt service payments which don't increase with inflation.  If an owner's operating expenses increase by 8%, and half the rent goes to fixed-payment debt service, rents need go up only 4% for the owner to "keep up" with inflation.

Second, the City's MNOI policy does not simply allow rent increases to "keep up" with inflated operating expenses.  It rather permits owners to raise rents sufficiently to assure that the building's NOI, and therefore its market value, increases at the rate of inflation.  Under an MNOI policy, an 8% inflation rate is potentially more beneficial to owners than a 3% inflation rate.

Finally, when rents are permitted to be raised so that the NOI raises at the inflation rate, the fact that the debt service is fixed over time means that the portion of the NOI that goes to owner fees and profits rises at a rate that far exceeds the inflation rate.[4]

In developing the regulations regarding a reasonable return, the City also significantly modified the 3% limit.  The regulations permit owners to "self-certify" their entitlement to an increase of up to 8%.  There is no substantive information required in the self-certification forms and they, and the requested rent increases, are automatically approved by City staff. https://www.stpaul.gov/departments/safety-inspections/rent-buy-sell-property/rent-stabilization/rulemaking-implementation#requests-for-exceptions.  Should the approval be challenged by an administrative appeal, the landlord will have to produce the MNOI worksheet. *Id*. So far there have been only three tenant appeals of self-certifications.

---

[4] For example, assume old monthly rents of $1,300 and operating expenses $600, leaving $700 of NOI, of which approximately $580 is debt service and $120 is cash profit. If inflation is 8%, then expenses the next year are $648.  To "keep up", rent must rise only $48/month to1,348 or 3.6% - less than half the rate of inflation.  Under the City's MNOI policy, however it is the $700 NOI which is permitted to rise 8% to $756.  To comply with this standard the rent has to increase by $48 to cover the increase in expenses plus $56 to cover the NOI increase, to $1,404 (or 8%).  The profit portion of the NOI is now $756-$580 = $176.  This example demonstrates that under an MNOI regime, a sudden increase in inflation allows a rent increase that is more than double that which is necessary to simply maintain the NOI, an increase in market value that keeps up with inflation, and a 47%  increase in the portion of NOI which the owner gets to keep.

Nor is producing the worksheet the burden asserted by plaintiffs.  The worksheet compares a calculated NOI for the base year and the "current year," which is actually 2021.  The calculations involve categories of income and expense which are typically used by most landlords with any significant number of apartments (and certainly by the plaintiff landlords) in annually budgeting, with year-end actual result added to the monthly budget items, and in tax preparation.  Preparing the worksheet will generally not involve much more than copying figures already prepared onto the worksheets and doing a few quick excel calculations.

**The City's reaction to the rent stabilization initiative.**

On September 21, the City Council approved substantial amendments to the Ordinance to become effective January 1, 2023.[5]  These were subsequently approved by the Mayor.  The amendment set out two categories of properties to be exempted from any rent increase limit: properties less than 20 years old, including properties built not more than 20 years ago, and properties with official restrictions as "affordable housing."   Of particular importance to the Intervenors' motion, the "whereas" clauses preceding the amendment demonstrate two point critical to the application of the intervention rule.  First, the City views itself as responsible to multiple parties with competing interests with respect to the Ordinance, including parties like the plaintiffs. One clause is explicit: "the City Council desires to balance the tenant interests in housing security with the interests of landlords to adjust vacant units to competitive rates." Second, the majority of other clauses cite concerns regarding the effect of rent stabilization on the production of new rental housing and the relocation of developers "to more predictable locations."[6]

---

[5] https://stpaul.legistar.com/LegislationDetail.aspx?ID=5741696&GUID=6AF3506E-0278-4800-9DA3-53D150769610&FullText=1; click on "Text."

**ARGUMENT**

**The prospective Intervenors have standing**.

The Eighth Circuit has held that parties seeking to intervene must have Article III standing.  _Mausolf v. Babbitt,_ 85 F.3d 1295, 1300 (8th Cir.1996).  Citing _Lujan v. Defenders of Wildlife_, 504 U.S. 555 (1992), the Court set out three elements required for standing: 1) an actual or imminent, concrete, injury; 2) a causal connection between the injury and the challenged conduct; and 3) a showing that the injury is likely to be redressed by a favorable decision.

