UNITED STATES DISTRICT COURT
*for* THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **WOODSTONE LIMITED PARTNERSHIP; LOFTS AT FARMERS MARKET LLC;** | Court File No. 22-CV-1589 NEB-JFD |
| *Plaintiffs*, | |
| *vs.* | |
| **CITY OF SAINT PAUL, MINNESOTA, A MINNESOTA CHARTER CITY; CITY COUNCIL OF THE CITY OF SAINT PAUL; ANGIE WIESE, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE DEPARTMENT OF SAFETY AND INSPECTIONS OF THE CITY OF SAINT PAUL; MAYOR MELVIN CARTER, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF SAINT PAUL; AND JOHN DOE,** | **CITY OF SAINT PAUL DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| *Defendants.* | |

## <u>INTRODUCTION</u>

This case involves the City of Saint Paul's recently enacted rent stabilization ordinance which limits the amount of rent increases for private residential housing rentals with the City. The ordinance was initiated by residents in Saint Paul who collected signatures and petitioned the City Council to have the ordinance placed on the ballot.

Once the ordinance was passed by a majority of the voters, it was automatically instituted via provisions in the City's Charter. Shortly after the ordinance became operational in the City, Plaintiffs commenced their lawsuit alleging the ordinance violated the Due Process, Takings, and Contract Clauses of the United States and Minnesota Constitutions. In addition, Plaintiffs asserted a companion claim for civil rights violations under 42 U.S.C § 1983 and a claim that one rule implementing the ordinance violates a Minnesota statute which permits cities to enact rent control.

It is incontrovertible that rent control, such as the City's rent stabilization ordinance, is constitutional under long-settled precedent from the United States Supreme Court. The ordinance does not violate due process because it is rationally related to the legitimate government purpose of preventing excessive and unreasonable rent increases caused by the growing shortage of and increasing demand for housing. *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988). In addition, because the ordinance is an economic regulation falling within the City's "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular," it does not effect a physical taking or regulatory taking. *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124

(1978).  Finally, Plaintiffs' claims under § 1983, and for violation of Minnesota's rent control statute (§ 471.9996), fail to state a claim upon which relief can be granted and should be dismissed as a matter of law. Because the rent stabilization ordinance is constitutional, the City is entitled to summary judgment on each of Plaintiffs' causes of action and Plaintiffs' Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

The City of Saint Paul ("City") faces a housing crisis.  The Minneapolis-Saint Paul metro is growing faster than the national average—but it is one of the slowest at building more housing. (*Stakeholder Rept.*, p. 153, Ex. 1 to Declaration of Megan D. Hafner.) So slow, in fact, that the MSP metro has the *lowest* rental-vacancy rate of every major metro in the United States. (*Id.* at 154.) In other words, the MSP metro is one of the worst spots in the country at meeting its housing-demands. For those in the bottom 30% of the area's median income, the current vacancy rate sits at 0%. (*Id.*)  The following table sums up the area's current housing-situation:

| 30% AMI Rental Units | |
|---|---|
| Needed | 169,585 |
| Supply | 64,238 |
| Gap | 105,347 |

| Increase 2000 – 2019 | |
|---|---|
| Renter Income | 1% |
| Gross Rent | 14% |

(*Id.* at 154-55.)

Over 50% of the City's residents are renters—and those renters face dramatic financial hardships. The median household income for these renters sits at $36,236, compared to $85,634 for households who own their homes. *Id.* at 19. And for those at the very bottom rung of the financial ladder, their outlook is even bleaker. About 60% of the City's renters who make under 30% of the area's median income are considered "cost burdened"—meaning these residents pay more than a third of their income on housing. (*Id.*) This leaves little to no room for any other expenses in their lives, a problem that's only growing in the City as new housing construction fails to keep pace with accelerating demand. (*Id.* at 15, 152-54.) The housing shortage and increasing demand for housing increasingly causes excessive rents.

**General election ballot measure implementing rent-stabilization in the City.**

Throughout the country, different cities and states experiencing similar housing crises have attempted to address the issues in a number of ways, including institution of rent control or stabilization policies. Rent control or stabilization policies come in all shapes and sizes, but the general idea is to limit how steep a tenant's rent increase can be over a certain period of time. Since at least 1984, Minnesota state law has expressly allowed cities to enact rent control ordinances in a general election. Minn. Stat. § 471.9996, subd. 2 (2022). In the summer of 2021, that is exactly what happened in Saint Paul. A group of residents drafted an ordinance and petitioned the City, pursuant to Chapter 8 of the City's Charter, to have an ordinance limiting residential rent increases placed on the ballot for the next general election. Because the petition and ordinance met the requirements of Chapter 8, the City Council placed the Ordinance on the ballot for the election on November 2, 2021. Thereafter, a majority of voters passed the ordinance and it became operative in the City of Saint Paul via Charter section 8.04. (St. Paul Charter, Chptr 8; Res. 21-1625, Exs. 6 and 8, Hafner Decl.)

The Rent Stabilization Ordinance ("RSO") passed by voters allowed any landlord to increase rent by 3% each year on their own. (RSO Ordinance, § 193A.03, Ex. 3, Hafner Decl.) The Ordinance further

directed the City to establish a "[p]rocess by which landlords can request exceptions to the limitation on rent increases based on the right to a reasonable return on investment." (*Id.* at § 193A.05.)  The Ordinance required this process to include at least seven factors for consideration:

- changes in property taxes,

- changes in maintenance or operating expenses,

- costs of certain capital improvements,

- changes in the number of tenants,

- substantial deterioration of the rental unit,

- compliance with state and local housing and health and safety codes, and

- the pattern of rent increases or decreases.

(*Id.*)

**The City creates the administrative rules and processes to implement the rent-stabilization ordinance.**

After the ballot-measure was approved by the voters, the City started working on creating the administrative structure to carry out the rent stabilization ordinance.  On April 6, 2022, the City Council amended the ordinance to provide a definitions sections.  (Ord 22-16, Ex. 4, Hafner Decl.) In addition, the City's Department of Safety and Inspections published proposed administrative rules to administer the RSO and opened these rules up for public comment.  (Rules

6

Promulgation, Ex. 11, Hafner Decl.) The City received hundreds of comments and, after carefully reviewing the public's input, made changes and tweaks to the rules. *Id.* The Final Rules were adopted on April 29, 2022.  (Final Rules, Ex. 9, Hafner Decl.)

There were several policies and rules created.  Pertinent to this lawsuit, the City created two paths to request an exception above the 3% allowable rental increase. One path let landlords raise rents between 3-8% by submitting a self-certification application to the City with information showing why an increase above 3% was necessary under the factors listed in the ordinance. (*Rent Stabilization Rules and Processes*, Ex. 10, Hafner Decl.)  The City could audit any self-certification application, but explicit City staff approval was not necessary for a rent increase up to 8%. (*Id.* at STP00033.)

The second path landlords could take to raise rents was to seek an increase above 8% via a process known as "staff determination." (*Id.* at STP00034.)  This pathway was required for increases above 8%. (*Id.*) The administrative rules also included a 15% yearly limitation on any rent increase per year, with the ability to defer any increase above 15% into next year's rental increase. (Final Rules at A(8)b, Ex. 9, Hafner Decl.)  If a landlord sought an increase and did not get the approval they were

expecting, they could appeal the City's decision to the Legislative Hearing Officer within 21 days of receiving that decision. (Ex. 10 at STP00034.)

On May 1, 2022, the ordinance went live and the City began administering the process for landlords to request an exception. Between then and August 23, 2022, the City received 151 requests for rental increases.  (K. Campbell Decl. Ex. 11 [Defs' Answers to Pltfs' Interrogs.] at p. 4-5,)[1] Of these, 121 were self-certification requests which were automatically approved once the landlords submitted their request. *Id.* During this same time period, 31 of the requests submitted were for rental increases above 8 % and those were to be handled via the staff determination process. (*Id.*)[2]

---

[1] Doc. No. 37, filed in support of Plaintiffs' motion for partial summary judgment.