On three occasions, the U.S. Supreme Court has disagreed with the Eighth Circuit's position regarding a standing requirement.   In _McConnell v. Federal Election Commission_, 54 U.S. 93 (2003), plaintiffs challenged legislation establishing campaign contribution limits, as well as the standing of intervenor's seeking to uphold the challenged provisions.  The Court held that because defendant Federal Elections Commission (FEC) had standing, intervenors whose positions were identical to the FEC's were not required to demonstrate standing. _Id_. at 233.  In _Town of Chester, N.Y. v. Laroe Ests., Inc_., 137 S.Ct. 1645 1651 (2017) the Court held that an intervenor supporting plaintiffs "must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests."  The necessary implication of this language is that standing is required only if additional relief is sought.  In _Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania_, 140 S.Ct.2367 (2020) the Circuit Court had held that a group of nuns who had intervened to defend a challenged exemption to an agency rule mandating the provision of contraceptive benefits lacked standing.  The Supreme Court found:

> Under our precedents, at least one party must demonstrate Article III standing for
> each claim for relief. An intervenor of right must independently demonstrate
> Article III standing if it pursues relief that is broader than or different from the
> party invoking a court's jurisdiction. See _Town of Chester_ v. _Laroe Estates, Inc._,
> 581 U. S. ——, ——, 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017). Here, the
> Federal Government clearly had standing to invoke the Third Circuit's appellate

jurisdiction, and both the Federal Government and the Little Sisters asked the court to dissolve the injunction against the religious exemption. The Third Circuit accordingly erred by inquiring into the Little Sisters' independent Article III standing.

*Id*. at 2379 n. 6. The D.C. Circuit is one of the few which, like the Eighth, requires standing for all intervenors.  But subsequent to the *Little Sisters of the Poor Saints* decision some district courts there have rejected that position:

> This Court therefore concludes that, because the Business Entities are seeking to intervene *as defendants*, and are not invoking the Court's jurisdiction—let alone seeking "relief that is broader than or different from the party invoking [the] [C]ourt's jurisdiction[,]" *see Little Sisters*, 140 S. Ct. at 2379 n.6—they are not required to demonstrate that they have Article III standing. And while the Court recognizes that some courts in this district have continued to require intervenor-defendants to demonstrate standing in light of the D.C. Circuit's prior holdings,… the Circuit's holdings in this regard predate, and are plainly inconsistent with, the Supreme Court's recent opinions.

*Environmental Integrity Project v. Wheeler*, 221 WL 6844257, at *2, (D.D.C. 2021); *See also*, *Twing v. United States*, No. 19-CV-00902 (KBJ), 2021 WL 7908121, at *1 n.2 (D.D.C. 2021) (holding that because intervenor's request for relief is no broader than the plaintiff's "it is not necessary to conduct an independent standing analysis," citing *Little Sisters of the Poor Saints.*).

Required or not, the intervenors do have standing.  The Eighth Circuit has held that an intervenor on the side of the defendant may establish an injury sufficient for standing by showing that relief sought by plaintiffs threatens the intervenor's interests.  *South Dakota v. Ubbelolide*, 330 F. 3d 1014, 1024-1025 (8th Cir. 2003); *Craig v. Simon*, 493 F. Supp. 3d 773, 779 (D. Minn. 2020); *Animal Protection Institute v. Merriam,* 242 F.R.D. 524, (D.Minn. 2006)(finding tht trappers alleged sufficient injuries for standing to intervene in suit challenging a state department's regulation permitting certain trapping practices); *Privacy Matters v. U.S. Department of Education*, 2016 WL 6436658 (D. Minn. 2016)(allowing intervention when plaintiffs sought to enjoin a policy protecting transgender intervenor's rights).

Ms. Bancroft and Ms. Wilhight are threatened with rent increases should Plaintiff's lawsuit result in elimination of the protections provided by the rent stabilization Ordinance. That threatened injury would be redressed by the court's rejection of the Plaintiffs' claims.

The organizational intervenors interests are similarly threatened should Plaintiffs obtain the relief sought. The Plaintiffs' lawsuit is directly challenging the constitutionality of the Ordinance which intervenors drafted and got on the ballot through the initiative process authorized by the City Charter and which was adopted through their campaign efforts. It is thus interfering with their rights exercised pursuant to Chapter 8 of the St. Paul City Charter and is creating an after-the-fact diversion of the substantial resources invested in that effort.