[2] Plaintiffs rely on this information to allege incorrectly that *"[a]pproximately only 1 in 10 staff determinations applications are being granted by Defendants."* (Doc. 32 at 23-24 (emphasis added)).  This allegation is wrong on many levels. The allegation is based solely on the City's answers to Plaintiffs' interrogatories seeking the City to identify only the number of staff determination requests received by the City over the course of 3 months, and the number that had been granted during those same 3 months, without any explanation or accounting for when requests were made.  (Doc. 37, Ex. 11 [Defs' Answers to Pltfs' Interrogs.] at p. 4-5, Campbell Decl.) Additionally, Plaintiffs' allegation does account requests that were withdrawn by landlords or that were pending at the time of the City's answers.  Importantly, requests were made on a rolling basis over the three-month period and Plaintiffs did not seek answers regarding when requests were made so the fact that only three requests

**The City considers amendments to the rent-stabilization ordinance.**

While the City was drafting regulations, the Mayor's Office convened a 41-person stakeholder group to analyze and discuss the rent-stabilization ordinance. (*Stakeholder Report* at 5, Ex. 1, Hafner Decl.) The mission of the group was to consider the medium to long-term perspective on what rent-stabilization should be in the City, and explore possible ways to improve and enhance the ordinance. (*Id.*) The group met weekly between February and June, 2022, and eventually issued a lengthy report with recommendations which was presented to the City Council on July 13, 2022.  (Res. PH22-2, Ex. 7, Hafner Decl.)

Contemporaneously, the City Council began considering other amendments to the Ordinance.  Throughout the summer and early fall, a fleet of proposed amendments were brought before the City Council.[3] These proposed amendments were debated, altered, and revised, until the final amendments were approved on September 21, 2022. (Ord. 22-37, Ex. 5, Hafner Decl.)  Notable among the amendments was an exemption for all new residential-construction for 20 years; a vacancy

---

had been approved as of August 23, 2022 does not equate to a three-month processing time or a "1 in 10" approval rate.

[3] Indeed, from the time the ordinance was approved by voters, the City Council has had numerous meetings and hearings on the amendments and other issues related to rent stabilization.  (Meeting dates, Ex. 12, Hafner Decl.)

decontrol allowing landlords to raise rent up to 8% plus inflation when there is a just cause vacancy, including when a tenant voluntarily vacates a rental unit; and adding an explicit reference to the Consumer Price Index to the myriad reasons a landlord could request an exemption to secure a reasonable return on their investment.  (*Id.*)  The amendments to the RSO Ordinance will take effect on January 1, 2023. (*Id.*)

**Lawsuit**

On June 16, 2022, Plaintiffs filed this lawsuit.  Plaintiff Woodstone Limited Partnership owns an interest in an apartment building with 157 units located at 2335 Stewart Avenue, Saint Paul, MN 55116.  (Pltffs' Compl. ¶¶ 18, 62.)  Plaintiff the Lofts at Farmer's Market LLC owns the "Loft at Farmers Market" which is an apartment building with 57 rental units in Saint  Paul.  This building was built in 2012 and purchased from the City in 2015.[4]  (Pltffs' Compl. ¶¶ 22, 68, 69.)

---

[4] In their Memorandum, Plaintiffs fail to acknowledge that the passage of the amendment for a 20-year new construction exemption means that Plaintiff the Lofts at Farmers Market building will not be subject to the RSO until 2032.

Plaintiffs assert multiple causes of action against the City of Saint Paul, the City Council for the City of Saint Paul, and various elected and appointed City officials in their official capacities only:[5]

- Count I asserts a cause of action under the United States and Minnesota Constitutions alleging the RSO violates due process. (Pltffs' Compl., p. 45);

- Count II asserts a cause of action alleging that the RSO violates the Takings Clause of the United States Constitution. (Pltffs' Compl., p. 49);

- Count III asserts a similar cause of action under the Minnesota Constitution.  (Pltffs' Compl., p. 51);

- Count IV asserts a cause of action under the United States and Minnesota Constitutions alleging the RSO violates the Contracts Clause.  (Pltffs' Compl., p. 53);

- Count V asserts a cause of action alleging the RSO violates Article XII, § 5 of the Minnesota Constitution (which pertains to Home Rule City Charter Amendments) and Minnesota Statute section 471.9996 (which pertains to rent control in Minnesota cities). (Pltffs' Compl., p. 55); and

- Count VI asserts a cause of action under 42 U.S.C. § 1983 seeking declaratory relief for their due process, takings and contract clause violations alleged in prior counts of the Complaint.  (Pltffs' Compl., p. 57).

The City brings the current motion for summary judgment on all causes of action in Plaintiffs' Complaint and seeks complete dismissal of

---

[5] Because they are sued only in their official capacity, in actuality, this case is against the City only. *See Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) ("[a] suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent").

the lawsuit given the well-settled law finding rent control, such as the City's RSO, constitutional.

**ARGUMENT**

**A.   Summary judgment standard.**

Summary judgment is appropriate when there are no material facts in dispute, and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. *Id.* at 248.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* Furthermore, if the opposing party fails to carry that burden, or fails to establish essential elements of their claims, summary judgment should be granted. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986).

Plaintiffs assert several causes of action against the City seeking to invalidate the City's Rent Stabilization Ordinance ("RSO").  In reviewing Plaintiffs claims, it is important to recognize that Plaintiffs are making a facial challenge to the legislatively-enacted RSO and alleging that the RSO, and rent control itself, is unconstitutional.  "A facial challenge to a

legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

**B.**    **As a matter of law, Plaintiffs' due process claim fails because it is not actionable along with the other constitutional claims Plaintiffs have asserted; regardless, the RSO does not violate due process because it is rationally related to a legitimate government purpose.**

As a preliminary matter, because Plaintiffs assert a Takings claim and a Contracts Clause claim against the City under the United States and Minnesota Constitutions, their separate due process claim should be dismissed as a matter of law.  "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Ent. Prot.*, 560 U.S. 702, 721 (2010) (plurality opinion) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994); *see also Heights Apartments, LLC v. Walz*, 30 F.4th 720, 733 (8th Cir. 2022) (citing *Stop the Beach* and upholding dismissal of separate substantive due process claim under the Fifth and Fourteenth Amendments where complaint also alleged violations of the Fifth Amendment Takings clause and the Contracts Clause of the U.S.

Constitution).  Because Plaintiffs assert claims against St. Paul pursuant
to other specific Constitutional provisions, their separate claim under the
Due Process clause is not actionable and should be dismissed without
further discussion.

However, even if the due process claim is addressed, Saint Paul's
RSO does not violate due process because it is rationally related to a
legitimate government purpose, which is the standard applicable to due
process claims.  The RSO is rent control legislation which is a form of
price control regulation.  *Pennell v. City of San Jose*, 485 U.S. 1, 11
(1988); (Pltffs' Mem. Sup. Mot. S.J., Doc. 32, p. 17.)  The standard for
ascertaining whether state price-control regulation, such as rent control,
is constitutional under the Due Process Clause is well established: "Price
control is 'unconstitutional ... if arbitrary, discriminatory, or
demonstrably irrelevant to the policy the legislature is free to adopt[.]' "
*Pennell*, 485 U.S. at 11 (quoting *Permian Basin Area Rate Cases*, 390
U.S. 747, 769-770 (1968) and *Nebbia v. New York*, 291 U.S. 502, 539
(1934)).

Moreover, "It is by now well established that legislative Acts
adjusting the burdens and benefits of economic life come to the Court
with a presumption of constitutionality, and that the burden is on the
one complaining of a due process violation to establish that the

legislature has acted in an arbitrary and irrational way."  *Koster*, 183

F.3d at 768 (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15

(1976)).  Substantive due process requires only that economic legislation

be "supported by a legitimate legislative purpose furthered by a rational

means." *Pension Benefit Guarantee Corp. v. R.A. Gray & Co.,* 467 U.S.

717, 729 (1984).  Thus, St. Paul's rent control ordinance needs only to be

rationally related to a legitimate state interest to satisfy Due Process.

Indeed, rent control is an economic regulation, and economic regulations

are subject only to the minimum scrutiny rational basis test.  *See e.g.*

*Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59,

83 (1978).