The lawsuit also threatens Intervenor's ongoing efforts to use the lawsuit to advance their corporate missions of protecting the housing stability of tenants in their community and assisting tenants and maintaining the affordability of housing in the City through enforcement of the Ordinance. The lawsuit further threatens to interfere with their missions and force these organizations to commit substantial additional resources to address the unregulated right of owners to raise rents should the Plaintiffs' lawsuit succeed. See, Havens *Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding that organizations may rely, for purposes of showing injury required for standing on potential frustration of their non-profit missions and resulting diversion of resources).

As is the case with the individual intervenors, these threatened injuries are a direct result of the Plaintiffs' lawsuit and will be addressed by a decision against the plaintiffs.

**The prospective intervenors are entitled to intervention as of right**.

Courts are to "accept as true all material allegations in the motion to intervene and must construe the motion in favor of the prospective intervenor." *Nat'l Parks Conservation Ass'n v.*

14

*United States Envtl. Prot. Agency,* 759 F.3d 969, 974 (8th Cir. 2014).   Rule 24 is to be construed

liberally, with all "doubts resolved in favor of the proposed intervenor." Id. at 975.  See also,

*Washington State Building & Constructions Trades v. Spellman*, 684 F.2d, 627, 630 (9th Cir.

1982) cert. denied, *Don't Waste Washington Legal Defense Foundation v. Washington, 461 U.S.

913* (1983)(citing Wright and Miller, Federal Practice and Procedure, § 1904, 1972); *Sagebrush

Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9th Cir. 1983);  *Wal-Mart Stores, Inx, v. Texas

Alcoholic Beverage Commission*, 834 F.3d 562, 565 (5th Cir. 2016).; Sierra Club v. Espy, 18 F.3d

1202, 1205 (5th Cir 1995)("Federal courts should allow intervention when no one would be hurt

and the greater justice could be attained.")  The following demonstrates that the prosective

intervenors are entitled to intervention as of right or, alternatively, permissive intervention.

Rule 24(a)(2) provides that on a timely motion, the court must permit anyone to intervene

who claims an interest relating to the property or transaction that is the subject of the action, and

is so situated that disposing of the action may as a practical matter impair or impede the

movant's ability to protect its interest, unless existing parties adequately represent that interest.

Courts have therefore  repeatedly recognized a four-part test for intervention as of right: 1) a

timely application; 2) an interest relating to the property or transaction which is the subject of the

action; 3) that disposition of the action may as a practical matter impair or impede the

intervenor's ability to protect its interest; and 4) that the intervenor is not adequately represented

by the existing parties.

**Timeliness of the application**.

 Timeliness is to be determined from all of the circumstances of the case.  *National

Association for the Advancement of Colored People v. State of New York*, 413 U.S. 345, 366

(1973).  The Eighth Circuit has emphasized three factors to be considered: reasons for any delay

in bringing the motion, how far the litigation has progressed, and the extent of prejudice which delay may cause existing parties. *Mille Lac Band of Chippewa Indians v. State of Minnesota*, 989 F.2d 984 (D. Minn. 1993).

Ms. Wilhight was unaware of this lawsuit until informed of it by her attorney on or about October 5, 2022, when he visited PACER and discovered the accelerated schedule for summary judgment. Ms.Banbury was generally aware of the lawsuit earlier but was unaware that its outcome could affect her appeal of her landlord's rent increase until a discussion with her attorney on or about October 5. Their attorneys have been working diligently to prepare their motion to intervene since that time.

The organizational intervenors have had to focus on even more immediate threats to St. Paul rent stabilization in the form of amendments setting out very damaging exemptions – for projects receiving public assistance and for buildings up to 20 years old. Proposals for these exemptions surfaced in July and were finally enacted on September 21, 2022. At that point it also became completely clear that advocates could not rely on the City to appeal should plaintiffs prevail.

HOME Line has been burdened with an additional pressing issue. Throughout 2022 the organization has been inundated with calls from renters facing eviction as a result of the COVID 19 pandemic. By the end of June, 2022, it had received 153% more eviction calls that during the same period the previous year. On June 1, 2022, state legislation protecting renters who had applied for federal emergency rental assistance as a result of the COVID 19 pandemic expired. Since them the number of eviction calls have escalated even further. August 2022 was HOME Line's busiest month ever with 3,550 total calls, of which 666 regarded evictions.