Plaintiffs in part misstate the test to be applied to a substantive

due process claim when they cite to *Lingle v. Chevron* and assert that

"The question is whether the Ordinance "substantially advances" or is

"rationally related" to its stated purpose."  (Doc. 32 at 17.)  The issue of

whether legislation "substantially advances" its stated purpose is not the

applicable standard in evaluating a due process claim.[6]  Instead the

---

[6] In fact, the Supreme Court in *Lingle* specifically disapproved of the
"substantially advances" language, describing it as "regrettably
imprecise" because it "can be read to demand heightened means-ends
review of virtually any regulation of private property." *Lingle,* 544 U.S. at
544. Such a review "would require courts to scrutinize the efficacy of a
vast array of state and federal regulations-a task for which courts are not
well suited... [and the Supreme Court has]... long eschewed such

standard is "rational basis" as explained in the *Birchansky* case cited by

Plaintiffs:

> We will uphold a [government regulation]... against...
> a substantive due process challenge if it is rationally related
> to a legitimate state interest....  Where there are plausible
> reasons for [the legislature's] action, our inquiry is at an
> end...  The law's rational relation to a state interest need only
> be conceivable, and supporting empirical evidence is
> unnecessary... We are not required to consider the
> legislature's stated purpose as long as the law could rationally
> further some legitimate government purpose[.]

*Birchansky v. Clabaugh*, 955 F.3d 751, 757 (8th Cir. 2020) (internal

citations and quotations omitted).  As discussed below, the City's RSO

easily meets the highly deferential "rational basis" test.

    1.  <u>The RSO itself does not violate due process.</u>

The Supreme Court has long recognized that housing rental rate

regulation involves the protection of consumer welfare which is a

"legitimate and rational goal."  *Pennell*, 485 U.S. at 13.  "Indeed, a

primary purpose of rent control is the protection of tenants...

[including...] 'persons with relatively fixed and limited incomes,

consumers, wage earners... from undue impairment of their standard of

living.'"  *Id.* (quoting *Bowles v. Willingham*, 321 U.S. 503, 513, n. 9

(1944)); *see also 301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27

---

heightened scrutiny when addressing substantive due process challenges
to government regulation." *Id.* at 544-545.

F.4th 1377, 1386 (8th Cir. 2022) (upholding tenant protection ordinance and finding that "ensuring that citizens have access to affordable housing is undoubtedly a legitimate governmental objective").

St. Paul's RSO, including the amendments, survive rational basis review without difficulty. Rational basis is found where there is "any reasonably conceivable state of facts that could provide a rational basis" for the governmental action. *See Carter v. Arkansas*, 392 F.3d 965, 968 (8th Cir. 2004) (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313 (1993)). Indeed, "a legislative choice ... may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications,* 508 U.S. at 315.

St. Paul's RSO was enacted to alleviate excessive rents that outpace incomes and to ensure access to affordable housing given the present shortage of residential rental units in Saint Paul. (RSO, § 193A.01, Ex. 1, Hafner Decl.)  Similarly, the amendments to the ordinance, among other things, were intended to address: housing shortages and accessibility to affordable housing, tenant and landlord concerns about process, ensuring the RSO did not dissuade construction of new housing and to balance tenants' interests in housing security with interests of landlords to adjust vacant units to competitive rates. (Ord. 22-37, Ex.5, Hafner Decl.)  These are all legitimate activities that meet a rational basis

standard.  *See Pennell*, 485 U.S. at 13.  The fact that the City Council amended the ordinance does not cut against a rational basis for the ordinance or amendments. Instead, it supports the rational basis for a legitimate state interest.

In *Pennell*, a rent stabilization ordinance was being amended to add "tenant hardship" as a factor to be considered after a "reasonable" rental rate had been set by a rent regulation board.  *Id.* at 4.  When landlords objected to inclusion of this additional factor and sued under due process and takings clauses, the Supreme Court held that there was no due process violation because rent control regulations are rationally related to the legitimate exercise of police powers used to address high rents as a result of housing shortages.  *Id.* at 13. More specifically, the Court found that the tenant hardship provision enabled the city to "fine-tune" its rent control ordinance and that it "represent[ed] a rational attempt to accommodate the conflicting interests of protecting tenants from burdensome rent increases while at the same time ensuring that landlords are guaranteed a fair return on their investment."  *Id.* at 13, 14, n. 8 (citing *Bowles*, 321 U.S. 517).

Moreover, Plaintiffs' citations to newspaper articles and selected papers on rent control are not evidence of arbitrariness. Nor are they convincing arguments that rent control is ineffective or will not achieve

the goals stated by the City. Even if they were, the arguments are insufficient to meet the heavy burden Plaintiffs have in this case because a rational basis exists when an ordinance is directed at remedying problems that are of legitimate government interest, even where the ordinance fails to achieve its stated purpose or has an unintended consequence. *301*, 27 F.4th at 1386.

In *301*, the Eighth Circuit recently upheld a tenant protection ordinance in Minneapolis and found that ordinances related to housing and landlord tenant relationships meet a rational basis test even where an ordinance fails to serve the City's stated purpose of alleviating housing burdens "[o]r has the unintended effect of reducing affordable rental housing." *Id.* (holding that ordinance satisfied rational basis test because it was directed at remedying problems that prevented people from finding housing). The lesson from *301* that Plaintiffs ignore is that under the rational-basis test, the City's ordinance does not have to be perfect.  The test looks for *rationality*—not a rigorous mathematical proof.

Ultimately, Plaintiffs cite almost no caselaw suggesting that rent-stabilization violates due process. Instead, their argument can be boiled down simply as this: Plaintiffs do not like *any* rent-stabilization policy and will not be satisfied until the City's ordinance is erased from the books entirely.  While Plaintiffs might disagree with the goals or methods

of the Rent Stabilization Ordinance, the ordinance meets the rational basis standard, unless Plaintiffs can refute "every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 320-21 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co., Inc.*, 410 U.S. 356, 364 (1973)). Plaintiffs' argument fails to refute "every conceivable basis," which means the City's ordinance passes the rational-basis test.

In making their preferred policy-argument, Plaintiffs cherry-pick misleading data points, omit necessary context from studies, and rely on anecdotal and self-serving emails from land developers to support their claim that rent control is bad and should not be instituted in Saint Paul. Plaintiffs' description of rent stabilization laws in general, the process for adoption of the RSO and the RSO itself, is overly simplistic and completely one-sided. For instance, Plaintiffs claim that the City did not investigate, study or provide evidence for the original ordinance or its amendments. (Doc. 32 at 10, 20.) Yet Plaintiffs ignore that the ordinance was voter-initiated from residents in St. Paul attempting to address the housing crises in the City. Plaintiffs ignore the numerous City Council meetings and public hearings about the ordinance and rent regulations in Saint Paul that occurred over the past year. (Facts, *supra*, p. 9, n. 3.) Plaintiffs ignore, the 41-member stake holder group that was convened

by the City which included renters, advocates, policy experts, owners, landlords, real estate, finance, development and legal professionals that was facilitated by the University of Minnesota's Center for Urban and Regional Affairs ("CURA"). This stakeholder group met weekly over the course of four months and discussed issues related to rent stabilization and included presentations involving extensive empirical analysis from housing and policy experts and culminated in a lengthy report issued in June 2022. (*Stakeholder Rept.*, Ex. 1, Hafner Decl.)  Further, in their Complaint and Memorandum, Plaintiffs cites only to critics of rent control and do not cite to any experts that support rent control. (*See e.g.* Minneapolis Rent Stabilization Study, CURA (Feb. 2021), Ex. 2, Hafner Decl.) (finding that "empirical evidence indicates the rent regulations have been effective in achieving two of its primary goals, maintaining below-market rent levels and moderating price appreciation.  Generally, places with stronger rent control programs have had more success preventing large price appreciation than weaker programs")).

There is no dispute that housing shortages and excessive rent are a problem in Saint Paul and many cities throughout the country.  While various experts might debate the efficacy of rent control, that is exactly what it is – a debate among economic and policy experts. Alleviating excessive and unreasonable rent increases caused by the growing

shortage of and increasing demand for housing is a classic example of legislative regulation under a city's police powers done through a statutorily-authorized, democratic and legislative process.

Plaintiffs would like this Court to step into the shoes of the City's voters and legislative decision makers and make a different policy-choice. But that's not the Court's role. St. Paul's enactment and amendment of a rent control ordinance involves legislative decision-making, not properly reviewed by courts.  As discussed above, the majority of Plaintiffs' Complaint and memorandum in support of their motion for summary judgment are spent on criticizing the policy of rent control in general and claiming that it does not achieve the goals set by the RSO. However, even where there is evidence to cast doubt on the wisdom of legislation, it is not the place for this Court to overrule decisions and determinations made by the City and residents via the legislative process.  Instead, it is "absolutely clear that the Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 124 (1978). Evaluating whether different public-policy choices have sufficient support among housing researchers and economists is exactly the type of scrutiny the Supreme Court has "long eschewed" for economic matters. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 545 (2005); *see also Williamson v. Lee*

22

*Optical of Oklahoma, Inc.*, 348 U.S. 483, 488 (1955) (stating that "[t]he day is gone when this Court uses the Due Process Clause... to strike down state laws, regulatory of business and industrial conditions, because they may be...out of harmony with a particular school of thought").