None of the organizational intervenors were aware of the accelerated summary judgment schedule until their attorney visited PACER on about October 5, 2022.   This accelerated schedule is a dramatic contrast with a typical case, exemplified by the original August 17 Scheduling Order setting August 7, 2023 as the final date for dispositive motions to be filed.

The intervenors are prepared to participate immediately in cross motions for summary judgments pursuant to the Court's Order, issued September 25, by responding to the plaintiffs' motion and filing their own memorandum in support of a motion for summary judgment by November 7.   Thus, timing of the intervention need not cause delay nor prejudice either current party.

Other Circuits have elaborated on the requirement that all circumstances be considered in determining timeliness of intervention.  To the three factors the Eighth Circuit has emphasized they have added a fourth consideration: the prejudice to intervenors should intervention be denied. *See*, *Stallworth v. Monsanto Co*,558 F.2d 257, 265-266 (5th Cir. 1977).  *R & G Mortgage Corp. v. Federal Home Loan Mortgage Copr*., 584 F.3d 1, 7 (1st Cir. 2012); *State v. City of Chicago*, 912 F.3d 979, 984 (7th Cir. 2019).   Here, there are two such factors.  The first is that, given the City's divided interest, the intervenors provide the only representation committed to protecting the interests of the thousands of citizens who voted for the rent stabilization Ordinance.  The second, related, factor arises from the City's response to an adverse preliminary injunction ruling in *Lamplighter Village Apartments v. City of St. Paul,* 534 F.Supp. 3d 129 (D. Minn. 2021).  In response, the City Council voted on June 23, 2021 to repeal the Ordinance challenged in that case.  This raises is the very real concern that that the City could similarly abandon defense of the Ordinance, making an appeal impossible.  See, *Mille Lacs Band* ,989

F.2d at 998 citing to *Dimond v. District of Columbia*, 792 F2d 179, 193 (D.C. Cir. 1986)( noting allowance of intervention after judgment for purposes of appeal..

Considering all of the circumstances of the case, and especially the lack of prejudice to the Plaintiffs, the timeliness requirement has been met.

**The Intervenors' interest.**

The 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967).  There are multiple recognized bases for intervention as of right in this case.

First, the organizational intervenors were closely involved in drafting the Ordinance, circulating the initiative petition, and campaigning for its adoption.  Public interest groups like the intervenors are entitled as of right to intervene in an action challenging the legality of a measure they have supported.  *Sagebrush Rebellion,* 713 F.2d at 527 (allowing intervenor who participated actively in the administrative process leading to the challenged decision); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1398 (9th Cir. 1995) (allowing intervenors who were participants in process resulting in the challenged endangered species designation).

Here, the current intervenors were not simply involved in the process of developing legislation, but they also drafted it, circulated the petition getting it on the ballot, and encouraged residents to vote for its adoption.  *See*, *Washington State Building & Construction Trades Council,* 684 F.2d at 630(noting that intervenor was public interest group sponsoring the successful initiative effort leading to the challenged statute); *Prete v. Bradbury*, 438 F.3d 949,954 (9th Cir. 2006)(finding that a public interest group that has supported a measure (such as

an initiative) has a "significant protectable interest" in defending the legality of the measure,

citing *Sagebrush Rebellion*)

    The significance of that effort is clearly recognized in California, where state initiatives

are very common and initiative proponents have regularly been granted a right to intervene when

successful results are challenged. The California Supreme Court's decision in *Perry v. Brown*,