St. Paul's RSO is the result of residents' initiative seeking rent control.  Limiting increasingly higher rents caused by housing shortages has long been recognized as a legitimate governmental exercise of police power and rent control is rationally related to that goal.  Thus, Plaintiffs' substantive due process claim fails as a matter of law.

2. <u>The implementation of the RSO does not violate due process</u>.

In addition, Plaintiffs' due process claim relating to the implementation of the RSO ordinance similarly fails as a matter of law. In support of their claims, Plaintiffs cite to *Birkenfeld v. City of Berkeley*, 550 P.2d 1001, 1006–07 (1976). (Doc. 32 at 23).  A review of *Birkenfeld*, however, establishes that it is not analogous to St. Paul's RSO and, if anything, supports the constitutionality of the RSO procedure.

In *Birkenfeld*, the City of Berkley's rent control regulation required a Board composed of five members to make all determinations concerning rent increases.  *Id.* at 1008.  There were more than 16,000 rental units in the city and the Board was charged with setting rents for

23

each of the individual rental units. *Id.* In addition, the regulation required a blanket roll back of rents to rates that were in effect approximately five years prior. *Id.* After that, the Board was prohibited from granting any adjustment of the rent until it received a petition from a landlord or a tenant and considered the petition at a hearing. In addition, the petition had to be accompanied by a certificate from a building inspector showing housing code compliance based on an inspection made within the preceding six months. *Id.*

The court concluded that the regulation, if implemented, would violate the due process rights of landlords because the regulations withheld the Board's power to adjust rates without unreasonable delay and required the Board to follow a procedure that would make delays inevitable. *Id.* at 1030. In reaching this conclusion, the court noted several provisions that resulted in the "procedural strait jacket" for the board. To list just a few:

- the Board could not order a general adjustment of rents based on generally applicable standards; instead it had to receive a petition and have a hearing for each rental unit in the city;

- the Board could not consider a landlord petition without the landlord's simultaneous filing of a housing certificate;

- the Board was required to have a full-blown hearing[7] for each rental unit even when there was no tenant request to be heard;

- the Board could not delegate the holding of hearings to a staff member, hearing officer or member of the board;

- In addition, three board members constituted a quorum and every decision made at hearings required three affirmative votes.

- the Board consisted of 5 members where each member was paid $50 per meeting, but each member was limited to compensation of $2400 per year.[8]

*Id.* at 1031.  Given these constraints, as well as others, the court found that the imposition of the rollback of the rent ceiling was virtually automatic and, thereafter, regardless of how inequitable that rent ceiling might be, it could not be adjusted except by an "inexcusably cumbersome" process.  Due to the process required to be followed by the Board and the limited amount of time allowed, the court found that the regulations "[i]nherently and unnecessarily precluded prompt action except for a lucky few."  *Id.* at 1032.

A comparison to the rent control procedure in St. Paul shows that the implementation of the RSO is nothing like that in *Birkenfeld*–in fact, the City's procedure is directly opposite of *Birkenfeld*'s problematic

---

[7] Including developing an extensive written record of all evidence submitted, summaries of testimony and findings, and documenting the reasons for each recommended decision, rule or order.  *Id.* at 1031.
[8] Thereby restricting the number of hearings that could be held each year.

25

procedures.  Under St. Paul's RSO, all residential landlords within the City can raise their rents 3% per year without any involvement with the City.  For rental increases from 3-8 percent, the City permits a "self-certification" process which allows landlords to increase rents up to 8 percent upon completion of an online form that is automatically approved, subject only to a tenant appeal within 21 days and possible City audit.  Rent increases above 8 percent are handled by City staff members that process requests daily.  There is no hearing required for rental increases unless there is an objection from a tenant or landlord. (*See* Facts *supra* pp. 7-8.)

Each year there will be many landlords that do not need to request a rent increase of more than 3 percent and they will have no involvement with the City.  For others, the RSO and City rules and policies provide for reasonable process for seeking larger rent increases; many increases are automatic and only subject to hearings if there is a tenant or landlord objection. The City has staff members working on landlord requests daily.  This is wholly different from the process described in *Birkenfeld* and is nowhere near unconstitutional.  Thus, Plaintiffs have failed to meet their burden as the party claiming unconstitutionality.  *Koster*, 183 F.3d at 768.

26

Given the well-settled law allowing local governments to pass rent control, including express authority in Minnesota statutes, Plaintiffs have failed to show that the RSO violates substantive due process.  Rent control, such as the RSO, is a well-recognized legitimate exercise of police power which has a rational relationship to the goal of limiting unreasonably high rents due to housing shortages.

**C.      Plaintiffs' Takings claim fails as a matter of law because the RSO does not effectuate either a physical or regulatory taking.**

Plaintiffs also allege a takings claim against the City under the Fifth Amendment to the United States Constitution and under Minnesota's Constitution. (Pltffs' Compl. pp. 49, 51.) Both the Fifth Amendment's Takings Clause, applicable to states and local governments under the Fourteenth Amendment, and the Minnesota constitution prohibit the taking of private property for public use without just compensation.  U.S. Const. amend. V; Minn. Const. art. I, § 13.  The Supreme Court has recognized two categories of Takings Clause cases: physical takings and regulatory takings.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 322 (2002).  A physical taking, "[t]he paradigmatic taking requiring just compensation… is a direct government appropriation or physical invasion of private property." *Lingle*, 544 U.S. at 537; s*ee also Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) ("The clearest sort of taking occurs when the government

encroaches upon or occupies private land for its own proposed use"). "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner[.]" *Tahoe-Sierra*, 535 U.S. at 322. But "the government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992) (emphasis in original).

In contrast to a physical taking, a regulatory taking "'occurs where even absent a direct physical appropriation, governmental regulation of private property 'goes too far' and is 'tantamount to a direct appropriation or ouster.'" *Lingle*, 544 U.S. at 537.  Regulatory takings can be further divided into two types: categorical under *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) and non-categorical.  *Lingle*, 544 U.S. at 538; *see also Heights Apartments*, 30 F.4th at 733.  Thus, the Supreme Court recognizes four paths for a plaintiff to challenge government regulation as an uncompensated taking of private property: (1) a physical taking, (2) a "total regulatory taking" under *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992), (3) a *Penn Central* taking, or (4) a land use exaction violation under existing precedent.  *Lingle*, 544 U.S. at 548.  This case does not involve a land use exaction, so analysis is only required under the first three paths.

An analysis of the law and the City's RSO establishes that Plaintiffs' takings claim fails as a matter of law because the RSO does not constitute a taking under any category of Takings jurisprudence.  The RSO is neither a physical nor regulatory taking.

## 1.   The RSO does not constitute a physical taking.

It is well established that rent control, such as the City's RSO, does not constitute a physical taking.  *Yee,* 503 U.S. at 529. "When a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge... without automatically having to pay compensation." *Id.* (citing *Pennell,* 485 U.S. at 12, n. 6). In *Yee*, the Court reiterated that it has "[c]onsistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails."  503 U.S. at 528-529 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982) and *FCC v. Florida Power Corp.,* 480 U.S. 245, 252 (1987) ("statutes regulating the economic relations of landlords and tenants are not *per se* takings")).

Because regulating the amount of yearly rental increases does not amount to an unwanted physical occupation of a landowner's property, and instead is only a regulation of the landowner's *use* of their property,

rent control does not amount to a physical *per se* taking.   *Yee*, 503 U.S. at 532.  The RSO does not require landlords to allow unwanted physical occupation of the landlord's property. Instead, landlords are voluntarily renting to tenants and the RSO is capping rental amounts charged at the amount that would provide landlords a "reasonable return on investment."  The RSO still allows landlords to possess, lease and sell their property.  For this reason, it is well-settled that the City's RSO does not effect a physical taking.