265 P.3d 1002, 1006 (Cal. 2011) describes the basis for these decisions:

>     because the initiative process is specifically intended to enable the people to amend the state Constitution or to enact statutes when current government officials have declined to adopt (and often have publicly opposed) the measure in question, the voters who have successfully adopted an initiative measure may reasonably harbor a legitimate concern that the public officials who ordinarily defend a challenged state law in court may not, in the case of an initiative measure, always undertake such a defense with vigor or with the objectives and interests of those voters paramount in mind. As a consequence, California courts have routinely permitted the official proponents of an initiative to intervene or appear as real parties in interest to defend a challenged voter-approved initiative measure in order "to guard the people's right to exercise initiative power" (*Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 822, 226 Cal.Rptr. 81, 718 P.2d 68 (*Building Industry Assn.*)) or, in other words, to ***504 enable such proponents to assert *the people's,* and hence *the state's,* interest in defending the validity of the initiative measure. Allowing official proponents to assert the state's interest in the validity of the initiative in such litigation (along with any public officials who may also be defending the measure) (1) assures *1126 voters who supported the measure and enacted it into law that any residual hostility or indifference of current public officials to the substance of the initiative measure will not prevent a full and robust defense of the measure to be mounted in court on the people's behalf, and (2) ensures a court faced with the responsibility of reviewing and resolving a legal challenge to an initiative measure that it is aware of and addresses the full range of legal arguments that reasonably may be proffered in the measure's defense. In this manner, the official proponents' general ability to appear and defend the state's interest in the validity of the initiative measure and to appeal a lower court judgment invalidating the measure serves to enhance both the fairness of the judicial process and the appearance of fairness of that process.

More generally, the right to intervene is recognized for public policy advocates such as

organizational intervenors for a law which is being challenged: *See*, *State of Idaho v. Freeman*,

625 F.2d 886 (9th Cir. 1980)(finding that National Organization of Women may intervene in

case regarding ratification of the equal rights amendment); *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. DOI*, 100 F.3d 837, (10th Cir. 1996)(finding wildlife photographer's advocacy for endangered species sufficient interest for federal Rule 24(a)(2)); *WildEarth Guardians v. National Park Service,* 604 F. 3d 1192, 1198 (10th Cir. 2010)(finding it "indisputable" that intervenor's environmental concern is a legally protectable interest); *United States v. Reserve Mining Co*., 56 F.R.D. 408, 418 (Dist. Minn. 1972) (finding broad interest of environmental groups in protection of Lake Superior was sufficient under Rule 24(a)(2)). Given their mission to protect low-income renters and the supply of affordable housing, the organizational intervenors would have a right to intervene, even without consideration of their efforts to get the rent stabilization initiative passed.

Finally, the interests of those governed or directly affected by challenged laws are sufficient to support intervention. *Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir 1989)(finding that immigration detainees had "direct, substantial, legally protectible interest" to intervene in action challenging dangerous practices in operation of the facility); *Reserve Mining*, 56 R.F.D. at 413  (finding that entities directly affected could intervene as of right); Wright, Miller & Kane,  Federal Practice and Procedure Civil 3rd §1908.1 fn 45.

Ms. Banbury and Ms. Wilhight have filed appeals challenging the landlord's imposition of rent increases in excess of 3%.  Ms. Banbury appealed an 8% rent increase.  City staff and the Hearing Officer concluded, after reviewing the landlord's submission of Net Operating Income information, that only a 6.1% increase is permitted under the Ordinance.  The  City Council approved the Hearing Officer's report on October 19, 2022, but her claim for a rent reduction has been put at risk by the plaintiffs' lawsuit.  Further, the City's rent stabilization rules effectively limited her landlord's claim for increased rent to an 8% increase. But the federal program

restricting the landlord's rent permitted an 11.9% increase and that increase was imposed by the landlord in every similarly regulated building in the metro area outside of St. Paul.  Thus Ms. Banbury faces a substantial further rent increase in the future should Plaintiffs prevail.

Ms. Wilhight's appeal involved the owner's adding an allocated portion of utility costs to a 3% increase.  Management estimated additional apportioned utility costs increasing her total increase in cost of occupancy to 11.3% to 12.5%.  City staff have concluded that the utility costs are rent increases limited by the Ordinance.  Her appeal is also pending a City Council hearing. A successful lawsuit by Plaintiffs will eliminate her appeal and subject her to a very substantial rent increase. Her rights under the Ordinance will be unaffected by the exclusions in the amendments adopted by the City.

Ms. Banbury and Ms. Wilhight therefore both have a protectable interest in the outcome of this litigation as the protections afforded them by the Ordinance would be eliminated were plaintiffs to prevail.