### 2.  The RSO does not constitute regulatory taking.

Plaintiffs appear to concede that the RSO is not a physical taking by referencing only regulatory takings in their Complaint.  (¶¶ 287, 297.) Again, just as the RSO does not effect a physical taking, it is well established that rent control, such as the City's RSO, does not effectuate a regulatory taking.  *Pennell v. City of San Jose*, 485 U.S. 1, 12 (1988).

### a. The RSO is not a per se regulatory taking under Lucas.

A *per se* or categorical regulatory taking occurs only in the rare situation where a regulation completely deprives a land owner of "all economically beneficial or productive use of land." *Lingle*, 544 U.S. at 528 (quoting *Lucas*, 505 U.S. at 1019).  The RSO does not deprive landlords of all economically beneficial or productive use of their land.

30

Plaintiffs have not alleged and could not establish that the RSO deprives them of **all** economically beneficial use of the property as required under *Lucas.* Plaintiffs are able to continue to use their properties as rental property, collect rents from their tenants, increase rental rates each year and turn a profit from leasing their rental property. The RSO does not cause a complete deprivation of value in any landlord's property, thus there is no categorical regulatory taking under *Lucas* as a matter of law.

         *b. The RSO is not a non-categorical taking under <u>Penn Central</u>.*

Where the impact of government action falls short of a complete elimination of value, a regulatory taking "nonetheless may have occurred[.]" *Palazzolo*, 533 U.S. at 617. To determine whether a use restriction effects a taking, courts typically apply the flexible test developed in *Penn Central*, which often includes balancing factors of (1) the economic impact of the regulation, (2) its interference with reasonable investment-backed expectations, and (3) the character of the government action. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) (citing *Penn Central*, 438 U.S. at 124). "The first two factors are 'primary'… [and] the third 'may be relevant.'" *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441–42 (8th Cir. 2007) (quoting *Lingle*, 544 U.S. at 538–39).

A *Penn Central* analysis involves an "ad hoc, factual inquiry" depending on the "circumstances of each case" to determine whether a particular regulation amounts to a taking. *Hawkeye*, 486 F.3d at 441 (citing *Outdoor Graphics, Inc. v. City of Burlington*, 103 F.3d 690, 694 (8th Cir. 1996)). The *Penn Central* test is informed by the Takings clause and designed to "prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Palazzolo*, 533 U.S. at 618 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

Due to the ad-hoc nature of regulatory takings analysis, facial challenges brought under the Takings Clause "face an uphill battle ... made especially steep" when the parties seeking relief "have not claimed ... that [government regulation] makes it commercially impracticable for them to continue business operations on their property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495–96 (1987) (finding no regulatory taking in part because landowners had "not even pointed to a single mine that can no longer be mined for profit"). In a facial challenge, the only issue properly before the court is whether the "mere enactment" of the regulation constitutes a taking. *Keystone Bituminous*, 480 U.S. at 495 (citations omitted). Moreover, a taking does not occur simply because a government regulation affects the value of

32

private property; Indeed, courts "must remain cognizant that government regulation – by definition – involves the adjustment of rights for the public good, and that [g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Lingle*, 544 U.S. at 538–39 (citations and internal quotation marks omitted).

Plaintiffs appear to be alleging a regulatory taking under *Penn Central* based on their allegations regarding "economic impact" and "investment backed expectations."  (Pltffs' Compl. ¶¶278, 282, 283.) Contrary to Plaintiffs' assertions, it has long been the law that rent control, such as the RSO, in the form of a capping of excessive rents and allowing for a "reasonable return" on landowners' investment is not a taking. *Pennell*, 485 U.S. at 12, n. 6 (reiterating that the Supreme Court has "consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails;" thus there was "no need to reconsider the constitutionality of rent control"); *see also CCA Assocs.*, 667 F.3d at 1259 (Dyk. J., concurring in part) (stating that "The Supreme Court in *Yee* recognized the legitimacy of rent control and expressed concern with such regulations only if the statute 'compel[s] a landowner over

objection to rent his property or to refrain in perpetuity from terminating a tenancy' ").

It is clear that the City's RSO which is limits excessive rent increases is not a taking given prior jurisprudence from the Supreme Court and interpretation of the general *Penn Central* considerations. Thus, this Court's consideration of the RSO can end at this point. However, even if the Court determines that further analysis is necessary under specific factors of *Penn Central*, Plaintiffs' Taking claim fails as a matter of law because each of the three common factors used by Courts weigh in favor of the City's RSO.

(1) Economic impact.

A taking does not result simply because the property owner has been deprived of the most profitable use of the property. *See Andrus v. Allard,* 444 U.S. 51, 66 (1979). In addition, it is well-settled that the "mere diminution in value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 645 (1993) (citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 384 (1926) (approximately 75% diminution in value) and *Hadacheck v. Sebastian,* 239 U.S. 394, 405 (1915) (92.5% diminution)).

In this case, Plaintiffs do not allege a specific diminution in value as to their properties.  Instead, they cite anecdotally to a study finding a 6-12% reduction in value to properties in St. Paul  as a result of the RSO.  (Pltffs' Compl., ¶¶ 6, 299.)  The City does not concede that this reduction in value is accurate. However, even if it was, the precedent cited above concluded a 75% and a 92% diminution in value were not takings.  Even if we take Plaintiffs at their word, a 6-12% diminution does not constitute an economic harm sufficient to state a taking.  This *Penn Central* factor weighs in the City's favor.

(2) Investment backed expectations

Similarly, the second *Penn Central* factor weighs in favor of the City.  This factor considers the  landlord's investment-backed expectations in the property. *Penn Central,* 438 U.S. at 124.  The Court in *Penn Central* pointed to *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), as the "leading case" involving public policies that "so frustrate distinct investment-backed expectations as to amount to a "taking." *Id.* at 127.  In *Pennsylvania Coal,* a statute limiting mining of coal, "made it commercially impracticable to mine the coal ... and thus had nearly the same effect as the complete destruction of rights claimant had reserved from the owners of the surface land ... [thus] the statute was invalid as

effecting a "taking" without just compensation. *Penn Central,* 438 U.S. at 127–28.

In the case at hand, the investment-backed expectations of landlords are not frustrated by a limitation on rental increases which do not effect a complete destruction of the landlords' rights to continue to lease and use their property. Plaintiffs can continue to use their property as rental properties and collect rent. *See Fed. Home Loan Mortg. Corp. v. New York State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 48 (2d Cir. 1996) (denying regulatory taking claim because "[a]lthough [plaintiff] will not profit as much as it would under a market-based system, it may still rent apartments and collect the regulated rents.") Unlike the total collapse of the property's mining-use in *Pennsylvania Coal*, the City's rent-stabilization ordinance here still allows Plaintiffs to continue on as landlords just as before. So, under this precedent, the Plaintiffs' investment-backed expectations have not been unconstitutionally frustrated.

In addition, Plaintiffs knowingly entered a highly regulated industry that is subject to sweeping changes, which caselaw says must be part of any market-participants' expectations. There are numerous state and federal laws that govern rental properties in Minnesota, from zoning laws and statutes regulating landlord tenant relationships, to fair housing and

anti-discrimination laws. Importantly, Minnesota statutes specifically contemplated and provided for rent control by cities in certain cases, such as where residents petition for an ordinance allowing rent control of residential properties.  Minn. Stat. § 471.9996, subd. 2.  "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Concrete Pipe*, 508 U.S. at 645 (citation omitted).

Ironically, Plaintiffs cite to Chicago as support for their position that they could not have anticipated rent control. (Doc. 32 at 33.) Chicago does not have rent control as there is an Illinois statute that completely prohibits rent control on private property.  50 Ill. Comp. Stat. Ann. 825/5.  In contrast, in Minnesota, there is a statute that **expressly provides** for cities to institute rent control in certain situations, one of which occurred in this case – a voter initiated ordinance applicable to residential rental properties.[9]  Plaintiffs' claim that they could never have anticipated rent control is belied by existing laws and statutes.  The RSO does not operate a complete destruction of their rights in their property and their investment-backed expectations have not been frustrated. This *Penn Central* Factor also weighs in the City's favor.

---

[9] In the same November 2021 election, Minneapolis voted in favor of rent control as well.  https://www.mprnews.org/story/2021/11/02/rent-control-minneapolis-st-paul-votes.

(3) Type of government regulations

"A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *301*, 27 F.4th at 1384 (citing Penn Central, 438 U.S. at 124).