**Potential impairment of the Intervenors' interests as a practical matter**.  The rule provides that intervenors need only show that their interests "may" be impaired.  This provision of the rule presents only a "minimal burden*." WildEarth Guardians*, 604 F.3d at 1199; *Utah Ass'n of Counties v. Clinton,* 255 F.3d 1246 (10th Cir. 2001) (citing *Grutter v. Bollinger*, 188 F3d 394, 399 (6th Cir. 1999). This requirement is clearly met.  Granting of summary judgment to the Plaintiffs will eliminate rent control in St. Paul.  It will obviate intervenor's efforts to draft and get the tenant protections provided by the Ordinance on the ballot; nullify the majority vote approving them; and eliminate the protections for low-income renters, including Ms. Banbury, currently provided by the Ordinance.  In doing so it will remove a major tool available to the intervenors to advance their missions and protect their clients.  As noted above, both Ms.

Banbury and Ms. Wilhight have appealed for protection from rent increases under the Ordinance. That protection would be lost were the plaintiffs to prevail.

**The Intervenors are not adequately represented by the City.**

This requirement ordinarily presents only a minimal burden.  But the *parens patriae* theory establishes a rebuttable presumption that the government will represent the interest of all citizens.  *South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th Cir. 2003).  However, the presumption was rebutted in *Ubbelohde*, as it is here, because:

> the government must represent the interests of all of its citizens, which often requires the government to weigh competing interests and favor one interest over another. Where such conflicts exist, "even the Government cannot always adequately represent conflicting interests at the same time."

*Id* at 1025, citing *Mausolf v. Babbitt,* 85 F.3d 1295, 1303 (8th Cir.1996).  That conflict clearly exists here.  While the "whereas" clauses of the amendments to the Ordinance, adopted by the City Council and approved by the Mayor, indicate some concern for tenants needing affordability and stability in their housing, they also cite a variety of purportedly competing interests and include a litany of purported adverse consequences impliedly attributed to the Ordinance adopted by voters. At the very least, the amendments to the Ordinance indicate that the City is concerned with balancing the interests of developers and concerns regarding purported adverse effects of the Ordinance against the affordable housing concerns of the intervenors and the voters who adopted the Ordinance. The presence of the Intervenors in this lawsuit will assure that the interests of tenants needing the protection of the Ordinance will be represented.

.In this case there is more than a balancing of conflicting interest supporting rebuttal of the parens patriae presumption. The citation from *Perry* set out above points out the inherent

22

likelihood of a direct conflict between the government and initiative supporters when a law enacted through the initiative process is challenged.   Here, the non-profit intervenors and other advocates had to resort to the initiative process precisely because St. Paul City Officials had no interest in adopting rent control. Three of the seven City Council members actively and publicly opposed the initiative while only two council members actively supported it. The Complaint at paragraph 115 asserts that as soon as the Ordinance went into effect, St. Paul's leaders began efforts to alter it.  City government therefore cannot be relied upon to defend the initiative's result with the interest of those who voted for the initiative as paramount.

Intervention is critical to assure that the voter's interests, and those of tenants otherwise vulnerable to unjustified rent increases, are vigorously represented in District Court.  But even more important is the assurance that these interests are represented, if necessary, at the appellate level.  There cannot be a clearer demonstration that the City cannot be relied upon to vigorously defend Ordinances designed primarily to protect the interests of low-income renters than the City Council's reaction to the preliminary decision in the *Lamplighter Village Apartments* case cited above..

### Alternatively, the Alliance should be permitted to intervene pursuant to Rule 24(b)(B)

Intervention may be permitted under Minn. R. Civ. Pro. 24.02 when the applicants' defense and the main action have common questions of law or fact.  The principal guide in deciding whether to grant permissive intervention is "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b)(2).  *U.S. v. Pitney Bowes, Inc.*, 25 F.3d 66, 73 (2nd Cir 1994).  As set out above, intervention will neither unduly delay nor prejudice the adjudication of the rights of the original parties.  Further, intervenors intend, as the attached answer indicates, to defend the Ordinance from the same

constitutional attacks that the City will necessarily address and to seek summary judgment on the same claims raised in the City's complaint. Therefore, intervention by the Alliance should be permitted pursuant to Rule 24.02.

Dated: October 20, 2022                    **HOUSING JUSTICE CENTER**
                                           /s John Cann_____
                                             John Cann (#0174841)
                                             1774 Portland Ave.,
                                             St. Paul, MN 5514
                                             651-645-7378
                                             jcann@hjcmn.org
                                             Margaret Kaplan (#0328601)
                                             382 Banfil Street.
                                             St. Paul, MN 55102
                                             612-600-4028
                                             mkaplan@hjcmn.org
                                             Attorneys for Intervenors