The RSO was enacted to alleviate excessive rents that outpace incomes and to ensure access to affordable housing given the present shortage of residential rental units in Saint Paul. (RSO, § 193A.01). Similarly, the amendments to the ordinance were intended to balance the conflicting interests of protecting tenants from burdensome rent increases and ensuring landlords receive a fair return on their investments by allowing vacancy decontrol and ensuring that the RSO did not discourage construction of new housing and further exacerbate the housing shortage in Saint Paul. (Ord 22-37, 5, Hafner Decl.) The RSO may impact the value of property or cap the rate of rental increases, but it allows landlords to obtain a "reasonable return on their investment" and is a "public program adjusting the benefits and burdens of economic life to promote the common good," therefore it is not a taking.

Moreover, courts have consistently held that these are proper areas of governmental concern: "[T]he purpose of preventing excessive and unreasonable rent increases caused by the growing shortage of and increasing demand for housing … is a legitimate exercise of [the] police powers." *Pennell,* 485 U.S. at 11; *see also CCA Assocs. v. United States*, 667 F.3d 1239 (Fed. Cir. 2011) ("Rent control and rent stabilization laws have been almost invariably held to represent legitimate government acts and not to support either physical or regulatory takings challenges.")

Under *Penn Central*, a regulatory taking may occur when government action that is "[f]unctionally equivalent to the classic taking in which government ***directly appropriates private property or ousts the owner*** …" *Lingle,* 544 U.S. at 539 (emphasis added).  The RSO does not directly appropriate or oust an owner from property.  It is not a functional equivalent of a *per se* taking; Instead it is a legitimate economic regulation.  And the Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Yee,* 503 U.S. 519, 528–29. Thus, this third factor weighs in favor of the City's RSO.

There has not been sufficient economic loss or interference with Plaintiffs' reasonable investment-backed expectations to constitute a taking. Additionally, the nature of the RSO is an economic regulation of rental prices, which the Supreme Court has repeatedly found to be valid. Thus, Plaintiffs cannot establish that the RSO effects a taking.

**D.     The RSO does not violate the Contracts Clause because (i) it only applies to future leases, not current ones; (ii) it does not substantially impair Plaintiffs' leases; and (iii) it is drawn in a way that treats all landlords similarly.**

The Contracts Clause states that no government shall "pass any law… impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. This language appears strict and absolute, but modern jurisprudence has softened it away from "the Draconian provision that its words might seem to imply." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234 (1978).[10] Now, courts use the following two-prong test to determine whether a state has impermissibly interfered with a contract:

> 1. whether the state law substantially impairs a contractual relationship, which takes into consideration the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights;

---

[10] Plaintiffs make a fleeting argument about asking the United States Supreme Court to overturn the modern lenient standard in favor of a hyper-strict reading. (Doc. 32 at 25-26). For this Court, the current United States and Eighth Circuit standards control for our analysis.

2.  if the first prong is met, whether the state law is
    drawn in an appropriate and reasonable way to
    advance a significant and legitimate public
    purpose.

*Heights Apartments, LLC v. Walz*, 30 F.4th 720, 728 (8th Cir. 2022)

(internal quotations and citations omitted). But before even applying this

test, courts must decide if the governmental regulation impacts a current

and  pre-existing contract, or if it will only affect a *future* contract. This

distinction is important because the Clause only protects interference

with an existing contract—there is no protection for interference with a

future contract. *Texaco, Inc. v. Short*, 454 U.S. 516, 531 (1982).

### 1.    **Plaintiffs current leases are not affected by the rent-stabilization ordinance.**

The Contracts Clause only prevents substantial impairments of

current contracts, not *future* ones. *Greene v. Dayton*, 81 F. Supp. 3d 747,

752 (D. Minn.), *aff'd*, 806 F.3d 1146 (8th Cir. 2015). This point was

addressed by the United States Supreme Court in *Texaco, Inc. v. Short*,

where an Indiana law required anyone with a lease to mine natural

resources, and who had not used that lease in 20 years, to record their

interest within two years or have that right extinguished. 454 U.S. at

518-19. A group of leaseholders who recorded their rights *after* their two-

year grace period expired argued the law violated their Contracts Clause

rights. But the United States Supreme Court disagreed, holding that a

governmental-regulation "cannot be said to impair a contract that did not exist at the time of its enactment." *Id.* at 531. The law unquestionably affected the leaseholders' future right to enter into a new mineral-extraction lease, but the "right to enter such an agreement" is "not a contract right." *Id.*

Contrast *Texaco* with *Heights Apartments, LLC v. Walz*, where the Eighth Circuit concluded the State of Minnesota's eviction-moratorium might impact a preexisting contract right. Near the beginning of the COVID-19 pandemic, Minnesota Governor Walz issued a series of Executive Orders creating an indefinite moratorium preventing landlords from evicting their tenants—even if the current leases expired or were breached. *Id.* at 724. Because the Executive Orders rewrote the terms of these existing leases, the Eighth Circuit determined that the Contracts Clause might apply to the situation. *Id.* at 728.

But unlike in *Heights Apartments,* the rent-provisions in Plaintiffs' current leases are not being rewritten by the City's rent-stabilization ordinance. The ordinance would only potentially affect the rent Plaintiffs can charge in *future* leases with tenants, similar to the ability to enter into future mining-leases in *Texaco*. But again, the right to enter a future agreement does not trigger a Contracts Clause violation. *Greene*, 81 F. Supp. 3d at 752. Since the only contracts that will be affected in this

42

case are future leases between the Plaintiffs and their tenants, there is no violation, and Plaintiffs fail to state a claim for relief.

### 2. The City's rent-stabilization ordinance does not substantially impair the Plaintiffs' leases.

Even though the Plaintiffs are not alleging a violation of a preexisting contract right, the City will still address the two-part Contracts Clause test for completeness. Under this two-prong analysis, the court determines if (1) the regulation "substantially impairs" a preexisting contract; and, if so, (2) is the regulation drawn in an appropriate and reasonable way to serve a significant and legitimate public purpose. *Heights Apartments,* , 30 F.4th at 728.

On the first prong, "substantial impairment" is a term-of-art hinging on "the extent to which the parties' reasonable contract expectations have been disrupted." *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 437-38 (8th Cir. 2007) (citations omitted). "Reasonable expectations are affected by the regulated nature of an industry in which a party is contracting." *Id.* (quoting *In re Workers' Comp. Refund*, 46 F.3d 813, 819 (8th Cir. 1995)). "Minimal alteration of contractual obligations may end the inquiry at its first stage." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978). "In determining the extent of the impairment, we are to determine whether

the industry the complaining party has entered has been regulated in the past." *Hawkeye Commodity Promotions,* 486 F.3d at 438.

Here, Plaintiffs are landlords—sophisticated participants in a highly regulated market where the City's rent-stabilization ordinance should have been among the "reasonable expectations" in their industry for three reasons.

**First**, as landlords operate in a heavily regulated industry. Plaintiffs should have reasonably expected the kind of changes from the City's rent-stabilization ordinance were at least *possible.* In fact, courts for decades have held that landlords cannot allege that laws substantially impaired their leases when they operate in a highly regulated industry whose regulations frequently change and impact their leases. *See, e.g.*, *Kraebel v. New York City Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 403 (2d Cir. 1992) (noting that New York's housing market was a heavily regulated industry and landlords should be aware that their leases could be affected by new regulations under a Contracts Clause analysis); *Gallo v. D.C.,* No. 1:21-CV-03298 (TNM), 2022 WL 2208934, at *7 (D.D.C. June 21, 2022) (concluding that District of Columbia's landlords operate in a heavily regulated industry); *California Rental Hous. Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 861-62 (S.D. Cal. 2021) (commenting that San Diego landlords "operate in a

44

highly regulated industry, with state and federal law governing multiple aspects of the landlord-tenant relationship, such as disclosure about hazards like lead-based paint and prohibitions against discriminatory rental practices"); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 384 (D. Mass. 2020) (acknowledging that "landlord-tenant relationships have historically been heavily regulated").

In fact, the Eighth Circuit has already held that Minnesota landlords operate in a heavily regulated industry and should be expected to anticipate regulatory changes to their leases for Contracts Clause purposes. *Heights Apartments*, 30 F.4th at 724, 729-32.  In *Heights Apartments*, Minnesota landlords challenged the Minnesota Governor's perpetual eviction-moratorium in response to the COVID-19 pandemic. *Id.* In the Eighth Circuit's Contracts Clause analysis, the court noted that Minnesota's landlords exist in a highly regulated ecosystem and should expect new laws to impact their contracts. *Id.* at 729. True, in *Heights*, the COVID-19 pandemic was determined to be such an extraordinary and unprecedented event, no reasonable landlord could have anticipated it. *Id.* But that's simply not true here. Rent-stabilization has been enacted throughout the country for at least a hundred years. *Melendez v. City of New York*, 16 F.4th 992, 1022 (2d Cir. 2021) (discussing the history of rent-control legislation in the United States).

The only way Plaintiffs can claim they were blindsided by the City's ordinance is by acknowledging they tightly shut their eyes to it. But the Contracts Clause analysis asks what a landlord's "reasonable expectations" should have been—not what their blissful ignorance was. *Hawkeye Commodity Promotions,* 486 F.3d at 437-38.

**Second**, and dovetailing with the point above, Plaintiffs cannot feign shock that the City passed its rent-stabilization ordinance because Minnesota's own statutes have warned Plaintiffs *for almost 40 years* this could happen. Minnesota Statutes section 471.9996 (2022) allows Minnesota cities—or their voters in an initiative—to pass rent-stabilization ordinances in a general election. This statute was first enacted in 1984—decades before the City passed its rent-stabilization ordinance. *See* Minn. S.F. 1683, ch. 551 (April 25, 1984). In fact, Plaintiffs' Summary Judgment Memo even *concedes* they were aware of this statute.  It stretches credulity for Plaintiffs—who are sophisticated landlords—to claim they had no idea a 40 year-old statute they admit to knowing about could affect them. Not only does it stretch credulity, it cuts against caselaw holding that landlords cannot claim ignorance of landlord-tenant law they're expected to understand and execute. *Reimringer v. Anderson*, 960 N.W.2d 684, 692 (Minn. 2021) (discussing

that a landlord cannot rely on ignorance of the law to evade a finding of bad faith in an illegal eviction).

**Third**, courts in other jurisdictions have routinely concluded for nearly a hundred years that rent-stabilization laws do not substantially impair a landlord's contract rights. Most famously, in *Marcus Brown Holding Co. v. Feldman*, the Supreme Court held that a rent-control law did not violate the Contracts Clause, writing, "contracts are made subject to this exercise of the [police] power of the State when otherwise justified, as we have held this to be." 256 U.S. 170, 198 (1921).

More recent cases echo *Marcus*'s approval of rent-stabilization laws. In *Interstate Marina Development Co. v. County of Los Angeles*, Los Angeles County's rent-control law was held to not substantially impair landlords' leases. 155 Cal. App. 3d 435, 449, (Cal. Ct. App. 1984). The law, which imposed a 7.5% ceiling on any rental increase was not a substantial impairment because it applied to all landlords uniformly and roughly gave landlords a similar rate-of-return they had before the rent-control ordinance was enacted. *Id.* Similarly, in *Kargman v. Sullivan*, the First Circuit Court of Appeals upheld Boston's rent-stabilization law under a Contracts Clause challenge because controlling rents was "a proper exercise of the locality's reserved [police] powers." 582 F.2d 131, 134 (1st Cir. 1978). The First Circuit noted that rent-stabilization laws do

47

not violate the Contracts Clause even if the need for rent-stabilization "may well have been minimal" under the circumstances, and cities are not constitutionally required to exempt certain landlords who could otherwise be trusted not to take advantage of their tenants. *Id.* And in *Brontel, Ltd. v. City of New York*, the United States Southern District of New York easily dismissed a Contracts Clause claim against New York's rent-stabilization ordinance, writing, "It is well established that the City's rent control laws do not unconstitutionally impair contract rights." 571 F. Supp. 1065, 1072 (S.D.N.Y. 1983), *aff'd sub nom. Rent Control Mem. Corp. v. City of New York*, 742 F.2d 1439 (2d Cir. 1984).

For their part, Plaintiffs claim the City's rent-stabilization ordinance substantially impairs their contract-rights because they cannot freely increase rent above 3% without filling out a self-certified application. (Doc. 32 at 29.)  Plaintiffs' argument is either that all rent stabilization schemes are unconstitutional, or filling out paperwork is so burdensome it rises to the level of a constitutional violation. Plaintiffs cite no authority for either argument and in fact, the cases cite above, namely *Interstate Marina Development Co.*, *Kargman*, and *Brontel*, hold the exact opposite. Also, as the City pointed out above, landlords exist in a highly regulated industry. No court has ever held that filling out paperwork—

especially in an industry already mired in paperwork—rises to the level of a constitutional infirmity for such sophisticated market-participants.

Plaintiffs also claim they could not have reasonably anticipated the City's rent-stabilization ordinance because only coastal cities have enacted similar ordinances, and no one in the Midwest—not even Chicago—has yet. (Doc. 32 at 33.) This is not persuasive. There is no legally recognized "rent-stabilization safe zone" enveloping the Midwest. Plaintiffs' argument is even more absurd on its face because in the same breath, they concede they've known about Minnesota's nearly forty year-old state statute authorizing cities to enact rent-stabilization ordinances. (*Id.*) (citing Minn. Stat. § 471.9996).

### 3. The City's rent-stabilization ordinance is appropriately drawn to treat all similarly situated landlords the same.

Finally, even if Plaintiffs could prove the City's rent-stabilization ordinance substantially impaired their contract-rights, we must still analyze "whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Heights Apartments,* 30 F.4th at 728. Generally, the government's public purpose is aimed at fixing "a broad and general social or economic problem." *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983). This means the government is "exercising its police power, rather than providing a benefit to special interests." *Id.* Under a

49

Contracts Clause analysis, the United States Supreme Court has described this police power as, "an exercise of the sovereign right of the Government to protect the lives, health, morals, comforts, and general welfare of the people," including "economic needs." *Manigault v. Springs*, 199 U.S. 473, 480 (1905); *Veix v. Sixth Ward Ass'n*, 310 U.S. 32, 39 (1940). "If the State shows a significant public purpose and is not a contracting party, then courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Ass'n of Equip. Manufacturers v. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019).

The City's rent-stabilization ordinance clearly lays out the following justifications for its existence, which include:

- Many City residents "pay a substantial amount of their monthly income on rent."

- There is a "present shortage of residential rental units" in the City.

- Current rent costs "have a determinantal effect on the health, safety, and welfare of a substantial number of Saint Paul residents."

- The hardest-hit populations in the City are "persons in low and moderate income households, and persons on fixed incomes who reside in the city."

- More than 50% of the City are renters.

- Tenants are found to "suffer great and serious hardship when forced to move from their homes."

- Communities in the City are "impacted by housing instability when rent increases outpace incomes."

- And the welfare of all City residents and workers depends on "ensuring that Saint Paul residents have access to affordable housing."

(Ex. 4, § 193A.01, Hafner Decl.) Other courts have held for decades that these justifications meet the Constitution's public-purpose requirement. For instance, in *Action Apartment Association, Inc. v. Santa Monica Rent Control Board*, the Ninth Circuit repeated a longstanding holding that rent-stabilization laws serve the same "legitimate public purpose" found in the City's ordinance of blunting "rising rents" and remedying "housing shortages." 509 F.3d 1020, 1023 (9th Cir. 2007) (citing *Schnuck v. City of Santa Monica*, 935 F.2d 171, 176 (9th Cir. 1991)). In fact, the Eighth Circuit recently cited and endorsed this "legitimate public purpose" language from *Action Apartment* when it upheld a similar public-purpose for a homeless shelter against another challenge under the Contracts Clause. *Dahlen v. Shelter House*, 598 F.3d 1007, 1012 (8th Cir. 2010) (citing *Action Apartment*'s holding that remedying "housing shortages constitutes a legitimate public purpose").

Also supporting the City's findings of a legitimate public purpose is the First Circuit, which long ago held that the purpose behind Massachusetts's rent-control statute was so strong that there was "no federal purpose in a minute reexamination" of the landlords' claims to strike it down. *Kargman v. Sullivan*, 582 F.2d 131, 135 (1st Cir. 1978).

51

Finally, in *Sobel v. Higgins*, New York's courts held the state's rent-stabilization law bore "a reasonable relationship to the valid public purpose of preserving affordable housing and preventing the dislocation of lower-income and moderate income tenants." 188 A.D.2d 286, 288 (1992) (citing *Pennell*, 485 U.S. at 11).

These precedents only confirm what we already know: The City's desire to keep rents from rising too fast and threatening residents with hardship and displacement is a constitutional public purpose that can fend off a Contracts Clause attack.

Plaintiffs also complain the City's rent-stabilization ordinance is not well-drawn because it does not take a more holistic and case-by-case approach to the unique peccadillos of every landlord's situation. (Doc. 32 at 35.) That is not the legal standard. Instead, the legal standard simply requires that all landlords be treated similarly to each other. This is best illustrated by the California Court of Appeals in *Interstate Marina Development Company v. County of Los Angeles*, 155 Cal. App. 3d 435, 449 (Ct. App. 1984). There, the court first noted that as long as the rent-stabilization law "applies to all residential landlords uniformly," then there is no issue. *Id.* "It is impossible to draw lines with mathematical precision," the court noted, "and legislators do not have to engage in a case by case approach to rent control." *Id.* "Some landlords

52

will always face a greater hardship than others. For example, those who own buildings which are being financed at market rates are in a far different situation from landlords who own unencumbered property which they have held for many years." *Id.* And "[I]t is inevitable that all landlords are not identically situated, and hence, all will not be affected to an identical degree." *Id.* The point though, is that a rent-stabilization law allows one thing: "Similar treatment for those similarly situated is sufficient." *Id.*

In our case, the City's rent-stabilization ordinance treats all landlords similarly. The ordinance simply states that "No landlord shall demand, charge, or accept from a tenant a rent increase within a 12-month period that is in excess of three (3) percent of the existing monthly rent for any residential rental property except" for legally approved exceptions.  (Ex. 4, § 193A.04, Hafner Decl.) One of those exceptions is when the landlord can show that an increase is needed for a "reasonable return on investment."  (Ex. 4, § 193A.06, Hafner Decl.) On its face, the City's ordinance treats all landlords similarly and—contrary to Plaintiffs' argument—allows for some holistic flexibility for landlords who can credibly show the need for higher rents.  Far from being the inflexible and unyielding ordinance Plaintiffs portray, the

City's RSO is designed to put all landlords on an equal footing. This is the very essence of a well-drawn law.

**E.    Plaintiffs' Section 1983 Claim must be dismissed because they fail to show an unconstitutional policy.**

Plaintiffs weave their constitutional due-process and Contracts Clause claims into a Section 1983 claim against the City. Section 1983 is a vehicle for a plaintiff to allege that a city violated their constitutional rights, but it can only be used against a municipality like the City by showing there was an unconstitutional policy or custom enforced against their substantive due-process rights. *Russell v. Hennepin Cty.*, 420 F.3d 841, 846 (8th Cir. 2005). This is generally known as a *Monell* claim. *Id.*

First, it's not clear if Plaintiffs can even allege a Section 1983 claim under the Contracts Clause. The Eighth Circuit recently identified a circuit split on this issue in *Heights Apartments, LLC v. Walz*—noting that the Fourth and Sixth Circuits do *not* recognize this cause-of-action, while the Ninth Circuit does. 30 F.4th at 727. Because the parties in *Heights Apartments* waived the issue, and it did not affect the Court's jurisdiction, the Eighth Circuit analyzed the case "without deciding" this specific question. *Id.* at 728.

The City contests the issue now. The Sixth Circuit recently conducted a lengthy analysis of the history and United States Supreme

Court precedent in *Kaminski v. Coulter*, and reasonably concluded that "an alleged Contracts Clause violation cannot give rise to a § 1983 claim." 865 F.3d 339, 347 (6th Cir. 2017). The Sixth Circuit's historical analysis concluded this holding "better reconcile[s] the Supreme Court's holdings" in prior cases "with the text and history of § 1983, but it also better comports with the time-honored principle that 'it is the Supreme Court's prerogative alone to overrule one of its precedents.'" *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3 (1997)). Since the United States Supreme Court has not overruled its precedents suggesting that Section 1983 cannot be used to bring a Contracts Clause claim, then the Supreme Court should have a final word on the matter—not a circuit or district court. *Id.*

Second, the Plaintiffs' Section 1983 claim simply fails because their due-process claim fails.[11] Plaintiffs' Section 1983 claim is based on the face of the City's rent-stabilization ordinance. (Doc. 32 at 37). If there is a rational-basis for the City's ordinance, then the entire Section 1983 house of cards collapses, and there is no *Monell* claim. *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389-90 (8th Cir. 2007) (stating that

---

[11] Even if this Court chooses to adhere Section 1983 liability onto Plaintiffs' Contracts Clause claim, that claim also fails. As the City argued above, the rent-stabilization ordinance also passes the deferential Contracts Clause analysis.

when a *Monell* claim only alleges that a municipal-policy—on its face—is unconstitutional, "no evidence is needed other than a statement of the municipal policy and its exercise"). As we explained above, the City's rent-stabilization policy more than meets the rational-basis test. *See* § B, *supra*.

**F.    The RSO implementation rules do not violate Minnesota Statute section 471.9996 which permits cities to enact rent control.**

Plaintiffs make a brief, unsupported argument in their Memorandum seeking summary judgment on Count V of their Complaint, which alleges that one of many rules in the City's process for RSO implementation is "illegal" under Minn. Stat. § 471.9996.  (Pltffs' Compl. pp. 55-56; Pltffs' Mem. Sup. Mot. S. J., pp. 37-38.)[12]

The Rules do contain one provision that states as follows:

> Notwithstanding any other provision of this regulation, the implementation of a Maximum Allowable Rent increase must be limited each year to fifteen percent (15%) of the Maximum Allowable Rent on the date the petition is filed.

---

[12] It appears that Plaintiffs are withdrawing or no longer pursuing a claim that the 15% Rule violates article XII, section 5 of the Minnesota Constitution because they make no mention of it in their memorandum seeking summary judgment on Count V of their Complaint.  This withdrawal would make sense because article XII, section 5 of Minnesota's Constitution concerns amendments to a city charter and neither the RSO nor the rulemaking and amendments following the initial adoption involved amending the Saint Paul City Charter.

> If the amount of any rent increase granted under these
> regulations exceeds this limit, any portion in excess of the
> annual must be deferred.
>
> In subsequent years deferred amounts of the allowable
> rent increase may be implemented.

(Final Rules, No. 8, Ex. 9, Hafner Decl.)  First, the rule does not violate

the statute because voters did pass a rent control ordinance.  There is

nothing in the statute that says cities cannot create regulations to

implement an ordinance that is initiated by voters.  Moreover, the

15-percent provision in the rules does not violate the statute because the

ordinance initiated by voters directed the City to set up a "[p]rocess by

which landlords can request exceptions to the limitation on rent

increases based on the right to a reasonable return on investment."

(Ex.4, § 193A.05, Hafner Decl.)   There are a number of factors and

considerations that go into determining a reasonable return on

investment.  The 15 percent provision allows for carryover of larger

increases to subsequent years so it is not a "cap" as described by

Plaintiffs.  The RSO was approved by voters; plaintiffs cannot use the

statute affirmatively to nitpick specific provisions in the rules

implementing the ordinance which were promulgated to comply with

ordinance provisions.

## **CONCLUSION**

For all of the reasons discussed above, Defendants City of Saint Paul, Minnesota, City Council of the City of Saint Paul, Angie Wiese, In her official capacity, and Mayor Melvin Carter, in his official capacity, respectfully request this Court grant their motion for summary judgment and dismiss each of Plaintiffs' claims with prejudice.

LYNDSEY M. OLSON
SAINT PAUL CITY ATTORNEY


Dated:  November 7, 2022          *s/ Megan D. Hafner*
                                 Megan D. Hafner, # 293751
                                 Kyle Citta, #0397000
                                 Assistant City Attorneys

                                 *Attorneys for Defendants City of Saint Paul, Minnesota, City Council of the City of Saint Paul; Angie Wiese; and Mayor Melvin Carter*
                                 750 City Hall and Court House
                                 15 West Kellogg Boulevard
                                 Saint Paul, MN 55102

                                 Telephone: (651) 266-8756
                                 Fax: (651) 266-8787
                                 megan.hafner@ci.stpaul.mn.us
                                 kyle.citta@ci.stpaul.mn.us