# Exhibit 1

# Saint Paul
# Rent Stabilization Stakeholders Group

June 2022

Report prepared by Center for Urban and Regional Affairs

Edward G. Goetz
C. Terrence Anderson
Anthony Damiano
Malik Holt-Shabazz
Ned Moore
Trupti Storlie

# Table of Contents

Executive Summary          .          .          .          .          .          .          .          .          .          1

Introduction   .          .          .          .          .          .          .          .          .          .          3

I. The Rent Stabilization Stakeholder Group Process .          .          .          .          .          5
    The stakeholder group          .          .          .          .          .          .          .          .          5
    Meeting summaries          .          .          .          .          .          .          .          .          7

II. Rental housing in Saint Paul          .          .          .          .          .          .          .          17
    The rental housing stock   .          .          .          .          .          .          .          .          17
    Rent trends and affordability          .          .          .          .          .          .          .          17
    Potential rent caps in Saint Paul   .          .          .          .          .          .          .          19

III. Policy considerations          .          .          .          .          .          .          .          .          22
    The rent stabilization policy framework .          .          .          .          .          .          22
    Objectives of a good and effective rent stabilization program   .          .          .          23
    Polling results: Group members' initial preferences on program features          .          24
    Public input          .          .          .          .          .          .          .          .          .          26
    Policy deliberations          .          .          .          .          .          .          .          .          28
        Rent caps          .          .          .          .          .          .          .          .          28
        Vacancy control/decontrol   .          .          .          .          .          .          .          28
        Other rent cap exceptions   .          .          .          .          .          .          .          30
        Housing stock exemptions   .          .          .          .          .          .          .          32
        Implementation and public information          .          .          .          .          .          33
        Other, complementary policies          .          .          .          .          .          .          34
        Summary          .          .          .          .          .          .          .          .          34

IV. Recommendations          .          .          .          .          .          .          .          .          36

Appendix          .          .          .          .          .          .          .          .          .          37

# Executive Summary

On February 18, 2022 Mayor Melvin Carter appointed a 41-member stakeholder group to explore ways of "improving and enhancing" the program of rent stabilization in Saint Paul that voters had enacted by ballot initiative the previous November.  The group's charge was to consider the medium to long-term perspective about how rent stabilization should operate in Saint Paul and to balance critical goals of equity and growth. On March 13, 2022 the City Council adopted a resolution asking the stakeholder group to provide information on a range of specific issues related to rent stabilization policy.

The rent stabilization stakeholder group (RSSG) was a diverse set of members that included tenant advocates, real estate developers, landlords, property owners and other stakeholders. The group began meeting on February 22, 2022 and ended its work on June 7, 2022, a 16-week period in which it met 15 times.

The RSSG proceeded in three stages.  First, there were several weeks of 'learnings' in which the wide range of rent stabilization program details found in other cities were presented to the group.  During these weeks group members developed a common understanding of the policy options available. Second, the group received and processed oral and written input from members of the public. The final phase of the group's work involved discussions and negotiations to develop a set of recommendations to the Mayor's Office and the City Council.

The RSSG heard from local and national experts about issues related to rent stabilization policies and impacts, housing inequality and discrimination, the housing stability and affordability challenges for lower-income renters, and the basics of housing finance and investment. The group also received input from 133 members of the public. Finally, the group heard an analysis of recent rent data for Saint Paul, providing them with background on rent and rental affordability trends over the past 20 years.

The RSSG organized its learnings and deliberation around five policy option areas. Rent stabilization programs across the country vary on these five dimensions and thus they provided focus areas for decision-making by the group. The policy areas are:
1. determination of the cap on rent increases,
2. whether or not a vacancy allows for a resetting of rents to the market level (a process referred to as 'vacancy decontrol'), and if so to what degree,
3. whether there are additional circumstances under which exceptions to the rent cap are made,
4. whether certain categories of housing stock are exempted from the program, and
5. how the program is administered and implemented.

Members of the RSSG created and agreed upon a set of 12 policy objectives for rent stabilization. In week 6 of its deliberations the group agreed that a successful rent stabilization program in Saint Paul would:

1. provide stability of residence and affordable housing for Saint Paul renters
2. provide renters with predictability in their housing costs from year to year
3. prevent rent gouging
4. provide property owners with the ability to recoup expenses for operational costs and property maintenance, and a reasonable rate of return on their investment
5. result in continued maintenance of property, providing renters with decent, safe, and clean living environments and property owners with properties that remain in good shape
6. allow and encourage the upgrading of the rental housing stock through capital improvements
7. result in the expansion of the rental housing stock and housing options in Saint Paul through new construction by continuing to attract investment and financing
8. operate through a clear, transparent, and simple set of regulations and processes so that all parties have a good understanding of the system
9. be efficient and process petitions and claims quickly
10. have regulations and procedures that are fair to all parties
11. produce good communication between renters and owners/management
12. produce stable communities in the city.

The RSSG broke into four small groups to develop a package of policy proposals that would achieve the greatest possible level of two potentially conflicting goals: breadth of support among the small group members, and comprehensiveness of the policy package.

On June 7 the group met as a whole to discuss what the small groups had produced and to decide on a set of recommendations to make to the Mayor and the City Council. The group made two recommendations:

***Recommendation 1,*** The RSSG recommends the following package of policy proposals:

- A rent cap of 3%
- A provision for reasonable rate of return
- A provision for the banking of preferential rents in some form
- A new construction exemption of 15 years
- Just cause eviction protections for renters

This package of proposals was approved by exactly 60% of those who voted on it.

***Recommendation 2.*** The group recommends some form of partial vacancy decontrol. RSSG members discussed a broad spectrum of possibilities for what "partial vacancy decontrol" could be in practice, but the group made no specific recommendation on the form of partial decontrol. The recommendation for some form of partial vacancy decontrol received support from 83% of the group members who voted.

# Introduction

In November of 2021 the voters of Saint Paul were presented with a ballot initiative to create a program of rent stabilization in the city. The ballot initiative was both specific in terms of outlining several provisions that would be included in a program of rent stabilization and intentionally unspecific in other areas where City staff would be directed to fill in details for implementation of the program. The ballot initiative passed by a margin of 53% in favor and 47% opposed.

The initiative stipulated that the program of rent stabilization would begin the following spring, on May 1, 2022. The program passed by the voters set allowable rent increases at 3 percent. The program included two small exemptions; one is that the rent limit would not apply to the tenant rent obligation where that obligation is set as a share of the tenant's income (a subset of publicly-subsidized housing units), and the second is that the rent limit will not apply "to the amount that a housing service provider can be reimbursed by a government entity under the Housing Support Act, Minn. Stat. § 2561."[1]

The ballot initiative also explicitly noted that the limitation on annual rent increases would apply regardless of whether the unit was vacated by the previous tenant.  The program approved by the voters contained a provision under which landlords can request exceptions to the rent limits based on their 'right to a reasonable return on investment.'  The initiative spelled out the factors that must be taken into account when such an appeal is made, but left details of implementation up to the City.

Between the November elections in 2021 and the May 1 commencement of the program, the City of Saint Paul had to create the administrative structure and the detailed processes for implementing the program the voters enacted. In early March 2022 the Saint Paul City Council considered enacted technical amendments to the ordinance to lay out the details of implementation. The plan, developed by the administration of Mayor Melvin Carter places the main responsibility for implementation of the ordinance with the City's Department of Safety and Inspections (DSI).  These actions were taken to ensure the City had the infrastructure in place to implement the program of rent stabilization enacted by the voters that took effect May 1, 2022.

A separate set of discussions about possible changes to the ordinance took place on a different track. During the campaign Mayor Carter had noted that while a supporter of the ballot initiative establishing rent stabilization in Saint Paul, he had reservations about some of the details of the proposed program. Shortly after the election Mayor Carter signaled his desire to see an amendment that would exempt new housing construction from the rent increase limits

---

[1] Sec 193A.06

3

prescribed in the ordinance. In February the Mayor announced his proposal for a 15-year "rolling" exemption for newly constructed residential properties.[2]

At the same time, the Mayor's office convened the 41-person stakeholder group to consider a range of possible amendments to the ordinance. Any such changes, including the Mayor's own proposal for a 15-year new construction exemption, would not take effect before November of 2022, 12 months after passage of the ballot initiative, as required by the city charter.  The rent stabilization stakeholder group (RSSG) began meeting in February. The group's charge was to consider the medium to long-term perspective about how rent stabilization should operate in Saint Paul, and "to collectively explore how to balance our critical goals of equity and growth and to develop a report with considerations toward improving and enhancing the ordinance."  In March the City Council adopted a resolution formally requesting input from the RSSG on a range of issues related to the medium and long-term form of rent stabilization in the city.

This report documents the deliberations of the RSSG and summarizes its findings. The report is organized into four parts. In Part I we describe *the process* that the stakeholder group underwent to deliberate and then offer considerations to the Mayor and City Council.  Part II presents data on the *state of the rental housing market* in Saint Paul. This was information presented to the stakeholder group in week 1 and week 12.  Part III of this report contains a summary of the *substantive issues* that arose and structured the deliberations of the group.  Part IV contains the *recommendations* of the RSSG.

---

[2] A rolling exemption excludes housing units from regulation based on the building's age, as compared to a new construction exemption that is tied to a specific date. Under a rolling exemption, buildings age out of exempted status and become rent regulated after the exemption period is completed.

# I. The Rent Stabilization Stakeholder Group Process

In this part of the report, we discuss the makeup of the group and the process it undertook over a 16-week period from February 22 to June 7, 2022.

### The stakeholder group

The Mayor announced the creation of the RSSG on February 18, 2022. The 41 members of the group are:

- Phillip Cryan, Service Employees International Union-Healthcare Minnesota and Iowa; Co-chair
- Tony Sanneh, Sanneh Foundation; Co-chair
- Katherine Banbury, resident
- Tony Barranco, Ryan Companies
- Cecile Bedor, CommonBond Communities
- Jay Benanev, resident and former City Council member
- Clinton Blaiser, Halverson & Blaiser Real Estate Development Group Ltd.
- Monica Bravo, West Side Community Organization
- Carolyn Brown, Community Stabilization Project
- Scott Cordes, Project for Pride in Living
- Arline Datu, resident
- Malik Davis, Rondo Realty Group
- Khayree Duckett, Dominium Apartments
- Kelly Elkin, Old National Bank
- Tou Fang, property owner
- Jessica Fowler, YWCA
- Thomas Godfrey, resident
- Robbie Grossman, Saint Paul Area Association of Realtors
- Tram Hoang, Housing Justice Center
- Myisha Holley, resident
- Rich Holst, property owner
- Mya Honeywell, realtor
- Abdiaziz Ibrahim, resident
- Rawnson Ivanoff, resident
- Nathaniel Khaliq, BNV Properties[*]
- Chue Kue, property owner
- Bill Lindeke, resident
- Nene Matey-Keke RNR Realty International
- Carin Mrotz, Jewish Community Action
- Thomas Nelson, Exeter Management

- Dalton Outlaw, Outlaw Development[**]
- Kevin Pranis, Laborers' International Union of North America - Minnesota and North Dakota
- B. Rosas, Minnesota Youth Collective
- Katheryn Schneider, property owner
- Julie Schwartz, Lake Street Realty Services, Inc.
- Emmanuel Speare, New City Properties
- D'Angelos Svenkeson, NEOO Partners Inc.
- Chris Tolbert, Saint Paul City Council
- Marcus Troy, resident
- Kou Vang, JB Vang
- Clara Ware, resident

\* Did not participate in the stakeholder group
\*\* Resigned from the stakeholder group for reasons unrelated to the work of the group.

Phillip Cryan of SEIU-Healthcare Minnesota and Iowa and Tony Sanneh of the Sanneh Foundation served as Co-chairs of the RSSG. The Mayor's office contracted with the Center for Urban and Regional Affairs (CURA) at the University of Minnesota to facilitate the group in its deliberations. Jon Grebner of the Mayor's office provided support to the group and helped coordinate its activities. The following City of Saint Paul staff members attended some or all of the meetings of the group:

- Tara Barenok, Office of Financial Services
- Kirstin Burch, Office of Financial Empowerment
- David Gorski, City Attorney's Office
- Mary Guerra, Office of Financial Services
- Brynn Hausz, City Council Staff
- Tony Johnson, Planning and Economic Development
- Noel Nix, Mayor's Office
- Luis Pereira, Planning and Economic Development
- Ian Welsh, City Attorney's Office
- Doua Yang, City Council Staff
- Adam Yust, City Council Staff

The group meetings were virtual and took place on ZOOM.  All of the meetings were also live-streamed to allow members of the public to observe.  One complication of this system was that the breakout rooms in Zoom could not be live-streamed. Thus, when the stakeholders group broke into small groups for discussions, those moments were unavailable to the public.

All of the meetings were recorded and made available on a web-site established by the City to contain the details and on-going record of the group's activities (https://www.stpaul.gov/departments/mayors-office/rent-stabilization-stakeholder-group). This

6

web-site contains a recording of each meeting, the minutes, and any slide presentations or other materials presented.

The RSSG proceeded in a three-step fashion.  First, there were several weeks of 'learnings' in which the wide range of rent stabilization program details found in other cities were presented to the group.  Group members came from a varied set of backgrounds and degrees of prior knowledge related to how rent stabilization works and the different dimensions of such programs. The first several weeks were used to provide a common understanding and background to all members before the group began its discussions.  Second, the group held a hearing on the evening of April 12 to hear from the public on the issue. These comments were processed and organized by CURA after the meeting for the group's consideration.  The final phase of the group's work involved discussions and negotiations related to the development of recommendations to the Mayor's Office and the City Council.

Some of the members of the RSSG were centrally involved in the pro-rent stabilization movement that put the initiative on the ballot and then campaigned on its behalf. These members came to the group with a sense that the question of what rent stabilization should look like in Saint Paul had already been decided by the voters. For many of these members, protecting the existing ordinance was their priority. At the same time, many of the members appointed to the stakeholder group work in the housing industry in one capacity or another as developers, landlords, real estate agents, or in finance. Some of these members brought very strong opinions against rent stabilization to this process and had as their base position the idea that rent stabilization in any form was wrong. These constituted the two polar positions among stakeholder group members, with many other members situated somewhere between the two. Members preferring either of these polar positions were asked, in this process, to move off of their starting points and contribute to a third outcome: one in which rent stabilization would exist in Saint Paul but would look different than the ordinance passed by voters in November 2021.

### *Meeting Summaries*

Meetings of the stakeholder group began on February 22 and ended on June 7, 2022, a 16-week period in which the group met 15 times.  Meetings took place on Tuesday afternoons from 1:00 to 3:00 p.m., except for the open forum for public input which took place on Tuesday, April 12 from 6:00 to 8:00 p.m. The facilitators established a process in which a post-meeting survey would be sent to members to solicit their reactions to and ideas about the content of the previous meeting and to allow members opportunities to ask questions that might be addressed at the next meeting. The full set of these surveys and responses are included in the appendix.

*Week 1: Tuesday, February 22.*   At this introductory meeting, Mayor Carter welcomed the members. The Mayor asked the members to "engage with each other in a spirit of constructive dialogue" to determine what rent stabilization would look like in the city of Saint Paul.  After the Mayor spoke, group members introduced themselves to each other. Each member gave their name and identified their affiliation or the group or interests they were representing.

After introductions the CURA team went over the suggested schedule for the stakeholder group. The group would meet each Tuesday afternoon at 1:00 for two hours.  The initial five or six sessions would be informational, providing members with background on how rent stabilization programs operate, how they look in other cities across the U.S., and where possible, what the research has shown about the impacts of different rent stabilization approaches.  These learning sessions would be organized around five major features of rent stabilization programs: 1) determination of the cap on rent increases, 2) whether or not a vacancy would result in a resetting of rents at the market level (a process referred to as 'vacancy decontrol'), 3) whether there are additional circumstances under which exceptions to the rent cap will be made, 4) whether certain categories of housing stock are to be exempted from the program, and 5) how the program is administered and  implemented.   The proposed schedule also included a date for a public hearing and then group discussions leading to a set of recommendations for the Mayor and City Council. It was initially envisioned that the group would switch to an every-other-Tuesday schedule after the public meeting on April 12.  This did not occur as the group needed every possible meeting time to process the information they had received, to bring in additional presenters and topics at group members' requests, and to deliberate on policy recommendations.

Also in this first meeting, guidelines for participation were offered by the CURA team and discussed by RSSG members. The members added some additional ground rules to those proposed by CURA.  The full set of ground rules is provided below:

1) Be real and true to your experience when sharing observations of perceived experience.
   Honor that communities have knowledge about how they experience systems and structures.
2) Give space for people to be vulnerable when speaking of their experiences.
   If someone has shared a difficult story, be aware of the follow up.
3) Acknowledge and respect differing opinions and perspectives.
   Recognize that these conversations may be contentious, and that each person will be coming from a unique position.
4) Step up, step back.
   Participate as much as you listen; it is a two-way street of learning.
   Set aside implicit power roles so all voices have equal weight.
5) Be open and curious.
   Lead with curiosity, honesty, transparency, courage, and humility.
6) Be quick to listen, slow to react/speak.
   Be slow to judgment when engaging.
   Commit to a principle of constructive engagement.
7) Try to stay away from jargon and specialized terms.
8) Keep an eye towards moving the discussion forward.
9) Leave time and space for others.
10) Respect pronouns.

8

***Week 2: March 1, 2022.***   This meeting began with a vote to finalize and approve the ground rules for participation discussed in the previous meeting. The set of 10 ground rules was approved unanimously. The CURA team then presented group members with a summary of the post-meeting survey.

The first week's post-meeting survey included a series of questions aimed at eliciting from members their particular concerns and hopes for this process and for the issue of rent stabilization in Saint Paul. Members were asked to identify which stakeholders need protection as the RSSG meets and deliberates. The answers to this divided into two clusters, the largest one focused on renters and another on real estate industry actors (property owners, developers, small businesses, etc.).

A second question asked what members' priorities were, as they engaged in this process. The largest single group of responses was related to the potential housing market outcomes of rent stabilization. These responses included concerns that rates of housing production and the quality of the housing stock be maintained, and that the market provide affordable rents and housing stability for renters.

The post-meeting survey also asked RSSG members to reveal their "greatest hopes" for this process. Responses were roughly evenly distributed across a group of answers that identified hope for agreement on specific policy elements such as vacancy control or an exemption, a group of answers that focused on a process that protected the well-being of a specific stakeholder group, and a group of answers related to housing market outcomes.

Finally, stakeholder group members were asked what their "greatest concerns" were going into this process. These answers tended to be the inverse of answers to the previous question and reflected concerns for the well-being of specific stakeholder groups or concerns about negative housing outcomes.

After the summary of the post-meeting survey, the CURA team began the 'learnings' sessions that were to dominate the next several meetings. The presentation at this meeting began with a brief history of rent control and rent stabilization in the U.S., the conditions under which rent stabilization has been used, the general character of rent stabilization in the U.S., and how widespread these policies are across the country.

The stakeholder group broke into small groups to discuss and react to this material, and then reconvened for a brief discussion. When this was concluded, the CURA team began a presentation on the first of the five program design areas; the rent cap.

***Week 3: March 8, 2022.***   The meeting began with a housekeeping item; members were informed of an on-line folder in which meeting documents would be available to them. Copies of slides used in the meetings, background studies for some of the learnings, and other documents offered by the stakeholder group members themselves were to be stored in the folder for

members to use and see as they wished between meetings. Over the next few weeks this space was also used to hold materials that some of the group members wanted to share with each other.

After a summary of the post-meeting survey responses, the CURA team resumed the learnings presentation.  The presentation completed the material on rent caps and how they are calculated and used in other cities. The group went into breakout rooms for conversations on the issue of rent caps, and then reconvened to report back some the details of their small group discussions.  The CURA team then moved on to the second policy design element, the issue of vacancy control/decontrol. The meeting ended after the RSSG had gone back to small groups for a discussion of vacancy control/decontrol.

*Week 4: March 15, 2022.*   In the week leading up to this meeting some stakeholder group members expressed the concern that the details of the existing Saint Paul ordinance, the program enacted by voters in the November 2021 elections, were not well known by group members. It was suggested that a recap of the program would be useful as a reference point while members were learning about all of the other potential approaches that exist and that have been tried elsewhere.  Thus, in this meeting of the stakeholder group a summary of the existing Saint Paul ordinance was provided to the members.

Following the recap of the Saint Paul ordinance, the learnings presentation focused on the third policy design element – exceptions to the rent cap. Possible exceptions to rent caps that were covered included provisions for "reasonable return on investment", the pass through of maintenance, capital improvement investments, utilities, and property tax increases. How other cities have approached these issues was described.  The issue of "banked" preferential rents is also a basis for rent cap exceptions in some cities, and this issue was covered as well.  Group members went into small groups to discuss this element of policy design and then reconvened for a full group discussion.

Then the group turned to the fourth policy design element, hearing about how other cities have incorporated exemptions of certain portions of the housing stock in their rent stabilization programs.  Potential housing stock exemptions covered were small-building (buildings with fewer than five units) exemptions, owner-occupation exemptions, and exemptions for subsidized housing.

*Week 5: March 22, 2022.*   Group members made suggestions about the April 12 public input session; suggesting a time limit for speakers, allowing the opportunity for written input from members of the public, that the session be held in the evening to make participation easier for many, and a need for an engagement strategy that would get the word out. It was agreed that the April 12 session would take place at 6:00 p.m. and last for two hours. All of the rest of the group's suggestions were also implemented.

Learning material on the final policy design element was then presented to the group related to how cities implement rent stabilization programs and the range of efforts made to establish

public information on the requirements of rent stabilization in order to enhance compliance. This presentation, like the ones before it, included examples of what other cities have done so that RSSG members could see the potential options to consider.

At this point, the group went into breakout rooms to discuss what should be the overall objectives of a rent stabilization program.  Group members were given the prompt: "What objectives would a successful rent stabilization program in Saint Paul achieve?" Participants were given some time to generate and write down their own ideas and then the small groups brainstormed together.  The ideas were captured on a google document for later analysis.

***Week 6: March 29, 2022.***   This meeting began with a presentation of the City Council Resolution (Resolution 22-408) passed on March 23, 2022.  The City Council declared its intention "to consider amendments and improvements" to the existing rent stabilization ordinance and asked the RSSG for input on 10 specific items:

1. How to ensure stable rental rates in Saint Paul;
2. How to ensure quality affordable housing for both incumbent renters and for prospective renters;
3. How to implement an exemption for new residential construction; specifically what length of time the exemption should be for;
4. Data on the impacts of the rent stabilization ordinance that justify the recommendation above;
5. Provide recommendations for ensuring affordability and protections for renters in exempted new construction and policies to mitigate displacement;
6. How to establish a rent increase cap, whether any possible exceptions should exist from such a cap, and what those exceptions might be;
7. Whether and how to implement vacancy decontrol, meaning the ability of a landlord to increase rent above the rental cap in cases where a tenant vacates a unit;
8. How to ensure compliance with a rent stabilization ordinance;
9. How to ensure that rental units and properties in Saint Paul are properly maintained, updated, and invested in while complying with the rent stabilization ordinance; and
10. Recommendations and best practices learned from implementing rent stabilization policies around the country for future consideration, including community education strategies that empower renters to understand their rights and landlords to understand and meet their responsibilities, staffing, budgetary considerations, and other recommendations as determined by the workgroup.

The group then went on to discuss the results of their exercise of the previous week in which they were asked to articulate what a successful rent stabilization program would achieve for the city of Saint Paul.  More than 200 individual comments were recorded by the group members and facilitators from the small group discussions of the previous week. These comments were analyzed by the CURA team and categorized into 12 potential program objectives.  The 12 statements of program objectives were presented back to the group at this meeting for their

11

review and comment. There was widespread agreement and acceptance of the 12 statements (which are presented in detail in Part III of this report).

In the second hour of the meeting, Dr. Kenneth Baar, an expert on rent stabilization programs and on the determination of 'reasonable rate of return' spoke to the group. His talk covered a range of topics including new construction investment, measuring reasonable return, the use of the consumer price index in rent caps, vacancy control and decontrol, and banking.

*Week 7: April 5, 2022.*  At this meeting the group members were polled on their positions on various aspects of rent stabilization policy.  At this point in the RSSG process the group members had heard in depth about the various components of rent stabilization policy that exist and were aware of the policy options in front of them. This poll was meant to gauge how stakeholder group members felt about these various policy options, prior to entering into deliberation together over recommendations. Participants were told that this was not a binding vote of any sort, but rather a test to see the extent of consensus or dissensus in the group as the group transitioned to discussion and negotiation. It was also made clear that this polling exercise artificially separated out each individual policy choice as a discrete question, even though many RSSG members had pointed out that for the purposes of making recommendations policy choices would need to be thought through together in packages. Members were polled on specific policy options across the five rent stabilization policy elements (rent cap, vacancy control/decontrol, exceptions to the cap, housing stock exemptions, and implementation/public education strategies).  The results of this poll are presented in Part III of this report.

In the second half of the meeting, the stakeholder group members heard a presentation from a guest speaker, Rebecca Walker of the Mapping Prejudice Project, on the history of housing discrimination in the U.S. and in the Twin Cities. Specifically, she described the pervasive discrimination against people of color and especially African-Americans that forced them into the lowest quality housing and the lowest-valued neighborhoods of the cities. This type of segregation robbed these groups of the wealth-building that Whites were able to benefit from through higher rates of homeownership and property value appreciation.

*Week 8: April 12, 2022.*  The stakeholder group convened in the evening of April 12 for the purpose of hearing input from members of the public.  Members of the public were given one minute to speak. A total of 37 people spoke at the open meeting. Some, because there was time available, spoke a second time.

In addition, 96 people provided the RSSG with written comments. The portal for providing written comments was open from Tuesday April 5 through the end of Friday April 15. All the written and oral comments were analyzed and categorized according to theme. A summary of the comments was given to the stakeholder group at the next meeting of the group.

*Week 9: April 19, 2022.*  No meeting was held.

*Week 10: April 26, 2022.*  This meeting of the stakeholder group was devoted to recapping the input the group had received from the public as well as a summary of their own responses to the polling questions from the April 5 meeting. Both the public input and the results of the group member polling are described in detail in Part III of this report.

*Week 11: May 3, 2022.*  At this meeting of the stakeholder group, the group heard from two speakers, Rasheedah Phillips of the nonprofit advocacy and research group PolicyLink, and Sarah Harris from the nonprofit housing developer Aeon.

Phillips presented statistics on renter insecurity in Minnesota and the affordability problem for renters in the Twin Cities metropolitan area. Phillips described how the housing insecurity is a racial equity issue, with disproportionate impact on BIPOC families.  She finished her talk by estimating the economic and community benefits of rent stabilization.

Harris also began her talk with statistics about the housing crisis for lower-income renters. She then focused her talk on the housing supply shortage noting both the loss of existing affordable housing and the lagging production of new housing, leading to low vacancy rates and high prices.  She ended her talk with a primer on financing housing and the need to attract investors to the local market.

*Week 12: May 10, 2022.*  The meeting began with a discussion of the threshold for agreement that would be considered sufficient to further a recommendation to the Mayor and City Council. The Co-chairs had announced in a previous meeting that, following the approach taken by the City's public safety taskforce that was convened in 2021, a 60% threshold of agreement would be used to establish what would constitute a recommendation from the group, while agreement from over 90% of group members would constitute a "strong recommendation" by the RSSG. Several members of the stakeholder group representing tenant interests expressed strong reservations about the 60% threshold, feeling it was too low. They were concerned that the overall makeup of the RSSG was such that 60% agreement might be achieved without any agreement from tenants.

After this discussion the group heard a presentation on rental market trends in Saint Paul. The CURA team analyzed data from the real estate analytics firm CoStar tracking a sample of rental buildings from 2000 to 2022. A full summary of this information is provided in Part II of this report.

The full group was then broken out into four small groups for deliberations. Up to this point in the group's process, small groups changed from one meeting to the next to give members the chance to interact with a large number of their colleagues over time. From this meeting forward, however, these four breakout groups were kept intact in order to facilitate the development of a deeper discussion among the members and the development of policy recommendations. These four groups had been purposefully formed by the co-chairs and facilitators to represent a balance of the interests that were represented in the full RSSG.  The groups were charged with trying to shape a package of policy proposals that would achieve the greatest possible level of

two potentially conflicting goals: breadth of support among the small group members, and comprehensiveness of the policy package.  Each of the groups was facilitated by one or two CURA team members.

Throughout the stakeholder group process, several participants and speakers had pointed out that the many elements of a rent stabilization policy provided opportunities for tradeoffs, so that one's position on a specific element such as the rent cap, might be dependent on the decision made about another policy element such as, for example, banking or vacancy decontrol. The small groups were encouraged to think holistically about a rent stabilization program for Saint Paul.  To anchor their thinking from the beginning they were asked to use the existing ordinance as the starting point – with one major exception. They were asked to add to their starting point some form of an exemption for new construction. This was added to the group's reference point because the existence of such an exemption had been largely agreed upon by the Mayor and the Council, and because the Council's Resolution to the stakeholder group asked for input on the form of such an exemption.  The groups were given two prompts to begin their discussions: "What does the current ordinance (with a new construction exemption) do well?" and "What does the current ordinance (with a new construction exemption) not do well?"

The group members moved into the small breakout rooms just 10 minutes before the end of the meeting, leaving only enough time for introductions. The small group discussions would begin in earnest the following week.

**Week 13: May 17, 2022.**   This meeting began with the Co-chairs reiterating the process that the RSSG would follow in its final weeks. The Co-chairs explained that each of the small groups would be deliberating on a potential "package" of proposals. The four packages that emerged from the small group process would then constitute the starting point for the large group discussion. The Co-Chairs explained that the small group process is not bound by the 60% threshold and that, in fact, the crossover appeal of a package proposal (i.e., having supporters who came from both the "No" and the "Yes" camps from the prior fall's election question) would be a strong indicator of its viability.

As previously noted, this meeting of the RSSG was, in effect, the first opportunity for the small groups to discuss possible policy packages. The rest of the meeting was thus devoted to the small group discussions.

**Week 14: May 24, 2022.**   This entire meeting was devoted to small group discussions, continuing to propose, debate, negotiate over, and try to craft compelling policy packages to bring back to the full RSSG.

**Week 15: May 31, 2022.**   This entire meeting was devoted to small group discussions. Near the end of the second hour the RSSG reconvened as a full group to hear the status of discussions in the small groups.  Group 1 had voted on a specific package but two of its members were not in attendance at the time of the vote. The Co-chairs directed that the two missing members have an opportunity to vote on the competing packages that Group 1 had considered and that the

14

results would be sent to the Co-chairs by Friday June 4.  Group 2 was nearing the end of its discussions and had developed four compromise proposals to vote on, with members of the group invited to vote for any of the compromise packages they supported (not just for the one they most would like to see move forward). Group 3 had not identified much common ground and had two quite disparate packages to choose between.  Group 4 had not yet taken a vote, but was close to doing so, having had many constructive "crossover" conversations among different stakeholders, leading them toward a vote on a single compromise package.

The Co-chairs gave the groups until Friday June 4 to conclude their respective processes and forward a proposed package for the consideration of the full RSSG.

*Week 16: June 7, 2022.*   All of the small groups concluded their processes by Friday June 4, and the Co-chairs and facilitators reviewed their proposed packages.  Several policy elements were common across the package proposals that received the most support in at least three of the small groups, including a recommendation for a 3% cap, some form of banking of preferential rents, a 15-year exemption for new construction, a continued process for reasonable rate of return, and support for just cause eviction protection for tenants.

The Co-chairs put forward this partial package of policy elements to the group for a vote. Twenty-one of the 35 members who voted, exactly 60%, voted in favor.  Several RSSG members indicated in the discussion prior to that vote that their support for a 3% rent cap was contingent on having vacancy decontrol, which was not included in the partial package because there were such clear divisions on it in the recommendations made by the four small groups. In response to this concern about the rent cap level being contingent on vacancy decontrol for some RSSG members, the Co-chairs offered up the same partial package of policy elements without the 3% cap and put that package (15-year new construction exemption; preferential banking; reasonable rate of return; and just cause protections for renters) up for a vote. This package received only 12 votes in favor (34%).

After the first vote took place, one RSSG member spoke up to indicate that he had just joined the meeting and had not voted on the first partial package offered by the Co-chairs.  He further indicated that his vote would have been "No" had he been in attendance when the vote occurred. This would have meant that support for the package would have been below the 60% threshold. Four other members of the RSSG, one of whom had also entered the meeting late, did not vote on the first question. Other members who voted on the two initial packages did not vote on other questions put to a vote later in the meeting, some of them still participating in the Zoom meeting but choosing not to vote and others having left the meeting before it concluded.

The Co-chairs then moved the group's discussion to the issue of vacancy control/decontrol. All four of the small group packages addressed vacancy decontrol directly, and it was clear from the reports of the small groups that this was a high-priority issue for RSSG members from a wide array of stakeholder perspectives. The packages from groups 1 and 3 called for full vacancy decontrol and the packages from groups 2 and 4 called for a specific, limited form of partial decontrol: making the maximum rent hike at the time of a change of tenants the total "banked"

15

amount of any allowed increases during the outgoing tenant's tenure that the landlord or property manager chose not to apply. The Co-chairs held a series of votes to see if the full group wanted to make a specific recommendation on vacancy decontrol. The first vote related to the preference of group members for full or partial vacancy decontrol. Twenty of the voting members (57%) voted a preference for partial decontrol and 15 voted for full decontrol. The Co-chairs then called for "yes/no" votes on each option. Twenty-nine of 35 voting members (83%) voted in favor of partial vacancy decontrol, while 15 of 34 voting members (44%) voted in favor of full vacancy decontrol.

At this point the Co-chairs suggested reconvening for one additional meeting the following week, to take up other policy elements on which there was not a significant level of agreement across the four small groups, to see whether it might be possible for the RSSG to reach 60% or higher agreement in order to make further policy recommendations to the City Council and Mayor.   However, multiple RSSG members suggested that it would be better to conclude the RSSG's work and report the votes already taken, and the decision of whether to convene for an additional meeting was put to a vote. The majority (17 of 31 RSSG members voting, or 53%) voted against meeting again the following week to take up other policy questions.

# II: Rental Housing in Saint Paul

### *The rental housing stock*

The CURA team provided the stakeholder group with information on the rental housing stock prior to the first meeting of the group. This information was a short summary of U.S. Census Bureau information about the housing stock in the city.  The American Community Survey (ACS) data for 2015-2021 (the most recent available at the time) showed there were 56,225 renter households in Saint Paul, 50% of which were Black, Indigenous, People of Color (BIPOC) and 50% were non-Hispanic White.  Seventy percent of BIPOC households in the city are renters, compared to only 39% of White households. Renting is most prevalent among Black households; 82% of Black households in Saint Paul rent.

The median income for renter households in Saint Paul was $36,236, compared to $85,634 for households who owned their homes.

Affordability problems are most acute for lower-income renter households. Close to 60% of renter households making less than 30% of the area median income (AMI) are "cost-burdened" (i.e., they pay more than 30% of their income on housing).

According to the ACS data, 70% of rental units in Saint Paul are in buildings with five or more units, while 17% are in single family homes.  Forty-one percent of non-homesteaded housing units in Saint Paul were built prior to 1950; 89% were built prior to 2005.

### *Rent trends and affordability*

In week 12 the CURA team presented a more detailed analysis of rental trends in Saint Paul. The analysis was based on data from CoStar, a real estate analytics firm. The CoStar data provides fine-grained information on rent changes over this period of time. A constraint of this database is that it covers only rents in buildings with five or more units and thus does not provide information about rents and rent trends in smaller buildings. In Saint Paul, however, 70% of the rental market is in larger buildings, as noted above.  The sample analyzed by CURA consisted of 549 buildings and over 24,000 units.  The sample was limited to buildings that rent units at market rates (i.e., subsidized housing was excluded).

The year-over-year change in nominal rents in Saint Paul have generally been below 5%.  Over time we see more variation within the market, a greater range between the highest and the lowest rent increases, in the post-housing crisis period.  Rents grew, on average, by 2.2% per year from 2000 to 2022. But there is variation in that pattern. In the years from 2000 to 2012, average rent increases were less than one percent, while in the post-crash period from 2013 to 2019, the average increased to 4.3. Figure 1 shows average rent increases in Saint Paul from 2000 to 2022.

Figure 1: Year over year change in nominal rents, Saint Paul 2000-2022



Black line represents mean change, grey area represents range of rent changes (10th to 90th percentile).

Trends in rent increase differed somewhat based on the age of the building. Prior to and during the housing crash, rents in newer buildings (built since 2000) tended to increase at a slightly higher rate than in older buildings. Since the end of the crash, the opposite has been the case. Table 1 provides the figures.

Table 1: Rent change by building age

| Time Period | Built Pre-2000 | Built Post-2000 |
|---|---|---|
| 2000-2007 Pre-Crash | 0.9 | 1.4 |
| 2008-2012 Crash | 0.8 | 1.1 |
| 2013-2019 Post-Crash | 3.3 | 2.7 |
| 2020-Present COVID | 2.0 | 0.1 |
| **Total** | **1.8** | **1.5** |

Table 2 shows what has happened to rents and incomes for Saint Paul renters. Renters with incomes in the top quartile (for all renters) saw average annual income increases of 4% and average annual increases in rents of just 2.6%.  This pattern is the same for renters with incomes in the second and third quartiles, too; income growth outpaced rent increases. However, for the lowest income renters in Saint Paul, the story is quite different. Renters with incomes in the bottom quartile saw their income increasing only 1.3% annually while their rents were increasing 4% each year on average (see Figure 2).

According to the ACS data, 56% of the renter households in the bottom quartile are cost-burdened, compared to only 1.8% of those in the top quartile.

Figure 2: Average annual income and rent change by income quartile, 2006-2019



Source: Author calculations, ACS, inflation adjusted

### *Potential rent caps in Saint Paul*

The CURA team modeled four potential rent caps to compare the allowable rent increases under each cap with the actual average rent increases in Saint Paul from 2000 to 2022. The results are shown in Figure 3.  The thicker, black line represents actual average annual rent increases in the city during this time period.  The other lines represent the maximum allowable rent increases under different rent cap scenarios. The horizontal red line is the 3% rent cap of the current ordinance.  Actual rent increases were below that level for almost the entire time period between 2002 to 2013. The post-crash period (2013-2019) saw rent increases above 3%, and then rent changes dipped below 3% during the pandemic.

Rent caps set above the CPI would, for the most part, not have had any impact on average rents in Saint Paul during this period. The two exceptions are 2015 and 2019 where average rent increases exceeded the CPI+3% level.

A cap set at the CPI would have had mixed effects over this time period. For many years between 2002 and 2013 average rent increases were below the CPI, but again during the post-crash period they were significantly higher than the rate of inflation.

Figure 3 looks at average rent increases and thus says nothing about the percentage of units that would have been affected under each of the caps.  The CURA team calculated these percentages and the patterns are shown in Figure 4. The graph shows that a cap set at CPI+7 (purple) would have affected very few rents for most of the study period until 2014 and 2015 when rents

19

increased significantly in the city. The same is true of a cap set at CPI+3 (blue). It would have had little to no impact until 2014. Then the percentage of units impacted by the cap would have increased to close to 20% and then to almost 60% of units in 2015, before dropping to just over 30% of units in 2016 and gradually declining since then.

Figure 3: Rent caps compared to average rent increases in Saint Paul, 2000-2022



The last two caps analyzed, a cap set at the CPI and a cap set at a fixed 3%, would have had a different pattern of impact over the study period. These two caps (the green and red lines) would have impacted close to 100% of rent increases in 2001 and 2002, then would have had no impact for four years until 2007 when these caps would have affected around 90% of rent increases in the city. What we are seeing in these dramatic increases and declines are "threshold effects." It is likely that many rents in Saint Paul during these years were very close to the CPI and to 3% so that slight fluctuations in inflation result in large number of units moving from below the cap to above it, or from above to below.  The CPI and flat 3% caps show a spike in 2015 just as the other caps did, with the CPI cap affecting significantly more units than the 3% cap in that year and in most subsequent years.

Figure 4: Share of units with rent increases over hypothetical caps, 2000-2022



The full set of slides for this presentation can be found in the appendix to this report.

## III: Policy Considerations

### *The rent stabilization policy framework*

The RSSG organized its learnings and deliberation around five policy option areas. Rent stabilization programs across the country vary on these five dimensions and thus they provided focus areas for decision-making by the group. Group members were provided with information on how other cities have approached these five elements and were provided with whatever lessons were available from research about the impacts associated with these five elements. The five are: 1) determination of the cap on rent increases, 2) whether or not a vacancy allows for a resetting of rents to the market level (a process referred to as 'vacancy decontrol'), and if so to what degree, 3) whether there are additional circumstances under which exceptions to the rent cap are made, 4) whether certain categories of housing stock are exempted from the program, and 5) how the program is administered and implemented.



Facilitators and the Co-chairs worked toward the goal of getting the stakeholder group to consider and make recommendations on as many of these program elements as possible. The first step was to inform group members about these program elements and the choices available to them.  This was done through presentations by the CURA team and guest speakers. At the end of the group process, proposed policy packages were also organized using this framework.

22

***Objectives of a good and effective rent stabilization program***

One of the early substantive achievements of the group was to agree upon a set of policy objectives for the Saint Paul rent stabilization program.  In week 5, members brainstormed ideas in response to the question: "What outcomes would a successful program of rent stabilization produce in Saint Paul?"  First, members were given an opportunity to think on their own and jot down their thoughts. Then they discussed the question in small groups and continued to brainstorm. This process produced over 200 separate statements recorded in Google Docs. Between meetings of the stakeholder group, the CURA team analyzed the ideas produced by the group and organized them into 12 separate statements. In week 6, the 12 statements were presented to the group for their reaction.  Members expressed support for these objectives, demonstrating that at the level of policy objectives, there was significant consensus within the group. The statements are provided below.

These 12 statements, receiving endorsement from the full stakeholder group, identify policy objectives in four broad areas.  The first three relate to benefits that a good program would produce for tenants, including stability, predictability, and protection from rent gouging.

---

**A good & effective rent stabilization program for Saint Paul would…**

1. provide stability of residence and affordable housing for Saint Paul renters
2. provide renters with predictability in their housing costs from year to year
3. prevent rent gouging
4. provide property owners with the ability to recoup expenses for operational costs and property maintenance, and a reasonable rate of return on their investment
5. result in continued maintenance of property, providing renters with decent, safe, and clean living environments and property owners with properties that remain in good shape
6. allow and encourage the upgrading of the rental housing stock through capital improvements
7. result in the expansion of the rental housing stock and housing options in Saint Paul through new construction by continuing to attract investment and financing
8. operate through a clear, transparent, and simple set of regulations and processes so that all parties have a good understanding of the system
9. be efficient and process petitions and claims quickly
10. have regulations and procedures that are fair to all parties
11. produce good communication between renters and owners/management
12. produce stable communities in the city.

---

A second cluster of statements (numbers 4 through 7) identify objectives related to the continued functioning of the housing market. Here stakeholders agreed that a good program of

rent stabilization should provide property owners with the ability to make a return on investment, result in continued maintenance and upgrading of rental properties, and result in the continued construction of new rental housing in the city.

Third, there were objectives (statements 8 through 10) related to the nature of the policy itself – that it be clear, transparent, and simple, and have processes that are efficient and fair.

Finally, group members identified two broader community benefits that a good rent stabilization program would foster, greater communication between renters and property owners and stable communities within the city.

### Polling results: Group members' initial preferences on program features

In week 7 of the process, RSSG group members were polled for their position on a series of policy options, if they were to state their preference on that particular policy question in isolation from all the other connected policy questions before them regarding how St. Paul should implement rent stabilization. The results showed some areas of agreement and other areas where more work was needed to bring group members together. The first set of questions related to rent caps. Two-thirds of the group members who responded to the poll indicated a preference for a variable cap over a fixed percentage cap.  In addition, there was not much agreement on what a fixed cap should be in any case. One-third of the members would prefer a rate of more than 5% if it were fixed, while 46% were in favor of 3% or less. There was also little agreement about the details of a variable rent cap with 52% preferring a cap at or less than the CPI and 49% preferring a cap above the CPI. The results are listed in table 2.

Table 2: Week 7 polling preferences of group members on rent cap options

| | | |
|---|---|---|
| Should the cap be fixed or variable? | Variable | 24 (67%) |
| | Fixed | 12 (33%) |
| Cap rate (if the cap is fixed) | Less than 3% | 2 (5%) |
| | 3% | 15 (41%) |
| | 3% to 5% | 5 (14%) |
| | 5% | 3 (8%) |
| | More than 5% | 12 (32%) |
| Cap rate (if the cap is variable) | Less than CPI | 15 (41%) |
| | Equal to CPI | 4 (11%) |
| | CPI plus up to 2% | 8 (22%) |
| | CPI plus more than 2% | 10 (27%) |
| Combination of fixed and variable cap? | Acceptable | 21 (55%) |
| | Not acceptable | 17 (45%) |

The second set of questions related to vacancy control/decontrol. A slight majority of the group members who voted (54%) expressed support for vacancy decontrol of some type.  Group members favored partial decontrol over full decontrol by a margin of 58% to 42%. The same margin was in favor of making vacancy decontrol contingent on other factors such as evidence of adequate maintenance or evidence that the tenant was not forced out. The results are in table 3.

Table 3: Week 7 polling preferences of group members on vacancy control/decontrol

| | | |
|---|---|---|
| Favor vacancy decontrol in some form? | Yes | 20 (54%) |
| | No | 17 (46%) |
| If there is some form of vacancy decontrol, do you favor partial or full decontrol? | Partial | 22 (58%) |
| | Full | 16 (42%) |
| Should vacancy decontrol be contingent on certain conditions (e.g., adequate maintenance)? | Yes | 22 (58% |
| | No | 16 (42%) |

RSSG members were also polled about their preferences related to other exceptions to the rent cap. Eighty-one percent (81%) of those voting favored a provision for allowing property owners a "reasonable rate of return."  Group members were asked to assume that the rent stabilization program allowed cost pass-throughs of some sort, either through a reasonable return provision or separately for certain costs such as capital improvements or emergency expenses. Then they were asked how such pass-throughs should operate. A majority of group members were in favor of limiting the pass throughs in different ways. Fifty-five percent felt that landlords should only be allowed to pass through a portion of the actual expenses, essentially 'sharing' a portion of the cost with the tenants. In addition, 58% were in favor of putting a top limit on the amount that rent would increase in a given year as a result of pass-throughs. Group members were not in favor of differentiating among properties in terms of pass-through policy, preferring to treat all properties with the same policy. Also, 58% of the members who responded were opposed to conditioning pass throughs on other factors such as upkeep.  Group members were asked two questions about the banking of preferential rents. Sixty-one percent were in favor of allowing banking, but two-thirds (66%) favored limiting the amount that landlords could bank. These results are shown in table 4.

Table 4: Week 7 polling preferences of group members on rent cap exceptions

| | | |
|---|---|---|
| Do you favor a provision for "reasonable rate of return"? | Yes | 29 (81%) |
| | No | 7 (19%) |
| Assuming pass-through of costs is allowed, should the owner be able to pass through the full costs or only a portion? | Full pass through | 17 (45%) |
| | Partial pass through | 21 (55%) |
| Assuming pass-throughs, should there be an upper cap to the rent increase that results? | Yes | 18 (58%) |
| | No | 13 (42%) |
| Assuming pass-throughs, should the policy be the same for all buildings or vary by the size of the building (# of units)? | Uniform policy | 19 (61%) |
| | Variable policy | 12 (39%) |
| Should pass-throughs be conditioned on other factors? | Yes | 13 (42%) |
| | No | 18 (58%) |
| Should owners be allowed to "bank" preferential rents? | Yes | 23 (61%) |
| | No | 15 (39%) |
| If there is banking, should the amount banked be limited in any way? | Yes | 25 (66%) |
| | No | 13 (34%) |

The fourth set of policy design options that group members were asked about related to potential exemptions for various categories of the housing stock. Most members were against an exemption for small properties (57% against exemptions for units in buildings with fewer than five units), and two-thirds were opposed to an exemption of such units if one of the units

were owner-occupied. There was a similar level of opposition to an exemption of single-family rentals, with 63% opposing such an exemption.  When asked about their preferred means of providing an exemption for newly constructed housing, 70% favored a rolling construction as opposed to an exemption tied to a specific date.  Moreover, 63% of those responding to the poll favored an exemption of 10 years or fewer. More than 90% of the group members favored an exemption for assisted housing in which rents paid by tenants are determined as a percentage of their income. Table 5 contains the data.

Table 5: Week 7 polling preferences of group members on housing stock exemptions

| | | |
|---|---|---|
| Should units in buildings with <5 units be exempt? | Yes | 16 (43%) |
| | No | 21 (57%) |
| Should units in buildings with <5 units be exempt if owner-occupied? | Yes | 13 (34%) |
| | No | 25 (66%) |
| Should rental units in single family homes be exempt? | Yes | 14 (37%) |
| | No | 24 (63%) |
| Are you in favor of a rolling exemption for new construction or tied to a fixed date? | Rolling | 70 (70%) |
| | Fixed date | 11 (30%) |
| If there is a rolling exemption for new construction, what is your preferred term for that exemption? | Less than 10 years | 14 (52%) |
| | 10 years | 3 (11%) |
| | 15 years | 6 (22%) |
| | 20 years | 4 (15%) |
| Should units where rent is based on a percentage of tenants' income be exempt? | Yes | 35 (92%) |
| | No | 3 (8%) |

Finally, RSSG members were asked two questions about program implementation. The responses are summarized in table 6.

Table 6: Week 7 positions of group members on program implementation

| | | |
|---|---|---|
| Should some form of a rent board be created to implement the ordinance? | Yes | 16 (43%) |
| | No | 21 (57%) |
| If there is a rent board, should it be appointed or elected? | Appointed | 24 (67%) |
| | Elected | 12 (33%) |

A majority of group members (57%) were opposed to the creation of a rent board, but if one were to exist, two-thirds of the members favored an appointed board.

## *Public Input*

On April 12 the RSSG had an open forum at which they took input from members of the public. At the same time there was a link for members of the public to use if they wished to submit a comment in writing.  A total of 39 people made comments at the April 12 hearing and another 96 people provided written comments. People were asked to provide the RSSG with their preferences for what the Saint Paul rent stabilization ordinance should look like and advised that the most useful statements were specific in terms of the policy choices that the stakeholder group was considering. The most common topic for public comments was the rent cap itself; 84 comments related to the rent cap and 75 of them (89%) indicated support for the 3% fixed cap.

A total of 75 comments were received that related to vacancy control/decontrol and 63 of them (84%) indicated support for vacancy control and the remaining 12 comments (16%) were in favor of decontrol.

An overwhelming percentage of the comments related to a process for reasonable return indicated support for such a provision (63 out of 65, 97%).

Only 15 people made specific comments about banking preferential rents. One was in favor and 14 were opposed.

Most of the comments related to a new construction exemption that the stakeholder group received were in opposition (64 of 74, or 86%). Very few comments were received that provided any useful information related to how a new construction exemption should be structured, if one were adopted.

Well over 90% of the comments related to other housing stock exemptions were in opposition; 97% (62 of 64) opposed an exemption for units in small buildings, 97% (60 of 62) opposed an exemption for single-family home rentals, and 100% of the comments related to an exemption for owner-occupation were in opposition (60 of 60).

Of the comments that did not directly pertain to one of the design elements of rent stabilization, two stood out for their frequency.  First, 23 people made the point that the issues of incentivizing new housing construction and the issue of ensuring the proper maintenance of the rental housing stock in Saint Paul should be dealt with separately and not be an objective of the rent stabilization policy.  Second, 18 people indicated that there should be no exceptions in the rent stabilization policy for properties that do not meet building or health codes.

The public input received in the open meeting/hearing for public input held by the RSSG is notable for the lopsided support seen there for the existing rent stabilization ordinance in Saint Paul. Some members of the stakeholder group subsequently discounted the public input as being merely the result of an organizing effort by pro-rent stabilization organizations.  While it is quite likely that the pro-rent stabilization organizations did work to get people to provide input at the public hearing, it is nevertheless also the case that very few comments were received in the RSSG's public hearing expressing any concerns or opposition to rent stabilization.. This cannot be attributed to a "crowding out" effect in which opponents were not left with any time to speak or any opportunity to make comments by the organized input of the tenant advocates. The oral comments from members of the public ended 40 minutes earlier than planned for, because everyone who wanted to had already spoken. Similarly, with written comments there was an opportunity for anyone to weigh in, from any stakeholder perspective, yet most of the written comments came from members of the public supportive of the ordinance passed by voters in 2021.

27

## Policy deliberations

**Rent Caps.**   The existing Saint Paul ordinance has a 3% cap for rent increases.  The norm across the country is to tie the rent cap to a measure of inflation, typically the Consumer Price Index (CPI).  Pegging the cap to inflation does not necessarily mean making the cap equal to the inflation rate.  Many cities have rent caps that are set at the CPI plus an additional percentage.  Other cities put their cap at a percentage of the CPI, so that allowable rent increases move with the rate of inflation but are not as great as inflationary changes. Finally, some cities have set their cap equal to the CPI changes.

Rent caps set at a fixed percentage are relatively less common though not rare.  Some cities actually combine the two, setting rent caps as equal to the CPI but with an upper and sometimes lower limit.

Tenant advocates strongly defended the 3% cap throughout the stakeholder group process. But, as seen in the week 5 polling, most group members favored a variable cap tied to the rate of inflation.  Ken Baar, who spoke to the group in week 6, argued for a cap tied to inflation as a means of allowing fair return and minimizing the number of "reasonable return" petitions that the City would have to otherwise process. Several group members argued in favor of an inflation-based cap using the current inflationary period as an example of the cost crunch that could burden property owners under a fixed rent cap.

The rental market analysis presented to the RSSG (summarized in Part II of this report) showed that for most of the years between 2000 and 2022, average rent increases were well below 3%. This was generally true until the post-crash period from 2013 to 2019 when rents increased at greater rates. It is only during that period that a 3% cap would have meant rent increases below the average of what actually occurred in Saint Paul.

A rent cap set at the CPI would have meant allowable rent increases below 3% for most of the period from 2000 to 2022.  In the last year and a half, when inflation has risen significantly above 3%, a CPI-anchored rent cap would have allowed rent increases above 3%.

In the end, however, the majority of the members of all four of the small groups recommended a flat 3% cap, and that is part of the partial package the RSSG has recommended to the Mayor and City Council.

**Vacancy Control/Decontrol.**   The existing Saint Paul ordinance explicitly calls for vacancy control, i.e., the continued application of the rent cap regardless of whether a tenant has vacated the unit.  The alternative, vacancy decontrol, allows owners to raise rents as far above the cap as they choose when a vacancy occurs.  The original rent cap is then reapplied in subsequent years until the next vacancy. Various arguments were made in favor of and against vacancy decontrol by stakeholder group members. Some argued that vacancy decontrol produces an incentive for landlords to evict tenants in order to raise rents above the cap. It is this very concern that has led some cities to pair vacancy decontrol with various tenant

protection initiatives. Many RSSG members from diverse stakeholder perspectives argued in their small group deliberations that there is an important connection between having some form of decontrol and making sure that there are just cause eviction protections in place for renters.

On the other hand, other RSSG members argued that vacancy decontrol is an important way in which property owners can cover the costs of unit improvements and updates that are made between tenancies. These group members worried about the ability to update units without a vacancy decontrol provision.

Vacancy decontrol can take several forms. At one end of the continuum is "full vacancy decontrol" in which there are no regulatory limits put on the amount of rent increase a landlord may charge upon a vacancy. At the other end of the continuum is vacancy control – such as what is currently in place in St. Paul, as a result of the vote last November -- in which rent caps apply even when there is a vacancy.  In between these approaches is an option referred to as "partial vacancy decontrol."  The most typical way to enact partial decontrol is to set an upper limit on how large the rent increase can be in between tenants.  This essentially substitutes a new and higher cap at the time of a vacancy for any rent stabilized unit.

Another option to achieve partial vacancy decontrol is to tie it to the banking of preferential rents. In this scenario, when a vacancy occurs a landlord may cash in the preferential rents that they have banked. It should be noted that this approach is both a more constrained form of partial decontrol and a more constrained form of banking.  This approach is a constrained form of partial decontrol because it only allows vacancy decontrol on units where the landlord has given preferential rents.  This approach constitutes a constrained form of banking because, as we shall see below, the cashing in of banked increases would only be allowed when a vacancy occurs.  Most forms of banking allow owners to cash in regardless of vacancy status.

The final policy design option related to vacancy decontrol is whether it is by right or made contingent on other factors related to property maintenance and upgrading.

The week 7 polling indicated that RSSG members a) preferred some form of vacancy decontrol by a 54% to 46% margin, b) preferred partial vacancy decontrol over full decontrol by a 58% to 52% margin, and c) felt that decontrol should be made contingent on other factors by an identical 58% to 42% margin.

Two of the policy packages produced by the majorities of the RSSG small groups included a provision for full vacancy decontrol, though when this proposal was voted upon by the full group, only 44% supported it. The other two small groups created policy packages that called for a specific form of partial vacancy decontrol. For both of these groups, partial vacancy decontrol was associated with banking. That is, upon a vacancy an owner would be able to increase rents above the cap only through cashing in banked preferential rents.

One idea that was mentioned by a group member in small group and in the RSSG's final meeting, but not voted on by the full group, was to allow landlords to increase rents at a rate up to the

CPI plus 7% upon a vacancy.  The "CPI+7" idea was taken from the State of Oregon's rent stabilization ordinance, which sets the statewide cap at CPI plus 7%.

Finally, none of the groups included any provision to make decontrol contingent on any other factors in the packages they put forward to the full RSSG.

***Other rent cap exceptions.***   Rent stabilization programs across the country allow for various exceptions to the rent cap. The existing Saint Paul ordinance includes a provision allowing for a reasonable rate of return for property owners. U.S. courts have ruled that such a provision is a necessary legal hurdle for any rent stabilization program. While there was never any question within the stakeholder group about whether a reasonable rate of return provision was a good idea (there was agreement that it was), there was considerable discussion and concern about how reasonable return is defined and who gets to define it. There was also concern about how it is being implemented in the existing ordinance and whether the process is efficient and unburdensome. As a result of these concerns with the details of implementing reasonable return, all of the small groups had conversations about the topic.  In the end, two of the small group packages said nothing substantive about reasonable return, while a third package suggested conditions under which 'self-certification' would be sufficient to trigger an above-the-cap rent increase based on the reasonable rate of return provision, and when a formal review would be necessary. The fourth small group package called for a reasonable return provision as it exists in the current ordinance.

A second category of rent cap exceptions are related to specific cost pass-throughs that are allowed in some rent stabilization programs. Some cities outline specific costs that may be passed through to tenants, in effect raising rents by an amount greater than the cap would otherwise permit. Such pass-throughs are most commonly associated with capital improvements, property tax increases, and utilities increases.  It should be noted that such costs increases can be and are accommodated in other programs through the reasonable rate of return provision.

Pass-through provisions, when they are used for specific costs typically operate in the way that reasonable return provisions operate.  That is, property owners petition to make the case that these costs are necessary and non-routine, and would cause an undue financial burden without the ability to recover through rents. While pass-through provisions were covered during the learnings sessions, there was very little discussion of specific pass-throughs by members of the RSSG.  Presumably this is the case because the provision for reasonable rate of return covered the topic.

Only one of the four small groups included provisions for cost pass-throughs outside of the reasonable rate of return mechanism.  Group 3 called for the pass through of utility increases and property tax increases.  The Group 3 proposal was unusual in that these pass-throughs would be direct and automatic, not requiring a justification.

The final type of rent cap exception discussed by RSSG members was "banking." Property owners often offer lower rents and lower rent increases to longer term tenants or tenants they wish to keep. Such a practice is called preferential rents.  In the context of a rent stabilization program a preferential rent is any increase that is below the maximum allowed by the cap. Figure 5 below illustrates the process.

Figure 5: Banking



"Banking"

(a)  Allowable rent increases at the cap
(b)  "Preferential rents"
(c)  Banked amount (a-b)

Line *a* is the rate of rent increase allowed by the rent cap.  Line *b* represents the rents charged as a result of the landlord offering preferential rents. Banking allows the landlord to make up that difference (line *c*) at some point in the future. Making up those preferential rents necessarily involves rent increases above the cap and thus constitute an exception to the cap.

Arguments in favor of banking claim that without it, property owners are incentivized to raise rents to the maximum allowed by the cap and would harm tenants who would otherwise receive preferential rents.

Concerns about banking include the fact that when the banked amount is recouped by the landlord, the rent increase can be a significant burden for the tenant.  Two policy options exist to temper the burden to the tenant of reclaiming banked rents. The first is to limit the amount of banked rents that can be recouped. This has been done by some cities by putting an upper limit on banking increases and/or by limiting the number of years preferential rents can be banked.  A second option for mitigating the burden of banking increases for existing tenants is to allow the recovery of banked rents only at the time of a vacancy.  As noted earlier, this approach to banking is essentially the equivalent of a limited form of partial vacancy decontrol.

The week 7 polling of group members revealed that 61% were in favor of banking and that 66% in favor of limiting banking in some way if some form of banking were adopted. Three of the small groups included some form of banking in their package. One group proposed banking for up to five years and required notification to the tenant of their preferential rents and the

31

potential for a banking increase in the future.  Two of the groups called for banking at the time of a vacancy.

***Housing stock exemptions.***   The current Saint Paul rent stabilization ordinance contains two minor exemptions. The first is that the limit on rent increases will not apply to the tenant rent obligation where that obligation is set as a share of the tenant's income. This condition applies to a subset of public-subsidized housing units. The second exemption is that the rent limit will not apply "to the amount that a housing service provider can be reimbursed by a government entity under the Housing Support Act." This exemption also applies to a very small number of housing units.

Notably, the Saint Paul ordinance does not exempt newly constructed units. To our knowledge this is the only ordinance in the country that does not include a new construction exemption. The Mayor and the City Council have signaled their intent to create such an exemption, thus the stakeholder group was asked for their input into how to structure a new construction exemption.

The argument in favor of a new construction exemption is that without it a rent stabilization program would constitute a significant disincentive for new construction of rental housing. This concern was voiced consistently by several members of the stakeholder group over the entire 16-week process and echoed in the presentation made by Sarah Harris of Aeon to the group in week 11.

Rent stabilization programs provide exemptions for new construction in one of two ways. The first is to exempt all housing constructed after a specific date.  That date is usually set at or near the initiation of the rent stabilization program.  A concern with exemptions of this type is that they result in an ever-shrinking stock of rent regulated units, both in relative and absolute terms, as new units are constructed that are exempt, and older units are demolished or otherwise removed from the stock. The second approach is to exempt new construction in a rolling fashion where the exemption lasts for a period of years and then units are brought into the regulated stock. The terms of rolling exemptions vary greatly from five years at the short end to 30 years at the longest.

The week 7 polling indicated that RSSG members favored a rolling exemption over a fixed exemption by a 70% to 30% margin. When asked about the terms of a rolling exemption, 63% favored 10 years or fewer. When the small groups forwarded their package proposals, three of the four called for an exemption of 15 years and the fourth group recommended 30 years.

Other ideas for the new construction exemption were considered by the group but not voted on. At least two of the four small groups discussed the need to build into any new construction exemption protections against the demolition of "naturally occurring affordable housing" (NOAH). This could be done by not extending the new construction exemption to cases in which NOAH was torn down and then replaced by new construction.  This recommendation made it into one of the packages but was not discussed by the full group.

32

One group also argued for including adaptive reuse in the new construction exemption. This was not considered or voted upon by the full group.

A final policy question related to a rolling new construction exemption is whether it will be provided retroactively.  Only one group made a recommendation in this regard, and it was general in nature: Group 4 called for "limited retroactivity" in the application of a rolling exemption for new construction. This idea was not discussed or voted on by the full group.

Rent stabilization programs across the country frequently exempt other parts of the housing stock. The most typical exemptions cover small buildings (buildings with fewer than 5 units), single family rentals, small buildings in which one of the units is owner-occupied, and publicly subsidized housing. All of these examples were described to group members during the learnings portion of the group process.  The week 7 polling indicated limited support for most of these. Only 43% of RSSG members indicated support for exempting units in small buildings, 37% supported an exemption for single-family home rentals, and 34% supported exemptions based on owner-occupation.  Only one of the groups called for an exemption of this type: Group 3 included an exemption for owner-occupied duplexes. This idea was not discussed or voted on by the full group.

There was more support for the idea of exempting publicly subsidized housing in some form. The week 7 poll indicated that 92% of members supported the idea of exempting units in which the tenant share of the rent is determined as a percentage of income. It should be noted that this does not apply to all publicly subsidized units.

The nuances of this type of exemption were treated differently by the four small groups and the larger group did not resolve those differences in the end. Two of the groups called for exempting subsidized units where rents are controlled by a land use regulatory agreement (LURA).  The other two groups explicitly argued against exemptions for Low Income Housing Tax Credit (LIHTC) projects and other subsidized units, except that one of those two groups did approve an exemption for units in which tenant rent is based on income.  As is apparent, the question of whether subsidized units should be exempt or not generated significant interest and debate, but there was no consensus at the end about how to define or delimit such an exemption.

Finally, one of the groups called for an exemption for units in which care or services are provided on site. This idea was not discussed by the large group nor was it voted on.

***Implementation and public information.***  There is a wide range of approaches taken by cities to implement programs of rent stabilization. The Saint Paul ordinance is silent on these details and the ballot initiative left it to City staff to work out details of implementation and lines of program responsibility and authority.  Stakeholder group members were shown a few examples of the implementation infrastructure created by other cities. These examples included extensive web-sites that provide resources for tenants and landlords including handbooks outlining responsibilities and obligations. Some cities provided trainings and workshops for tenants and

separate ones for landlords on certain aspects of the law. Other resources included minutes and decisions of rent boards where they exist, and annual reports on the operation of the program.

The major discrete policy choice faced in shaping an implementation infrastructure is whether a separate "rent board" will be created for the purpose of monitoring compliance, adjudicating disputes and appeals, and rendering decisions on petitions related to reasonable return. In the week 7 polling, RSSG members opposed the establishment of a rent board by a 57% to 43% margin.

There was no widespread convergence on matters of implementation across the four small groups.  Two of the groups called for educational programming, one specified the need for a rental registry for the purpose of implementing the program, and one expressed a preference for a staff-run program (as opposed to reliance on a rent board) located in the City's Department of Safety and Inspections (DSI).  There was no large group discussion of these matters and no votes on any of the specific recommendations.

Short of making specific recommendations about how to implement rent stabilization, the stakeholder group did offer more general guidelines. In week 5 the group agreed to a set of policy objectives that should guide the operation of rent stabilization in Saint Paul.  In that agreement group members stated that a good and effective rent stabilization program would be clear, transparent, and simple, and have processes that are efficient and fair.

***Other, complementary policies.***  During the learnings phase of the stakeholder group process, members learned that other cities have often pursued policies that are complementary to rent stabilization in order to increase the effectiveness of the program or to address potential unintended consequences.  The two most common examples of these complementary policies are 1) tenant protections made available to address the potential incentives to evict that accompany any form of vacancy decontrol, and 2) controls on demolition or conversion of existing rental housing to address the incentive to remove buildings from the stock of regulated units.

Tenant protections from eviction appeared in all four of the small group packages. In three of the packages, the small groups called for the City to enact some form of "just cause eviction" protections. The remaining group offered a more limited version of tenant protections, calling for a specific provision that would apply only to rent stabilized units.

One of the groups also incorporated a provision for relocation assistance for tenants who are evicted as a means of discouraging evictions. How and under what specific conditions such relocation assistance would be made was not spelled out by the group.

***Summary***.  In sum, the RSSG members engaged in extensive discussions about the policy elements of rent stabilization and considered a wide range of alternatives.  Table 7 below summarizes the outcomes of the four small group discussions, listing the policy package that

34

received the largest number of votes within each group. As the table demonstrates, there were significant areas of agreement across the four groups (highlighted in yellow in the table).

Table 7: Policy packages produced by the small groups

| | Group 1<br>Votes in favor<br>(5 of 9, 55%)<br>3 proposals voted on | Group 2<br>Votes in favor<br>(6 of 9, 67%)<br>4 proposals voted on | Group 3<br>Votes in favor<br>(6 of 10, 60%)<br>3 proposals voted on | Group 4<br>Votes in favor<br>(6 of 9, 67%)<br>1 proposal voted on |
|---|---|---|---|---|
| Rent Cap | 3% | 3% | 3% | 3% |
| Cap exceptions | Full vacancy decontrol | Vacancy decontrol through banking | Full vacancy decontrol | Partial decontrol through banking |
| | | Banking (see above) | Banking (up to 5 yrs, tenant notification required) | Banking (see above) |
| | | | Utility pass through | |
| | | | Prop tax pass through | |
| Reasonable rate of return | X | X | X<br>Self-certification for increases 4 to 10% | As is |
| NC exemption | 15 years | 15 years | 30 years | 15 years for NC & adaptive reuse, limited retroactivity |
| | | | | NOAH demolition protection |
| Other housing stock exemptions | Units with income-based rent | Subsidized units with land use regulatory agreements (LURA) | Subsidized units with LURA | No exemption for LIHTC and subsidized stock |
| | | | Exempt owner-occupied duplexes | |
| | | | Exempt units with care or services | |
| Implemen-tation | | | Staff run program | |
| | | Rental registry | | |
| | Free workshops for landlords on compliance | | Educational programming | |
| Other | Just cause eviction ordinance | Just cause ordinance | Renter stability provision (applies to rent stabilized units) | Just cause |
| | | Relocation assistance | | |

Areas of agreement across three or more groups are highlighted in yellow.

# IV. Recommendations

As described in the previous section of this report, the stakeholder group held many discussions and considered a large number of policy options. In the end the group made two recommendations: one on a package of five items and a second on a single item.  Many of the ideas discussed by the group are not reflected in these two recommendations because there was not enough agreement on them during the time the RSSG met, deliberated and voted. These ideas were laid out in Part III of this report and may provide a guide for the Mayor and the City Council in their own deliberations on what rent stabilization should look like in Saint Paul.

## *Recommendation 1*

The following package of policy proposals was recommended by the RSSG:

- A rent cap of 3%
- A provision for reasonable rate of return
- Banking in some form
- A new construction exemption of 15 years
- Just cause eviction protections for renters

This package of proposals was approved by exactly 60% of those who voted on it.

## *Recommendation 2*

The group recommends some form of partial vacancy decontrol. In the discussion that preceded this vote, it was clear that RSSG members understood that there is a broad spectrum of possibilities for what "partial vacancy decontrol" could be in practice, between the rejected polar opposites of full vacancy decontrol and full vacancy control. The recommendation for some form of partial vacancy decontrol received support from 83% of the group members who voted.

# Saint Paul
# Rent Stabilization Stakeholders Group

# Appendix

**The Saint Paul Rent Stabilization Ordinance**

- ## Chapter 193A. - Residential Rent Stabilization

- ## Sec. 193A.01. - Findings.

In order to retain or find adequate rental housing, many residents of the City of Saint Paul pay a substantial amount of their monthly income for rent; that the present shortage of residential rental units and the prevailing rent levels have a detrimental effect on the health, safety, and welfare of a substantial number of Saint Paul residents, particularly persons in low and moderate income households, and persons on fixed incomes who reside in the city; that residential tenants constitute over fifty (50) percent of the residents in Saint Paul; that residential tenants suffer great and serious hardship when forced to move from their homes; that the community is impacted by housing instability when rent increases outpace incomes; and that the welfare of all persons who live, work, or own property in the City of Saint Paul depends in part ensuring that Saint Paul residents have access to affordable housing.

(Ord of 11-2-2021)

- ## Sec. 193A.02. - Authority.

Pursuant to Minn. Stat. § 471.9996 sub. 2, the City of Saint Paul shall establish a policy limiting rent increases on residential rental properties as approved in a general election.

(Ord of 11-2-2021)

- ## Sec. 193A.03. - Limitation on rent increases.

No landlord shall demand, charge, or accept from a tenant a rent increase within a 12-month period that is in excess of three (3) percent of the existing monthly rent for any residential rental property except as otherwise allowed under section 193A.05 or 193A.06.

(Ord of 11-2-2021)

- ## Sec. 193A.04. - Vacancy.

Limitation on the amount of annual rent increase shall apply regardless of change of occupancy in a residential rental unit except as otherwise allowed under section 193A.05 or 193A.06.

(Ord of 11-2-2021)

- ## Sec. 193A.05. - Reasonable return on investment.

(a)  The city shall establish a process by which landlords can request exceptions to the limitation on rent increases based on the right to a reasonable return on investment. Rationale for deviations from the limitation on rent increases must take into account the following factors:

(1)  Increases or decreases in property taxes.

(2)  Unavoidable increases or any decreases in maintenance and operating expenses.

(3)  The cost of planned or completed capital improvements to the rental unit (as distinguished from ordinary repair, replacement and maintenance) where such capital improvements are necessary to bring the property into compliance or maintain compliance with applicable local code requirements affecting health and safety, and where such capital improvement costs are properly amortized over the life of the improvement.

(4)  Increases or decreases in the number of tenants occupying the rental unit, living space, furniture, furnishings; equipment, or other housing services provided, or occupancy rules.

(5)  Substantial deterioration of the rental unit other than as a result of normal wear and tear.

(6)  Failure on the part of the landlord to provide adequate housing services, or to comply substantially with applicable state rental housing laws, local housing, health and safety codes, or the rental agreement.

(7)  The pattern of recent rent increases or decreases.

(b)  It is the intent of this chapter that exception to limitation on rent increases be made only when the landlord demonstrates that such adjustments are necessary to provide the landlord with a fair return on investment.

(c)  The city will not grant an exception to the limitation on rent increases for any unit where the landlord has failed to bring the rental unit into compliance with the implied warranty of habitability.

(Ord of 11-2-2021)

- **Sec. 193A.06. - Exceptions.**

(a)  The limitation on rent increases shall not apply to the amount that a housing service provider can be reimbursed by a government entity under the Housing Support Act, Minn. Stat. § 256I.

(b)  The limitation on rent increases shall not apply to changes in the tenant obligation for income based payments where the renter obligation is established as a share of income.

(Ord of 11-2-2021)

- **Sec. 193A.07. - Enforcement, penalties, and prohibitions.**

  (a)  *Penalties for violation.* In addition to any other remedy available at equity or law, failure to comply with the provisions of this chapter may result in criminal prosecution and/or administrative fines as provided by section 1.05 of the Legislative Code.

  (b)  *Private right of action.* Any tenant aggrieved by a landlord's noncompliance with this chapter may seek equitable relief in any court of competent jurisdiction to the extent permitted by law.

  (c)  *Prohibition of waiver.* Any lease provision which waives or purports to waive any right, benefit or entitlement created in this chapter shall be deemed void and of no lawful force or effect.

  (Ord of 11-2-2021)

- **Sec. 193A.08. - Severability.**

  If any of the parts or provisions of this section or the application thereof to any person or circumstance is held invalid or unconstitutional by a decision of a court of competent jurisdiction, the remainder of this section, including the application of such part or provisions to persons or circumstances other than those to which it is held invalid, shall not be affected thereby and shall continue in full force and effect. To this end, the provisions of this section are severable.

  (Ord of 11-2-2021)

- **Sec. 193A.09. - Effective date.**

  This section shall become effective May 1, 2022.

  (Ord of 11-2-2021)

**Resolution from Council to Rent Stabilization Stakeholder Group**

WHEREAS, an initiative was placed on the ballot for the City General Election held November 2, 2021, creating a rent stabilization ordinance to be codified at Chapter 193A of the Legislative Code ("the ordinance"); and

WHEREAS, after the City General Election, the Council of the City of Saint Paul determined that a majority of those voting on the ballot question voted in its favor; and

WHEREAS, given the City General Election results, and pursuant to Section 8.04 of the City Charter, the rent stabilization ordinance became law; and

WHEREAS, a stated public purpose of the ordinance is to protect the welfare of all persons who live, work, or own property in the City of Saint Paul by ensuring that Saint Paul residents have access to affordable housing; and

WHEREAS, on February 18th, 2022, Mayor Melvin Carter announced the convening of a forty-one member Rent Stabilization Stakeholder Group ("RSSG") by the University of Minnesota Center for Regional and Urban Affairs ("CURA") to identify considerations on improving and enhancing rent stabilization in Saint Paul; and

WHEREAS, the Mayor and Saint Paul City Council seek feedback and policy recommendations from the RSSG to help inform and improve the ordinance; and

WHEREAS, CURA's work with the RSSG will be done pursuant to City contract to provide facilitation services to the RSSG and produce a report to be delivered to the Mayor and City Council by July 1, 2022; and

WHEREAS, the Saint Paul City Council wishes to declare its intent to consider amendments and improvements to the ordinance as contained in the report delivered to the City Council; now, therefore, be it

RESOLVED, that the Saint Paul City Council desires specifically that CURA include analysis and recommendations on the following topics from discussions with the RSSG in its report to the Council:

1. How to ensure stable rental rates in Saint Paul;

2. How to ensure quality affordable housing for both incumbent renters and for prospective renters;

3. How to implement an exemption for new residential construction; specifically what length of time the exemption should be for;

4. Data on the impacts of the rent stabilization ordinance that justify the recommendation above;

5. Provide recommendations for ensuring affordability and protections for renters in exempted new construction and policies to mitigate displacement;

41

6.  How to establish a rent increase cap, whether any possible exceptions should exist from such a cap, and what those exceptions might be;

7.  Whether and how to implement vacancy decontrol, meaning the ability of a landlord to increase rent above the rental cap in cases where a tenant vacates a unit;

8.  How to ensure compliance with a rent stabilization ordinance;

9.  How to ensure that rental units and properties in Saint Paul are properly maintained, updated, and invested in while complying with the rent stabilization ordinance; and

10. Recommendations and best practices learned from implementing rent stabilization policies around the country for future consideration, including community education strategies that empower renters to understand their rights and landlords to understand and meet their responsibilities, staffing, budgetary considerations, and other recommendations as determined by the workgroup.

Resolution 22-408.

# St. Paul Rental Market Snapshot

## Renter Demographics in St. Paul

### Table 1 Housing Tenure

|                       | Total HH | Renter HH | % Renter |
|-----------------------|----------|-----------|----------|
| White (Non-Hispanic)  | 72,986   | 28,146    | 38.6     |
| BIPOC                 | 40,168   | 28,080    | 69.9     |
| Total                 | 113,154  | 56,226    | 49.7     |

*Source: CURA calculations 2015-2019 American Community Survey*

### Table 2 Housing Tenure by Specified Racial/Ethnic Group

|                      | Total HH | Renter HH | % Renter |
|----------------------|----------|-----------|----------|
| Black                | 16,771   | 13,766    | 82.1     |
| Asian                | 12,562   | 7,296     | 58.1     |
| Native American      | 873      | 555       | 63.6     |
| Hispanic (Any Race)  | 7,243    | 4,503     | 62.2     |

*Source: CURA calculations 2015-2019 American Community Survey*

### Table 3 Median Household Income by Tenure

| Tenure            | Median HH Income |
|-------------------|------------------|
| Owner Households  | $85,634          |
| Renter Households | $36,236          |
| All Households    | $57,876          |

*Source: CURA calculations 2015-2019 American Community Survey*

**Figure 1 Cost-Burdened Renter Households by Income**



*Note: Housing cost-burden is defined as a household that pays more than 30% of its income on housing.*
*Source: CURA calculations, ipums.org*

# St. Paul Housing Stock Characteristics

**Table 4 Housing Units by Building Size by Homestead Status**

| Building Size | Total Units | Non-Homesteaded | |
|---|---|---|---|
| | | N | % |
| 1 Unit (SF) | 65,122 | 10,336 | 15.9 |
| 2-4 Units | 14,041 | 8,364 | 59.6 |
| 5+ Units | 42,978 | 42,840 | 99.7 |
| Total | 122,141 | 61,540 | 50.4 |

*Note: Mixed-tenure buildings counted as homesteaded*
*Source: CURA calculations, Ramsey County Assessor*

**Table 5 Buildings by Building Size by Homestead Status**

| Building Size | Total Buildings | Non-Homesteaded | |
|---|---|---|---|
| | | N | % |
| 1 Unit (SF) | 59,662 | 50,851 | 85.2 |
| 2-4 Units | 6,373 | 2,703 | 42.4 |
| 5+ Units | 1,395 | 20 | 1.4 |
| Total | 67,430 | 53,574 | 79.5 |

*Note: Mixed-tenure buildings counted as homesteaded*
*Source: CURA calculations, Ramsey County Assessor*

**Table 6 Non-Homesteaded Housing Units by Age**

| Age | Units | % |
|---|---|---|
| 1950 or Older | 25,449 | 41.4 |
| 1950-1965 | 9,040 | 14.7 |
| 1965-1980 | 13,520 | 22.0 |
| 1980-1995 | 4,433 | 7.2 |
| 1995-2005 | 2,453 | 4.0 |
| 2005-2022 | 6,645 | 10.8 |
| Total | 61,540 | 100 |

*Source: CURA calculations, Ramsey County Assessor*


**Figure 2 St. Paul Cumulative Rental Housing Production 2010-2020**



*Source: CURA calculations, Met Council*
- Average 478 market rate units per year and 328 affordable units per year

45

**Table 7 Homestead Status by District Council**

| District Council | Total | Non-Homesteaded | |
|---|---|---|---|
| | | N | % |
| Battle Creek-Highwood | 8,511 | 4,275 | 50.2 |
| Como | 5,631 | 2,217 | 39.4 |
| Dayton's Bluff | 6,104 | 2,978 | 48.8 |
| Downtown | 6,831 | 5,471 | 80.1 |
| Greater East Side | 9,733 | 3,655 | 37.6 |
| Hamline-Midway | 4,869 | 2,019 | 41.5 |
| Highland | 11,907 | 5,966 | 50.1 |
| Macalester-Groveland | 8,317 | 2,633 | 31.7 |
| Merriam Park, Lexington-Hamline | 8,040 | 4,749 | 59.1 |
| North End | 9,134 | 4,549 | 49.8 |
| Payne-Phalen | 10,154 | 4,656 | 45.9 |
| St. Anthony Park | 5,098 | 3,555 | 69.7 |
| Summit-University | 7,429 | 4,288 | 57.7 |
| Summit Hill | 3,522 | 1,870 | 53.1 |
| Thomas-Dale | 4,569 | 2,352 | 51.5 |
| West Seventh | 6,468 | 3,649 | 56.4 |
| West Side | 5,824 | 2,658 | 45.6 |
| Total | 122,141 | 61,540 | 50.4 |

*Source: CURA calculations, Ramsey County Assessor*

**Table 8 Non-Homesteaded Units by Building Size by District Council**

| District Council | 1 unit (SF) | | 2-4 units | | 5+ units | | Total |
|---|---|---|---|---|---|---|---|
| | Units | Pct. | Units | Pct. | Units | Pct. | Units |
| Battle Creek-Highwood | 550 | 12.9 | 242 | 5.7 | 3,483 | 81.5 | 4,275 |
| Como | 284 | 12.8 | 93 | 4.2 | 1,840 | 83.0 | 2,217 |
| Dayton's Bluff | 771 | 25.9 | 845 | 28.4 | 1,362 | 45.7 | 2,978 |
| Downtown | 530 | 9.7 | 4 | 0.1 | 4,937 | 90.2 | 5,471 |
| Greater East Side | 1,005 | 27.5 | 324 | 8.9 | 2,326 | 63.6 | 3,655 |
| Hamline-Midway | 436 | 21.6 | 509 | 25.2 | 1,074 | 53.2 | 2,019 |
| Highland | 541 | 9.1 | 189 | 3.2 | 5,236 | 87.8 | 5,966 |
| Macalester-Groveland | 572 | 21.7 | 410 | 15.6 | 1,651 | 62.7 | 2,633 |
| Merriam Park, Lexington-Hamline | 540 | 11.4 | 828 | 17.4 | 3,381 | 71.2 | 4,749 |
| North End | 993 | 21.8 | 626 | 13.8 | 2,930 | 64.4 | 4,549 |
| Payne-Phalen | 1,165 | 25.0 | 1,295 | 27.8 | 2,196 | 47.2 | 4,656 |
| St. Anthony Park | 230 | 6.5 | 173 | 4.9 | 3,152 | 88.7 | 3,555 |
| Summit-University | 713 | 16.6 | 785 | 18.3 | 2,790 | 65.1 | 4,288 |
| Summit Hill | 263 | 14.1 | 279 | 14.9 | 1,328 | 71.0 | 1,870 |
| Thomas-Dale | 631 | 26.8 | 797 | 33.9 | 924 | 39.3 | 2,352 |
| West Seventh | 554 | 15.2 | 400 | 11.0 | 2,695 | 73.9 | 3,649 |
| West Side | 558 | 21.0 | 565 | 21.3 | 1,535 | 57.8 | 2,658 |
| Total | 10,336 | 16.8 | 8,364 | 13.6 | 42,840 | 69.6 | 61,540 |

*Source: CURA calculations, Ramsey County Assessor*

**Minutes**
**St. Paul Rent Stabilization Task Force**
**February 22, 2022**

**Members present:** Katherine Banbury, Tony Barranco, Jay Benanav, Clinton Blaiser, Monica Bravo, Carolyn Brown, Scott Cordes, Phillip Cryan, Arline Datu, Khayree Duckett, Kelly Elkin, Tou Fang, Thomas Godfrey, Robbie Grossman, Tram Hoang, Myisha Holley, Rich Holst, Mya Honeywell, Abdiaziz Ibrahim, Rawnson Ivanoff, Nathaniel Khaliq, Chue Kue, Bill Lindeke, Carin Mrotz, Tom Nelson, Dalton Outlaw, Kevin Pranis, B. Rosas, Tony Sanneh, Katheryn Schneider, Julie Schwartz, Emmanuel Speare, D'Angelos Svenkeson, Chris Tolbert, Marcus Troy, J. Kou Vang, Clara Ware.

**Members not present:** Cecile Bedor, Malik Davis, Jessica Fowler, Nene Matey-Keke

**City of St. Paul staff present:** Tara Barenok, Kirstin Burch, Jon Grebner, David Gorski, Ian Walsh, Doua Yang.

**CURA staff present:** C. Terrence Anderson, Tony Damiano, Edward Goetz, Malik Holt-Shabazz, Trupti Storlie.

1. Call to order
   - The meeting was called to order at 1:00.  The meeting was virtual.

2. Agenda
   - Housekeeping
   - Welcome from Mayor Carter
   - Introductions
   - Schedule
   - Expectations
   - Ground Rules

3. Housekeeping
   - Reviewed basic functions of Zoom for active participation.
   - Meetings are public: observers are able to watch, but not interact.
   - Meetings are recorded.

   - **Decision**: Recordings will be posted on the City's webpage.

4. Welcome from Mayor Carter
   - Thanks to co-chairs, commission members, facilitators,
   - Anticipates this to be a challenging conversation, but also believes that we can come together to create a policy that enables people in the community to live with sustainability and dignity.
   - Currently, the city is navigating a three-part process
     - Staff working to prepare for implementation of the ordinance that the voters passed this fall. May 1 is the implementation date.

48

- o Work with the city council to establish an ordinance to clarify an exemption for new housing construction.
- o Stakeholder-informed process of determining the medium- and long-term form of rent stabilization.
- Calls for a spirit of constructive dialogue.
- The question of "if St. Paul should have rent stabilization" has already been decided, the question of "how" is before us.
- Wants taskforce to think about a permanent iteration of this group
  - o to access and leverage a wider set of expertise and backgrounds as the City implements rent stabilization in the future.

5. Review of the Commission's charge
- "How", not "if"
  - o How should rent stabilization operate in St. Paul?
  - o What characteristics should it have?
- Medium to long-term perspective
  - o Separate conversations are occurring about implementation of the voter-approved initiative.
- A process of learning and deliberation leading to a set of considerations for the City to move forward.

6. Expected timeline
- Two phases of the task force's work.
  - o Part one: Learning together, weekly meetings
    - ▪ February 22 to April 5
  - o Part two: Deliberations
    - ▪ April 12 to June 15
- Final report due to the Mayor's Office June 24.

7. Introductions
- All in attendance introduced themselves.
- The Commission's co-chairs are:
  - o Phillip Cryan: West Side resident, elected leader of Service Employees International Union (SEIU), represents about 4500 people,
  - o Tony Sanneh: St. Paul resident, property owner in St. Paul, including an apartment building. Runs a nonprofit for underserved and people of color.

8. Open Discussion
- Members discussed the schedule for the task force and how it related to the implementation of the ballot initiative.

9. Adjournment
- The meeting was adjourned at 3:01 p.m.



# Agenda

- Housekeeping
- Welcome from Mayor Carter
- Introductions
- Schedule
- Expectations
- Ground Rules

cura Center for Urban & Regional Affairs

# Housekeeping

Observers are present: open meeting

Meeting is recorded



Change your name or add pronouns

Turn on transcription





cura Center for Urban & Regional Affairs

50

# Housekeeping

Screens on for maximum participation (as able) 

 Mute your sound unless you're talking

Use the raise hand speak 

cura Center for Urban & Regional Affairs



WELCOME

Mayor Carter at Minnesota Public Radio in 2018.

(Evan Frost/MPR)

cura Center for Urban & Regional Affairs

# The Commission's Charge

- "How", not "whether"
  - How should rent stabilization operate in St. Paul?
  - What characteristics should it have?
- Medium to long-term perspective
  - Separate conversations occurring about implementation of the voter-approved initiative
- A process of learning & deliberation leading to set of considerations for the City to move forward

cura Center for Urban & Regional Affairs

## Introductions

- Facilitators
  - Ed Goetz
  - C. Terrence Anderson
- Co-chairs
  - Tony Sanneh
  - Phillip Cryan

cura Center for Urban & Regional Affairs

## Introductions

- Name
- Pronouns (he/him, she/her, they/them)
- Affiliation

cura Center for Urban & Regional Affairs

## Part I Learning Together

**Feb 22: Welcome, Introductions, Preliminaries**

March 1: History & legislative context, cap levels

March 8: Decontrol and Exceptions

March 15: Exemptions

March 22: Administration

March 29: Guest - cross jurisdictional lessons

April 5: Additional Topics as determined by Task Force

cura Center for Urban & Regional Affairs

52

## Part II Deliberation

April 12: Public Hearing

April 26: Small Group Discussions

May 3: Small Group Discussions

May 17: Deliberate considerations for Council/Mayor

May 24: Deliberate considerations for Council/Mayor

June 7: Finalize decisions regarding considerations

June 24: Prepare and deliver final report to Mayor

CURA Center for Urban & Regional Affairs |

## Expectations

- Privileging experiential knowledge vs. theory
  - Data from implemented policies
  - Direct experiences
- Offering information to the group
  - Share with CURA facilitators and co-chairs prior to meetings
  - Submit discussion and deliberation topics to CURA facilitators and co-chairs to add to agenda

CURA Center for Urban & Regional Affairs |

## Expectations

- Regular attendance
- Post-meeting input
  - What worked and what could be improved
  - Additional questions and comments

CURA Center for Urban & Regional Affairs |

## Ground Rules

- Be real and true to your experience or when sharing observations of perceived experience
  - Honor that communities have knowledge about how they experience systems/structures

- Differing opinions and perspectives are acknowledged and respected
  - Recognize that these conversations may be contentious and that each person will be coming from a unique position

cura Center for Urban & Regional Affairs

## Ground Rules

- Step up, step back
  - Participate as much as you listen because it is a two-way street of learning
  - Set aside implicit power roles so all voices have equal weight

- Be open and curious
  - Lead with curiosity, honesty, transparency, courage, and humility

cura Center for Urban & Regional Affairs

## Ground Rules

- Be quick to listen slow to react/speak
  - Be slow to judgment when engaging
  - Commit to a principle of constructive engagement

- Other additions?

cura Center for Urban & Regional Affairs

54

# THANK YOU!

POST – SESSION SURVEY:

- TASK FORCE: CHECK YOUR EMAIL

HTTPS://WWW.STPAUL.GOV/DEPARTMENTS/FINANCIAL-EMPOWERMENT/RENT-STABILIZATION



@CURAUMN



**Minutes**
**St. Paul Rent Stabilization Task Force**
**March 01, 2022**

**Members present:** Katherine Banbury, Cecile Bedor, Jay Benanav, Clinton Blaiser, Monica Bravo, Scott Cordes, Phillip Cryan, Arline Datu, Malik Davis, Khayree Duckett, Kelly Elkin, Tou Fang, Jessica Fowler, Thomas Godfrey, Robbie Grossman, Tram Hoang, Myisha Holley, Rich Holst, Mya Honeywell, Abdiaziz Ibrahim, Rawnson Ivanoff, Chue Kue, Bill Lindeke, Nene Matey-Keke, Carin Mrotz, Dalton Outlaw, Kevin Pranis, B. Rosas, Tony Sanneh, Katheryn Schneider, Julie Schwartz, Emmanuel Speare, Chris Tolbert, Marcus Troy

**Members not present:** Tony Barranco, Carolyn Brown, Nathaniel Khaliq, Tom Nelson, D'Angelos Svenkeson, J. Kou Vang, Clara Ware
**City of St. Paul staff present:** Tara Barenok, Jon Grebner, David Gorski, Luis Pereira, Ian Walsh, Doua Yang, Tony Johnson, Brynn Hausz

**CURA staff present:** C. Terrence Anderson, Tony Damiano, Edward Goetz, Trupti Storlie

1. Call to order
- The meeting was called to order at 1:00 by Phillip Cryan.  The meeting was virtual.

2. Agenda
- Approval of Previous Minutes, Ground Rules
- Summary of Week 1 Feedback Survey
- Learning Session: Rent Control History, Legislation, Caps

3. Approval of Previous Minutes, Ground Rules
- Meeting minutes were amended to include Kirstin Burch as a City of St. Paul staff member
- Meeting minutes were amended to correct the spelling of Katheryn Schneider's name.
- **Vote:** Minutes approved with amendments
- Ground rules: First item was updated
  - Original: Be real and true to your experience when sharing observations of perceived experience.
  - Amended: Be real and true to your experience when sharing observations of perceived experience with concrete information.
- **Vote**: Ground rules were approved
- Both documents will be published on the city webpage and available in a stakeholder shared folder.

4. Summary of Week 1 Feedback Survey
- Ed Goetz presented themes from the four survey questions from the previous week
- C. Terrence Anderson noted that the primary purpose of the survey was for stakeholders to get to know the differences in perspectives; the results are for the stakeholder team.
- De-identified, full responses were requested and will be sent out.

5. Learning Session: Rent Control History, Legislation, Caps

- Evolution of rent control approach: From rigid prices freezes to complex and flexible set of regulations
- Political ebb and flow: Popularity changes over time
- Four approaches to setting cap
- Research findings related to rent levels and tenant stability under rent caps
- Continue with Caps next time

9. Adjournment
- The meeting was adjourned at 3:01 p.m by Phillip Cryan.



# ST. PAUL RENT STABILIZATION TASK FORCE

WEEK 2: MARCH 1, 2022

Center for Urban and Regional Affairs | cura
UNIVERSITY OF MINNESOTA

---

**ST. PAUL RENT STABILIZATION TASK FORCE**

Week 2: March 1, 2022

cura Center for Urban & Regional Affairs

## Agenda

1. Approval of Week 1 minutes
2. Finalize ground rules
3. Summary of post-meeting survey
4. Learnings
   1. History of rent control
   2. Rent caps

---

**St. Paul Rent Stabilization Task Force Ground Rules (revised)**

1) Be real and true to your experience when sharing observations of perceived experience.
   Honor that communities have knowledge about how they experience systems and structures.
2) Give space for people to be vulnerable when speaking of their experiences.
   If someone has shared a difficult story, be aware of the follow up.
3) Acknowledge and respect differing opinions and perspectives.
   Recognize that these conversations may be contentious, and that each person will be coming from a unique position.
4) Step up, step back.
   Participate as much as you listen; it is a two-way street of learning.
   Set aside implicit power roles so all voices have equal weight.
5) Be open and curious.
   Lead with curiosity, honesty, transparency, courage, and humility.
6) Be quick to listen slow to react/speak.
   Be slow to judgment when engaging.
   Commit to a principle of constructive engagement.
7) Try to stay away from jargon and specialized terms.
8) Keep an eye towards moving the discussion forward.
9) Leave time and space for others.
10) Respect pronouns.



cura Center for Urban & Regional Affairs

For approval March 1, 2022

58

## Table 1: "Which stakeholders need protection as we deliberate?"

| | | | |
|---|---|---|---|
| **Cluster 1:** | **Renters** | **44** | **51%** |
| | Renters | 20 | 23% |
| | Renters - all | 15 | 17% |
| | Renters - low-inc | 4 | 5% |
| | Housing insecure | 3 | 3% |
| | Renters - low/mid inc | 1 | 1% |
| | Renters - working class | 1 | 1% |
| **Cluster 2:** | **Industry actors** | **26** | **30%** |
| | Property owners | 14 | 16% |
| | Small property owners | 8 | 9% |
| | Non-profit prop owners | 2 | 2% |
| | Developers | 2 | 2% |
| | **Balance stakeholders** | **11** | **13%** |
| | **Future residents/taxpayers** | **3** | **3%** |
| | **Other** | **3** | **3%** |
| | **Total** | **87** | |

cura Center for Urban & Regional Affairs

## Table 2: Priorities

| | | | |
|---|---|---|---|
| **Cluster 1:** | **Market & social outcomes** | **23** | **49%** |
| | Housing supply, investment | 8 | 17% |
| | Maintain a variety of housing | 2 | 4% |
| | Housing prices, property values | 2 | 4% |
| | Property maintenance | 1 | 2% |
| | Unintended consequences | 1 | 2% |
| | Affordable housing/rent | 5 | 11% |
| | NOAH | 1 | 2% |
| | Predatory owners/increases | 1 | 2% |
| | Equity / stratification | 2 | 4% |
| **Cluster 2:** | **Program elements** | **12** | **26%** |
| | Cap 3% | 2 | 4% |
| | Cap and "banking" | 1 | 2% |
| | Cap and inflation | 1 | 2% |
| | Vacancy decontrol | 2 | 4% |
| | Integrity of November vote | 3 | 6% |
| | Enforcement | 3 | 6% |
| **Cluster 3:** | **Stakeholders** | **8** | **17%** |
| | Property owners (incl small) | 4 | 9% |
| | Housing insecure | 2 | 4% |
| | Balance stakeholders | 2 | 4% |
| | **Process** | **2** | **4%** |
| | **Other** | **2** | **4%** |
| | **Total** | **47** | |

cura Center for Urban & Regional Affairs

## Table 3: Greatest Hopes

| | | | |
|---|---|---|---|
| **Cluster 1:** | **Program elements** | **11** | **32%** |
| | Implement ballot initiative | 3 | 9% |
| | Investors, supply, new housing | 3 | 9% |
| | Renovation & maintenance | 2 | 6% |
| | New construction exemption | 1 | 3% |
| | Vacancy decontrol | 1 | 3% |
| | Clarity | 1 | 3% |
| **Cluster 2:** | **Stakeholders** | **10** | **29%** |
| | Balance stakeholder needs | 4 | 12% |
| | Property owners | 2 | 6% |
| | Renters | 2 | 6% |
| | Housing insecure/vulnerable | 2 | 6% |
| **Cluster 3:** | **Market & social outcomes** | **7** | **21%** |
| | Affordable rent/housing/city | 3 | 9% |
| | NOAH | 1 | 3% |
| | Community | 1 | 3% |
| | Rent gouging | 2 | 6% |
| **Cluster 4:** | **Implementation** | **4** | **12%** |
| | Implementation | 2 | 6% |
| | Long term/sustainable | 2 | 6% |
| | **Other** | **2** | **6%** |
| | **Total:** | **34** | |

cura Center for Urban & Regional Affairs

**Table 4: Greatest Concerns**

| Cluster 1: | Market & social outcomes | 17 | 35% |
|---|---|---|---|
| | Disinvestment, investors, supply | 9 | 19% |
| | Unintended consequences | 4 | 8% |
| | Affordable rent/housing | 1 | 2% |
| | Renovation & maintenance | 1 | 2% |
| | Rent gouging | 1 | 2% |
| | Predatory owners | 1 | 2% |
| Cluster 2: | **Stakeholders** | **12** | **25%** |
| | Property owners | 4 | 8% |
| | Property owners: Small business | 3 | 6% |
| | Property owners: Out of state | 1 | 2% |
| | Renters | 2 | 4% |
| | Balance stakeholder needs | 2 | 4% |
| Cluster 3 | **Program elements** | **11** | **23%** |
| | Loopholes & gutting the program | 4 | 8% |
| | Cap, inflation | 2 | 4% |
| | Clarity/uncertainty | 2 | 4% |
| | New construction exemption | 1 | 2% |
| | Vacancy decontrol | 1 | 2% |
| | Program flexibility | 1 | 2% |
| Cluster 4: | **Implementation** | **3** | **6%** |
| | Implementation | 1 | 2% |
| | Litigation | 1 | 2% |
| | Ordinance won't work | 1 | 2% |
| | **Power of developers/owners** | **5** | **10%** |
| | **Total** | **48** | |



# ST. PAUL RENT STABILIZATION TASK FORCE

WEEK 2: LEARNINGS – HISTORY & CAPS

MARCH 1, 2022

Center for Urban and Regional Affairs | cura
UNIVERSITY OF MINNESOTA

# First generation rent control

- First enacted in 1920
- Reaction to wartime "rent profiteering"
- *Emergency* action
- Courts established constitutionality
- Terminated in 1924 (except in NY)
  - New York enacts RC in 1920
  - 100,000+ dispossessions imminent



cura Center for Urban & Regional Affairs

60

## First generation rent control

- Enacted again during WWII



- 1942 Emergency Price Control Act
- Congress enacts rent control for Washington, DC
- Federal rent controls covered area with 93 million people

cura Center for Urban & Regional Affairs

## First generation rent control



- Absolute ceiling on rents
- Applied to all rentals
  - 1949 Congress exempted new construction
- Extended into 1950s
  - Postwar housing shortage
  - Korean War
- Disappeared in most places mid-50s
  - (except NY)

cura Center for Urban & Regional Affairs

## 2ND GENERATION RENT CONTROLS

- Renewed federal, state, and local action
- NYC, Boston, Miami enact laws in 1969
  - Boston, Miami add laws struck down by Courts
- Massachusetts enacts enabling legislation in 1970

cura Center for Urban & Regional Affairs

61



August 1971
to
January 1973



cura Center for Urban & Regional Affairs

## 2nd generation rent controls

- MA enabling legislation
- NJ tenant organizing
- CA ballot initiatives



- NY state & local legislation

cura Center for Urban & Regional Affairs |

## 2nd generation rent controls

- "Moderate rent control" or "rent stabilization"
- Caps on rent increases
- Exemptions of housing stock
- Passthroughs & exceptions
- Decontrol
- Specification & composition of rent board
- Conversion & eviction regulations

cura Center for Urban & Regional Affairs

# Pendulum swings back

- By early 1980s 10% of privately-owned residential rental units subject to control
- 1980s/1990s political turn
- MA eliminates rent control, 1994
  - Statewide voter referendum 51% to 49%
- Several states preempt local rent control laws
- CA restricts rent control, 1995

 Center for Urban & Regional Affairs

## Restrictions on rent control in the U.S.

| Has rent control | Pre-empts rent control | | | Dillon Rule | Other |
|---|---|---|---|---|---|
| CA | AL | IL | MN* | OR* | AR | DE |
| MD | AZ | IN | MS | SC | NV | HI |
| MN* | AR | IA | MO | SD | PA | ME |
| NJ | CO | KS | NH | TN | RI | MT |
| NY | CT | KY | NM | TX | WV | NE |
| OR* | FL | LA | NC | UT | VA | OH |
| DC | GA | MA | ND | WA | VT | WY |
| | ID | MI | OK | WI | | |
| 7 | 32 | | | | 7 | 7 |

\* Oregon preempts local rent control but enacted statewide rent control;
Minnesota preempts local rent control unless approved by voters in general election

**cura** Center for Urban & Regional Affairs

# 3rd wave of rent control

- Post-housing crisis period of rent increases
- Spreads to other jurisdictions
- Laws strengthened
- St. Paul becomes only city outside of a coastal state to enact RC
- Mpls likely to be the second



**cura** Center for Urban & Regional Affairs

63



# THEMES

- **Evolution of rent control approaches**
  - From rigid price freezes to complex and flexible set of regulations
- **Political ebb and flow**
  - Popularity changes over time
- **Not static**
  - Approaches change within cities

cura Center for Urban & Regional Affairs



# BREAKOUT ROOMS

An opportunity to share reactions, thoughts, and questions. Is this history relevant to St. Paul?

# Program design options



| Choice of cap | Decontrol | Exceptions to cap | Exemptions | Compliance & education |
|---|---|---|---|---|
| • Flat pct increase<br>• Pegged to CPI<br>• CPI + pct<br>• Nominal amount<br>• Maximum increases | • Vacancy decontrol? (full or partial) | • Pass throughs (maintenance, CI, utilities, property taxes)<br>• "fair or reasonable return"<br>• "banked" increases<br>• Limits to exceptions (max increases) | • New construction (rolling or fixed)<br>• Small buildings (single family homes, 2-4 unit buildings)<br>• Owner-occupation | • Tenant or petition driven<br>• Monitoring<br>• Dispute resolution<br>• Public information<br>• Fees to support implementation |

cura Center for Urban & Regional Affairs

# Program design options



| Choice of cap | Decontrol | Exceptions to cap | Exemptions | Compliance & education |
|---|---|---|---|---|
| • Flat pct increase<br>• Pegged to CPI<br>• CPI + pct<br>• Nominal amount<br>• Maximum increases | • Vacancy decontrol? (full or partial) | • Pass throughs (maintenance, CI, utilities, property taxes)<br>• "fair or reasonable return"<br>• "banked" increases<br>• Limits to exceptions (max increases) | • New construction (rolling or fixed)<br>• Small buildings (single family homes, 2-4 unit buildings)<br>• Owner-occupation | • Tenant or petition driven<br>• Monitoring<br>• Dispute resolution<br>• Public information<br>• Fees to support implementation |

cura Center for Urban & Regional Affairs

---

# Rent cap impacts

- Over time rent control programs reduce rents paid in controlled units

- "Tenure discounts" significant over time

cura Center for Urban & Regional Affairs

## RENT DISCOUNTS FOR LONG-TERM TENANTS, WITH AND WITHOUT RENT CONTROL

|  | Without rent control | With rent control |
|---|---|---|
| Tenants staying 5 to 10 years | 16.3% | 29.6% |
| 10 + years | 27.9% | 39.3% |

from Clark and Heskin, 1982

cura Center for Urban & Regional Affairs

# Rent cap impacts

- Over time rent control programs reduce rents paid in controlled units

- "Tenure discounts" significant over time

- Rent caps eliminate "rent gouging"

cura Center for Urban & Regional Affairs

# Rent cap impacts

- Rent caps increase residential stability
  - Tenants stay in units longer
- e. g., San Francisco:
  - Rent control increases stability 20%
    - Large share of those still in their units would have otherwise moved out of SF
    - Stability effects stronger for older households & for longer-term residents
    - Stability effects stronger among BIPOC tenants
- Consistent research finding

cura Center for Urban & Regional Affairs

Source: Diamond et al., 2019

# Setting caps

- A balance
  - Simplicity and complexity
  - Uniformity and variability
  - Predictability and responsiveness
- Four approaches
  - Annual determination by rent board
  - Flat percentage increase
  - Variable increase tied to measure of inflation
  - Variable rate with upper and/or lower limits



cura Center for Urban & Regional Affairs

66

# Setting caps

- Massachusetts & Maine
  - "fair net operating income"
  - Created formula that varied by building
  - Incorporated data on taxes, operating expenses, capital improvements, building conditions
- Berkeley relied on annual cost study
  - switched to CPI-based cap in 2005
- NYC Rent Guidelines Board sets cap annually

cura Center for Urban & Regional Affairs |

# Setting caps

- Massachusetts & Maine
  - "fair net operating income"
  - Created formula that varied by building
  - Incorporated data on taxes, operating expenses, capital improvements, building conditions
- Berkeley relied on annual cost study
  - switched to CPI-based cap in 2005
- NYC Rent Guidelines Board sets cap annually

cura Center for Urban & Regional Affairs |



HTTPS://WWW.STPAUL.GOV/DEPARTMENTS/FINANCIAL-EMPOWERMENT/RENT-STABILIZATION

@CURAUMN

Center for Urban and Regional Affairs | cura
UNIVERSITY OF MINNESOTA

67

**Minutes**
**St. Paul Rent Stabilization Task Force**
**March 08, 2022**

**Members present:** Katherine Banbury, Tony Barranco, Cecile Bedor, Jay Benanav, Clinton Blaiser, Scott Cordes, Phillip Cryan, Arline Datu, Khayree Duckett, Kelly Elkin, Tou Fang, Jessica Fowler, Thomas Godfrey, Robbie Grossman, Rich Holst, Mya Honeywell, Abdiaziz Ibrahim, Rawnson Ivanoff, Chue Kue, Bill Lindeke, Nene Matey-Keke, Carin Mrotz, Tom Nelson, Dalton Outlaw, Kevin Pranis, B. Rosas, Tony Sanneh, Katheryn Schneider, Julie Schwartz, Emmanuel Speare, D'Angelos Svenkeson, Chris Tolbert, Marcus Troy, Clara Ware

**Members not present:** Monica Bravo, Carolyn Brown, Malik Davis, Myisha Holley, Nathaniel Khaliq, Tram Hoang, J. Kou Vang,

**City of St. Paul staff present:** Kirstin Burch, Jon Grebner, David Gorski, Mary Guerra, Brynn Hausz, Tony Johnson, Luis Pereira, Ian Welsh, Doua Yang, Adam Yust

**CURA staff present:** C. Terrence Anderson, Tony Damiano, Edward Goetz, Malik Holt-Shabazz,

1. Call to order
- The meeting was called to order at 1:00 by Tony Sanneh.  The meeting was virtual.

2. Agenda
- Approval of Previous Minutes
- Announcement
- Summary of Week 2 Feedback Survey
- Learning Session: Rent Caps, Decontrol

3. Approval of Previous Minutes
- Meeting minutes were amended to indicate that Brynn Hausz, City of St. Paul, was in attendance
- **Vote:** Minutes approved with amendment.

4. Announcement
- A shared Google Drive folder has been created that will contain minutes, post-meeting survey results, PowerPoints, and other resources for taskforce members. The link is: https://drive.google.com/drive/folders/1n1Ao9JPEUL5q8D3weyl6CyZeKLpdDauH.

5. Summary of Week 2 Post-meeting Survey
- Ed Goetz presented themes from the post-meeting survey questions from the previous week
- 18 of the 41 members submitted answers.

6. Learning Session: Rent Caps and Decontrol
- Wide range of caps used by cities. Four approaches typically used:
  - Fixed percentage increase
  - Variable increases, tied to inflation rate
  - Variable increases combined with fixed percentage (as an upper and/or lower limit)

68

- o   Rate set by rent board.
- Breakout and full-group discussion of rent cap approaches. Arguments for and against fixed and variable rates were made.
- Vacancy decontrol is the most common form of decontrol in rent stabilization programs. Three variations of vacancy decontrol:
  - o   Full decontrol – no limit to rent increases when vacancy occurs
  - o   Partial decontrol – increase allowed above the cap, but not unlimited
  - o   Vacancy control – no change to the allowable rent increase when vacancy occurs.
- Full group discussion of decontrol.
  - o   It was felt that a better understanding of the provisions of the current St. Paul program would facilitate a more productive discussion.

7. Adjournment
- The meeting was adjourned at 3:00 p.m. by Tony Sanneh.

69

**ST. PAUL RENT STABILIZATION TASK FORCE**

Week 3: March 8, 2022



## Agenda

1. Approval of Week 2 minutes
2. Announcement
   a. Shared folder for Task Force materials
3. Post-meeting survey summary
4. Learnings

---

### Table 1: Work / Live in St. Paul?

|  | Yes | No |
|---|---|---|
| Live in St. Paul | 11 | 6 |
| Work in St. Paul | 17 | 0 |

---

### Table 2: "What was your most important takeaway?"

| | | |
|---|---|---|
| There is a history to learn from | 6 | 32% |
| Importance of emergency/inflation conditions | 5 | 26% |
| What the impacts have been | 2 | 11% |
| Task Force processes | 2 | 11% |
| Other | 4 | 22% |
| Total | 19 | |

## Table 3: A 'new or surprising' thing learned.

| | | |
|---|---|---|
| The 'waves' or 'generations' of rent control | 7 | 47% |
| The cyclical nature of support | 3 | 20% |
| The extent of preemptions | 2 | 13% |
| Conditions of enactment | 2 | 13% |
| Facilitator bias | 1 | 7% |
| **Total** | **15** | |

cura  Center for Urban & Regional Affairs

## Table 4: "What did you hear/learn that made you rethink?"

| | | |
|---|---|---|
| Nothing | 7 | 47% |
| Varieties of rent control types | 2 | 13% |
| That we have examples to learn from | 2 | 13% |
| Other | 4 | 26% |
| **Total** | **15** | |

cura  Center for Urban & Regional Affairs

## Table 5: "Questions to follow up on?"

| | |
|---|---|
| Property taxes / values | 3 |
| Inflation and its role in rent control | 2 |
| Research sources and methods used | 2 |
| Other | 4 |
| **Total** | **11** |

cura  Center for Urban & Regional Affairs

# Follow up questions

- Historical average rent increases in St. Paul?
- Verify that Cambridge, MA saw 20% increase in new development and increase in property values when rent control ended.
- "rents are almost always reduced when rent control is implemented…"
- Reason for the end of rent controls in MA

cura Center for Urban & Regional Affairs



**ST. PAUL RENT STABILIZATION TASK FORCE**

RENT CAPS, DECONTROL, EXCEPTIONS

Center for Urban and Regional Affairs | cura
UNIVERSITY OF MINNESOTA

## RENT CAPS
(CONT.)

- Four approaches
  - Determined by rent board
  - Flat percentage increase
  - Variable increase
  - Variable with upper/ lower limits



cura Center for Urban & Regional Affairs

72

| Jurisdiction | Rent Increase Cap (current) |
| --- | --- |
| Los Angeles, CA | 100% of CPI (minimum limit is 3%, maximum limit is 8%) |
| Oakland, CA | 100% of CPI |
| Richmond, CA | 100% of CPI |
| Sacramento, CA | CPI + 5% |
| San Francisco, CA | 60% of CPI, maximum 7% |
| San Jose, CA | 5% flat increase |
| Santa Ana, CA | The lesser of 3% or 80% of CPI |
| Washington, DC | CPI + 2% (max 10%); Elderly/disabled 100% CPI, max 5% |
| Camden, NJ | 100% of CPI, maximum 6% |
| Hoboken, NJ | 100% of CPI |
| Jersey City, NJ | The lesser of a) 4% or b) pct. difference between CPI 3 months prior to the end and 3 months prior to the beginning of the lease term. |
| New Brunswick, NJ | Housing component of CPI (2.8% in 2002) |
| Newark, NJ | 100% of CPI, maximum increase of 4% |
| Trenton, NJ | Housing component of CPI, updated every 6 months |
| New York City (RS) | Administered annually through Rent Board. Usually under 2% |
| State of California | CPI + 5% |
| State of Oregon | CPI + 7% |



| Jurisdiction | Rent Increase Cap (current) |
| --- | --- |
| Los Angeles, CA | 100% of CPI (minimum limit is 3%, maximum limit is 8%) |
| Oakland, CA | 100% of CPI |
| Richmond, CA | 100% of CPI |
| Sacramento, CA | CPI + 5% |
| San Francisco, CA | 60% of CPI, maximum 7% |
| San Jose, CA | 5% flat increase |
| Santa Ana, CA | The lesser of 3% or 80% of CPI |
| Washington, DC | CPI + 2% (max 10%); Elderly/disabled 100% CPI, max 5% |
| Camden, NJ | 100% of CPI, maximum 6% |
| Hoboken, NJ | 100% of CPI |
| Jersey City, NJ | The lesser of a) 4% or b) pct. difference between CPI 3 months prior to the end and 3 months prior to the beginning of the lease term. |
| New Brunswick, NJ | Housing component of CPI (2.8% in 2002) |
| Newark, NJ | 100% of CPI, maximum increase of 4% |
| Trenton, NJ | Housing component of CPI, updated every 6 months |
| New York City (RS) | Administered annually through Rent Board. Usually under 2% |
| State of California | CPI + 5% |
| State of Oregon | CPI + 7% |



# Rollbacks

- Setting of base rent retroactive to date before beginning of rent control program
  - Typically 6 months to one year
- Addresses time lag between announcement of rent controls and their application
- To head off anticipatory rent increases by property owners



## RENT CAPS & OTHER PROGRAM ELEMENTS

- Not a decision made in isolation
- Implications for pass-throughs allowed
- Impact of vacancy decontrol
- Possibility of tailoring to specific sectors of rental market

**cura** Center for Urban & Regional Affairs



# BREAKOUT ROOMS

- What are the best reasons for going with a flat percentage increase?
- What are the best reasons for going with a variable cap?

# Program design options



| Choice of cap | Decontrol | Exceptions to cap | Exemptions | Compliance & education |
|---|---|---|---|---|
| • Flat pct increase<br>• Pegged to CPI<br>• CPI + pct<br>• Nominal amount<br>• Maximum increases | • Vacancy decontrol? (full or partial) | • Pass throughs (maintenance, CI, utilities, property taxes)<br>• "fair or reasonable return"<br>• "banked" increases<br>• Limits to exceptions (max increases) | • New construction (rolling or fixed)<br>• Small buildings (single family homes, 2-4 unit buildings)<br>• Owner-occupation | • Tenant or petition driven<br>• Monitoring<br>• Dispute resolution<br>• Public information<br>• Fees to support implementation |

**cura** Center for Urban & Regional Affairs

# Decontrol

- Permanent decontrol
- Full vacancy decontrol
  - Upon vacancy, owner can raise rents without limit
- Partial vacancy decontrol
  - Upon vacancy, owner can raise rents above the cap, but not unlimited
- NYC "luxury decontrol"
  - Permanent decontrol, ended in 2019

cura Center for Urban & Regional Affairs

# Impact of decontrol

- Little research done
- Three NJ studies show no different in rents between cities with and without rent control
  - Authors suggest it is vacancy decontrol…
- Berkeley study in 2013:
  - tenants moved in pre-1999: avg rent = $780
  - Vacancy decontrolled HHs avg. rent = $1,436

cura Center for Urban & Regional Affairs |



(a) Unregulated rents
(b) Regulated rents
(c) Regulated rents with vacancy decontrol

cura Center for Urban & Regional Affairs



Nagy, *Journal of Urban Economics,* 1997

(a)  Unregulated rents
(b)  Regulated rents
(c)  Regulated rents with vacancy decontrol



# Consequences & incentives

- An incentive to evict?

- An incentive for tenant to remain in unit?

- Disincentive for maintenance?

- Incentive to take units out of rental market?

**Examples of vacancy decontrol**

- Approximately ½ of rent control programs in 1980s had some form of vacancy decontrol

- 2017 Newark: vacancy decontrol up to 20% depending on how much spent to upgrade unit

- 2019 NYC:
  - Eliminates luxury decontrol
  - Eliminates partial vacancy decontrol



76



# BREAKOUT ROOMS

- Talk about the tradeoffs of vacancy control/decontrol
- Which renters would benefit the most from vacancy control?
- Which rental property owners would benefit the most from vacancy decontrol?

# Program design options

| Choice of cap | Decontrol | Exceptions to cap | Exemptions | Compliance & education |
|---|---|---|---|---|
| • Flat pct increase<br>• Pegged to CPI<br>• CPI + pct<br>• Nominal amount<br>• Maximum increases | • Vacancy decontrol? (full or partial) | • Pass throughs (maintenance, CI, utilities, property taxes)<br>• "fair or reasonable return"<br>• "banked" increases<br>• Limits to exceptions (max increases) | • New construction (rolling or fixed)<br>• Small buildings (single family homes, 2-4 unit buildings)<br>• Owner-occupation | • Tenant or petition driven<br>• Monitoring<br>• Dispute resolution<br>• Public information<br>• Fees to support implementation |

**cura** Center for Urban & Regional Affairs

# Pass-throughs

- Most typically for capital improvements, property taxes, utilities

- Policy questions:
  - What pct of cost can be passed on?
  - How is it amortized?
  - Is there an upper limit?
  - Who makes the determination if it is allowable?

**cura** Center for Urban & Regional Affairs

77

# Examples

- NYC
  - MCI: major capital improvements
    - Must be approved by rent board
    - Amortized over 12.5 years, subject to 2% cap on annual rent increase
  - IAI: individual apartment improvements
    - Need not be approved
- San Francisco:
  - owners in buildings with 5 or fewer units can pass through 100% of CI, subject to 5% annual cap
  - Owners of bigger buildings can only pass 50%, subject to 10% annual cap
- DC permits increases up to 20% for building wide improvements, 15% for other

cura Center for Urban & Regional Affairs



"FAIR AND REASONABLE RETURN"

See Section 193A.05 of the St. Paul ordinance

cura Center for Urban & Regional Affairs

- Required by Courts
- Often in place of specific pass-throughs
- "Fair return" defined in many different ways
  - Hoboken, NJ: 6% above maximum interest rate on local savings account
- Can be made contingent
  - On health and safety compliance
  - Building code compliance
  - Reasonable purchase price

# Pass-throughs

- Allow flexibility to accommodate special circumstances
- and to allow 'fair and reasonable return'
- Require a system of petition and adjudication

cura Center for Urban & Regional Affairs

# Preferential rents and banking

Prevalence of preferential rents in NYC, 2017



cura Center for Urban & Regional Affairs

# Preferential rents and banking



- Preferential rents:
  - Lower than maximum-allowed rent increase
- Can owners "bank" and recover them later?

cura Center for Urban & Regional Affairs

## "Banking"

(a) Allowable rent increases at the cap
(b) "Preferential rents"
(c) Banked amount (a-b)



cura Center for Urban & Regional Affairs

79

# Preferential rents and banking



- ▪ Preferential rents:
  - ▪ Lower than maximum-allowed rent increase
- ▪ Can owners "bank" and recover them later?
  - ▪ Do preferential rents become basis for calculating future increases?
  - ▪ Limit to the amount 'cashed in' by owners?

cura Center for Urban & Regional Affairs



**BREAKOUT ROOMS**

Which exceptions to rent cap limits do you think are most necessary and why?

HTTPS://WWW.STPAUL.GOV/DEPARTMENTS/FINANCIAL-EMPOWERMENT/RENT-STABILIZATION



@CURAUMN



Center for Urban and Regional Affairs | cura
UNIVERSITY OF MINNESOTA

80

**Minutes**
**St. Paul Rent Stabilization Task Force**
**March 15, 2022**

**Members present:** Katherine Banbury, Tony Barranco, Cecile Bedor, Jay Benanav, Monica Bravo, Scott Cordes, Phillip Cryan, Arline Datu, Malik Davis, Khayree Duckett, Kelly Elkin, Tou Fang, Jessica Fowler, Thomas Godfrey, Robbie Grossman, Tram Hoang, Myisha Holley, Rich Holst, Mya Honeywell, Rawnson Ivanoff, Chue Kue, Bill Lindeke, Nene Matey-Keke, Carin Mrotz, Tom Nelson, Kevin Pranis, B. Rosas, Tony Sanneh, Julie Schwartz, Emmanuel Speare, D'Angelos Svenkeson, Chris Tolbert, Marcus Troy, J. Kou Vang,  Clara Ware

**Members not present:** Clinton Blaiser, Carolyn Brown, Abdiaziz Ibrahim, Nathaniel Khaliq, Dalton Outlaw,  Katheryn Schneider

**City of St. Paul staff present:**Kirstin Burch, Jon Grebner, David Gorski, Mary Guerra, Brynn Hausz, Tony Johnson, Luis Pereira, Ian Welsh, Doua Yang, Adam Yust

**CURA staff present:**C. Terrence Anderson, Tony Damiano, Edward Goetz, Malik Holt-Shabazz, Trupti Storlie

1. Call to order
- The meeting was called to order at 1:00 by Phillip Cryan.  The meeting was virtual.

2. Agenda
- Approval of Previous Minutes
- Time of March 29 Meeting
- Announcements
- Summary of Week 3 Feedback Survey
- Summary of Ballot Question approved by voters
- Learning Session: Rent Cap Exceptions

3. Approval of Previous Minutes
- **Vote:** Minutes approved.  83% Yes, 3% No, 13% Abstain

4. Announcement
- The speaker for the March 29th session requested that we change the start time to 2PM CST because they are in different international time zone.  Meeting would start on March 29th would start at 2 PM and finish at 4 PM.
  - Vote: 80% Yes, 20% No: We are checking with the speaker re: the length of their presentation; another option would be to start our meeting at the normal time 1 PM and have the speaker join us at 2 PM.
- Request to keep the post-meeting survey open longer was polled. The following was agreed to:

- o   Stakeholders will receive post-meeting survey link on Tuesday night. Stakeholders have until Sunday evening to fill out the survey.
- o   Friday: meeting minutes will be emailed for review, changes, and approval.
- o   Monday: survey results will be emailed for review.

5. Summary of Week 2 Post-meeting Survey
- 12 stakeholders submitted responses; too few for substantive discussion.
- Meeting logistics were changed to address concerns; meeting content (summary of the existing ordinance) was added to address questions raised.

6. Summary of Ballot Question approved by voters
- Rent cap set at 3%
- Vacancy control: rent cap applies regardless of change of occupancy
- Reasonable return on investment: "The city shall establish a process by which landlords can request exceptions to the limitation on rent increases based on the right to a reasonable return on investment." The rationale for deviating from the cap that are listed in the ordinance were summarized.
- Exemptions: Shall not apply to changes in tenant payments where those are based on share of income
- Penalties and legal rights

7. Learning Session
- Rent cap exceptions, including pass-throughs, "reasonable rate of return", and "banking" were described and summarized.
- Research on the impact of rent stabilization on property maintenance was summarized.
- Housing stock exemptions, including small-building exemptions, owner-occupant exemptions, new construction exemptions, and subsidized/assisted housing exemptions were described and summarized.

8. Adjournment
- The meeting was adjourned at 3:00 p.m. by Phillip Cryan.

**ST. PAUL RENT STABILIZATION TASK FORCE**

Week 4: March 15, 2022



## Agenda

1. Approval of Week 3 minutes
2. Time of March 29 meeting
3. Announcements
4. Post-meeting survey summary
5. Summary of Ballot question approved by voters
6. Learnings

## Questions to follow up on

- What is our end goal?
- More information re: disinvestment in rental housing
- More information about maintenance



## St. Paul's Existing Program

- Rent cap set at 3%
- Vacancy control
  - Rent cap applies regardless of change of occupancy
- Reasonable return on investment
  - "The city shall establish a process by which landlords can request exceptions to the limitation on rent increases based on the right to a reasonable return on investment."

# Reasonable return on investment

- Rationale for deviating from cap must account for:
  - Changes in property taxes
  - Unavoidable changes in maintenance/operating expenses
  - Capital improvements necessary for code compliance
  - Deterioration of unit other than by normal wear and tear
  - Changes in occupancy or services provided
  - The provision of adequate housing services or compliance with housing laws, health and safety codes or rental agreement
  - Pattern of recent rent increases or decreases

cura Center for Urban & Regional Affairs

# Existing Program (cont.)

- Exemptions:
  - Shall not apply to changes in tenant payments where those are based on share of income
- Penalties and private right of action

cura Center for Urban & Regional Affairs |

# St. Paul's Existing Program

1. 3% Rent Cap
2. Vacancy control
3. Reasonable return on investment
4. Exemption for tenants in housing where tenants pay is based on their income
5. Penalties and legal rights

cura Center for Urban & Regional Affairs |

84



## Program design options

| Choice of cap | Decontrol | Rent cap exceptions | Housing stock exemptions | Compliance & education |
|---|---|---|---|---|
| • Flat pct increase<br>• Pegged to CPI<br>• CPI + pct<br>• Nominal amount<br>• Maximum increases | • Vacancy decontrol? (full, partial, none) | • Pass throughs (maintenance, CI, utilities, property taxes)<br>• "fair or reasonable return"<br>• "banked" increases<br>• Limits to exceptions (max increases) | • New construction (rolling or fixed)<br>• Small buildings (single family homes, 2-4 unit buildings)<br>• Owner-occupation | • Tenant or petition driven<br>• Monitoring<br>• Dispute resolution<br>• Public information<br>• Fees to support implementation |

cura Center for Urban & Regional Affairs

## Pass-throughs

- May property owners 'pass-through' some extraordinary costs to the tenant, allowing rent increases above the cap amount?
  - Allow flexibility to accommodate special circumstances
  - and to allow 'fair and reasonable return'
  - Require a system of petition and adjudication

cura Center for Urban & Regional Affairs

85

# Pass-throughs



- Most typically for capital improvements, property taxes, utilities

- Policy questions:
  - What pct of cost can be passed on?
  - How is it amortized?
  - Is there an upper limit?
  - Who makes the determination of whether the pass-through is allowable?

cura Center for Urban & Regional Affairs

# Capital Improvement

- Most common form of pass-through

- Can provide strong incentive for building improvements
- Requires working definition of capital improvement (v. normal maintenance)
- Some cities condition CI pass-through on judgment of good faith maintenance

cura Center for Urban & Regional Affairs

# Examples

- NYC:
  - MCI: major capital improvements
    - Must be approved by rent board
    - Amortized over 12.5 years, subject to 2% cap overall
  - IAI: individual apartment improvements
    - Need not be approved
- San Francisco:
  - owners in buildings with 5 or fewer units can pass through 100% of CI, subject to 5% annual cap
  - Owners of bigger buildings can only pass 50%, subject to 10% annual cap
- DC: up to 20% for building wide improvements, 15% for other

cura Center for Urban & Regional Affairs

86



**"FAIR AND REASONABLE RETURN"**

See Section 193A.05 of the St. Paul ordinance

- Required by Courts
- Often in place of specific pass-throughs
- "Fair return" defined in many different ways
  - Hoboken, NJ: 6% above maximum interest rate on local savings account
- Can be made contingent
  - On health and safety compliance
  - On building code compliance
  - On reasonable purchase price

# Maintenance

- Two separate studies of NYC show decline in quality of regulated units
- Boston study shows modest decline in small aesthetic items
- DC study finds no evidence of quality decline
- 1970s studies of Fort Lee, NJ and Boston show no impact on maintenance expenditures

# Maintenance

- Suggests program design might be able to mitigate maintenance disincentive

- Pass-through incentives, or

- Authorizing rent reductions, or

- Making rent increases conditional on adequate maintenance

# Preferential rents and banking



- Preferential rents:
  - Lower than maximum-allowed rent increase

cura Center for Urban & Regional Affairs

# Preferential rents and banking

Prevalence of preferential rents in NYC, 2017



cura Center for Urban & Regional Affairs

# Preferential rents and banking



- Preferential rents:
  - Lower than maximum-allowed rent increase
- Can owners "bank" and recover them later?

cura Center for Urban & Regional Affairs

88

"Banking"



(a) Allowable rent increases at the cap
(b) "Preferential rents"
(c) Banked amount  (a-b)

# Preferential rents and banking



- Preferential rents:
  - Lower than maximum-allowed rent increase
- Can owners "bank" and recover them later?
  - Do preferential rents become basis for calculating future increases?
  - Limit to the amount 'cashed in' by owners?



RENT CAP
EXCEPTIONS

SUMMARY

- For specific costs, or
- A general provision (reasonable return)
- Requires process for decision-making
- Typically limited or conditioned





## Program design options

| Choice of cap | Decontrol | Rent cap exceptions | Housing stock exemptions | Compliance & education |
|---|---|---|---|---|
| • Flat pct increase<br>• Pegged to CPI<br>• CPI + pct<br>• Nominal amount<br>• Maximum increases | • Vacancy decontrol? (full, partial, none) | • Pass throughs (maintenance, CI, utilities, property taxes)<br>• "fair or reasonable return"<br>• "banked" increases<br>• Limits to exceptions (max increases) | • New construction (rolling or fixed)<br>• Small buildings (single family homes, 2-4 unit buildings)<br>• Owner-occupation | • Tenant or petition driven<br>• Monitoring<br>• Dispute resolution<br>• Public information<br>• Fees to support implementation |



## HOUSING STOCK EXEMPTIONS

- By building size
- By owner-occupation
- By date of construction
- By affordability restrictions



## By building size

- Small buildings
  - e.g., NYC excludes 5 or fewer
  - Jersey City exempts 3 or fewer
- Often framed as "mom and pop" or small-time operators
  - DC exempts 4 or fewer AND owned by an individual
- Single family home exemption
  - Growing investor ownership of SFH rentals complicates the picture

cura Center for Urban & Regional Affairs

## By owner occupation

- Owner occupation in 2 to 4-unit buildings
- Owner or family member occupation
- Controversial and contested

cura Center for Urban & Regional Affairs

## By date of construction

- New construction exemption, justified by
  - fear of dampening rate of housing construction
  - expectation that new buildings rarely provide housing for low-mod renters
- Exemption tied to a fixed date or to a fixed number of years

cura Center for Urban & Regional Affairs

91

# New construction exemptions



- **Tied to a specific date**
  - Oakland, 1983
  - NYC, 1974
  - LA, 1978
  - Washington, DC, 1975
- **or rolling**
  - Newark, NJ, length of initial mortgage or 30 years, whichever is less
  - New Brunswick, NJ, same as Newark
  - Takoma Park, MD – 5 years (& only upon petition)
  - State of Oregon – 15 years



# Other

- **Buildings with affordability requirements**
  - LA: units with "government imposed regulatory agreement…" guaranteeing affordability
  - Rents are already regulated
- **Luxury exemptions**
  - MA exempted up to 25% of units at the high end of the market
  - NJ cities have / had luxury exemptions defined by rent amount
  - NYC eliminated its luxury exemption in 2019

# LOSS OF RENTAL HOUSING STOCK

- **Movement of units into exempted categories**
  - Demolition and replacement with new construction
  - Owner-occupation
- **Removal of units from rental market**
  - Condominium conversion



## Loss of Housing Stock

- Research shows that units are withdrawn by various means
  - Diamond et al., 2019; Asquith, 2019; Sims, 2007
  - Significant numbers of units removed
- Many cities respond with condo conversion or demolition controls
  - Prohibit, limit, or condition conversion/demo
  - Barriers to conversion increased evictions in SF Asquith (2019)

cura Center for Urban & Regional Affairs |

## Housing stock exemptions

- Small building
- New construction
- Owner occupation
- Subsidized/assisted housing

- Loss of rental housing stock
- "complementary" regulations to limit loss of rental housing

cura Center for Urban & Regional Affairs |



BREAKOUT ROOMS

Which subset of property owners are most likely to benefit from the exemptions we have talked about? Which subset of tenants are most likely to be affected by those exemptions?

93

HTTPS://WWW.STPAUL.GOV/DEPARTMENTS/FINANCIAL-EMPOWERMENT/RENT-STABILIZATION



@CURAUMN

Center for Urban and Regional Affairs | cura
UNIVERSITY OF MINNESOTA

**Minutes**
**St. Paul Rent Stabilization Task Force**
**March 22, 2022**

**Members present (bold): Katherine Banbury**, **Tony Barranco, Cecile Bedor**, **Jay Benanav**, Clinton Blaiser, **Monica Bravo**, Carolyn Brown, **Scott Cordes**, **Phillip Cryan**, **Arline Datu**, **Malik Davis**, **Khayree Duckett**, **Kelly Elkin**, Tou Fang, Jessica Fowler, **Thomas Godfrey**, **Robbie Grossman**, Tram Hoang, **Myisha Holley**, **Rich Holst**, **Mya Honeywell**, **Abdiaziz Ibrahim**, **Rawnson Ivanoff**, Nathaniel Khaliq, **Chue Kue**, **Bill Lindeke,**  Nene Matey-Keke, **Carin Mrotz**, **Tom Nelson**, Dalton Outlaw,  **Kevin Pranis**, **B. Rosas**, **Tony Sanneh**, **Julie Schwartz**, **Katheryn Schneider**, **Emmanuel Speare**, D'Angelos Svenkeson, **Chris Tolbert**, **Marcus Troy**, **J. Kou Vang**,  Clara Ware

**City of St. Paul staff present (not italicized):**Kirstin Burch, Jon Grebner, David Gorski, Mary Guerra, Brynn Hausz, Tony Johnson, Luis Pereira, Ian Welsh, *Doua Yang, Adam Yust*

**CURA staff present (not italicized):**C. Terrence Anderson, Tony Damiano, Edward Goetz, Malik Holt-Shabazz, Trupti Storlie

1. Call to order
- The meeting was called to order at 1:00 by Phillip Cryan.  The meeting was virtual.

2. Agenda
- Approval of March 22 Minutes
- Announcements
- Post-Meeting Survey Summary
- Rent Stabilization Objective (continued)
- Cross-jurisdictional learnings: Ken Baar

3. Approval of Previous Minutes
- **Vote:** Minutes approved.  79% Yes, 0% No, 21% Abstain

4. Announcement
- Created a resolution to identify direction requested from this Task Force
  - Presented by St. Paul Council Member Chris Tolbert
  - Resolution includes ten different topics that would be helpful (e.g. how to ensure rental rate stabilization, rent increase cap, ensure compliance, ensure that maintenance occurs, etc.)
  - Resolution passed unanimously
  - The desire is that recommendations balances the interests and needs of all stakeholders.

5. Summary of Post-meeting Survey

- Not enough feedback for a full analysis, but two substantive points
- Procedural
  - Members like small group breakouts
  - Members like the Google document to record their own thoughts as the discussion progressed
  - We will continue to employ these techniques
- "Comparisons" to other jurisdictions should be treated as examples
  - Information from other cities' rent stabilization to share different policy options and how they have been implemented
  - Constrained by the cities that actually have rent stabilization; don't have a midwestern, large city to directly compare
  - Not intended as a comparison, simply information for you as you go into deliberations.

### 7. Group Activity: Rent Stabilization Objectives (continued)

- Recapped the steps in the process
  - 3/22  - small group discussions and brainstorming
  - More than 200 individual comments
  - Themed into 12 program outcomes
- Today: Fine tune 12 program outcomes
  - Small group discussion: identify changes to the themes (wording changes, add missing detail)
  - 12 Program outcomes will be updated as working statements moving forward; can be adjusted as deliberation continue, but these will be the target as we evaluate different rent stabilization features.

### 8. Cross Jurisdictional Learnings: Guest Speaker - Ken Barr

- 

### 9. Adjournment
- The meeting was adjourned at 3:00 p.m. by Tony Sanneh.

96

**ST. PAUL RENT STABILIZATION TASK FORCE**

Week 5: March 22, 2022



# Agenda

1. Approval of Week 4 minutes
2. Announcements
3. Post-meeting survey summary
4. Learnings
5. Rent stabilization objectives

## Table 1: "What was your most important takeaway?"

| | |
|---|---|
| There is a history to learn from | 32% |
| Importance of emergency/inflation conditions | 26% |
| What the impacts have been | 11% |
| Task Force processes | 11% |
| Other | 22% |
| Total | |



## Table 2: A 'new or surprising' thing learned.

| | |
|---|---|
| The 'waves' or 'generations' of rent control | 47% |
| The cyclical nature of support | 20% |
| The extent of preemptions | 13% |
| Conditions of enactment | 13% |
| Facilitator bias | 7% |
| Total | |

### Table 3: "What did you hear/learn that made you rethink?"

| | |
|---|---|
| **Nothing** | **47%** |
| **Varieties of rent control types** | **13%** |
| **That we have examples to learn from** | **13%** |
| **Other** | **26%** |
| **Total** | |

cura  Center for Urban & Regional Affairs

### Table 4: "Questions to follow up on?"

| | |
|---|---|
| **Property taxes / values** | |
| **Inflation and its role in rent control** | |
| **Research sources and methods used** | |
| **Other** | |
| **Total** | |

cura  Center for Urban & Regional Affairs



## ST. PAUL RENT STABILIZATION TASK FORCE

PROGRAM ADMINISTRATION

Center for Urban and Regional Affairs | cura
UNIVERSITY OF MINNESOTA

98

# Program design options



| Choice of cap | Decontrol | Rent cap exceptions | Housing stock exemptions | Compliance & education |
|---|---|---|---|---|
| • Flat pct increase<br>• Pegged to CPI<br>• CPI + pct<br>• Nominal amount<br>• Maximum increases | • Vacancy decontrol? (full, partial, none) | • Pass throughs (maintenance, CI, utilities, property taxes)<br>• "fair or reasonable return"<br>• "banked" increases<br>• Limits to exceptions (max increases) | • New construction (rolling or fixed)<br>• Small buildings (single family homes, 2-4 unit buildings)<br>• Owner-occupation | • Tenant or petition driven<br>• Monitoring<br>• Dispute resolution<br>• Public information<br>• Fees to support implementation |


cura Center for Urban & Regional Affairs

---

# Rent Boards

- Hear & decided petitions
- Hear & resolve disputes
- Set/enforce rent caps
- Oversee registration of regulated units
- Report annually to Council/Mayor
- Develop/manage public information materials

cura Center for Urban & Regional Affairs |

---

# Example rent boards

| City | Members | Tenants | Landlords | Homeowners | Other |
|---|---|---|---|---|---|
| Los Angeles | 7 | 0 | 0 | | 7 |
| Oakland | 9 | 2 | 2 | 5 | |
| San Francisco | 5 | 2 | 2 | | 1 |
| Newark | 5 | 2 | 2 | 1 | |
| Camden | 7 | 2 | 2 | 2 | 1 |
| New Brunswick | 5 | 1 | 1 | 1 | |
| New York | 9 | 2 | 2 | | 5 |


cura Center for Urban & Regional Affairs

99

## NOTICE & ENFORCEMENT

- Registration of units
- Specific, effective, reasonable penalties
- Encourage / increase compliance



Most laws require initial registration

- Record of unit attributes
- Base rent
- Services provided

## NOTICE & ENFORCEMENT

- Registration of units
- **Specific, effective, reasonable penalties**
- Encourage / increase compliance



- Penalties for unlawful increases
- Right of action for injunctive relief and damages
- Powers given to City Attorney and/or rent board.
  - In SF, tenant rights organizations, too

## NOTICE & ENFORCEMENT

- Registration of units
- Specific, effective, reasonable penalties
- **Encourage / increase compliance**





100

## Oakland workshops, 2021

**NOTICE & ENFORCEMENT**

- Registration of units
- Specific, effective, reasonable penalties
- Encourage / increase compliance



- Tenant rights workshop
- Small property owner workshop
- Security deposits (property owner focused)
- Tenant rights workshop in Spanish

(workshops scheduled monthly)

## Berkeley webinars, 2020 - 2021

**NOTICE & ENFORCEMENT**

- Registration of units
- Specific, effective, reasonable penalties
- Encourage / increase compliance



- Security Deposits: Rights and Responsibilities
- Evictions in Berkeley
- Landlord 101
- Lease-Breaking Webinar
- Registering your Berkeley Rental Property"
- Berkeley rent control 101

https://www.cityofberkeley.info/Rent_Stabilization_Board/Home/Landlord_and_Tenant_Workshops___Seminars.aspx

# Costs

- 1984 study estimated cost of administering laws ranged $2 to $72 per unit per year
  - $5 to $195 in 2002 dollars
- Costs highest in first few years
- Sources:
  - General funds
  - Annual registration fees
  - Petition, hearing fees





**NOTICE & ENFORCEMENT**

- Registration of units
- Specific, effective, reasonable penalties
- Encourage / increase compliance

cura Center for Urban & Regional Affairs

- Oakland

  https://www.oaklandca.gov/topics/rent-adjustment-program#resources

- New Brunswick, NJ

  https://www.cityofnewbrunswick.org/residents/departments/planning_development/rent_control/index.php

- Santa Monica, CA

  https://www.santamonica.gov/departments/rent-control#RelatedResourceBagPart

# Complementary policies

- e.g., conversion limits
- Eviction and tenant protections:
  - Just cause
  - Harassment prevention
  - Relocation assistance
  - Limiting fees

cura Center for Urban & Regional Affairs



## BREAKOUT ROOMS

What principles should guide our decisions about creating an infrastructure to implement rent stabilization? What are the top objectives?

102

HTTPS://WWW.STPAUL.GOV/DEPARTMENTS/FINANCIAL-EMPOWERMENT/RENT-STABILIZATION

@CURAUMN

Center for Urban and Regional Affairs | cura
UNIVERSITY OF MINNESOTA

**Minutes**
**St. Paul Rent Stabilization Task Force**
**March 29, 2022**

**Members present (bold): Katherine Banbury, Tony Barranco, Cecile Bedor**, Jay Benanav, Clinton Blaiser, **Monica Bravo**, Carolyn Brown, **Scott Cordes, Phillip Cryan, Arline Datu, Malik Davis, Khayree Duckett, Kelly Elkin**, Tou Fang, Jessica Fowler, **Thomas Godfrey, Robbie Grossman**, Tram Hoang, **Myisha Holley, Rich Holst, Mya Honeywell, Abdiaziz Ibrahim, Rawnson Ivanoff**, Nathaniel Khaliq, **Chue Kue, Bill Lindeke,**  Nene Matey-Keke, **Carin Mrotz, Tom Nelson**, Dalton Outlaw,  **Kevin Pranis, B. Rosas, Tony Sanneh, Julie Schwartz, Katheryn Schneider, Emmanuel Speare**, D'Angelos Svenkeson, **Chris Tolbert, Marcus Troy, J. Kou Vang**,  Clara Ware

**City of St. Paul staff present:** Kirstin Burch, Jon Grebner, David Gorski, Mary Guerra, Brynn Hausz, Tony Johnson, Luis Pereira, Ian Welsh

**CURA staff present:** C. Terrence Anderson, Tony Damiano, Edward Goetz, Malik Holt-Shabazz, Trupti Storlie

1. Call to order
  - The meeting was called to order at 1:00 by Phillip Cryan.  The meeting was virtual.

2. Agenda
  - Approval of March 22 Minutes
  - Announcements
  - Post-Meeting Survey Summary
  - Rent Stabilization Objective (continued)
  - Cross-jurisdictional learnings: Ken Baar

3. Approval of Previous Minutes
  - **Vote:** Minutes approved.  79% Yes, 0% No, 21% Abstain

4. Announcement
  - City Council passed a resolution to identify direction requested from this Task Force
    - Presented by St. Paul Council Member and Task Force member Chris Tolbert
    - Resolution includes ten different topics the City Council would like the Task Force to address.
    - Resolution passed unanimously

5. Summary of Post-meeting Survey
  - Many Task Force members liked the use of Google document to record their own thoughts for small group breakouts
    - We will continue to employ these techniques whenever possible
  - Concerns about cities used as "comparisons."
    - References to other cities are not made for comparison sake, but rather to describe different approaches to rent stabilization, to provide the Task Force with information on as many policy options as possible.

6. Group Activity: Rent Stabilization Objectives (continued)

- Recapped the steps in the process
  - 3/22 - small group discussions and brainstorming
  - More than 200 individual comments
  - Themed into 12 program outcomes
- Today: React to and possibly fine tune the 12 program outcome statements

7. Cross Jurisdictional Learnings: Guest Speaker - Ken Baar

- Dr. Baar made a presentation and then fielded questions on several topics for consideration by the Task Force.
  - Dr. Baar's talk touched on new construction exemptions, return on investment examples, the use of the consumer price index (CPI) in rent caps, vacancy control and decontrol, banking, and fair return. He also talked about the inter-relatedness of these policy design approaches.

8. Adjournment
- The meeting was adjourned at 3:00 p.m. by Phillip Cryan.

**ST. PAUL RENT STABILIZATION TASK FORCE**

Week 6: March 29, 2022

cura Center for Urban & Regional Affairs

## Agenda

1. Approval of Week 5 minutes
2. Announcements
3. Post-meeting survey summary
4. Rent stabilization objectives (continued)
5. Cross-jurisdictional learnings: Ken Baar

## Rent stabilization program outcomes

- 3/22 - small group discussions & brainstorming
  - What outcomes would a good rent stabilization program produce for St. Paul?
- More than 200 individual comments
  - Themed into 12 program outcomes
- Today: small group discussions
  - Begin with your individual reactions – on google doc
  - Are these the correct outcomes?
  - What would you change?
  - What is missing?

 cura Center for Urban & Regional Affairs |

---

**A good & effective rent stabilization program for St. Paul would…**

1. provide stability of residence and affordable housing for St. Paul renters
2. provide renters with predictability in their housing costs from year to year
3. prevent rent gouging
4. provide property owners with the ability to recoup expenses for operational costs and property maintenance, and a reasonable rate of return on their investment
5. result in continued maintenance of property, providing renters with decent, safe, and clean living environments and property owners with properties that remain in good shape
6. allow and encourage the upgrading of the rental housing stock through capital improvements
7. result in the expansion of the rental housing stock and housing options in St. Paul through new construction by continuing to attract investment and financing
8. operate through a clear, transparent, and simple set of regulations and processes so that all parties have a good understanding of the system
9. be efficient and process petitions and claims quickly
10. have regulations and procedures that are fair to all parties
11. produce good communication between renters and owners/management
12. produce stable communities in the city.

106

**St. Paul Rent Stabilization Task Force Ground Rules (revised)**

1) Be real and true to your experience when sharing observations of perceived experience.

 Honor that communities have knowledge about how they experience systems and structures.

2) Give space for people to be vulnerable when speaking of their experiences.

 If someone has shared a difficult story, be aware of the follow up.

3) Acknowledge and respect differing opinions and perspectives.

 Recognize that these conversations may be contentious, and that each person will be coming from a unique position.

4) Step up, step back.

 Participate as much as you listen; it is a two-way street of learning.

 Set aside implicit power roles so all voices have equal weight.

5) Be open and curious.

 Lead with curiosity, honesty, transparency, courage, and humility.

6) Be quick to listen slow to react/speak.

 Be slow to judgment when engaging.

 Commit to a principle of constructive engagement.

7) Try to stay away from jargon and specialized terms.

8) Keep an eye towards moving the discussion forward.

9) Leave time and space for others.

10) Respect pronouns.

 Center for Urban & Regional Affairs

For approval March 1, 2022

**Minutes**
**St. Paul Rent Stabilization Task Force**
**April 5, 2022**

**Members present (bold):** **Katherine Banbury**, **Tony Barranco, Cecile Bedor,** Jay Benanav, **Clinton Blaiser**, **Monica Bravo**, **Carolyn Brown,** Scott Cordes, Phillip Cryan, **Arline Datu**, **Malik Davis**, **Khayree Duckett**, **Kelly Elkin**, Tou Fang, **Jessica Fowler**, **Thomas Godfrey**, Robbie Grossman, **Tram Hoang**, **Myisha Holley**, **Rich Holst**, **Mya Honeywell**, **Abdiaziz Ibrahim**, **Rawnson Ivanoff,** Nathaniel Khaliq, **Chue Kue**, **Bill Lindeke,** Nene Matey-Keke, **Carin Mrotz**, **Tom Nelson**, Dalton Outlaw, Kevin Pranis, B. Rosas, **Tony Sanneh**, **Julie Schwartz**, **Katheryn Schneider**, Emmanuel Speare, **D'Angelos Svenkeson**, **Chris Tolbert**, **Marcus Troy**, **J. Kou Vang**, **Richard Holst, Clara Ware**

**City of St. Paul staff present:** Jon Grebner, David Gorski, Mary Guerra, Brynn Hausz, Tony Johnson, Luis Pereira, Ian Welsh

**CURA staff present:** C. Terrence Anderson, Tony Damiano, Edward Goetz, Malik Holt-Shabazz, Trupti Storlie

1. Call to order
- The meeting was called to order at 1:00 by **Tony Sanneh**. The meeting was virtual.

2. Agenda
- Approval of March 29 Minutes
- Announcements
- Post-Meeting Survey Summary
- Rent Stabilization Objective (continued)
- Mapping Prejudice: Rebecca Walker

3. Approval of Previous Minutes
- **Vote:** Minutes approved.

4. Announcement
- No CURA Team announcements
- Chair Tony Sanneh announced City of St Paul will be having a public comment period of the rent stabilization rules April 7 – April 12 and two links were put In the chatroom. The St Paul Rent Stabilization Group has its own comment link.
- Councilmember Tolbert announced administration will be publishing the draft rules last Friday, April 1st. Comments can be submitted to the Department of Safety and Inspections between April 7 – April 22, 2022 regarding the draft rules as the Rent Stabilization ordinance currently stands. Councilmember Tolbert also stated the Current ordinance as it stands will come before City Council on April 6th
- CURA Ed Goetz stated the vote on May 1st will not necessarily impact the work this committee is working on.
- CURA Ed Goetz also answered the following questions from a committee member regarding the April 12 Public meeting:

1. List of meeting attendees will appear on the Zoom call, but CURA will have roster of public input session attendees at a later date.  Members of the Stakeholder Group will serve as observers at the public input session.
2. The public input will serve as information to assist committee members during their deliberations and inform the decisions of this group.
3. After the Public hearing, the group will pivot to deliberations role and look into policy recommendations.  CURA will document input received from the public input session and send to committee members.
4. A flyer was sent out regarding the April 12 public input session and please disseminate to your networks.
5. A separate opportunity to sign up to speak and/or to submit written comments will open up after today's meeting and will end on April 15th.
6. Our regular Tuesday meeting on April 12th will not occur and the April 12th public input session will serve as that week's official meeting.


5. Policy Preferences Poll
- CURA went through a number of polling questions with committee members seeing where people are at this point in time regarding rent stabilization and to see where there are areas of agreement, disagreement.

6. Mapping Prejudice: Historic Housing Discrimination in St Paul by Rebecca Walker, Humphrey School of Public Affairs, University of Minnesota – Twin Cities

- Rebecca Walker made a presentation and then fielded questions on several topics for consideration by the Task Force.
  - Rebecca Walker's talk touched on historical analysis on housing discrimination in St Paul including the expansion of land use segregation from 1884 to present day, access to housing, use of racial covenants, racial housing discrimination covenant Minneapolis maps and start of St Paul racial covenant maps, city governments history of enacting policies to promote segregation, and discussing how bias towards people of color occurring to this day regarding housing appraisals, discrimination, predatory lending, and foreclosures
  - Rebecca Walker took questions

7. Adjournment
- The meeting was adjourned at 3:00 p.m. by Tony Sanneh

# Mapping Prejudice

Historic housing discrimination in St. Paul

Rebecca Walker | Humphrey School of Public Affairs | University of Minnesota
April 5, 2022



## Turn of the century, St. Paul

110





## William T. Francis

- Moved to St. Paul in 1887, age 18
- Clerk at Northern Pacific Railway

111

- 1901 Attended law school
- 1904 became Nor. Pac. Railway's chief legal official (and the highest ranking Black employee in any MN business at this time)

Powered by Esri

## Attended Pilgrim Baptist Church

(est. 1866 as MN 1st Black church)

112





113



Metropolitan Council, MetroGIS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EP…   Powered by Esri

## 1884



Metropolitan Council, MetroGIS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EP…   Powered by Esri

### 1884 St. Paul is...

- Small
- Walkable
- Mixed-use

114

Metropolitan Council, MetroGIS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EP…   Powered by Esri

Metropolitan Council, MetroGIS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EP…   Powered by Esri

**1908**

115



Metropolitan Council, MetroGIS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EP…    Powered by Esri

## 1908 St. Paul is...

- Growing!
  - European immigrants and Great Migration
  - Streetcars
  - New, residential only neighborhoods

116



Metropolitan Council, MetroGIS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EP…    Powered by Esri



Metropolitan Council, MetroGIS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EP…    Powered by Esri

117



Metropolitan Council, MetroGIS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EP…    Powered by Esri



Metropolitan Council, MetroGIS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EP…    Powered by Esri

## 1924

 

William and Nellie Francis

- In private law practice since 1912
- Argued many early MN civil rights cases
- Political activist
  - Led local ban on *The Birth of a Nation*
- Nellie Francis led charge to pass MN anti-lynching law

Metropolitan Council, MetroGIS, Esri, HERE, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, EP…    Powered by Esri

## Purchased a home at 2092 Sargeant Ave in Mac-Groveland



120

Powered by Esri

## Immediately met with intimidation and white violence

- Local improvement association offered to buy the house
- Marched on the house with burning torches
- Sent threatening letters and phone calls
- Culminated in at least two instances of KKK burning crosses in their yard
- Persevered, and stayed for 3 years

121



**Start of the 20th C led to the emergence of racial segregation and of White efforts to police the color line**



Emergence of racial segregation in U.S. cities



## How did St. Paul go from relatively integrated to very segregated during the first half of the twentieth century?

- Growing Black middle class
- 1920s Rondo emerged as the center of Black life in St. Paul
  - by 1940, upwards of 90% of St. Paul's Black residents lived in the Rondo/Frogtown area





## Mapping Prejudice has worked to answer this question.

How did white real estate developers, landlords, property owners, and politicians inscribe racism into the built environment?

"And this condition and covenant shall run with the land and bind the heirs, executors administrators and assigns of the party of the second part." (The grantee therein.)

"This deed is further given on the express condition that, and the party of the second part agrees, that the said premises shall not at any time be sold, conveyed, leased, or sublet, or occupied by any person or persons who are not full bloods of the so-called Caucasian or White race.

"And this condition and covenant shall run with the land and bind the heirs, executors, administrators and assigns of the party of the second part." (The grantee therein.)

## Racial covenants were used by real estate developers to sell the perceived value of whiteness

cheaper than any lot in that block.



## LAKE OF THE ISLES BARGAIN

A fellow cannot interest the dollar without using dollar instincts, and this lot is purposely slashed in price to attract the dollar. The map shows you where it is and what it looks at. The lot has curb and gutter, stone sidewalk, city water, gas and electricity. It is a beautiful lot, high and commanding, with a frontage of 75 feet and a depth of 140 feet. Mr. Stifft lives next door, at 2815 Benton boulevard.

Old price $4,000.  Today's discount $1,250.  New price **$2,750.**
Terms, $750 down, balance on or before 3 years; 6% interest.

I appeal to the instincts of those about to marry.  Isn't this the most remarkable offering you ever heard of.  Restrictions—

The party of the second part hereby agrees that the premises hereby conveyed shall not at any time be conveyed, mortgaged or leased to any person or persons of Chinese, Japanese, Moorish, Turkish, Negro, Mongolian, Semetic or African blood or descent.  Said restrictions and covenants shall run with the land and any breach of any or either thereof shall work a forfeiture of title, which may be enforced by re-entry.

Lake Street Frontage



- Ensured new development was reserved for white people
- Prevented people of color from purchasing homes
- Determines who can accumulate intergenerational wealth through homeownership (and who can't)



Powered by Esri

**Very very preliminary** data on racial covenants for Ramsey
County (< 25% of deeds analyzed)

Powered by Esri

Powered by Esri

Neighborhood improvement associations were key to enforcing racial covenants.

129



- Brought suits against covenant-violators
- Racial covenants ruled unenforceable by U.S. Supreme Court in 1948
- Neighborhood associations continued to police the color line
  - Intimidation
  - Collective agreements not to sell

Powered by Esri

## Real estate developers and agents also key to producing and protecting segregation

- Racial covenants
- Other exclusionary deed restrictions
- Racial steering
- Explicit in the National Assoc. of Real Estate Boards' code of ethics

131



# COLUMBIA HEIGHTS

## Up Where the Sun Shines

**W**ILL you not accept this invitation to come and look us over? Central avenue is paved to 37th Ave. N. E. You can motor up in great comfort and our wonderful progress will prove a source of WONDER to you.

**W**E are still offering acre lots of rich, rich soil that will grow anything that can be grown in Minnesota, from $350 up, and good building lots (restricted) from $100 up on monthly payments.

**W**E have city water, gas, electric light, stone walks, both phones, A TEN MINUTE STREET CAR SERVICE, large school, two churches and a club house. Pay me a visit today. Our office, corner of 37th Ave. N. E. and Central, is surrounded by a private park and is very pretty.

*Wishing you jolly good luck*

*Edmund G Walton*

Powered by Esri

## City governments enacted policies to promote segregation,

Particularly through zoning ordinances.

- Single Family
- **Multi-Family**
- Commercial
- **Industrial**



### 1930s - Redlining

- Redlining maps produced by agents employed by the federal Home Owners Loan Corporation
- Rated neighborhoods A ("Best"), B ("Still Desirable"), C ("Definitely Declining"), and D ("Hazardous") in terms of their "riskiness" for mortgage lending
- Based explicitly on the racial demographics of the neighborhood



**Redlining maps used presence of racial covenants as a criteria**

Powered by Esri

**If you're Black in Ramsey County in the first half of the 20th century, buying a home is nearly impossible:**

- Much of the city has racial covenants or other exclusionary restrictions
- Can't get a mortgage to purchase in other areas

136

Powered by Esri

**In 1956, route for I-94 freeway was run directly through the heart of Rondo**

137



Demolition of homes for construction of I-94 through Rondo

Powered by Esri

## Despite fierce community protests, freeway plans went through

- Destroyed hundreds of their homes, businesses and institutions.
- 75% of those displaced were Black (~600 families)



Demolition of homes for construction of I-94 through Rondo

139



Demolition of homes for construction of I-94 through Rondo

Powered by Esri

**Today:**

Bias in appraisals, discrimination in mortgage approval, predatory lending, and a foreclosure crisis continue to disproportionately impact people of color.



National foreclosure rates by race. Data source: Federal Reserve

Powered by Esri

Powered by Esri

**The racial gap in access to homeownership is rooted in the past and is perpetuated by policies today.**

142



## The black-white homeownership gap

Percentage point gap between black and white
homeownership rates, 100 largest metro areas

Source: American Community Survey                    THE WASHINGTON POST

Powered by Esri

# Racist policies of the past continue to shape who rents and who has access to homeownership

**Minutes**
**St. Paul Rent Stabilization Task Force**
**April 26, 2022**

**Members present (bold):** **Katherine Banbury**, Tony Barranco, **Cecile Bedor**, **Jay Benanav**, **Clinton Blaiser**, Monica Bravo, **Carolyn Brown**, **Scott Cordes**, **Phillip Cryan**, **Arline Datu**, **Malik Davis**, **Khayree Duckett**, **Kelly Elkin**, **Tou Fang**, **Jessica Fowler**, Thomas Godfrey, **Robbie Grossman, Tram Hoang**, Myisha Holley, **Rich Holst**, **Mya Honeywell**, Abdiaziz Ibrahim, **Rawnson Ivanoff**, **Nathaniel Khaliq**, Chue Kue, **Bill Lindeke**, **Nene Matey-Keke**, **Carin Mrotz**, **Tom Nelson**, Dalton Outlaw, **Kevin Pranis**, **B. Rosas**, **Tony Sanneh**, **Julie Schwartz**, **Katheryn Schneider**, **Emmanuel Speare**, **D'Angelos Svenkeson**, **Chris Tolbert**, **Marcus Troy**, J. Kou Vang, **Richard Holst**, **Clara Ware**

**City of St. Paul staff present: Jon Grebner**, **Brynn Hausz**, **Tony Johnson**, **Ian Welsh**

**CURA staff present:** C. Terrence Anderson, Tony Damiano, Edward Goetz, Trupti Storlie

1. Call to order
- The meeting was called to order at 1:00 by **Tony Sanneh**.  The meeting was virtual.

2. Agenda
- Approval of April 5 Minutes
- Schedule Adjustments
- Summary of Public Comments
- Break out room re: Public Comments
- Summary of Week 7 polling questions
- Break out room re: Week 7 polling questions

3. Approval of Previous Minutes
- **Vote:** Minutes approved.

4. Schedule Adjustments
- A meeting of the Task Force is being added for May 10 at the regular time (1:00 p.m.).
- Co-chairs announced that the Task Force will be hearing from speakers in the coming weeks on two issues. The first is the perspective of housing development and investment, explaining the decisionmaking process and considerations involved in budgeting a development project.  The second is a speaker on issues of household level financial concerns and the difficulties of finding and maintaining affordable places to live in the current market and the household-level tradeoffs many are forced into to afford housing.
- There was discussion about hearing additional perspectives and the relative merits of having Task Force members speak or outside speakers.

5. Summary of Public Comments
- CURA provided a summary of the public comments, both verbal and written. There were comments from a total of 133 people. The comments were placed in the context of the six

145

policy design areas that the Task Force had covered in previous weeks. The presentation summarized the information that had been sent to Task Force members earlier.

6. Breakout room & Report Back
- Taskforce members broke into six groups to discuss the feedback.
- Key points included the most appropriate way to use the data (numerical vs. qualitative) and notice of the imbalance in comments in favor of the ordinance and the potential reasons for that.

7. Week 7 Polling Questions

- CURA gave a summary of the responses from the Task Force members to the polling done on April 5.
- 39 out of 41 taskforce members provided responses to at least some of the items. Some members skipped some questions, so individual question responses ranged.
- Responses provided areas of agreement and disagreement. This provided some information regarding where the taskforce might make considerations that could have broad consensus.
- A document containing the polling results will be sent to Task Force members after the meeting and uploaded to both the City's website and the Task Force's shared drive.

8. Breakout room & Report Back

- Taskforce members broke into six groups to discuss the feedback.
- Each of the six groups reported their discussions back to the full group.

9. Adjournment
- The meeting was adjourned at 3:00 p.m. by Philip Cryan

**Minutes**
**St. Paul Rent Stabilization Task Force**
**May 3, 2022**

**Members present (bold):** Katherine Banbury, **Tony Barranco**, Cecile Bedor, **Jay Benanav**, **Clinton Blaiser, Monica Bravo, Carolyn Brown, Scott Cordes, Phillip Cryan, Arline Datu, Malik Davis,** Khayree Duckett, **Kelly Elkin,** Tou Fang, **Jessica Fowler,** Thomas Godfrey, **Robbie Grossman, Tram Hoang, Myisha Holley,** Rich Holst, **Mya Honeywell,** Abdiaziz Ibrahim, **Rawnson Ivanoff,** Nathaniel Khaliq, Chue Kue, **Bill Lindeke,**  Nene Matey-Keke, Carin Mrotz, **Tom Nelson,** Dalton Outlaw,  Kevin Pranis, **B. Rosas, Tony Sanneh, Julie Schwartz, Katheryn Schneider, Emmanuel Speare,** D'Angelos Svenkeson, **Chris Tolbert, Marcus Troy, J. Kou Vang, Clara Ware**

**City of St. Paul staff present:**  Jon Grebner, David Gorski, Mary Guerra, Brynn Hausz, Tony Johnson, Luis Pereira, Ian Welsh, Doua Yang

**CURA staff present:** C. Terrence Anderson, Tony Damiano, Edward Goetz, Malik Holt-Shabazz, Trupti Storlie

1. Call to order
   ● The meeting was called to order at 1:00 by Phillip Cryan.  The meeting was virtual.

2. Agenda
   ● Approval of April 26 Minutes
   ● Schedule Adjustments
   ● Speaker 1: Rasheedah Phillips, PolicyLink
   ● Speaker 2: Sarah Harris, Aeon
3. Approval of Previous Minutes
   ● **Vote:** Minutes approved.

4. Schedule Adjustments
   ● **Added** a meeting on May 10.

5. Speaker 1: Rasheedah Phillips, PolicyLink
   ● See attached slides

6. Speaker 2: Sarah Harris, Aeon
   ● See attached slides

7. Adjournment
   ● The meeting was adjourned at 3:05 p.m. by Phillip Cryan.

# Apartment Economics Primer
*Policy Action To Address The Twin Cities Housing Crisis*

**Spring 2022**

# Take aways

**Types of housing**
**Metrics in our region**
**Economics of housing**
**Why it matters**
**What we can do to make it better**

Before we start – some definitions

- **AMI** – Area Median Income = for MSP $118,200 (based on 2019 data…)
- **NOAH** – Naturally Occurring Affordable Housing ≤60% AMI
- **Restricted** affordable housing – Section 8, LIHTC – this is *not* NOAH
- **'Workforce'** Housing – 80% ($94,560) – 120% AMI ($141,840)
- **Affordable Housing** – ≤ 60% AMI
- **Cost burdened** – 30%+ of income spent on housing (*i.e., >1/2 NOAH residents*)
- **Upscale Investors** – buy, renovate, and increase rents on NOAH
- **Self-Eviction/Displacement** – cost burdened, can't afford rent, vacate

3

**Why are we having this conversation?**
Many neighbors are cost burdened and struggling to find affordable places to live.



To have a vibrant, growing, and equitable region, all residents must be able to afford quality housing.



# Housing = Stability

- Emergency room visits reduce by 60%
- Health care costs reduce by 50%
- Highly-nomadic households increase demand on public services and costs
- Homeless people with criminal records were rearrested at double the rate of their counterparts who secured housing
- Since 2008, home prices have increased 3.1x faster than incomes
- For occupations that will add the most jobs in the next ten years (including personal care aides), 70% provide a median wage lower than that which is required to afford housing
- 58% of larger companies that lack nearby affordable housing options report that employees cite long commute times as a reason why they left the company
- Children with housing instability are more likely to repeat a grade

*The costs to our region for health care, employee recruitment, public safety, achievement gaps, and equity are increasing exponentially.*

*Housing is the upstream stabilizer – its efficient, effective, and more just.*

6

149

# Housing = Equity

- Pay inequities for women (0.80:1) and BIPOC (0.53:1) result in greater % of income used for housing

- 72% of students facing homelessness are BIPOC

- A disproportionate number of NOAH units were sold in moderate income, racially diverse neighborhoods

- *Minnesota ranks 47th out of 51 (worst) when it comes to leveling the playing field between white and black residents. Between 2004 and 2014, Minnesota had the seventh fastest growth of people of color in the US and by 2040 people of color will be the majority in four counties including Hennepin and Ramsey*



7

The Crisis in Metrics

The Housing Ecosystem

How to Increase Housing?

Taking Action

8

The Crisis in Metrics - Overall



9

### The Crisis in Metrics - Overall



### The Crisis in Metrics - Overall



### The Crisis in Metrics – We are severely under supplied

**Great Recession**

- Money for new development dried up

- Investors stopped investing in housing projects, making it difficult for developers to build new housing

- In 4 years the metro only delivered ~1,500 units/year vs. 5,000 units/year demand

- Supply shortage exacerbated affordable housing crisis – feeling effects still



*Information comes from Dougherty Mortgage Twin Cities 2017-2018 Multifamily market viewpoint & CBRE  2018 Q1 Market Snapshot.

151

**The Crisis in Metrics – Affordable Housing**

Approximately 150,000 families' homes at risk across Minnesota. 108,700 in the Metro.

| 2013 – 2020 | |
|---|---|
| NOAH Lost | 52,000 |
| New Affordable Built | 7,762 |
| Net Loss | 44,000 |
| *Annual* Net Loss (avg) | **6,300** |



13

---

**The Crisis in Metrics – Vacancy Rates**

***Increased demand and constrained supply have led to:***

- **Historically Low Vacancy Rates**
  - Lowest rental vacancy rate of major metro markets in the US
  - 0% vacancy for 30% AMI
  - Less than 2% Class C* apartment vacancy rate (effectively full)
  - *Demand + barriers to new supply make NOAH more susceptible to upscale conversions*

- With healthy housing supply, rents should grow in-line with inflation
- For a healthy rental growth rate, market vacancy needs to be in the range of 5% or more

\* Class C denotes older vintage apartment buildings which would generally be naturally occurring affordable housing.    14

---

**The Crisis in Metrics - MN Housing partnership – 2021 report**

| 30% AMI Rental Units | |
|---|---|
| Needed | 169,585 |
| Supply | 64,238 |
| **Gap** | **105,347** |

15

**The Crisis in Metrics - MN Housing partnership – 2021 report**

| 30% AMI Rental Units | |
|---|---|
| Needed | 169,585 |
| Supply | 64,238 |
| **Gap** | **105,347** |

| Increase 2000 – 2019 | |
|---|---|
| Renter Income | 1% |
| Gross Rent | 14% |

16

**The Crisis in Metrics - MN Housing partnership – 2021 report**

| 30% AMI Rental Units | |
|---|---|
| Needed | 169,585 |
| Supply | 64,238 |
| **Gap** | **105,347** |

| Increase 2000 – 2019 | |
|---|---|
| Renter Income | 1% |
| Gross Rent | 14% |

| Cost Burdened Renters | |
|---|---|
| White | 44% |
| Black | 58% |

17

**The Crisis in Metrics - MN Housing partnership – 2021 report**

| 30% AMI Rental Units | |
|---|---|
| Needed | 169,585 |
| Supply | 64,238 |
| **Gap** | **105,347** |

| Increase 2000 – 2019 | |
|---|---|
| Renter Income | 1% |
| Gross Rent | 14% |

| Cost Burdened Renters | |
|---|---|
| White | 44% |
| Black | 58% |



18

### The Crisis in Metrics - MN Housing partnership – 2021 report

| 30% AMI Rental Units | |
|---|---|
| Needed | 169,585 |
| Supply | 64,238 |
| **Gap** | **105,347** |

| Increase 2000 – 2019 | |
|---|---|
| Renter Income | 1% |
| Gross Rent | 14% |

| Cost Burdened Renters | |
|---|---|
| White | 44% |
| Black | 58% |

■ Owners  ■ Renters

| | Owners | Renters |
|---|---|---|
| Somali | 7.8% | 7.7% |
| African- | 24.5% | 78.5% |
| Asian- | 42.2% | 67.8% |
| Hmong | 47.0% | 53.0% |
| Ojibwe | 47.9% | 52.1% |
| Korean | 59.4% | 40.6% |
| Chinese | 67.7% | 32.3% |
| All | 72.3% | 27.7% |
| Vietna | 72.6% | 27.4% |
| White | 77.0% | 23.0% |

| Regional Growth – 10 years |
|---|
| For occupations that will add the most jobs in the next ten years (including personal care aides), 70% provide a median wage lower than that which is required to afford housing |

19

---

### The Crisis in Metrics – December 2021 Ramsey County Affordable Housing

| | New Market | New Affordable | NOAH |
|---|---|---|---|
| Cost/unit | ~$300,000+ | ~$300,000+ | ~$150,000+ |
| Time | 24 - 48 mos | 36 - 60 mos | 1 - 3 mos |

In Ramsey County, more than 37,000 families live at or below 30% AMI, said County Board Chair Toni Carter. The County Estimates that it needs 15,000 new affordable units.

• 15,000 X $300,000 = **$4.5 BILLION**

• County recently announced $74M funding

• And need to keep up with new demand!



Below is the St. Paul population by year:

| Year | Population | Change % |
|---|---|---|
| 2010 | 285,465 | |
| 2011 | 288,812 | 1.17 |
| 2012 | 291,244 | 0.84 |
| 2013 | 295,045 | 1.31 |
| 2014 | 297,674 | 0.89 |
| 2015 | 300,010 | 0.78 |
| 2016 | 303,155 | 1.05 |
| 2017 | 305,255 | 0.69 |
| 2018 | 307,695 | 0.80 |
| 2019 | 308,096 | 0.13 |
| 2020 | 311,527 | 1.11 |
| 2021 * | 315,047 | 1.13 |
| 2022 * | 317,664 | 0.84 |

Source: Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2020 & 2020 US Census updated

20

---

### How to Increase Housing – *This is a money problem!*

Estimated TCMA **shortage of 45,000 affordable homes** today!

- 45,000 x $300k = **$13.5 BILLION NOW!!**

MSA needs to **add 5,000 homes ever year** for population growth.

- 5,000 x $300k/unit = **$1.5 BILLION / YEAR!!**

There is not political will to publicly fund our way out of this housing shortage.
**We need private capital.**

21

|  | New | NOAH | New Restricted |
|---|---|---|---|
| Cost/unit | **~$300,000**+ build | **~$150,000**+ buy and rehab | **~$300,000**+ build |
| Capital Pressure | Regulatory impact/yield | Higher costs/lower rents Limited gap funding | 1:10 applications (constrained sources) |
| Timing | **24-36 mos** | **60-90 days** Public process disconnected | **36 – 60 mos** Construction price volatility |
| Resident | 80%+ | • Typical at 40-60% AMI • **>1/2 cost burdened** | • <30-60% AMI • **Special needs** |
| Bottom line | Need private capital **Investors have options** | ½ cost, more volume **urgent** | **Highly competitive funds**; long-lead |

## The impact of NOAH loss



### Crossroads at Penn

- 2015
- Richfield
- 698 Families
- Economic evictions - 30 - 45 days
- Schools and workforce displaced

## The impact of NOAH loss



### Crossroads at Penn

- 2015
- Richfield
- 698 Families
- Economic evictions - 30 - 45 days
- Schools and workforce displaced

*lost*



155

## The impact of NOAH loss

**Crossroads at Penn**
- 2015
- Rosefield
- 698 families
- Economic evictions - 30 - 45 days
- Schools and workforce displaced

**Call to Action**
- Seasons 422 ($8M gap)
- Minneapolis 220 ($3M gap)
- Blooming Meadows 306+ ($6M gap)
- Huntington Place 834 ($50M+ gap)
- Cobblestone 74 ($500K gap)

*1,856 families (~5,000 residents) remained in homes*



## The impact of NOAH loss

**Crossroads at Penn**
- 2015
- Rosefield
- 698 families
- Economic evictions - 30 - 45 days
- Schools and workforce displaced

**Call to Action**
- Seasons 422 ($8M gap)
- Minneapolis 220 ($3M gap)
- Blooming Meadows 306+ ($6M gap)
- Huntington Place 834 ($50M+ gap)
- Cobblestone 74 ($500K gap)

*1,856 families (~5,000 residents) remained in homes*



## The impact of NOAH loss

**Crossroads at Penn**
- 2015
- Rosefield
- 698 families
- Economic evictions - 30 - 45 days
- Schools and workforce displaced

**Call to Action**
- Seasons 422 ($8M gap)
- Minneapolis 220 ($3M gap)
- Blooming Meadows 306+ ($6M gap)
- Huntington Place 834 ($50M+ gap)
- Cobblestone 74 ($500K gap)

*1,856 families (~5,000 residents) remained in homes*
*~$100M Gap!!! ....partially sourced....*




**The Crisis in Metrics**

**The Housing Ecosystem**

**How to Increase Housing?**

**Taking Action**

Lifecycle of Housing



| | New | Workforce | NOAH<br>75% of TCMA Affordable | Restricted<br>25% of TCMA Affordable |
|---|---|---|---|---|
| Age | New | 10-25 years old | 25+ years old | New – 15 yrs old |
| Resident Income | >80% AMI | 60 -120% AMI | 30 - 60% AMI | 30 - 60% AMI |
| Funding | Private | Private | Private ++ | Publicly Funded |
| Rents | Market | Market | Market ++ | Income restricted |
| | | 90%+ of housing market | | |

- Today's new is tomorrow's NOAH - shortage of one type drives need for another
- Managing market affordability is *the critical factor* in reducing the # of cost-burdened households
- Eroding market rate affordability drives the need for more subsidized/income restricted units.

29

**The Crisis in Metrics**

**The Housing Ecosystem**

**How to Increase Housing?**

**Taking Action**

30

157

## How to Increase Housing – Cost of Housing

*Funding Uses - What are the Project Costs?*



SOFT
- $1M SAC/WAC Fees, Park Dedication, Entitlements & Permits
- $2.5M Legal, Design, Due Diligence, Environmental, RE Taxes, etc.
- $1.5M Development Fee - typically 3% of project costs

LAND
- $5MM Land side acquisition, paid to the landowner

CONSTRUCTION
- ~$20MM (50%) Union Labor (Ex: Local 563, Local 49, Local 633, IBEW 110, Carpenters 322, Roofers 96, Teamsters 346, etc.)
- ~$20MM (50%) Building Materials (Lumber, Concrete, Steel, Glass, Copper, etc.)

Construction Costs are increasing faster than inflation.

Levers to reduce project costs: soft costs, land, and regulatory barriers.

| 100 Unit NOAH | | Upscale ($M) | | Preserve ($M) | |
|---|---|---|---|---|---|
| Sources | Debt (FNMA/FMAC) | 12.1M | 82% | 7.5M | 47% |
| | Equity | 2.8M | 20% | 2.4M | 15% |
| | Soft | 0 | 0% | 2.5M | 16% |
| | Gap | 0 | 0% | 3.6M | 23% |
| | **Total Sources** | **$15.2M** | | **$16.0M** | |
| Uses | Acquisition | 12.0M | 79% | 12.0M | 75% |
| | Construction/Rehab | 2.5M | 16% | 3.0M | 19% |
| | Transaction / Prof Fees | 0.7M | 5% | 1.0M | 6% |
| | **Total Uses** | **15.2M** | | **16.0M** | |
| | Avg Mo Rent (1BR) | $2,623 (100%) | | $1,164 (60%) | |
| | Resident Supports | No | | Yes | |

## How to Increase Housing – "Capital Stack" example

*Funding Sources - How a New Market Rate Project is Funded*



Harper Apartments, Saint Paul – 65% Associated Bank; 33.25% State Retirement System; 1.75% Developer (Ryan)

33

158

### How to Increase Housing – Investors

*Investor Profile, Priorities, & Risk Tolerance:*



<u>Local Bank</u> –
- **Profile:** Very risk adverse. Regulated by Federal Reserve & OCC. Banks require borrower to demonstrate ability to maintain positive cash-flow under multiple scenarios to ensure payback.

- **Project Risk:** Will not close without proof of equity and project fully approved. Will take 60-70% of value of project with rates 2-3% over an index.



<u>Fund Investors:</u>
- **Profile:** Takes calculated risks to get a good risk adjusted return that will grow the pension on behalf of the pension holders. Open to wide range of investments and geographies.

- **Project Risk:** Closes after entitlements are complete and full Budget is set.



<u>Local Developer:</u>
- **Profile:** Wants to build more projects locally. Tries to identify local projects that will attract investment from Banks & Investors. Cannot build without funding from outside sources.

- **Project Risk:** Funds all pursuit costs. Takes entitlement & GMP risk pre-closing. Construction risk, loan guarantee risk, and project cash-flow risk post-closing.

34

### How investors assess opportunities

- **Appraisal** - Income Approach Valuation (Capitalized Value)

- **Debt Service Coverage Ratio** (DSCR)

- **Yield**

All based on **Net Operating Income** (NOI) - Income less expenses = NOI
More cash flow (higher NOI) is always best

35

### How investors assess opportunities

**Income Approach Valuation**

- Investment properties are typically bought, sold and valued based on the Income Approach which utilizes Capitalization

- Capitalization is the conversion of a single income stream or a series of income streams into a lump-sum value

- A capitalization rate converts NOI into an estimate of value

- The Capitalization Rate is determined by NOI divided by the purchase price, and inversely, a value can be estimated by the NOI divided by the Capitalization Rate

- The greater the risk, the higher the capitalization rate

- The lower the capitalization rate, the higher the value, meaning an investor is willing to accept less income return because of perceived less risk



36

159

### How investors assess opportunities

**Cash Flow and Debt Service Coverage Ratio**

For each dollar of rent (revenue) received, ~35-45% goes to pay expenses:
Insurance, property taxes, utilities, license fees, maintenance (which increases as building ages),
reserves for replacement of short- and long-lived items (e.g., appliances, carpeting, roofing).
*These expenses typically increase on pace with inflation, and in certain times can exceed it, but rarely are less.*

The 35-45% expense ratio DOES NOT INCLUDE THE LOAN EXPENSE WHICH REDUCES THE REALIZED INCOME TO AN INVESTOR.

Lenders/Banks typically require a minimum debt service coverage ratio (DSCR) of 1.20x. The DSCR reveals how much money is available to cover current debt, as well as whether there is enough income to cover any additional debt. A DSCR of less than 1 can indicate the need to increase net operating (NOI) or decrease expenses to take on additional debt.

$$Standard\ debt\ service\ coverage\ ratio = \frac{net\ operating\ income}{total\ debt\ service}$$

37

### How investors assess opportunities

*What is Yield?*
Investors analyze the 'Yield' to assess the potential return on their investment

- High Yield = Good Investment & High Investor Interest ↑

- Low Yield = Bad Investment & Low Investor Interest ↓

$$Yield = \frac{Net\ Operating\ Income}{Total\ Project\ Cost}$$

**Apartment projects require a yield of 6-7% in order to be financed**

38

### How the Twin Cities compare to top 30 US Cities – YOY Rent Growth



*MSP ranks*
*LAST in rent growth*
(source: Dec 2021 Yardi Matrix report)

**Investors will go where they can find the best yield based on risk.**

39

160

**Certainty of rent – affordable housing**

Residents with low or no income present rental risk

Bring it Home - $1B initiative for rental subsidies
• Project based rental vouchers – certainty underwrites new development
• Resident held rental vouchers – moves with the resident - helps affordability in NOAH and new
• Goal: fund 100% of eligible renters (currently funding only 25%)

***Status:***
This year!? (Again, in discussion for some time – we hope….)

40

**Affordable Housing property taxes**

***Currently, affordable housing -***
• pays property taxes
• Is valued at market rate – even when rents are restricted by agreement
• Has seen a greater % increase in valuation than other property types

**'4D' Property Tax Treatment** sought (credit for units that are restricted ≤60% AMI)

***Status***
• 4D Coalition – legislative fix reducing tax class to 25%
• 2022 session (4 years in discussion and still we hope…)
• Goff Public

41

**How the Twin Cities compare to other US Cities – Taxes and Expenses**

Apartment Expenses:

**MSP ranks 128th out of 150**

| | Ranked by Expenses Per Unit | |
|---|---|---|
| Rank | Market Name | Expenses Per Unit |
| 125 | Washington-Arlington-Alexandria, DC-VA-MD-WV | $ 8,613.67 |
| 126 | Chicago-Naperville-Elgin, IL-IN-WI | $ 8,730.21 |
| 127 | Madison, WI | $ 8,795.70 |
| 128 | Minneapolis-St. Paul-Bloomington, MN-WI | $ 8,852.29 |
| 129 | New Haven-Milford, CT | $ 8,967.04 |
| 130 | Fort Lauderdale-Pompano Beach-Deerfield Beach, FL | $ 9,027.54 |
| 131 | Providence-Warwick, RI-MA | $ 9,110.64 |
| 132 | Salinas, CA | $ 9,126.00 |

Taxes/Insurance:

**MSP Ranks 141st out of 150**

| 138 | San Jose-Sunnyvale-Santa Clara, CA | $ 3,005.45 |
|---|---|---|
| 139 | Lakeland-Winter Haven, FL | $ 3,005.34 |
| 140 | Oakland-Hayward-Berkeley, CA | $ 3,098.50 |
| 141 | Minneapolis-St. Paul-Bloomington, MN-WI | $ 3,122.70 |
| 142 | San Diego-Carlsbad, CA | $ 3,145.33 |
| 143 | San Francisco-Redwood City-South San Francisco, CA | $ 3,260.98 |

(source: Real Page)

*Lower rent growth.  Higher expenses.  Worse yield.*
*Investors have many different options – and **MSP is at the bottom!***
**MSP needs private capital….**

42

161

## How to Increase Housing – Investor Decisions

### Owners/Investors/Capital Groups

Investors have many investment options. They will go where they can find the best risk adjusted returns.



The Crisis in Metrics

The Housing Ecosystem

How to Increase Housing?

Taking Action



# What can we do?

### Issues in summary

- Housing critical to regional success
- Need is massive and growing
  - *$13.5B/now + $3.4B/yr*
- Public resources insufficient
- Political will insufficient
- Regulatory environment lowers yield
  - Rent Control
  - Inclusionary Zoning
  - Fees (SAC/WAC/Park dedication)
- *Yield matters – must compete for investors*

### Solutions

- Build!!!   New is tomorrow's NOAH
- Subsidize all housing construction
- Fund NOAH gaps
- Fix '4D' classification policy
- Fund vouchers 100%
- Ample private capital available – incent it!
- Consider yield impact of all policy

162

# Rent Stabilization as Effective Housing Policy

**Presented by**
**Rasheedah Phillips**
**Director of Housing, PolicyLink**



**PolicyLink**                                    Lifting Up What Works®

---

**Winning On Equity**

| | |
|---|---|
| **Mission** | **PolicyLink** is a national research and action institute advancing racial and economic equity by Lifting Up What Works.® |
| **Population** | **100 million residents** economically insecure living at or below 200 percent of the national poverty level. |
| **One Unifying Result** | *All people in America—particularly those who face the burdens of structural racism—participate in a just society, live in a healthy community of opportunity, and prosper in an equitable economy. We focus on advancing liberating policies for the 100 million people living in or near poverty, the majority of whom are people of color.* |

Rent Stabilization as Effective Housing Policy                                                 3

# Challenges of the Rental Market



**PolicyLink**                                    Lifting Up What Works®    63

## Stable Housing is Out of Reach for Many in the State



**Stable housing is out of reach for thousands of renters in Minnesota** due to rising rents and stagnant wages. This means:

# 86 hours/week

## 2.2 full time jobs

For a minimum wage worker to afford a typical two-bedroom*

**\*note:** renting at the fair market rate **Source:** Out of Reach: the High Cost of Housing (2018), National Low Income Housing Coalition; PolicyLink

**PolicyLink**                                                    Lifting Up What Works®

---

## Renter Insecurity in Minnesota



**PolicyLink**                                                    Lifting Up What Works®

---

## Renter Insecurity in Minnesota



**PolicyLink**                                                    Lifting Up What Works®

## Metro Area Renters and Shrinking Affordability - 2013



## Metro Area Renters and Shrinking Affordability - 2019



## Black Metro Area Renters and Shrinking Affordability



## Latino Metro Area Renters and Shrinking Affordability



## White Metro Area Renters and Shrinking Affordability



## St. Paul Neighborhood Poverty



## St. Paul Tenure by race



## Housing Cost Burden in St. Paul



## Housing Cost Burden in St. Paul by race



## Benefits of a Well-Tailored Rent Stabilization Policy



18

## What is Rent Stabilization?

- Sets maximum allowable rent increases to restrict price gouging, **stabilizing housing costs and granting greater ability to afford housing costs**
- Provides consistent and predictable rent increases, **protecting against destabilization and reducing sudden evictions and tenant turnover costs**
- Establishes rent boards that serve as mediators between landlords and tenants, **leveling the playing field in the landlord-tenant relationship**
- Creates rental registries to track compliance and enforce penalties, **maintaining housing habitability and greater transparency in the landlord-tenant relationship**



## Why Rent Stabilization?

- Immediately addresses the crisis at scale
- Works to increase housing stability and affordability for current tenants and prevents displacement
- Cost-effective
- Protects low-income households and advances racial and gender equity
- Cascading benefits: economic, health, educational, climate-friendly development, civic participation, long-term housing affordability and stability

## Principles for Effective Rent Stabilization

- Ensure maximum coverage of rental homes
- Pair rent control with robust tenant protections and systems to maintain safe, quality homes
- Maximize neighborhood stability



Rent Stabilization as Effective Housing Policy                                                                21

# Benefits of Rent Stabilization



22

## Economic Benefits of Housing Stability



**If all renters paid only what they could afford on housing...**

...they would have an extra $124 billion to spend in the community each year, or

# $6,200
### per household***

This would cover the basics for a three-person household, like:
• 90% of an entire food budget,
• 63% of the cost of child care,
• nearly all transportation costs, or
• 66% of the cost of tuition at a public four-year university.

Everyone would be better off, and racial inequities would shrink.

Increase in yearly disposable income by race:

| White | Black | Latino | Asian or Pacific Islander | Native American | Mixed/other |
|-------|-------|--------|---------------------------|-----------------|-------------|
| 7% | 13% | 11% | 7% | 8% | 10% |

69

## Economic Benefits of Reasonable Rents





## Economic Benefits of Eliminating Cost-Burden





## Economic Benefits of Reasonable Rents



26

## Environmental Benefits of Housing Stability

**Rent control** reduces housing costs**, granting households the ability to** live in transit rich urban centers**, reducing the need to drive**

Personal vehicle usage **is the largest contributing factor of climate change.**

St. Paul, MN: In 2019, workers living at below 200% poverty had the longest average commute time by all modes among all income groups.



Average travel time to work (minutes) by poverty: St. Paul, MN; Mode: All modes; Year: 2019

**Source:** Transform, National Geographic.

**PolicyLink**                                                    Lifting Up What Works®

---

27

## Health Benefits of Housing Stability

**Rent control and stabilization requires** proactive code inspections**, resulting in:**

- **Safe Housing Conditions:** Stably housed residents are  20%  **less likely to experience housing problems** and be exposed to hazardous conditions

- **75%** of displaced households in San Mateo ended up in worse housing situations because they had **no other choice** and may be forced to live in cramped conditions, homes with asbestos, lead, mold, and bug infestation, leading to illness

- **Regular Access to Health Services**
  Stably housed residents are **23% more likely to access health services.**

- Displaced households are more likely to*:
  - Visit the ER by **10%**
  - Be hospitalized by **30%**
  - Make a mental health related visit by **80%**

**Source:** Matthew Desmond "Eviction's Fallout: Housing, Hardhip, and Health; Fuller-Thomson, E., J. D. Hulchanski, and S. Hwang. 2000. "The Housing/Health Relationship: What Do We Know?" Reviews on Environmental Health 15 (1–2): 109–33; Justine Marcus and Miriam Zuk "Displacement in San Mateo County: California Consequences for Housing, Neighborhoods, Quality of Life, and Health"

**PolicyLink**                                                    Lifting Up What Works®

---

28

## Community Benefits of Housing Stability

**Long term housing stability benefits all by facilitating** social capital **crucial for:**

- Forming of social clubs and neighborhood institutions
- Sustaining voter blocs to pass initiatives, leverage resources, and elect representatives

**Long term housing stability fosters a sense of** identity and culture **that is important to:**

- The success local businesses, such as ones that offer culturally specific goods or niche services
- Newly settled immigrants or those with limited English proficiency
- Establish a home outside of the house: a community, shared memories, familiarity



**PolicyLink**                                                    Lifting Up What Works®

71

# Thank you!

Please contact Rasheedah Phillips, Director of Housing at
Rasheedah@policylink.org with any questions or requests
for additional materials.



**Minutes**
**St. Paul Rent Stabilization Task Force**
**May 10, 2022**

**Members present (bold): Katherine Banbury**, **Tony Barranco**, Cecile Bedor, **Jay Benanav**, **Clinton Blaiser**, **Monica Bravo**, Carolyn Brown, **Scott Cordes**, **Phillip Cryan**, **Arline Datu**, **Malik Davis**, Khayree Duckett, **Kelly Elkin**, Tou Fang, Jessica Fowler, **Thomas Godfrey**, **Robbie Grossman**, **Tram Hoang**, **Myisha Holley**, **Rich Holst**, **Mya Honeywell**, **Abdiaziz Ibrahim**, **Rawnson Ivanoff**, Nathaniel Khaliq, **Chue Kue**, **Bill Lindeke**,  Nene Matey-Keke, **Carin Mrotz**, **Tom Nelson**, Dalton Outlaw,  **Kevin Pranis**, **B. Rosas**, **Tony Sanneh**, **Julie Schwartz**, **Katheryn Schneider**, **Emmanuel Speare**, **D'Angelos Svenkeson**, **Chris Tolbert**, **Marcus Troy**, **J. Kou Vang**,  Richard Holst, **Clara Ware**

**City of St. Paul staff present:**  Jon Grebner, David Gorski, Mary Guerra, Brynn Hausz, Tony Johnson, Luis Pereira, Ian Welsh, Doua Yang

**CURA staff present:** C. Terrence Anderson, Tony Damiano, Edward Goetz, Trupti Storlie

1. Call to order
   ● The meeting was called to order at 1:00 by **Tony Sanneh**.  The meeting was virtual.

2. Agenda
   ● Approval of May 3 Minutes
   ● St. Paul Rental Market Information: Dr. Tony Damiano
   ● Review of Ordinance: Ed Goetz

3. Approval of Previous Minutes
   ● **Vote:** Minutes approved.

4. St.Paul Rental Market Information
Dr. Tony Damiano presented information regarding the rental housing market trends for St. Paul.

   ● Average rent growth during the last 22 years was 2.2% and peaked in 2019 at around 5% per year.
   ● The smaller building rental market (1 to 4 units) is harder to measure and not covered by the data source used.
   ● Even as average increases have declined slightly, the market appears more volatile in recent years especially in newer buildings.
   ● Though highly variable, rents in "C" class buildings (most likely to be NOAH) showed slightly larger increases in rents compared to A and B class buildings.
   ● Low-income renters experienced higher rent increases on average while also seeing much less income growth over the study period.
   ● Very low-income households are also experiencing a high-rate of housing cost-burden.
   ● In the low-inflation environment of the past 20 years a CPI cap would have been the most strict, 3% in the middle, and a "CPI + a percentage" would have been the loosest.
   ● In the more recent high inflation environment, the 3% cap would have been the strictest.

5. Discussion of 60% Threshold
- Several taskforce members raised concerns about the 60% threshold for what constitutes a recommendation from the taskforce. Their concern is that such a threshold could be reached without any agreement from renter advocates on the taskforce. Conversation ensued about different thresholds, the rationale for the 60/90 thresholds, the overall makeup of the taskforce, and about the continued participation of some of the renters in the process.

6. Review of Current Ordinance
- Ed Goetz reviewed the current ordinance.

7. Small group breakouts
- Taskforce members broke into small groups to begin deliberations on potential policy-package proposals.

7. Adjournment
- The meeting was adjourned at 3:00 p.m. by Phillip Cryan.

# ST PAUL RENTAL MARKET ANALYSIS

ST PAUL RENT STABILIZATION STAKEHOLDERS GROUP



Center for Urban and
Regional Affairs | **cura**
UNIVERSITY OF MINNESOTA

---

## Data Summary

- CoStar – Real estate analytics company tracks rents in a sample of buildings in large cities. Sample runs from Q1 2000 – Q1 2022

- Sample is representative of rental market for larger buildings 5+ units (~74% of St. Paul rental market

- The sample itself consists of 549 buildings and about 25,000 units. Sample limited to market rate buildings.

- Rental distribution of CoStar sample largely matches that of St. Paul

- Data on income and rents in later section comes from the US Census Bureau's American Community Survey (ACS). Sample runs from 2006-2019

**cura** Center for Urban
& Regional Affairs |

---

## YoY Change in Nominal Rents in St. Paul 2000-2022



Black line represents mean change, grey around represents range (90/10) of rent change by building.

Source: Author calculations, Costar

## YoY Change in Rent in St. Paul

|  | Average | Min | Max | Range |
|---|---|---|---|---|
| 2000-2007 Pre-Crash | 0.8 | -4.6 | 5.9 | 10.5 |
| 2008-2012 Crash | 1.0 | -2.1 | 3.5 | 5.6 |
| 2013-2019 Post-Crash | 4.3 | -0.6 | 9.3 | 9.9 |
| 2020-Present COVID | 2.8 | -7.3 | 7.4 | 14.6 |
| Overall | 2.2 | -7.3 | 9.3 | 16.5 |

Source: Author calculations, Costar

cura Center for Urban & Regional Affairs

## YoY Change in Rent in St. Paul – Relative to Inflation

|  | Average | Min | Max | Range |
|---|---|---|---|---|
| 2000-2007 Pre-Crash | -1.4 | -7.2 | 2.1 | 9.3 |
| 2008-2012 Crash | -1.0 | -2.5 | 0.2 | 2.7 |
| 2013-2019 Post-Crash | 3.2 | -2.0 | 9.9 | 11.9 |
| 2020-Present COVID | 0.0 | -8.3 | 5.7 | 14.0 |
| Overall | 0.3 | -8.3 | 9.9 | 18.3 |

Source: Author calculations, Costar

cura Center for Urban & Regional Affairs

## Rent Change by Building Age



| Time Period | Pre-2000 | Post-2000 |
|---|---|---|
| 2000-2007 Pre-Crash | 0.9 | 1.4 |
| 2008-2012 Crash | 0.8 | 1.1 |
| 2013-2019 Post-Crash | 3.3 | 2.7 |
| 2020-Present COVID | 2.0 | 0.1 |
| Total | 1.8 | 1.5 |

Source: Author calculations, Costar

cura Center for Urban & Regional Affairs

176

# Rent Change by Real Estate Class



| Time Period | A Class | B Class | C Class |
|---|---|---|---|
| 2000-2007 Pre-Crash | 0.8 | 0.9 | 0.9 |
| 2008-2012 Crash | 0.8 | 0.9 | 0.8 |
| 2013-2019 Post-Crash | 3.1 | 3.2 | 3.2 |
| 2020-Present COVID | -1.0 | 2.0 | 2.0 |
| Total | 1.3 | 1.9 | 1.8 |

Source: Author calculations, Costar

# Average Annual Income and Rent Change by Income Quartile 2006-2019



Source: Author calculations, ACS, Inflation adjusted

# Average Annual Income and Rent Change by Income Quartile 2006-2019



Source: Author calculations, ACS, Inflation adjusted

## Average Annual Income and Rent Change by Income Quartile 2006-2019



Source: Author calculations, ACS, Inflation adjusted

## Average Annual Income and Rent Change by Income Quartile 2006-2019



Source: Author calculations, ACS, Inflation adjusted

## Average Annual Income and Rent Change by Income Quartile 2006-2019



Source: Author calculations, ACS, Inflation adjusted

## Housing Cost Burden by Income



Source: Author calculations, ACS

## Small Building Rental Market



## Changing Rental Market Structure in St. Paul – Investor-Owned Homes



Source: Federal Reserve Bank of Minneapolis

https://www.minneapolisfed.org/article/2021/new-property-data-tool-reveals-patterns-of-investor-ownership-in-the-twin-cities-area

# Changing Rental Market Structure in St. Paul – Investor-Owned Homes



Source: Federal Reserve Bank of Minneapolis

https://www.minneapolisfed.org/article/2021/new-property-data-tool-reveals-patterns-of-investor-ownership-in-the-twin-cities-area

cura Center for Urban & Regional Affairs

# Visualizing Various Rent Caps 2000-2022*



cura Center for Urban & Regional Affairs    Source: Author calculations, BLS    *NOTE: 2022 Inflation taken from FNMA forecast April 2022

# Visualizing Various Rent Caps 2000-2022*



cura Center for Urban & Regional Affairs    Source: Author calculations, BLS, CoStar    *NOTE: 2022 Inflation taken from FNMA forecast April 2022

180

# Modeling Different Rent Caps
# 2000-2022*

| Threshold | Average | Min | Max | Range |
|-----------|---------|-----|-----|-------|
| Flat 3% | 3.0 | 3.0 | 3.0 | 0.0 |
| CPI | 2.4 | -0.6 | 5.5 | 6.1 |
| CPI +3% | 5.4 | 2.4 | 8.5 | 6.1 |
| CPI +7% | 9.4 | 6.4 | 12.5 | 6.1 |

Source: Author calculations, BLS
*NOTE: 2022 Inflation taken from FNMA forecast April 2022

cura | Center for Urban & Regional Affairs

# Takeaways

- Average rent growth during the last 22 years was 2.2%, It peaked in 2019 at around 5% per year.
- Smaller building market harder to measure, growth in investor-owned homes.
- However, even as average increases have declined slightly, the market appears more volatile in recent years especially in newer buildings.
- Though highly variable, rents in "C" class buildings (most likely to be NOAH) showed slightly larger increases in rents compared to A and B class buildings.
- Turning to the ACS data we see low-income renters experienced higher rent increases on average while also seeing much less income growth over the study period.
- This is reflected in high-rate of housing cost-burden for very low-income households.
- In the low-inflation environment of past 20 years. CPI cap most strict, 3% in the middle. CPI + a percentage loosest.
- However, in our more recent high inflation environment inflation rates above 3% make the 3% cap the strictest.

cura | Center for Urban & Regional Affairs

# THANK YOU



cura@umn.edu



# Share of Units Over Hypothetical Cap



Source: Author calculations, Costar

# Share of Units Over Hypothetical Cap



Source: Author calculations, Costar

# Share of Units Over Hypothetical Cap



Source: Author calculations, Costar

# Share of Units Over Hypothetical Cap



Source: Author calculations, Costar

# Post-meeting survey results

## Feb 22 Survey Full Results

**Q1 Which stakeholders need protection as we deliberate about rent stabilization in St. Paul?**

- Tenants and property owners both need protections.  Developers need to know that rent stabilization will not destroy their projects.
- Small mom and pop landlords and low income renters such as section 8 tenants
- Tenants in working class and lower middle class housing and neighborhoods
- The future residents of St. Paul that can't find housing.  The future tax payers in an underbuilt Saint Paul.
- owners and renters
- Renters, because they are vulnerable to rent hikes and economic evictions as we deliberate. They represent the largest group of people who will be impacted by this ordinance, and yet they have the least representation in our task force. This speaks to how renter voices have always been silenced and overlooked.
- Renters. Just renters and unhoused people. Renters are way under-represented in the stakeholder group already. Our lives and our ability to live and thrive in St. Paul are at stake. The City needs to focus on its residents, not wealthy real estate who continue to make St. Paul more and more inaccessible.
- Low-income tenants, the number of physical spaces that exist to house tenants, non-corporate landlords, taxpayers
- renters of all incomes, and smaller mom/pop housing providers
- low income families and individuals
- renters, those who are attacked in our society via racism, classism, sexism
- Small Local Property Owners
- The Smaller Property Management and Renters
- renters, property owners, first-time homebuyers, taxpayers
- small landlords, and renters
- Renters.
- Landlords and lower income renters. NOT middle class and upper income renters.
- Renters
- Landlords, tenants, housing programs ect.
- All residents in Saint Paul deserve to live with dignity in a safe environment.   Renters and Property Owners alike.  Residents of Saint Paul with unethical landlords increasing rent drastically and on a monthly basis need to be protected.   Housing providers need the assurance that they can continue to maintain and care for properties in a market where bills are skyrocketing-building supplies, labor, property taxes are all unpredictable and a 3% cap in this uncertain time is causing many of great landlords to sell and leave our city.   It is heart wrenching.
- All of them
- All stakeholders have legitimate concerns and perspectives that need to be taken into account. But the reason voters passed this measure is to protect renters from excessive rent increases that would undermine their ability to remain in their homes and communities, so

184

the primary group of stakeholders whose concerns and perspective need to be heard in this process is St. Paul renters.

- "It is imperative that we operate with a conscientious approach in our deliberations regarding rent stabilization. Furthermore, as we discuss renters and property owners, we must operate with the highest degree of mindfulness while recognizing that there are real people that will be affected greatly by the final outcomes of this deliberation. In terms of renters, there are many in our city, especially in the BIPOC community, that are having tremendous survival struggles that not only continue to get worse, but should be considered unsustainable as they are today. Moreover, many individuals and families in Saint Paul that live under the nightmare of housing insecurity, and worse yet homelessness, should have the utmost advocacy and consideration in our deliberations because housing is truly a topic of survival, liberty, opportunity and quality of life. -- On the other hand, it will also be incumbent on us to be conscious of the fact that property owners not only have private property ownership rights, but have also voiced valid concerns about their operating sustainability. In fact, we must keep in mind that property owners are indeed the facilitators of rental housing in our community and we need them to have sustainable business models in order to operate as well as have the ability to create more housing opportunities. Any inability for rental property owners to manage their properties in a fiscally sensible way will have negative consequences not only for them, but also renters. Therefore, if their needs and rights in this deliberation are not adequality considered, then our community could face even more proliferation of low rental housing supply in tandem with diminished quality and upkeep of the infrastructure that is already in place. --Thus, both renters and private property owners need protection from unintended outcomes that could be detrimental to our overall goal of creating sustainable, affordable housing. "
- Renters
- We need a good balance between protecting renters who are experiencing real hardship in the current environment, where rents are increasing rapidly and housing options are scarce, while still enabling new and diverse housing development, which is essential to work toward restoring balance in our housing market.
- "For me, "protection" sends the message that someone or some entity needs more/less protection than another; rather, I will acknowledge that all stakeholders are impacted in some way.

| Renters | ---Construction workers (new properties) |
| Property Owners & | Community |
| Developers | -Neighborhoods |
| -Private-, nonprofit-, | --Residential |
| individual- owned | --Business/Commerce |
| --Employees/Staff | Government |
| ---Day-to-day | -St. Paul |
| management/administration | -Ramsey County |
| of property (existing | -State of Minnesota" |
| properties) | |

- The stakeholders who most need protection are the low-income individuals and families, particularly individuals and families of color.  They are the ones with the fewest resources, the greatest financial burden and those least likely to have a voice or a seat at the table in this kind of venue.  I understand the Committee is looking for balance in how we think about

185

this ordinance, but a lot of the money and the power are on the side of the landlords and the developers.  I want to see them get a fair break, but not at the expense of some of the poorest among us trying to take care of themselves and their families and trying to make ends meet working multiple minimum-wage jobs.

**Q2 What priorities should St. Paul's rent stabilization program address?**

- St. Paul's priorities should be a logical and forward-thinking policy that does not exclude the concerns of all stakeholders, and results in stable property values as well as rent.
- "Vacancy decontol: keeps rents stabilized while tenant is living in home and also keeps landlords in business when they have to do turn overs which cost alot of money due to vacancy and turn over cost. Rent cap that is tied to inflation. "
- Ways to interpret and narrow justifications for exceeding the yearly rent raise cap, a way of compiling rent prices between renters year to year to prevent property owners from unlawfully raising rent without the city noticing, a municipal tenant's board for owner - tenant disputes to keep them from all pouring over into the district court & keep administration costs down(Wisconsin has municipal courts like this)
- To avoid the unintended consequence that housing supply does not keep up with demand.
- the hard 3% cap
- The program should maintain the protections that St. Paul voters on for the maximum number of people. We should avoid creating dual housing markets where some people are protected and others are not, because this will further exacerbate inequities in our housing system.
- The lack of affordable housing in St. Paul. The percent of income St. Paul renters are spending on housing.
- Increasing the supply of affordable homes
- Allowing future investment and keeping a rolling 50 year inventory of housing stock affordable to the city most vulnerable renters.
- making sure that in the future we have a wide variety of rental stock for all types of people who wish to reside in St Paul
- Keeping rents affordable while not punishing landlords
- maintaining the full integrity of the ordinance as it was written and voted for, for the first year
- How will tenants and property owners know about the details of this regulation? How will it be enforced?
- "Why there is hardly any Affordable Housing being Built Yearly, Open Access for Renters, Funding Streams, and Land Use Access to Built Houses for Low-income Families"
- Avoiding disinvestment, ensuring protections against discrimination, preventing real estate prices from rising
- Decontrol, and weather providers get to use their unused difference in cap increases.
- Cap increase at no more than 3%
- St. Paul needs to attract investment in new housing as well as the renovation of existing rental housing. Both Minneapolis and suburban areas compete for this investment. Rent control will lead to disinvestment. St. Paul also needs lots more new construction of affordable housing. The ordinance that passed fails to address these issues.
- How implementation will impact smaller landlords, how to do education to tenants and landlords that cuts through or propaganda and misinformation. I think the rationale for exempting new construction makes 100% sense and it also creates some really important

186

question marks for parameters on how long construction is considered "new" and what a later on-ramp looks like.

- Right now housing programs and community landlords are considered the same when it comes to laws and requirements.   However, the tenants served in housing programs have very different needs and require different services. It is becoming more and more difficult for the tenants in our housing programs to find housing in the community once they have completed the program.  This is due to many factors; however, high rent is at the top of the list and families are not able to locate housing in the community with their section 8 voucher; the rent is just to high.  Having rent go up every year takes a already struggling family living paycheck to paycheck to barley staying a float or not being able to maintain their housing.  We need growth; however, we also need equity and affordability.
- Predatory landlords that increase rent on unsuspecting tenants,  especially in the affordable housing arena.
- Program should prioritize development of more housing of all types and assistance for those most in need.
- "-Affordability of rent
    o -St. Paul residents being able to remain in their homes and communities (protection against displacement and gentrification)
    o -Resilience/sustainability of these protections over time
    o -Effective communication, outreach and enforcement measures for both renters and property managers/owners"
- "Saint Paul's rent stabilization program should work to address the dire, unprecedented shortage of affordable housing in our City that is not only detrimental to current renters, but will also affect generations of renters to come. Furthermore, the product of this program should be one that creates an environment conducive to achieving actual affordable housing options in tandem with an increased overall supply to meet the demands of our community.
    o In order to achieve these goals, we would be well suited to establish what rental price brackets constitute affordable housing in the first place as the answer to that question can vary. The same question could be asked in terms of what constitutes a reasonable right of return for rental property owners as well as what events and costs would trigger exemptions for the rental property owners?
    o In other words, some communities, especially those living in poverty, need more deeply affordable rental housing options than those in the community that have higher monetary resources. Likewise, rental property owners have varying degrees of resources to manage and upkeep their properties as well as different motivations for being rental property owners in the first place. Therefore, identifying formulas, or standards that could be used to arrive at workable solutions will be crucial for both renters and property owners.
    o There are many intersecting reasons for why our City finds itself in such a dire affordable housing crisis, especially when considering members of our BIPOC community who have faced historical inequities that contributed to long term, generational poverty at higher rates. Furthermore, private property owners who lease their properties are not the only cause for the affordable housing issues we face. Considering these sociological and historical contexts of our housing crisis, I feel the that incurred costs of these changes should be spread out among the City of Saint Paul as a whole, and not just placed on renters and private property owners. Therefore, I feel that it is incumbent upon this rent stabilization program to address

ways in which the City can help to empower renters to have more resources as well as empower property owners to be able to sustain and, or grow their housing stock while also offering more affordable housing options  This could be done in many ways such as looking at adjusting City fee and compliance costs, property tax credits, or other offset strategies. I feel this ordinance can be truly successful all the way around, if we find ways to balance these things.  "

- Protection and preservation of saint paul's most vulnerable tenants. While also understanding developers, investors and landlords increasing operations or holding cost including the increase in xcel and taxes.
- Balance.  Reasonable stability for renters while still enabling an environment for reasonable return on rental housing operations and development.  Reasonable return will allow for continued investment in our existing housing stock, as well as needed growth to help ensure there is enough housing for all that is both affordable and high quality.
- "Deliver voters' 3% annual cap, while assuring property owners/developers they can meet their Returns on Investment in St. Paul. --Acknowledge the top need/s of the stakeholders and how the needs are being addressed."
- Special attention should be paid to the least among us, that they have affordable places to live.  Because even with new construction, there's no guarantee that the new construction will provide affordable places for low-income families and individuals.

### Q3 What is your greatest hope regarding rent stabilization in St. Paul?
- My greatest hope is that St. Paul will have the best rent stabilization framework and policies compared to elsewhere, and that through community involvement of all stakeholders, with logic and reasoning driving our decisions, we will assure a vital community where there are ample affordable housing choices, but also enough incentive for property owners to continue to invest, and maintain property values to prevent neighborhood gentrification.
- I would like to balance it out. We need to make sure that tenants do not experience huge rent increases but we also need to make sure that we are not squeezing landlords out of business.
- That St. Paul remains a place where working people live and raise families, not a city of luxury condos with vacant units overlooking homeless encampments
- It takes into account the issues of funders of new housing.
- remove the unintended consequences of this ordinance
- My greatest hope is that St. Paul is brave enough to stand up to the forces that have historically held us back from advancing housing justice (landlord and real estate lobbies) - and that we choose to do what no other city has done - in implementing the ordinance that was voted on, and will benefit the majority of our neighbors who rent their homes.
- That the Mayor's Office will uphold the ordinance that passed in November without adding exemptions for huge companies (especially those that take public money). There is no reason to jack the price of affordable housing, it's meant to be affordable.
- An amended ordinance that is limited to protecting renters from price gouging
- Clarity regarding rent increases, and which costs are not considered rent for the purposes of the rent calculation. In particular property taxes, and water/trash.
- that we are able to keep affordable rents from increasing more than inflation or wages.  I feel like we need to ensure that renters have the same type of stability in housing as a mortgage holder.  When you buy a house you know what your mortgage payment will be for the next

30 years.  The only thing that increases is taxes and maintenance costs.  This should be true for renters as well.

- That all landlords are not treated the same
- That the ordinace is fully implemented
- I hope it will protect the renters without denigrating new affordable home constructions. At the same time, allow small local property owners to continue to provide affordable housing.
- To Implement Policies and Funding that will Address Homelessness and Affordable Housing
- a solution that works long-term
- That it less strict on Providers with less then ten units or providers looking to improve units for tenants.
- That rent will not be increased to more than 3% annually.
- That we can continue to produce new housing while constructively addressing the needs of lower income renters through an expansion of the LIHTC program and more state bonding for affordable housing.
- That the city will have robust, visionary implementation that becomes a model for other urban centers.
- I would like to see tenant protected from large increases that displace them from their homes and/or prevent them from finding housing in the first place.  I understand that new buildings are needed due to housing shortage; however, what is the point of new housing if you are not able to afford it.  I would like to see more invested in the buildings and properties in the community now that need repairs and improvements.
- That the city will listen to all parties and understand there is a better way to protect our most vulnerable without scaring investors away.   Specifically addressing the new construction and the vacancy control.
- That it encourages development of more housing of all types, offers assistance for those most in need and does not restrict the supply of capital necessary for a healthy housing market.
- That we make this a city that working-class renters from diverse racial and ethnic backgrounds can continue to call home for decades to come.
- My greatest hope about rent stabilization in Saint Paul is that we achieve a blueprint that truly achieves affordable housing, but not to the detriment of renters, or private property owners who are leasing their properties. The success of both renters and property owners are not mutually exclusive. In fact, we need both renters and rental property owners to be successful for this program to work.
- My greatest hope is we find a solution(s) that provides opportunities to keep development thriving while protecting homes and properties from SOLELY profit driven sharks who only care about their pockets and not the Saint Paul neighborhoods.
- An amendment to the current ordinance that both protects renters while still encouraging housing development, which is essential to decreasing housing scarcity and bringing balance to the housing market.
- "Deliver voters' 3% annual cap, while assuring property owners/developers they can meet their Returns on Investment in St. Paul.
  - Make it worthwhile for both small and large developers to want to invest/build in St. Paul, as all developers/property owners are needed to fill the affordable housing rental gap.

189

- o Acknowledge that it is very costly for developers (private, individual, nonprofit) to do so anywhere, considering supply/demand, labor/product shortages, rising interest rate environment
- o Developers will know what they need for size/# of units = Return on Investment
- o Increase first-time homeownership in St. Paul.
- o Improve the messaging: Messaging about "affordable housing" – does mainstream understand that AMI is $73,500 for individuals and $104,900 for a family for four in the Twin Cities?  "
- My hope is that all St. Paul renters can find and live in decent, affordable accommodations in areas that best suit their needs with regard to education, transportation, shopping, medical needs, social needs, etc.

**Q4 What is your greatest concern regarding rent stabilization in St. Paul?**
- Property owners may not have ample incentive to update their properties and that may lead to neighborhood gentrification that decays our city's equity in real estate.
- Its not tied to inflation. Inflation is already at 7.5 percent and property tax went up 18%. Small mom and pop landlords who are providing affordable housing will be squeezed out of the market.
- That the proposal may become gutted & full of large loopholes and as a result protection would become the exception rather than the norm for tenants.
- It will limit the investment into new housing in St. Paul and the affordability crisis will only deepen.   We are trying to regulate a privately owned, finite resource in a City that is growing and many people crafting these policies do not have factual awareness of how new housing gets funded and built.
- no more rental home production, small owners lose their properties, hurts renters
- My greatest concern is that the thoughts/ideas/positions of people who have a vested financial interest in changing the ordinance carry more weight than actual empirical evidence, research and lived experience. That we make decisions based on fear and uncertainty as opposed to leaning on what is known.
- That because real estate interests are over-represented in the stakeholders and have financial power over the City, they'll get whatever they want while the majority of people in St. Paul will have their voices ignored.
- That the city will slowly adopt too few changes and the supply of affordable homes will decrease as a result.
- Disinvestment in black and brown communities, a race towards the bottom regarding housing stock, and preemptive housing provider non-renewals to reset rents.
- Right now because property is less expensive than many other areas of the country out of state real estate investors are buying up property in our city.  This is a bad thing for a number of reasons and this is something we should try to stop.
- It will remove the incentive for current and future investors to invest in rental housing. Which by default will raise rent rates due to lack of affordable housing.
- That the people's ordinance will be torn apart by exemptions, particularly retro active exemptions that make no sense other than eating away the ordinance.
- That it will not protect the vast majority of the renters, except for a few taking advantage of the system. That it will backfire, and rents will artificially rise regardless of market feedback.

- My Greatest Concern is that Low-income Residents are Left Out of Conversations with Elected Officials and Wealth Building is for the Rich! There needs to be Transparency and Accounting for Affordable Housing  with Elected Officials!
- A cycle of disinvestment and greater shortage of housing
- Not addressing mom and pop landlords issues
- That developers, landlords and their lobby groups will force the mayor and the council to back down.
- A lawsuit that freezes the city's ability to amend the ordinance and leaves the issue in limbo for an extended period of time.
- That landlords and realtors will use their power and resources to derail or weaken or just drag this out.
- Tenants are having a hard time affording rent now; even the 3% increase every year is causing hardship to so many individuals and families. Landlords have a heard time getting the rent that is due now because tenants are not able to afford it. We will have more housing; however, tenants will not be able to afford the rent and current tenants will be displaced.  Harder to find housing in the community.
- "That common sense will be thrown out, and that the good landlords and citizens of Saint Paul will flee to easier areas to maintain a business and standard of living. – There is SO little upside right now, taxes are high, crime is skyrocketing and people are leaving the city."
- Greatest concern is that the ordinance is not amended because as written it has shut down the Saint Paul housing development market and created a high level of uncertainty for all stakeholders. It needs to be amended to exclude new construction, provide a reasonable % rent increase above CPI, offer vacancy decontrol, efficient self-certification and housing assurances for those most in need.
- That sky-is-falling rhetoric and political opposition from some groups and individuals who opposed the ballot measure will lead to the city gutting some of the core provisions necessary to making this policy truly effective in achieving the goals that led St. Paul voters to approve it.
- My greatest concern about rent stabilization is the potential negative outcomes that could arise for both renters and property owners if a true balance is not achieved in terms of how both can still be successful in a rent stabilization environment. I think many agree that something meaningful needs to be done about the immense lack of affordable rental housing in Saint Paul. Likewise, many understand the reasons why property owners need to be able to operate a positive income rental property to stay afloat. Therefore,  if we do not implement rent stabilization in a balanced way that considers these factors, then the result of decreased rental housing could be more damaging than what we are faced with right now, which is already a very dismal situation for many renters.
- My biggest fear is that we lose valuable investment dollars from larger groups and people only rely on local development before local development has the resources and infrastructure in place to fill in the gap.
- The ordinance will be too rigid and deter needed housing growth and reinvestment.
- The messaging becomes or remains renters vs property owners; one is bad and one is protected.
- "The above are my priorities [answer to previous question].  I understand that rental property owners and developers may have different priorities, and I understand we have to strike a balance in addressing the needs of all sides.  But I hope we remember that a majority

of St. Paul residents voted for this ordinance, and so I hope we can honor and respect what the voters want by adhering closely to the spirit of the ordinance. -- I don't want the process to be sabotaged and my hope is everyone is acting in good faith, and that we come out of this ready to present a strong ordinance ready for implementation to Mayor Carter in June"

**Q5 Meeting logistics: what worked well?**
- It was well organized and led, as well as efficient in its use of time
- The Zoom format works well.
- Tuesdays are fine, too hard to accommodate everyone
- Facilitation was concise and meaningful. Good flow. Didn't try to put too much in one agenda.
- I thought the open dialogue and introductions went well.
- Digital is great.
- I thought it was a very well run meeting.
- 2 hours seems right.  We'll see as we move into the challenges.
- Not too sure yet, because its just the first meeting.
- "I didn't have any Problems
- The time of the event worked well.
- Everyone was able to introduce themseslves.
- Good discussion from a wide variety of community members.
- All good. I appreciated being given a break at the midpoint!
- I was not able to come to the first meeting.  Our offices closed for the weather and was not able to get home in time for the meeting.
- I was pleased with logistics, it is a massive group of people and it went well.
- The moderators attention to the questions in the chat bar and their willingness to keep things moving along.
- Mostly seemed very smooth
- The format is very organized and it feels like a place where people should be comfortable speaking their minds and collaborating on this very important issue.
- "The introduction, meeting structure and the organization was great for the first meeting and made things easy to understand and clear on how they will move forward. "
- For an opening organizational meeting (and for general learning sessions) I thought the current format worked fine.
- It's just a little annoying that some members don't turn on their videos.  I would like to see who I am working with, who is on the team.

**Meeting logistics: what could be better?**
- I cannot think of anything at this time.
- Nothing, it was very well ran
- The format with 41 participants, plus public observers, is not conducive to real dialog. Please consider expediting the formation of smaller groups that can dig deeper in a format where people speak freely.

- Could we please create a process for people to speak? I've seen people do different things (raise their virtual hand, simply unmute, "stack" in the chat). I'm happy with anything but want to make sure I'm not speaking out of turn.
- Some difficulty getting into the right meeting, a little hard to keep up with the conversation especially typing. I think the group rules make sense, but if someone suggests they don't want other people to use the word landlord, that's not a rule you should implement. It was piggybacked off of respecting pronouns and I think that it's disrespectful to equate those two groups. Being a landlord is not a protected identity, it's a choice. If the word landlord has negative connotations, it's because they've been allowed to exploit housing insecurity for huge profit without being checked.
- Group was far too big, meeting agenda wasn't concise and led to haphazard questions/discussions at the end.
- Information ahead of time, with clear point of emphasis where feedback is required. We need to understand is this a Mayoral task force or city council, and we also need clarity regarding body of work this group is responsible for discussing.
- I want to see folks who are not normally heard from given just as much time and space as those who normally take up space.
- Not too sure yet, because its just the first meeting.
- Checking Zoom Links 10 Minutes to make sure there is good connections!
- Please make sure that we abide by Mayor Carter's vision for the group and not get bogged down in short-term political fights
- none at this time.
- Divide the group into 4: Then have a co-chair(facilitator heading discussions in each group)
- It is difficult for a committee of 41 people to reach consensus.
- I'd like to see the chairs assert their roles and do more of the facilitation.
- It is hard to say at this point, as we get into the emotional aspects I fear there will be a lot of need for strong mediation.
- Good to see a variety of faces in the first meeting but needs to break in to smaller groups to offer the chance for more voices to be heard.  There is also uncertainty about how the Task Force's work coincides, or not, with the City Council's.  The leaders should encourage and expect all attendees to read the CURA report.  It has clear and thorough discussions of much of what we will be re-reviewing in the weeks ahead. It is ok, and for many a compliment, to expect people to take this work seriously and to be prepared.
- There was some understandable confusion about the list of who should be a panelist and who in the "audience."
- Possibly consider seeing if the group could meet late morning rather than the middle of the afternoon for those of us who have kids to pick up from school.
- not currently
- It will be difficult for 40 people to engage in discussion effectively once we get to that point -- so hoping for breakout groups and other ways to connect with each other.
- I'm not sure if it's my laptop or the Zoom meeting, but a number of times I've raised my hand with the Reaction button, but then the hand is out there for only a few seconds, then it disappears.  I have to keeping hitting the button, and because of that I'm not recognized so I have to take myself off mute.

## March 1 Survey Full Results

- **18 Respondents**
- **Do you work in St. Paul? 17 Yes, 0 No,  1 missing**
- **Do you live in St. Paul? 11 Yes, 6 No, 1 missing**

**Q1: What was your most important takeaway today? (16 responses of 18)**

- That this has been done before so there should be lots to learn
- Long history of Rent control in US
- The claim that rent control worked while it also showed same program was terminated. Seems hard to believe that something that worked would have been terminated.
- The way everyone collaborated
- There is a long history of rent control in the USA.
- For over 100 years there has been a need for rent stabilization, usually during times of extreme economic hardship.
- RC has been a response to emergency situations and its parameters are not static and are generally conditions-based
- That interest groups are stalling to prevent meaningful discussion
- That rent control/rent stabilization has been with us for quite some time, and it's been instituted in response to various economic needs and crises to assist the people, families and communities who are most in need of help.
- "Rent Control was passed because inflation was way too high"
- Vacancy decontrol.
- From the data, historically, rent caps really do work overall!
- Historically, rent control has come about in direct response to failures in the housing market.
- That certain subsets of data do not show a complete picture of the success or failure of a policy.
- Some task force members don't understand the scope of our work and should be asking their questions of the mayor or city council if they have issues/questions, rather than putting that burden on other task force members. I'm sure others have questions as well, but we should be asking them of people who can answer them, not taking up our valuable time in these weekly meetings. We have a lot to do and I'd like to focus on our task at hand.
- My most important takeaway is that I am pleased that there is a considerable amount of historical data which could guide us to a better understanding of which aspects of rent stabilization regulation had achieved balanced solutions for renters and rental property owners. Moreover, my hope is that this historical data will be substantial enough to help us all form a genuine understanding of the positive, and or negative affects these policies have had on both renters and rental property owners alike.

**Q2: What was one new or surprising thing you learned today? (15 responses of 18)**

- That rent control was initially enacted as a protection from inflation decades ago.
- That rent control has been implemented with an actual monetary cap not just a percentage
- That rent control was established after wars and depression
- That many states have policies against rent control.

194

- Rent stabilization has come and gone in certain areas, and not maintained, or re-adapted to accommodate changes through time.
- Political support for RC has been cyclical
- That there's been two rent stabilizations in America previously
- It was interesting to note how many different cities and communities enacted rent control throughout our country during the 20th century, and now that we're in the 21st century, we're entering into a third wave of rent control.  Yes, it's cyclical but it comes about because of economic downturns, whether due to war or whatever, where the financial consequences weigh heaviest on low-income individuals and families and communities of color.
- How many exemptions the first few generations of rent control had.
- I learned that even though the government enforced rent control during world War 1 and, many states abolished rent control after the war.
- How important it is to be clear that rent stabilization is not rent control for many different reasons; one being that RS gives renters, like mortgage owners, a sense of what their housing expense will be but it doesn't limit a landlord from setting the rent up front at what they need. Because inflation doesn't effect a mortgage but does effect renters it levels the playing field in this regard.
- Saint Paul is the first non coastal city to enact rent control
- I was surprised to hear the facilitators demonstrate a bias in support of the adoption of rent control by saying that it had "proved that it worked to provide better outcomes".  There are contradicting studies that show that rent control leads to expansion of gentrification, lower overall housing supply, and inability for people to find entry level housing.  Rent control has been shown to produce winners and losers, benefitting few at the expense of others.
- Rent stabilization is not a new tool, and St. Paul is certainly not the first to use it.
- Something that had been insightful during our session was identifying the ebb and flow of rent stabilization polices as they related to pressures exerted from national economic stability, housing supply status, as well as peace and wartime periods. In other words, I found this to be useful because it gives credence to the notion that affordability issues are not necessarily instigated simply by arbitrary rental costs, but at times by exterior forces beyond the control of renters and rental property owners.  Establishing and acknowledging this causation context is crucial and gives merit to the notion that an earnest approach towards rent stabilization guidelines should work to strike balance, rather than create undue burdensome policy that works against renters, or rental property owners.

**Q3 What, if anything, did you learn or hear today (including in the breakout sessions) that made you rethink your position or assumptions or perspective about rent stabilization in St. Paul? How did they change? (15 responses out of 18)**
- My position has not changed
- Nothing
- It was good to hear how other think about rent Stabilization
- During times of economic growth measures for rent control often lessen or go away.
- That rent control units have considerably lower rents over a ten year period, causing benefits of neighborhood stabilization, and superior quality of life of individuals, but also causes inefficient use of units, perhaps longer commutes, less velocity of units, etc.  A successful program will require significant balancing, but fortunately, we have a lot of examples from other cities, as well as studies, to guide us.
- The ideologically broad-based support for RC measures historically.
- That is has already been done before. It made me even more pro-rent stabilization

- I understand there has to be a balance between the needs of renters and property owners and developers, but overall, not much has really changed for me coming from the perspective of a renter.
- Often we hear that rent control is not successful, but it's lack of success is never broken down. Seeing that the first few generations of rent control had SO many exemptions tells me that there should be little to no exemptions when tackling rent stabilization in Saint Paul, especially with new construction.
- "I still have the same position. We need to vacancy decontrol and or exempt small mom and pop landlords from rent control"
- I'm stronger in my assumption that renters will have to fight very hard to not have this ordinance wittled down.
- Not sure anything changed.  I felt most of the information reinforced my existing perspectives.
- That the Twin Cities have the lowest rent growth of the top 50 markets in the United States.
- I was surprised to hear that rent stabilization was used to protect people from housing instability during times of high inflation. This made me think that it's a better tool for our current moment, given that we're experiencing record-high inflation. I didn't realize that forms of rent control/stabilization have been deployed by the federal government that many times in our history. It's a piece of information that is not broadly discussed or known. It made me think that St. Paul is not taking such a big risk by implementing rent stabilization because it's been done by so many other places so many times in our history. Lastly, the research was very clear in naming that rent stabilization works at stabilizing rents, which is its ultimate goal. We shouldn't let ourselves get distracted by theories about why it doesn't work because we are seeing it accomplish its goal in cities and states across the country.
- As I mentioned, having expansive historical data helps us to think more critically about our own positions, and gain better understanding of where others are coming from.  I feel these affects are paramount to achieving consensus. Therefore, while my personal position on rent stabilization has not changed, I continue to think critically about this topic in tandem with working to sincerely understand the basis of both similar and opposing viewpoints held by others.

**Q4 Do you have any questions about today's learnings that you would like the facilitators or the task force to follow up on? (14 responses of 18)**

- What has been the historical avergae increase of rents in St. Paul?
- I would like to see the studies used to make assumptions about rent control and sample group used
- Where property taxes affected by areas with rent stabilization? What demographics has rent control affected the most?
- If there are studies that show that rent control units have lower rents over a ten year period, are there studies that indicate what happens to overall real estate values of rent control buildings versus non-rent control buildings?
- No, the presentation seemed fair and balanced.  We need a little more time in the breakout groups so everyone has a chance to say something.  And maybe we could acknowledge that everyone needs a chance to speak and elicit their opinions, so we all know what we are all thinking.

- not enough information about negative effects of rent control too much positive
- Do we know how these exemptions affected the first few generations of rent control?
- "Can you verify this: ""In the early 1990s, rent control in some cities, such as Boston and Cambridge, Massachusetts, was ended by state referenda. When rent control ended in Cambridge, the city realized a 20% increase in new development and an increase in property values, according to a study by the MIT Center for Real Estate""
- I was also wondering if the government also increased property taxes 18% while they enforced rent control during world War 1. Plus was there sky rocketing inflation during that time? "
- I think it would be useful to speak specifically about inflation and how it impacts housing costs.
- Professor Goetz made a comment that rents are almost always reduced when rent control is implemented.  I assume this is rents relative to inflation (real vs nominal).  Just want clarification that my assumption is accurate.
- Please provide the data sources used to create the materials.  Also, please include data and studies that show where rent control has had adverse effects in housing markets.
- I would like to learn more about the relationship between housing costs and inflation. How do they truly relate?
- "In find it important that, through content moving forward, the group is able to gain a deeper understanding of why certain municipalities have embraced rent stabilization techniques, and why others have either pulled back, or banned them altogether. It seems through federal policy, all areas of the United States have been affected by rent stabilization at one time, or another. Furthermore, the response by a large number of states had been to ban it outright seemed quite staggering. In addition, some communities embraced it and, or enacted their own versions.  Thus, I had felt there was a seemingly subjective answer given to the group during our session when a member asked about the causation of the rolling back and, or banning of rent stabilization, and if those reactions were due to arbitrary political swing, or some deeper policy flaws that had adverse affects on communities. Furthermore, the answer that had been given implied that political swings had a higher degree of dictating these reactions than anything else. While there may already be a plan to speak about these things, it would be helpful to have clarification about if there is empirical data that supported the statement that political swings played a larger affect on how each state experienced and reacted to rent stabilization policies, or if there had been substantial negative, or positive outcomes that caused these different reactions. Furthermore, I find this very important because as we decide policy implementation recommendations, it is imperative that we have a good compass of what successes and problems had arisen in communities when rent stabilization was implemented to the point where they either embraced, amended or banned the policy outright.

### Q7 Meeting Logistics:  What can we do to improve your experience? (8 responses of 18)

Have a small designated time for general conversation about grammatical errors and meeting notes. We spent way too much time not talking about rent control
- Keep the meetings on track.
- I like that we take a break between the hours.
- Show studies from other sources that also shows the negative consequences of rent control.

- More advanced notice about breakout sessions' content and a reminder to folks that ground rules apply to the breakout sessions.
- Show a more broad range of perspectives including data that supports and does not support rent control policies.
- Maybe we can add time limits to our agendas (especially the first half) so that we don't get derailed and can get to the meat of the agenda.
- "To improve time management, continuity and focus, I feel it would be useful to consider not engaging group questions until prompted by the moderators at break points, or the end of presentations, or at the very least, finding some sort of balance. Questions could be documented in the chat, or people could raise their hands and wait to get called during a set Q&A time decided by the Co-Chairs and Moderators. Some of this content is very involved and I feel it would run more smoothly and have better focus if this was considered. Likewise, in relation to time management and questions, I want to mention and remind that at the onset of this commission, we spoke much about inclusion and respect. Therefore, I was a bit dismayed when a member was asking clarifying questions about the new construction pieces of the ordinance, that there were members of the group writing accusations in the chat that the person's was actively trying to ""derail"" or impede the session. I found this to be highly inappropriate and could damage this process if the group allows that kind of side talk about a member that is simply working to better understand something.  Furthermore, that practice might discourage others from asking questions, and trying to get clarification on something they do not understand. I do not think this should be allowed to happen again. If someone is indeed taking up too much time with questions, then the Co-Chairs should act to try and table it for a more opportune time in the session."

## MARCH 8 SURVEY COMMENTS

| What was your most important takeaway today? (from the learning topic for today) |
| --- |
| Most other RC policies include elements that are more lenient than Saint Paul's current ordinance |
| That there is a range of options with rent caps and rent decontrol. |
| Is our assignment to figure out how to best implement a 3% rate cap? If so, why are we spending time discussing whether a rate cap or variable should be used? |
| There are legitimate and clear pros and cons to both the fixed-rate cap and the varies-with-inflation rate cap approaches. No obvious right answer about which of those two approaches is best. |
| That there are many ways to approach Rent Stabilization. And if structured properly, it can help support all stake holders to build our community. |
| That vacancy decontrol isn't helpful because it would undermine the whole point of rent stabilization. If we allow it then the City is completely voiding what the public wants. |
| The need for a lot of thoughtful consideration around vacancy decontrol and building changes of ownership. |
| Three weeks in, the task force is poorly planned, disorganized and has no clear mission, definitions or rules for proceeding. It mirrors the unfortunate ordinance we have been asked to modify. |
| Members of the group are not on the same page when it comes to our goal |
| wasted time listening to emotional pleas vs zero time understanding other side |
| We do not have common definitions as a commission in order to respond to our interact with the policy at hand. |
| We need to follow agenda, and give people time to get thoughts across But the discussion certainly drew out the tensions between property owners and renters. I was glad that the renters spoke up because the early part of the discussion and the focus seemed to be dominated by property owners, or at least, that was my overall impression. |
| That rent control advocates are firmly stuck in a position and are not willing to even try to be educated from other lived experiences in order to tackle the very serious topic in front of us. I think we all need to acknowledge that we are here with the goal of making the City better. This has to be the baseline!!! We wouldn't be investing this amount of time if we didn't want to see a positive outcome for the City. |

| What was one new or surprising thing you learned today? (from the learning topic for today) |
| --- |
| the statewide Massachusetts referendum on rent control vote |
| Vacancy control, supposedly, is intended to protect tenants from harassment and informal evictions. |
| It seems like stakeholders don't understand each other's pain points. For example, homeowners/property owners actually have additional and inflationary costs tied to their "set" mortgage payments. A lot of property owners keep their increases less than 3%, but may be forced to raise rents prior to May 1 in order to protect themselves from future controlled pricing. |
| The value of predictability for property owners, not just for renters. |

Not a lot of committee members fully understand the ordinance

Not sure if everyone understands basic economics. I don't mean it in a derogatory way, but if we are to have a productive and inclusive discussion, we need to have a basic understanding of economics as a foundation, so we can be on the same starting page. We need renters, landlords, and investors to support our community. One is not more important that the other.

I didn't know that rent control advocates do not understand that housing is equally a business as it is a human right.

How many landlords are willing to admit that they would withhold maintenance on rent stabilized units.

That a gentleman in the small group I was in just received a 16 percent rent increase for his 2 bedroom apartment and that should be criminal.

Nothing.

starting to see disrespect of others time being allowed

I appreciate the facilitator suggesting sub-committees, but I agree with the renter who said that the comments from both sides should just come out in general discussion as they have been. I believe this was the first time that the renters' side came out very clearly. There's certainly been lots of views from the property-owners' side, but no one suggested sub-committees until the renters began to speak. And if we indeed have until November to work this out, let's take the time we need to get both sides views out on the table.

No. We are getting fed very basic information without the benefit of local data. We are also not getting real data related to the outcomes of cities with rent control ordinances in place.

**What, if anything, did you learn or hear today (including in the breakout sessions and discussions) that made you rethink your position or assumptions or perspective about rent stabilization in St. Paul? How did they change?**

Absent a right to renew or just cause eviction, vacancy decontrol could lead to massive displacement/instability for some of the most vulnerable renters.

I still want to see rent stabilization become a reality: give it time to take effect and see what comes of that. But appreciate that we're talking about options for change for the future should the circumstances around the economy, inflation, etc. bring to bear some unforeseen effects.

Are they property owners in this group who have raised rents more than 3% annually? Without judgment - please share the reasoning for doing that. I've only heard property owners say they don't raise more than 3% annually.

I prefer no rent stabilization and let the market decide. However, I see there is room for sensible measures to rent stabilization.

None.

I think I realized how many realtors, landlords, and Chris Tolbert are unwilling to have a discussions on the issues to a point where they'd understand or empathize with any renter. I wanted to find common ground, but it seems a lot more hopeless than before.

Nothing.

Not sure

more about the 3 or 4 states that have rent control again, nothing about the 37 other states that have outlawed and why

Nothing. There is no data being presented here in a complete enough form where anyone can be successful in changing an opinion. We need more complete information.

Same as previous.

## Do you have any questions about today's learnings that you would like the facilitators or the task force to follow up on?

I am curious about what research can tell us about disinvestment in rental housing and how different rent control programs have approached that issue, whether it's become a problem, etc.

I'd like to learn more about what is intended about "disincentive for maintenance." Ordinance advocates, correctly I believe, point out a landlord's duty to maintain the property. Assuming that's true, what types of maintenance/repairs could be lawfully abandoned or deferred if a cap is too low?
Ordinance advocates say the exception process to the cap provides a fair avenue for what I believe is too low a cap. Could the facilitators provide empirical evidence of the tradeoffs of administration in seeking exceptions? The opportunity costs of time, the compliance costs of training and knowledge, the potential for connection/corruption to influence exception outcomes, how the additional bureaucracy is a subsidy to corporate landlords and disadvantages smaller operators.

I believe the presenter has done that to some degree in presenting some of the positive effects and/or consequences of rent caps and decontrol. I believe presenter is trying to provide a balanced presentation.

Can we take a look at an actual example of the economics facing both the tenants and the owner of a small rental property (perhaps a duplex), a medium sized property (perhaps an 8 unit building), and a large sized property (perhaps 100+ units), so that we can talk about actual human circumstances and numbers? Everyone just throwing out numbers and anecdotal stories are unhelpful to the purpose of this task force.

Again, specifically define our task. What is our end goal?

Quality of rent stabilization units to non rent stabilization? Has there been increase or decrease or neutral of investment in a community after rent stabilization has been enacted?

Please use the data regarding historic St. Paul Rental levels, and then consider demographic data trends at the macro level. Focusing on historic St. Paul doesn't paint the picture of where St. Paul is going in comparison to the national, and metro-wide trends. IT IS underselling the rapidness of growth in our metro and the need for housing supply to grow exponentially.

What is in our scope for what we can do? It seems like we're being asked to make recommendations just so the city can say they got community input, and not because they're going to follow them. Why should I trust the taskforce?

This is not a question, but I want to identify that over the course of the first two meetings, landlords spent considerable time processing their responses to being called landlords and as a point of process required us to generate alternatives for a word that is actually a defined legal term, and I do not recall that conversation being curtailed or foreshortened the way a renter and tenant advocate was quieted this week. I would offer that both are emotional responses but that one, perhaps because it conformed to a specific process-oriented conversation style, was accepted as generative and the other labeled emotional and outside of the scope of our time together. I am representative of neither of these people or roles, but if we're going to work as a group of diverse voices, we need to flex to accommodate all kinds of emotional responses and not just the ones that feel comfortable within Robert's Rules of Order.

201

| |
|---|
| Why are there no representatives of institutional capital on the task force? Were they asked to participate? |
| Are we focused on next year or May 1st? |

| **Meeting Logistics: What can we do to improve your experience?** |
|---|
| Folks need to raise their hands and be recognized before speaking.<br>Each speaking contribution should have a limit, ideally 30-60 seconds.<br>Tony should model Phillip's approach to chairing/facilitating discussion.<br>Folks should refrain from using the chat as an additional discussion room, it's distracting from the presentation/verbal discussion and not approached with the same comity as group discussions.<br>Agenda and scheduled should be laid out for the group at the beginning of each meeting.<br><br>Lastly, I think the next survey should include a question about whether participants are sincerely open/willing to consider recommending changes to the ordinance. I joined with the assumptions that we were working to craft amendments that could reach consensus in the group, but it would appear that some folks are completely unwilling to concede/believe that the ordinance can be improved upon. |
| Glad we're starting and ending on time. Seem to be a majority of folks who still don't turn their videos on. However, it would be nice if those who are speaking in the forum would turn their cameras on when they speak. |
| The moderator / co-chairs need to have the ability to keep the meetings on track. We are all here because we want what is best for the residents of Saint Paul and we need to be more efficient with our time together. |
| I know we are in the data collection and learning phase, but maybe give more time for discussion after a break out session. At least give each breakout session group 2-5 minutes to share what they found. Lastly, I do understand the time constrain, so if need, sub-committee groups is fine. But one of the facilitator should be present for the discussion as to facilitate and record the discussion. |
| Please use the current ordinance as a baseline before presenting on topics regarding other cities. |
| Make sure the co-chairs are not biased in how they respond/facilitate |
| Stand firm on that break. And I like the small groups. |
| Send slides in advance keep things moving. Establish some basic rules for length of comments. Allowing people go on rants is not productive. |
| Make sure no one person dominates the discussion; maybe have someone moderate the chat a bit so that it's remains accessible to / used by everyone |

March 15 Survey Results

| Do you have any ideas regarding how the public hearing should be run to encourage engagement and participation? |
| --- |
| What is the format? Does there need to be 3 readings? I would NOT recommend a hearing on this prior to understanding the May 1st implementation of the rules, which SHOULD have a public hearing of their own prior to a hearing from this group. |
| Allow the folks who are connected to renters to be the one to recruit for this. We need renters to be in the public hearing, asking and answering questions, and giving them the platform to speak. |
| CURA should consider proactive outreach to interest group representatives soliciting their participation.<br><br>Ask all participants which of the elements (cap, decontrol, compliance, etc.) they plan to speak on and limit input to 30-60 seconds for each element.<br><br>Allow all participants to submit written testimony that taskforce can consider after reviewing in the Google Drive. |
| -Main hearing or hearings need to be in evening or on weekend to enable people to participate<br>-Might be useful to have an online form for people to submit comments/stories/concerns, in addition to hearing(s), for those who can't make the hearing(s) |
| Ensure that both sides have equal time to be heard. |
| Require sign up. If time left after those who signed up, let others speak. limit comments to 2 minutes |
| Keep it short as possible please |
| I think we should just have one break out and one discussion at the end. No mid break out session. Go through the materials quicker, 1hr to 1 hr 20 min. Allow at least 15 min for break out and 20+ min for full group discussion. |
| Ample notice, advertising throughout the city so all stakeholders are aware, educate public on our process, share areas of common ground as there surely will be some, time limit comments, have right to cut off redundant dialect if hearing too long. |
| Sign up in advance to speak and limit remarks two 2 minutes, or submit comments in writing. |
| Without engagement there most ikely will not be participation. Perhaps take a survey of this group and find out what they would like/are able to committ to. |
| I think there should be multiple public hearings (one during the 9am-5pm timeframe and one in the evening) so that people can participate regardless of work schedules. There should be an in-person option and a remote option. There should be an email address that people can submit their public comments to, as well as a phone number (even a google voice #) so that people can call and leave a message sharing their comment. |
| More time and/or meet in person. Make sure we hear from each stakeholder group. |
| I think allowing the Renters of Color to tell their storties Why the Rent Stabilization Policy needs to be Implemented Today because People will become Homeless in the Future! |
| This is such an emotional conversation with great division. I propose case studies for current housing providers and renters/tenants |

203

I think that it would be helpful to reiterate that the rent stabilization task force in particular is not here to re-litigate whether rent stabilization should be implemented, or not. Rather, it should be made clear that our particular mission is to form policy application recommendations based on group consensus stemming from an informed, historical understanding of rent stabilization in tandem with finding balance between the factors that are important to the different stakeholders. Framing this way may better entice content from the public to be more useful to help us better understand what is important to them as renters and rental property owners.

**What was your most important takeaway today? (from the Learnings)**

That Saint Paul does NOT HAVE ENOUGH HOUSING SUPPLY!!! That is the biggest problem we are facing and NOTHING that we are doing will add to the supply of housing - and we may very well lose units! Our housing affordability crisis will only get worse.

This policy treats single units and their accounting metrics on and individual basis and don't take into account the portfolio of owner

The rationale for deviating from cap and what it must account for.

Showing how maintenance has decreased because of rent control passing, it is an argument used by landlords to not pass strong policies, even though maintenance is an issue for most without rent control.

The bureaucracy of determining, considering, and enforcing exceptions and exemptions is going to be quite extensive. The ability for tenants to certify exceptions based on prior maintenance record was also interesting.

-All these pieces/levers interact. Answering the question "what exceptions, if any, should be allowed for?" in isolation, without knowing what is being done on cap level and control/decontrol, is pretty meaningless. Have to answer them in connection with each other/as a whole.

I appreciated that the facilitator went over the points of the existing rent stabilization program. I think it's important that we as a group be able to distinguish what constitutes "maintenance" for the property owner versus what constitutes "capital improvements." From a renter's viewpoint, replacing a faulty refrigerator or stove is considered maintenance. I don't see why maintenance should decline because of rent stabilization.

how complex most the policies almost always become with many many key details having to be negotiated

There can be a lot of exemptions. Maybe even too many, where it might be better to just let the market handle it.

Pros and cons of different city's experiences throughout history.

There is a near zero correlation among the semantics of the various city and state rent control programs that have been attempted in the United States and notable because none of them have worked. It reinforces the liberal, Nobel laureate economist Paul Krugman's conclusion that, "The analysis of rent control is among the best-understood issues in all of economics, and – among economists anyway – one of the least controversial. In 1992, a poll of the American Economic Association found 93 percent of its members agreeing that a ceiling on rents reduces the quality and quantity of housing."

That the recommendation to maintain the ordinance as is, is not an option many in this group even consider to be a valid option. I would surmise that nearly 100% of renters, and perhaps a percentage of others in the group would want this very option. I'm wondering if this option could be stated out loud so one's vision and awareness of the group and what we are tasked to do might open/shift. Sometimes when tasked with making recommendations one might think that requires changing or altering it.

Creating exempt categories incentivizes property owners to move units to exempt categories. Universal coverage treats all property owners the same.

Don't seem to be getting a broad base of engagement. All sizes of developers and property owners need to share if/why the 3% cap is problematic.What do they need? Property owners and developers of different sizes have different needs. Where are their voices?

The Research was Great but it still does not Lead to Conversations about why we need to Implement the Rent Stabilization Policy Now, and Affordable Housing in the Future!

Reasonable return on investment provision will require a lot of thoughtful conversation. There are lots of details to sift through to help further clarify the ordinance.

Marcus was the most influential participant in the conversation-understanding the pressure he is experiencing is excruciating. He was also in a breakout-not mine- and reported back an understanding that housing providers also have burdens and obligations.

Once again, the data this week had helped me gain better perspective of how other municipalities have approached rent stabilization. In fact, I feel the diverse applications speak to an absence of any true, one size fits all rent stabilization structure. Therefore, I think the group will be well suited to look closely at what makes the City of Saint Paul unique in it's challenges for both renters and rental property owners alike. Based on the various particular metrics and standards put into practice around the country, I had been given more optimism that we have a room in our deliberation to be innovative as we find reasonable balance for the Saint Paul stakeholders involved.

## What was one new or surprising thing you learned today? (from the Learnings)

Why do we keep comparing St. Paul to NYC, San Fran, and Washington DC? We are no where near as populated and we are so much more affordable when compared to those cities. If success is measured by being like those Cities, that doesn't feel like success and therefore what are we even doing here?

The costs to the tenants from "pass-throughs"

Preferential rents was shocking.

How common communities make distinctions between small and large operators.

That concern about the spread of rental-properties-as-short-term-investment-vehicles-only business models has reached the point where the Minneapolis Fed is investigating and reporting on it.

I liked the idea that in the program the task force is designing, we can mitigate maintenance disincentives through a number of means.

I did not know about the lawsuit / court case that requires "reasonable return" to be in a rent control policy. I would like to learn more about that? What legal precedents are there around these issues in the US?

I didn't know the concept of pass through and banking preferential rents. So those were interesting.

All the well meaning but unintended consequences.

Lots of people have questions, but it disrupts flow of learning and makes me wonder if we lose some content due to time constraints.

The ordinance provides for a process for landlords to apply for exemptions to the 3% if they need it.

I learned that building maintenance, specifically around major building structures, doesn't suffer because of rent stabilization. Habitability has been an issue that has existed before this ordinance, and it will continue afterwards unless we address it with other policies.

We've learned what's happening in other places, but what's the impact of the 3% cap in St. Paul? Provide current information to the group about the recent reduction of housing development in St. Paul. What's the impact to renters, property owners and developers if the trend continues?

When we Listen to each other support then the Real Change will Come!

It was helpful for me to be able to gain more insight into various exemption categories that have been enacted elsewhere. Aside from showing alternative approaches, having this information can also elicit innovation to what has already been done to make it fit what the stakeholders need in the City of Saint Paul. While this may be redundant, I find it worth repeating that the data makes me optimistic a balance for renters and landlords can be achieved and crafted uniquely to the meet the needs of the City of Saint Paul. Furthermore, week by week it becomes ever apparent to me that a permanent rent stabilization board should be convened to address the ever changing forces that affect rental housing dynamics in our City with a goal to be proactive rather than reactive, because ultimately, the consequences of this policy have very real effects on real people in our community that are both renters and also rental property owners.

**What, if anything, did you learn or hear anything today in the presentation, breakout sessions or group discussions that made you rethink your position or assumptions or perspective about rent stabilization in St. Paul? How did they change?**

It was refreshing that some rent control advocates listened to the concerns of property owners and realized that we are all working toward solutions.

My perspective has not changed; however, I have a better understanding for the challenges we are facing.

We need to have collective conversations around how we will track to make sure property owners are following the rent control policy

I've generally become more sympathetic to the ordinance as passed through our discussions, but today moved me in the opposite direction. It would seem some of the elements mean we're going to end up with a complicated system, most notably vacancy control.

There are a number of avenues to get to a final product that will work for all interested parties.

Nothing. I still feel that we are still getting a history lesson and don't have a real sense of the potential impact of ordinance

I am more inclined for a simple vacancy decontrol solution instead of a highly complex ongoing regulation regime

At the risk of sounding insensitive, I think renters need to get educated on the basic economics of housing. They need to understand that most of the time, its not the greedy landlords that increase rents. Yes, there are always bad players. But there are multitude of factors that contribute to rent increases.

It is also up to us, our community, to do a better job at providing said education to the renters as well.

The more I hear, the more I see potential unintended consequences. The first was this ordinance. Condos, knock down and rebuilds, deferred maintenance. Maybe we need to step back and really consider what behaviors or actions we want to change. Is a rent cap the best way to achieve our goals?

If we don't implement a universal exeption for renters we will create a dual housing market where not all renters will be protected. For rent stabilization to succeed in its goal of making housing affordable and keeping folks in their homes, from what we learned in the past 2 classes we know that rent stabilzation does stablilize rent!

It was helpful to see the St. Paul policy in detail. I didn't realize there was an exemptions process and that it took into account so many of the things owners have already named (property taxes, capital improvements, etc.). I feel more comfortable with the policy knowing this exemptions process will be put in place.

I had always heard that rent stabilization made maintenance worse, but the research shows that's not true, especially regarding major building structures.

Because so many cities have exemptions and carveouts, I incorrectly assumed that was necessary. Now I've learned that exempting new construction may actually harm our housing market because it incentivizes the demolition of old buildings.

The research showed that exemptions create an incentive for property owners to shift units to exempt categories. This made me think about the harm that exemptions create, and how universal coverage could be a more equitable way to approach rent stabilization. It treats all property owners equally.

There may be a # of costs property owners could pass-through to renters. Without knowing that detail why would a developer invest in a new property or project or St. Paul, or why would a lender provide financing?

To Much Support Against the Policy!

I was so moved by the experience that Marcus had- the monthly rent increases infuriates me.

In my 20 year experience as a housing provider, I increase rent on existing tenants extremely rarely-like twice in the last 5 years- less than 5 percent and only when forced by increasing expenses-fuel bills, property taxes, home improvements. My turnover is very low-most of my tenants become my friends and only move on because of life situations or home ownership opportunities.

I coach my tenants to become housing providers. To build generational wealth.

It is hard for me to coach young investors to invest in my beloved city-Saint Paul.

The housing situation in STP is TRAGIC.

I propose an easier path to housing provider through the FHA products, help us empower our neighbors.

207

New considerations are always weighed by me based on the weekly presentations and insights shared by fellow task force members. As I have mentioned for this week, I have continued faith that our group can create balanced recommendations if we remain objective with our focus and strive to give all stakeholders a voice that ultimately contributes to our final recommendations.

**Do you have any questions about today's learnings that you would like the facilitators or the task force to follow up on?**

Can we talk more about what having SO many exemptions do to a rent control policy? It is not as simple as most make it out to be.

I don't quite understand why new development is discouraged from coming into an area that has rent stabilization. If they set the rents at a high enough price when the units go on the market, won't they get the return they anticipate on their investment? Haven't they already calculated for that? What am I missing here?

Do we see the same problem with converting controlled units to uncontrolled units with the "rolling exemption" style policies (e.g. the 15-year window)? My understanding is that those kinds of polices eventually add controlled housing to cities.

Yes, with some housing loss due to rent stabilization regulations; what had the government/local officials done to increase housing stocks? Did they make it easier or harder for investors to build more affordable housing units, such as tax credits or ease of permits?

We should dig more into impact on real estate values, if any. There is likely a good body of data available.

In our meetings, I'd like to continue to be grounded in the reality of the ordinance and what it actualy includes so we aren't spending so much time in the specualtion of what might occur.

Why Rent Stabilization Policy is Important in Communities of Color?

I think Mayor Carter made it very clear in our first meeting that the purpose of our work together is to make recommendations for the implementation of rent stabilization. He said this is a HOW conversation, not an IF conversation. At this point it's just obvious that some folks engaged in this process are invested in undermining or stalling it. It's disappointing and makes it seem challenging to know how to move forward effectively.

I appreciate the presentation on impact to rental housing stock due to exemptions. I'd like to hear more about magnitude of impact on both rental and overall housing stock due to various exemptions, and also how exemptions potentially benefit growth in overall housing stock (especially new construction exemptions).

I think it would be helpful to gain a better understanding of the rental housing stock in Saint Paul as it compares to the other communities that we had studied. Moreover, a better understanding of aspects such as the average structure ages, types of structures (e.g. Single family home, duplex, tri and 4 plex up to large developments). In addition, any unique cost basis factors for rental units in Saint Paul when compared to other cities that might come from aging stock, or higher operating costs would be prudent to take into consideration.

Likewise, it would help to know if we have a higher incidence and infrastructure of small building rental properties as compared to some of the other cities we had studied that might be more heavily geared toward a higher incidence of large building structures. Furthermore, what do the numbers in Saint Paul show for the quantity of "mom and pop" rental property owners compared to larger outfits? Gaining a better feel for what the current rental landscape in Saint Paul is within these contexts would be important to consider as we collaborate on what recommendations make sense. In fact, I have wondered at times during our sessions if the variance of how different communities have implemented rent stabilization in their community has been influenced to an extent by these things.

**Meeting Logistics: What can we do to improve your experience?**

The meeting today had much better organization and it was good to hear respectful dialog on all sides. Thanks to the co-chairs for the changes from last meeting as it was more efficient.

Thank you to CURA and the co-chairs for facilitating a much better meeting today. And kudos to Phillip for an implementing distinct Q&A sections, I hope we continue this moving forward.

Can you send out the meeting link before the next meeting? I had trouble getting into the meeting this last time around.

Not Logistics but a question. For sake of transparency, can CURA explain who is paying for their services?

Thanks for your excellent work.

Doing okay for now.

Keep the planned meeting schedule. When I committed I was told specific times. I made sure I met those times in agreement with my employer.

Maybe limit questions or comments until after we learn the module's content. Need better use of time for breakout rooms to make sure everyone can share. Maybe add a minute or two with expectation each person answers question or shares. Are we put in break out rooms randomly each time?

Write your State Legislators and tell them to support the S.F. 3414 bill that passed out of committee this week and which would retroactively prohibit Saint Paul and Minneapolis from enacting rent control via petitioned ordinance and completely prohibit rent control in the State of Minnesota.

A contunued reminder that the folks of Saint Paul voted yes for this ordinance to stabilize rents. Possible recommendations might be made to help in other areas but not if it would corrupt the ordinance's integrity. Whatever can be done each week to insure everyone is crystal clear with what the entire ordinance actually provides.

Facilitators in small breakout groups would help ease tensions.

I found it very helpful when it was decided we would not stop during the lecture for questions and save them for more opportune break moments. Please continue that format so we can better focus on the material.

# March 22 Survey Responses

| Feedback on Small Group Exercise: please share your thoughts on the small group work from today so that we can help design better collaboration exercises. |
|---|
| Thought it went well. Perhaps make sure that everyone is clear on the instructions before we go into our breakout groups. |
| I thought the small group exercise was a good use of time. |
| It was great. More time and less structure would have made it even better. Just the prompts and some time to discuss them, with a space to take notes, would have worked as well as or better than what we tried today. |
| Our group was not clear on what we were supposed to do. We spent more time writing our answers at less time sharing our thoughts. |
| More time in small groups is needed. |
| I enjoyed it and my group. It is always interesting to hear other's perspectives. We had a bit more time than needed, as most people can formulate their thoughts and comments in under two minutes. |
| Most productive format so far. 'Mid-Level' comments and "growth/positive mindset" framework were effective ground rules. Written and verbal comment options were a more comfortable way to communicate. Technical issues will work themselves out with practice. |
| I think that more folks from CURA should try to be in some of these smaller groups. I heard from someone that after telling her story of being a renter that she was cut off and was told to think more "critically". This type of behavior keeps happening to renters in this space and it needs to be addressed. We agreed on community agreements and they keep getting broken. |
| I liked the google doc format because we were all able to express ourselves. When it is all talking, some people take up more space and others don't ever get to speak up. |
| It was helpful to ask participants to make arguments from both renter and owner perspective, that might be a good practice going forward |
| The small group exercise went well in my opinion. I would consider giving us a little more time, like extra minute, or two, to jot down our thoughts before we go into the group. |
| The small group exercises seem to be much more productive and a good way to understand different opinions and position. |
| I don't think the value of home ownership was raised as a way to combat rent increases. |
| Only had 2 in our first breakout room. Woild have been better with more |

| What was your most important takeaway today? (from the Learnings) |
|---|
| I like the idea of a Rent Board as an accountability mechanism for both the property owner and the tenant, and the importance of transparency. |
| That the way the text is written in the proposal will be critical |
| We are missing the stakeholder voices including Investors (those entities that complete capital financing stacks often associated with larger housing projects) and direct lenders.<br>I will make the assumption that there is a significant gap of rental units in St. Paul, so in order to increase the needed supply, all sizes of developers/property owners are needed. |

| What was your most important takeaway today? (from the Learnings) |
|---|
| Rent board balance is difficult and will tend to lean one way or the other. Boards that have 9 members is more likely to be far. |
| St. Paul needs to decide whether to have an elected or appointed body oversee rent stabilization going forward, or whether to go with an administrative-staff-only approach. |
| To structure my thoughts around; "What if the program did work." |
| Awareness that there is common middle ground, and non-common middle ground that must be somehow made. There are two forces or factions, and for a successful program, there needs to be a fair and equal balance. Any future rent control board should have (in my opinion) many who do not have a "horse in the race". |
| Implementation of an oversight program by May 1st seems complicated especially with no initially allocated funding (I realize some is close to being approved) and multiple amendments to clarify and modify the rent control ordinance already in front of the City Council. Of the programs discussed there was no consistent standard. Also difficult to determine effectiveness of the wide range of programs. Some form of self-certification for compliance seems necessary with mediator backup if disputed. Quick, cost effective resolutions will be important for both Ts and LLs. |
| Learning about the many ways enforcement of rent control happens in other states was very informative and presented great ideas that could be done with this policy in Saint Paul. |
| Complementary policies can be passed to avoid unintended consequences such as condo conversions or evictions. |
| There are a lot of moving pieces on enforcement, and concern from both sides about how the requirements will be fairly applied |
| I felt it was useful and important for group members to view rent stabilization from alternative points of view. Likewise, in terms of content, getting a glimpse of website layouts and content that other municipalities employ was interesting and helpful. Furthermore, that section made it apparent that there is value to making sure the public has access to as many resources as possible when it comes to maneuvering and operating within a rent stabilization environment. I especially liked the intent of attention to accessibility to information as a way to potentially minimize instances of non-compliance. In addition, the "rent board" portion of the presentation solidified my position that one is needed and it should work to be balanced in it's application of the actual ordinance and not guided by personal opinion about the merits, or lack there of, of rent stabilization. |
| That this exercise continues to look at cities like Oakland, Portland, and New Jersey. There has been NO STATISTICAL EVIDENCE to support that the implemented rent control policies support our neighbors (especially our BIPOC neighbors) in improved outcomes. This group deserves to see the statistical reasons why rent control is successful prior to setting an alphabet soup of rules that will impact many in the community. |
| I am having a hard time with the financials from the 1980s being taken as fact today. There have to be more relevant case studies, looking an extrapolating 35 year old data is unacceptable. If this is a proven process, let's see current proof and case studies please. |
| That not everyone realizes that there is nothing fixed for expenses for anyone, including homeowners and landlords. |

## What was your most important takeaway today? (from the Learnings)

A system like Berkley has in place with a comprehensive website for every conceivable problem and answer and provides actual paper work to download makes it easier and more efficient to deal with problems. Workshops to learn more about the process and insuring housing packets get into the hands of all renters and landlords will continue to make the process more clear and user friendly and not up to the renter to try and find help when there is a problem with their housing.
We had a landlord that after 14 years allowed our roof to cave in that brought many related challenges during its demise over the years. We were displaced. We now live in an "affordable" apartment building managed by a corporation that for the first 2 years raised our rent 2-3x each year within the year's lease. They were eventually taken to court and are not permitted to do this gauging any longer. They still regularly raise rents over 10%. Many residents are elders on fixed incomes who are required to be means-tested.
Transparency and regulations must exist in Saint Paul.

Most understand need for rent stabilization but still uncertain of impact.

## What was one new or surprising thing you learned today? (from the Learnings)

Hearing about the websites provided by other cities that have rent stabilization, and the wealth of information provided for both renters and property owners.

The way other city's comprise boards

Registration fees maybe a fee be passed to to tenants or covered by other means.

There will be a lot of new cost associated with new program oversite. I just hope landlords won't have to foot the bill alone

That other people seemed to agree that keeping outside investors out of st paul was a positive thing.

The makeup of rent control boards vary, and although there should be a fair and balanced mix, neutrality is important for ongoing program success.

Something new- registering rental units and its importance with transparency.

The cost of implementation is really low for how much benefit the ordinance brings. With rent stabilization, the city can keep more than half of the city's residents (renters) in stable housing for a couple hundred dollars per year per unit. Meanwhile, building a unit housing costs over $250,000.

Wide range of potential administrative costs

Where non-compliance is concerned, I was surprised to see the level that some municipalities have instituted for penalty. For instance, I found jail time, or misdemeanor level charges to be excessive at best. I think there is a more reasonable way to enforce and penalize.

That nearly everyone involved in the conversation has little to no understanding of how newer apartment projects are designed and constructed. In new buildings all utilities are already separated to each unit, so ideas like the including utilities in rent payments is not even actually possible in many new buildings.

How little strong data exists.

See answer above.

I'm learning more about the answer to our housing crisis many property owners/developers think is a supply problem. The more I read and learn and review the data on this belief the more I am convinced this is similar to the "trickle down" answer which data has shown has broadly failed.

**What, if anything, did you learn or hear anything today in the presentation, breakout sessions or group discussions that made you rethink your position or assumptions or perspective about rent stabilization in St. Paul? How did they change?**

I had the sense that there could be reasonable discussions between property owners and renters. Really liked that we were all asked to consider both points of view--renters and property owners and what the important aspects of rent stabilization would be for both sides.

The way boards are composed, it only further made me realize we should use a hearing officer who is a professional and non-vested

We've heard during each meeting how some renters are being taken advantage of: large increases in rent and improperly maintained properties. The conclusion: reasonable increases in rent + properly maintained properties will result in minimal turnover, stronger communities and renters wouldn't be forced to move.

Oakland city site has nice website for resources both for tenants and renters.

Different kinds of property owners/landlords sometime have sharply divergent interests and policy goals with regard to rent-stabilization policy.

Having a plan is better than not having any protection in place at all.

No real difference.

Learned that our diverse breakout session group of stakeholders have very similar perspectives whether wearing the T or the LL hat. We all wanted safe, stable, diverse, affordable and well maintained housing. No change to position or assumptions (I disagree that rent control is the way to get there), but good to learn there is a commonality of values.

I used to think that policy implementation was too expensive, but when you compare the cost of implementing to the cost of building a unit of housing, it's very clear that this policy is cost-effective. There has also been a lot of fear and confusion around implementation. Now that I've heard about how other cities have implemented this policy, it makes me feel better about how St. Paul can do it. Once we have the systems in place, everything will become clearer for landlords.

There seems to be a lot of openness on renter side to allowing owners to recovery for costs of improvements if they're fairly applied

It is helpful to gain better understanding where people are coming from and I think that the breakout session allows for that. While my perspective hasn't changed, it does make it better informed which I think is important.

The cost of implementation of this program is real and the benefit of any program is purely experimental. I feel very concerned for all renters and landlords in Saint Paul.

I understand there is a current need to protect renters from the actions of some property managers. I am disappointed by the lack of current data on relevant experiences of cities in similar size and economic situation as Saint Paul.

Nothing

Saint Paul desperately needs universal regulations to protect renters. There's so much bias about affordibility. What does that even mean? There seems to be an assumption that renters are simply inconvenienced if they complain about rents raising above 3% or that they can "just move". Renters who are wage earners simply can not afford to pay market value. Wages have been flat for 40 years.

213

| **Do you have any questions about today's learnings that you would like the facilitators or the task force to follow up on?** |
| --- |
| Information provided to the committee shows St. Paul currently has 61,540 rental units. Considering the national housing crisis of which St. Paul is not immune, it would be helpful to understand the actual # of rental units St. Paul needs today (what is the shortfall, or gap?). Equally as important, how many rental units are currently IN the multifamily to-be-built pipeline, considering large developments take 24-36 months to construct. Are multifamily housing permits increasing at the level to fill St. Paul's housing gap: why or why not? |
| Total housing gap for the last 5 years, has it increase or decreased? |
| Of the various State/Local implementation programs discussed, have any been modified over time to eliminate methods not working and establish new, more effective processes? |
| Any estimates of cost to owners of compliance (data only covered cost to government?) |
| Not at this time. |
| Please provide STATISTICAL EVIDENCE to support that the implemented rent control policies support our neighbors (especially our BIPOC neighbors) in improved outcomes. |
| I would like more financially focused data discussions with cost to maintain properties in this current world-increasing taxes, fuel, supply chain issues, labor shortage. |
| Can we discuss the legal definition of "affordable" housing? |

| **Meeting Logistics: What can we do to improve your experience?** |
| --- |
| Continue to provide the link to the meeting the same day/earlier in the day as the Task Force meeting. |
| |
| Continue using the the Google Doc written and verbal comments in the Breakout Sessions. It was great. |
| The flow of the meeting was very good today. |
| Please continue to hold questions until presentation is complete |
| More time to connect with small group and reminder of the boundaries set to discuss questions.... |

214

March 29 Survey Responses

| Please note any additional questions for Ken Barr: |
| --- |
| Please help me understand more about vacancy decontrol-in my properties, my renters stay for years, I have to invest real money to compete for renters when I have a vacancy-why can't I choose to look at Craigslist, Hot Pads, Zillow, etc. and price similar to other properties?<br><br>If I supply a product with similar demand, should I not be allowed to charge what others are demanding?<br><br>No one has to sign a lease with me. If I price to high, there will not be a demand. |
| Please provide the name of a City where rent controls have led to a better standard of living, better health outcomes, and better overall affordability for BIPOC neighbors. |
| What has been the impact to multi-family real estate values in rent-stabilized areas versus similar non-rent-stabilized areas? |
| 1) Are there any current rent control programs in the world that do not exempt new construction? If the answer is zero, or close to zero, why is that? 2) Using your "legislation by copy machine" analogy and based on your experience, what elements should a program include to offer the best balance of supply, stability and subsidy? 3) What are the legal and historical precedent for Federal lawsuits opposing rent control as a violation of the 5th and 14th Amendments to the Constitution? 4) What type of subsidy programs either for new or renovated affordable construction or rental assistance or both have been the most effective in your view? 5) Have you done any research on effective use of State/Municipal transfer fees? 6) How about research on preferential tax treatment, similar to 1031EXCH, for sale of NOAH property to affordable housing groups as a way to keep them affordable? |

| What was your most important takeaway today? (from the Learnings) |
| --- |
| That some schemes have calculated "reasonable rate of return" according to NOI. That was an interesting concept that I don't remember hearing until today. |
| The speaker had a lot of opinions, but was not engaging, he rambled and spoke in great generalizations. He also failed to answer the question-why will investors choose Saint Paul when they can choose a suburb. |
| Felt like I understood fair return on investment a bit more. |
| That the choice of the speaker today further demonstrates the bias of the CURA moderators in favor of a stringent rent control ordinance. This blatant bias is affecting the ability for our task force to have critical information needed to do that work required to help the residents of Saint Paul. |
| The small group discussion was very good. I think it would have been more valuable to spend the last hour in the small group discussion rather than listening to this very boring uninformative old white guy that had no new info for us.<br><br>He was trying to explain some complex concepts in a short time. He should not have given any history since we just spent 2 weeks learning history. With only an hour he should have stuck to 1 concept rather than giving a high level view of the economics of rental properties.<br><br>As a property owner his info was not new. For non business people I would guess the info was not understood. So I am guessing that for most of the audience this was a waste of time. |

| What was your most important takeaway today? (from the Learnings) |
| --- |
| I hope that any other speakers brought in are better vetted because I feel that the best use of our time is spent in small group discussion. |
| It is important to tie the rent cap to a metric, and that the CPI or a percentage thereof, could logically be considered as a fair to all stakeholders. |
| Categorical answer from Ken about inflation-based versus fixed rate |
| Ken Baar highlighted that the current Saint Paul ordinance does not contain the four (4) elements he deems essential to a successful program: i) Exemption for new construction; ii) Rent increases based, at a minimum, on CPI; iii) Vacancy Decontrol and iv) Simplicity of Implementation and Oversight. |

| What was one new or surprising thing you learned today? (from the Learnings) |
| --- |
| I was surprised to hear Mr. Barr claim a flat, non-CPI cap is "terrible." |
| It is really becoming clear to me that we need to include some type of CPI to the ratios. |
| That California has more development in areas that have rent control |
| Rate of Return incentives for sustainability improvements is a new concept that had not been shared by CURA and is an idea that fits other goals within the city. |
| Very surprised that CPI is continually being brought up as a "fair return" when it doesn't take into account the impact of a number of local costs that have a greater impact on the generation of Net Operating Income and therefore the actual return than CPI does. |
| The importance of a rent cap metric other than just a simple percentage. |
| Surprised by the level of agreement, across different stakeholder groups and policy perspectives, about the list of desired outcomes |
| The City Council gave clear guidance in Resolution 22-408 on the specifics it would like to see from our group. We should start focusing on these. |

| What, if anything, did you learn or hear anything today in the presentation, breakout sessions or group discussions that made you rethink your position or assumptions or perspective about rent stabilization in St. Paul? How did they change? |
| --- |
| It was interesting to discuss rent gouging with renters. Some of the increases are jaw dropping and reinforce the need for some resolution. I really like the idea of a rental board consisting of community members so that we can identify and correct some of these situations. |
| I'm really starting to believe that all of us together, both renters and property owners, can make this ordinance work from now and well into the future. |
| Thoughts haven't changed. CURA IS BIASED AND NOT A FAIR GROUP TO BE LEADING THIS PROCESS. |

216

**What, if anything, did you learn or hear anything today in the presentation, breakout sessions or group discussions that made you rethink your position or assumptions or perspective about rent stabilization in St. Paul? How did they change?**

Now we are getting close to figuring out the mechanics of a body of regulations that need to be fair to all stakeholders, and have sound reasoning and basis. The details need to clearly specified, easy to communicate and understand, flexible for future changes (a living document), and a rent board and appeal process that is observed as fair is critical.

Useful reminder from Ken's presentation of how much of the long-term value/profitability of real estate investments comes from the appreciation of the property

Exemptions need to be added not only for new construction but to owner occupied properties.

**Do you have any questions about today's learnings that you would like the facilitators or the task force to follow up on?**

I was disappointed looking at the speaker's slides about model properties. Why can't we use our real life examples? He also mentioned that a flat percentage increase was a bad option-and it seemed to go unnoticed. Could we get a bit more opinion from him on that, as it is what we are facing.

Appreciated Ken Baar's presentation. Wish we had had more time.

Before advancing further, the task force needs to be educated at a basic level about how housing projects are financed and what the true decisions are for lenders and equity providers. Without the basis of knowing how housing projects are produced, this task force is doomed to fail and the quality of life in Saint Paul will be damaged for decades.

We have not heard much information about the impact to real estate values based on data in areas with rent stabilization. I would image that successful programs dot not have a negative impact and may have a positive impact, while unsuccessful programs have perhaps a negative impact. Rent stabilization should hopefully also lead to neighborhood stabilization which includes real estate values. Our program needs to be cognizant of neighborhood stabilization as an equally important priority for St.Paul residents.

Are there any current rent control programs in the world that do not exempt new construction? Has CURA done research on what type of subsidy programs either for new affordable housing construction or rental assistance or both have been the most effective?

**Meeting Logistics: What can we do to improve your experience?**

Good meeting

The new format is really much more helpful, to discuss and use the google drive. It feels like we have more time to listen to the position of others and allow time for real conversation rather than the bickering that has been slowly fading on the chat.

Just keep sending the meeting link the day of the meeting. Thanks.

For CURA's benefit, suggest having Task Force members answer the City Council RES 22-408 questions independently in writing and sharing answers with the group. Members could have option of submitting confidentially or not.

May 3 Meeting responses

| What was your most important takeaway today? (from the Learnings) |
|---|
| It was very helpful to see data on how rising rents and unaffordability are impacting St. Paul renters, and more importantly, the disproportionate impact on BIPOC renters. |
| Seeing the amount of affordable zip codes decreasing drastically over the last few years. It it clear that renters are starting to run out of options with their housing and where to settle down. |
| Rent control advocates don't understand the key fundamentals of housing creation and operation and they don't care to know. In practice, they are preaching of a moral high ground while it appears that they prefer to remain intellectually ignorant on the most important elements of the creation, operation, and maintenance of housing in STP. |
| We have a significant shortage of affordable housing units, and need to create more, but rent control is deemed too risky to attract development, and we have lost some good projects. Financing can be impacted, and certainly valuations will decline. There is an article in the Minneapolis Star and Tribune showing this, but it is not even brought up! Why? |
| I was blown away by Rasheedah's presentation. Rarely does one hear this kind of clarity in such detail in one setting. I only hope it shed some light on what renters are up against to some of the stakeholders who seemingly have rationalized these facts out of their consciousness. Nevertheless, it is always powerful to hear about and understand how renters are impacted and how much of a crisis it truly is to all of us. |
| Sarah Harris from Aeon presented real-time, relevant info on the gaps in housing in St. Paul/Twin Cities and the economic impact associated with it. However, following her discussion, a few individuals again monopolized the remaining few minutes to share the same information they've shared every week. We consistently lack feedback from the collective group and a # have stopped participating- why is that? <br><br> It often feels like we are trying to determine the outcome of a baseball game while spending 95% of the attention and conversation on just two positions: the pitcher (perceived terrible "rent gouger") and catcher (renters who've experienced excessive rent hikes). How can this task force make informed decisions if we don't truly understand the roles of ALL positions in the baseball game? <br><br> The question to Aeon about receiving government funds demonstrated the lack of understanding of the role of a nonprofit developer and diverse capital stacks needed to complete affordable housing projects. The comment about double digit inflation and the property owner eating all of that expense w/out a pass-through to the tenant demonstrated the lack of understanding of cash flow, DSCR, ROI, and government imposed lender covenants. The comment about "construction hasn't stopped in St. Paul because I see projects going up" demonstrated the lack of understanding of a project's typical timeline. <br><br> There are a # of task force members who know of projects that have stopped, been pulled off the table or stalled at Credit Committee due to the uncertainty of St. Paul's Rent Cap. They know this information because this is what they do everyday (med/large developers, lenders, appraisers) and the reason they were asked to be on this task force. St. Paul needs all property owners, small, mid-size and large, to develop/expand thousands of housing/units. This is not (just) a "rent gouger" problem; but, a national housing/unit shortage issue which St. Paul is not immune to. Dissuading and in some cases restricting development in St. Paul will only exacerbate the problem. |
| My most important takeaway is that rent stability is a huge equity issue and needed to be addressed a long time ago. |

**What was one new or surprising thing you learned today? (from the Learnings)**

I learned that the most impactful thing we can do to making building easier are zoning changes.

Housing tenure is the highest with white people and the lowest with Black people. This shows just how much displacement is intentional and hurting people of color the most.

That many members of our group are not willing to listen to the economic realities of what rent control will do including less new construction, higher investor risk, less likely or less advantageous financing, and lower property values. It is surprising to see the same people say the same thing each time about the difficulties of renting. We know this, that is why there is rent control, let's come up with policies that will not ruin our city, drive investment dollars away, and cause gentrification and lower property values. Lower property values are seen in all research online, but has not been discussed. WHY?

All the stats on the deblitating effects of the housing crisis for renters especially our BIPOC neighbors. The zip code stat was horrifying. And the fact that this will effect our society, our city at large, not "just renters".

How much money renters will save with rent stabilization and all of the better ways we could be spending that money.

**What, if anything, did you learn or hear anything today in the presentation, breakout sessions or group discussions that made you rethink your position or assumptions or perspective about rent stabilization in St. Paul? How did they change?**

I was surprised to hear the affordable housing developer say that we need to increase rent growth in order to attract capital. It doesn't make sense to me that in order to keep housing affordable, we should raise rents more to prove to private capital that they can extract more wealth from our communities.

The presentations only made my think and reasoning more valid. Renters are never the top priority when it comes to thinking about where to start a development project. Seeing that there is almost no more space for affordability in this state is heartbreaking and there needs to be solutions to it NOW.

The material shared has continued to reinforce the opinion that we are wasting a significant amount of human energy on an effort that is not going to solve the problem of stable / affordable housing in Saint Paul. We are running out of time to create new housing to support our growing City.

No, other than it is going to be hard to develop a policy that will not ruin our city, when members are too closed-minded to listen to valid presentations and will speak mis-truths about the reality of the severity of the issue. One lady mentioned that there still is development, there is not! We lost developers the day rent control was put on the ballot. Why do we not hear this? Why is this process so bias? Why can't we get the same amount of presentation time about the economic realities of rent control versus the rehashed need for it due to renters not being able to find affordable housing. This process does not seem fair at all.

I am even more convinced how our current rent stabilization policy has to be kept in tact as a comprehensive tool to protect folks now while the investers, developers and bankers get their act together on the supply side which has been a problem for at least since the housing bubble/burst in 2008. Rent stabilization had nothing to do with this debilitating long term chaotic problem

Continues to confirm why I know rent stabilization is important.

**Do you have any questions about today's learnings that you would like the facilitators or the task force to follow up on?**

I would like to see Peter Brown's financial modeling analysis in addition to the St. Paul rent history research.

I would really appreciate if we stopped comparing renters stories to those of a landlord or developers. I think a lot of people in the task force don't realize that the renter/landlord relationship has a very clear power dynamic- very often it is not built on the grounds of friendship and community, which is clear given how renters in the space are talked to. Both experiences are different and one of them holds power while the other doesn't.

It would be helpful to have more information related to funding sources for new construction projects. It was interesting to find out that union pension funds are a significant source of money for new projects and we should learn more about that.

If you have stated something before, do not state it again. There is one individual who dominates the discussions reiterating the difficulties being a renter. Presenters with valid points are dismissed by the group who seem unwilling to hear the economic realities. Let this process be fair! If not, it will destroy our city! CURA, you can do much better! Be fair and balanced! I assume that was your charge, not to try to push rent control and disadvantageous policies. Let's hear about downward valuations, there is enough evidence out there!

I'd like that the entire group get a chance to see Peter Brown's financial analysis showing how rent caps would impact investor returns. This is a very important piece that has been missing from our discussion.


**Meeting Logistics: What can we do to improve your experience?**

I appreciate having questions be held until the end of presentations, it helps us stay on track time-wise.

logistics are good, thank you for making improvements as the meetings go on.

Too few voices are getting heard. The conversation is dominated by a couple of people that have very specific opinions that are incredibly repetitive. The Co-chairs should help to limit the time for individuals that have already shared a perspective.

Thank you

Mute everyone who's ignorant :D

# ST. PAUL RENT STABILIZATION TASK FORCE

Results of the April 5 poll
of Task Force members

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS

## 1. Should the rent cap be fixed or variable?



Fixed 12

Variable 24

## 2. For a fixed cap: annual percentage increase



| annual percentage increase | |
|---|---|
| less than 3% | 2 |
| 3% as in the ordinance | 15 |
| between 3% and 5% | 5 |
| 5% | 3 |
| more than 5% | 12 |

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS



3. For a variable cap: annual percentage increase

| | |
|---|---|
| less than the CPI | 15 |
| equal to the CPI | 4 |
| CPI plus up to 2% more than the CPI | 8 |
| CPI plus more than 2% | 10 |

## 4. Combine a fixed and variable rate for the cap



No       21
Yes, acceptable    17

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS

## 5. Vacancy Decontrol in some form



No     17
Yes    20

## 6. For vacancy decontrol, which of the following do you favor?



# of Responses

| | |
|---|---|
| Partial vacancy decontrol (owner may raise rents above the regular cap, but only up to some set maximum) | 22 |
| Complete vacancy decontrol (owner may raise rents as much as they want when there is a vacancy) | 16 |

227

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS

7. In some cities, vacancy decontrol is allowed, but only under certain conditions, such as the level of maintenance or a statement from the previous tenant that they were not pressured to move out. Assuming the program has some form of vacancy decontrol, should decontrol be conditioned on any factor?



Yes   22
No    16

8. The current ordinance calls for a process of allowing for a "reasonable rate of return". Do you favor this method of allowing the potential pass-through of extraordinary costs?



# of Responses

No      7
Yes    29

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS



9a.  Assume there are amortized pass-throughs (either specifically identified or covered in a "reasonable rate of return" provision of the law). Which of the following do you prefer?

Only a portion of the cost can
be passed through              21

Owner can pass-through
100% of the cost               17



9b. Assume there are amortized pass-throughs (either specifically identified or covered in a "reasonable rate of return" provision of the law). Which of the following do you prefer?

There should be an upper cap to the total rent increase, even when there is a pass-through; a limit that is above the regular rent cap, allowing the pass-through of allowed costs.    18

There should be no upper cap when a pass-through is approved.    13

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS



| | |
|---|---|
| Allowable pass-throughs are the same for all buildings | 19 |
| Allowable pass-throughs that vary by size of the building (number of units)? | 12 |



# 9d: Should pass-throughs be conditioned on other factors?

Pass-throughs are conditional on some other factor (such as health, safety, building code compliance)?   13

Pass-throughs are not conditioned on other factors.   18

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS

10.  Should owners be allowed to "bank" preferential rents? (If an owner raises rents at a rate below the cap, can they at some later point raise rents up to where they would have been if they had been raising rents at the maximum rate?)



|      |    |
|------|----|
| No   | 15 |
| Yes  | 23 |

## 11. If there is banking, should there be a limit in any form to the amount banked?



# of Responses

Yes     25
No      13

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS

## 12.  Should the program exempt rental units in buildings with 4 or fewer units?



No     21
Yes    16

## 13.  Should the program exempt rental units in smaller buildings (4 or fewer units) only if the owner lives in the building?



No      25
Yes     13

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS

## 14. Should the program exempt rental units in single family homes?



|     |    |
| --- | -- |
| No  | 24 |
| Yes | 14 |

## 15. Assuming the program has a new construction exemption, which approach do you favor?



A rolling construction exemption based on the number of years since construction (i.e., all buildings younger than x years old are exempt)     26

A construction exemption based on a specific date (i.e., all buildings built after the year 20xx are exempt)     11

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS



less than 10-year
exemption                 14
10-year exemption          3
15-year exemption          6
20-year exemption          4

17. Do you support an exemption for assisted housing units where rents are based on a percentage of tenants' income? (Similar to what is in the current ordinance.)



| Yes | 35 |
|-----|----|
| No  | 3  |

APRIL 5, 2022 POLICY DESIGN POLLING RESULTS



18. Do you feel that some form of a rent board should be created to administer the ordinance and preside over disputes and petitions (e.g., "reasonable rate of return" requests)?

No      21
Yes     16

## 19. How should the board be filled?



An elected board      12

An appointed board      24

St. Paul Rent Stabilization Stakeholders Group
Summary of Public Input

Part one: Transcript of Public Input Meeting, April 12, 2022

1. Jean Giebenhain: Yes, my name is Jean Giebenhain from ward four and with MICAH and Isaiah. We owned a duplex for over 20 years we never raised the rent even close to 3%. Renters are long term generally leaving when they were able to save enough to buy a home. When they did leave they found us new renters happy landlords happy renters. Happy New Homeowners own homeowners under the new policy if we would have made large investments in the property and needed to raise rent more than 3%.  We could apply for that exemption we don't want exemptions for small buildings, owner occupants, owner occupancy single family homes, or new construction. We do want to process for exemptions created by the city, we don't want exceptions when units don't need health, safety and building codes or loophole fees renters.
Stable housing, they can depend on Thank you.

2. Dayna Kennedy: Thank you I'm Dana Kennedy with beacon interfaith housing collaborative I live in Ward four.  As a developer beacon understands the intricacies of assembling investors and the vagaries of the market.  As a builder of deeply affordable homes, we know what it means for those who live at 30% Am I to be beholden to out of town investors.  How disruptive it is in classrooms when children come and go, or two businesses when employees come and go, due to rent gouging.  That's why beacon analyzed and signed on to support rent stabilization last fall to expand stability, we need a policy with vacancy control red caps at 3% know exemptions for small buildings on our occupancy single family homes or new construction this prevents.  This prevents price gouging allows renters to stay in their current homes, creating more housing stability and St Paul Thank you so much.

3. Matthew Nowaczewski: an excuse me, my name is matt Nova chef ski I'm a leader with Isaiah alongside 100 others who are watching this hearing.  I am a homeowner born and raised in St Paul I live in war two when I love my city.  That's why I believe that a strong rent stabilization policy. Policy should stick with a 3% rent increase month a year provide stability of residence for St Paul and renters for rent rent gouging so outside investors are discouraged from rat gouging.  Most importantly, I want this policy to produce stable communities in the city I get inspired when my fellow resident get together and help people who truly need it. That's what we did last fall, I asked all St Paul lights to stand with me and demanding a strong rent stabilization policy to defend the will of 53% say Paul voters who voted yes last November.

4. Dan Humes: My name is Dan Humes. I live in Ward four, and there are approximately 100 people from Isaiah watching this with me.  I've been fortunate to be a homeowner for the greater part of my life, but I went through a divorce after 20 years in owning two homes and suddenly became a renter.  During the four years, my rent went from 858 to 1200 dollars and

244

doodle life circumstances I lost the level of stability, security and financial benefit that many wreck renters struggle with now. 53% of St Paul voters past rent stabilization it's a will of the people to create an environment of safeguards for renters it's frustrating that some states senators and corporate landlord lobbies are trying to override the will of the majority. Renters ought to have the same protection from price gouging and financial stability that the 3% limit increases. Thank you very much.

5. MICAH: So, this is actually John Slade, working for the interfaith Council on metropolitan interfaith Council on affordable housing, I am both a resident of Ward seven the organizer for MICAH and a longtime resident of a long time, St Paul family. I'm a landlord have a single family home and Dayton's Bluff and I get pretty disgusted when I see what other landlords in this town, are doing i'm embarrassed to be a landlord when I see what the large corporate extractors of wealth are doing. There are big apartment buildings that are getting gentrified and people who are really getting hurt by that that's why it's so important to have a 3% fixed CAP. I believe that new construction does not need an exemption new construction can set the rent it wants at the time it gets their, their pro form, I can deal with that. I would like to thank you very much want to see no vacancy decontrol, particularly since the renter state of the red protection that said that there was a no just cause for nonrenewal got removed. Otherwise, it can be a major avenue for injustice, thank you.

6. Ann Schulman She/her/ Meriam Park: My name is Anne Schulman I live in Ward four, I'm a frontline healthcare worker and voted for rent stabilization. It's important that my vote and the vote of 30,000 like-minded people, many of them five park households count. I stood before the Minnesota state senate two times last month and shared that my rent increased 9% in January. This policy makes sure that my neighbors and my myself stay in our homes it's an important link towards creating affordable housing. Investing in housing stock is great, but it will not keep renters from experiencing price gouging and huge increases that destabilized families. We're asking this committee for equity security and predictability with rents, we want a 3% CAP, no vacancy decontrol, no need to, no new construction and very limited exemptions, we want this policy to focus on the people that will be affected the most, the renters who are at risk from systematic proprietary practices that the voters wanted changed. Has been given the opportunity to invest in the city of St Paul I encourage it to follow through and protect us with a strong rent stabilization policy thank. Thank you.

7. Debra Howze: My name is Deborah Howze. I am a home care worker SEIU healthcare member and I, and I rented in St Paul for three years, I struggled with housing. Before I found my current home in St Paul. I love my place but recently it went up 100 per month, this is hard on my current wages of $14.16 hour. $100 per month may not seem like a lot to you, but it is a lot to me, I recently lost a client I career, for which has. Multiple times doing Coco bit meaning, I had no paycheck my cars in the shop and gas prices are climbing. You can get depressed not knowing if you're going to have a place to live in 30 days. We voted last year for 3% CAP and windows protection and I hope you'll make sure in it is in place, so we have stability. No one knows when you'll be facing a crisis, and this is especially true of low income elderly and disabled people. We can have a safe stable place in there free from huge rent increases or being pushed out of our homes. That would be amazing Thank you.

8. Laura Delventhal (she/her): hi my name is Laura Delventhal and I'm a renter living in Ward four of St Paul. I'm here with 100 other Isaiah leaders who are watching the hearing.  I live in affordable housing, but affordable housing quickly becomes unaffordable when you're surrounding neighborhood rapidly gentrified.  With four luxury apartment buildings now surrounding mine our families rent was able to be raised by 22% in just three and a half years. I have watched many long term residents many residents of color forced out of my building due to these dramatic rent hikes. Last year alone, my rent went up by over 6%. Three more luxury buildings are about to be finished. Me and my neighbors cannot wait, we need rent stabilization now a 3% cap on rental increases is essential if we are to keep people in their homes and I will add, I'll add if any new building exemptions are contemplated it's essential that the new affordable housing units being built are not included in this exemption the units cannot be truly affordable if their rent can be raised by more than 3% a year, thank you.

9. Barbara Taylor: Thanks. I am Barbara Taylor, and I am a resident of Ward three and one of over 100 Isaiah members watching this hearing.  I'm a retired homeowner who chose St Paul for its diversity and neighborhood feeling. I worked and voted for rent stabilization and angry that there are attempts by some to dilute this ordinance. My vision is that this ordinance will be enforced, as it was envisioned with no exemptions.  A strong rent stabilization policy prevents price gouging, provide stable rent increases each year and housing stability for St Paul renters. People need to be able to budget for their rent as I do, for our mortgage. We all benefit from stability in our local community, where all voices matter and there's economic stability for all. Thank you.

10. Elaine Tarone: Thank you I'm Elaine Tyrone. I'm a retired homeowner in word four and volunteer with MICAH and Project Home, which is a shelter for homeless families with kids in many of them in school in St Paul. Through volunteering in a project home for 20 years I met families with kids in the schools with parents who sounded a lot like Deborah we just heard from.  I was frustrated, time after time watching these families move from place to place, because then rent kept getting raised on them and their salaries did not go up. They were making less than minimum wage, what we need is a number of things. I support rent stabilization for the medium and long term.  For small and large units for new and old units and I favor no vacancy decontrol and watch that used against these families with kids too often they need stability, they need to live in one live in one place, so they can go to school and they're the future of our Community.
So we need seconds, thank you.

11. Andy Dawkins: hi I'm Andy Dawkins members St Paul Strong nonpartisan either pro or con rent control.  And February eight I've moderated a panel discussion on rent control with developers landlords and tenants, since then, our website St Paul strong has received many comments with good ideas about how to do rent control and St Paul. Here are three: One, include inclusive zoning within a new construction exemption request or require acceptance of a certain number of section eight tenants. Two: In any new construction exemption request for luxury units building a 1% margin and the rents and dedicate that to deeply affordable housing fund. Three:  Acknowledge that the vote was a statement of desperation that you can support moving forward simultaneously with other affordable housing commitments, such as eliminate the capital gains tax when a mom and pop landlord sells to a nonprofit that agrees to keep

rents affordable, with a 10 year clawback if they don't.  It's clear from the panelists, the experts, and the commentators that your focus the city's focus as we enact rent control should be, what can we do to maximize affordable housing, thank you.

12. Sthaler: Yes, this is Skip Thaler. I'm a former landlord in St Paul and Minneapolis. I sold everything I had. I had 16 apartment buildings in St Paul 254 apartments that were kept you could eat off the floor I kept flower pots, I had pictures and always kept the paint off the baseboard etc., and when this when this came forward I said I am no longer going to be part of this, I cannot run a business when insurance goes up 12%, utilities go up 35%, maintenance goes up 20 to 25% with gas price increases, wage increases, and so on. I would have been out of business in three to four years or short and bottom line is is that if you do not have some type of escalator or some type of protection against inflation, you will lose a lot of landlords like myself you already lost. I'm the opposite of a slumlord and I kept my buildings nice and I was very unhappy when all this came down so.  You, the deck is stacked right now, because a lot of people like myself are in the minority, but the bottom line is is that you're you're going to have a you're going to create slums in the cities in the next 10 years.

13. Patty Mac: hey I'm a small landlord and have been keeping run slow and stable, but now I have to raise rents 3% every year. I'll be severely limited the rent I can get when the current tenant moves out.  For example, if they've been there for six years and decide to move out and I haven't raised the rent which I tend not to do, when they move out, it will only be allowed to raise the rents 3% or maybe 8% if I can argue it, so the four-bedroom two bath 3000 square foot square foot home I get 1900 dollars for now. And six years will only rent for 1900 and $57 at 3% or maybe $2,052 at 8%. Well neighboring homes, a similar size and location will be renting up to $2700 or more. So even if I raise my rents 3% a year I'm limited to $2200 in six years because I'm starting out haven't kept my rents low for my tenants, so my tenants are naturally disappointed and I don't believe it's equitable. And I think landlords should be allowed to raise rents more than 3% in between tenants, and the rule is really hurting all of us landlords who in the past have been helping tenants with stable rents, thank you.

14. JENNIFER: Thank you, my name is Jennifer Sweeney and I am a property manager. I managed scattered site units and St Paul scattered site owners are small operators. The rules are cumbersome and hard to navigate. This 22-page document is daunting and most mom and pop small operators will need CPA or lawyer to figure this out. Making these rules is accessible to everyone. I have two suggestions: 1) exceptions for a reasonable return needs to be simpler. Number two, they can see decontrol is needed and essential to preserve St Paul's unique housing stock, I know, preservation and well-maintained units is important to the city let's show it. Thank you.

15. Tracy Roscoe: My name is Tracy roscoe and I'm a renter and work too. I'm here tonight, with over 100 people watching this public hearing with Isaiah.  I've been around your on and off and St Paul for the last 10 years I'm on a limited budget and not knowing how much my rent would increase has had me crunching numbers and various scenarios and praying that I would be able to afford a roof over my head. It's made me emotionally draining, sick, in some cases. Please join me in protecting this policy and ensure that all renters have a predictable rent increase of no more than 3% a year housing as a basic human right and every person

deserves to have a home that they can afford and a place where they can feel welcomed. Thank you. Thank you.

16. Bara Berg: I'm Barbara, Ward one, I am concerned about this whole determination to have changes in the ordinance. On November 3 of this year people voted for the ordinance that we voted for. It is the law, the city should have arranged for implementation to begin preparations immediately. We're now almost six months out from the passage of the ordinance there is still not a rent stabilization Board, which is needed to record base rents, established rent increases, receive an exemption, landlord applications with no self certification, they need to maintain records of documented capital improvements and code violations there should be a fair chance to test what the voters of St Paul passed.  Five years before any modifications or changes, preferably 10 years before we change what the voters asked for.

17. Mercedes Lee (SPFE/Takeaction MN) - she/her: hello, my name is Mercedes Lee I'm a homeowner in Ward six, a member of St Paul federation of educators committee on political education, and Take Action Minnesota political committee Member and a second grade teacher in SPS. As a teacher in SPS I'm part of a district that serves over 38,000 families, people who need and deserve stable housing options and rent prices that are fair and predictable from year to year.  Our community has already decided on how to achieve this, when we voted in past the rent stabilization ordinance this past fall.  As we move forward, we need a policy that retains a 3% fixed CAP not tied to CPI and includes no exemptions for small buildings and single family homes, we also do not want a policy with exceptions when units don't meet health, safety and building codes. Really is not meant to solve the safety or maintenance problems and other ordinances around this specific issue needs to be crafted to address it. Thank you so much.

18 Duane Johnson: My name is Dwayne Johnson I live in ward three and I'm going to say a leader. As a 31-year resident of St Paul in the homeowner I voted in favor of rent stabilization last fall, I feel that my neighbors and their families, deserve the same stability that I feel.  That they won't be suddenly evicted from their home by large rent increase, so I was gratified that enough other residents felt the same and voted for this policy. No such policy is perfect, but I am dismayed by the fear mongering and threats and doom coming from the landlord association and Republicans in the Senate.  And they forget that the reason that people want to live in St Paul, the reason that St Paul is valuable to developers is because we live in a first grade community.  No matter whether our neighbors are black, white, Brown, no matter what their income level, we have a broad solid social fabric. We, the people make St Paul.  A strong rent stabilization frequency will stop rent gouging so that a vital part of our St Paul Community doesn't have to live in fear, thank you.

19 Sean Lim: hi my name is Sean Lim. I'm an organizer with the Ministry of youth collective. I've personally lived in dilapidated housing and, as a young student I was priced off of campus as a result.  I found a community in the Hamline-Midway neighborhood for the past four years. Midway is now becoming rapidly gentrified and working class tenants, who have lived alongside me here for years now face excessive price hikes. As a mutual aid practitioner I've talked to countless on housing polites who have been evicted with nowhere to go. And as property managers my parents work with hundreds of section eight families and St Paul

landlords. No lobbyists or politician can change the clear facts and the findings from the extensive CURA study on capping rent increases at 3% universally applied across all units, there should be no new construction exemption. This policy has passed. And it should be implemented expeditiously with fully funded enforcement no exceptions, no exemptions, no decontrol, no carve outs period, thank you.

20. Ianni: My name is Ianni, homeless and the ward six. First of all let's remember government and business are two different things. As the document reads it looks as if it is taking the risk out of being in business.  And looking at how government has allowed the pooling and amassing of such wealth by so few in this country has written the goal is. To take the risk out of the open markets, limiting the readers distribution of wealth and putting the burden on the tenant who is generally one paycheck away from living out of a car or attempt homeless. This is not what the people of St. Paul voted for. Also the document is a legal nightmare for the city. Looking at page five items six line D.  In order to administer this fairly and justly the ordinance needs to be set with a litmus test for both sides, what is good for one must be good for the other. Both renter and property owner as written, this is not what the people of St. Paul voted for.

21. Brigitte Temple: hello, my name is Bridget Temple, I'm a director at Work to.  In November, the city empowered our, voters in the city empowered the city of St Paul to help protect renters. We want a policy with a 3% fixed cap on increase the rent with no exemptions for small businesses or owner occupancy buildings or exemptions for single family homes. We do not want exemptions for new construction, because that disproportionately impacts disabled renters. We do not want vacancy, we want a policy with vacancy control. And we want a process for exceptions created by the city. We need additional separate policies to increase investments in creating more affordable housing and ensure that our rental housing is maintained to meet the health, safety, building codes, thank you.

22. Yankuba: Yes, thank you very much, Hi my name is Yankuba I am a renter in St Paul a healthcare worker and member of SEIU. I am giving too much of my income towards the rent when I rent an apartment I pay a non-refundable application fees and at least a month rent for a deposit which I immediately forfeit $100 non-refundable, which I know I will never get. And also, I put a month fee for a deposit which I immediately forfeit 1500 dollars nonrefundable. And I know I will never get my deposit back when I lit up but get the apartment, no matter how clean, I live it every year, my rent has high carb it used to be one I used to be $200 per year or so, by hundreds, each year, I am told the new rent will be so much higher and I can either pay more.  I voted yes for rent stabilization I am asking you. Thank you, thank you.

23. Nick Studenski (he/him): hi I'm a renter in ward four. I was initially a supporter of this ordinance when I heard last summer I signed a petition. I've spent the past I've seen numbers that investments in new units in the city of St Paul has fallen by a factor of something like six so I'm not particularly sympathetic for landlords big corporate developers that people are talking about. But new units need to get built that might needs to come from somewhere. If it falls by a factor of six what is replacing it, we need new units, there are dozens of studies that document that new housing construction has a lower impact on rent in the surrounding area and so as a renter I'm concerned that, without you know, without new construction there's

not going to be a new supply of housing. So I'm concerned that they're not that some of these exemptions, although we don't have sympathy for landlords maybe things like bringing something up to code, if you buy a house that was previously rented out and isn't up to code for example your or nobody is going to buy those houses and improve on so there's who will places to live, so thank you.

24. Abu Nayeem (he/him): My name is Abu, and I am I'm a director or before so recently the DSI have put out there rulemaking process on how the ordinance will be implemented on the first.  So first I would like to ask the task force will you comment on this, and can you influence can you make a public comment to the rulemaking process of the city to allocate because you have a voice in this process and part of the rulemaking process that I'm concerned with is tenants not being informed of a price increase. So according to the rulemaking process the tenants will have to do a loss and you had to bring it to court to challenge. These are rent increases greater than 3% and also, I would like to ask the task force, Have you considered thinking about climate change? Right now Minnesotans are paying the highest paid and for energy costs for heating and with a capital improvements, you can improve the quality policy using.  Using inclusive financing so there's ways to pay back investments for tenants are saving money and improving the quality of the reservations, thank you.

25. Erin Hanafin Berg: Good evening, can you hear me. Yes, okay great um my name is Aaron Hannifin Berg, I am a simple property owner and also the deputy and policy director at Repost, which is a St Paul based nonprofit Community revitalization organization. At Repost we know the inherent value of old buildings and the sense of place that they provide and rehabilitating and adapting former office buildings.  Warehouses, schools, factories, and hotels can create housing, while also employing people in construction trades and saving valuable materials from landfills.  My organization is concerned about how a proposed new construction exemption to the rent stabilization ordinance and St Paul might apply to historic buildings, whether vacant and under-utilized or occupied but deteriorating dozens of properties and St Paul had been rehabilitated and converted to rental housing, especially since initial passage of the Minnesota historic. Our concern is that know what will also be naturally occurring affordable housing will also be subject to demolition in favor of new construction if new construction is exempted. We believe that we can't just hope that landlords of older properties will do the right thing and keep their older buildings both habitable and affordable. So we asked you not to include an exemption for new construction if that does not also include rehabilitation and upkeep of existing older buildings, thank you.

26. Cory Cole (she/her): hello, my name is Corey Cole and I'm a renter in ward one and a public health professional. It is well known in my field that stable, predictable housing and protection from displacement and gentrification is connected to nearly every health and safety problem in the books. Reliable housing reduces drug overdoses prevents suicide and allows the connections that keep our community healthy to continue thriving. In terms of protecting lives families and communities, this policy as written is the minimum step. And attempts to undermine it with blanket exemptions or decontrols will also undermine the health and safety of our city, thank you.

250

27. Jake Sinderbrand: can you hear me now. My name is Jake Sinderbrand. I'm in Ward seven and very fortunate to own my home but I'm seeing my neighbors who are renters displaced by sudden unaffordable rent increases. I think we need to keep in mind that, regardless of whether you live in new construction or if you're a tenant in existing construction that has no bearing on your ability to afford rent increase, we need to take attendance first housing policy and ensure that everyone in St Paul has a safe place to live, we need to make sure this policy goes through as enacted by the voters without an exemption, thank you very much.

28. David Blessign: Alright I'm from Ward seven. I'm a lifelong renter in both the East and West side the St Paul; currently in ward seven. And it used to be, you could move around the city easily for a job or for any reason and rent affordably in any part of the city rent was just a part of the monthly budget. Today, however rents have reached a scale where most daily goals you do throughout the month are just to make rent payments. It's an unjust and it's unsustainable portion of a wage earners income. And REX have it with one sense of well-being I support a 3% CAP all right, without exceptions to create a universal affordable stable housing market. The CAP should be applied to all rental units across the city, including vacancy control. Landlords can benefit from a process of exemption if they need to adjust their rent increases, but this will be run by the city and closing my lifestyle. As always. In closing, my lifestyle has always meshed beautifully with renting until the last decade, when rent rolls far beyond CPI, and this is distinct from all other budgetary needs, thank you.

29. Nasroahmed: Yes, Hello. My name is Nasroahmed, I am a renter in St. Paul. I also I homework, or I am a home health care worker and a member of the SEIU have to occur. The past two years, has been really hard for me and my family. I care for my disabled disabled son at home he's in person program is and ------ have been paused during the pandemic. It has been hard for me to work any other jobs, our rent is too high, and on the top of that my son is disabled and required a special diet. And the food is first sponsor as I've identified for my family. I struggle to make it all I currently all best to do rent families like mine are suffering and needs to support we voted for rent stabilization last fall for. Our families. Our neighbors now we need you to make sure our vote is respected, thank you.

30. Kate Hurley: hi my name is Kate I'm a property owner in St Paul I own operate 1500 naturally occurring affordable housing units in Ramsey County.  I'd like to committee to consider the following when implementing this policy. I'm going to quote the Isaiah website to start everyone deserves to have a safe, stable and affordable place to call home and that's part of my job I'm 100% in favor of promoting and providing affordable housing. And I hate increasing rents, however, if the rent stabilization ordinance is implemented as it was intended it's going to deter owners and operators from maintaining and upgrading their communities. I'd like you to recognize that landlords don't control the following things that ultimately impact rental rates. 30% increases in gas prices, 12% increases in property taxes, the cost of inflation, when it comes to materials needed for maintaining properties. The cost of the increasing cost of labor. There needs to be exceptions to this policy in order to create and maintain safe stable and affordable housing and St Paul. Thank you.

31. Bol: hello, can you hear me. Oh well, so I'm good evening everyone, my name is Bol Benjamin I am a resident here at the Hamline-Midway area renter, pretty close to the Allianz

field stadium, and I also am an organizer for SEIU local 26. I want to speak on behalf of myself and a lot of our members who are also managers in the area and saying that you know, we believe that what St Paul had voted for this last election is, you know, it's definitely the will of the people and definitely reflects like the type of response that we need for this housing crisis. Like I'd mentioned a little bit ago I live in the Midway area pretty close to the stadium and I've seen my rent go up like $150 and, like the last year, both for November. And I know in the buildings close to me that rate has been matched or even exceeded that. And so, they'll be up and so yeah I would say that we, I am you know, we are all in support of this and we need to have more protection for Thank you.

12. Sthaler: so thank you. I've got one question for everybody here. I no longer am in Minnesota and part of the reason was is because some of the what's been passed; it's basically forced me out of the rental business. But I asked the people to look at it, maybe through a little different set of eyes, and that is why can the government raise taxes 12, 13, 14, 15% I know between, and they doubled, how many people's rents doubled, why can the government who pays a lot of these people's wages, why can they raise their taxes and then expect the people that have to pay these, the landlord, to not be able to somehow secure that extra increase to take care of those those increases in taxes or insurance or maintenance or gas. Everything goes up if we if you put a 3% increase that's called price controls and Nixon tried it back in the 60s and 70s and it didn't work because you started to have scarce commodities, as a result of it, and this is what people they're so short sighted in looking at this thing and a couple people brought up as there's not going to be any more new construction.  People can people can go to other states which I did and don't have to deal with this, so why would you want to be regulated by the laws that are proposed to be put in place, and I have no axe to grind but i'm out of there, and you really you're going to lose more people that are good landlords and you're going to end up with slums in the city of St. Paul.

32. Parker von Sternberg: hello, my name is Parker I'm a student at the U. I've been living in Hamline-Midway the last couple years. I want to reiterate something that was brought up earlier regarding the current proposed rules, I do think that notice to tenants regarding self certified rent hikes. I think if that is the system that is continued with, I think notice needs to be part of that process so that tenants can look at the reasons that are being proffered for this raise over 3%. And I think, I also want to agree that there is also a deep need for the construction of new housing and we need to recognize that, perhaps, as the speaker before me said, those with the money to build it will punish St Paul if they cut into their margins too much. Now. Whether that's ethical, I think, is perhaps beyond the scope of this but it's true and exceptions may need to be made, because at the end of the day, St Paul needs that money to build the housing. Deals with the devil need to be made so.

5. MICAH: And, once again, this is John Slade from MICAH.  I would like to kind of follow up on on the, on the economics of this. Housing is, has always been a risk providing a residential housing, has always been a regulated industry, I can't store nuclear waste in my basement - my property right does not include that because there is a sense of public good.  I feel that rent stabilization because housing is so critical to people as a landlord I, I have limitations, I can only go so far.  I feel that perhaps some of the folks that are saying we're going to have to get out of the city, because we can't raise rates like we want to are probably folks that we don't want in

252

the industry, and so, if some of those folks who are looking for quick turnaround, and you know jacking large apartment buildings are out that's, that's actually for the for the benefit of Minnesota it's say we're in a super tight, super hot housing market and so that it's a really important thing to to continue to have have that. Thank you, Thank you so much for the time.

2. Dayna kennedym: Thank you so much, this has been a wonderful evening and a great opportunity and I have been so moved by the renter's I've heard. And it's it really has moved me. I grew up with a single mom we lived on the floor on mattresses and I it brought me right back to those difficulties and I've been a homeowner for a long time now.  And yes, gas rates have gone up and we're working on the foundation of our very old house and it's going to be very expensive, and so I understand the maintenance issue that people are talking about tonight. The difference is my mortgage for 22 years has been the same, and I could save for it and budget for it, and I want renters to not go through what I went through and to be able to budget, even though gas is going up and property... I'm experiencing all of that, as a homeowner The difference is my bottom line remains the same, and thank you again for this wonderful evening.

13. Patty Mac: hi yeah I spoke before and I was the one for not keeping the 3% in between tenants.  And I do understand how important it is to have stable rents, I mean I've kept my rent stable, so I do understand all that, but it also is a business. And I would like to point out to people who might not know at that at our mortgages are higher our insurance is higher enter property taxes are all higher than regular Homeowners. If we have a rental all those expenses are higher so you can just look at what you have if I want to put in like a energy saving thing that a regular homeowner would get a rebate for I'm not eligible that. So we're always painful prices for everything.  My other point is that, instead of being able to argue for a good return on investment or certain percent ceiling level, why not also let landlords raise rents per a reasonable just rent like maybe it could be determined by the city for the area size quality. Because if the caps that are established right now I would never be able to raise my rents, to the level that others, maybe someone right next to me would be allowed to have theirs. So how is that, how can one landlord be allowed to charge one amount, while another is restricted for a comparable property right next door just there needs to be another way, thank you.

19. Sean Lim: Thank you yeah, I would like to kind of push back on what was just said, a bit. Again, my parents are property managers, they work with immigrant families, they work with section eight families, they work with landlords and I just wanted to say that housing is a human right, it is not, we should not be looking at it like a business, a profitable business because people's livelihoods, people's standards of living depends on having a safe stable clean place to live right. And so, if the government is failing on delivering on that and the government is not doing anything to ensure that people aren't being priced out into third, fourth ring suburbs are priced out of the state, even, then we are doing our due diligence to stand up for neighbors and so that's why I work so hard to get this onto the ballot. That's why I have fought to get petition signatures and that's why I'm going to continue to advocate for this policy and no exemptions, because I'm housing as a human right and people need a place to live and  if you did you. Thank you.

28, David Blessign: hello, can you hear me. I've got, one of the reason we're here is because rents went up 3% for decades. I've owned apartment buildings with my parents and we kept rents stable.  And rents have gone up about 125% in the last 10-15 years. And so the CPI has not gone up at all. And this is where we find ourselves. We, kind of, I don't know, I guess that's all I got to say.

33. Mike Hirabayashi: Okay, can you hear me?  Yes, great. I am Mike Hirabashi, I live in Ward six I used to work security at the MIA for five years and I was Union started during that time and negotiated contracts. I'm so I'm well I'm familiar with how quickly inflation rises, etc. that decent amount and also equally familiar with how statement wages have been. People have been squeezed harder and harder every year for decades with corporation now seeing record breaking profits, all the time. And that was before COVID so people are just getting crushed these days with the housing insecurity at record levels, we need to rent stabilization and we need to respect what St. Paul voted for, thank you.

10. Elaine Tarone: Thanks, I just have a really quick comment. I haven't heard anybody make the connection with all the homeless encampments we've had in St Paul over the last two three years, and these are people who, these are the consequence of having low wages and rising rents and I think the whole idea of housing as a human right really needs to lead this whole discussion when I hear landlords talk about their right to make a profit, I never hear them say what what then shall we do with these homeless families and homeless citizens. This is, this is an issue, thank you, thank you.

34. Cisco Cole: Yeah I've heard slums mentioned a couple times during this conversation and want to point out that that's. Pretty antiquated term used as a fear point here in the slums are specifically what happens when there is no Community building and there is no rent stabilization.  I'm a landlord myself, and I do believe that the best way for us to approach Committee community building is with things like rent stabilization where everybody has an equitable opportunity to have that housing and without it. I do believe that's when you have with those those two gentlemen referred to as the feared slums happening, that's what I that's all thanks okay thank.

35. Stephanie Stegeman (she/her) St. Paul: hi yes, my name is Stephanie Stegeman I live in Ward three I organized with Isaiah. I'm very proud of our city that we are being good neighbors and looking out for each other people have been saying, this is a problem and many of us are homeowners and are comfortable, but still fighting for this, because that's what a good neighbor does. And when you have a good neighbor you have a good Community and I truly believe that and I hope that the City Council and the board really takes a look at all this information and tries to find a wonderful solution that they'd be proud of, thank you.

7. Debra Howze: I was hoping that we can all get together and come together and get along and come to a solution so that it could work for all people involved. And yes, housing is a human right for all Americans and people working and we don't have enough money. Gas prices are going up, everything… The government, has you know, has hoodwinked us and that they need to work with those making sure people get what they need, and no homelessness here in our State that has. How much surplus money and we all should be able to get what we

need, and I just want to say you know I'm just feeling some tension, maybe it's just me, with the with the landlord and the renters and the haves and have nots that we have got to make this thing work, and this should not be our last hurrah talking this out that been the people have spoken.

36. Kevinmcconnon: I'm Kevin McConnon from St Paul long time lifelong resident here very proud of St Paul, we obviously need to attend to the needs of the, of the renters in our community,  number one.  And number two we absolutely need to honor the vote of the of all of the citizens of St Paul, and this is something that I think if we don't honor these types of situations, then, what do people think when things come up and we get a chance to vote on it and then all kinds of changes or adjustments are made or it's not done that's not right, that's just not the way things are should be done and we absolutely need to honor what we voted for last November, absolutely Thank you.

# Part two: Written comments

As a Saint Paul resident, my primary concern is that increasing barriers to construct new housing—at a time when construction costs are already skyrocketing, and land costs and property taxes are increasing—will only magnify the scarcity of affordable housing. My hope is that new housing construction will be exempt from rent control for a set period of time. I also hope that the city will do everything in its power to make it easier to build more housing by relaxing zoning codes and pursuing more state and federal funds to subsidize affordable housing construction throughout the city.

We are already seeing home values in St Paul not increasing like they are in Mpls since 2020. The unintended, negative consequences of Socialism continue to make things worse.
Many St Paul Landlords have been selling affordable rental homes and trading into the suburbs, and those St Paul homes are usually being sold to owner occupants. How exactly will fewer available rental homes create more affordable housing in St Paul?

The ordinance should use CPI +3-5% as the annual rent cap; allow for vacancy decontrol, where rents can be raised when renters change; an elected quasi-judicial rent stabilization board independent of the mayors office and city council made up of renters, landlords, and homeowners; the rent stabilization board should have ample staffing for admin, education, petitions, and data collection; funded with rental registry fees; exempt 1-4 unit rentals (small mom and pop landlords with many more variable costs) and newly constructed buildings for 12-15 years; a reasonable return standard for exceeding the CPI+3-5% cap based on maintenance of net operating income, allowing for year-over-year profit growth tied to market inflation. Rent stabilization is needed and it needs to be administratively possible, while balancing the intent of the policy to stabilize rent for renters and providing property owners/managers with the right to reasonable (non-hyper-speculative) profit.

Saint Paul Rent Stabilization Ordinance
I believe there is a valid reason for the recent passage of the Rent Stabilization ordinance.  I question however, whether it will accomplish what I understand as its goal.  That being to prevent rent gouging by predator landlords.  Not only may this not improve the stability problem, but actually make our current situation worse. Good landlords may be penalized, as well as for many renters in our tenant population, both in market and affordable housing. It can also have a negative impact on our tax base and in turn, our homeowners.
I thought closely about the 12 ways the 41 member task force identified to make an effective stabilization program (attached).  My understanding is this list was created by stakeholders, both the tenants and landlords.  I believe the two ideas (below) can either accomplish or satisfy all these requirements.
I don't believe it is possible to have a tenant-stable system, without landlord stability.
I think there were different goals people had who voted on the rent stabilization ordinance:
• Affordable tenant stability (this was the stated intention in the ordinance language)

• Creating more deeply affordable housing
• Giving a voice to renters
• Reducing rents to all tenants across the board
• Restricting return on investment for landlords (this was stated in the ordinance language)

If stability for renters is the real issue, and I think the valid issue, we should focus on that, and not risk collateral damage for other stakeholders.  A few renters who simply want a reduced rent without concern who or how it gets paid for, is as unfair as predator landlords gouging their vulnerable tenants. Above all, we should have voted on an ordinance that accomplishes what it set out to do.  Since passage of this ordinance, we have some landlords greatly increasing rents before it takes effect, a dramatic decrease in potential affordable housing supply, and reduced property values. So we have anything but stability.

My approach would be to increase affordable supply and specifically focus on predator landlords. This is a balanced approach.

The suggested goal is rent stabilization, both for the tenant and the landlord.
1. The immediate problem many tenants currently face and the reason for the rent control/stabilization ordinance:
The stated reason for this ordinance is to protect tenants who experience unreasonable and unaffordable rent increases from landlords who give only short notices, sometimes forcing tenants out of their homes. It's intent is to stabilize the housing supply for tenants who require affordable housing.
A potential solution for the vast majority of tenants:  Landlords would be required to offer a minimum of three-year leases, renewed annually at the option of the tenant.  Leases will state the total annual rent for each year, reflected monthly for each twelve-month period at time of signing. (Another way to state this option is to require landlords to offer three, one year leases at time of signing, with the option of the tenant to terminate at years two or three)
The most important part of this approach is that the tenant initially only needs to focus on the first 12 months' rent.  This is what most tenants need to know when they initially agree to a one-year lease.  If they can afford it, they can agree and sign the lease.  In addition however, the landlord would be required to offer a minimum, three-year lease, identifying the second year's monthly rent as well as the monthly rent for that of the third year.  The landlord can base this on whatever the landlord feels it needs, i.e., it could be stated in total dollars, or an increase based on inflation or no increase at all.  The tenant however can terminate the lease, at their choosing, for any reason, after each year.  The tenant can earlier renew a longer lease every year or any time prior to termination. This forces the landlord to compete with the market, both with the initial lease and any stated increases or other conditions.
If the tenant loses their job or for any other reason, they can decide to look elsewhere to live.  The tenant will have up to more than two years to find another place to move.  This approach also gives a strong voice to the tenant. The landlord can offer longer leases for good tenants or can even reduce rental rates after a lease is signed.  This goes a long way to actually stabilizing the living conditions for any tenant with these terms in their lease.  Good landlords already offer these kinds of leases to keep their good tenants and reduce expensive turnover.  Problem tenants can be dealt with using existing statutory laws.  The only landlords who may be damaged by this kind of requirement are the landlords who might financially abuse and gauge tenants.

2. One longer term solution to increase affordable supply:
 Saint Paul needs to effectively address the shortage of affordable housing within the City. I believe this is the greater need, but controlled by market forces. Over time it has become a top priority. So what is the best way to relieve the shortage?
Promoting affordable housing does not have to be a zero-sum game; we don't  need to take away from those who provide market-rate rental housing to help those who cannot afford market-rate rents. We do not need to discourage new investment. This can and should be done by adhering to zoning guidelines and being sensitive to the character of surrounding neighborhoods.
If deeply affordable housing is our most important need in Saint Paul, the goal should be to build the most units we can, as fast as we can. This could be achieved by encouraging the building of new market-rate rental housing—by developers who are willing to build without public subsidy and who will pay market-rate property taxes.
The future tax revenue derived from these projects can be bonded for up-front funding, similar to TIF. The difference is, the city would also create a restricted fund that future revenue and use it to subsidize the private development of new affordable housing. In this way, the city can control the location, the quality and the desired amenities for this affordable housing. One hundred percent, not just twenty percent, of this new housing would be dedicated as affordable. This can generate the greatest amount of funding on a relatively short period of time.  Saint Paul would retain any subsidies granted within the City, rather than to out-of-town developers who might well use the subsidy elsewhere.

256

As suggested by the task force:

A good and effective rent stabilization program for Saint Paul would:

1. provide stability of residence and affordable housing for St. Paul renters
2. provide renters with predictability in their housing costs from year to year
3. prevent gauging
4. provide property owners with the ability to recoup expenses for operating costs and property maintenance, and a reasonable rate of return on their investment
5. result in continued maintenance of property, providing renters with decent, safe, and clean living environments and property owners with properties that remain in good shape
6. allow and encourage the upgrading of the rental housing stock thru capital improvement
7. result in expansion of the rental housing stock and housing options in St, Paul thru new construction by continuing to attract investment and financing
8. operate thru a clear, transparent, and simple set of regulations and processes so that all parties have a good understanding of the system
9. be efficient and process petitions and claims quickly
10. have regulations and procedures that are fair to all parties
11. produce good communications between renters and owners/management
12. produce stable communities in the city

As a senior citizen and a homeowner in Ward 3 I am in favor of St Paul rent stabilization because a roof over one's head is not a commodity, but a necessity, and as a community we should all be concerned that our neighbors are protected in their ability to live in our community. The average worker, or retiree, does not typically receive an income increase over 3% in a year. The voters of St Paul passed this housing stabilization effort in an effort to maintain community. If landlords need assistance maintaining their property other legislation should be brought forth to financially assist them. This is a separate issue and should not be conflated with renter's ability to afford housing in the community of St Paul. If we want to address public safety in our community we must first address decent, affordable housing. To have single individuals and families unsettled, living from pillar to post, due to rising rental costs is not good for our whole community.

I want a policy with:

a 3% fixed cap

no exemptions for small buildings

no exemptions for owner-occupancy

no exemptions for single-family homes

no exemptions for new construction

And most importantly, I don't want exceptions when units don't meet health, safety, and building codes. This is an issue which needs to be addressed by City code enforcement. I have seen these units in the City of St Paul rented at exorbitant rates and feel nothing but shame for a City, which would allow this. Please do not "water down" the ordinance at the behest of people who stand to financially gain from increased, uncontrolled rental charges. Encourage them to seek redress for their grievances through legislation which would assist them financially. Their financial gain should not be on the backs of the residents of St. Paul. Again, housing should not be seen as a commodity and therefore the needs of those maintaining housing stock in our city are seen as "victims" of this Ordinance, which seeks to address the need for stable, affordable housing, which a person(s) can rely on for it's affordability from one year to the next.

I live in Ward 3. I'm a new homeowner in St. Paul. It's still incredibly exciting to me that rent stabilization passed last November with 53% of voters citywide. This was a historic and powerful campaign to deliver much, much needed policy around rental practices in the city.

When I think of this policy and the many friends and neighbors and community members that have fought for it, there are certain aspects we know are vital: predictable housing costs to expect form year-to year, preventing price gouging (as a former renter, I experienced this multiple times), stabilizing rent in existing housing, and creating critical housing stability for St. Paul renters. I want to also stress that I recognize that this policy is not meant to nor equipped to provide solutions to other challenges of housing like housing supply or housing stock maintenance solution. This policy has fixed mechanisms for rental stabilization, and this specificity of purpose is so important so that the policy can accomplish its function. I appreciate very much this specificity to make the policy sharp and functional for all parties involved.

I do believe that further ordinances should be considered to address both creating more affordable housing supply and to ensure that rental housing meets standards of health, safety, and building codes. But again, I recognize these must be

brought forth in their own independent ordinance proposals.

From the beginning, I was very aligned with this rental stabilization policy. I firmly believe that the policy should provide a 3% fixed cap on rental increases, no cap higher than CPI, no exemptions for smaller buildings, owner-occupancy, or single-family homes. As well, I also feel there should be no exemptions for new construction or vacancy decontrol. Finally, I would also hope the policy will create space by which the city can consider and create exceptions in the future.

I truly believe that this rental stabilization policy can bring together the many stakeholders involved to chart the best path forward. Delivering on this policy will be immensely important for the many, many renters here in St. Paul that contribute greatly to the vibrancy and strength of the city.

I have been a renter in the Twin Cities for 7 years and this policy should be implemented as it was originally written to protect renters from large rent increases and help people stay where they are and not get priced out of their neighborhoods.

Without this stabilization we will continue to be Intimidated by our landlords We are afraid to make complaints for fear they will raise our rent even further And they are now beginning to make us pay for our water which is totally unfair.  But if we complain about this we feel our rent will be raised an even larger amount.  Please initiate this program for fairness.

The rent ordinance should be amended to include the following: rent cap of CPI+5%; vacancy decontrol; rent stabilization board and staff, independent of city council and mayor/city department like other cities across the country; exemptions that include 1-4 unit properties and newly constructed building for 12 years; reasonable return based on MNOI used as a guideline for request to increase rent above the rent cap.

I am a condo owner in Ward 2, which voted in favor of the rent stabilization initiative.  I am strongly in favor of this initiative for the following reasons:
1.  It can provide housing stability for St. Paul renters
2.  It can provide renters with predictability in their housing costs from year to year
3.  It will prevent rent gouging
4.  It stabilize rents in currently existing housing

Additionally, I would be strongly in favor of our city passing the following ordinances/policy solutions in the future:
1.  Increase investments in creating more affordable housing supply
2.  Ensure that rental housing is maintained to meet health, safety and building codes

Thank you for your attention to this important topic.

There are reasons that this is being called the most extreme rent control measure in the country. Sadly I predict that Saint Paul housing stock, especially historic buildings are going to fall into disrepair as owners will no longer be able to put money into their buildings with their income greatly restricted. I am a small landlord who is considering selling my small buildings as a result of rent control. My rents have always been affordable and below-market but I fear I will not be able to sell my buildings to someone local or an owner-occupier like myself when I'm ready for retirement largely due to vacancy decontrol. Small local landlords will be leaving this business and big investors with no regard for Saint Paul neighborhoods or their tenants will be the predominant buyers.

Myself and all the small local housing providers that I know give steep discounts to good long-term tenants. Sadly, vacancy decontrol will make it so that is no longer possible.

I am a small Saint Paul housing provider who has been providing below-market affordable housing for 25 years in two beautifully kept historic fourplexes. Because of vacancy decontrol I am forced for the first time to raise my rent to market rate and to raise the rent every year by 3%. Small local housing providers like me give deep discounts to long-term tenants and we can no longer do that if we have to give those same discounts to new renters when one of our 20-year tenants moves. This also undermines my ability to sell my building to someone local like me who cares about the neighborhood.

I am a landlord and feel that the 3% rent control cap is so UNFAIR. There is NO cap on any of my expenses property taxes, garbage, utlities, and other things. I am also wondering why the NEW BUILDERS don't have to incur this!

Please allow as many exceptions as possible to caps on rent. Artificially interfering in the rental market only worsens the conditions rent stabilizations seek to address.  Segregated racial and socioeconomic neighborhoods will only become more entrenched. There are other ways to provide affordable housing without blanketing the city with a policy that smothers investment.

Immediately allow vacancy decontrol, this is critical for every rental property owner no matter how many units they own.

I am a small property owner. I am a Realtor who helps other small property investors get started. I don't know how to interpret the proposed language of this draft. I didn't own my two St Paul properties in 2019. How do I determine base rent? If I can't figure it out and my profession is real estate, how can anybody who owns one or two small buildings?

I'm writing in support of St. Paul's rent stabilization program and want to voice what that program should do. The St. Paul rent stabilization program should:

- Provide housing stability for St. Paul renters
- Provide renters with predictability in their housing costs from year to year
- Prevent rent gouging

Rent stabilization is a policy designed and proven to work to stabilize rents in currently existing housing. It is NOT a housing supply solution or a housing stock maintenance solution. Those are both important issues that need to be dealt with through OTHER complementary ordinances. Securing safe and affordable housing is not an issue that can be addressed through only one policy. Rent stabilization is one measure of what should be many to make sure everyone in St. Paul has a stable place to live.

Therefore, the St. Paul rent stabilization program should not seek to solve problems outside of stabilizing rent.

I voted for Rent Stabilization as written. We also need new housing to be built. Has the government exhausted its own options before adjusting the rent stabilization language, just shifting the burden back on those who are struggling to find and keep housing?

I am a resident of St. Paul who fully supports rent stabilization. Voters approved rent stabilization in last fall's election and the city has a responsibility to follow through and implement policy to make it happen. This is necessary to provide housing stability to renters. They are too often at the complete mercy of their landlords, some of whom are good, and many of whom are not. Housing is one of the most basic human rights and with our vote, we are showing that we, as a city, believe this and want to provide it to our residents.

Renters deserve to have predictable rent costs and landlords need to be prevented from price gouging. This rent stabilization policy does just that by capping rent increases at 3%. I urge you to move forward by listening to RENTERS. They are a huge part of our city and we want them to continue to be.

I am a life-long renter in both the East and the West side of Saint Paul. It used to be that you could move around easily for a job or any reason and rent affordably in any part of the city. Rent was just part of the monthly budget.
Today however, rents have reached a scale where most daily goals throughout the month are just to make the rent payment. It's an unjust and unsustainable proportion of a wage earner's income and wrecks havoc with one's sense of well being. I support a 3% cap on all rent without exemptions to create a universal, affordable, reliable and stable housing market.
The cap should be applied to all rental units across the city including a vacancy control. Landlords can benefit from a process for exemptions if needed created and run by the city.
In closing, my lifestyle has always meshed beautifully with renting until the last decade when rents rose far beyond CPI distinct from all other budgetary needs.

With inflation on the rise, it's more important than ever to cap rent increases at 3%, creating a stable housing lifeline for individuals and families whose income is not keeping pace with inflation. And more economic pressure is in the horizon, with a new BA.2 variant and no certainty as to when student loan payments will restart - possibly as soon as Sept. 1 of this year.

While I understand that these economic pressures are also hitting landlords, the fact of the matter is that for renters, the repercussions of uncapped rent increases are a risk of homelessness. Reduced profit margins or the need to sell properties that aren't as profitable can't compare to the risk of not having the basic human necessity of safe, stable shelter.

Exemptions shouldn't be allowed - and are honestly no better for property owners and landlords than renters. If there is an exemption for new construction, for example, new buildings will see vacancies increase as renters seek rent-capped housing in existing buildings. The same is true for owner-occupied, single-family, or small buildings. Exemptions for any sub-category will force people to leave their stable housing for rentals where they have predictable and reasonable expectations as to how their rent will increase, destabilizing our community. And a blanket exemption for many types of units is as good as no rent cap whatsoever, which voters have already demonstrated we don't want and won't accept.

Please consider and enact the will of Saint Paul voters on this issue. We want to see ourselves and our neighbors secure and stable in housing that allows us to build community, connections, and supports - housing that doesn't make us decide

whether we will pay our rent next year or our utility bills or our student loan payments.

Thank you for your time in serving on this task force and in reviewing these comments,
lifelong renter, Ward 4

Rent stabilization policies should be evaluated on the extent to which they increase the number of affordable housing units in the city. Policies which increase the number of affordable units are helpful, while policies which decrease the number of affordable units are harmful.

Policies should incentivize the construction of new housing, the conversion of existing market rate rentals into naturally occurring affordable housing over time as buildings age, and the retention of existing affordable housing.

Notably, policies that stabilize or even lower rents can be harmful if they also lower the number of affordable units available, because such policies would decrease the number of people with access to affordable housing.

While I believe that the rent control ordinance is an ineffective way to provide more stable housing in the medium-term to long-term, I'm grateful for the efforts made by the stakeholder to attempt to clarify the ordinance and consider the economic realities of owning and managing depreciating assets.  Aside from the flawed premise of rent control, my biggest concern about the proposed rules is the administrative burdens these add to the property owner and property management companies.  These reporting and exception-seeking processes drive up property staffing costs, which add to operating expenses, which erode Net Operating Income, which adds to additional requests for additional rent increases.   Furthermore, it seems unrealistic that the City is able to afford the staff required to accurately and fairly manage this ordinance based on the amount of details suggested in the initial draft of the fair rate of return policy while mediating disputes between property owners and residents.  I encourage the stakeholder group to spend additional energy around simplifying and streamlining the exception-seeking process. Further, I encourage the stakeholder group to financially analyze the cost of administering this ordinance versus using those funds to create and maintain additional housing at all levels, especially affordable housing.

This should never be implemented and shouldn't have been put on the ballot.  And as a majority of eligible voters didn't vote, there was no real majority. I don't believe it will work as you are thinking, and there must be provisions made to change or end this in future.  Already developers and builders have put on hold or ended new rental construction and this will continue if this idea continues.  You should be planning on ways to get more homeowners, not renters, to buy homes in the city.  We do not need any more high rise apartments built. As a homeowner, I do not support this.

I am asking you to implement the rent stabilization as was passed by the voters in St Paul.  As a renter myself, I know the importance of a stable community in our building.  I do not think that new construction should be exempted from this 3% policy.  They can plan ahead and start out their rent where it needs to be.  As difficult as it will be I understand a need for a city oversight so that there can be exemptions for reasonable causes. Thank you.

I support rent stabilization for St. Paul, and this task force should not make changes to the measure we voters have approved. As someone who has been forced to move from my home for 13%+ increases in just one year, a 3% cap is more than fair. As renters, we should not be forced from our homes because of an exorbitant rent increase. We deserve security and stability. Renters are being affected NOW, so this ordinance needs to take effect NOW, and without exemptions for new buildings.

The voters said quite decisively last fall we want rent stabilization, watering down the proposal is the opposite of what the citizens of St. Paul want. City council needs to accept that in order to build a better community and do the other things that need to be done they need to have citizens who live in affordable housing and are invested in their community.  A landlord is either neutral or crappy...there are no good ones. I had one who let her abusive alcoholic son live on the premise - who decided to try and enter my apartment without my permission while screaming obscenities at me because he thought I was responsible for his car getting towed (I was not). I had rodent issues that took 3 years 3 YEARS to be resolved because they didn't want to spend the money on an exterminator.  When they finally put out glue traps and I asked them to deal with the screaming living mouse they wanted me to?? They decided to sell the property and then leaned heavily on me and my neighbor to move out despite having leases that went for almost a full year after that.  Forget trying to own...affordable places are being snapped up by flippers, developers, investors with cash offers. They are hollowing out the city and the ONLY real solution is to stop making St. Paul a place they can suck money out of. None of these landlords live here nor is "owning" property any kind of job as far as I can tell.  I believe in representative government but not when you are getting very CLEAR instructions from voters and not representing us.  Y'all let the referendums happen because they aren't leading.  Now is the time to stand behind rent stabilization because you can't both make being unhoused illegal (which let's be real...y'all treat that like a crime) AND making housing something people can't afford.

St. Paul's draft of the (MNOI) is a copy of Richmond California's (MNOI) rent control process. Richmond has a population of

only 116,448 and a rent control budget of almost three million per year.  St. Paul has a population of 311,572 and 85% more proposed rent-controlled units than Richmond.  What will this cost St. Paul?

St. Paul has not experienced widespread unreasonable rent increases.   Rents in Richmond had risen by more than 30 percent in five years – (equating to approximately 6% average rent increase per year), according to the Haas Institute.   CURA states "that from 2000 to 2019 incomes increased faster than (Minneapolis) rents for renter households at the median and above. Tenants in the bottom quartile saw rent increases (44% increases from 2006 to 2019) and almost no growth in income. Yes, 44% sounds like cause for concern- however 44% is for 13 years. This increase equates to a less than 2.75% average rent increase per year.

Richmond has approximately 10,000 rent-controlled units with a rent program budget for five employees of $2,886,764.  St. Paul MN has over 70,000 registered rental units.  Again, at what cost? Richmond's program is funded by "landlord" registration fees of $218 per rent-controlled unit per year+ an annual $234 business fee per parcel.   Using the Richmond model-if a St. Paul "landlord" rents a unit for $900 per month the following year's rent increase would be capped at 3%- $27 per month rent.  The monthly cost of the registration fees would be $21.  76% of the 3% rent increase would go to pay for the rent control program registration fees.  Interestingly Richmond's original draft estimated the fee at $47 per unit.

St. Paul's draft assumes a crisis that doesn't exist.  St. Paul does not lack affordable housing.
 An April 8th 2022 Zillow search found that the majority of units listed are affordable.

St. Paul: 122-2 bed units available between 1000-1,500 per month
        59- 1 bed units with between $875-$950

The free market was working in St. Paul. In 2019 The Department of Housing and Urban Development, Office of Policy Development and Research Comprehensive Housing Market Analysis Minneapolis-St. Paul-Bloomington, Minnesota-Wisconsin U.S defined our housing market as "modestly affordable".  The affordability Index, a measure of median renter household income relative to qualifying income for the median-priced rental unit, has generally risen since reaching a low in 2010 with median renter household incomes rising an average of 5.0 percent annually from 2010 to 2017, whereas median gross rents rose an average of only 3.2 percent during the period.

The ballot initiative was flawed, present to the voters without any indication of cost.  The St. Paul City Council should repeal it in whole or:
1. Exempt new construction for 20 years and:
2. Exempt all housing that maintain affordable rent levels in their non-subsidized apartments in HUD Standards similar to MPLS 4D Affordable Housing Program and:
3. Allow property owners to reset rents when vacancy occurs.  There is no supporting proof that "landlords" are going to force evictions in order to raise rents. On the contrary; many residents each year enjoy below market rents because the length of their tenancy is beneficial to the owners. And:
4. Raise the rent increase cap from 3% to 7%+CPI (similar to Oregon) and:
5. Allow all fees charged to rental property owners to register, appeal and the additional administrative costs to be added back on to each unit above the 3% rent increase cap
6. Allow banking unused allowable rent increase should be allowed.

The City should work hard to preserve rental units in existing older duplexes, tri- and four-plexes. These units often provide amenities such as fenced yards for pets and gardening. These units are also spread throughout the City and are often the only affordable units in more expensive neighborhoods, and help fulfill the mission of the Fair Housing Act. The current ordinance disincentivizes repairs and needed remodeling by the small landlords that often hold these units. Between the cost of housing and this ordinance, these units are likely to become owner occupied units and we'll lose even more affordable units, especially those in higher-priced neighborhoods.

I live in Ward 7, St. Paul. I believe that keeping the rent stabilization ordinance as enacted by the people of St. Paul is crucial to keeping a vibrant and sustainable city. I have seen too many of my neighbors displaced when their homes are sold out from under them by their landlords because investors can pay more and charge a higher rent. We have heard for years that developers won't build affordable housing in our city without the ability to enact unlimited rent increases, but they're not

building it now, and haven't for decades. Without some means of keeping rent in check, St. Paul will no longer be a city where any of us can afford to live. Beyond that, it is the duty of our elected leaders to implement the ordinance that we enacted.

Hello St. Paul Rent Stabilization Task Force,

I'm an organizer with the Minnesota Youth Collective.
I've personally lived in dilapidated housing, as a U of M student, I was priced off campus. As a result, I've found a community in the Hamline-Midway neighborhood the past 4 years.

Midway is becoming rapidly gentrified and working class tenants who've lived here for years face excessive price hikes. As a mutual aid practitioner, I've talked to countless unhoused St. Paulites who have been priced out, and evicted with nowhere to go. My parents have worked closely alongside hundreds of Section 8 families to find them housing.

No lobbyist or politician can change the clear facts and findings from the extensive CURA study on capping rent increases at 3%, universally applied, across all units. There should be no new construction exemption.

This policy has passed and it should be implemented expeditiously with fully funded enforcement. no exceptions, no exemptions, no decontrol, no carve outs. Period.

Thank You.

A new company purchased building where I rented on Grand Ave and doubled all rents - all of us moved within 2 months. this should not be allowed..it was tough to find and relocate in that time

, Let's remember Gov and business are two different things.
-As this document reads, it looks as if it is taking the risk out of being in business.
-Look at how Gov has allowed the pooling and amassing of such wealth by so few in this country.  As written, the goal is to take the risk out of open markets, limiting the redistribution of wealth and putting the burden on the tenant, who is generally one paycheck away from living out of a car or tent, aka homeless.

- This is not what the people of Saint Paul voted for!

Also, the document is a legal nightmare for the City. Especially pg 5 Item (6) line D.
-In order to administer this Fairly & Justly, this ordinance needs to be set with a Litmus Test for both sides. What is good for one must be good for the other, both renter and property owner.
As written, this is not what the people of ST Paul voted for.

We all deserve stable housing without rents going up above 3% a year forcing people and children from their homes. Please no rent gouging.

I'm a homeowner in St. Paul's Mac-Groveland neighborhood. The voters spoke. We want the democratic process to work. We NEED to have the diversity that the 3% cap would help keep. We want stability for our neighbors. No new construction exemptions. The old Saint Paul establishment is organizing to maintain the status quo using fear to grow their power, override the will of the voters rather than do what's truly best for Saint Paul.

The rent control ordinance voters passed last fall included the following language: "The Ordinance also directs the City to create a process for landlords to request an exception to the 3% limit based on the right to a reasonable return on investment." It is unfortunate that the ordinance was so poorly defined that it includes language so vague that it constitutes a massive loop-hole that can be used to eviscerate the spirit of the voter's intent.  The task force needs to defend the spirit of the ordinance by setting a very high bar for exemptions.

Hello!  I very happily voted for rent stabilization back in November, and am hoping that the stakeholder group takes this important opportunity to provide St. Paul renters, many of whom are people of color, with housing stability and predictable housing costs. I know that many people are concerned about the ordinance's impact on development and housing supply, and while those are indeed valid concerns, there are many other approaches that could be used to address the lack of housing stock.  We need a policy with a 3% fixed cap that will protect tenants and prioritize St. Paul renters over the interests of landlords and developers.  I'm a white renter who is lucky to live in a safe, clean building with trustworthy landlords who have never jacked up my rent without warning.  So many of my fellow St. Paulites do not have this good fortune, and this ordinance needs to focus on them, and making their lives easier and more stable. Thank you for the work you're doing on this essential issue!

I am a small landlord with 4 single family homes.  In the past, like many other small landlords,  I've kept my tenants rent relatively stable - raising rents only when really necessary.  Raising them maybe $50 every 3 - 7 years, because I knew when they moved out I could raise them back to market rates again.  The last 3 tenants who have moved out all bought homes, they were able to take advantage of the lower rents and save up a down payment.

I have now informed my tenants that moving forward I will not be able to do that anymore; I will have to raise their rent 3% every year - because when they move out I will not have the option to raise the rent back to reasonable market rates.  My tenants are naturally disappointed.

If I don't raise the rents 3% every year I will be severely limiting the rent I can get when they move out.  For example, if they have been there for 6 years and decide to move out- and I haven't raised the rent - when they move out I will only be allowed to raise the rent 3% (or maybe 8% if I can argue it).  So the 4br/2ba, 3000sq' home that I get $1900 for now, in six years will only rent for between $1957 at 3% inc  and $2052  at 8% inc, while neighboring homes of similar size and location will be renting for up to $3000 or more.  Even if I raise my rents 3% a year - I'll only be getting $2200 in 6 years - because I have been keeping my rents low for my tenants.

So the rule about not raising rents more than 3% in between tenants is really hurting all of the landlords who have been helping tenants with stable rents.  I feel personally affronted by this new rule and wonder why I've been trying to keep things affordable and stable for tenants all these years.

I understand how important it is to have stable rents - my actions have demonstrated that.  But I would also like to note that I am not a charity - having rentals is a business and it is a lot of hard work.   Our rentals are actually our retirement account.

OR - instead of being able to argue for good ROI and a certain % ceiling level - why not also let landlords raise rents per a reasonable rent?  Maybe determined by the city for the area, size, quality, etc.  With the caps established right now - I would never be able to raise my rents to the level that others will be allowed to have.  How is that equitable?  How can one landlord be allowed to charge one amount, while another is restricted for a comparable property?

I am a landlord with two single family homes. In the past, like many other small landlords, I've kept my tenants' rent relatively stable - raising rents only when really necessary - when they moved out after several years - to market rates.
Instead of putting the responsibility on the landlord to defend a reasonable rate of return, why not let the market decide what rent should be? That's how the housing market works, and it's a good system.
Now I will have to raise rent 3% every year - because when they move out, I will not have the option to raise the rent to market rates. The rule about not raising rents more than 3% in between tenants is really hurting all of the landlords who have been helping tenants with stable rents.
I feel personally affronted by this new rule and wonder why I've been trying to keep things affordable and stable for tenants all these years. What about the small landlords who keep rent low for great tenants and adjust every few years??
I understand how important it is to have stable rents - my actions have demonstrated that. But I would also like to note that I am not a charity - having rentals is a business and it is a lot of hard work. Our rentals will be our retirement income.
Why not let landlords raise rent to market rate rent in between tenants? With the caps established right now, I would never be able to raise my rents to the level that others will be allowed to have because my rents are reasonable and lower than many around me.

Dear Task Force members,

I'm commenting as a homeowner in the Highland neighborhood of St. Paul. I support rent stabilization, renters having access to secure housing as a function of stabilized rent, and more people being able to call St. Paul home.

First, I'll comment on the focus of the task force: The St. Paul rent stabilization program should 1) provide housing stability for St. Paul renters; 2) provide renters with predictability in their housing costs from year to year; and 3) prevent rent gouging.

Rent stabilization is a policy designed and proven to work to stabilize rents in currently existing housing. It is NOT a housing supply solution or a a housing stock maintenance solution. Those are both important issues that need to be dealt with through OTHER complementary ordinances. The St. Paul rent stabilization program should not seek to solve problems outside of stabilizing rent.

Second, I'll comment on what the the policy should include:

- a 3% fixed cap; NO higher than 3%, nor higher than CPI
- NO exemptions for small buildings
- NO exemptions for owner-occupancy
- NO exemptions for single-family homes
- NO exemptions for new construction
- vacancy control; NO full or partial vacancy decontrol
- a process for exceptions created by the city; NO exceptions when units don't meet health, safety, and building codes
- NO pass-throughs
- NO banking of preferential rent

To reiterate an above point: Rent stabilization is not meant to solve supply or maintenance problems, and other ordinances should be crafted to address those issues. Most importantly, rent stabilization does not create supply or maintenance issues - - those existed long before rent stabilization was passed and will continue to exist unless we are intentional about addressing them.

We need additional and separate policies to: 1) increase investments in creating more affordable housing supply; 2) ensure that rental housing is maintained to meet health, safety and building codes.

Thank you for your work as a task force.

Make rent more affordable for low income people please!!! So many people are becoming home because a studio apartment is 1000$ a month and not everyone can afford that. What happened to the 400$ a month studio apartments?

I have concerns about the new construction exemption that has been discussed by the Rent Stabilization Stakeholders group, proposed by Mayor Carter, and endorsed by members of the City Council through the resolution approved on March 23, 2022. This exemption seemingly has advanced without much discussion or consideration of the potential impacts on existing older and historic buildings.

I am a St. Paul property owner, and work as the Policy & Deputy at Rethos, a St. Paul-based non-profit community revitalization organization. At Rethos, we know the inherent value of old buildings and the sense of place they provide. Rehabilitating and adapting former office buildings, warehouses, schools, factories, and hotels can create housing while also employing people in the construction trades and saving valuable materials from landfills. Building reuse through historic rehabilitation has been shown to provide an economic return on investment of more than 9:1 in Minnesota, and its less-quantifiable benefits to society are much greater.

Rethos is concerned about how a proposed new construction exemption to the rent stabilization ordinance in St. Paul might apply to historic buildings, whether vacant and underutilized or occupied but deteriorating. Dozens of properties in St. Paul have been rehabbed and converted to rental housing, especially since initial passage of the Minnesota Historic Tax Credit in 2010, providing thousands of new homes in St. Paul. Rehabilitated historic buildings in St. Paul, Minneapolis, and other cities statewide provide homes at a wide range of price points, from luxury to deeply affordable with income restrictions. Putting these rehab development deals together is complicated to begin with; obtaining historic tax credits is an involved and sometimes lengthy process, and the credits come only after construction is completed and then are spread out over five years. Imposing another constraint that limits the developer's ability to pay back the construction and bridge loans that are critical in this whole process would almost certainly halt these kinds of projects within St. Paul.

Will there be any market incentive to maintain existing buildings that already provide affordable housing if new construction is exempted from the rent stabilization ordinance, but rehabilitation of existing properties is not? As in most cities, old buildings make up most of St. Paul's unsubsidized affordable housing, or Naturally Occurring Affordable Housing (NOAH). Hopefully, committed property owners and people who can easily access credit and capital will continue to provide rental units that comply with both the letter and the spirit of the new law. But if new construction is exempted from the ordinance, and if the costs of repairs and ongoing maintenance keep pace with inflation – currently well beyond the 3% cap – some of those existing NOAH landlords may make the decision to either demolish and start anew or sell their properties for new development, both displacing current residents and raising rents in the process. Elected leaders can't just hope that most current landlords will do the right thing and keep their older buildings both habitable and affordable.

If new construction is exempted but the rehabilitation of existing buildings is not, historic tax credit projects will evaporate, and NOAH units likely will be demolished, thrown in the landfill, and replaced with new buildings. Both of those scenarios

264

would have a devastating impact on the livability of St. Paul. Policymakers must consider more than just the strain on renters to make sure that older buildings in St. Paul will survive this experiment.

Mapping Prejudice recently gave a presentation to the Rent Stabilization Stakeholders group and made it clear that the decisions being made today must avoid the potential for disparate impacts on marginalized groups decades in the future. I have lived in St. Paul for the majority of my fifty-one years and have seen a lot of change, including in the neighborhoods of Macalester-Groveland and Highland Park that I knew best as a child. Large swaths of these neighborhoods, where smaller, older houses were accessible to families of modest means (like my own), have been demolished. New houses, costing three or four times as much, have been constructed in their place. There can be no doubt that this phenomenon, which has turned some blocks into monocultures of newly built houses on existing foundations, has had the effect of keeping people out of St. Paul neighborhoods that already had a history of discriminating against people of color and being inaccessible to low-income residents. I worry that our city's notable collection of older, 6- to 12-unit apartment blocks, which date from the early 1900s all the way through the 1960s and early 1970s, might also be demolished and replaced with new multi-family housing just to take advantage of the rental cap exemption – an effect that essentially will double-down on the historic patterns of discrimination that are painfully obvious in the development history of St. Paul.

The Rent Stabilization Stakeholders group is charged with making recommendations to the mayor and City Council that will save affordable housing units and honor the voters' intent while accommodating growth and manageable change within the city. It's a tall order, but the so-called "market-driven solutions" that have already impacted many neighborhoods of St. Paul over the past two decades clearly demonstrate what can happen when new construction is unconstrained and existing homes are regarded as "less desirable." Older buildings should be recognized as the assets they are, and we urge Mayor Carter and members of the St. Paul City Council not to overlook the unintended consequences of the rent stabilization ordinance and proposed new construction exemption on these buildings - and on the people who call them home.

Rent stabilization passed in NOVEMBER 2021. How is it possible for something to be passed that wasn't DEFINED? Why are we still trying to figure out "what this looks like"?. Does no one realize the impact this is having on property management companies who are being held in limbo on what is happening? May 1 is days away. I can't believe this is acceptable and the people who brought this law to be voted on should be ashamed of themselves for proposing an ill-proposed "law". Unbelievable. Can't wait to see most if not all of this "law" revoked in November 2022.

If the city is going to tie rent to a single-digit percent increase, city services and taxes should be tied to the same increases. Colleges - who rent dorm rooms - should also be forced to play by the same rules. Or, the rate of increase should be tied to inflation.

This restrictive policy, along with the crumbling infrastructure of our city (high crime, failing schools, poor road conditions, etc) and sky-high property taxes are already driving families out of the city. Small landlords and smaller rental units will cease to exist and large corporate landlords will set the tone for the city. Is that really what people want?

It's tragic, really. So many other ways this could have been accomplished.

Not to mention, I am sure our property taxes will increase to help pay for the management of this bogus program?

Thank you to the City Council, The Task Force, and the people of St. Paul who would like to change the way humans live in St. Paul.

Rent Stabilization came at an unprecedented time.. The last couple of years have pushed inflation into a spiral. This is not the fault of any one person, but the collective inequitable systems that our State and country have continued to hold up.

The asks are simple:

* Provide housing stability for St. Paul renters
* Provide renters with predictability in their housing costs from year to year
* Prevent rent gouging

Rent stabilization is a policy designed and proven to work to stabilize rents in currently existing housing. It is NOT a housing supply solution nor a housing stock maintenance solution. Those are both important issues that need to be dealt with through OTHER complementary ordinances.

Therefore, the St. Paul rent stabilization program should not seek to solve problems outside of stabilizing rent.

St. Paul deserves to have a robust plan for addressing rent stabilization. The campaign was won by grassroots efforts and the voice that is often ignored.

Key points that should be taken into account on the HOW:
* No blanket exemptions that basically hold up status quo of protecting landlords
* No exemptions for properties that are not safe for tenants
* A clear, non subjective exemptions process
* Continuous review of how tenants are being affected (do not make a plan and ignore it for decades)

With any change, their are growing pains with that change. There are ways to identify risk and move forward. I hope that the decisions will be ones that keep the security of the people of St. Paul and the future that they bring at the forefront.

Thank you for your work.

---

I support the HENS policy points unequivocally. I am opposed to any modifications especially those proposed by Mayor Carter for exceptions for new development which would effectively gut the intent of the ordinance. The voters have spoken, and the Mayor and Council may either build trust in democratic institutions by honest effort at implementing the ordinance or fan the flames of discontent by bureaucratic sabotage.

---

With runaway inflation and corporate greed all over right now, St. Paul's rent stabilization is so important! Keep it strong in protecting renters. Thank you. - renter in St. Paul, Minnesota

---

I live in Ward 3, and I'm an ISAIAH leader.

As a 31-year resident of St. Paul and a homeowner, I voted in favor of rent stabilization last fall. I feel that my neighbors and their families deserve the same stability that I feel, that they won't be suddenly evicted from their home and community by a large rent increase. I was gratified that enough other residents felt the same and voted for this policy.

No such policy is perfect, but I am dismayed by the fear-mongering and threats of doom coming from the landlord association and Republicans in the Senate who want to nullify our vote. They forget that the reason that people want to live in St. Paul, the reason that St. Paul is valuable to developers, is because we live in a first-rate community. No matter whether our neighbors are black, white, brown and no matter what their income level, we are active in a broad, solid social fabric. We the people make St. Paul.

What I want in the ordinance:

- a rent increase cap of 3% to allow predictable maximum increases; this should prevent rent gouging while allowing property owners a decent return on investment.

- no decontrol; the cap should continue from tenant to tenant.

- no exemption for new construction unless it meets affordability standards set by another city program (a certain number of affordable units, etc.); I understand that this will cause developers to recalculate costs and methods of assuring full (profitable) tenancy to make large projects viable to outside investors. It may drive some away. But I believe that outside investors are primarily profit-driven. Profit must be balanced by the needs for maintaining a strong community.

- viable exceptions; most of the landlords who live in St. Paul are not rent gougers. They are responsible community members who often extend themselves and sacrifice profit to support their renters. No one wants them to go broke or not receive a fair return on their investment.

Thanks you.

---

You, the Rent Stabilization Stakeholders Group, are engaged in no easy task. I have watched every session. 41 on a video platform is not easy to start with; then the conflicting message from the Mayor as to your charge - yes/no to looking at the proposed new construction exemption; and then so much of the train has left the station - the exemption amendment and

266

now the rules & procedures too.  I genuinely appreciate the sincere desire to do a good job, aiming more for what rent control looks like in it's second year.

I did testify for the one minute the evening of April 12.  I am writing to emphasize several things:
   1. Your focus, our focus, the City's focus should be - as we enact rent control - WHAT CAN BE DONE TO MAXIMIZE AFFORDABLE HOUSING.
   2. If the new construction exemption gains traction, please consider such things as a requirement for Inclusive Zoning, or acceptance of a certain number of Sec. 8 tenants, or a requirement that the developer build in a 1% margin for luxury units to be dedicated to an affordable housing fund.
   3. Separate from, but simultaneous with any passage of the new construction exemption, the City needs to acknowledge the vote for rent stabilization was a cry of desperation and embark on additional affordable housing commitments, such as lobbying Congress and the State Legislature to eliminate the Capital Gains tax when a "Mom & Pop" landlord sells to a bona-fide non-profit that agrees to keep rents affordable, with a ten-year claw-back if the non-profit does not.

As I testified, I am a member of St. Paul STRONG.  We are non-partisan and take no position pro or con rent control, but we did host a panel discussion of developers, landlords, and tenants on SPNN Cable February 8.  Because the Mayor was slow to let us know his plans, the community was starved for information.  Following that a good number of developers, landlords, and tenants have been in touch with us with their thoughts and ideas, such as the 1, 2, and 3 above.  Some have even advocated for compromise proposals that could be a win-win for everyone.  Please reach out to these folks and consider putting a package together that might even get a 7-0 vote at the City Council.

There are other ideas that can be found by googling < saint paul strong > and clicking on rent stabilization at the top.

A comprehensive rent stabilization policy buys us time to explore a transformation of housing within the United States. To some, this policy feels extreme, but for decades upon decades landlords and developers have had little to no regulation at all. Rent stabilization isn't even leveling the playing field between tenants and landlords, it's just buying a bit of breathing room for tenants. Especially considering most landlords have historically not raised the rent more than 3% per year in Saint Paul.

If the city really is concerned about development of affordable housing, then the city itself needs to step up and build more housing itself instead of relying on developers. It will never be cost effective for developers to build enough affordable housing with the subsidies currently available. Developers are driven by a bottom line, not by common good. It's not financially viable for developers to build enough affordable housing, and even if it was, artificial scarcity drives up the profit they make. If I was a developer, and I could restrict the supply of housing to make more money, why wouldn't I?

Rent stabilization gives us a chance to look at other options, at transformative practices, at expanded public housing, and more. The policy should remain as comprehensive as possible, and be as enforced as strictly as it can be, as long as rents keep skyrocketing and wages grow minimally.

W4, homeowner. Very pleased that this policy passed as did the vast majority of my ward  -  57 %. I feel strongly that we respect the voice of the people – especially the majority of whom are renters.
The St. Paul rent stabilization program should :
• Provide housing stability for St. Paul renters
• Provide renters with predictability in their housing costs from year to year
• Prevent rent gouging
• Stabilize rents in currently existing housing
The St. Paul rent stabilization program is NOT meant to:
o solve problems outside of stabilizing rent.
• a housing supply solution
• a housing stock maintenance solution
I want a policy with:
• a 3% fixed cap
• no exemptions for small buildings
• no exemptions for owner-occupancy
• no exemptions for single-family homes
• limited  exemptions for new construction
• No vacancy decontrol
• a process for exceptions created by the city

I do NOT want in a rent stabilization policy with:
• A cap higher than 3%
• A cap higher than CPI
• Full or partial vacancy decontrol
• Pass-throughs
• Exceptions when units don't meet health, safety, and building codes
• Banking of preferential rent

Thank you,

This is a horrific time when history is repeating itself going back to the middle ages.  Landlords who want to further line their greedy pockets, with those who simply want a safe and affordable home for their families and pets.  This is an especially difficult time given an unprecedent increase in crime which has affected so many of us.  The St. Paul Rent Stabilization Force will not stop working in this humanitarian effort for affordable housing

Thank you.

I am the Executive Director of Twin Cities Housing Development Corporation which owns and operates affordable rental properties in St. Paul, Minneapolis and the surrounding metro area.

I understand that the objective of the task force is to get feedback on implementation of the rent stabilization ordinance not comments on the merits of the ordinance.  I would like to note here that I don't think that properties that are already subject to rent limits designed to assure affordability should have been subject to the rent caps.  These properties are designed to be affordable and each property is designed to be affordable to a particular segment of the lower income population of households, not all low income households. Also, if funded by tax credits and some other sources of debt these properties cannot terminate a household other than for good cause.  If there is an opportunity to exempt properties in the future serious consideration should be given to exempting properties that already have affordability restrictions.

Given that affordable properties are subject to the new ordinance I have the following recommendations as to implementation.

The ordinance should allow properties that already have rent restrictions to adjust rents upon turnover up to the rent limit of the relevant affordable program. This is particularly important in those situations where a household has been in an affordable rental unit for many years and the allowable rent limits have increased more than 3% each year and thus more than the households rent subject to the 3% cap. (Note rent limits are established by HUD based on surveys of income.)  If this can occur, the rent remains affordable (because the property is subject to affordability limits) and the property is able to capture that increment of rent to use in maintaining the property for a longer period of time than they otherwise would be able to with the 3% cap. The result is that the property can operate for a longer period of time without seeking additional affordable housing subsidies and those subsidies can be available for new projects.

Most affordable projects are precluded from terminating a household without cause under the tax credit rules and some lender rules thus the risk of affordable owners terminating a household without cause in order to increase the rent upon the unit turnover is much less likely to happen.  A just cause termination requirement could also address this concern, but I don't think it is a significant concern for most affordable properties given the regulations associated with the affordable housing funding.

It is also important to recognize that the definition of an affordable unit, as defined by the affordability limits established by the various programs, varies widely from 60% of AMI to fully subsidized rents.  All affordable properties are not designed to serve all low-income households.  Any given property is designed to serve households at a given income range.  If the rent at an affordable property increases more than 3% upon unit turnover, but is still within the affordability limits, that rent is still serving a low-income household and providing an affordable rent.  If a household in a property with rent limits at 50% of AMI for example, loses income through a job loss or other unanticipated event, that household may not be able to be served by that property any longer and may need to seek out a property designed to serve lower income households.

There is a lack of housing serving very low-income households, those at 30% of AMI and below and likely also serving below 50% AMI households.  These households can only be served through rental subsidies and developments with more deeply skewed rents.  The 3% cap on rent increases at properties designed to serve households with incomes greater than 50% AMI

268

is not going to help these very low-income households.  In fact, this cap will likely require that affordable developments seek out more subsidy sooner thus making less subsidy available for new developments serving lower income households. As mentioned above, the ability to capture additional rent upon unit turnover would help properties operate without additional subsidy for longer periods of time.

The ordinance does not address the redevelopment of properties as affordable housing.  We regularly acquire properties that have existed for many years, often decades, and are in need of substantial rehabilitation and financial restructuring.  New ownership entities should be able to establish new rents, within the rent limit restrictions.  If the allowable rent restrictions allow for rents that are more than 3% higher than the previous owners' rents, the rents should be able to be established as high as the allowable rent limits if determined to be appropriate for the project and the local market.  This would allow the owner to maximize the size of the first mortgage and limit the amount of deferred debt required to finance the project.  This would make more deferred debt available for other affordable projects.

I feel the rent control ordinance as written is too strict and without vacancy decontrol, we will see significant devaluing of properties across the city. We also need new development exemptions because without new construction the city will stagnant.

I believe that rent stabilization should help to provide stable housing for renters in St Paul. Stability means predictable housing costs and no price gouging rent hikes.

Over 30,000 St Paul voters endorsed the rent stabilization ballot measure as written. I urge you to support a policy with:
a 3% fixed cap
no exemptions for small buildings
no exemptions for owner-occupancy
no exemptions for single-family homes
no exemptions for new construction
vacancy control
a process for exceptions created by the city.

Thank you!

Dear Task Force members:
    I live in Ward 4, St. Paul and I have been a renter in St. Paul for the last 10+ years.  I was very happy with the passage of the Rent Stabilization Initiative in November 2021 and hope it is instituted according to the language of the initiative.
    Rising costs are everyone's concern and for myself, being on a fixed income, there are sometimes ways that budgets can be stretched to cover costs.  Rents cannot be molded to fit a budget, so it has top priority in any household budget.  Knowing that my rent will not go up over 3% per year helps me to plan a budget that works for my income.  I do not favor a higher percentage than was set in the passed initiative.
    I do not favor exemptions.  If I have to plan for a rental increase of 3% each year, then that same budgeting process should be good for the landlords, big and small.
    I hear the landlords complain about their costs, and I understand that costs rise for them also, but I cannot afford to help them manage their budgets by tapping into mine.  I already pay for my own heat, my own gas and electric, and I keep up the yard work.
    Please implement the initiative using the directives that were laid out and voted on and passed by the people of St. Paul.  Thank you for your work and your time.

I own a home in Ward 3 and voted yes for rent stabilization.  I understand the bigger picture.  We all do better when we all do better. You can't police your way out of a destabilized city. We waste so much money on police if we only made policy changes that stabilized our social fabric. I'm proud of St. Paul voters for voting to cap rent increases to no more than 3% annually. This is one of many steps for a better St. Paul for everyone.  This is what it looks like to be a good neighbor.  Good neighbors have great neighborhoods.  I reject the idea that this policy creates slums.

I believe the St. Paul rent stabilization program should help provide stability, and predictability in renters' housing costs and prevent rent gouging. With this policy, we will have a more stable St. Paul and thus a safer Saint Paul that won't have to lean so hard on the public safety net (police, public health, our public schools). A solution to reduce costs.  I strongly believe the rent stabilization program is not meant to solve problems outside of stabilizing rent nor is it a housing supply solution, nor a housing stock maintenance solution. I believe other ordinances should be crafted to address other supply and maintenance problems. Most importantly, rent stabilization does not create supply or maintenance issues.  Those existed long before rent stabilization was passed and will continue to exist unless we are intentional about addressing them.

In the future, we should consider policy solutions to increase investment in creating more affordable housing supply and ensure rental housing is maintained to meet health, safety and building codes.  I would like a policy with a 3% fixed cap on rent, no exemptions for small buildings, no exemption for owner-occupancy, no vacancy decontrol and there should be a process for exceptions created by the city.

I believe there should be an exemption for new construction that Mayor Carter is championing. However, I do believe there should remain no penalty for historical building renovations as the owner of Restore pointed out in her public comment. We want to encourage more developers to continue to restore these older buildings that add character and housing to St. Paul and should have the same exemption as new construction.

I do not want a policy with a cap higher than 3%.  This number was well researched and is solid.  I do not want a cap higher than CPI. I do not want full or partial vacancy decontrol or pass-throughs.

I do want democracy protected and upheld to reflect the intentions of nearly 100,000 St. Paul voters back in November 2021.

Hello,

I recently became a homeowner in Saint Paul, living in Ward 1, but for about 7 years I was a St. Paul renter, mostly in Ward 4. Finding affordable housing in St. Paul was never easy, but towards the end of my time as a renter, it was becoming noticeably harder.

I want the rent cap policy to stick to a 3% fixed cap, not allow exemptions for small buildings (which would cut off many people's access to smaller dwellings), not allow exemptions for owner-occupancy, not exemptions for single-family homes, not allow exemptions for new construction, no vacancy decontrol and provide a process for exceptions created by the city.

The entire success of this measure, voted for by the people of St. Paul, depends on being crafted in a way that is faithful to the spirit of what the people of St. Paul voted for.

Thank you.

I am a homeowner in St. Paul Ward 2.

I was one of the voters who voted YES for rent stabilization. The results from last November show that as Saint Paulites, we want everyone across income, race & ward to have a place to call home and predictable housing costs. Housing is a human right and I'm excited for Saint Paul to lead the way. In Ward 2, voters came 55.1% in favor of rent stabilization which is higher than the city-wide results and 80% of precincts voted in favor of rent stabilization.

The Saint Paul Rent Stabilization program should provide the following: housing stability for current St. Paul renters (51% of our STP citizens are renters); provide renters with predictability in their housing costs from year to year, similar to what I have with my monthly home mortgage; prevent rent gouging; stabilize rents in currently existing housing as this will immediately allow folks to stay in their homes.

The discussion about rent stabilization was allowed for a lot of conversation about housing in all it's forms in the Twin Cities. Much policy and system changes need to happen. However, what St. Paul rent stabilization program is NOT meant to do: it should NOT seek to solve problems outside of stabilizing rent; NOT be a solution for housing supply; it is NOT a housing stock maintenance solution. Other complementary ordinances should be passed to address housing concerns outside of the scope of rent stabilization. I think it is important to be clear that rent stabilization is not meant to solve supply or maintenance problems. Other ordinances should be crafted to address those issues. Most importantly, rent stabilization does not create supply or maintenance issues - those existed long before rent stabilization was passed and will continue to exist unless we are intentional about addressing them. As a city we should think about passing the following ordinances/policy solutions in the future: increase investments in creating more affordable housing supply, and ensure that rental housing is maintained to meet health, safety and building codes.

In my view, the elements of a good rent stabilization policy will have:
§ a 3% fixed cap
§ no exemptions for small buildings
§ no exemptions for owner-occupancy

270

§ no exemptions for single-family homes
§ no exemptions for new construction (OR share what restrictions you would put on new construction if this were an amendment passed by the city council)
§ No vacancy decontrol
§ a process for exceptions created by the city

In order to keep a "level playing field" and not allow loopholes for landlords to gouge renters, I do NOT want a rent stabilization policy with:
§ A cap higher than 3%
§ A cap higher than CPI
§ Full or partial vacancy decontrol
§ Pass-throughs
§ Exceptions when units don't meet health, safety, and building codes
§ Banking of preferential rent

I'm excited to support advancing a strong, effective & sustainable Saint Paul rent stabilization policy to ensure all across race, class and ward can have a home to count on.
Thank you.

To me rent stabilization protects tenants and assures landlords of a fair profit.

I live in ward 3, and am a homeowner or will be when the mortgage is paid off.  I am excited that the ordinance passed in December by a vote of the residents of St. Paul. I was one of the 53% of voters who voted YES for rent stabilization in Saint Paul.
This ordinance is not about zoning, and not about number of housing or office space in the city.  This is about how tenats are able to maek a home. There is room for other ordinances to build more housing, or where to locate housing, or how existing buildings can ve converted into another use.

Separate from rent stabilization, we in St. Paul should think about passing the following ordinances/policy solutions in the future:
• Increase investments in creating more affordable housing supply
• Ensure that rental housing is maintained to meet health, safety and building codes

In my view a good rent stabilization policy allows tenants to continue living in their home, not be forced to move every year or more due to rising rents.  Rents stabilization also allows tenants to budget their rent in addition to other household expenses already budgeted. Rent stabilization will prevent rent gouging.  Features of rent stabilization should be:
• a 3% fixed cap on annual rent increases.  History in the Twin cities shows that 3% is enough for landlords to stay in business.
• no exemptions for small buildings
• no exemptions for owner-occupancy
• no exemptions for single-family homes
• no exemptions for new construction.  The landlord can set rents whatever they want at the beginning, and after that rent increase will be 3% or less. No bait and switch for consumers.
• No vacancy decontrol.  This is a way for landlords to evict people and raise the rent maybe many times in a single year, and should not be allowed.
• a process for exceptions created by the city

I don't want a policy with:
• A cap higher than CPI
• Pass-throughs
• Exceptions when units don't meet health, safety, and building codes.  A landlord whose property doesn't meet codes, should not be permitted to make money off of danger to others, and certainly not to charge more for the dubious privilege of having others live in unsafe conditions.
• Banking of preferential rent

Although I was born and raised in Saint Paul, I am now in college on the west coast. Last year, I moved off campus with some friends. I'm grateful we have rent stabilization here so that I can budget and plan for predictable rent increases.

However, when it came time to renew our lease, the landlord tried to raise our rent almost double the amount that the law allows. Perhaps they thought we would NOT know our rights, but we did. This is due in part to the education and awareness around rent stabilization on campus and throughout the city.

Therefore, I want to impress upon this working group how important it will be, moving forward, that your recommendations include an education and awareness component specifically for students. I suggest posters in libraries, campuses and other public locations on an ONGOING BASIS, since young people will continually be becoming renters long after the initial ordinance becomes familiar to adults.

Lastly, I want to underscore my feelings about the rent stabilization victory in Saint Paul, for which I voted. To expand stability in families and communities, we need a policy with vacancy CONTROL, rent caps at 3% and no exemptions for small buildings, owner-occupancy, single-family homes or new construction.

Thank you for collecting public comment.

I am a Ward 1 single-family home owner, in the Summit-University neighborhood. I voted YES for rent stabilization, because I wanted St. Paul to ensure that each neighborhood will be open to all.

Diversity in housing allows for economic diversity. On our block, single-family home owners, duplex owners, and apartment renters live side by side. Housing diversity encourages a mix of ages and incomes that makes for stronger neighborhoods. It allows for people to remain in their communities as their housing needs change. Perhaps this is why Ward 1 supported rent stabilization with a 59% majority.

A rent stabilization policy should work to keep rents more predictable and stable so that people can remain in their homes even if rent rises modestly. It should disincentivize landlords buying property to make a quick profit, at the expense of long term stability.

A strong rent stabilization policy will include a 3% fixed cap, without exemptions for small buildings, owner-occupancy, single family homes, or new construction. There should be a process for exceptions created by the city.

I do not support a watered-down rent stabilization policy with a cap higher than 3%, or higher than the Consumer Price Index. There should be no exceptions for failure to meet building codes.

The rent stabilization policy cannot solve all housing problems. St. Paul needs additional policies to incentivize landlords to maintain properties, to protect St. Paul's quality housing stock. This includes student housing. We also need separate laws that discourage tear-downs of quality housing stock.

Thank you.

The voters voted for rent stabilization so please follow through on implementing it. It is important to me that my community and neighbors have housing security and I am confident that landlords can make this work once they know it is required. I voted for rent stabilization because it will help us build a democracy and caring community, so that people who have fewer resources can budget and provide for their families. Thank you for your work on behalf of St Paul.

I'm a homeowner in Ward 5. I'm pleased that a majority of the voters in my ward voted in favor of rent stabilization. I look forward to strong implementation of this policy for the following reasons:
Provide housing stability for St. Paul renters
Provide renters with predictability in their housing costs from year to year
Stabilize rents in currently existing housing
Prevent rent gouging

Other ordinances to complement rent stabilization should be passed to address housing concerns which aren't intended to be addressed by St. Paul's rent stabilization program, such as housing supply or housing maintenance. These issues existed before rent stabilization was passed, and will continue to exist unless they are intentionally addressed by appropriate regulations outside of and in addition to rent stabilization.

I suggest that St. Paul should pass additional ordinances and policies to increase investments in supplying affordable housing and to ensure that rental housing is maintained to meet health, safety, and building codes. This is the means by which fear-

mongering about slums can be effectively addressed.

I want a rent stabilization policy with:
a 3% fixed cap
no exemptions for small buildings
no exemptions for owner-occupancy
no exemptions for single-family homes
no exemptions for new construction
no vacancy decontrol
a process for exceptions created by the city

I DO NOT want the implementation of rent stabilization to allow:
a cap higher than 3%
a cap higher than CPI
full or partial vacancy decontrol
pass-throughs
exceptions when units don't meet health, safety, and building codes
banking of preferential rent

I realize that pressure will be (and already is being) exerted, both in public forums and out of public view, by monied interests who rank profit as more important than equitability. Who place their right to do as they wish as more important than maintaining healthy and equitable communities. I fervently advise that policy makers firmly resist any such pressures, no matter how persuasively they are stated. Favor community over profit.

I expect that the will of the voters will be implemented immediately and that the implementation will remain uniformly in force, with no sunsetting, in order to satisfy the intent of providing stability and consistency.

Vacancy decontrol is going to force small local housing providers to raise the rent every year on their long-term tenants. Our strategy has been to keep their rents low, affordable and under Market so they will be able to stay. Vacancy decontrol will make it impossible to do that

I attended the April 12th meeting on Rent Stabilization as a member of Pilgrim Lutheran Church and ISAIAH. I am a St. Paul homeowner. I have been an eastside homeowner for 12 years, had previously been a renter for the majority of my adult life. I am 71 years old and must continue working in order to pay my very stable mortgage payments. I cannot imagine how I would manage if I were a renter with no assurance of reasonable rate increases. I voted in favor of the rent stabilization initiative. I believe the majority of the citizens of St. Paul have expressed their wishes and efforts driven by private companies operating from a capitalist drive should not override this democratic process. I don't believe that fearmongering and dire predictions have any place in this discussion. I live in a neighborhood surrounded by immigrants from at least 8 different countries. We are safe and supportive of one another. I am aware that at least half of them work multiple jobs and multiple generations all contribute to be able to pay rent to provide stability to their families.
Please honor the will of the constituents of St. Paul as determined by the November 2021 vote.
Sincerely,

Hi, I live in Roseville.  I may not live in St Paul BUT i am a retired Social Worker and worked for St Paul Public Housing for many years, have worked at a mental health clinic and as a Care Coordinator for Medica.  Affordable housing is the MOST important way for stability for individuals and families.  It is also one of THE MOST stressful times when people's housing is threatened or lost--many times not due to anything they have done!
Our community needs and deserves to have the stability of safe, affordable housing and rent stabilization can be a part of this important system so people can budget an increase and that landlords can't gouge tenants.
We all have to work together for our community and to help with ways to support our hard working families to have stable housing which is the foundation for families.
Thank you,

Hi. I own a single family home and a duplex in Ward 4. I became a property owner and landlord because I want to provide safe, affordable, long-term, stable housing for my community, which is the disability community.

A strong rent stabilization policy includes keeping rent increases to 3% a year. 3% is more than enough to keep up with costs, and if it isn't, there should be an ability to apply for an exemption to recoup expenses for operational costs and property

273

maintenance, and a reasonable rate of return on their investment. Yet this process should not come at the expense of people with disabilities and other marginalized communities having safe, stable, affordable housing. I also want this policy to protect our community against price gouging and predatory landlords who want to use housing — which should be a basic human right — to extract as much profit as the market will allow.

HOME Line is a tenant advocacy organization that serves tenants across the state through our free and confidential legal advice hotline. In the interests of our St. Paul clients we urge the Rent Stabilization Task Force to stand behind the will of St Paul voters, and ensure swift and effective implementation of the rent stabilization ordinance as passed. Since HOME Line first began serving St Paul renters in 2006, our hotline staff has answered hundreds of calls specifically about rent increases, with these numbers increasing each year.

Since the passage of rent stabilization in November, our hotline has received 87 calls about rent increases, close to three times the number of calls we received about rent increases in the same time period last cycle. In many of these calls, St Paul renters asked us if the rent stabilization ordinance could protect them from rent increases they were experiencing at the moment. Many of our callers are low income renters on the edge of housing instability. Clear implementation of this ordinance cannot wait. As May approaches, HOME Line looks forward to clear guidelines from the city on the implementation of rent stabilization so we can fully address the questions and needs of our St Paul clients.

The most common issues we hear about on our hotline are: repairs, evictions & notices to vacate, deposits and other lease issues. Underlying all of these is the issue of affordability. Evictions and informal lease terminations are often a direct result of rent increases or a tenant's inability to pay full rent after a reduction of income. Tenants who face issues with repairs, deposits, and unfair lease terms are often wary of advocating for themselves out of fear that they'll lose access to some of the only housing affordable to them.

Affordability is a racial justice issue. The majority of households we advise in St. Paul are low-income and are made up of Black, Indigenous, and people of color. The average Black family in the Twin Cities make just above 30% AMI while the average white household makes over 80% AMI. Right now in St Paul, there are zero vacant rentals available to a household at 30% AMI. That means most Black renters cannot afford to live here. The ability of the city to regulate rent levels and aggressive rent increases is an important step to making housing affordable in St Paul and is a chance for the City to right historic racism in access to housing.

Rent stabilization can play a critical role in protecting renters from loss of housing, but to effectively stem the tide of displacement in the aftermath of COVID it MUST be combined with additional renter protections including just cause eviction, pre-eviction notices, and giving tenants the opportunity to purchase their buildings. We hope our expertise in tenant/landlord issues and our relationships with renters throughout the state will help guide forthcoming policy to best benefit our clients and St. Paul renters.

The intent of the St. Paul rent stabilization program should be to provide housing stability for St. Paul renters, provide renters with predictability in their housing costs from year to year, and prevent rent gouging. Rent stabilization is a policy designed and proven to work to stabilize rents in currently existing housing. It is NOT a housing supply solution, a housing stock maintenance solution. Those are both important issues that need to be dealt with through OTHER complementary ordinances. Therefore, the St. Paul rent stabilization program should not seek to solve problems outside of stabilizing rent.

St. Paul voters are smart and they know exactly what they voted for: a STRONG rent stabilization policy without blanket exceptions and with a 3% cap. The Rent Stabilization task force should NOT be re-writing/re-deliberating an ordinance that 30,000+ voters agreed on.

St. Paul voters told the City to implement a rent stabilization policy that includes a 3% fixed cap, no exemptions for small buildings, no exemptions for owner-occupancy, no exemptions for single-family homes, no exemptions for new construction, vacancy CONTROL, and a process for exceptions created by the city

St. Paul voters did NOT pass a policy with a cap higher than 3%, a cap higher than CPI, full or partial vacancy decontrol, pass-throughs, exceptions when units don't meet health, safety, and building codes, banking of preferential rent.

St. Paul needs additional and separate policies to increase investments in creating more affordable housing supply and ensure that rental housing is maintained to meet health, safety and building codes. Rent stabilization is not meant to solve

supply or maintenance problems, and other ordinances should be crafted to address those issues. Most importantly, rent stabilization does not create supply or maintenance issues - those existed long before rent stabilization was passed and will continue to exist unless we are intentional about addressing them.

I am a small landlord in St Paul. We need much more reasonable annual increases. Maybe CPI + 10%. Look at inflation now. Does the city want 90% of landlord filing appeals / exemptions? Also, landlords don't have the time or energy to do that. We need to move quick to keep our buildings full.

Also, we NEED vacancy decontrol. Otherwise landlords will have to proactively give larger annual increases.

If landlords are forced to adhere to very strong restrictions, then landlords won't want to do business in St Paul. That will not be good for the city or for renters. The government should be providing the deeply affordable housing that we so badly need.

15 yr exemption on new construction is not long enough. Should be 25 - 30 yrs. Why are we trying to protect residents that can pay new construction rents? We need developers to build as MUCH as possible. Seriously, dont be stupid by deterring new development is our city. Ultimately that will hurt lower income residents the most down the road. These units that are expensive now will be NOAH down the road.

The annual increases need to follow inflation at a minimum. When people move out there needs to be vacancy decontrol. New construction should be exempt.

I am a home owner in St Paul.  Nearly 60% of my ward (Ward 4) voted in favor of rent stabilization. This is an ordinance that has gained strong approval within our city.  It was crafted by tenant advocates, policy experts, and community members to hold annual rent increases to 3%, which is the historic average increase for the past few decades.   Our city has a large population of families that rent their homes and the ability to have these families stay in one stable house is vital to our cities' success.

The rent stabilization program should focus on helping our citizens provide stable and affordable homes for their families. This is one tool that can be used to help our citizens gain affordable and stable housing.   The intent of this program is to help moderate the cost of rent; so renters can count on a predictable amount for their housing costs from year to year. This program should: provide housing stability for St. Paul renters, provide renters with predictability in their housing costs from year to year, prevent rent gouging   stabilize rents in currently existing housing.

This program may bring up other needs for our renting public. These and any other additional issues with our housing in this city should be addressed separately and not be added to rent stabilization program.

 I think it is important to be clear that rent stabilization is not meant to solve supply or maintenance problems. Other ordinances should be crafted to address those issues. Most importantly, rent stabilization does not create supply or maintenance issues - those existed long before rent stabilization was passed and will continue to exist unless we are intentional about addressing them.

As a city we should think about passing the following ordinances/policy solutions in the future * Increase investments in creating more affordable housing supply

* Ensure that rental housing is maintained to meet health, safety and building codes

I believe the elements of a good rent stabilization policy should have

* a 3% fixed cap for rent increases.

* it will be effective for all rental properties in St. Paul;  no exemptions for small buildings; no exemptions for owner-occupancy; no exemptions for single-family homes; no exemptions for new construction.

* No vacancy decontrol

* a process for exceptions to the 3% increase amount created by the city

The rent stabilization policy should not allow a cap higher than 3% for rent increases.

I don't want a policy with:

A cap higher than 3%

A cap higher than Consumer Price Index

Full or partial vacancy decontrol

Pass-throughs

Exceptions when units don't meet health, safety, and building codes

Banking of preferential rent

Thank you for this opportunity.  Leslie Hanson

Hi, I'm a homeowner in St Paul and I support rent stabilization . My kids had the chance to grow up in our ward 4 neighborhood and attend the same schools with the same friends and have continued these important relationships into their adult lives. I had a predictable home mortgage and knew what my yearly housing costs would be. Whether we are black, brown or white or no matter our city ward families who choose to remain in the homes they love should not be driven out by frequent egregious rent increases. Rent Stabilization is just one tool to help keep our neighborhoods secure and thriving. We also need to create strong renter protection rights.

The rent stabilization program should:
Provide housing stability for St. Paul renters
Provide renters with predictability in their housing costs from year to year
Prevent rent gouging
Stabilize rents in currently existing housing

Rent stabilization is not a solution to the continuing decades-long housing shortage in our communities. It is meant to help current renters stay in the homes they love. Other ordinances should be passed to address housing concerns that are outside of the scope of the St. Paul rent stabilization program. The housing shortage should not be blamed on the vote for Rent stabilization, as a matter of fact it should be looked at as one of the reasons the discussion about the housing shortage is occurring and more importantly the recognition of the need to make investments in affordable housing.

A good rent stabilization policy will have:
a 3% fixed cap
no exemptions for small buildings
no exemptions for owner-occupancy
no exemptions for single-family homes
no exemptions for new construction
No vacancy decontrol
a process for exceptions created by the city

A good  rent stabilization policy WILL NOT HAVE:
A cap higher than 3%
A cap higher than CPI
Full or partial vacancy decontrol
Pass-throughs
Exceptions when units don't meet health, safety, and building codes
Banking of preferential rent

I live in Ward 5 in Saint Paul. I'm a homeowner.

I was one of the 53% of voters who voted YES for rent stabilization in Saint Paul. I live in a Ward that voted 53.6% in favor of rent stabilization which is higher than the city-wide results.

The goals of the St. Paul rent stabilization program should:
• Provide housing stability for St. Paul renters
• Provide renters with predictability in their housing costs from year to year
• Prevent rent gouging
• Stabilize rents in currently existing housing

I'm my opinion, the St. Paul rent stabilization program is NOT meant to do
seek to solve problems outside of stabilizing rent, not a housing supply solution, is not a housing stock maintenance solution.

Other ordinances should be crafted to address these issues. They existed long before rent stabilization was passed and will continue to exist unless we are intentional about addressing them.

I do NOT want a policy with:
• vacancy decontrol
• A cap higher than 3%

• A cap higher than CPI
• Full or partial vacancy decontrol
• Pass-throughs
• Exceptions when units don't meet health, safety, and building codes
• Banking of preferential rent

I want a policy that
• Has a 3% fixed cap at CPI.
• no exemptions for small buildings
• no exemptions for owner-occupancy
• no exemptions for single-family homes
• no exemptions for new construction. If   there will be an exemption it should be within a shorter timeframe (less than 10 years rather than 15)
• a process for exceptions created by the city

Hello, St. Paul Rent Stabilization Task Force members.  I'm a St. Paul homeowner living in Ward 3 and I was one of the 53% of voters who voted yes for rent stabilization in Saint Paul.

I have teenage children who will be renters soon, so it is very important to me and my family that rent stabilization is in place to protect them from rent spikes and provide them predictable housing costs.

Rent stabilization should do this - protect renters from price gouging and destabilizing increases in housing costs.

Rent stabilization should not seek to solve housing supply or maintenance issues.  Those issues should be addressed with other complementary policies, including investments in affordable housing and enforcement of building codes.

I would like to see a rent stabilization policy that includes a fixed cap on rent increases, such as 3% (certainly no higher than CPI growth), without exemptions for small buildings, owner occupancy, or single family homes.  There should not be vacancy decontrol, pass-throughs, exceptions for units that fail to meet code, or banking of preferential rent.  New construction should be exempt for no more than 5 years, which is plenty of time to establish building occupancy and begin to stabilize rents.

Thank you for your work on this important issue that affects so many of us in St. Paul.

I am a renter in Ward 1 who was very excited for rent stabilization to pass. I want a policy with a 3% fixed cap, no exemptions for small buildings, no exemptions for single-family homes, and a process for exceptions created by the city. I don't want a policy with vacancy decontrol,  a cap higher than 3% or CPI, or exceptions when units don't meet health, safety, and building codes.

I have dwelt in Ward 5 as a homeowner for two years.  Before that, I was a renter in two properties in St. Anthony Park and once in a single-family house in Highland Park.  In those three rental situations, I was very fortunate to enjoy several years of no rent increases, but that was over 30 years ago.  Times have changed for the worse for renters.

Although the majority of St. Paul City Council members found the newly-passed rent stabilization initiative a burden on themselves and city government, I want to focus on what a positive light this new law will accomplish for our city.  Minnesota became the negative focus of world consciousness when the two real-time videos of police executions of Philando Castille and George Floyd revealed our racial cruelty problems.  As a white homeowner in Ward 5, I view my work to pass the rent stabilization initiative as a necessary and positive effort to reduce racial cruelty in my city.  I am proud that 80% of Ward 5 precincts voted in favor of rent stabilization.  Many of us understand that having a stable rental home is a necessary foundation for good public health in our community, and I want St. Paul's government to ensure that this public health measure of rent stabilization stays in place for our huge renting population.  Owning my own house provides peace of mind and stability for me as a community member, and I am certain that government regulation against rate hikes above 3% per year will provide very welcome peace of mind and stability for St. Paul renters.  I am enthusiastic that rent stabilization promises to have a beneficial effect on school children's academic performance:  it will cut down on the number of children disoriented from the disruption of displacement out of their home due to unmanageable rent increases.  I do not want to return to the situation where renters remained vulnerable to steep rate hikes—keeping renters in such precarious circumstances and liable to displacement seems like a direct stimulus for more burglary theft, car and property break-ins, more mental illness, and more danger for everyone in St. Paul, be they renters, homeowners, or visitors.  I want the safety

that rent stability can provide the entire community.

I do appreciate that the Council passed two recent ordinances on April 6 which accommodate our voters' wish for a good rent stabilization policy.  Thank you for that.  And thanks for your efforts to increase affordable housing in St. Paul.  I have heard we have a painful deficit on that public health issue.  Rent stabilization is not a housing supply solution.  Instead, rent stabilization is a solution helping St. Paulites remain in their homes and avoid the problem of dwelling in a tent or car.  Rent stabilization does nothing to increase the amount of affordable housing, nor is it intended to do that.  It simply addresses a glaring need in the rental housing we presently have.

Sticking to a 3% cap on annual rent increases is the right thing to do.  I do not want a cap which is higher than the Consumer Price Index, nor one which grants full or partial vacancy decontrol.  I do not want St. Paul to make exemptions for small residential buildings, nor for single-family homes, nor for owner-occupied properties.  Enforcing these principles has the potential to immediately improve the lives of renters.  I want that to happen because I am concerned about the current level of suffering that will be alleviated by long-term predictability of rent.  I want myself and my city government on record that we care about all the people who live here, and keeping rent stabilization as a robust policy is a prime indicator of our humane intent for community well-being.  I want St. Paul to be known as a good place to live; embracing rent stabilization will do that.

Hello. I am a longtime renter in the Twin Cities (most recently the past 4 years in St. Paul). I'm a single, middle-aged woman who works a full-time job at a public library that pays me just under $18/hour. I enjoy my job but find it very difficult to make ends meet on my income; I have taken various part-time and freelance jobs in the past to help pay for major expenses and chip away at my debt, though this has been difficult during the pandemic. I live in a small one-bedroom apartment that costs $999/month plus utilities. That's over half of my take-home pay each month. If my rent goes up significantly, I will not be able to keep my apartment, plain and simple -- and I am well aware that my rent is considered "reasonable" in the current market.

Last November I voted to pass the rent stabilization initiative, and I appeal to you to honor the will of the voters -- many of whom are people like me who are responsible, hard-working renters who don't have high-paying jobs or other financial support. Please keep the 3% fixed cap passed by voters, without exemptions for small buildings or single-family homes. For other exemptions, please direct the city to create a process that takes health, safety, and building codes into consideration. The rent stabilization initiative can exist alongside additional plans to increase investment in new and affordable housing! The two don't have to be mutually exclusive.

Thank you for your time and consideration.

I live with my parents who are homeowners in Ward 4. As someone who has rented before, I know that the cost of rent is very high and that it continues to increase. In fact, one reason I live at home is that renting on my own is expensive and as a young person starting out her career, I'd like to save money. I believe that no matter the color of our skin or how much money we have in our pockets, we all deserve to feel stability, live in affordable homes, and stay in a community of choice for however long we want. For this reason, I was excited to vote yes for rent stabilization in November and am proud that Ward 4 voters voted 57% in favor of rent stabilization- higher than the city-wide results.

Now that the rent stabilization ballot question has well since been voted on, we need a strong rent stabilization policy set in St. Paul. A rent stabilization policy should provide housing stability for St. Paul renters, provide renters with predictability in their housing costs from year to year, prevent rent gouging, and stabilize rents in currently existing housing. St. Paul's rent stabilization program is not meant to solve problems outside of stabilizing rent. To be clear, rent stabilization is NOT a housing supply solution nor is it a housing stock maintenance solution. Although they are important issues, there must be other ordinances created to solve them. Those issues existed before rent stabilization passed in St. Paul and will continue to exist unless we address them as separate issues and build more deeply affordable housing. If developers and investors are halting developments, they are doing so prematurely as a fear tactic, not as a consequence of rent stabilization, as the policy has not even been implemented.

In my opinion, a good rent stabilization policy creates a fixed cap at a maximum of 3%, with no exemptions for small buildings, no exemptions for single-family homes, no exemptions for new construction, no vacancy decontrol, and a process for exceptions created by the city.

I do not want a rent stabilization policy with a  cap of more than 3%, a cap of more than Consumer Price Index (CPI), full or

partial vacancy decontrol, pass-throughs, exceptions when units don't meet health, safety, and building codes, or banking of preferential rent.

St. Paul was clear in what we voted for last fall; we want a strong rent stabilization policy that will keep people in the homes and neighborhoods we want to live in. We need a policy that respects the value that everyone, no matter what we look like or where we come from, deserves a stable and affordable home.

I used to work security at the MIA for five years and was union steward during that time and negotiated our contract during that time. I'm well familiar with how quickly inflation rises, and I'm equally familiar with how stagnant wages have been. People have been squeezed harder and harder every year for decades, with corporations announcing record breaking profits all the time, but wages not budging an inch. And that was before Covid. We need Rent Stabilization to be implemented as intended without any new exceptions. We need to respect what St. Paul voted for.

I live and rent in ward 2. I have lived here in St Paul since 2018.

I was active with Isaiah in the fall, putting many, many hours into phone banking to inform voters and pass the rent stabilization measure by 53% in the city. I was so happy that this measure passed because it seems more and more the will of the people is being dismissed by politicians in office. (e.g. gun control, abortion, etc.)

I am a Marriage and Family Therapist. I say that to note that I am somewhat of a barometer of the state of humans in this area. I hear what the stressors are and the impact those stressors have on mental health and well-being. The field of Marriage and Family Therapy focuses on how systems impact individuals and families and communities. Hence, one thing that struck me in listening to the community hearing on April 12th was how the renters and the owners are pitted against each other to get their rights met. For renters the right to affordable housing and owners, the right to earn a profit. What was not being talked about was the failure of the larger systems at play that have not addressed or resolved the decades long housing shortage. Systems such as our political system that supports systemic racism, capitalism, white supremacy, etc.

I have watched a hearing at the federal level that discussed the issue of rising rental costs as a nationwide issue. And watched a 60 minutes segment on this issue as well. The problem is massive and our 3% limit increase in St Paul is a very tiny drop in the bucket to shift the tide. But it would be so critical to be a community that actually assisted that shift. I realize it will be a long haul for the nation but I am sure the economic impact on families if this is not curbed will be devastating. At the community hearing an owner put forth the fear that we would have slums within 10 years. He seemed to not consider what will happen to individuals and families if rents continue to rise and more wealth is extracted from our communities. I don't know what the impact will be but I expect they would be equally as dire.

The St. Paul rent stabilization program should provide housing stability for St. Paul renters, with predictable housing costs from year to year. And firmly prevent price gouging of renters. Rents must be stabilized in currently existing housing.

St. Paul rent stabilization program is NOT meant to solve problems outside of stabilizing rent. This is NOT intended to be a housing supply solution or a housing stock maintenance solution

To be clear that rent stabilization is not meant to solve supply or maintenance problems. Other ordinances should be crafted to address those issues. Most importantly, rent stabilization does not create supply or maintenance issues - those existed long before rent stabilization was passed and will continue to exist unless we are intentional about addressing them.

As a city we should think about passing ordinances/policy solutions in the future that increase investments in creating more affordable housing supply and ensure that rental housing is maintained to meet health, safety and building codes

A good rent stabilization policy must include a 3% fixed cap, no exemptions for small buildings, no exemptions for owner-occupancy, no exemptions for single-family homes,no exemptions for new construction, a process for exceptions created by the city

I strongly do NOT want in a rent stabilization policy that contains vacancy decontrol, a cap higher than 3%, a cap higher than CPI, full or partial vacancy decontrol, any pass-throughs, or exceptions when units don't meet health, safety, and building codes and no banking of preferential rent.

Thank you for your consideration,
Ward 2

Dear Stakeholder Task Force:

As the former Met Council chair and current leader with the North Central States Regional Council of Carpenters, I want to thank you for your work in trying to grapple with challenging policy questions around a tough issue.

Our organization believes the best way to solve the affordable housing policy is by increasing the supply. We need to build thousands of units of housing in Saint Paul and the region to keep the costs down. We strongly favor the new construction exemption and believe that the Task Force ought to explore every way to signal to investors and stakeholders that we want to build while we work on a rent stabilization ordinance that serves renters. Striking that balance and being clear about it has been the biggest stumbling block the city has struggled with to date.

Thank you again for your work and we hope you get the policy right. Renters, workers, businesses and the future growth of the city depends on it.

Thank you,

I am a homeowner in Ward 4 of St. Paul. I feel very strongly that the Rent Stabilization ballot initiative should be implemented as is, WITHOUT a 15-year exemption for new construction.

I am not an expert so sometimes I look to people with more experience and expertise for guidance. PLEASE READ the following excerpt from an op-ed in MinnPost written by Tim Walsh because it is very enlightening and informative on this issue! Mr. Walsh is a commercial real estate finance lawyer from St. Paul.

"I've spent the past 30-plus years as a commercial real estate finance lawyer.  I've managed the real estate function for large company portfolios, which included construction, development, leasing, financing, purchases and sales. Certain developers are now fanning the flames of fear and blaming St. Paul voters in an attempt to hold our city hostage.

Those well-versed in housing finance know that when a developer explores financing options, a pro-forma is created that projects costs and income over a 10 or 20 year period. It is rare that these pro-formas include rent increases greater than 3 percent. A developer who stays within historic market margins — such as 3 percent — signals more certainty and will attract more capital.

Few policies outperform rent stabilization when it comes to increasing neighborhood stability. A few developers have threatened to pack up their toys and leave the sandbox. Only, their math doesn't check out."

Hi, I live in St. Paul (SD 64B, Ward) . I am a leader with ISAIAH and I watched, along with nearly 100 ISAIAH leaders, the public hearing on April 12. I was one of the 53% of voters who voted YES for rent stabilization in Saint Paul.

I am a retired St. Paul Public School special education teacher. I worked on the East Side where nearly all of our families were renters. And it is through this work that I witnessed the impact that housing instability had upon my students and their families.

The disruption to their lives is incalculable. Whether made homeless or needing to move, children miss days from school, which means they may miss meals, they may be unable to take medication that is administered by the school nurse and if receiving special education services such as occupational therapy, speech therapy or social work services, they miss these too.

The anxiety, and even sometimes shame, of losing their homes or having a fear of losing their homes, due to unexpected hikes in rent was not just experienced by the parents, but also acutely felt by their children. Results of this emotional distress were often difficulty focusing, displaced anger or a general sense of unhappiness.

My children were  able to go to their neighborhood school and build lifelong friends on our block. They were able to have a consistent education and a sense of belonging. Housing stability has provided me the opportunity to build wealth, something Black and brown community members in St. Paul have historically been denied.

Whether you are a renter or homeowner in Saint Paul, our housing crisis is a serious threat to the kind of multi racial

democracy and caring economy all of St Paul desires.

Protect this policy and  stick with a 3% rent increase limit to provide stability of residence and affordable housing for St. Paul renters. Protect this policy in order to provide renters with predictability in their housing costs from year to year as I have had as a homeowner.

Rent stabilization is necessary so renters can plan and know what to expect year to year in their housing costs.  Renters should not have to depend on the chance of having a benevolent landlord who does not raise rent erratically or drastically. Landlords already acting in a responsible way will be able to adjust, those that gouge will not be able to any longer. Exceptions here and exceptions there will erode the spirit and purpose of the rent stabilization the citizens of St Paul voted for.  Anecdotally, I know of at least 4 long term neighbors who rent who have had to leave my neighborhood because of rent increases. Property owners have increased rent resulting in fewer long term neighbors just on my block.  These properties now have new student renters every year as it seems only groups of students can afford the rent now.  I want the stability that long term neighbors who rent contribute to my neighborhood.

As a coalition of community-based organizations and advocacy groups in the Twin Cities region dedicated to racial equity and sustainability in growth and development, the Alliance has long worked with city leaders and local organizations to advance shared goals around housing policy in St. Paul. The passage of the rent stabilization policy in November was a significant step for housing justice and stability, not just for the city of St. Paul, but a model for the region in its strength, scope and flexibility. That is why we strongly urge the city to honor the expertise of renters, the will of voters and the specific intent of this particular policy intervention: renter stability.

It is imperative that the city acknowledge that rent stabilization is NOT a housing supply solution or a housing stock maintenance solution. Those are both important issues that need to be dealt with through DIFFERENT complementary ordinances.  Therefore, the St. Paul rent stabilization program should not seek to solve problems outside of stabilizing rent.

Rent stabilization policies are designed and proven to work to stabilize rents in currently existing housing. Saint Paul's program therefore, by definition, must be focused solely on providing housing stability for St. Paul renters by preventing rent gouging and creating predictability in their housing costs from year to year for tens of thousands of St. Paul renter households.

In November more than 30,000 voters approved a detailed and specific policy carefully crafted by renters, researchers and housing experts to avoid the pitfalls of rent stabilization policies in other localities, including close loopholes that undermine the intended protections for renters, and meet the specific needs of St. Paul.

We strongly recommend the city maintain and move forward with a policy that creates a 3% fixed cap on rent annual increases with vacancy control to prevent landlords from evicting current tenants in order to raise the rent between tenure. We strongly oppose any rent cap higher than 3% or even partial vacancy decontrol. This policy must also allow for a process for exemptions created by the city but NOT include blanket exemptions for small buildings, owner-occupancy, single-family homes or new construction. We also strongly oppose any pass-throughs, exceptions when units don't meet health, safety, and building codes or banking of preferential rent.

As an organization with deep and broad policy expertise, we know that St. Paul needs additional and separate policies to increase investments in creating more affordable housing supply and ensure that rental housing is maintained to meet health, safety and building codes. These are also critical and urgent needs but NOT issues that are addressed or compromised by rent stabilization.

Finally, we want to uplift the impact of a strong rent stabilization ordinance on low-wealth disabled renters, who are disproportionately represented among Black, Indigenous, and other nonwhite communities, as well as seniors. Many disabled and senior renters live in newer buildings that, due to ADA law, have built-in accessibility features that allow these tenants to experience dignity and independence in their homes. Additionally, as the State of Minnesota prioritizes supporting disabled residents to acquire and maintain housing independently in the community, the need for affordable, accessible housing grows. Unfortunately, the higher rental cost of newer housing, even in so-called "affordable" properties, represents a cost-burden to many disabled and senior renters living on fixed incomes, as their options for accessible units remain limited. A strong rent stabilization ordinance protects renters who are already stretching limited incomes to remain in homes that meet daily accessibility needs. It is vital that we consider the disparate impact that changes to the current ordinance will have on all members of our majority renter community.

Hello. I live in Ward 4 in St. Paul and am a leader with ISAIAH. I understand that the issue of housing is very complex with a lot of moving and interacting parts. I also believe that landlords and property developers should be able to get a reasonable return on their investments. Additionally, I realize that rent stabilization, in the manner that was approved by Saint Paul voters in November, will not on it's own solve the affordable housing crisis. More will need to be done. But what it will do is move us a step forward in addressing this issue, and do it in a way that does not require those least able to bear the financial burden to do just that.  Cities and states have used that strategy over and over again in the past and right now Saint Paul is saying, "No more.". Let's address this problem in ways that will also allow renters in Saint Paul to have stability in their home situation. Something EVERY one of us deserves to have. Thanks for your time.

I am a long-time Saint Paul homeowner. I have experienced being both a renter and a landlord and I am excited that the rent stabilization policy was passed by voters in Saint Paul last November. I attended the April 12 public meeting on Rent Stabilization facilitated by CURA.

Saint Paul's new rent stabilization policy should provide housing stability for renters in Saint Paul, provide renters with predicable housing costs year to year and prevent rent gouging.

I support a policy with no exemptions for new construction but if there must be an exemption it should only be in force for the first three years of occupancy. Three years is plenty of time for a new building's owner to adjust rents to find the market.

I support there being exceptions to the 3% cap on rent increases with those exceptions being defined, managed and granted by the city – not self-policed by landlords.

As a city we should consider passing the following ordinances/policy solutions in the future:
• increase investments in creating more affordable housing supply
• ensure that rental housing is maintained to meet health, safety and building codes

I see housing as a basic and something to which all are entitled. Providing stable housing is one more tool in building a healthier community.

Thank you,
Saint Paul, Ward 3

I'm a homeowner in Ward 3.   I voted yes for rent stabilization along with 53% of St Paul voters last fall.  Housing is a very complex issue requiring attention and public policy from many angles.  This policy is intended to address one of those angles: provide stable and predictable housing cost for renters, year over year, through rent stabilization. This allows renters of existing housing to budget for their housing allowance and prevent rent gouging on those units.

Other angles of housing need to be addressed with other initiatives and policies, such as addressing housing stock maintenance issues and market, affordable and deeply affordable housing supply issues.  Those are critical issues to attend to, but best addressed on their own.  I highly favor investments in affordable housing.

I want a rent stabilization policy with:
a 3% fixed cap
no exemptions for small buildings
no exemptions for owner-occupancy
no exemptions for single-family homes
no exemptions for new construction
a process for exceptions created by the city

I do not want a policy with:
A cap higher than 3%
A cap higher than CPI
Full or partial vacancy decontrol
Pass-throughs
Exceptions when units don't meet health, safety, and building codes
Banking of preferential rent

My values and faith lead me to supporting this policy. There is enough to go around, we are surrounded by great wealth.  We need to step away from a scarcity mentality and holding tightly to what is "ours" and look at the greater good of the community.  When we do, we can see more clearly the needs of all people.  When we create a stable environment for the renters in our community we take a step in having more overall stability to our community.  We do this for ourselves and for each other.

I want this ordinance to limit rent increases to 3% that includes utilities. This year my landlord increased rent 3% and will now charge for utilities for a total 7.5% increase. The rent cap needs to include previously included amenities like utilities, laundry, parking, general maintenance, etc. This will provide St. Paul renters with housing stability and predicable rental costs year to year.

I am a leader with ISAIAH, and I live in Ward 4 in Saint Paul. I am a public health professional working for the State of Minnesota in the health equities division. I can say unequivocally that having a stable home is a significant health determinant. If a person is living month-to-month, not knowing whether they will be able to afford their next month's rent or having to move multiple times, their ability to focus on seeking stability in terms of healthy living patterns, healthy food patterns, developing connections and success in schools, developing a relationship with a doctor or healthcare system all get bumped down the list of priorities. In Saint Paul we are saying that this is not OK. Rent stabilization, although it will not be the "magic pill" to solve all affordable housing problems, is one way we can begin to address this community need. And with over 50% of renters being people of color this is also an equity issue! It's time to follow the voters' lead in Saint Paul! Thanks for your time.

I'm a homeowner in Ward 4 in Saint Paul.  I was one of the 53% of voters who voted YES for rent stabilization in Saint Paul. My ward voted 57% in favor of rent stabilization which is higher than the city-wide results.

The St. Paul rent stabilization program should:
Provide housing stability for St. Paul renters
Provide renters with predictability in their housing costs from year to year
Prevent rent gouging
Stabilize rents in currently existing housing
The St. Paul rent stabilization program should not:
It should not seek to solve problems outside of stabilizing rent.
It is NOT a housing supply solution
It is NOT a housing stock maintenance solution

 Complementary ordinances should be passed to address housing concerns that are outside of the scope of the St. Paul rent stabilization program. Rent stabilization is not meant to solve supply or maintenance problems. Other ordinances should be crafted to address those issues. Most importantly, rent stabilization does not create supply or maintenance issues - those existed long before rent stabilization was passed and will continue to exist unless we are intentional about addressing them.

As a city we should think about passing the following ordinances/policy solutions in the future
Increase investments in creating more affordable housing supply
Ensure that rental housing is maintained to meet health, safety and building codes

I want these features in a rent control policy:
a 3% fixed cap
no exemptions for small buildings
no exemptions for owner-occupancy
no exemptions for single-family homes
no exemptions for new construction (OR share what restrictions you would put on new construction if this were an amendment passed by the city council)
a process for exceptions created by the city
I do NOT want these things included in a rent stabilization policy:
A cap higher than 3%
A cap higher than CPI
Full or partial vacancy decontrol
Pass-throughs

283

Exceptions when units don't meet health, safety, and building codes
Banking of preferential rent

---

Dear Stakeholder Group:

Do we think that everyone, no matter their race or income, deserves an affordable, safe and stable home, or do we think renters should be at the mercy of landlords and live in fear? Voters in St. Paul saw the Rent Stabilization ordinance as a legitimate part of addressing the affordable housing crisis because it changes the power dynamic. It will stop corporate and predatory landlords from displacing our neighbors with unreasonable rent increases.

We have never done enough to get affordable housing built but with over 50% of St. Paul that are renters we are starting to look at the problem more concretely. It's fine to say the solution is building more housing, but affordable housing is being built at a snail's pace. We need to implement rent stabilization now and continue to lobby for subsidies that attract builders of affordable housing. Affordable housing has almost always needed public money to get built and that won't change.

Our elected leaders need to use your power to protect people and implement the policy that the majority voted for, in the spirit of what was passed. People know that change is needed and knew what they were voting for – justice.

Landlords want us to take inflation into account, but what about the renters that are affected by it, often more than landlords? Landlords have many stable and relatively stable expenses. Mortgage payments are stable. Insurance is relatively stable and energy costs are not outside of a landlord's control if improvements are made in a building to address energy use. Exceptions on individual cases can be made.

Having more stable housing helps everyone in St. Paul because it means children are getting a better education, people are healthier physically and mentally, neighborhoods are stronger and more people will want to live here.

It is important to have caps on rent for new construction because everyone deserves to have predictability with their rent and it will slow down gentrification which can destroy whole neighborhoods and put people in the street. And not having a cap on new affordable housing will soon make it unaffordable.

Developers want to make large profits from the housing they build, but they have to follow safety and quality regulations. There are limits. A cap on rents won't prevent a reasonable profit as developers can set the rent at a level they chose at the beginning. How can we know if builders will keep coming to St. Paul with rent stabilization unless we implement the ordinance as voted for?

Changing the ordinance could make it useless. Changes that could destroy the effectiveness of the ordinance are:

• Allowing rents to increase with a new tenant.
• Allowing rents to increase at the rate of inflation. (It's a false comparison as all costs don't rise as much as inflation.)
• Differentiating between large and small landlords. (Any landlord can be exploitative.)
• Differentiating by the age of a building makes no sense to me.
• Giving landlords several years before implementation isn't needed as most landlords haven't been giving tenants more than a 3% increase for 20 years

St. Paul, MN 55106

---

How does the city incentive further investment in housing? What can be learned from studying the success and failures of other rent control policies? I think its a fair assessment that this ordinance, as written, had caused harm to the housing stock in St. Paul, and will continue to have an adverse effect on housing availability, and affordability.

---

I am a Ward 2 homeowner St. Paul.  I, along with 55.1% of residents in Ward 2, supported rent stabilization. St. Paul rent stabilization should provide housing stability and predictability. It should prevent price gouging and stabilize rents. I strongly encourage you to support the rent stabilization policies which the majority of St. Paul voters supported!

---

I am a condo owner who lives in Ward 2 in St. Paul. I was excited to be one of the voters who voted 55.1 % in favor of rent stabilization, which is higher than the city-wide results. The rent stabilization program should provide housing stability for St.

Paul renters and provide them with predictability in their housing costs from year to year. It should prevent rent gouging and stabilize rents in currently existing housing. The rent stabilization program is not meant as a housing supply solution or a housing stock maintenance solution. It should not seek to solve problems outside of stabilizing rent. Most importantly, rent stabilization does not create supply or maintenance issues--those existed long before rent stabilization was passed and will continue to exist until we are intentional about addressing them. Other complementary ordinances should be passed in the future to address housing concerns that are outside of the scope of the St. Paul rent stabilizing program. As a city we should create policy solutions to increase investments in creating more affordable housing supply and to ensure that rental housing is maintained to meet health, safety and building codes. I would like a rent stabilizing policy with a 3% fixed cap and no exemptions for small buildings, owner occupancy, and single-family homes. I would like to see a process for exceptions created by the city. I don't want a policy with a cap higher than 3% or CPI or exceptions when units don't meet health, safety and building codes.
I believe that this ordinance will avoid exploitation of renters while ensuring a reasonable return on investment for landlords.

SUMMARY OF PUBLIC COMMENTS TO ST. PAUL RENT STABILIZATION STAKEHOLDERS GROUP

- The open meeting occurred Tuesday evening, April 12.
- The portal for providing written comments was open from Tuesday April 5 through Friday, April 15.
- 37 people spoke at the open meeting.
- 96 people provided written comments.
- 6 people provided both written and oral comments. In three of those cases, there was no overlap in the content of the comments as they related to the program design options being considered by the Stakeholders Group.  The other 3 repeated their positions. These repeats constitute 2% of all the input the Stakeholder Group received and thus does not constitute a significant influence over the distribution of input received.


A.      References to the November vote and the existing ordinance.

- 37 people specifically stated that they wanted to see the existing ordinance, the program voted in by St. Paul voters last November, to remain in place.  While some of these people went on to make specific comments about elements of the program, we took the overall comment to reflect the following positions:
    - o   support for a flat 3% rent cap
    - o   opposition to exemptions for small buildings, single-family homes, and owner-occupied buildings
    - o   opposition to vacancy decontrol
    - o   opposition to an exemption for new construction
    - o   support for a "fair and reasonable return" process.

- In the summaries that follow, we will report the number (and percentages) of people who expressed an explicit position on any policy design option.  We will then add those who were silent on the issue but who expressed support for the existing program.  Thus, on those items that reflect a design option specifically reflected in the current ordinance, we will report two sets of figures. Those who spoke directly to the issue, and then we will add to those, the number of commenters whose position on the issue is revealed by their support of the existing ordinance.
    - o   For example, in table 1 below, we see that 62 people made specific comments about the rent cap, and 53 of those comments supported the existing 3% cap.  An additional 22 people, who said nothing specific about the rent cap, expressed their support for the existing ordinance – which has a 3% cap.  Those 22 people are accounted for in the final two columns of the table.

B.    RENT CAP

- 62 people made specific comments about the rent cap.  Table 1 shows the distribution of answers.

| Table 1: Position on rent cap | n | Pct. | Including blanket support for ordinance | Pct. |
|---|---|---|---|---|
| Support the 3% cap | 53 | 85 | 75 | 89 |
| "not 3%" | 3 | 5 | 3 | 4 |
| Set it at the CPI | 1 | 2 | 1 | 1 |
| CPI + 3 to 5% | 1 | 2 | 1 | 1 |
| CPI + 5% | 1 | 2 | 1 | 1 |
| CPI + 7% | 1 | 2 | 1 | 1 |
| CPI + 10% | 1 | 2 | 1 | 1 |
| "tie it to inflation" | 1 | 2 | 1 | 1 |
| TOTAL | 62 | | 84 | |

C.    VACANCY CONTROL/DECONTROL

- 44 people made specific comments on the issue of vacancy control/decontrol.

| Table 2: Position on vacancy control | n | Pct. | Incl. blanket support for ordinance | Pct. |
|---|---|---|---|---|
| Support vacancy control | 32 | 73 | 63 | 84 |
| Support vacancy decontrol | 11 | 25 | 11 | 15 |
| Support decontrol for subsidized units | 1 | 2 | 1 | 1 |
| TOTAL | 44 | | 75 | |

D.    EXEMPTIONS

- 62 people made specific comments on exemptions of one type or another.
  - o  38 people spoke against a new construction exemption (64 people when we count those who expressed support for the original ordinance)
  - o  10 people spoke in favor of a new construction exemption
- 6 comments were made about what the nature of a new construction exemption should be. All of the 6 were in favor of a rolling exemption for new construction. Table 3 shows the details.

| Table 3: Type of new construction exemption | n |
|---|---|
| 3-year exemption | 1 |
| 5-year exemption | 1 |
| 12 years | 1 |
| 12 to 15 years | 1 |
| 20 years | 1 |
| 25 to 30 years | 1 |

- Table 4 presents information on other exemptions.

| Table 4: Position on other housing stock exemptions | n | Pct. | Incl. blanket support for ordinance | Pct. |
|---|---|---|---|---|
| Support a small building exemption | 2 | 6 | 2 | 3 |
| Oppose a small building exemption | 33 | 94 | 62 | 97 |
| | | | | |
| Support a single-family home exemption | 2 | 7 | 2 | 3 |
| Oppose a single-family home exemption | 33 | 94 | 60 | 97 |
| | | | | |
| Support an owner-occupant exemption | 0 | 0 | 0 | 0 |
| Oppose an owner-occupant exemption | 30 | 100 | 60 | 100 |

E.     BANKING

- 15 people made specific comments about banking preferential rents.  One of the 15 (7%) was in favor of banking and 14 (93%) were opposed to it.

F.     FAIR RETURN

- 35 people made comments about a process of fair return.  Seven (7) people made comments about how that process should work.  Tables 5 and 6 present the summary information.

| Table 5: Position on "fair return" exceptions | n | Pct. | Incl. blanket support for ordinance | Pct. |
|---|---|---|---|---|
| Support a process to ensure fair return | 33 | 94 | 63 | 97 |
| Oppose a process to ensure fair return | 2 | 7 | 2 | 3 |
| TOTAL | 35 | | 65 | |

| Table 6: Fair return details | n |
|---|---|
| Should be based on maintenance of net operating income (NOI) | 2 |
| Should be 'a very high bar' for such exceptions | 1 |
| Should be 'limited' | 1 |
| Should be only to bring a building up to code | 1 |
| Make it simple | 1 |
| Make it clear and non-subjective | 1 |

288

G.      RENT BOARD

- Only two comments were received regarding rent boards.  Both comments were in favor of creating such a board in St. Paul.

H.      OTHER

- A number of additional comments were made that have relevance for the design of the St. Paul rent stabilization program, but that, for one reason or another, did not fit into the categories laid out above.  Table 7 provides the summary of these comments.

| Table 7: "Other" comments | n | Pct. |
|---|---|---|
| New construction and maintenance should be addressed separately | 23 | 34.8% |
| No exception for properties that don't meet building/health codes | 18 | 27.3% |
| No blanket exceptions/exemptions | 4 | 6.1% |
| Exemption for rehab, too - (NC exemption unfair) | 3 | 4.5% |
| As many exceptions/exemptions as possible | 2 | 3.0% |
| Make no distinction between large and small landlords | 2 | 3.0% |
| Simplify and streamline processes | 2 | 3.0% |
| Create a robust public education component | 1 | 1.5% |
| Ample staffing/funding/rent registry fees | 1 | 1.5% |
| Mandate notice to tenants for above-cap raises | 1 | 1.5% |
| Limited exceptions/exemptions | 1 | 1.5% |
| NC exemption should not include affordable subsidized housing | 1 | 1.5% |
| For NC exemption: require IZ[*] or acceptance of Sec 8 or affordable housing contribution | 1 | 1.5% |
| Subsidized units should be exempt | 1 | 1.5% |
| Exemption for naturally occurring affordable housing (NOAH) | 1 | 1.5% |
| Incentivize maintenance | 1 | 1.5% |
| Wait 5 or 10 years before modifying what voters approved | 1 | 1.5% |
| 3-year leases to provide tenant and landlord stability | 1 | 1.5% |
| City could set reasonable increases (rent caps) based on area, size of unit, etc. | 1 | 1.5% |
| TOTAL | 66 | |

* IZ = inclusionary zoning requirement for affordable housing

## Summary of small group processes
May 17 – May 31

**Group 1 Summary**
**Facilitators:** Tony Damiano and Ned Moore

**Participants:**

| | |
|---|---|
| Katherine Banbury | Kevin Pranis |
| Clinton Blaiser | Tony Sanneh |
| Thomas Godfrey | Katheryn Schneider |
| Chue Kue | Marcus Troy |
| Nene Matey-Keke | |

**Discussion Process:**
Discussion process began on May 17 with conversations around the two question prompts: 1) What does the ordinance do well? And 2) What does the ordinance not do well?  Each person was given an opportunity to speak on each question before allowing someone to speak again. Renters in the group liked the ordinance and thought its simplicity as well as its universality made it a strong ordinance that increased housing stability for tenants. Industry representatives, in general, were categorically opposed to rent control. Their concerns centered on the lack of vacancy decontrol and how "reasonable rate of return" would be defined. They expressed concerns that the ordinance would disincentivize the maintenance of existing housing and prevent new housing construction from taking place.

Conversations during the following meeting on May 24 focused mainly on the idea of "banking" rent increases. Tenants supported banking as a compromise on vacancy decontrol, industry representatives did not see banking as sufficient especially for units that were currently renting below market rate. Landlords worried that they could not raise rents to market rate. There were discussions about having a subsection of the group meet to work on a compromise proposal for the group to take up. Vacancy (de)control was the largest sticking point.

The last small group discussion meeting on May 31 began with three different subgroups submitting plans to be voted on by the small group as a whole.  One proposition was submitted by a group of three tenants and one landlord. Another was submitted by a labor representative and the last was submitted by a small landlord. Participants spent most of the time during the meeting debating each of the plans before voting. Among the participants in attendance (7) the vote was 4 votes for the tenant plan and 3 votes for the small landlord plan. The co-chairs decided to keep the vote open until the end of the week to allow non-present members to vote. Two of the three missing attendees voted for the small landlord plan via email and that was the plan presented to the group as a whole in the final meeting.

Other discussions of note:

The group discussed several unique ideas including the following:
- Anti-wage theft provisions for construction workers

- Free education programs including workshops for landlords focusing on compliance and understanding reasonable rate of return.
- Exclusion of Low-Income Housing Tax Credit (LIHTC) housing from a new construction exemption. The reasoning being that LIHTC housing, while containing some income restrictions landlords can, in some cases, raise rents by significant amounts (over 10% per year) and still be in compliance with federal rules.

**Group 2 Small Group Summary**
**Facilitators**: Trupti Storlie and Malik Holt-Shabazz

**Participants**:

| | |
|---|---|
| Jay Benanav | Kelly Elkin |
| Scott Cordes | Tou Fang |
| Philip Cryan | Jessica Fowler |
| Malik Davis | Rawnson Ivanoff |
| Khayree Duckett | Brian Rosas |

**Discussion Process:**
The discussion process began on May 17 and continued on May 24 with conversations around the two question prompts.  Each group member was instructed that they could speak in the Zoom Room or put their answers and/or comments to the questions in the Zoom chatroom. Participants were also called on by the group facilitators to check in to see if they wanted to provide any feedback if they did not initially speak to ensure they had a chance to comment and to check on if they were having any technical Zoom issues.  Once all participants had a chance to provide feedback, then participants were allowed to speak again and ask each other questions on any given points.  Group 2 participants were reminded of overall Group Ground Rules through small group deliberations.  The group agreed on the 3% rent cap and there was a discussion theme of co-creating an ordinance that focused on housing instability challenges of being a renter and property management problems after the COVID pandemic. Further discussion from the group was:

<u>Things that the ordinance does well:</u>
- The enforcement is light touch and the private tenant is clear on their rights and can take action.
- Makes things fair for current renters
- Protects people who need help and support
- Clarity with a 3% cap
- Easy for renters to understand their rights, If they get notice for something bigger, they should be a rationale and it's trigger for them to take action to protect themselves/ask for more information
- Easy for property owners to plan their investments
- When purchasing property, does the property price make sense? Given this constraint on the increases?
- Can they buy it and still charge enough rent for operating costs (including income for small business owners) and building reserves for capital improvements/maintenance.

- Does the cap drive down property values in St. Paul so that cash flows make sense at lower rent and increase affordability in the city?
- Should rent stabilization cap be tied to inflation due to cost increases?
- Expenses impacted by CPI are only part of the rent, majority are not - Jay
- Enables new construction to set rent at any rate needed for cash flow; not rent control.
- Brings us all together
- *May* hold landlord accountable
- Vacancy control

**Things that the ordinance does not do well:**
- Vacancy control - seems like a blunt tool; just cause protections might be a better fit
  - Why were the tenant protections laws struck down?
  - Just cause is better than an affidavit process because of the pressures on tenants by landlords.
- Enforcement is through the Department of Safety and Inspections
  - Rent board would offer more tenant protection
  - What was the rationale for this decision?
  - How efficient would this process be for both tenants and landlords?
- Reasonable Rate of Return
  - Whose job is it to define what a reasonable rate of return standard is?  Does the group feel like it is the governing body?  In the case of St. Paul, it would be the Department of Safety & Inspections?
  - While the current ordinance allows for a reasonable rate of return, there is not clarity regarding the definition and standards for reasonable rate of return?  Depending on the definition, could the ordinance work well?
  - The definition of reasonable rate of return and the due diligence necessary to support any cases for this exception might be an administrative burden on smaller rental businesses.
- Policy may not be fair to prospective renters: Supply considerations
  - The ordinance without the new construction exemption does not address supply concerns.
  - The new construction exemption is not clearly defined.
  - The number of permits had dropped since the ordinance has been in serious discussion and then voted upon.
    - Is this because the ordinance is bad or because the ordinance is in flux and may have changes?
    - Phillip expressed some thoughts that this was a temporary drop due to uncertainty
    - Kelly expressed concern that investors and developers are choosing other cities for projects because of the ordinance.
    - Does this decreased competition make it more likely to build at more affordable rates in St. Paul? Competition between cities
- Additional aspects of the ordinance need to be clarified: tenant notification, rate of return, administration and adjudication processes.

The May 31 group meeting started with recap of our previous meeting notes and points of agreement by the facilitator and then the group were asked to provide feedback on the CURA proposal form that allowed for information in seven areas: rent cap, vacancy control/decontrol, other rent cap exceptions, terms of a new construction exemption, other housing stock exemptions, implementation and public information strategies, and "other."  Each participant gave their feedback on the form's seven areas. Group participants agreed with the 3% rent cap from our previous Small Group deliberation meetings.  The major areas of compromise were the length of time of the new construction exemption and vacancy decontrol.  The new construction exemption discussion was only started by the participants after the introduction of a mandatory relocation assistance program requirement was attached to the exemption. Participants agreed on additional areas including Just Cause protection for renters, rental registry, exempting buildings that receive rental subsidies.  The group adjourned at 3pm and agreed to move the process into group facilitators and a few group members developing "Packages" to digitally vote through SurveyMonkey by Friday, June 3 at 5:00pm.  All participants voted except one.  Participants were allowed to vote for multiple packages.

**Group 3 summary**
**Facilitator**: Edward Goetz

**Participants**:

| | |
|---|---|
| Tony Barranco | Robbie Grossman |
| Cecile Bedor | Mya Honeywell |
| Monica Bravo | Abdiaziz Ibrahim |
| Carolyn Brown | Thomas Nelson |
| Arline Datu | Clara Ware |

**Discussion Process:**
When the small group process began on May 17, each member of the small group was given a chance to respond to the two discussion prompts: "What does the current ordinance do well?" and "What does the current ordinance not do well?" There were significant differences of opinion among small group members on this. Some members felt that the problem with the ordinance was its mere existence, that it has had a chilling effect on investment and has driven away much needed housing development. Other members of the group thought that the ordinance did a good job of producing renter stability and these members spoke in favor of preserving the existing ordinance. These are, essentially, the two polar positions that surfaced repeatedly during the stakeholder group processes; on the one side a position that the very existence of rent stabilization was wrong and on the other side a strong defense of the existing ordinance and a concern that it not be altered. The first session of small group talks ended with the talk revolving around these polar positions.

The second day of small group discussion began with Tony Barranco presenting a package for consideration by the group. His package called for a rent cap set at the CPI plus 2%, or a 3% cap, whichever was higher, a 30-year new construction exemption, direct and automatic pass-through of utilities and property tax increases, full vacancy decontrol, a provision for banking of preferential rents, a reasonable rate of return provision for capital improvements, exemption

293

for owner-occupied duplexes, units with care or services provided on site, and units controlled by a "land use regulatory agreement" (the vehicle through which the affordability requirements of subsidized housing are  implemented), implementation by City of Saint Paul staff in DSI, and a self-certified reasonable return process.  The Barranco package also called for just cause eviction protections as a way of alleviating concerns over evictions that might be incentivized by vacancy decontrol. The entire small group session was taken up in discussion of these provisions.  At the end of the session a quick straw poll showed that this package was strongly support by five members of the small group and strongly opposed by four (one member did not vote). More importantly, there was no "crossover" support for the package, all of the five supporters were housing industry people and all four opponents were tenant advocates. Small group members were encouraged to meet outside of the RSSG process in the subsequent week to explore potential points of compromise. Although some members of the small group made efforts to facilitate such a meeting, it did not take place.

Before the third and final small group discussion day, May 31, tenant advocate Arline Datu offered an alternative package for consideration by the group. Her package called for a 3% rent cap, a 5-year exemption for new construction, vacancy decontrol through the banking of preferential rents, no pass through of costs except what is allowed under a reasonable rate of return provision, an exemption for owner-occupied duplexes, and just cause eviction protections.  The group debated these two proposals, but the debate was in the fashion of trying to convince the other side to agree to one's own proposal. There was no talk of common ground or potential compromises.  In fact, one amendment to the Barranco proposal that was made made it even less friendly to renters by restricting the just cause protections so that they applied only to rent stabilized units.  The third and last day of small group discussion ended with no agreement, and not even a vote.

In the days following this meeting, Robbie Grossman offered a package that was a slight alteration of the Barranco package. Those who had supported the Barranco proposal signaled their support for the Grossman proposal and the Grossman proposal was substituted in. The Grossman proposal was not supported by the tenant advocates. In the end, the four tenant advocates voted for the Datu proposal, the rest of the group members voted for the Grossman package.


**Group 4 Summary**
**Facilitator:** C Terrence Anderson

**Participants:**

| | |
|---|---|
| Tram Hoang | Julie Schwartz |
| Myisha Holley | Emmanuel Speare |
| Rich Holst | D'Angelos Svenkeson |
| Bill Lindeke | Chris Tolbert |
| Carin Mrotz | J. Kou Vang |

**Discussion process:**

Group 4 small group process began on April 17 like all of the other groups. The group began its discussion with the two questions "what does the current ordinance do well?" and "what does the current ordinance not do well?" There were significant differences among the members of the group, but there were also some clear areas of alignment. Using the areas of differences, the facilitator used the first two sessions of the small group time to talk about the distinct areas of conversation that needed the most conversations. The areas included were the cap rate, reasonable rate of return, exemptions, vacancy control or decontrol, and the new construction exemption. The group went through the different options within each of these policy areas and each member got a chance to share their position on each of the policy areas too. The primary focuses that existed within the group included providing stability for renters, ensuring that the process was navigable for landlords, ensuring that the construction of rental housing in St. Paul is flourishing, ensuring that various kinds of investments by landlords can be recouped through rents, ensuring that landlords wouldn't gouge renters, and writing a policy that is easy to understand. These focuses were not shared uniformly among each individual group member, but were acknowledged as needs for the eventual group recommendation.

To move the group forward, the facilitator brought forward a draft recommendation to be discussed. The draft recommendation was not intended to be indicative of the groups preference, but rather to ensure group members were making specific recommendations for changes instead of abstractly talking about what the policy should do better. The draft recommendation received several critiques and this moved the conversation forward. First, the group was able to quickly decide (unofficially) that the current policy for a reasonable rate of return was sufficient. Second, the group had a thorough discussion regarding the new construction exemption. While there were some members of the group that wanted less than 10 years and some that wanted more than 15 years, the group was able to come to a consensus that 15 years is an acceptable amount of time. However, the group did think that protecting NOAH housing from being torn down for new construction apartments is important. There was also no significant push back on recommending that there should be no exemption for LIHTC and other buildings that receive subsidies. The group, unofficially, also gave no significant pushback to limiting the retroactivity of a new construction exemption.

The majority of the disagreement in the group centered around the conversation about whether to recommend vacancy control, vacancy decontrol, or partial vacancy decontrol. There were members who preferred each of the three options. Ultimately, a majority of the members compromised that they could accept partial vacancy control through the mechanism of preferential banking. The majority group members further preferred that there would be a cap to how much a landlord could raise rents even with preferential banking, but that that cap should be determined by policy makers. The members of the group that did not vote to move the majority proposal forward did so because of reservations regarding partial vacancy control; these members preferred full vacancy control. Further, group members that did not vote for the proposal further noted that if a policy did not have full vacancy decontrol, then the policy should have a higher overall cap than 3%.

In a final vote, 6 out 9 members voted for the recommended policy with 3 out of 9 members voting against the majority proposal for reasons stated above. One member did not vote

because they could not be reached. The majority proposal had members that were renters, renter advocates, landlords, and other positions in the housing industry.

## SMALL GROUP POLICY PACKAGES

Group 1 Policy package matrix

| (1)<br>Tenant Group Proposal | (2)<br>Chue/Small Landlord* | (3)<br>Kevin/Labor |
|---|---|---|
| Flat 3% rent cap | Flat 3% rent cap | |
| Vacancy decontrol only through banking | Full vacancy decontrol | Partial decontrol: 5% allowable increase |
| Limited banking (see above) | No banking, but flexible | Banking unlimited over time but limited to 5% in any single year |
| Reasonable rate of return | Reasonable rate of return | Reasonable rate of return |
| 7-10 Year NC exemption | 15 year NC exemption | 15 year NC exemption |
| Buildings that receive any subsidy (e.g. LIHTC, where rent is not directly tied to income) not exempted | | |
| No retroactivity | | |
| Wage Theft Protections | | Wage theft protections |
| Exempt units where rent is tied to income (e.g., Section 8) | Exempt units where rent is tied to income (e.g., Section 8) | Exempt units where rent is tied to income (e.g., Section 8) |
| Free workshops for landlords on compliance focusing reasonable rate of return | Free workshops for landlords on compliance focusing reasonable rate of return | Free workshops for landlords on compliance focusing reasonable rate of return |
| Just Cause Eviction Ordinance | Just Cause Eviction Ordinance | |

* Received the most votes

Group 2 policy package matrix

| Package 1 | Package 2* | Package 3 |
|---|---|---|
| 3% cap | 3% cap | 3% cap |
| Partial vacancy decontrol at CPI+7% | Partial vacancy decontrol through banking | Partial vacancy decontrol through banking |
| 15 year NC exemption | 15 year NC exemption | 10 year NC exemption |
| Exemption for LURA | Exemption for LURA | Exemption for LURA |
| Rental registry | Rental registry | Rental registry |
| Just cause eviction | Just cause eviction | Just cause eviction |
| Mandatory relocation assistance | Mandatory relocation assistance | Mandatory relocation assistance |

* Received the most votes

Group 3 policy package matrix

| Proposal 1 | Proposal 2[*] |
|---|---|
| ● Fixed 3% cap | ● Fixed 3% |
| ● Vacancy decontrol through banking | ● Full vacancy decontrol |
| ● Banking (see above)<br>● No pass through for utilities/taxes beyond what is allowed under reasonable return | ● Banking<br>● Pass through for utilities<br>● Pass through for taxes |
| ● NC exemption 10 years | ● NC exemption 30 years |
| ● Exempt Own-Occ duplexes | ● Exempt own-occ duplexes<br>● Exempt units with care or services<br>● Exempt units controlled by LURA |
| ● Separate just cause ordinance | ● Renter stability provision (applies to rent stabilized units)<br>● Self-certification on reasonable rate of return<br>● Staff run program<br>● Educational program |

* Received the most votes

Group 4 policy package matrix

| Group 4 proposal[*] |
|---|
| ● 3% |
| ● Partial decontrol through banking |
| ● Banking (see above)<br>● Reasonable rate of return (as is) |
| ● 15 years for NC & adaptive reuse, limited retroactivity<br>● NOAH demolition protection<br>● No new construction exemption for LIHTC and subsidized stock |
| ● Just cause |

* Only package voted on

**June 7 votes on recommendations**

| | Package of Cross-group agreements | Same package without 3% cap | Type of vacancy decontrol | In favor of partial decontrol? | In favor of full decontrol? |
|---|---|---|---|---|---|
| K. Banbury | Yes | No | Partial | Yes | No |
| T. Barranco | No | No | Full | Yes | Yes |
| C. Bedor | No | No | Partial | Yes | No |
| J. Benanav | Yes | Yes | Partial | Yes | No |
| C. Blaiser | No | No | Full | Yes | Yes |
| M. Bravo | Yes | No | Partial | No | No |
| C. Brown | | | Partial | Yes | No |
| S. Cordes | No | Yes | Full | Yes | Yes |
| P. Cryan | Yes | Yes | Partial | Yes | No |
| A. Datu | Yes | No | Partial | Yes | |
| M. Davis | | | | | |
| K. Duckett | No | No | Full | Yes | Yes |
| K. Elkin | Yes | No | | | |
| T. Fang | Yes | Yes | Full | Yes | Yes |
| J. Fowler | | | | | |
| T. Godfrey | Yes | No | Partial | Yes | No |
| R. Grossman | No | No | Full | Yes | Yes |
| T. Hoang | Yes | No | Partial | No | No |
| M. Holley | Yes | No | Partial | Yes | No |
| R. Holst | | No | Full | No | Yes |
| M. Honeywell | No | No | Full | No | Yes |
| A. Ibrahim | Yes | No | Partial | Yes | No |
| R. Ivanoff | Yes | No | Partial | No | No |
| C. Kue | No | | Full | Yes | Yes |
| B. Lindeke | No | Yes | Full | Yes | Yes |
| N. Matey-Keke | No | No | Full | Yes | Yes |
| C. Mrotz | Yes | Yes | Partial | Yes | No |
| T. Nelson | No | No | Full | No | Yes |
| K. Pranis | No | Yes | Full | Yes | Yes |
| B. Rosas | Yes | No | Partial | Yes | No |
| T. Sanneh | No | Yes | Full | Yes | Yes |
| K. Schneider | Yes | No | Partial | Yes | No |
| J. Schwartz | Yes | Yes | Partial | Yes | No |
| E. Speare | Yes | Yes | Partial | Yes | No |
| D. Svenkeson | Yes | Yes | Partial | Yes | No |
| C. Tolbert | No | No | | | |
| M. Troy | Yes | No | Partial | Yes | No |
| J. K. Vang | Yes | Yes | Full | Yes | Yes |
| C. Ware | Yes | No | Partial | Yes | No |

# Exhibit 2

# MINNEAPOLIS RENT STABILIZATION STUDY

Edward G. Goetz, Anthony Damiano,
Peter Hendee Brown, Patrick Alcorn,
Jeff Matson





Center for Urban and
Regional Affairs | cura
UNIVERSITY OF MINNESOTA

© 2021 The Regents of the University of Minnesota.



This work is licensed under the Creative Commons Attribution-NonCommercial-ShareAlike 3.0 Unported License. To view a copy of this license, visit http://creativecommons.org/licenses/by-nc-sa/3.0/ or send a letter to Creative Commons, 444 Castro Street, Suite 900, Mountain View, California, 94041, USA. Any reproduction or distribution of this work under this license must be accompanied by the following attribution: "© The Regents of the University of Minnesota. Reproduced with permission of the University of Minnesota's Center for Urban and Regional Affairs (CURA)." Any derivative use of this work must be licensed under the same terms and accompanied by the following attribution: https://www.cura.umn.edu/research/minneapolis-rent-stabilization-study, February, 2021." For permissions beyond the scope of this license, contact the CURA editor.

# Contents

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . **1**

## 01 Part 1: Rent Regulation in Other Cities

**History of Rent Control in the United States** . . . **3**

**Components of Rent Stabilization Legislation** . . **5**

Rent Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Definition of Controlled Stock . . . . . . . . . . . . . 6

Mechanisms to Decontrol Units . . . . . . . . . . . . 7

Protection Against Evictions . . . . . . . . . . . . . . . 9

Cost Pass-Throughs . . . . . . . . . . . . . . . . . . . . . . 10

Preferential Rent and "Banking" Increases . . . 11

Infrastructure, Implementation, and
Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Outreach and Education . . . . . . . . . . . . . . . . . . 12

**Peer Cities Analysis** . . . . . . . . . . . . . . . . . . . . . . . **13**

Oakland, California . . . . . . . . . . . . . . . . . . . . . . 13

Portland, Oregon . . . . . . . . . . . . . . . . . . . . . . . . 16

Newark, New Jersey . . . . . . . . . . . . . . . . . . . . . 17

Sacramento, California . . . . . . . . . . . . . . . . . . . 18

**Impact of Rent Regulations** . . . . . . . . . . . . . . . . **20**

Affordability and Housing Costs . . . . . . . . . . . 20

Impact on Controlled and Noncontrolled
Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Housing Stability/Tenure Length . . . . . . . . . . 22

Housing Construction . . . . . . . . . . . . . . . . . . . . 23

Conversions, Teardowns, and Owner
Move-ins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Maintenance and Capital Improvements . . . . 23

Distribution of Benefits . . . . . . . . . . . . . . . . . . 24

## 02 Part 2: The Minneapolis Rental Market

**Market Conditions in Minneapolis Rental
Housing Stock** . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

Composition of the Rental Housing Stock . . . 25

Age of Rental Housing Stock . . . . . . . . . . . . . . 26

Ownership Characteristics . . . . . . . . . . . . . . . . 28

**Rental Safety and Habitability** . . . . . . . . . . . . . . **30**

Rental Tiers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Tenant Complaints . . . . . . . . . . . . . . . . . . . . . . . 30

Code Violations . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Potential Growth in Housing Market** . . . . . . . . **32**

Predicted Growth in Housing . . . . . . . . . . . . . 32

**Rent Trends** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

Rent Trends, 2001–2019 . . . . . . . . . . . . . . . . . . 33

Rent Trends in Small-Building Rentals . . . . . . 37

Advertised Rents . . . . . . . . . . . . . . . . . . . . . . . . 38

**Affordability Analysis** . . . . . . . . . . . . . . . . . . . . . **38**

Rent and Income Trends for Minneapolis
Renters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Cost Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**Tenant Focus Groups** . . . . . . . . . . . . . . . . . . . . . . **42**

Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Upkeep . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**Homelessness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**

**Hypothetical Rent Changes Under
Different Rent Caps** . . . . . . . . . . . . . . . . . . . . . . . **44**

Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Rent Caps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Impact of Rent Caps—A Retrospective
Analysis, 2001–2019 . . . . . . . . . . . . . . . . . . . . . 46

## 03 Part 3: Economic Analysis

**Industry Perspectives** . . . . . . . . . . . . . . . . . . . . . **48**

Method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Summary of Responses . . . . . . . . . . . . . . . . . . . 48

Detailed Responses . . . . . . . . . . . . . . . . . . . . . . 49

**Scenario Modeling** . . . . . . . . . . . . . . . . . . . . . . . **52**

Rent Increases Under Different Rent Caps . . . 53

Rent Caps and Investment Metrics . . . . . . . . . 53

## 04 Part 4: Conclusion

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **57**

## 05 Part 5: Sources

**Sources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **58**

# EXECUTIVE SUMMARY

## Form of Rent Regulation Programs

Approximately 200 municipalities and two states across the United States currently have a form of rent regulation. Rent regulation programs have taken on many forms. The variation in laws occurs across five dimensions:



**1. Choice of cap.** Programs vary by how they cap rent increases. Most programs tie the cap to the Consumer Price Index (CPI), a widely used measure of inflation. The most restrictive programs set the cap at a percentage of the CPI, while more lenient programs set the cap at the CPI plus an additional percentage point increase. The range is illustrated by Berkeley, California, which caps rents at 65% of the CPI, and the state of Oregon, which allows rent increases at the CPI + 7%.



**2. Exceptions** to the cap. Many programs allow owners to pass through costs for a range of items. Most common are allowances for major capital improvements, utilities increases, and property tax hikes. Some programs allow for owners to appeal on the basis of a "right to reasonable return," which allows the owner a base return from the property. Some jurisdictions allow owners to bank increases and then convert the banked increases at a later date. Even when exceptions such as these are allowed, many programs nevertheless limit the total increase that an owner is allowed.



**3. Exemptions.** Various exemptions to rent caps exist. The most common is an exemption for new construction. Some programs also exempt small buildings, either across the board or when owner-occupied.



**4. Decontrol.** Vacancy decontrol, which allows a landlord to return the rent to market level when a tenant vacates the unit, is used widely. A vacancy bonus is allowed in some jurisdictions that allow for a higher-than-cap increase, but that is not unlimited (as in total vacancy decontrol).



**5. Compliance and education.** Programs vary by how compliance is monitored and how disputes are handled. Generally, some programs require tenants to initiate complaints and challenges while others aim for more proactive implementation.

## Impact of Rent Stabilization Programs

Many studies of existing rent stabilization programs have produced a variety of findings related to affordability and housing costs, impacts on new construction, housing stability, conversions, teardowns, and other impacts on the rental stock, maintenance and capital improvements, and distribution of benefits from rent control. Outcomes in individual cities depend on the unique features of not only the rent regulations themselves but also the characteristics of the local housing market.

- The empirical research indicates that rent regulations have been effective at achieving two of their primary goals: **maintaining below-market rent levels and moderating price appreciation.** Generally, places with stronger rent control programs have had more success preventing large price appreciation than weaker programs.

- There is widespread agreement in the empirical literature that **rent regulation increases housing stability** for tenants who live in regulated units.

- **Little empirical evidence shows that rent control policies negatively impact new construction.** Construction rates are highly dependent on localized economic cycles and credit markets. Additionally, most jurisdictions with rent stabilization specifically exclude new construction from controls, either in perpetuity or for a set period of time.

- Rent regulations are shown to be **related to an overall reduction in rental units** as owners have commonly responded to rent regulation by removing units from the rental market via condominium conversion, demolition, or other means.

- There is little evidence that rent regulations cause a reduction in housing quality. Some evidence shows that **major capital improvements keep pace with need but that more aesthetic upkeep may suffer**. Most programs allow for the pass-through of capital improvement costs.

- **There is considerable debate in the empirical literature about whether the majority of benefits from rent stabilization go to the neediest households.**



DANIEL MCCULLOUGH/UNSPLASH

## The Minneapolis Rental Market

- Rent trends in Minneapolis since 2000 have shown three distinct patterns. In the years 2000 to 2007 there was a steady but modest increase in rents annually. The housing crisis of 2008 to 2012 saw a stagnation of rents at the median. The third pattern emerged after the housing crisis—the years 2013 through 2018 saw steeper rent increases and a wider variation in rent increases across the market.

- From 2000 to 2019 incomes increased faster than rents for renter households at the median and above. However, tenants in the bottom quartile saw steep rent increases (44% increases from 2006 to 2019) and almost no growth in income (2.9% increase in the same period).

- BIPOC renters generally, and Black renter households in particular, saw a worsening of affordability for most of the study period. Black households saw rent increases in this period while incomes fell in real dollars. White households fared best, with incomes steadily and consistently rising more rapidly than rents.

- We used rent trends in Minneapolis to model what might have happened to rents had various rent caps been in place. A rent cap set at 75% of CPI and one at the CPI would have had a consistent but relatively small impact on the middle of the Minneapolis rental market. Rent caps at higher levels (CPI + 3% and CPI + 7%) would not have constrained rent increases in Minneapolis until the postcrash period. These caps would have limited the most aggressive rent increases in the city but would not have affected median increases.

## Building-Level Economics

We also investigated the potential impact of rent control from the perspective of building owners and the housing industry more generally. We interviewed 30 industry people to collect their thoughts and concerns about a rent stabilization program. We also modeled the impact of various rent caps by creating an example apartment pro forma based on actual Minneapolis rents in the study period, illustrating how those rents and the economic measures that apartment owners consider would change under different rent caps.

## Industry Perspectives



The informants we spoke with expressed a range of concerns about the potential impact of rent stabilization.

- Many of the owners said that their rents would not actually be impacted by any of the example rent caps we shared with them, as they say they charge below-market rents and raise rents gently. They questioned the need for rent regulation.

- Nevertheless, almost all informants expressed as their greatest concern the potential for a rent stabilization program to constrict rent growth while operating expenses continue to rise. Some noted that they would be incentivized to increase rents prior to enactment of a program of rent regulation.

- Informants expressed additional concerns that ranged from a negative impact on new housing development and reduced maintenance and decline in housing quality, to changes in lending terms and the withdrawal of units and investors from the Minneapolis market.

- Most informants felt that the actual impact of rent stabilization would depend on the specific features of the program and market factors.

## Scenario Modeling

Scenario modeling was done for a hypothetical, class C or Naturally Occurring Affordable Housing (NOAH) unit. Returns were expressed in percentage terms to allow scaling to an apartment building of any size. We specifically examined five metrics that capture the economic performance of apartments:

1. Cash-on-cash return (average annual returns)
2. Cash-on-cash return in the final year (2018)
3. Average annual change in value (appreciation)
4. Total change in value (appreciation)
5. Internal rate of return (IRR)

The model indicated that rent caps at 75% of CPI and at CPI would have allowed for returns, across all of these metrics, comparable to what was achieved at the middle (defined by both the average and median rent increases seen in Minneapolis since 2009) of the market.

A rent cap at CPI + 3% would have allowed returns comparable to what would have been achieved by raising rents at the 90th percentile. The CPI + 7% cap would have allowed returns far in excess of what would have been achieved at the top of the market in Minneapolis during these years.

## PART 1: RENT REGULATION IN OTHER CITIES

*In this section, we review the experience of rent stabilization in other cities in the United States. We provide a brief and high-level history of rent regulations and describe the most common policy options found. We take a more in-depth look at rent stabilization in four peer cities, focusing both on program design and also on implementation issues. Finally, we review the literature regarding the policy and economic impacts of rent regulations.*

Many make the distinction between *rent control* and *rent stabilization*. Under this view, the differences between rent control and rent stabilization have to do with the strength and sometimes the scope of regulations. However, these terms usually serve as a stand-in for the historical distinction between first-generation and second-generation regulations. The first generation of rent regulations in the United States contained long-term price ceilings on rent. The second generation emerged in the 1970s and contained a series of more moderate regulations. This more moderate form is the most common form of rent regulation today, and it typically incorporates approved rates of increase, exempts certain properties, and sometimes contains provisions such as vacancy decontrol that allow rents to rise to market levels when a tenant moves out. The only remaining first-generation rent control program is in New York City, which also has a more moderate rent stabilization program.

Much of the early work on rent control was generated by economists who focused on first-generation rent control programs that placed a hard ceiling on rents. This literature also frequently assesses the potential impact of rent control from a theoretical perspective rather than from an empirical assessment of how rent regulation has worked out. The early work in economics led to a widely held set of views that rent control would, in fact, produce a set of adverse impacts in local housing markets, including a decline in maintenance of housing, a decline in the production of new housing, and rent increases in the portion of the housing stock

not controlled. These views approach the status of orthodoxy among economists and real estate professionals.

The literature reviewed in this section, however, paints a different picture of the actual track record of rent regulation. First, as already noted, rent regulations have taken on many different forms and include provisions that deviate in many ways from the strict model of rent control invoked by economists. Second, studies show a mix of outcomes that are largely determined by the specific provisions of the regulations being studied. Third, rent regulations can be effective tools to achieve the goals of stability and affordability. Fourth, some jurisdictions couple rent regulations with additional policies to address the negative market outcomes feared by its skeptics.

### History of Rent Control in the United States

Rent regulations in the United States originated in World War I when local jurisdictions, such as New York City and Washington, DC, imposed emergency controls to prevent profiteering. However, during this time rent control was not promoted at the federal level and local laws were invalidated in the 1920s as housing emergencies came to an end (Keating, 1998). Policies in the United States are primarily associated with the federal controls that emerged during World War II. The wartime economy put significant stress on local housing markets, and rent control programs were introduced to guarantee affordable housing and prevent rent

gouging (Arnott, 1995). The Office of Price Administration (OPA) was established in 1942 as a federal independent agency with a broad authority to ration goods, set prices, and control rents.

Under this authority, the OPA designated localities as "defense rental areas" and imposed a rent ceiling on the designated area. In addition to freezing rents, the OPA also rolled back the allowable rent to the level it had been at before any appreciation due to the wartime production economy. At the height of the wartime rent control, almost 80% of all dwelling units were located in areas under federal rent control (Fetter, 2013). These regulations continued until well past the end of war, only being terminated en masse in the late 1940s, with some continuing into the 1950s.

By the end of the 1950s, rent controls largely disappeared and did not re-emerge until the 1970s (Arnott, 1995). The second generation of rent control policies, often called rent stabilization or "moderate rent control," emerged in the 1970s due to rampant inflation, social upheaval, and mass tenant organizing. This generation of rent stabilization programs was predominantly local in origin. From 1970 to 1983, median rents in the United States grew twice as fast as renter incomes (Appelbaum and Gilderbloom, 1990). Major cities such as Boston, Washington, DC, Los Angeles, and San Francisco adopted rent stabilization policies during this time, as well as smaller cities throughout New York, New Jersey, Massachusetts, Connecticut, and California (Arnott, 1995). In contrast to earlier



## HISTORY OF RENT CONTROL IN THE UNITED STATES

**1920s**
Local controls invalidated as housing emergencies came to an end

**1942**
Office of Price Administration established to ration goods, set prices, & control rents

**1970s**
Moderate local programs enacted due to inflation, social upheaval, & tenant organizing

**2010s**
Renewed interest postrecession (OR statewide rent control legislation, CA statewide rent cap; NY strengthened laws)

**1910s**
Emergency local controls enacted during WWI to prevent profiteering

**1940s**
Federal controls introduced during WWII to guarantee affordable housing & prevent gouging

**1950s**
Rent controls largely disappeared by the end of the decade

**1990s**
Backlash against rent regulation (MA statewide rent control ban & CA Costa-Hawkins Rental Housing Act)

**2020s**
200 municipalities across CA, NY, NJ, MD, DC have rent control regulation; statewide programs in CA & OR

programs, which established strict price ceilings, the second generation of programs was more moderate, instead capping the amount rent could be increased year to year. Additionally, they included various provisions that allowed landlords to increase rents beyond the fixed cap, such as increases for capital improvements, maintenance, a guaranteed "reasonable rate of return," and hardship provisions. Until recently, almost all of the contemporary rent regulations in the United States originated during this time period.

New York deserves its own treatment, due to the unique nature of the interaction between its rent control and rent stabilization programs. New York was the only city to continue the rent controls of the World War II era, enacting the New York Emergency Housing Act of 1950 when the federal legislation expired. The law only covers buildings built before 1947 where a tenant has continuously occupied the building since 1971. These units are subject to a maximum base rent system, which places a hard cap on the nominal rent that can be charged for the unit. However, the number of rent controlled units has continuously declined, from about 2 million in the 1950s to approximately 22,000 currently. This is because once a unit becomes vacant, it is typically permanently deregulated, except for certain conditions in which a family member is allowed to subsume a lease.

Rent stabilized apartments are much more prevalent in the New York rental housing stock—about 50% of the total rental units. Rent stabilization covers most buildings that have six or more units and were constructed before 1974. Rents in these units can be increased yearly, subject to the cap determined by the Rent Guidelines Board. While the specifics of regulations have changed throughout the history of the program, the most recent update was the 2019 Housing Stability and Tenant Protection Act.

The 1990s saw a backlash against rent regulation led by the real estate industry. In 1994, Massachusetts residents voted to ban rent control statewide after a landlord-backed initiative was placed on the ballot. Regulations in California were curtailed by the 1995 Costa-Hawkins Rental Housing Act. Dozens of states moved to preempt all forms of rent regulation at the municipal level. These policies were often championed by the American Legislative Exchange Council (ALEC). On its website, ALEC provides template legislation for state lawmakers to adopt the preemption model.[1] Currently, 38 states prevent local jurisdictions from enacting rent control laws—including seven states that use Dillon's Rule, which restricts cities from acting where they are not given specific consent from the state government.

The rapid appreciation in rents in metropolitan areas across the country during the postrecession period has created renewed interest in rent control policies. In 2018, a proposition to substantially expand rent stabilization in California qualified for the ballot though it ultimately failed. In 2019, Oregon became the first state in the nation to pass statewide rent control legislation. Soon after, California passed AB1482, which established a statewide rent cap. In New York, tenant advocates successfully strengthened the existing law by passing the Housing Stability and Tenant Protection Act of 2019. The bill removed a sunset provision and made the law permanent, enabled any locality to opt-in to rent stabilization, and closed loopholes that allowed units to be deregulated. Action has also occurred at the local level. Several cities in California, such as Richmond and Sacramento, have adopted rent control programs in recent years. Currently, there are ongoing campaigns to either pass rent control legislation or repeal preemption laws in Illinois, Massachusetts, and Washington state. Approximately 200 municipalities across California, New York, New Jersey, Maryland, and Washington, DC, currently have a form of rent regulation, in addition to the statewide programs in California and Oregon.

---

1  https://www.alec.org/model-policy/rent-control-preemption-act/

**Figure 1.1: Program Design Choices**



**RENT STABILIZATION PROGRAM COMPONENTS**

*Choice of Cap*
- No increase
- Flat % increase
- Pegged to CPI
- CPI + %
- Nominal amount

*Exceptions*
- Pass-throughs (maintenance, cost of living, utilities, property taxes)
- "Reasonable return"
- "Banked increases"

*Exemptions*
- New construction (rolling or fixed)
- Small buildings (single-family homes, 2- to 4-unit buildings)
- Owner-occupied

*Decontrol*
- Vacancy decontrol (full or partial)
- Luxury decontrol

*Compliance Education*
- Tenant- or petition-driven
- Monitoring
- Public information
- Fees to support implementation

---

### Components of Rent Stabilization Legislation

The details and implementation of rent regulations vary based on jurisdictional goals. Broadly, these goals include protecting tenants from excessive rent increases, alleviating the affordable housing crisis, preserving existing affordable housing, providing housing habitability and security of tenure for renters, maintaining economic and racial diversity, and preventing real estate speculation (Been et al., 2019).

Rent stabilization comes in many varieties in the United States. Local governments have fashioned programs to fit local concerns and to respond to local political factors. The variations in rent stabilization approaches occur across five different dimensions: the rent cap and its operation, exceptions to the cap, exemptions of building or unit type that are allowed, provisions for decontrol, and program monitoring and implementation. Figure 1.1 depicts these major choices.

Both political and policy considerations impact the details of rent stabilization programs. Some design components reflect direct trade-offs. For example, legal mechanisms that enable landlords to return rents to market levels upon vacancy may alleviate opposition from the real estate industry, but they also limit the program's efficacy in providing stability and affordability. Exemptions can also create incentives that are contradictory to the spirit of the regulations. Jurisdictions that allow for stabilized units to be easily converted to condominiums risk incentivizing property owners to withdraw their units from the rental market. In this section we summarize the common components of US rent regulations and the range of options available to policymakers in drafting a potential program.

### Rent Regulation

Rent caps, the rate that landlords are allowed to increase rents year to year, are the definitional component of modern rent control programs. Policy options here include not just the magnitude of the allowable increase but the mechanism for establishing a cap. While first-generation rent control policies placed a hard ceiling on rents, contemporary programs allow limited annual increases. Caps enable rents to rise with inflation and help internalize a portion of the appreciation related to other costs, such as property taxes, utilities, and labor. The cap thus limits a landlord's ability to generate revenue from rents from beyond increases in the cost-of-living rate and operating costs.

*While first-generation rent control policies placed a hard ceiling on rents, contemporary programs allow limited annual increases. Caps enable rents to rise with inflation and help internalize a portion of the appreciation related to other costs, such as property taxes, utilities, and labor. The cap thus limits a landlord's ability to generate revenue from rents from beyond increases in the cost-of-living rate and operating costs.*

The magnitude and form of caps are determined in a variety of ways. Many rent-regulated jurisdictions utilize the Consumer Price Index (CPI) to determine each year's allowed increase. Some, like Los Angeles, Richmond, and Newark, set the allowable increase at the full amount of the yearly regional CPI. In Newark, the rent board publishes

the monthly CPI percentage, and the allowed rent increase is equal to the CPI for the month that a tenant's new lease began. For example, if a tenant's prior lease ended on December 31, 2020, and the new lease began on January 1, 2021, the allowable increase would be 1.7%—the CPI for January 2021.

Some programs determine increases as a percentage of the annual CPI. For example, West Hollywood's program allows an increase equal to 75% of the CPI, Berkeley's allowable increase is 65% of the CPI, and the cap in Cambridge was typically 85% of CPI. Since 2005, the allowed increase in Berkeley has ranged from a low of 0.1% in 2010 to a high of 2.7% in 2007, with an average increase of approximately 1.7%.

Other jurisdictions have a cap that is equivalent to the CPI, plus an additional set base percentage. For example, the state law in Oregon caps rent increases at 7% each year, in addition to the full amount of the CPI. In 2020, this was equal to an allowed increase of 9.9%. Units covered under California's statewide law are subject to a statewide rent cap of either 5% plus the CPI or 10%, whichever amount is less. In Jersey City, the allowable increase is directly tied to the change in cost of living during a lease (Been et al., 2019). The increase is limited to 4% or the percentage difference between the CPI 3 months prior to the end of the lease and 3 months prior to the start of the lease, whichever is less.

There can be variation in the specific CPI subsection used to determine the increase (Flaming et al., 2009). Most jurisdictions use the *CPI for All Urban Consumers: All Items* as the standard for determining rent increases. One alternative index is *Urban Wage Earners and Clerical Workers: All Items*. A potential benefit of using this index is that it more accurately reflects the change in cost of living for renters, as renters are more likely to work in those types of jobs.

Another potential index is the *All Items Less Shelter* index. The CPI for *All Urban Consumers: All Items* measures the cost of the typical household basket of goods, including housing costs. However, the index uses rent as the measure for the cost of housing, creating a circular logic where large increases in rent are used to determine the level of rent increase allowed. While the cumulative change from 1978 to 2007 for the *All Items* index increased 233%, the *All Items Less Shelter Index* increased only 197% for the same time frame. These examples highlight the importance of the index used in determining allowable rent increases.

Finally, nominal rent increases have occasionally been used in controlled jurisdictions. In some years, the Berkeley and Santa Monica Rent Boards have authorized nominal dollar increases based on average rents multiplied by a percentage increase (Flaming et al., 2009). Arguments for using a nominal increase instead of a percentage is that percentage increases allow the largest increases for the most expensive units, but changes in operating costs for apartments are largely uniform. However, this practice appears to be seldomly used by jurisdictions with rent regulations.

### Glossary

- **Rent Control/First-Generation Rent Regulations:** Policies that strictly regulate rent increases, usually in the form of a rent ceiling. Most commonly found in World War I and World War II era programs.

- **Rent Stabilization/Second-Generation Rent Regulations:** The most common form of modern regulations, allowing for yearly capped rent increases, usually in the form of a percentage of the previous year's rent. Additionally, these policies often allow for some costs to be passed on to tenants.

- **Rent Cap:** The limit placed on the amount rent can be raised each year. Most often, in the form of a percentage coupled with the inflation rate.

- **Vacancy Decontrol:** A provision of rent regulation policies that allows for rents to be raised any amount when a unit becomes vacant.

- **Just-Cause Eviction Protections:** A policy often implemented in coordination with rent regulations to protect tenants from without-cause evictions. Usually limits evictions to failure to pay rent, serious breach of lease, and a small number of landlord-based causes.

- **Rent Banking:** A provision that would allow landlords to not increase rents in some years in order to "bank" them and use several stored increases in one year.

- **Preferential Rents:** A practice where landlords offer a lower rent than they are legally allowed to, often with the expectation that they will be able to return it to the legal market level when a tenant renews their lease.

- **Fair Return:** A provision in almost all rent regulations that entitles a landlord to a "fair return" on their investment. When a landlord is able to prove they meet the criteria for not receiving a fair return, they can be granted rent increases above the allowable yearly increase.

## Definition of Controlled Stock

Another component of rent stabilization programs is the universe of properties that are subject to the regulations. Many considerations affect whether a unit is covered by the program, including the age and size of the property, the unit's price, and the tenant's income, among others. For example, many cities attempt to address fears of dampening new development by



STEVE SCHNEIDER, DONNY JIANG/UNSPLASH

exempting newly built properties either indefinitely or for a set period of time. Others attempt to protect "mom-and-pop" landlords by exempting owner-occupied duplexes and other small properties.

Policymakers often attempt to maximize the breadth of the program by applying it to a wide range of units. However, this can complicate the political feasibility as the real estate industry typically fights to include as many exemptions as possible. There is a potential trade-off here between alleviating industry opposition and ensuring the effectiveness of a program.

### NEW CONSTRUCTION

One of the most common exemptions in rent stabilization legislation is for new buildings. To minimize the impact of regulations on new construction, most cities exempt buildings constructed after a certain date or allow a grace period of a number of years before regulations take effect. Statewide legislation in New Jersey excludes new construction for 30 years, while Oregon and California preclude newly constructed units for 15 years after completion. In California, the Costa-Hawkins Act prohibits cities from extending rent controls to dwellings constructed after 1995. Similarly, all the cities in Massachusetts that formerly had rent control exempted newly constructed buildings from regulations (Sims, 2007). In New York City, rent stabilization typically only applies to buildings that were constructed before July 1, 1974.

### SMALL BUILDING EXEMPTIONS

Exemptions also exist depending on the size and type of a building. While many programs apply to all rental units, some cities exclude smaller buildings, such as single-family homes, duplexes, and triplexes. New York City exempts all buildings with six or fewer units. In New Jersey, the law excludes buildings with four or fewer units. In California, the Costa-Hawkins Act prevents any local rent control program from regulating single-family homes. However, those properties are now regulated by the new statewide law, which covers all rental units that are over 15 years old.

## Mechanisms to Decontrol Units

Another common feature of rent stabilization programs is a mechanism to decontrol units, both permanently and temporarily. The most common form of decontrol occurs when a unit is vacated, but units can also be removed from rent regulations when an owner moves into a controlled property, when the property is converted to a condominium or removed from the market, or if a tenant's income surpasses a certain threshold.

### VACANCY DECONTROLS AND VACANCY BONUSES

Vacancy decontrols are a common feature of modern programs. Vacancy decontrol allows a landlord to raise rent without restriction when a unit becomes vacant. Once the unit is reinhabited, controls enter into effect for the duration of the new tenancy. Policies differ in the level of decontrol allowed. Under the Costa-Hawkins Act in California, there is no restriction on rent increases when a unit becomes vacant. Once a tenant vacates the unit, rent can be set at any amount, setting a new base rent for the next tenant. When the new tenant begins their lease, yearly caps on rent increases go into effect for the duration of the new tenant's lease.

In Washington, DC, only partial decontrol is allowed, known as a vacancy bonus. The level of bonus is dependent on the duration of the prior tenant's residency in the unit. The rent can be increased by 10% when a unit becomes vacant if the tenant occupied the unit less than 10 years and 20% if the length was over 10 years. In the past, New York rent stabilization previously allowed landlords to increase rents up to 20% upon vacancy, with additional bonuses if the landlord had not claimed a vacancy increase in over 8 years. However, the Housing Stability and Tenant Protection Act of 2019 fully eliminated vacancy increases in New York, meaning rent caps stay in place even when a unit becomes vacant.

Before the statewide ban on rent control in Massachusetts, both Boston and Brookline had their own versions of vacancy decontrol (Sims, 2007). Boston allowed units to enter "passive control" once a unit became completely vacated by its

prior tenants. At that point, the land-lord could raise rents on a year-to-year basis, but tenants were able to appeal unfair increases to the rent control board. Brookline had a more traditional sys-tem, in which vacant apartments were exempt from all controls upon vacancy. Cities in New Jersey also have a range of regulations regarding what happens when a unit becomes vacant. Of the 120 cities with rent stabilization legislation, about three-quarters have some form of vacancy decontrol. In some New Jersey cities, decontrols are permanent, mean-ing that once a unit becomes vacant it is permanently exempt from new restric-tions. Other cities in the state only allow vacancy bonuses ranging from 15% to 35%. Finally, some restrict the frequency with which vacancy increases can be im-plemented (Baar, 1998).

The regulation of vacancies can have crit-ical impacts upon the outcomes of rent stabilization programs. Vacancy decon-trol may ease anxieties from property owners as it allows them to recoup some of their foregone profits. However, it also severely undermines the long-term effectiveness of rent control programs. The experience of Berkeley is a useful example of how decontrols impact af-fordability. From the passage of the city's rent stabilization ordinance until the pas-sage of Costa-Hawkins in 1995, Berkeley had full vacancy *control*, meaning rent caps stayed in effect even when a unit became vacant. However, the passage of the Costa-Hawkins Act banned vacancy control, creating a 3-year transition pe-riod of partial decontrol and then full decontrol. By 2013, 85% of all rent-sta-bilized apartments in the city had turned over at least once and rents increased to the higher levels typical of the Bay Area's unrestricted market. Additionally, in 2010 the Berkeley Rent Stabilization Board found that tenants were paying an aggregate amount of $100 million more annually in rent than if vacancy-related increases had not occurred (Kelekian and Barton, 2013).

In 2013 approximately 3,000 long-term tenants had not yet gone through a cy-cle of decontrol. In those apartments the

average rent was approximately $780 per month, compared to the average of $1,436 for the other 16,000 stabilized units that had undergone at least one cycle of decontrol (Kelekian and Barton, 2013). The Berkeley Rent Board further found that the difference in monthly rent paid between a renter who began their lease in 2010 versus 2017 was approxi-mately $1,500 (Cash et al., 2018).

## OWNER MOVE-IN, CONDO CON-VERSIONS, AND WITHDRAWAL FROM THE MARKET

A common critique of rent regulations is that it incentivizes landlords to with-draw properties from the rental market by converting them into condominiums. Because of this, some jurisdictions in-clude provisions that prevent or limit the ability to convert controlled units to condos. Without protections, condomin-ium conversions potentially undermine the foundational goals of rent control programs (Baar, 1983). If property own-ers are easily able to withdraw their properties from the market through conversions, there is a risk of losing af-fordable rental housing.

In Massachusetts, restrictions on con-versions were included in each city's program before the statewide rent control ban (Sims, 2007). Landlords in Cambridge were required to submit an application to the city's rent control board for a conversion to proceed. In Boston, written notice had to be given to tenants 3 years before a conversion, in addition to providing assistance in find-ing new housing and the payment of a severance fee. In effect, the regulations made it very difficult to remove con-trolled units from the market.

In New Jersey, local jurisdictions are pre-empted by state law from enacting their own regulation of condominium conver-sions. However, state law specifies that a landlord must also give a 3-year notice before pursuing an eviction related to a condo conversion. If the landlord is not able to find comparable replacement housing for the tenant, the tenant is en-titled to up to five 1-year stay-of-eviction

actions. After the first stay action, a land-lord is able to compensate the tenant with a cash payment equal to 5 months' rent and legally obtain possession of the unit (Baar, 1983).

Conversions in California are typi-cally subject to local laws, though a minimal layer of protection is guaran-teed through state law. Landlords must go through the Subdivision Map Act process, which includes providing ten-ants with a 180-day notice if they will be evicted and the first opportunity to purchase (Gorska and Crispell, 2016). Or-dinances regarding condo conversions in California vary from place to place, but many share common features. Most only allow for conversions if the vacancy rate is above a certain threshold (3%–5%, generally). Others prevent conversions if it would cause the proportion of rental units to the city's total housing stock to drop below a certain percentage. In Al-ameda and Santa Clara counties, this is 40%, while others have adopted lower thresholds. Other restrictions include caps on the number of units that can be converted each year, and the prohibition of the conversion of smaller buildings. However, a common way property own-ers avoid local and state regulations is through the Ellis Act, which allows land-lords to evict all tenants in a building if they plan to remove the building from the rental market completely. This can result in converting the building to con-dos or tearing it down and rebuilding in its place (Pastor et al., 2018).



TROYFOTO/SHUTTERSTOCK

New York updated its regulations related to condominium conversions in the 2019 rent control expansion. Previously, to legally convert a rental property into a condominium, 15% of the property's tenants had to be willing to purchase their unit (Rosen, 2018). Additionally, the 15% required to move forward could be made up of both current tenants and nontenants who wanted to purchase a unit. The updated regulations increase the threshold to 51% of the building's tenants and no longer allow for nontenants to be included in meeting the requirement.



IAKSHMIPRASADA S/SHUTTERSTOCK, NIKKI MCCOMB, DC SLIM/SHUTTERSTOCK, SHAYLYN/UNSPLASH

### LUXURY DECONTROL

New York City is the only US jurisdiction that implemented a mechanism to bring units out of controlled status based on rent level and tenants' incomes (Been et al., 2019), referred to as *luxury decontrol*. However, this provision of the program was fully repealed with the 2019 expansion of the state's rent control laws. In the past, units could be decontrolled under a high-rent, high-income provision if they met two conditions. First, the income of the tenant currently occupying the unit had to exceed $200,000 for the two prior years. Second, the unit's rent had to meet the Deregulation Rent and Income Threshold (DRT), which in recent years was between $2,700 and $2,800 per month.

## Protection Against Evictions

Many of the program features discussed so far, such as vacancy decontrol, condominium conversion, and owner move-in exemptions, can incentivize landlords to evict tenants. Thus, many rent stabilization programs are accompanied by tenant protections to guard against evictions. Programs without protections risk unwarranted actions where a landlord evicts a tenant to increase rent without restriction, and eviction protections without rent regulations risk landlords increasing rents to an unaffordable level in order to evict a tenant. A common way to protect tenants from this practice is called "just-cause eviction." Just-cause eviction limits the legal reasons that an eviction can be filed against a tenant, usually to nonpayment of rent, breach of

lease, illegal activity, or nuisance, in addition to a few landlord-based reasons.

In Oregon, the statewide rent stabilization law contains a just-cause eviction provision that limits the reasons that a tenant can be evicted. The only valid reasons for eviction are criminal activity, serious breaches of the tenant's lease, and failure to pay rent. Additionally, there are a few landlord-based cases in which evictions can take place: if the unit is being significantly renovated or demolished, if the owner or an immediate family member is moving into the unit, or if the unit is sold to a new owner who plans to move in. In these cases, the landlord must provide a 90-day notice of eviction and compensate the tenants with the equivalent of 1 month's rent in relocation assistance. However, eviction protections do not come into effect in Oregon until after the first year of a tenancy. Therefore, a no-cause eviction can legally occur at the end of the first year of a lease. Additionally, after the first year, a landlord may evict

*Many of the program features discussed so far, such as vacancy decontrol, condominium conversion, and owner move-in exemptions, can incentivize landlords to evict tenants. Thus, many rent stabilization programs are accompanied by tenant protections to guard against evictions.*

a tenant if they have violated the terms of the lease three times in the preceding 12 months. This has caused significant concern from tenant advocates who are fearful the provision will incentivize landlords to evict tenants for minor breaches of their lease (Chew and Treuhaft, 2019).

Under California's 2019 statewide rent control expansion, tenants are covered by just-cause protections after the first 12 months of residing in the unit. However, the protections only apply to buildings that are older than 15 years, and single-family homes and most owner-occupied properties are exempt. Similar to Oregon, the law recognizes two categories of evictions: at-fault and no-fault evictions. Allowed reasons for at-fault evictions are failure to pay rent, breach of a material term of the lease, unpermitted sublet of the unit, or criminal activity, among others. The law also requires the landlord to provide a written notice with a 3-day window for the tenant to remedy any violation. After that, the owner may file for a legal eviction. There are also only four no-fault evictions allowed in California: intent to withdraw a property from the rental market, occupation of the unit by the owner or an immediate family member, a substantial renovation that will last longer than 30 days, and a vacancy of the property ordered by a court of law. In the case of a no-fault eviction, the landlord must provide the tenant with one of two options: relocation assistance equal to 1 month's rent or a waiver for the rent of the final month of the lease.

## Cost Pass-Throughs

### MAINTENANCE AND CAPITAL IMPROVEMENTS

Cost pass-throughs are individualized increases granted to landlords to recover some of their expenses related to maintenance and capital improvement. Rent regulations are critiqued on the basis of inhibiting the maintenance of rental units. The argument is that as revenue is capped, costs continue to increase. Instead of accepting lower profit margins, landlords are expected to minimize costs where available. Cost pass-throughs are included to incentivize maintenance and capital investment. However, without safeguards, they risk allowing unnecessary rent increases for trivial maintenance and renovation activities. Jurisdictions vary in the amount of maintenance and capital improvement costs that can be passed through to tenants and what maintenance and capital improvement actions are eligible under cost pass-through provisions.



NDFOO/SHUTTERSTOCK

Capital improvement pass-throughs in Los Angeles County are designed to incentivize compliance with the county's rent stabilization ordinance and allow landlords to recover only costs directly related to capital investments. To pass through costs, landlords are required to register the county annually and complete an application to pass through any costs. If approved, a landlord is allowed to collect up to 50% of the total cost of a capital improvement[2] or primary renovation.[3] The approved pass-through is not considered rent and is included as a separate line item on a tenant's monthly housing payment. Once the approved costs are recovered, the landlord can no longer collect the additional amount. Further, the county can decline a pass-through that would, when added to any rent increase for the year, increase a tenant's rent by more than 8%.

In New York, landlords are able to recover the full cost of their investment (Been et al., 2019). The law distinguishes two separate processes for major capital improvements (MCI) and individual apartment improvements (IAI). MCIs include investments like new windows, roofs, or heating systems and are subject to approval from the State Department of Housing and Community Renewal. IAIs—upgrades to individual units such as new carpeting or a new kitchen appliance—require no approval. Under the previous law, pass-throughs for buildings over 35 units were amortized over 9 years and buildings under 35 units were amortized over 8 years. However, the rent stabilization expansion passed in 2019 extended the amortization period to 12.5 years and 12.0 years, respectively. Additionally, the previous law capped the MCI increases at 6%, but they are now capped at 2%. The MCI rental increases must be removed from the rent after 30 years following the date of the increase. Finally, landlords are

no longer able to increase rents for stabilized apartments for an MCI if the building has less than 35% rent stabilized units.[4]

Landlords in Berkeley are required to petition the rent control board to recover costs related to major capital improvements. To qualify for a capital improvement increase the improvement must materially add value to the property, prolong its useful life, have a useful life over more than 1 year, and a minimum direct cost of either $200 per unit or $1,500 per property, whichever is less. The types of improvements that qualify must (1) bring the property into compliance with a new code, (2) significantly improve the property's seismic safety, (3) be provided to the tenant in good faith to primarily benefit the tenant, or (4) be a major repair. The allowable increase per unit for capital improvements ranges from 0.927% to 1.187% of the project's total cost.

### UTILITIES AND PROPERTY TAXES

Some jurisdictions allow landlords to apply for individualized rent increases that are due to property tax increases. Many of the rent control jurisdictions in New Jersey allow this type of pass-through (Baar, 1983). For example, Newark allows landlords an increase equal to one-twelfth of the proportion of the current year's property tax *increase*.

Some programs also allow individual adjustments to cover increases in utility costs. Landlords in San Francisco, for example, can apply to the rent board for an individual adjustment if the landlord pays for gas, electricity, or steam, and the cost paid by the landlord increases from one calendar year to the next. In such cases, landlords are eligible for an increase equivalent to 100% of the increase in utility cost.

---

2   The County ordinance defines a capital improvement as including, but not limited to, the complete exterior painting of the building, landscaping, flooring, fixtures, doors, windows, fences, security items, meter conversions, major appliances, or window screens and coverings. All capital improvements must have a useful life of at least five years, and can not include regular maintenance or from the failure of the landlord to conduct regular maintenance. (Ord. 2019-0063 § 2, 2019)

3   A primary renovation must include either or both: 1) Replacement or substantial modification of any structural, electrical, plumbing, or mechanical system that requires a permit pursuant to State or local law. 2) Abatement of hazardous materials, such as lead-based paint or asbestos, in accordance with applicable federal, State, and local laws.

4   https://hcr.ny.gov/system/files/documents/2020/11/fact-sheet-24-10-2019.pdf.

## RIGHT TO FAIR RETURN

Most rent stabilization programs include provisions that allow for landlords to apply for rent increases above the allowable limit under hardship provisions that enable them to increase rent to ensure they do not have problems related to cash flow. Additionally, almost every program provides for a fair return on investment, usually by guaranteeing a certain "reasonable" rate of return (Arnott, 1995). Such provisions are, according to some, necessary to prevent legal challenges (Been et al., 2019; PolicyLink, 2001). A study of New Jersey cities found that while a rent control board only received about three or four applications for a hardship increase on average each year, over 70% of applications were approved (Baar and Keating, 1981).

A great deal of variation occurs in how jurisdictions define a fair return. Typically, the standard is determined by weighing the income a landlord receives from a property against their approved operating costs relative to the property's valuation (Been et al., 2019).

Another standard uses the landlord's net operating income (NOI), which is the difference between the total income earned from a property and the expenses required for operating costs. Rent regulations potentially limit the income earned by a landlord on a property, while their operating expenses increase year to year. The city of Richmond, California, guarantees landlords a right to earn an amount equal to their NOI in the base rent year of the law, 2015, plus 100% of the increase in CPI. However, if this amount is greater than a 15% increase, the portion that is in excess of the 15% must be deferred to the following year or later.

As with many of the provisions in rent stabilization programs, hardship increases and right to fair return provisions are balanced against the goals of most programs to limit rent increases. Regulations that are too generous incentivize landlords to apply for unneeded rent increases, adding administrative cost to



TONY WEBSTER/FLICKR

the program and undermining affordability goals (Been et al., 2019; Appelbaum and Gilderbloom, 1990).

## Preferential Rent and "Banking" Increases

Preferential rent refers to the practice of landlords offering a rent increase that is lower than the amount they are legally allowed to make. Banking refers to the ability of the landlord to recover the foregone rent increase in subsequent years. This program feature, in effect, allows landlords to offer rent increases below the cap in some years and above the cap in other years to make up for it. Some programs put limits on banked increases. For example, Oakland, California, allows banking but does not allow banked increases to exceed an amount three times the CPI. The program also does not allow the banking of increases for a period greater than 10 years. In New York, the rent stabilization expansion of 2019 locks in the preferential rents for the duration of the tenancy. Following the end of the tenancy, the landlord can claim the banked amount and return the rent to its legal regulated amount (NY Office of Rent Administration, 2019).

## Infrastructure, Implementation, and Enforcement

Rent stabilization programs are implemented in a variety of ways. One of the most common is through an elected or appointed rent control board. General-

ly, the board is governed by a mixture of landlords, tenants, and additional members who don't represent the interests of either group. Rent boards vary in function across jurisdictions. The primary purpose of most is to establish the base rent and allowable rent increase each year. Other primary responsibilities of these boards are to mediate conflicts between landlords and tenants; hear and decide upon landlord applications for additional increases based on hardship, capital investment, and vacancy; and hear and adjudicate appeals from both landlords and tenants.

For example, the Berkeley Rent Stabilization Board has nine members and is responsible for enacting regulations, hearing petition appeals, and generally administering the program (City of Berkeley, 2021). The board's responsibilities include providing information to landlords and tenants, determining annual rent increases, conducting administrative hearings, and issuing petitions on applications to adjust rents. Additionally, the board collects data on rent increases, evictions, and owner move-ins, publishing periodic reports on program outcomes.

Another function of rent boards is to maintain and enforce a registry of all rental properties that are subject to rent stabilization policies. In these jurisdictions, landlords are required to register their property with the rent board to legally increase rents. They ad-

ditionally pay a registration fee, which is usually used to cover the administrative expenses of the boards. Registration fees allow the rent boards in Berkeley and Santa Monica to operate cost neutral for the local government (Montojo et al., 2018). In Berkeley, any unit covered by the rent stabilization ordinance must be registered yearly with the rent board, and the owner is required to pay a registration fee of $250 per unit. The cost of the registration fee may be passed through to the tenant only if the tenant has occupied the unit since before 1999, and the pass-through must be approved by the rent board. In the 2021 fiscal year, the Berkeley Rent Board will have an authorized expenditure amount of about $6.1 million.

In other jurisdictions, no elected or appointed body administers the program, but instead responsibilities are delegated to a new or existing department of the government. The Tenant Protection Program in Sacramento is housed within the city's Business Compliance Unit of the Community Development Department and is administered by city staff and one "hearing examiner" appointed by the city council. The Tenant Protection Program is responsible for the implementation and administrative enforcement of the program, including maintaining a registry of regulated rental units, publishing the yearly cap, hearing petitions from landlords and tenants, and publishing annual reports on program outcomes.

Other jurisdictions do not have a specific body that enforces their rent control programs. For example, the statewide rent stabilization program in Oregon does not have its own administrative body. Instead, rent increases are determined by a set percentage of 7% per year plus the annual CPI. A pre-existing state agency, the Oregon Department of Administrative Services, is responsible for announcing the annual increase, which is predetermined by the most recent regional CPI report (Senate Bill 608). While this program has less administrative overhead and is simpler to implement, it can lead to difficulties in enforcing compliance with the law. In Oregon, tenants are

required to take a landlord to court to enforce provisions of the law. If found guilty, the landlord is required to pay the tenant an amount equal to 3 months' rent plus any damages suffered. Additionally, the landlord would likely be required to pay the tenant's legal fees and any administrative fees incurred. While this method provides tenants with an opportunity for remediation, it requires a significant amount of time and resources for a tenant to pursue. Moreover, tenant-based compliance programs like this require that tenants be aware of the program and its provisions and puts the entire burden of implementation on them.

Another service in some cities is an online calculator that computes allowable rent increases. A tenant or a landlord can simply enter the current rent and the calculator applies the rent increase cap to produce the maximum allowable rent increase. The city of Berkeley provides an online search tool in which a user can enter an address and see the rent ceiling that applies to that unit.

## Outreach and Education

Efforts to ensure compliance with rent stabilization programs are critical policy decisions for cities. While remedies are often available when a landlord violates the law, many cities create programs to educate both landlords and tenants on their rights and responsibilities to prevent infractions. The city of Oakland hosts frequent workshops on a variety of topics related to rental housing, including sessions geared toward teaching landlords about specific components of the rent stabilization program and sessions specifically designed for small property owners. The city also provides regular workshops in multiple languages for tenants. Most jurisdictions with rent stabilization programs maintain a website with information regarding the rights and responsibilities of tenants and landlords. The New York Office of Homes and Community Renewal has over 40 one-page fact sheets that provide overviews of different details of the state rent stabilization legislation.

Some programs require that yearly notices be sent to landlords notifying them of their responsibility to register their properties and pay the registration fee. In 2019–2020 the city of Newark piloted a program that sent letters to 7,800 landlords reminding them to register their property by the deadline. The program increased the number of registered landlords from 520 in 2018 to an all-time high of over 2,800 in 2020. The city of Sacramento is in the process of designing a similar outreach program for 2021, only the second year of the city's program.

Additionally, administrators of rent programs often coordinate with local organizations to conduct outreach to tenants. The city of Sacramento is partnering with a local housing nonprofit, Sacramento Self Help Housing, in implementation and outreach around the program.



MATTHEW OSBORN/UNSPLASH

## Peer Cities Analysis

To provide a deeper understanding of how programs operate, we chose four peer cities using the criteria of city size, size of the city's rental market, and the size of the city's operating budget. Because of the small sample size of cities with rent stabilization, many of the traditional peer cities of Minneapolis were eliminated. Additionally, almost all of the potential peer cities are located in New York, New Jersey, or California. The unique characteristics of those housing markets present difficulties in drawing firm conclusions from an analysis. Our focus in this section is on how the programs are implemented.

The cities chosen were Oakland, California; Portland, Oregon; Newark, New Jersey; and Sacramento, California. While the Newark and Oakland programs have been active for decades, both Sacramento and Portland (via Oregon's statewide law) enacted rent stabilization policies in 2019. We hope that the latter two cities are able to provide specific insight into the administrative and operational procedures of a new rent stabilization program.



EDDIE HERNANDEZ/SHUTTERSTOCK

### Oakland, California

**THE ORDINANCE**

The city of Oakland passed rent control in 1983. The ordinance was for many years considered one of the weakest rent control programs in the Bay Area. The policy, which is known as the Rent Adjustment Program (RAP), limits the amount of rent increases to the CPI for the region. The program has vacancy decontrol,



**MINNEAPOLIS PEER CITIES**

**Portland**
Senate Bill 608
· State law enacted 2019
· Enforced at individual level
· CPI + 7% cap

**Minneapolis**

**Sacramento**
Sacramento Tenant Protection Act
· City ordinance enacted 2019
· Enforcement is in development phase
· Cap at CA CPI for All Urban Consumers for All Items + 5%, with a maximum total increase of 10%

**Newark**
Newark Ordinance Section 19:2-3.1
· City ordinance enacted 1973
· Administered by Office of Rent Control & Newark Rent Control Board
· Cap at change in CPI from 15 to 3 months before date of the proposed increase

**Oakland**
Rent Adjustment Program (RAP)
· City ordinance enacted 1983
· Active enforcement by Dept. of Housing & Community Development
· Regional CPI cap

and rental units constructed after January 1, 1983, are exempt. Other exemptions apply to single-family homes, condominium units that are rented, and government-subsidized units.

The program allows banking, in which the owner is allowed to make up in subsequent years for lower-than-allowed rent increases in previous years. Such banking increases, however, are limited to no more than three times the current year's CPI. Owners are not allowed to bank increases more than 10 years.

Though there are various exceptions to the allowable rent increase cap, property owners must petition the rent board for any increase in excess of the CPI. Thus, all exceptions are not "as of right" and require notification to the board and the board's approval. Owners can petition for the following exceptions to the rent cap:

- Up to 70% of allowable capital improvements costs made in the previous 24 months
- Costs to cover repairs from fire, earthquake, or natural disaster to the extent that these costs are not insured
- Increased housing service costs including insurance, utilities, heat, water, and other services
- "Fair return" increases that allow the owner to maintain a base net operating income

Though these various pass-throughs are allowed in the law, there is also an overall 10% limit in the Oakland ordinance for any 12-month period, and a 30% limit for any 5-year period.

Tenants may petition the rent board to contest illegally high rent increases, a lack of required notice for additional increases (as specified in the ordinance), the expiration of a capital improvement amortization period, and an improper service of the annual rent increase notice.

Some elements of the Oakland law are governed, as are all rent stabilization programs in California, by the state Costa-Hawkins Rental Housing Act, which prescribes vacancy decontrol, new construction exemptions, and exemptions for single-family homes.

## PROGRAM EVOLUTION

The program has evolved considerably over time, with most modifications made to strengthen it. One change was to eliminate an exemption for capital. Originally, "substantially rehabilitated units" were exempted from further rent controls under the program. The concept behind this exemption was that if a unit was thoroughly rehabilitated and updated it was essentially like new construction and therefore should be treated as new construction is in the program. The provision was thought to be an important incentive for upgrading and improving the housing stock. In practice, the threshold for what was considered substantially rehabilitated was a rehab cost that was greater than 50% of the cost of building an equivalent number of new units. This exemption was eliminated in recent years after tenant organizations complained that it was being abused by owners. In 2017, tenant organizations complained that landlords were adding up the costs of routine maintenance and capital improvements from many previous years to apply for certificates of exemption[5]. Oakland was one of the few cities in California to allow this type of exemption. San Francisco is another but requires the rehabilitation investment to exceed 75% of the cost of newly constructed units. Between 1997 and 2017, San Francisco granted only 19 exemptions of this sort. Though Oakland eliminated the substantial rehabilitation exemption, RAP retains a provision under which owners may petition to pass through capital improvement costs.

Another recent (2019) change in Oakland's program is the elimination of an exemption for two- and three-unit buildings in which one of the units is occupied by the owner. This provision also induced some abusive practices by owners and realtors. Realtors began, in essence, marketing this exemption by describing it to potential investors. Realtors were pushing a business model in which an investor would purchase a duplex or triplex and evict the tenants on the basis of an intention to move in and/or petition for exemption from rent control on the same basis. In exchange for eliminating this exemption, the law was also adjusted to give the owners of duplexes and triplexes an expedited hearing for "fair return" petitions. A fair return petition is a request for larger-than-cap rent increases to provide the owner with a fair return on their investment. Though purchase and evictions in two- and three-unit buildings had become common, once the law changed there were very few fair return petitions made.[6]

## COMPLEMENTARY INITIATIVES

The rent stabilization policy regime in Oakland goes beyond the rent increase caps in RAP. The Oakland law includes substantial tenants' rights in other forms.

In 2003, Oakland initiated a "just-cause eviction" policy. The ordinance (Oakland Municipal Code Section 8.22.300 et seq.) was passed by voters in 2002 and amended in 2016 and 2018. The most recent amendment was to extend the just-cause requirements to tenants in duplex and triplex buildings.

The city also has a tenant harassment ordinance (O.M.C. Section 8.22.610 E) modeled after similar ordinances in San Francisco, Santa Monica, West Hollywood, and East Palo Alto. Enacted in November 2014, the Tenant Protection Ordinance (TPO) cites

---

5  BondGraham, Darwin. 2017. "Some Oakland Landlords Are Using a Legal Loophole to Exempt Housing from Rent Control." East Bay Express, September 13. www.eastbayexpress.com/oakland/some-oakland-landlords-are-using-a-legal-loophole-to-exempt-housing-from-rent-control/Content?oid=9074126.

6  Interview with Leah Simon-Weisberg and Jackie Zaneri, Attorneys for Alliance of Californians for Community Empowerment, February 2, 2021.

the high and rising market demand throughout the Bay Area as creating "an incentive for some landlords to engage in harassing behaviors or fail to make repairs to pressure existing tenants in rent-controlled units to move so that rents can be raised." The city council decided that the existing remedies of the just-cause eviction law, the provisions of RAP, and the tenant option of pursuing a legal recourse were insufficient deterrents to this type of landlord behavior. Prior to enactment of the TPO, the city was receiving 100 to 200 complaints per month. Many of the cases were outside the jurisdiction of RAP. The ordinance defines harassment as the failure to fully provide housing services or a threat to do so, the failure to perform repairs and maintenance or a threat to do so, abusing the owner's right of access to a rental unit, removal of personal property from a rental unit, attempts to influence a tenant to vacate through fraud, intimidation or coercion (including threats to report the tenant to Immigration and Customs Enforcement), and any of 10 additional specified actions. The TPO prohibits retaliation against the tenant, as well.

Tenant/landlord relations in Oakland are also governed by a Tenant Move Out Agreement ordinance (O.M.C. Section 8.22.700 et seq.) that regulates the rights and responsibilities of each party at the stage of tenant turnover. The city's Uniform Residential Tenant Relocation ordinance (O.M.C. Section 8.22.800 et seq.) requires a relocation payment from owners to tenants in the case of owner move-ins and for other "no tenant fault" evictions.

### IMPLEMENTING THE ORDINANCE

The Oakland program is implemented by the city's Department of Housing and Community Development. The city follows an "active-enforcement" model that "uses extensive outreach to inform tenants and owners about their rights and obligations under the law and program regulations, maintains full and accurate records through reporting requirements for initial rents and eviction proceedings, provides mediation and dispute resolution services, and actively enforces the law and program regulations when it finds violations."[7] To implement this enforcement model, RAP has 26 full-time equivalent (FTE) staff members. RAP staff are divided into three units: Administration and Policy (7 FTEs), Community Engagement and Enforcement (8 FTEs), and Hearings (11 FTEs).

The Administration and Policy unit includes a Program Manager and Assistant Program Manager, who lead the entire RAP effort. This unit is also responsible for supporting the rent board, conducting research and analysis, and producing reports. The Community Engagement and Enforcement unit is responsible for tenant and property owner outreach, conducting workshops and other public education efforts. The Hearings unit includes six Hearing Examiners, case analysts, and support staff. The hearing officers hear and rule on petitions made by landlords and tenants. Appeal of the hearing officers' rulings are

heard by the full rent board, which is made up of seven individuals, including two residential rental property owners, two tenants, and three persons who are neither owners nor tenants. There are six alternate members of the board, two in each category. Board members are nominated by the mayor and confirmed by the city council and serve 3-year staggered terms. Service on the rent board is not compensated. Members meet weekly and hear appeals of decisions of the hearing officers.

According to the most recent annual report of the RAP unit, the city expanded its housing counseling hours from 12 hours per week to 35, and counselors provided assistance to approximately 8,000 residents over 2 years. In the past 2 years, RAP staff held hearings on 1,531 petitions from tenants and landlords. In the same period, city staff facilitated 14 workshops, including one in Spanish. In 2019, the city offered:

- Small-property owner's workshop on RAP issues related to owner-occupied duplex/triplexes
- Landlord 101 workshop
- Tenants' rights workshop
- "Evictions in Oakland—A workshop for Oakland property owners"
- "Landlord and tenant rights and responsibilities—security deposits"

The RAP office offers an online property owners packet, in multiple languages, outlining the law and the responsibilities of tenants and landlords under the City's rent regime, as well as available resources. A tenants' packet offers the same information.

The city also lists on its website local organizations that provide assistance to tenants and other organizations providing assistance to property owners, with full contact information for all. Finally, the staff also offers a mediation program for tenants and landlords.

Owners of rental property covered either by the Rent Adjustment ordinance or the Just Cause for Eviction ordinance must file with the city and pay an annual fee of $101 for each unit, due by January 1. Owners who pay the fee on time are allowed to pass half of the fee to the tenant as a one-time charge. For this fee, tenants and landlords receive significant support in terms of explaining rights and responsibilities according to the law. Our informants noted that most property owners want to follow the law and thus are interested in knowing and understanding what it requires. Rather than needing to hire costly legal advice, owners can access the information and resources made available by the city for the cost of the per-unit fee.

In fiscal year 2019–2020, RAP fees produced $7,994,654 in revenues to the city. Various other fees and investment interest supported a total RAP budget of $8.2 million.

---

7  RAP Annual Report 2018-19 and 2019-20. Report to City Administrator from Director of City of Oakland Housing and Community Development Department, February 1, 2021.



JPL DESIGNS/SHUTTERSTOCK

## Portland, Oregon

Rent control in Portland, Oregon, is governed by a state law. The state of Oregon has preempted local governments from enacting rent control. The state's largest city, Portland, has suffered from high housing prices for years. In 2017, the city had one of the largest median rent increases in the country. In the 5 years from 2014 to 2019, rent in Portland rose by more than 30%. There was an unsuccessful effort in 2017 to lift the local ban on rent control. Advocates came back the next year and switched their strategy to enacting a state law that would regulate rents, while keeping the local ban in place. Senate Bill 608, enacted in 2019, was the result.

### THE LAW

The law contains two parts: a rent-increase cap and a tightening of the rules for evictions. Both the cap and the eviction protections apply only to multi-unit buildings. The law exempts units in buildings constructed in the previous 15 years, a rolling exemption that adds new units to the controlled stock each year. The 15-year exemption was a conscious attempt to avoid what the law's framers felt was the negative impacts of the Costa-Hawkins approach in California. The California law sets the new construction exemption at a specific date, 1995. This results in an ever-shrinking stock of controlled housing and a growing stock of uncontrolled housing, which leads to significant disparities in outcomes and a kind of dual housing market. Though private-sector sources sometimes indicate that investors have 10- to 15-year time horizons for the investments they make, the framers of the Oregon law settled on 15 years purely as a political compromise that was amenable to both the tenant faction and the landlord groups.

Government subsidized units are exempted. The bill limits rent increases to the CPI + 7%. The program has vacancy decontrol, allowing owners to increase rents without limit when a vacancy occurs.

The tenant protection measures in the law require a just cause for evictions. If tenants are evicted due to "landlord-based" causes (such as intent to demolish or repurpose the building, intent of owner to move in, or sale to new buyer who intends to move in) landlords must provide 90-day notice and 1 month of paid rent to the tenant as relocation assistance. This provision does not apply to landlords who own four or fewer rentals.

The just-cause provision applies to renters after a year of tenancy in their apartment. Although tenants may be evicted without just-cause protections in the first year of their tenancy, vacancy decontrol does not apply in this case. Eliminating vacancy decontrol for such cases is an attempt to discourage short-term evictions.

Landlords found guilty of violating the provisions of the rent cap or just-cause protections must pay tenants for damages plus 3 months of rent.

### IMPLEMENTATION

The state rent control law in Oregon does not establish any state-level administration or enforcement responsibilities. The sole act of the government in implementing the law is the publication of the official rent increase cap, which is done by the Department of Administrative Services. Every September state economists establish the acceptable rent increase for the upcoming year using the CPI for western states. For 2020, the cap was 9.9%.

Enforcement of the law happens at the individual level. It is incumbent upon tenants to use the courts to enforce the compliance of landlords. The entirely laissez-faire approach of the state was a consequence of a lack of appetite for an enforcement infrastructure among state legislators, according to the legislative aide who designed the bill.[8] Rent control advocates wanted active state enforcement but such provisions were not written into the law.

Nothing prevents local governments from enforcing the law by establishing a rental registry system and collecting rent increase data. Nor is there anything preventing local governments from providing information and public education support for the program. But, such efforts are unlikely at best.

### IMPACT

The Oregon rent control program is best understood as an anti-rent-gouging law. With the vacancy decontrol and the high

---

8  Interview with Taylor Smiley Wolfe. February 3, 2021.

rent cap, which allows rent increases of close to 10%, the law only constrains the highest rent increases. The Speaker of the House acknowledged that the main goal of the legislation was to "end the practice of rent gouging."[9] In 2018, when the bill was introduced, some estimates of the Portland rental market indicated that up to one-quarter of rent increases in the city exceeded 10%. Thus, the bill's proponents felt that it would have an important impact despite the high cap and the vacancy decontrol. Nevertheless, there is evidence that some landlords in Oregon rushed to increase rents on current tenants before the law took effect. When California enacted its statewide law, it set base rent at what applied in March of the previous year, to avoid last-minute increases.

According to real estate investment services firm CBRE, "Investors remain interested in Portland-area multifamily properties." The firm's analysis indicates that the rent control program has not had "an appreciable impact on apartment markets in the state, especially metro Portland." The firm also found "no evidence of lower property values in the market yet, with cap rates for multifamily generally stable."[10]



SEAN PAVONE/SHUTTERSTOCK

## Newark, New Jersey

### THE ORDINANCE

Rent control in Newark dates to 1973, when it was enacted by the city's municipal council. However, it has been updated throughout the course of its history, most recently in 2019. The law has been significantly strengthened over the years. Originally the ordinance capped rent increases at 4% for buildings of 50 units or more and 5% for buildings less than 50 units. In 2014, the ordinance was amended to cap rent increases at an amount equivalent to the percentage change in the CPI from 15 months before the date of the proposed increase to 3 months before the date of the proposed increase (Newark Ordinance Section 19:2-3.1). Only buildings that are in compliance with city ordinances and are registered with the rent board are eligible for rent increases.

The primary categories of buildings exempt from the rent control ordinance are all public housing units and owner-occupied properties with one to four units. Additionally, newly constructed buildings with four or more units are exempt from the ordinance for 30 years. Buildings that were substantially rehabilitated can be exempt for 5 years if the building was vacant for 18 months prior, and 1 year if the building was not exempt. Substantial rehabilitation is defined in the ordinance as exceeding 50% of the building's value. Landlords must apply for the exemptions for newly constructed properties and rehabilitated vacant properties prior to occupancy in the building.

### IMPLEMENTATION

Newark's program is administered by the Office of Rent Control and the Newark Rent Control Board. The Office of Rent Control's main purpose is to provide educational and technical assistance to both landlords and tenants. According to the office's website, it provides technical assistance on "which apartments are subject to local rent control laws; what is the legal base rent; what rent increases the law permits; tax surcharges; water/sewer surcharges; major new improvement surcharges; hardship increases; and annual registration requirements."[11] It additionally keeps files on all registered properties, available for inquiries related to specific properties.

The rent control board is responsible for "conduct[ing] hearings and mediation of tenant and landlord petitions regarding the adjustment of rents under the City's rent control laws."[12] This includes granting rent increases, decreases, surcharges; imposing monetary penalties for violation of the law; holding public hearings; and collecting and maintaining the necessary information to implement the program. To carry out these tasks, the board is imbued with the power to request hiring of staff as necessary, and adopting rules and regulations to further the provisions of the ordinance. Finally, it can recommend ordinance and bylaw changes to the municipal council.

The board consists of five members, all appointed by the mayor and approved by the council: two tenants, two land-

---

9  Dake, Lauren. 2019. "Rent Control Is Not the Law in Oregon." Oregon Public Broadcasting, February 28. www.opb.org/news/article/oregon-rent-control-law-signed/.

10  Stribling, Dees. 2019. "No Evidence Yet of Impact from Oregon Rent Control Law." Bisnow National, December 4. www.bisnow.com/national/news/multi-family/no-evidence-yet-of-impact-by-oregon-rent-control-law-102074.

11  City of Newark Office of Economic and Housing Development: Office of Rent Control. www.newarknj.gov/departments/rentcontrol.

12  ibid.

lords, and one member who is a homeowner and neither a tenant nor landlord. Members serve 2-year terms and are paid an annual stipend of up to $3,500 dependent on how many meetings they attend throughout the year. The primary petitions that the board hears are related to individualized increases—tax surcharges, capital improvements, and hardship increases. Both tenants and landlords have the option to appeal any decision of the rent control board to the Law Division of the Superior Court within 45 days of a judgment being issued.

### ADJUSTMENTS TO THE PROGRAM

The program has undergone reforms in recent years as both tenant groups and real estate groups have tried to influence the ordinance. In 2014, a number of changes were made. The first, mentioned above, reformed the annual rent cap from a 5% cap for buildings of less than 50 units and 4% for buildings of 50 or more units to an annual cap tied to the CPI.[13]

The new ordinance also initiated an ongoing debate in the city regarding the renovation of rental units. Until 2014, landlords were able to increase rents by up to 25% if they could prove they spent $100 or more per room to renovate the unit. With the purpose of restricting rent increases related to minor improvements, the 2014 ordinance increased the threshold to $5,000 per room and decreased the cap to 20%.[14] After backlash from landlords, the council took up the issue again in 2017. The city kept the increase at 20% but changed the formula used to calculate the amount spent to qualify for the increase. The 2017 ordinance allowed a 20% increase if a landlord spent an equivalent amount to 8 months of rent. Previously, a $1,000/month unit was required to receive $15,000 in renovation to receive a $200 increase in rent. Under the new ordinance, the same unit only required $8,000 in renovation (8 months multiplied by $1,000 rent).[15] However, just a few months later tenants successfully pressured the council to dial back the new ordinance. The most recent update now requires landlords to spend an equivalent to 12 months of rent, and the allowed increase was lowered to 10%.[16]

In recent years the city has increased efforts at unit registration and compliance. Historically, less than half of the eligible rental units have been registered. In 2018, only 584 properties were registered. However, the city conducted a pilot program in 2019 to increase enforcement. Over 7,900 letters were mailed to landlords notifying them of their obligation to register their units. The city reported a 454% increase in registered properties, a total of 2,885.[17] Additionally, increased enforcement led to a total over $65,000 in rebates being issued to tenants who were overcharged rent, an increase of 323% from 2018.[18]



CASSIOHABIB/SHUTTERSTOCK

## Sacramento, California

### THE ORDINANCE

The city council adopted the Sacramento Tenant Protection Act on August 13, 2019, establishing the Tenant Protection Program. Under the program, rent increases are capped at 5% plus the percentage of the annual increase of the California Consumer Price Index for All Urban Consumers for All Items, with a maximum total increase of 10%.[19] To legally increase rent, a landlord is also required to provide written notice to the tenant. The ordinance also establishes eviction protections for tenants. After a tenant has occupied a unit pursuant to a lease for 12

13  Nix, Naomi. 2014. "Newark City Council Passes New Rent Control Ordinance." NJ.com, May 21. www.nj.com/essex/2014/05/newark_city_council_votes_on_rent_control_ordinance.html.

14  ibid.

15  Yi, Karen. 2017. "New Rule 'Deconstruction of Rent Control' in Newark, Advocates Say." NJ.com, March 8. www.nj.com/essex/2017/03/newark_rent_control_ordinance.html.

16  Rouse, Karen. 2017. "Newark Tenants Try to Tighten Rent Control as Downtown Booms." New York Public Radio, WNYC, August 2. www.wnyc.org/story/newark-tenants-turn-voters-control-rising-rents/.

17  Office of Mayor Ras J. Baraka. "Press Release: Mayor Baraka Says Rent Control Registration by Landlords at All-Time High," November 20, 2020. www.newarknj.gov/news/mayor-baraka-says-rent-control-registration-by-landlords-at-an-all-time-high.

18  Barker, Cyril Josh. 2020. "Newark Steps up Rent Control Enforcement in Response to Growing Demand for Housing." New York Amsterdam News, February 13. http://amsterdamnews.com/news/2020/feb/13/newark-steps-rent-control-enforcement-response-gro/.

19  Sacramento City Code Chapter 5.156: Tenant Protection.

months, they are entitled to a renewal of lease unless at least one of the following conditions apply:

- Failure to pay rent
- Breach of rental agreement
- Criminal and nuisance activity
- Failure to give access
- The unit requires necessary and substantial repairs,
- The owner or an immediate family member plans to use the unit as a primary residence for at least 12 months
- Withdrawal of the unit from the rental market

Advocates have raised concerns about the 1-year period in which no-cause evictions are still legal, fearing that landlords will use the period to displace tenants.[20] Instead, they preferred the eviction protections to immediately go into effect when a lease is signed. Another option was presented by a city council member Katie Valenzuela, which would reduce the period from 1 year to 3 months.[21]

Like all local rent stabilization programs in California, the Tenant Protection Program is subject to the Costa-Hawkins Act, which exempts all units constructed after 1995 and single-family homes. Additionally, under Costa-Hawkins vacancy decontrol is mandatory. Other exempted units are:

- Short-term rentals (less than 30 days)
- Rental units in institutional care facilities
- Units owned, operated, or subsidized by a government entity
- Units where the tenant shares a kitchen or bathroom with the property owner
- Units that the landlord or an immediate relative of the landlord use as their primary residence

In total, 42,000 units across 8,100 parcels in the city are subject to the Tenant Protection Program.

## IMPLEMENTATION

The details of the program itself are dictated by the ordinance, but the administrative and operational procedures of the new program were not immediately designed. Instead the city manager was tasked with "adopt[ing] administrative procedures to implement the provisions of this chapter, including, but not limited to, preparing a rental housing registry in conjunction with the Rental Housing Inspection Code."[22] The program is organizationally situated in the Business Compliance Unit of the Community Development Department. On

September 24, 2019, the city council approved the Tenant Protection Program's operating and revenue budget, including 3.0 FTE employees—2.0 Customer Service Specialists and 1.0 Program Specialist.[23] However, tenant advocates have raised concerns with the size and structure of the program.[24] First, there is skepticism that three FTE positions will be able to handle the volume of requests from tenants and landlords. Second, tenant advocates preferred an independent elected rent board, such as those that exist in other cities, with the power to make binding decisions.

Like local governments across the country, city staff in Sacramento shifted their focus to COVID-19 response in 2020. Because of this, the construction of administrative procedures is still taking place. According to a timeline provided by the city, staff resumed program development and implementation in September 2020 and planned to carry out that process through the end of 2020. This process has included the development of a rental registry of all properties covered by the Tenant Protection Program. Additionally, staff set the program fee at a yearly rate of $20 per rental unit.

As of February 2021, administrative and operational practices for the Tenant Protection Program have not been implemented. However, according to the timeline set by the city, the first round of registration of units will occur in early 2021. At the end of January, the city began their initial outreach to landlords, notifying them of the requirement to register their rental units and sending billing notices. Additionally, the city began outreach to tenants to notify them of their rights under the Tenant Protection Program. From mid-January to March, registration forms will be mailed to the 8,100 parcels covered by the program, and invoices for registration fees will be sent from April 2021 to May 2021.

In the first full calendar year of the program, concerns have emerged from tenants and advocates about the effectiveness of the city's outreach and educational efforts. During a January 5th city council meeting, several residents testified during the public comment period to several instances of landlords ignoring the city ordinance governing the Tenant Protection Program. Additionally, several mentioned receiving incorrect information from city staff regarding the program.

According to city staff, no formal administrative hearings have occurred under the program yet, but they eventually will be overseen by an appointed "hearing examiner."[25] The examiner will be responsible for hearing and adjudicating complaints,

---

20  Interview with Sacramento Tenant Organizer, February 19, 2021.

21  Sacramento City Council Meeting, January 5, 2021.

22  Sacramento Tenant Protection Program Website: www.cityofsacramento.org/Community-Development/Code-Compliance/Tenant-Protection-Program.

23  Sacramento City Council Meeting, January 5, 2021.

24  Interview with Sacramento Tenant Organizer, February 19, 2021.

25  Sacramento City Council Meeting, January 5, 2021.

appeals, and petitions. However, staff noted that the city attorney's office had issued several letters to landlords in violation of the Tenant Protection Program, resulting in the rescinding of unlawful rent increases or evictions.

## Impact of Rent Regulations

## Affordability and Housing Costs

Empirical research indicates that rent regulations have been effective at achieving two of their primary goals: maintaining below-market rent levels and moderating price appreciation (Autor et al., 2014; Early, 2000; Heskin et al., 2000; Sims, 2007; Clark and Heskin, 1982; Levine et al., 1990). However, there is disagreement regarding the size of the impact. Outcomes in individual cities are dependent on the unique features of not only the rent regulations themselves but also the characteristics of the local housing market. Generally, places with stronger rent control programs, such as Berkeley and Santa Monica, have had more success preventing large price appreciation than weaker programs, such as those in cities across New Jersey.

A study from California analyzed the impact of vacancy control policies on median rent levels. Prior to the Costa-Hawkins Act of 1995, which phased out all vacancy controls in the state, the cities of Berkeley, East Palo Alto, Santa Monica, West Hollywood, and Cotati had policies that restricted the ability of landlords to raise rents when a unit became vacant. The study found that vacancy controls had been effective in keeping rents lower. Cities with controls on average had lower rent levels than cities with vacancy decontrol or no rent control at all (Heskin et al., 2000).

Similarly, in Santa Monica, a study found that the city's program was effective in preventing large increases in rent (Levine et al., 1990). The authors constructed a hypothetical timeline of rental increase in the city from 1979–1980 to 1987 based on the CPI, providing a baseline comparison for rents in the city before and after regulations were implemented. They found that the average difference between the expected and actual

rents was $159 per month. Schulman (1980) found similar results analyzing Santa Monica.

Under the stronger rent control program that existed in Berkeley before 1995, rents increased at a lower rate than the rental component of the Bay Area's CPI. While that component increased by 106% from 1980 to 1990, the total rent increases of rental units in Berkeley increased by only 54%. Further, the loss of low-income rental units was half that of the total Bay Area. However, Berkeley still lost a significant portion of its low-income housing during this time, pointing to the need for further policies to complement any rental regulations (Barton, 1998).

The experience of Los Angeles in the 1980s illustrates how differences in the details of rent control programs can produce varied results. The initial program enacted in 1979 was fairly moderate, guaranteeing a yearly increase of 7%. In a 1984 report the city found that while regulations were successful in stabilizing rents and giving more stability to tenants, rents in controlled apartments rose at approximately the same rate as noncontrolled areas outside Los Angeles. This was most likely due to the combined effect of the relatively high permissible increases and vacancy decontrol (Teitz, 1998). In 1985 the city adjusted the increase mechanism to a system based upon the annual CPI increase—with a guaranteed minimum increase of 3% and a maximum of 8%. The change led to an estimated net benefit increase of 29% for tenants—approximately $138 million in 1987. The shift to the CPI-based system was a major factor in the increased benefits, holding rent increases significantly below prior levels.

There is evidence that the end of rent control in Cambridge, Massachusetts, led to large rent increases for decontrolled units. A survey from the city in 1998 found that nominal rents for tenants in formerly controlled units had risen 40% between 1994 and 1997 (Autor et al., 2014). Prior to the program's termination, rent-controlled units were valued at a 45% to 50% discount compared to never-controlled units. After the termination of the program, those properties' values rose 18% to 25% relative to never-controlled properties with similar characteristics.



STEVE SCHNEIDER, SUZANNE TUCKER/SHUTTERSTOCK, GRANDBROTHERS/SHUTTERSTOCK

Overall, the end of rent control accounted for $2.0 billion of $7.7 billion in property appreciation from 1994 to 2004. Sims (2007) found that after the termination of rent controls, rent increased approximately $84 per month, leading to a wealth transfer of $17 million per month from tenants to landlords.

In Washington, DC, rent regulations likely had a significant impact on moderating rent increases (Turner, 1998). The Urban Institute estimated that monthly rents likely would have been anywhere from $50 to $200 higher in 1987 absent controls, with the best estimate ranging from $95 to $100 in monthly rent.

However, some studies have found that rent control did not significantly curb rising rents. A study of rent control jurisdiction in New Jersey did not find a significant reduction in controlled rents relative to the uncontrolled stock (Ambrosius et al., 2015). While they found that rents in uncontrolled cities were higher than in controlled cities, the results were not statistically significant. Gilderbloom and Ye (2007) also found that rents in rent regulated cities in New Jersey were only slightly lower than in cities without rent control. Multiple authors argue that programs in New Jersey have failed to provide significant relief to tenants because of their moderate nature, primarily only preventing exorbitant rent increases (Ambrosius et al., 2015; Appelbaum and Gilderbloom, 1990; Gilderbloom and Ye, 2007). Gilderbloom and Ye (2007) go so far as to call the programs in New Jersey "symbolic rather than distributional reform." While the research indicates that moderate rent control is associated with less significant impacts on rents, these programs are able to protect tenants from extreme rent increases and price gouging.

Finally, some have argued that by reducing the supply of housing, rent regulations actually cause rents to increase. Diamond et al. (2019) found in their study of San Francisco evidence that a 1994 rent control expansion in the city increased overall rents by 5.1%. They find that the higher rents are due to the overall reduction in housing supply, which they calculate to be a 6% reduction in total rental supply. Further, they found that the landlord response to the 1994 expansion of rent controls was to remove up to 15% of total units from the rental supply. This happened through owners moving out of their properties or demolishing them and constructing new buildings that would then be exempt from regulations.

However, despite overall increases in the cost of rent in San Francisco, tenants in rent-controlled apartments significantly benefited from rent control laws. Rent control provided an average benefit between $2,300 and $6,600 each year from 1995 to 2012, for a total of $214 annually and $2.9 billion in aggregate (Diamond et al., 2019). On the other side, rent control created a cost of $2.9 billion, with an incidence of 58% to current tenants and 42% to future tenants. The authors conclude that the costs of rent control essentially counteracted the benefits. However, the study does not account for renters who moved into newly controlled apartments following the expansion of the law in 1994 and might understate the aggregate tenant benefits.

Many studies document the negative impacts of vacancy decontrol on preventing rent increases. In his study of San Francisco, Goetz (1995) found that advertised rents continuously increased prior to and following the adoption of rent control in 1979. The city's vacancy decontrol allowed a steady increase in advertised rents and, in fact, led to an accelerated rate of increase after adoption of the policy. Appelbaum and Gilderbloom (1990) cite several studies in their literature review that show rents in decontrolled units rising at a faster rate than units that were not decontrolled. In Los Angeles during the 1980s, rents for decontrolled units were "substantially higher" for decontrolled units, with an average rent that was 29% higher than nondecontrolled units.

## Impact on Controlled and Noncontrolled Stock

Diamond et al. (2019) found that the San Francisco program drove rents upward in both the controlled and noncontrolled stock, in an aggregate amount that matched the savings it produced for tenants in controlled units. Fallis and Smith (1984) created a model that compared predicted rents to actual rents in Los Angeles 2 years after the implementation of its rent stabilization ordinance. They found that while the expected increase in rents during the 2 years was 23.9%, rent-stabilized units only increased by 13.7%. However, nonstabilized units increased at a rate higher than the expected increase in absence of controls. In the absence of rent controls, uncontrolled rents were forecasted to increase by 23.9%. However, uncontrolled rents increased by 46.2% in the 2-year period.

Evidence from other locations, however, indicates that rents were reduced for all rental units, whether or not they were controlled (Autor et al., 2014; Sims, 2007; Gyourko and Linneman, 1989). Further, there is evidence that the end of rent control in Massachusetts led to an increase in assessed value for both decontrolled and never-controlled units in Cambridge (Autor et al., 2014). They estimate that approximately half of the $1.7-billion increase in assessed property value for units decontrolled following the Massachusetts rent control ban was due to the effects of rent decontrol. Furthermore, the removal of rent control impacted rental units that were never subject to regulations. The authors estimate that 13%, or approximately $1.1 billion, of the property value increase for never-controlled units was due to the indirect effects of ending rent control. These increases are due to both direct and indirect effects. First, following the end of rent control landlords were able to charge market rents. The indirect effects consider the mechanisms that properties increase in value due to changes in neighborhood desirability—landlords renovate and modernize their units, new higher-income tenants who value these amenities move into the neighborhood, moving into higher rent never-controlled properties (Autor et al., 2014).

## Housing Stability/Tenure Length

There is widespread agreement in the empirical literature that rent regulation increases housing stability for tenants who live in regulated units (Ambrosius et al., 2015; Diamond et al., 2019; Glaeser and Luttmer, 2003; Gyourko and Linneman, 1989; Heskin et al., 2000; Sims, 2007; Levine et al., 1990). Some of the economic literature treats lengthened housing tenure as a market distortion, evidence that renters are being forced to stay in housing that they would not prefer under a perfectly competitive market (Gyourko and Linneman, 1989). Others note the impact lengthened tenure has on a landlord's ability to realize the full market potential of their properties (Basu and Emerson, 2000). They argue that when rents can be returned to market levels upon vacancy, landlords prefer short-staying tenants. However, a tenant's type is not known to the landlord, leading to asymmetric information between the two parties.



THAIPHY PHAN QUANG

However, housing research overwhelmingly stresses the importance of housing stability for economic well-being and physical, emotional, and mental health (Harkness and Newman, 2005; Smith et al., 2003; Welch and Lewis, 1998; Guzman et al., 2005; Bartlett, 1997). Housing stability has been associated with greater educational achievement among children (Scanlon and Devine, 2001; Kerbow, 1996; Brennan, 2011; Newman and Holupka, 2014).

*...housing research overwhelmingly stresses the importance of housing stability for economic well-being and physical, emotional, and mental health. Housing stability has been associated with greater educational achievement among children.*

Diamond et al. (2019) found that in San Francisco, tenants in rent-controlled apartments were significantly more likely (10%–20%) to be able to stay in their homes relative to those in noncontrolled housing. The effects were particularly prevalent for older households. However, they also found that the effect of the program was less for neighborhoods with greater turnover and more rapidly rising rents. They hypothesize that several features of the San Francisco program interfere with tenant stability in some neighborhoods. These features are (1) no-fault evictions if the landlord is planning to move into the property themselves, (2) the Ellis Act provision that allows landlords to evict tenants if they plan to tear down a property or convert it into a condo, and (3) the ability of landlords and tenants to negotiate cash payment from landlords to tenants in exchange for the tenants' early move-out.

Research in Santa Monica found that the city's program was successful in increasing the tenure length of renters (Levine et al., 1990). Comparing survey data from before the program was adopted in 1979 and in 1987, they found that the average tenant stayed in their unit 2.3 years longer after the program than before.

Sims (2007) found that the end of rent control in Massachusetts cities was negatively correlated with the length of time a renter stayed in a unit. The elimination of rent control in the 1990s was associated with a decrease in tenure of 1.84 years, a 30% reduction from the mean of 6 years.

A study of four California cities also points to increased housing stability due to the presence of vacancy controls (Heskin et al., 2000). The authors found that tenant turnover was about 10.1% lower from 1985 to 1990 in cities with controls than those without. They also found that cities with vacancy controls became more diverse in the time period studied, with specific increases in the percentage of Latinx residents in block groups with vacancy controls.

Barton (2011) found that in 1990, 33% of Berkeley tenants had been in the same unit for 6 or more years—an increase from 20% in 1980. Similarly, the percent of tenants who had been in place for less than 15 months fell from 44% in 1980 to 31% in 1990. While factors apart from rent control could impact the changes in duration of tenancy, Berkeley's experience is consistent with the proposition that rent control programs help create stability for tenants.

While Gyourko and Linneman (1989) found that rent control is not an effective redistributional tool for tenants, their findings show that it is an effective mechanism to provide housing stability. Their analysis is furthered by a study of New York City rent control in 1968, which found that 80% of the difference in expected length of tenure between tenants in rent-controlled and non-rent-controlled apartments is due to the policy itself (Ault et al., 1992). However, both studies view reduced tenant mobility as a negative consequence, arguing that rent control creates inefficiencies in the housing market by artificially prolonging tenure length and reducing tenant mobility. Analyzing gentrification in New York, Freeman and Braconi (2004) found that while living in rent-stabilized housing did not significantly decrease the odds of a poor household moving from their dwelling, non-college-educated household heads were significantly more likely to stay in their unit if they lived in rent-stabilized housing.

Also related to tenant stability, rent regulations provide transparency and predictability to the rent increases that tenants face. Without rental regulations, tenants likely do not know in advance if, and by how much, their rent will be increased, creating uncertainty in a renter's budgeting. As Gilderbloom and Ye (2007) point out, rent control provides tenants with a baseline understanding of how their rent will be changed year to year, facilitating a greater level of budget planning that can increase residential stability.

## Housing Construction

Many economists have theorized that rent control or stabilization will significantly dampen housing production. According to this view, developers are discouraged from building new units because rent regulations hinder the profitability of new units (Appelbaum and Gilderbloom, 1990; Sturtevant, 2018). Thus, new housing development may shift to a different, nearby city or simply not occur at all. However, little empirical evidence shows that rent control policies negatively impact new construction (Gilderbloom and Ye, 2007; Turner, 1998; Sims, 2007; Arnott, 1995; Goetz, 1995; Appelbaum and Gilderbloom, 1990). Construction is more dependent on localized economic cycles and other factors, especially in moderate programs that allow for various exemptions. Additionally, most jurisdictions with rent stabilization specifically exclude new construction from controls, either in perpetuity or for a set period of time. Nevertheless, some economists have argued that even with exemptions, new construction will decrease if there is uncertainty about future market conditions (Sturtevant, 2018).

Studying the end of rent control in Boston, Brookline, and Cambridge, Sims (2007) found that the end of rent control had no statistically significant impact in the short term on the construction of new housing. Similarly, Gilderbloom and Ye (2007) compared municipalities in New Jersey that had rent control to those without and found no statistically significant difference in construction activity during the period studied.

## Conversions, Teardowns, and Owner Move-ins

While there is little evidence that rent control has a negative impact on the construction of new housing, empirical research is clearer that rent regulations can incentivize property owners to withdraw rental units from the market through condominium conversions, owner move-ins, or teardowns (Barton, 1998; Diamond et al., 2019; Sims, 2007; Gyourko and Linneman, 1989; Olsen, 1991).

Most notably, a 2018 study from San Francisco found that the 1994 expansion of rent control laws created significant incentives for landlords to remove their properties from the market (Diamond et al., 2019). The authors found a 15% total reduction in rental units available because of a combination of owners moving into their properties, tearing down and reconstructing properties, significantly renovating them, or converting them into condominiums. The significant property investment led to a decrease in rental units available and in the number of renters per building. Also looking at San Francisco, Asquith (2019) found that the housing market poorly absorbed demand shocks. Landlords, unable to realize large price gains from the surge in demand, are more likely to withdraw some or all of their units from the market under San Francisco's owner move-in provision or Ellis Act evictions.

Sims (2007) also found evidence that rent control may have incentivized property owners to convert their units to owner-occupied. Following the end of rent control, units in decontrolled areas were approximately 7 percentage points more likely to be converted to a rental or condominium than in areas that never had rent-controlled units.

The removal of rent-controlled units from the market could be a result of a combination of vacancy decontrol and the exemption of new construction that pushes landlords to utilize these avenues to maximize profits from their properties. This has led many to recommend additional regulations to protect the existing

stock against conversion, preventing property owners from easily being able to withdraw their units from the rental market (Baar, 1983; Arnott, 1995). Where conversion is easy, rent stabilization can lead to the loss of units. Rosen (2018), for example, argues that the increase from 109,000 cooperative units in 1974 to 255,000 in 1999 in New York City was due to the ease with which property owners could sell off their rental properties and convert them into cooperative housing.

## Maintenance and Capital Improvements

Economic theory suggests that maintenance will decrease as a result of rent regulations. Housing quality is theorized as a function of the landlord's ability to earn revenue on their properties at market-rate rents. When rent increases are capped, landlords will respond by lowering their operating costs and reducing maintenance. However, others have argued that the impact is theoretically ambiguous (Olsen, 1988; Kutty, 1996; Moon and Stotsky, 1993; Frankena, 1975). Additionally, Arnott and Shevyakhova (2014) notes that maintenance failure is an issue in all long-term rental contracts where the owner is responsible for maintenance, regardless of whether or not the unit is subject to rent regulations.

Olsen (1988, p. 295) states that "the effects of rent control on maintenance of the controlled stock are based on incredibly simple models of housing markets and rent control ordinances and on casual empiricism." However, all contemporary rent control programs allow for yearly rent increases and many programs reward landlords for maintenance and capital improvement. For example, some only approve rent increases if a unit is in compliance with building codes, and others grant larger rent increases to cover costs for significant maintenance projects.

Kutty (1996) finds that the impact of rent control on housing maintenance is largely dependent on the features of the program itself. Programs with features allowing for responses to changes in the quality of housing services, either

incentives or penalties, largely prevent declines in maintenance. Olsen (1988) presents a theoretical model that, in fact, shows apartments could be *better* maintained under rent control if the rewards for maintenance and penalties for downgrading are large enough.

*Programs with features allowing for responses to changes in the quality of housing services, either incentives or penalties, largely prevent declines in maintenance.*

Gyourko and Linneman (1989) found that a higher percentage of controlled units in New York City were classified as "deteriorating" or "dilapidated" compared to uncontrolled units. Importantly, however, their study only considers New York City's rent-controlled units, which are subject to hard caps and significantly older, having been built prior to 1947. As a result, they make no causal claim between housing quality and the presence of rent control because of the possibility that structural differences between the controlled stock and uncontrolled stock are unrelated to the effects of rent control.

One study of Massachusetts cities found that while there was no evidence that rent control was associated with major maintenance problems—plumbing, heating, and electrical failures—it was associated with "chronic aesthetic problems" (Sims, 2007). These include peeling paint, holes in the wall, and loose railings. Using plumbing deficiencies as a proxy for housing maintenance, Gilderbloom and Ye (2007) found that rent control in New Jersey cities had no significant impact on housing quality outcomes. In Los Angeles, a city-conducted study found that while housing quality did decrease in rent-controlled units, the decline was modest and occurred at a slower rate than in surrounding noncontrolled cities (Teitz, 1998).

In Washington, DC, a study found that about one in five rental units in the district were physically deficient (Turner, 1998). Absent rent controls, landlords' revenues would have increased 33%, and many reported they would invest increased revenues into deferred maintenance. However, the number of buildings that were physically deteriorated decreased overall in the decade following the adoption of rent control, making it difficult to draw any conclusion about the impact of regulations on maintenance. Furthermore, 80% of tenants in rent-controlled buildings believed that maintenance was good or better than it would be without regulations.

## Distribution of Benefits

The question of who benefits is important in evaluating the effectiveness of rent regulations. Some have argued that the benefits of rent regulations are unevenly distributed and poorly targeted (Glaeser and Luttmer, 2003; Olsen, 1991; Gyourko and Linneman, 1989; Grebler, 1952). Glaeser and Luttmer (2003) argue, for example, that not only does restricting rents decrease the number of units available, but it also leads to an inefficient allocation of housing. Rental units become available to a greater number of potential renters, who value a rental unit at a lower level than other renters. Because there is no sorting mechanism, the units are randomly distributed to prospective renters, causing a misallocation.

Grebler (1952) argued that landlords would engage in highly selective behavior of more affluent tenants. While limited in raising rents, they will protect their interests by only renting to more economically stable tenants. Others concluded that because wealthier households spend more money on housing, a percentage reduction in their rent will create more benefit for them than it would for a poorer household (Olsen, 1991).

The empirical evidence on this subject, however, is mixed. Sims (2007) finds that rent control in Massachusetts did not adequately serve the populations targeted by the program, predominantly low-income and BIPOC renters. Of renters in controlled units, only 26% were in the bottom quintile of the household income distribution, and while Latinx and Black residents were 25% of the related cities' populations, they were only 12% of the population in rent-controlled units.

Gyourko and Linneman (1989) found New York City's rent control program to be poorly targeted. While many poor families received benefits, so too did many higher-income families. Many low-income families benefited from rent controls, other equally poor families received no benefits. Although Black renters received less benefit from occupying a rent-controlled apartment than their white counterparts, they were more likely to reside in a rent-controlled apartment. Turner (1998) also found the distribution of benefits in Washington, DC, unevenly distributed. One quarter of DC renters paid rents as high, or higher, than market-rate levels in 1987. Of those who paid less than market level, one-third paid within $100 less than market level, another third between $100 and $200 less, and the final third more than $200 below market levels. The most likely beneficiaries were those who stayed in their units for a prolonged period of time. This is not surprising, given the bonuses available to landlords when a unit became vacant. Low-income households moved more frequently and thus rented apartments that had returned to market-level rents through vacancy bonus increases.

On the other hand, several studies have shown programs to be well targeted. Clark and Heskin (1982) found that low-income, Black, and Latinx tenants overwhelmingly benefited from rent control programs in Los Angeles. The city of Los Angeles completed its own studies in both 1984 and 1988 and found that while older white renters benefited the most, there were positive benefits across the board for all renters (Teitz, 1998). Similarly, Gilderbloom and Ye (2007) found that Black residents and low-income residents of New Jersey cities were more likely to live in rent-controlled housing. Barton (1998) provides survey data showing low-income and nonstudent tenants as the largest share of residents in Berkeley's rent-controlled housing.

# PART 2: THE MINNEAPOLIS RENTAL MARKET

*In this section we report on the existing rental housing stock in the city of Minneapolis. We focus on the characteristics of rental housing in the city, including size, age, condition, cost, and location. To provide the most updated and fine-grained information, and because no single data set has all of the necessary information, we use several different sources in this section.[26]*

## Market Conditions in Minneapolis Rental Housing Stock

### Composition of the Rental Housing Stock

In 2020, according to the parcel database for Minneapolis, the city had 208,653 housing units (see Figure 2.1). The largest percentage of these units (43.7%) were apartments in buildings with four or more units. Another 11.1% of the units were in duplex and triplex buildings. Multi-family buildings thus account for 54.8% of housing units in the city. The rest of the stock is single-family housing, either detached (36.1%) or attached (9.1%). Condominium units are included in the single-family attached category and make up the bulk of that category.

For details of the rental housing stock in Minneapolis we primarily rely upon the city's rental licensing data.[27] Figure 2.2 presents data on the tenure status of residential buildings and housing units in the city. According to the rental licensing data, there are just fewer than 20,000 rental buildings in the city and over 90,000 rental units.[28] Single-family detached homes account for 37.2% of residential buildings with rental licenses in the city, and 7.9% of rental units. This is in all likelihood an undercount since compliance with rental licensing is likely to be lower among owners of single-family homes.



STEVE SCHNEIDER

**Figure 2.1: Minneapolis Housing Stock, 2020**

| PROPERTY TYPE | UNITS | % | BUILDINGS | % |
|---|---|---|---|---|
| Single-Family Detached | 75,333 | 36.1 | 75,329 | 81.0 |
| Single-Family Attached | 18,914 | 9.1 | 3,181 | 3.4 |
| Duplex/Triplex | 23,156 | 11.1 | 11,148 | 12.0 |
| Apartment (4 or More Units) | 91,112 | 43.7 | 3,291 | 3.5 |
| NA | 138 | 0.1 | 41 | 0 |
| **Total** | **208,653** | | **92,990** | |

Source: City of Minneapolis parcel data.

**Figure 2.2: Rental Housing Stock, 2020**

| PROPERTY TYPE | BUILDINGS WITH RENTAL LICENSE | % | UNITS WITH RENTAL LICENSE | % |
|---|---|---|---|---|
| Single-Family Detached | 7,404 | 37.2 | 7,406 | 7.9 |
| Single-Family Attached | 716 | 3.6 | 3,218 | 3.4 |
| Duplex/Triplex | 8,701 | 43.8 | 18,174 | 19.5 |
| Apartment (4 or More Units) | 2,999 | 15.1 | 64,339 | 70.0 |
| NA | 33 | 0.2 | 113 | 0.1 |
| **Total** | **19,853** | | **93,250** | |

Source: City of Minneapolis Rental Licensing Data.

---

26   In the analyses to follow we rely upon the most recently available data to describe current conditions. Because we use multiple data sources, however, the definition of "current" may change from one analysis to the next. All tables will identify dates and data sources.

27   There are 260 multi-family buildings with four or more units that do not have a rental license. Of these, 53 are tax exempt, but there is no clear indication as to why these buildings have no rental licenses.

28   Some buildings are mixed-tenure buildings. These are counted among the category "buildings with rental license."

Small-building rentals, defined as rentals in buildings with fewer than four units, make up 30% of the city's rental units but 85% of the city's rental buildings. The prevalence of small-building rentals varies by community area, however, as shown in Figure 2.3.

In three of the city's community areas with the largest number of rental units—Central, University, and Calhoun-Isles—there are relatively few small-building rentals. Just 11% of rentals in Central are in small buildings, 17% in University, and 23% in Calhoun-Isles. In contrast, in the Camden community more than 80% of the rental units are located in small buildings. Near North, Nokomis, and Northeast communities also all have a majority of their respective rental units located in smaller buildings. The largest number of small-building rentals are located in Powderhorn (5,730), Northeast (5,101), and Near North (3,360). As noted in Part 1 of this study, some rent stabilization programs exempt some or all small-building rentals. Such an exemption in Minneapolis would have a definite spatial pattern and impact.

One- and two-bedroom units are the most common rental units in Minneapolis. Together they account for 70% of all rentals in the city. Thirteen percent of the rental stock is studio apartments, and 17% of rental units have three or more bedrooms (see Figure 2.4).

The distribution of small units is also quite varied. Figure 2.5 divides the rental stock into studios and one bedrooms (small units) and units with two or more bedrooms. This roughly divides the Minneapolis rental stock into two equal parts. But significant variation exists in the location of units by size. The Central community rental stock is overwhelmingly studio and one-bedroom units; larger units make up only 19.4% of rentals in Central. Larger units are one-third (34.8%) of rentals in Calhoun-Isles and 39% of rentals in Longfellow. On the other end of the spectrum, the rental stock in Camden is 72% larger units, Near North is 69.5% two-bedroom units or larger, and Southwest is two-thirds large units.

## Age of Rental Housing Stock

Figures 2.6 and 2.7 show the average age of buildings with rental licenses in Minneapolis. Several patterns emerge. First, the rental stock is old, an average of 94 years old. As Figure 2.6 shows, the oldest rentals, on average, are in duplex and triplex buildings and in single-family detached dwellings. Condominiums and townhouses are an average of 62 years old. Figure 2.7 shows the average age of rentals by community area.

The oldest rental stock is in the communities of Phillips, Powderhorn, Northeast, Calhoun-Isles, and Near North. Each of these community areas has an average age for rental units that are above the citywide figure. Nokomis and Central have the youngest rental stock on average.

**Figure 2.3: Small-Building Rentals by Community Area**

| COMMUNITY | TOTAL RENTAL | SMALL-BUILDING* RENTALS | |
| | | N | % |
|---|---|---|---|
| Calhoun-Isles | 13,125 | 2,967 | 22.6 |
| Camden | 3,266 | 2,680 | 82.1 |
| Central | 14,273 | 1,604 | 11.2 |
| Longfellow | 5,137 | 1,963 | 38.2 |
| Near North | 6,152 | 3,360 | 54.6 |
| Nokomis | 2,766 | 1,948 | 70.4 |
| Northeast | 7,753 | 5,101 | 65.8 |
| Phillips | 5,653 | 1,715 | 30.3 |
| Powderhorn | 13,544 | 5,730 | 42.3 |
| Southwest | 6,118 | 3,056 | 50.0 |
| University | 15,463 | 2,679 | 17.3 |

*\* One- to four-unit buildings.*
Source: Rental Licensing Data.

**Figure 2.4: Rental Housing Stock by # of Bedrooms**

| BEDROOMS | % |
|---|---|
| 0 Bedroom | 13.1 |
| 1 Bedroom | 39.7 |
| 2 Bedrooms | 30.5 |
| 3 Bedrooms | 12.0 |
| 4 Bedrooms | 3.1 |
| 5 or More Bedrooms | 1.6 |

Source: 2019 One-year American Community Survey.

**Figure 2.5: 2+ Bedroom Units by Community**

| COMMUNITY | % 2 BR+ |
|---|---|
| Calhoun-Isles | 34.8 |
| Camden | 72.0 |
| Central | 19.4 |
| Longfellow | 39.1 |
| Near North | 69.5 |
| Nokomis | 57.8 |
| Northeast | 57.7 |
| Phillips | 43.6 |
| Powderhorn | 44.4 |
| Southwest | 66.0 |
| University | 57.3 |
| Total | 45.5 |

Source: 2019 ACS.

**Figure 2.6: Average Building Age by Type**

| PROPERTY TYPE | N | AVERAGE AGE |
|---|---|---|
| Single-Family Detached | 7,404 | 93.3 |
| Single-Family Attached | 716 | 62.2 |
| Duplex/Triplex | 8,701 | 101.8 |
| Apartment (5 or More Units) | 2,999 | 81.1 |
| NA | 33 | - |
| Total | 19,853 | 94.1 |

Source: City of Minneapolis parcel data.

The following figures break down the rental stock by whether it was constructed before or after 1980. More than 90% of rental units and 75% of buildings with rental licenses were built prior to 1980 (see Figure 2.8). Small-building rentals are the oldest in the city. Almost 100% of duplex and triplex rental buildings were built before 1980, and 95% of single-family detached rentals are at least that old.

**Figure 2.7: Average Building Age by Community**

| COMMUNITY | AVERAGE AGE |
|---|---|
| Calhoun-Isles | 97.7 |
| Camden | 89.9 |
| Central | 81.8 |
| Longfellow | 92.2 |
| Near North | 95 |
| Nokomis | 80.7 |
| Northeast | 100.4 |
| Phillips | 103.4 |
| Powderhorn | 100.9 |
| Southwest | 86.2 |
| University | 90.5 |
| Total | 94.1 |

Source: City of Minneapolis parcel data.

**Figure 2.8: Rental Housing Stock by Type by Age**

| PROPERTY TYPE | BUILDINGS | | | UNITS | | |
|---|---|---|---|---|---|---|
| | TOTAL | PRE-1980 | % BUILT PRE-1980 | TOTAL | PRE-1980 | % BUILT PRE-1980 |
| Single-Family Detached | 7,398 | 7,036 | 95.1 | 7,400 | 7,038 | 95.1 |
| Single-Family Attached | 715 | 418 | 58.5 | 3,218 | 1,662 | 51.6 |
| Duplex/Triplex | 8,698 | 8,526 | 98.0 | 18,168 | 17,785 | 97.9 |
| Apartment (4 or More Units) | 2,999 | 2,731 | 91.1 | 64,339 | 43,803 | 68.1 |
| NA | 33 | 28 | - | 113 | 88 | - |
| Total | 19,843 | 18,739 | 94.4 | 93,238 | 70,376 | 75.5 |

Source: City of Minneapolis Rental Licensing Data.

Figure 2.9 presents the same data by community area. Consistent with the previous tables, the data show that the youngest rental housing stock in the Central community and University. In these two community areas almost all of the rental units have been built since 1980.

**Figure 2.9: Rental Housing Stock by Age by Community**

| PROPERTY TYPE | BUILDINGS | | | UNITS | | |
|---|---|---|---|---|---|---|
| | TOTAL | PRE-1980 | % BUILT PRE-1980 | TOTAL | PRE-1980 | % BUILT PRE-1980 |
| Calhoun-Isles | 1,721 | 1,646 | 95.6 | 13,122 | 10,018 | 76.3 |
| Camden | 2,266 | 2,182 | 96.3 | 3,266 | 3,043 | 93.2 |
| Central | 429 | 321 | 74.8 | 14,273 | 7,520 | 52.7 |
| Longfellow | 1,184 | 1,140 | 96.3 | 5,137 | 4,244 | 82.6 |
| Near North | 2,345 | 2,129 | 90.8 | 6,148 | 4,920 | 80.0 |
| Nokomis | 1,360 | 1,334 | 98.1 | 2,766 | 2,555 | 92.4 |
| Northeast | 2,810 | 2,680 | 95.4 | 7,750 | 6,380 | 82.3 |
| Phillips | 941 | 862 | 91.6 | 5,651 | 4,847 | 85.8 |
| Powderhorn | 3,167 | 3,060 | 96.6 | 13,544 | 12,712 | 93.9 |
| Southwest | 1,894 | 1,862 | 98.3 | 6,118 | 5,963 | 97.5 |
| University | 1,726 | 1,523 | 88.2 | 15,463 | 8,174 | 52.9 |
| Total | 19,843 | 18,739 | 94.4 | 93,238 | 70,376 | 75.5 |

Source: City of Minneapolis Rental Licensing Data.

## Ownership Characteristics

Most rental units in Minneapolis are owned by corporate (LLC) entities. These groups operate more than 59,000 units—63% of the rental stock in Minneapolis. One-third of rental units are owned by individuals, and small percentages are owned by government and nonprofit organizations according to the rental licensing dataset.[29] Figure 2.10 shows the breakdown.

Corporate and LLC ownership is most prevalent in larger apartment buildings. Two-thirds of these rental buildings are owned by corporations and LLCs (see Figure 2.11). These entities also have a large presence in the single-family and duplex/triplex market, owning one-third and one-fifth of those types of rental buildings, respectively. Individuals own two-thirds of single-family detached rentals and 79% of duplexes and triplex buildings.

Anecdotal information and news accounts indicate that remote investors, typically in the form of corporations and LLCs, are increasing their presence in the local rental market, in both apartment buildings and small-building rentals. Figure 2.12 breaks down the rental stock by the address of the owner. We look at whether the owner has a Minneapolis address, an address in Minnesota but outside of Minneapolis, or an address out of the state. Local Minneapolis ownership is most

common in duplexes and triplexes, where 15% are owned locally. Most Minneapolis rental buildings list an ownership address elsewhere in the state. Ownership by entities outside the state is most common in single-family attached buildings (47.9%), and more than 10% of single-family detached rental buildings are owned by out-of-state entities.

Camden has the largest percentage of rental buildings owned by out-of-state entities, followed by Powderhorn, Southwest, and Near North (see Figure 2.13). As a percentage of a community area's rental buildings, however, out-of-state ownership is most common in Central (26.5%). More than 10% of rental buildings in Camden, Southwest, Nokomis, and Longfellow are owned by out-of-state entities.

### Figure 2.10: Rental Units by Ownership Type

| OWNER TYPE | TOTAL UNITS | % OF TOTAL |
|---|---|---|
| Corporate/LLC | 59,058 | 63.3 |
| Government | 2,020 | 2.2 |
| Individual/Other | 31,216 | 33.5 |
| Nonprofit | 956 | 1.0 |
| **Total** | **93,250** | **100.0** |

Source: City of Minneapolis Rental Licensing Data.

### Figure 2.11: Ownership Characteristics of Residential Buildings

| PROPERTY TYPE | CORP/LLC N | % | GOV'T N | % | NONPROFIT N | % | INDIV/OTHER N | % | TOTAL N |
|---|---|---|---|---|---|---|---|---|---|
| Single-Family Detached | 2,477 | 33.5 | 15 | 0.2 | 28 | 0.4 | 4,884 | 66.0 | 7,404 |
| Single-Family Attached | 104 | 14.5 | 0 | 0.0 | 1 | 0.1 | 611 | 85.3 | 716 |
| Duplex/Triplex | 1,785 | 20.5 | 35 | 0.4 | 22 | 0.3 | 6,859 | 78.8 | 8,701 |
| Apartment (4 or More Units) | 2,031 | 67.7 | 23 | 0.8 | 44 | 1.5 | 901 | 30.0 | 2,054 |
| NA | 16 | | 4 | | 0 | | 14 | | 33 |
| **Total** | **6,413** | **32.3** | **77** | **0.4** | **95** | **0.5** | **13,268** | **66.8** | **19,853** |

Source: City of Minneapolis Rental Licensing Data.

### Figure 2.12: Rental Buildings by Owner Location

| PROPERTY TYPE | MINNEAPOLIS N | % | MN NOT MINNEAPOLIS N | % | OUT OF STATE N | % | TOTAL N |
|---|---|---|---|---|---|---|---|
| Single-Family Detached | 903 | 12.2 | 5,514 | 74.5 | 987 | 13.3 | 7,404 |
| Single-Family Attached | 44 | 6.1 | 329 | 45.9 | 343 | 47.9 | 716 |
| Duplex/Triplex | 1,345 | 15.5 | 6,949 | 79.9 | 407 | 4.7 | 8,701 |
| Apartment (4 or More Units) | 305 | 10.2 | 2,516 | 83.9 | 178 | 5.9 | 2,999 |
| NA | 7 | - | 25 | - | 1 | - | 33 |
| **Total** | **2,604** | **13.1** | **15,333** | **77.2** | **1,916** | **9.7** | **19,853** |

Source: City of Minneapolis Rental Licensing Data.

---

29  Owner type was classified using a keyword search on multiple fields in the parcel database, including owner name, taxpayer name, and rental license applicant name.

**Figure 2.13: Rental Buildings by Owner Location and Community**

| COMMUNITY | N OUT OF STATE OWNERSHIP | % MINNEAPOLIS RENTAL WITH OUT OF STATE | % COMMUNITY AREA WITH OUT OF STATE |
|---|---|---|---|
| Calhoun-Isles | 171 | 8.9 | 9.9 |
| Camden | 312 | 16.3 | 13.8 |
| Central | 114 | 5.9 | 26.5 |
| Longfellow | 121 | 6.3 | 10.2 |
| Near North | 207 | 10.8 | 8.8 |
| Nokomis | 153 | 8.0 | 11.2 |
| Northeast | 181 | 9.4 | 6.4 |
| Phillips | 48 | 2.5 | 5.1 |
| Powderhorn | 248 | 12.9 | 7.8 |
| Southwest | 229 | 11.9 | 12.1 |
| University | 132 | 6.9 | 7.6 |
| Total | 1,916 | 100 | 9.7 |

Source: City of Minneapolis Rental Licensing Data.

## SNAPSHOT OF MINNEAPOLIS RENTAL STOCK BY COMMUNITY

· Number of Small Building Rentals (4 Units or Less)
· Average Building Age
· Percentage of Rentals Owned by Out-of-State Entities

Sources: Rental Licensing Data.
City of Minneapolis parcel data.
City of Minneapolis Rental
Licensing Data.



**Camden**
3,266 units | 89.9 avg age
16.3% out-of-state ownership

**Northeast**
7,753 units | 100.4 avg age
9.4% out-of-state ownership

**Near North**
6,152 units | 95 avg age
10.8% out-of-state ownership

**Central**
14,273 units | 81.8 avg age
5.9% out-of-state ownership

**University**
15,463 units | 90.5 avg age
6.9% out-of-state ownership

**Calhoun-Isles**
13,125 units | 97.7 avg age
8.9% out-of-state ownership

**Phillips**
5,653 units | 103.4 avg age
2.5% out-of-state ownership

**Longfellow**
5,137 units | 92.2 avg age
6.3% out-of-state ownership

**Powderhorn**
13,544 units | 100.9 avg age
12.9% out-of-state ownership

**Southwest**
6,118 units | 86.2 avg age
11.9% out-of-state ownership

**Nokomis**
2,766 units | 80.7 avg age
8.0% out-of-state ownership



UNIVERSITY OF MINNESOTA



STEVE SCHNEIDER



STEVE SCHNEIDER



GLEN HANSEN/UNSPLASH



**Figure 2.14 Rental Inspections in Tier 2 and Tier 3 Buildings, by Community Area**

Source: City of Minneapolis, Inspection Services.

## Rental Safety and Habitability

Our examination of current housing conditions in the Minneapolis rental market includes multiple measures of livability found in various city databases relating to rental licenses, the Public 311 database, and housing code violations found by inspectors. One argument made by opponents of rent stabilization measures is that they will have an unintended effect on lower-quality housing much in need of repair, as limits on rents will prevent landlords from making improvements. Deferred maintenance could have a disparate impact on low-income communities in Minneapolis or force renters to choose between higher costs and worse living conditions, as the following analysis shows.

### Rental Tiers

The city of Minneapolis utilizes a tiered system for inspection of rental properties that ensures buildings in worse condition (Tier 3) are inspected more frequently than those largely free from housing code violations or complaints (Tier 1.) Closely tied to the building's physical condition, properties are scored primarily on safety and quality-of-life variables, with active code violations, nuisance violations, and condemnation letters also taken into account. Tier 1 properties are only inspected every 8 years. These properties meet current building codes and have incurred no violations in the last 2 years. Tier 2 properties are inspected every 5 years, and Tier 3 buildings are those thought to be in the worst condition, with the most code violations, and are inspected annually. The data are provided as part of the rental license database found on the city's Open Data Portal, which is updated weekly. The existence of a property ID in this data set means the data can be combined with other information

(e.g., parcels) to show how value or ownership type (individual, LLC, etc.) may be correlated with inspections tier.

Figure 2.14 shows each community's percentage of rental units that are Tier 2 or 3. Camden and Near North have the largest percentage of rentals in these categories, but significant numbers are also found in Phillips, Calhoun-Isles (the Uptown area), and University. These communities make up the majority of low-income areas found in the city, and as such, the neighborhoods with the largest percentage of properties in need of improvements.

## Tenant Complaints

Data found in the Public 311 database can also be used to highlight areas of concern as these data contain tenant complaints regarding housing conditions, safety, and livability. The data are available in annual snapshots dating back to 2012 and include the geographic location of the complaint as well as the complaint type. Similar to the code violation data, the overall trend in tenant complaints has decreased in most if not all communities since the data were first made available.

The communities of Camden and Near North again have consistently seen the highest percentage of rental units with a tenant complaint, with rates two to three times higher than surrounding neighborhoods (see Figure 2.15). Tenant complaints are another difficult data set to make sense of as there are a variety of reasons a tenant will or will not make a complaint. Fear of retaliation in the form of eviction, rent increases, or even deportation of individuals and households in questionable legal status all have an impact on tenant complaints. However, looking in their entirety, these data show patterns of substandard rentals in particular communities across the city that closely align with what's seen in the code violations and rental inspections data.

**Figure 2.15: 311 Complaint by Community Area, 2012–2017**

Source: 311 Complaints City of Minneapolis, 311 Department.

## Code Violations

Code violations have a direct impact on the rental inspections tier data described in the previous section. One component is the number of violations cited in previous years. Our analysis considered code violations back to 2010.

The highest number of code violations occur in the Near North community area, followed closely by Camden and Powderhorn. These three communities typically have two to three times as many violations as other community areas in the city. These are also communities with a high number of rental units. Thus, it is important to look at the rate of code violations. Figure 2.16

presents the code violations as a percentage of licensed rental units in each community area.

The trend in code violations is down over the last decade, but patterns of communities with higher numbers of violations per licensed rental unit have remained relatively constant. The rate of code violations is highest in Camden, Near North, and Powderhorn. The communities of Camden and Near North have experienced more than two violations per unit per year for much of the decade, while neighborhoods like Uptown and University, with large numbers of older buildings and younger renters, have seen fewer violations. Only the Phillips community has seen an increase in violations over the past few years.



**Figure 2.16: Rate of Code Violations by Community Area, 2010–2019**

Source: Code Violations City of Minneapolis, Regulatory Services.

The number of reported code violations is likely to be sensitive to the rate of inspection and the implementation of the rental tier system in which some properties are inspected more often than others.

## Potential Growth in Housing Market

### Predicted Growth in Housing

An analysis of recent city assessor data as well as conversations with Community Planning and Economic Development (CPED) long-range planners was used to inform our efforts to predict growth in the housing market both by geography and by the type of housing constructed. While the Met Council estimates that the city will add approximately 10,000 new housing units by 2030, we can see from recent production that this may be a conservative estimate. In the last 20 years the number of housing units increased by roughly 25,000, with the majority of these being multi-family rentals. Development during most of this period has also been concentrated in three areas of the city: the downtown central business district (CBD), the area surrounding University of Minnesota, and the Calhoun-Isles (Uptown) community. Looking at the trends in Figure 2.17 we see the increase in new construction of multi-family housing over the past two decades and an increase in the number of units per building. From 2012 to 2017 the city saw a spike (with the exception of 2015) in construction of larger apartment buildings. That trend has declined since 2017.

Figure 2.18 shows that over the past decade a larger percentage of new multi-family buildings are being constructed outside



Figure 2.17: New Multi-Family Residential Construction, 2000–2019

Source: New Multi-Family Construction, Percent New Units, Buildings by Community, Condos City of Minneapolis, Assessors Office.



Figure 2.18: Percent New Multi-Family Residential Buildings in CBD, Uptown, University Areas, 2010–2019

Source: New Multi-Family Construction, Percent New Units, Buildings by Community, Condos City of Minneapolis, Assessors Office.



Figure 2.19: Multi-Family Buildings by Community Area, 2012–2019

Source: New Multi-Family Construction, Percent New Units, Buildings by Community, Condos City of Minneapolis, Assessors Office.

the three main areas of apartment construction—the CBD, Uptown, and University—and are dispersing to other parts of the city. This pattern confirms what we heard from CPED staff, that much of the "low-hanging fruit" (e.g., vacant lots in high land value areas) has been developed, leading housing developers to seek opportunities elsewhere. This along with the 2040 development plan, which allows higher densities along transit corridors in neighborhoods that are currently primarily single-family residential, leads us to assume that this dispersal pattern will continue.

Figure 2.19 shows where multi-family housing has been built in the city since 2012. We see that construction has especially increased in the Powderhorn community area and in Northeast. In fact, for the past decade, Powderhorn has replaced Calhoun-Isles as the third most common location for new multi-family buildings in the city. A smaller increase in the number of buildings built occurred in Near North in this time period.

While most rent stabilization ordinances exempt new construction from rent increase limits, the effects of new market-rate rentals have been shown to impact older properties in the surrounding neighborhood. Prior CURA research (Damiano and Frenier, 2020) shows that new construction of large multi-family buildings affects the bottom end of the market, inducing rent increases in nearby buildings. As new construction fans out to more parts of the city we could expect rents to rise in more places.

Another phenomenon since the start of the last housing bubble (2006–2008) has been the shift from condo construction to rentals among new units (see Figure 2.20). Condominium construction peaked in 2006, but since that time apartments have dominated multi-family housing construction.

Several factors have contributed to this shift. During the period from 2000 to 2006 the easy availability of credit and mortgages (many of them subprime ARMs) led to a condominium building boom and numerous conversions of existing apartment units to condominiums. Following the housing crisis that began in 2008, the tightening of credit and mortgage lending, the growing wealth of younger professionals, changes in housing preference, and a Minnesota law regarding warranties on condominium construction all led to a precipitous decline in new condo units. A cycle of apartment building booms occurs roughly every 15 years with the last 5 to 7 years in Minneapolis certainly reflecting such a boom.[30]

### *Rent Trends*

### Rent Trends, 2001–2019

The data for this analysis come from CoStar, a national real estate analytics firm that tracks rents by sampling a consistent set of buildings over time, while adding new buildings as they are completed. CoStar focuses on larger apartment buildings of five units or more. While this sampling method does limit our

---

30   https://streets.mn/2015/08/09/are-minnesotas-construction-defect-laws-causing-a-condo-shortage/.



**Figure 2.20: Condominium Construction, 2000–2019**

Source: New Multi-Family Construction, Percent New Units, Buildings by Community, Condos City of Minneapolis, Assessors Office.

**Figure 2.21: Average Rent Growth by Bedroom, 2000–2020**

Source: CoStar (aggregate data).

analysis somewhat, according to the city's parcel data, close to 70% of rental units are in buildings with at least five units.

Figure 2.21 uses the aggregate data provided by CoStar and details average rent increases by year and by bedroom for the city of Minneapolis. The aggregate data cover the first quarter of 2000 through the second quarter of 2020. The line in black is the overall trend. Units by bedroom number are given in the colored trend lines. The graph depicts the average year-over-year change in rents. Two patterns are easily identifiable in the graph, and they are the dip in rent increases seen during the housing crisis and the decline in rents immediately prior to and into the pandemic.

In addition, we see that whereas all units tended to track together in the precrisis period and into the crisis, there is greater variation by bedroom size since then. The lines diverge in 2010 and we see greater variation in rent increases by bedroom size after that.

Figure 2.22 provides another look at rent increases in this time period. This graph and those that follow utilize a customized subset of the CoStar data compiled by CURA staff that consists of building-level rent data for one- and two-bedroom units. For this data set, the panel runs from first-quarter 2000 to fourth-quarter 2018. These data are fairly representative as 70% of rental units in the city are one- or two-bedroom units.

**Figure 2.22: Rent Growth, 2001–2019**



Source: CoStar.

**Figure 2.23: Rent Increases by Time Period, All Unit**

| TIME PERIOD | AVERAGE | MIN | MAX |
|---|---|---|---|
| **2000–2007 Precrash** | 2.0 | −1.0 | 4.5 |
| **2008–2012 Crash** | 0.3 | −2.8 | 1.8 |
| **2013–2018 Postcrash** | 2.7 | −2.9 | 9.4 |
| **Total** | **1.8** | **−1.6** | **5.6** |

Source: CoStar.

**Figure 2.24: Rent Increases by Time Period by Building Age**

| TIME PERIOD | PRE-1980 | POST-1980 |
|---|---|---|
| **2000–2007 Precrash** | 2.0 | 1.9 |
| **2008–2012 Crash** | 0.3 | 0.3 |
| **2013–2018 Postcrash** | 3.1 | 1.9 |
| **Total** | **1.9** | **1.6** |

Source: CoStar.

This graph adds information about the spread of rent increases each year. The bold black line is the median rent increase each year. The shaded area shows the range of rent increases each year, from the 10th percentile, the lowest rent increases, to the 90th percentile. We have chosen the 10th and 90th percentiles to illustrate the bottom and top of the market, respectively, because to choose the absolute minimum and maximum rent changes would have introduced extreme outliers into the analysis. The 10th and 90th percentiles are more stable proxies for the low and high ends of the market. Figure 2.22 shows that from 2001 through 2008, there was a narrow band of rent increases. Beginning during the crash years and then especially since the crash, there has been much greater variance in rent increases.

Figures 2.23 and 2.24 quantify the average rent increases by three time periods: 2000 to 2007 (precrash), 2008 to 2012 (during the crash), and 2013 through 2018 (postcrash). They tell a consistent story of moderate rent increases prior to the collapse of the housing market, stagnation of rents during the crisis, and then larger increases during the recovery period. The data also show a greater variance in rent increases since the crash, with maximum rent increases averaging 9.4% over that period (see Figure 2.23). We also see that older rental buildings experienced higher average increases than newer buildings since 2012.

Figure 2.25 shows the rate of rent increases annually for buildings constructed prior to 2000 and after 2000. It indicates that the higher rent increases on average for older buildings has occurred chiefly since 2015. The graph is essentially the same when building age is divided between pre-1980 and post-1980. We have chosen to illustrate pre- and post-2000 because, as indicated in Part 1 of this study, exemptions for

new construction in rent stabilization programs are often established for 15- or 20-year periods. In this case, pre- and post-2000 provides a cut point that approximates a common rent stabilization feature.

Figure 2.26 illustrates rent growth between 2001 and 2019 by real estate class, which is a grading system developed by the industry to classify properties by what part of the market they cater to. *Class A* buildings are high-end buildings with amenities that cater to renters at the top of the market, while *class B* and *C* buildings are usually older, with fewer amenities.

Again, we see these different market segments performing as one during the precrash and crash years. Since the crash, there is much greater variation in the marketplace, with class A buildings recording lower rates of rent increase in recent years than class B and C units.

A strong correlation exists between building age and quality rating. A full 98% of class C buildings were constructed before 1980. Conversely 93% of class A buildings were constructed post-1980. We highlight this to show how both older and lower-quality buildings have, on average, seen higher rent growth in recent years. This is the housing stock that is more likely to be occupied by lower-income renters.

CoStar breaks down its sample by building size and type, generally by number of floors (low-, mid-, and high-rise). They also classify some buildings as "garden" apartments, which are usually low-rise buildings that can be U-shaped with a garden or green space in the middle. The patterns we see in Figure 2.27 echo patterns that we have seen already. Rents for all types of buildings tracked each other from 2000 through the end of the crisis in 2012. Since the crash, there is

**Figure 2.25: Rent Increases by Building Age (Pre-2000 vs. Post-2000)**



Source: CoStar.

**Figure 2.26: Rent Growth by Real Estate Class**



Source: CoStar.

**Figure 2.27: Rent Growth by Building Type**



Source: CoStar.

**Figure 2.28: Rent Growth by Community Area**

| COMMUNITY AREA | 2000–2007 PRECRASH | 2008–2012 CRASH | 2013–2018 POST-CRASH | TOTAL |
|---|---|---|---|---|
| Calhoun-Isles | 2.0 | 0.3 | 2.7 | 1.8 |
| Camden | 1.9 | 0.2 | 1.6 | 1.3 |
| Central | 2.0 | 0.3 | 2.3 | 1.7 |
| Longfellow | 2.0 | 0.3 | 2.7 | 1.7 |
| Near North | 2.0 | 0.5 | 2.3 | 1.7 |
| Nokomis | 1.9 | 0.3 | 3.0 | 1.9 |
| Northeast | 1.9 | 0.4 | 2.5 | 1.7 |
| Phillips | 2.0 | 0.2 | 2.7 | 1.7 |
| Powderhorn | 2.0 | 0.3 | 3.1 | 1.9 |
| Southwest | 1.9 | 0.4 | 3.1 | 1.9 |
| University | 1.9 | 0.3 | 3.3 | 2.1 |
| **Total** | **2.0** | **0.3** | **2.7** | **1.8** |

Source: City of Minneapolis Rental Licensing Data.

*Figures are average annual rent increases in percentages.*

great variation in rent increases across building type. Rents in hi-rise buildings, for example, have spiked higher and lower than for any other building. Garden apartment buildings and low-rise buildings have seen the greatest rent growth since the crash.

Rent changes since 2000 have not varied greatly by community area. Figure 2.28 reports the average year-over-year rent increases by community area, for the entire study period and for the three subperiods (precrash, crash, and postcrash). Minor differences occur across community areas prior to and during the crash. Since 2013, however, there is more variation. We see the largest average rent increases in the University, Powderhorn, and Southwest community areas and the smallest average rent growth in the Camden community.

As with the city as a whole, significant differences appear in average rent growth between older (pre-1980) and newer (post-1980) buildings across communities. Particularly postcrash, older buildings in a majority of communities saw higher average rent increases compared to newer buildings. Postcrash, Calhoun-Isles has seen the highest average rate of rental inflation. Central and Powderhorn also saw significantly higher rent growth in their older rental stock since 2013. Phillips, Nokomis, and University show the opposite trend, with newer housing showing larger average rent increases postrecession.

## Rent Trends in Small-Building Rentals

Given the large number of small rental properties in the city (small-building rentals account for more than 30% of all rentals in Minneapolis), it is important to understand rental trends in these units, too. The CoStar data cannot be used to provide this information, however. In fact, we have no annual source of rent trends for small-building rentals. The American Community Survey (ACS) provides information on rents for small buildings, but the sample size is small, and unlike the CoStar data that we relied upon, the ACS data sample different units each year (i.e., it is not a panel database that tracks the same units each year). This introduces a large amount of variation from year to year, making estimates of actual change unreliable.

To get a sense of how small-building rentals performed over this period of time, we conducted a statistical analysis to test whether rent changes for small-building rentals were different from the changes of larger building rentals. We controlled for building type, building age, and number of bedrooms and observed the trends over time for small-building and large-building rentals. Rent changes for small-building rentals were more volatile than the changes seen in larger buildings, but for most years the differences across building size were not statistically significant. We conclude that rent trends in small buildings generally track the pattern seen in larger buildings.



**Figure 2.29: Estimated Rent Growth, Small and Large Buildings**

5 Units or Greater   Fewer than 5 Units

Source: Authors' calculations using ACS data.

Figure 2.29 presents the findings graphically. We see that rent increases in smaller buildings tended to precede increases in larger buildings by a year or two, but that changes as the two groups tend to track each other over time. More extensive data and further analysis are necessary to carefully examine the rent trends for small-building rentals.

## Advertised Rents

A view of advertised rents—what households seeking housing will find in the marketplace—is compiled quarterly by Housing Link, a service that scrapes rental listing information from online sites. The information is different from that provided by the Co-Star data, which include both continuously occupied and newly occupied units. The Housing Link data also contain information about single-family rentals and other small buildings that CoStar does not track. The data show how rents change in unoccupied units, which can be useful when considering vacancy decontrol policies. Figure 2.30 presents the Housing Link data from fourth-quarter 2011 to second-quarter 2020 as year-over-year percentage changes in advertised rents.

In general, the rental listing data are much more volatile compared to the CoStar data. Nevertheless, the general upward and downward trends between the two data sets tend to track. The black line is the overall trend, while the colored lines provide the trends for apartment buildings, duplexes, single-family detached homes, and attached homes (condos and townhomes). The data show higher peaks as asking rents regularly increased over previous-year levels by more than 10% and in some quarters by more than 15% and 20% between 2016 and 2019. The shaded area is the first quarter of 2020, the end of which saw the beginning of the pandemic. The figure shows (as the CoStar data did) a softening of the market in 2019, before the beginning of the pandemic.

## *Affordability Analysis*

In this section we analyze data on rental affordability, which is determined by the ratio between rents and income. To match households on these two items we must utilize data from the American Community Survey (ACS). We use a sample of individual records downloaded from ipums.org.[31]

## Rent and Income Trends for Minneapolis Renters

The ACS data we report are adjusted for inflation using the Minneapolis–St. Paul Metro CPI for All Items, and amounts are reported in 2019 dollars unless otherwise noted. All of the income data relate to renter households only. Because the ACS is a small sample and not panel data, the data can be "noisy" (exhibiting large increases or decreases in a single year due to the outsized influence of outliers). To produce more legible graphs and provide a clearer sense of the trends in Minneapolis during this time period, we present the data as 5-year moving averages. The first year of the ACS panel data is 2006, and that year serves as the baseline for this analysis. All changes depicted in the following graphs represent cumulative percent changes since 2006.

Figure 2.31 presents the data for changes in rent and income for the median renter in Minneapolis since 2006. By 2010 (the first year for which a 5-year average could be computed) both incomes and rents were below the 2006 level, likely as a result of the housing crash and resulting recession that began in 2008. For the median renter in Minneapolis, rents and incomes did not return to 2006 levels until 2014. From that point onward incomes rose against their 2006 value at a higher rate than rents rose from their 2006 value. At the end of the study period,

### Figure 2.30: Advertised Rents by Building Type, 2012–2020



Source: Housing Link.

---

31   Ipums is the largest repository of individual-level US census and survey data.

income for the median renter in Minneapolis had increased by just more than 25% since 2006 while rent had increased just over 10% during that time period. Figure 2.31 shows an improving affordability picture for the median renter in Minneapolis.

The pattern shown in Figure 2.31 hides, however, starkly different stories for renters at the top and the bottom of the rental market in Minneapolis over these years. Figure 2.32

### Figure 2.31: Change in Rent and Household Income for Median Renter, 2006–2019



Source: ACS.

shows the trends in income and rent for renters in the bottom quartile and for those in the top quartile. Renters in the bottom quartile saw increases in rents throughout the study period. By 2010 these renters were already paying close to 20% more than they had been in 2006. By 2019 they were facing rents that had grown by 44% since 2006. In contrast, incomes for this group fell dramatically after 2006, bottoming out in 2013 at a level that was more than 20% less than the 2006 level. Although incomes for these renters have recovered since 2013, by 2019 they stood at a level that was only 2.9% higher than they had been in 2006.

For renters at the top of the Minneapolis market, incomes never fell below 2006 levels. They increased steadily over this period and stood more than 50% higher in 2019 than they had been in 2006. Rents for this group also grew over this time period (after an initial fall), but the cumulative increase was less than 20% by 2019.

Figure 2.33 summarizes the disparate experience of Minneapolis renters in terms of affordability over this period of time. For the top quartile of renters, incomes increased by 54.4% (in 2019 dollars) between 2006 and 2019, but their rents increased only 17.3%. For renters at the median, incomes rose by 25.8% and rents by 11.4%. Affordability improved over this period for the middle of the Minneapolis renter market and the top of the market. The pattern for renters in the bottom quartile, however, was dramatically different. For this group, incomes grew by only 2.9% while rents increased by 44.1%. This group saw growing problems of affordability between 2006 and 2019. Moreover, they were squeezed at

### Figure 2.32: Rent Affordability for Bottom Quartile and Top Quartile Renters, 2006–2019

**Bottom Quartile Renter**



**Top Quartile Renter**



Source: ACS.

*Figure 2.33 summarizes the disparate experience of Minneapolis renters in terms of affordability over this period of time. For the top quartile of renters, incomes increased by 54.4% (in 2019 dollars) between 2006 and 2019, but their rents increased only 17.3%. For renters at the median, incomes rose by 25.8% and rents by 11.4%. Affordability improved over this period for the middle of the Minneapolis renter market and the top of the market. The pattern for renters in the bottom quartile, however, was dramatically different. For this group, incomes grew by only 2.9% while rents increased by 44.1%. This group saw growing problems of affordability between 2006 and 2019. Moreover, they were squeezed at both ends, seeing essentially stagnant incomes while simultaneously seeing the largest percentage rent increases in the Minneapolis market. Rent increases for this group were two and a half times more than the increases seen by renters in the top quartile and almost four times those seen by renters at the median.*

both ends, seeing essentially stagnant incomes while simultaneously seeing the largest percentage rent increases in the Minneapolis market. Rent increases for this group were two and a half times more than the increases seen by renters in the top quartile and almost four times those seen by renters at the median.

Large differences also exist by racial group. Figure 2.34 presents the income and rent changes between 2006 and 2019 for different racial/ethnic groups. The racial/ethnic data for some groups should be considered with caution as small group sizes may produce unreliable sample values. The larger the group the greater the confidence in the values. Figure 2.34, for example, shows some extreme volatility for some groups (most prominently American Indian/Alaskan Native), despite the fact that we are computing running averages over a 5-year period.

The patterns show that the most favorable affordability changes over these years were experienced by white renters, who saw an income increase of over 30% and a cumulative rent increase of less than 20%. BIPOC populations ended the period with slightly higher income increases than rent increases, but this hides significant variation. While affordability improved for Latinx and Asian groups, it declined for Black renters and American Indian renters. Even for the Latinx and Asian groups, rent increases were above income increases for much of the study period. These two groups saw a significant jump in income in the last 3 years to turn around their affordability pattern.

Black renters and American Indian renters, however, saw rents increase in excess of income increases during this period. The pattern for Black renters is especially stark. This group saw significant income declines over the entire period. By 2019, the income of the median Black renter was close to 10% lower than it had been in 2006. Rents, on the other hand, were more than 5% higher over the study period.

*Black renters and American Indian renters, however, saw rents increase in excess of income increases during this period. The pattern for Black renters is especially stark. This group saw significant income declines over the entire period. By 2019, the income of the median Black renter was close to 10% lower than it had been in 2006. Rents, on the other hand, were more than 5% higher over the study period.*

### Figure 2.33: Growth in Income and Rent by Income Percentile, 2006–2019



Source: ACS.

Figure 2.34: Cumulative Change in Rent and Household Income for Median Renter by Race/Ethnicity



Source: ACS.

## Cost Burden

A direct way to measure affordability is to compute the ratio of rent to income, or what is referred to as "rent burden." Rents that constitute more than 30% of a household's income are considered a burden. Figure 2.35 shows the percentage of renter households with a housing cost burden, broken down by household income.

Figure 2.35 shows, as would be expected, that the prevalence of cost burden is much higher for the lowest-income households. Households with incomes less than 30% of the area median income (30% of AMI = $30,000) have experienced a steady rate of rent burden since 2010. About 50% of these households are rent burdened, a figure that does not change much over the 10-year period. The group of households with incomes between 30% and 60% of the AMI (incomes between $30,000 and $60,000) saw a growing prevalence of rent burden in the past 10 years. In 2010, about 27% of these households were rent burdened; by 2019, the figure was just over 35%. Rent burden was a relatively rare problem for households with incomes above 60% of AMI (incomes greater than $60,000). The rate of rent burden for this group was less than 5% for most of the years since 2010.

The prevalence of rent burden did not vary significantly by the citizenship status of the household. For most years since 2010, the prevalence of rent burden was higher for households with children compared to those without, single-person households compared to larger households, and multi-generational households (i.e., with grandparents) than for other households.

#### Figure 2.35: Rent Burden by Household Income



**Household Income as Percentage of AMI**
■ < 30% AMI   ■ 30% – 60% AMI   ▬ > 60% AMI

Source: ACS.

We cooperated with *Inquilinxs Unidxs por Justicia*, a renter's rights and organizing group, to recruit Minneapolis tenants for two focus groups. The first focus group was conducted on December 8, 2020, and the second on January 19, 2021. The December group was conducted in Spanish. Staff members at *Inquilinxs Unidxs por Justicia* translated and transcribed the meeting. The second group was conducted and transcribed by a member of the CURA research team.

Tenant concerns that emerged during the focus groups centered broadly on two issues: rising rents (the cost of housing), and property upkeep and the responsiveness of landlords on maintenance issues.

### Rents

In the first focus group, participants expressed concern about rents. Some had larger households, occupying larger units, and therefore paid relatively higher rents. For these participants rent increases in the 3% to 5% range were problematic because of the absolute dollar increase that they represented. These tenants did not think of their rent increases in terms of percentage increases, but rather reported them, and spoke about them, in absolute dollar terms. Thus, a $1,500 rent would increase by $75 per month at a 5% increase. This was seen by the participants as producing a great strain on their incomes and budgets, which could not easily absorb such increases. Even a 3% raise in this scenario would mean $45 extra each month, an amount that participants felt was beyond their ability to absorb. Of course, as rents rise, so do the absolute values of 3% or 5% increases. So that the same rate of increase in the next year will mean even a higher absolute rent increase.

Some of the Spanish-speaking participants (the first focus group) reported multiple rent increases in a single year. One referred to rent increases every 3 or 6 months; another said, "In March we paid $750, in July we paid $850, and in February we will pay $950." Another reported rent increases every 6 months.

One participant in the second focus group reported exorbitant annual rent increases—that rent for a studio bedroom in Uptown almost doubled over a 3-year period. This participant endured average annual rent increases of 28% for those years. More common were rent increases (reported by the participants in absolute dollar terms) that worked out to roughly 5% annual increases.

Participants noted that their costs go well beyond rent. Looking at housing costs simply as rent ignores the fact that landlords also impose various fees upon tenants. Some participants who have lived in Minneapolis the longest reported that fees have increased in recent years. One reported landlords who charge a fee for online payment of rent (thought by the participant to

be the best and safest way to pay during the pandemic); other participants reported that landlords sometimes claim that the rent was late and tack on a late fee as a result, a fee that can be as much as an additional $150. In such cases as these, it is essentially the landlord's word against that of the tenant. And when landlords threaten an eviction as a result, the tenants often capitulate and pay the extra fee. One participant paid rent with certified checks to document that it was paid on time, thereby incurring an additional fee each month for the certified checks. Fees can be added for use of the laundry room, storage space, and parking, among other services. In some cases, tenants also pay utilities. All of these costs exist outside of the rental agreement but represent burdens to the lower-income renters with whom we spoke.

Almost all the tenants who participated in our focus groups indicated a worry about being able to stay in their housing unit. Most of this concern was related to rising rents. One woman who reported that her landlord did a decent job in keeping up the building (see the following section on maintenance) reported concern with rising rents. She has seen her rent increase 29% over the past 5 years. She wants to stay in the neighborhood (Stevens Square) because she likes it and it is near transit and her place of work. Another woman, the mother of three living with her spouse, said, "I don't feel safe because if I can't pay the rent they will evict me." The pandemic has affected their ability to make the rent and she reports that the landlord harassed them at the beginning of the pandemic when they had difficulties. All of the participants in the first focus group reported that they would be unable to pay higher rents than they currently pay.

Many participants worried about losing their units if rents continue to increase because finding affordable housing in Minneapolis is difficult. Even if they consider the landlord neglectful or rapacious, and even if they consider their housing unit problematic, dangerous, and getting more so, they are hesitant to move out because of the difficulty of finding another affordable unit. One participant, renting a single-family home from a national firm, spoke of physical problems with the house that made her living situation difficult: mold that has affected the health of her three children, flooding in the basement, leaking walls, and doors that do not work. She said, "The reason why we haven't moved is the family is growing and in Minneapolis it is hard to find affordable rent. We haven't moved because it's so hard; you feel stuck."

### Upkeep

Some of the residents reported significant problems with property upkeep and the responsiveness of their landlords. In some cases, these concerns were the first they voiced, taking precedence over the issue of rent. Two of the participants in the second focus group had rented from embattled Minneapolis ex-landlord Stephen Frenz and reported significant maintenance issues that went uncorrected while he owned the

building. Two other participants, who rent from a national firm that owns and rents out single-family homes in Minneapolis and other markets across the country, spoke of their difficulties getting any response to the deteriorating conditions in their units. Even contacting the landlord was difficult in their case, said one participant: "Even though we're renters they want us to keep up the property like we were the owner. They have an office in Roseville and when you go there, no one is there. They have Atlanta-area phone numbers and local numbers, but no one answers the local numbers. They have an 800 number for maintenance or neighbor issues, and when you call that number they just say they don't do that kind of work." The other tenant who was renting from this company spoke of inadequate electrical systems in the house: "The landlord sent somebody out to fix it, but it still blows out. They said we did it. My TV blew out too. I can't put a small air conditioner in the front of the house so we put it in the kitchen. They said we need a new line, but nothing was ever done."

### Homelessness

Homelessness in the region has increased over the last two decades according to several agencies and organizations that study and provide support for this population. According to Hennepin County, homelessness has increased by 20% from 2009 to 2018, with a 50% increase in the unsheltered population (see Figure 2.36). Wilder Research, which conducts a statewide point-in-time survey every 3 years that attempts to count every sheltered and unsheltered homeless person, also reports homelessness rates up 33% between 2000 and 2018.

**Figure 2.36: Hennepin County Homeless Population, 2009–2018**



Source: Homeless Population, Wilder Research 2018 Homelessness Study, Wilder Research 2015 Homelessness Study.

**Figure 2.37: Unsheltered Homeless Population**



Source: Unsheltered Homeless.

Hennepin County–St. Stephen's Human Services' latest report and survey found an overall increase in the unsheltered homeless population from 404 in January 2018 to 732 in July 2019, an increase of 81% (see Figure 2.37). A portion of this increase is likely due to seasonal variation.

In recent years, Minneapolis has seen a significant increase in homeless encampments. In the summer of 2018, a homeless encampment emerged on the city's south side, along Franklin Avenue near Hiawatha. The area had more than 300 tents by the fall, making it one of the largest homeless encampments ever in the state.[32] The site was cleared by December 2018, as many people moved to the temporary "Navigation Center" that had been built in response. The site was reoccupied by homeless families in 2019 and again in 2020.

The year 2020 saw the emergence of several homeless encampments in city parks. The Minneapolis Parks and Recreation Board provided some support to these encampments in the form of restrooms, portable toilets, and trash/recycling containers.

St. Stephen's Human Services, which partners with Hennepin County in providing shelter services and research around the causes of homelessness, states in a 2019 report that "homelessness is a complicated issue with many societal causes including large deficits in affordable housing."[33] Housing instability, including evictions for failure to pay rent, plays a large role in homelessness. According to a survey of unsheltered homeless individuals conducted in January 2018 and again in July 2019, the number of homeless persons who had been evicted fell from 45% to 28% but was still the third largest

contributing factor toward the lack of shelter. The primary reasons stated for homelessness continue to be mental illness and drug/alcohol addiction. Survey respondents were also asked if they had ever been on a lease, with 75% of those responding saying yes. However, survey respondents were not asked about the cost of housing, the reasons for an eviction, or whether either of these affected their homeless situation.

## Hypothetical Rent Changes Under Different Rent Caps

This section uses building-level CoStar data from previous analyses in this report and presents a series of hypothetical counterfactual situations. Specifically, we ask, How would a variety of rent stabilization scenarios have affected rents over the past 19 years? The following estimates should be understood as rough calculations based on available data and in many ways represent an upper bound for both the modeled effect on overall rents and the reduction in rents that individual units in the sample would receive.

## Methods

As we lay out in previous sections, while the CoStar data provide unique insights into the rental market, it is limited in several ways. First, it only samples buildings that are five units or larger. Second, we only are only able to directly sample one- and two-bedroom units. Additionally, rents in our sample include only buildings that contain 100% market-rate units, meaning that they do not receive any outside subsidy and have no income restrictions on who can occupy particular units.

For the purposes of the following analysis, we make several important assumptions:

- We assume landlords and property owners in the sample would not have changed their behavior as far as how they adjusted rents over time, with an annual rent cap. Such changes in behavior would include but not be limited to increasing rents to cap if/when they would otherwise have been lower than the cap and taking units off the market in the form of condo conversion or other building-use change.

- We assume no vacancy decontrol. That is, we assume rent increase limits are binding on all units regardless of whether the unit becomes vacant and/or the unit remains occupied by the same household throughout the study period.

- We assume no allowances for utility or capital improvement pass-throughs.

- We assume 100% compliance by landlords.

---

32  https://nextcity.org/daily/entry/how-minneapolis-managed-a-massive-homeless-encampment.

33  https://www.hennepin.us/-/media/hennepinus/your-government/projects-initiatives/coc/unsheltered-report-jul-2019.pdf

## Rent Caps

As shown in our literature review, it is common for rent stabiliza-tion programs to limit rent increases to a factor related to overall inflation. In practice, this means using the CPI for the Minneapo-lis–Saint Paul metropolitan area. At the low end of rent increases we model a rent cap of 75% of CPI. We also model a rent cap set at the regional CPI. At the least restrictive end of the spectrum, we model rent caps set at the CPI + 3% and CPI + 7%.

Figure 2.38 illustrates what these rent caps would have meant annually from 2000 to 2019. The lines illustrate the maximum al-lowable rent increases under each cap. For example, the CPI + 7% cap results in a cap that ranges from just over 6% (in 2015) to over 10% (in 2001, 2008, and 2011). It is important to note that the CPI was slightly higher on average from 2001 to 2008 than it has been since. A rent cap set at the regional CPI, or at 75% of the CPI, would have resulted in no allowable rent increases in 2009 and 2015.

A simple means of illustrating how these different rent caps would have affected the Minneapolis market in these years is to overlay information on what rent increases actually looked like in these years. Figure 2.39 shows the four rent caps and the median rent increases during this period and the highest (90th percentile) increases. Where the median and maximum increases are above a given rent cap, those rents would have been limited in those years. For example, in 2001 both the median rent increase and the highest rent increases would have been limited by caps at 75% of CPI and at the CPI. Those same rent increases would not have been affected by caps at CPI + 3% and CPI + 7%. In 2004, neither the median nor the highest rent increases in Minneapolis would have been affected by any of the rent caps.

The figure also shows that the CPI + 3% cap would not have affected the median rent increase in the city over this time pe-riod, and it would have constrained the highest rent increases only from 2013 on. The most lenient cap, CPI + 7%, would not

### Figure 2.38: Annual Rent Caps



### Figure 2.39: Rent Caps and Actual Rent Increases, 2001–2019



Source: Author's calculations based on U.S. Bureau of Labor Statistics data



**Figure 2.40: Share of Units Over 20 Years Old Hitting Rent Cap Threshold**

Source: Authors' calculations based on CoStar data.

have affected median increases and would have constrained the highest rent increases only between 2014 and 2018.

As the review of other programs demonstrated, rent stabilization programs in the United States typically exempt new construction from rent restrictions. As a result, in the following pages we present the analysis only for units in buildings that are more than 20 years old. We chose this threshold not as an endorsement of a new construction exemption, or as an endorsement for a 20-year limit, but rather to simply provide an example of how rents would be affected under such circumstances.

## Impact of Rent Caps—A Retrospective Analysis, 2001–2019

Figure 2.40 shows tremendous swings from one year to the next in terms of the share of units in the sample that would be affected by the rent caps. In 2001 and 2002, over 95% of units would have been affected by caps set at 75% of CPI and at the CPI level. These numbers drop precipitously to zero in 2004 and 2005 and then shoot back up again in 2006 and 2007. This pattern emerges because during these years most rent increases in Minneapolis were right at the CPI or just under it. Minor variations in the CPI itself, then, led to significant changes in the percent of units affected. This is a common pattern with threshold-based phenomena. Figure 2.39 illustrated the breadth of impact, but not the depth. That is to say, although almost 100% of the rent changes would have been affected by the caps in 2001 and 2002, they would not have been affected much.

Figure 2.41 depicts rent increases that occurred in Minneapolis. It shows that for most years, especially the early years of this century, most rent increases were less than 3% or 3% to 5%. Small changes in the CPI, which for these years bounced between 2% and 4%, lead to dramatic swings in the percentage of units affected by rent caps set at or near the CPI.

Figure 2.41 also provides an additional glimpse into the size of rent changes in the Minneapolis market over these years. It is not until the postcrash years that we see sizable rent increases in the range of 5% to 10% or above 10%.

An additional way to gauge the impact of various rent caps is to calculate what the median rent increase would have been with the caps in place (see Figure 2.42). We see that caps set at 75% of CPI and at the CPI have an effect from the outset, though it is small. Median rent increases would have been lower in Minneapolis from 2000 on, though the magnitude of the effect increases over the time period.

There is little effect of either of the more lenient caps (CPI + 3% and CPI + 7%) until 2014 and later. This is the time when the market saw the larger rent increases, and thus even these more lenient caps would have reduced the median rents during these years.

Figures 2.43 and 2.44 summarize how specified rent caps would have reduced rent at different parts of the market (measured by different points in the distribution of rent changes) by 2019. The percentiles across the top row can be thought of as the "aggressiveness" of the landlord. Landlords at the 10th percentile are not raising rents much, while those at the median represent the "typical" unit. Landlords who raised their rents at the 75th or 90th percentile were the most aggressive in the market.

Figure 2.43 shows that had a rent cap been in place at the CPI (second row of data), the rents in units that had been increasing at the 10th percentile (the least aggressive changes) would have been 5.3% less in 2019 than if the cap had not been in place. Moving to the right on that row, we see that rents for units that had been changing at the median would have been 13.8% less in 2019 than if the CPI cap were not in place. Finally, for buildings in which the landlords were most aggressive, where rents had been

### Figure 2.41: Rent Changes by Size of Increase



Source: CoStar.

### Figure 2.42: Hypothetical Median Rent Under Varying Rent Caps



Source: Authors' calculations based on CoStar data.

### Figure 2.43: Percent Difference in Rent in 2019 Between Baseline and with Cap

| CAP | 10TH | 25TH | 50TH MEDIAN | 75TH | 90TH |
|---|---|---|---|---|---|
| 75% CPI | 8.1 | 10.4 | 17.3 | 23.7 | 28.7 |
| CPI | 5.3 | 7.0 | 13.8 | 20.4 | 25.7 |
| CPI + 3% | 0.0 | 0.0 | 3.8 | 8.9 | 13.9 |
| CPI + 7% | 0.0 | 0.0 | 0.0 | 2.3 | 7.2 |

Source: Authors' calculations based on CoStar data.

### Figure 2.44: Differences in Rent Expressed as Annual Income Changes

| CAP | 10TH | 25TH | 50TH MEDIAN | 75TH | 90TH |
|---|---|---|---|---|---|
| 75% CPI | $536 | $680 | $885 | $1,216 | $1,684 |
| CPI | $339 | $442 | $615 | $916 | $1,244 |
| CPI + 3% | $0 | $0 | $87 | $258 | $548 |
| CPI + 7% | $0 | $0 | $0 | $69 | $239 |

Source: Authors' calculations based on CoStar data.

increased at the 90th percentile, a cap at the CPI would have meant a 2019 rent 25.7% lower than without the cap. Figure 2.44 presents the same information but expressed at the annual change in rent over the entire period.

Note that these estimates assume either continuous occupation by the same tenant over the entire period, or they assume no vacancy decontrol. They also assume no other pass-throughs or exceptions over the entire period.

The more lenient caps would have had no effect or a negligible effect over the study period on rents that were increasing at the "less aggressive" levels and also up to the median. These more lenient caps generated sizable effects only for landlords raising rents at the 75th percentile and higher.

# PART 3: ECONOMIC ANALYSIS

*The building economic analysis portion of this report consists of two parts. The first is a summary of potential issues and impacts of a rent stabilization program gathered from interviews with 30 participants in the Minneapolis apartment market. The second part is a scenario modeling exercise where we created an example apartment pro forma based on actual Minneapolis rents in the study period and then modified that model to illustrate how those rents and the economic measures that apartment owners consider would change under different rent caps. We used information gleaned from the interviews to inform our models.*

## Industry Perspectives

### Method

We interviewed 30 people involved in Minneapolis apartments, ranging from for-profit developers, nonprofit developers, owners, landlords, investors, and lenders to experts in real estate law, market research, appraisal/valuation, and construction. We selected a broad range of participants so as to obtain perspectives from both owners/landlords and developers as well as knowledgeable experts in the industry who had less direct economic interests in apartments but who understood the perspective of those who did. These disinterested informants in some cases validated and in other cases questioned the responses of the more self-interested informants and gave us the ability to triangulate between different perspectives. Figure 3.1 shows the breakdown of interviewees, a number of whom represented more than one perspective. For example, owners and developers are also typically investors, and some developers have worked in both for-profit and nonprofit development.

### Figure 3.1: Interviewees by Role

| ROLE/PERSPECTIVE | NO. |
|---|---|
| Owner/Landlord | 15 |
| Developer (Market Rate, Affordable) | 8 |
| Nonprofit Developer/Owner | 5 |
| Lender | 6 |
| Industry Expert | 7 |
| Investor (Owners and Developers) | 18 |
| Total | 40 |

Source: Authors' calculations based on CoStar data.

We sent a 10-item questionnaire to each interviewee in advance. We held structured, open-ended interviews that lasted between 1 and 2 hours, during which we reviewed the questionnaire and took notes. The following is a summary of the

feedback we received from the industry informants we spoke to. Most of these items refer to potential economic impacts, while others are related to possible strategic and tactical changes in industry behavior that the informants felt might be induced by rent stabilization. These perspectives reflect the consensus of the people we spoke to, and, where opinions were divided, we included all viewpoints. When an informant's words captured an idea better than our words, we included their direct quotes in italics.

### Summary of Responses

Many of the owners said that their rents would not actually be impacted by any of the example rent caps we shared with them, as they say they charge below-market rents and raise rents gently. That said, almost all informants expressed as their greatest concern the potential for a rent stabilization program to constrict rent growth while operating expenses continue to rise. This would potentially reduce not just profits but the amount of income available for capital reinvestment in apartment properties over the long run. Apartment owners rely on both income growth and the ability to refinance and use gains from appreciation to reinvest in their properties periodically, and most informants expressed concern that reinvestment could decline and with it, the quality of housing.

More generally, informants expressed concerns that a rent stabilization program could lead to a slowing or decline in the rate of growth of property values (which would potentially affect reinvestment, values, returns, sales prices, and the city's tax base); could lead to stricter lending terms (making it more difficult to buy or refinance); and could add new costs of administration (city) and compliance (owners). Many informants expressed concern that rent stabilization, along with other recent new regulations, could have (or already has had) a chilling effect on the apartment market in Minneapolis that could reduce access to capital for new projects and reinvestment in older properties; lead to a constricting of the new production pipeline and a reduction in new supply; lead to condo conversions

and replacement of older buildings with new, higher-density buildings; lead to higher rents and values in the long run; and lead owners to divest, potentially causing a shift in housing ownership away from smaller local owners toward large national owners. Many informants expressed concern about the timing of this idea as 2020 has led to declining rents and increasing vacancy, and an apparent market correction already appears to be underway. Informants commented that the design and implementation of a rent stabilization program would require collaboration amongst all parties—owners, developers, tenants, and the city—if it is to succeed.

All of the responses we detail here are speculative. Without knowing the details of a rent stabilization program, it is difficult to predict what might happen and to what degree, and even if the details were known, it would still be difficult to predict long-term impacts. As one of our respondents said in their reply to every single question on the questionnaire and in the interview, *"It depends."*

## Detailed Responses

The informants we spoke with identified a range of potential impacts of a rent stabilization program on the practices and strategies of participants in the Minneapolis apartment market. The concerns focused on (1) potential impacts on rents and revenues, (2) capital investment and reinvestment, (3) changes in the rental housing stock related to new construction and removal of units from the market, (4) rental housing financing, and (5) the profile of rental housing owners/operators. Informants also suggested the need to consider both short- and long-term implications of rent stabilization and widely questioned the need for such a program in Minneapolis at this time.

### THE NEED TO THINK SHORT AND LONG TERM

Several of the informants we spoke with regarded rent stabilization as different from other regulations that have the effect of one-time, upfront costs (e.g., inclusionary zoning and park dedication fees). There was a general concern that rent stabilization may produce less of an immediate impact to tenants and landlords related to changing rents but more significant effects in the longer term, affecting property values, capital reinvestment, housing quality, housing supply, and the city's tax base. Informants mentioned potential impacts to apartment economics that ranged from reduced income available for capital improvements to declining rates of growth for property values and deterioration of housing stock. These effects may be more difficult to predict or plan for as they involve numerous variables and forces over many years.

### QUESTIONING THE NEED FOR RENT STABILIZATION IN MINNEAPOLIS

A number of informants commented that the Minneapolis market is unusual because it is a "rent to occupancy" market rather than a "rent to vacancy market," which means Minneapolis landlords and owners focus on keeping occupancy high at slightly lower rents rather than on maximizing rents at the cost of higher vacancy. Rent stabilization may incent current and future owners to prioritize rent growth over occupancy. These owners also said that they prioritize maximum occupancy and minimum turnover of tenants, as turnover costs are greater than the value of the rent increases they might receive if they turned units over more often. Most informants, including nonprofit developers, lenders, investors, and other industry experts, suggested that there is not a rent problem in Minneapolis, that rents are not overpriced, and that rates of increase are not overly high when considered across longer time frames (e.g., from the 2000s to the present rather than the past 5 years).

Many informants expressed concern that as the city's regulatory framework becomes increasingly more restrictive, uncertainty grows for owners, investors, and lenders, who may choose to deploy their resources elsewhere. Informants noted that since 2019, the city has implemented or considered: Inclusionary Zoning (2019), Resident Protection Act (2019), Advance Notice of Sale, Tenant Option to Purchase, and Rent Stabilization. Many informants asked why rent stabilization is being considered now, as rents are not overpriced and rent increases have not been high when considered over a longer time frame, and now rents are falling, vacancy is climbing, and fear and uncertainty are very high.

> One nonprofit leader said, "There have been more changes in the past 3 years than in the past 20 years." An owner said, "Markets hate uncertainty, and there are two responses to uncertainty: Raise rents or sell." One lender said, "Now is not the time."

### POTENTIAL IMPACTS ON RENTS, REVENUES, AND HOUSING COSTS

*Potentially limited impact on rents.* Despite their concerns about a rent stabilization program, most owners and informants said that the rent cap examples from other cities and states that we shared with them would not actually apply to their properties. Most owners claimed that they already charge below-market rents and raise them gently rather than aggressively (in the example of rent caps on rates of increase that we shared, all are higher than the rent increases these owners claim to typically make). Informants pointed to this as support for their belief that rent stabilization is unnecessary.

Our own analysis of the data presented in Part 2 confirms the expectation that a rent cap might have a limited impact on rents. The data indicate that from 2000 until 2013, the median and average rent increases in Minneapolis would have been affected only by a cap as low as the CPI or 75% of CPI.

*The imminent passage of a rent stabilization ordinance may cause some owners to raise rents in advance.*

The expectation of limited impact notwithstanding, several owners commented that if they thought rent stabilization was imminent, they would immediately and aggressively raise rents from current below-market rates to market rates. The purpose of such increases would be to minimize the reduction in future income and property value, which together affect an owner's profits and their ability to reinvest in a property.

> One owner said, "All tenants would get letters. We would raise rents to market levels. All of the gains from the next 10 years, I would need to collect them all now. Everyone else would do it, too."

***Rent stabilization may cause some owners to increase non-rent fees and charges.*** Some owners indicated that they would be incentivized to seek ways to increase nonrent income from fees and charges for parking, storage lockers, laundry, lost keys, late fees, etc.

Our focus group sessions with tenants indicate that this already occurs in the market. Tenants reported that a portion of their increased housing costs are the result of fees and charges that are separate from the contract rent.

***Rent stabilization may add costs to the city for administration and to owners for compliance, some of which would be passed on to tenants through higher rents.*** Owners anticipated incurring new costs related to compliance requirements and indicated that they will be incented to pass some or all of these costs along to tenants through increased rents.

Our peer-city study of Oakland, California, noted that the city charges $100 per unit annually to fund their policy infrastructure and allows owners to pass along half of that in a one-time fee to tenants.

## POTENTIAL IMPACTS ON CAPITAL REINVESTMENT, BOTH SHORT- AND LONG-TERM

The impact on capital reinvestment was the greatest concern expressed by nearly all of the market informants we spoke to and stemmed from the expectation that rent stabilization would constrict income to property owners while expenses continued to rise, reducing net operating income (NOI) for capital expenditures, debt service, and profit. This concern had both short-term and long-term dimensions.

***Rent stabilization may cause some owners to reduce spending on operations and maintenance.*** Owners indicated that in the immediate term, they would be inclined to maintain their profit levels and may therefore reduce spending in other areas such as maintenance and upkeep and this, in turn, could reduce housing quality. This might include, for example, less effort spent on snow and ice removal, landscaping, etc.

> One nonprofit housing leader said, "If you do something to limit my rents, then all costs downstream will be affected. And If you think developers and owners would proceed with a lower return on investment, you would be wrong. They would proceed with the same ROI, and lower operating costs to make the pro forma work."

***Rent stabilization has the potential to reduce capital reinvestment in apartments over the long run.*** Many owners refinance periodically (e.g., every 10 years) and use the gain from appreciation to fund major capital expenditures and to distribute profits. Informants suggested that if income were to decline, property values would then grow at a slower rate, and the amount of money available from refinancing for capital expenditures would be reduced as well. Over time, a decline in capital expenditures could lead to declining housing quality and could also further reduce property values.

> "This is the real pressure point—you will hold off, delay another year, and instead of replacing the roof you will patch the roof."

> Another owner said, "Old NOAH needs ongoing capital reinvestment but if there is no return, why invest in the building?"

> And one industry expert said, "There will be no carpet replacement. The quality of housing will go down because there is no incentive to maintain it and the tenants are going to have to live with what they get."

## POTENTIAL IMPACTS ON NEW CONSTRUCTION AND THE APARTMENT HOUSING STOCK

The market participants we interviewed pointed to a number of changes in the apartment housing market that could be triggered by rent stabilization.

***Rent stabilization may constrict the production of new apartments.*** Many informants commented that rent stabilization would at least temporarily constrict the housing production pipeline, which is required to keep pace or catch up with demand. This constraint on supply would increase scarcity and cause rents and values to rise at steeper rates over the long run. Many of the developers we spoke to commented that they have either stopped activity in Minneapolis or are in the process of doing so because of the passage of the inclusionary zoning ordinance in 2020 and other new regulations. Developers and other informants suggested that apartment production might slow down, at least temporarily, as developers take a

"wait-and-see" approach, while several informants commented that while some developers may exit the market, others will come in and find new ways to develop in Minneapolis.

Our review of program experiences elsewhere indicates that new development is typically not affected by rent stabilization programs, at least in part because most programs exempt new construction.

**Rent stabilization may result in loss of existing apartment units through conversion/demolition.** Several informants thought a small number of apartments would be converted to condominiums to avoid rent regulations, and that older buildings might be replaced with new construction at higher density so as to avoid a rent cap through a possible new construction exemption.

Our review of the experience of other cities indicates that condominium conversion and demolition or removal of buildings by other means is a concern after rent stabilization is enacted and is often addressed by additional regulations.

### POTENTIAL IMPACTS ON APARTMENT FINANCING

**Rent stabilization may cause capital flight from the Twin Cities.** Informants—particularly developers—expressed concern that rent stabilization may cause risk-averse capital to seek other markets. Respondents argued that a large share of the capital—equity and debt—invested in Minneapolis housing comes from outside of the state. Rent stabilization and the city's regulatory framework may be perceived to increase risk and uncertainty, causing capital to look elsewhere for lower risk and more favorable yields. Capital flight may constrict the production of new housing as well as reinvestment in older buildings in Minneapolis.

> According to one local developer, "Lending and investing decisions are made in board rooms in big cities by people who care only about risk-adjusted returns. It is all about margin and risk. The announcement will have a chilling effect on capital."

> Another developer said, "This policy will chase people out of town. Capital comes from big life insurance companies and pension funds and that takes 80% of developers off the table. All of the local fee developers will be unable to source capital for Minneapolis projects."

**Rent stabilization has the potential to lead to stricter lending terms.** Opinions were divided (among all informants and among members of the lending community) on the impact of rent stabilization on lending. Some people thought little, if anything, would change, other than smaller loan sizes to reflect

changes in value (if values grow more slowly or decline). Others, including several commercial lenders, thought lending terms could become stricter, including higher interest rates, lower loan to value (LTV) ratios, and stricter capital reserve requirements. Banks make loans based on an LTV ratio and the lower the LTV, the smaller the loan amount as a share of the total cost of the property. This means that with a lower LTV, a buyer must provide more equity—cash—if they are to purchase a property. This would raise the barrier to entry and make it more difficult for first-time buyers, individuals, and smaller "mom-and-pop" property owners to enter the apartment market or to refinance in the future.

### POTENTIAL LOCAL MARKET IMPACTS

**Rent stabilization may cause some owners of older apartments to exit the Minneapolis market.** A number of informants commented that rent stabilization may cause both larger owners and small mom-and-pop companies to consider divesting of their properties. Several informants commented that they knew of portfolios that were quietly being offered for sale off-market. Several other owners with properties in Minneapolis and elsewhere in the Twin Cities said they were exiting or considering exiting the Minneapolis market and reinvesting in other surrounding cities. In all cases, informants commented that it was not just rent stabilization but all of the recent new regulations that were creating uncertainty in the marketplace.

**Rent stabilization could accelerate the transition of apartment ownership in Minneapolis from local to nonlocal owners.** According to our informants, a large share of Minneapolis apartments are locally owned as compared to other markets where apartments are predominantly owned by big national firms. If rent stabilization were to cause local owners to divest, the new buyers would not necessarily be other local owners.

> One developer said, "New properties are owned by REITs and guys in New York who are sophisticated and run huge portfolios. Lots of these older properties in Minneapolis are smaller mom-and-pop deals."

> One nonprofit development leader said, "We are speeding towards transferring ownership towards disinterested, investor-driven owners from out of town. I get a call every day from one coast or the other saying, 'We have seen your property and we are interested in it and in other parts of your portfolio too.'"

Many informants who are not owners and landlords went out of their way to say that Minneapolis has good landlords and owners who try to do the right thing and who are assets to the community.

> One nonprofit development leader said, "Minneapolis has assets in local owners who really do give a damn. It is not like on the coasts, where that type of owner is gone. There are now only national entities on the coasts—and no local connection. By ignoring the value of these local assets, you are forcing those people out."

***Disagreement about the potential impact of rent stabilization on property values.*** Many informants believed that rent stabilization would cause property values to grow at slower rates or to decline. Property values are based on income growth over time, and if that growth is constricted while costs continue to rise, then property values and tax revenues would be negatively impacted.

> One owner said, "Rent stabilization would increase cap rates and cut the value of our portfolio. It would make Minneapolis a less attractive place to attract capital. And theoretically, if assessed values go down, so do property taxes, so the city should be cautious."

The city's "2018 Assessment for Taxes Collected in 2019" shows that apartments represented 17.5% of the city's estimated tax base. Should values decline or rise more slowly as a result of rent stabilization, it would affect this portion of the city's tax base.

Several owners took the opposite view, however, suggesting that rent stabilization would cause rents and values to increase in the long term. These owners believe that rent stabilization will have a chilling effect on production and may incent some owners to convert apartments to condos or replace old buildings with new, higher-density apartments that would likely be excluded from rent stabilization because of their age. In this scenario, rent stabilization would reduce growth in apartment supply and even cause supply to shrink.

> One developer said, "We are done doing development in Minneapolis because of inclusionary zoning [and rising costs] but I am holding onto my apartments. I'm bullish on Minneapolis and I think rents are going to skyrocket."

***The CPI is an unreliable proxy for all of the costs associated with operating rental housing.*** A number of owners expressed concern that the CPI is an inadequate proxy for rates of increase on expenses because some costs do not track with the CPI. Some expenses grow faster than the CPI (labor and materials) and other expenses, such as property taxes and insurance, are unrelated to the CPI and are unpredictable. Owners say that property taxes have been increasing at steeper rates in recent years (reflecting increased property values) and that this is the

largest and most unpredictable line on their expense budget. Insurance is another large cost that is based on variables unrelated to the CPI and insurance costs in 2020 increased for some owners because of public safety concerns. Utilities, too, do not rise at predictable rates. Our review of program designs in other cities indicates that some incorporate cost pass-throughs for taxes and utilities.

***A rent stabilization program should be a product of collaboration if it is to succeed.*** A number of informants said that collaboration would be key to the design of a workable and successful rent stabilization program: *"It has got to make sense for everybody: owners, tenants, developers, and the city's coffers."*

## Scenario Modeling

One objective of this study is to consider how the interview responses from the previous section can help to illuminate what has happened in the Minneapolis apartment market and what might have happened (or could happen in the future) if a rent stabilization program had been (or were to be) implemented.

The purpose of this part of the study is to explore how different rent caps would affect (1) rents for tenants and (2) the economics of apartment properties. We model these outcomes for the 10 most recent years. We chose a 10-year ownership period because that is the typical investment horizon used by many investors.

The models were based on the following:

- The pro forma model is of a single typical market rate, class C or NOAH type apartment unit. It can be scaled to any number of units (a fourplex, 20 units, 50, 100, etc.).

- Informants suggested that rents for class C apartment units in 2019 were between $900 and $1,050, for an average of $975.

- Median rent for a Minneapolis apartment in 2019 was $984, which is close to the average of $975, so we used Minneapolis median rents as a proxy for class C rents. (The average apartment rent in 2019 was higher, $1,097, a figure driven up by outliers at the top of the market.)

- We then used median rents in starting years (2004/2009) and increased them at the rates of example rent caps (75% CPI, CPI, CPI + 3%, and CPI + 7%).

- We included assumptions for vacancy, miscellaneous income, and expense rate of growth, capital reserve, and debt service. The model delivers typical returns when run at the historic rental increase rates for an average Minneapolis apartment (minimum annual cash-on-cash returns of 7% to 10% and an internal rate of return of at least 15%).

After modeling rents from 2009 to 2018 for our profile apartment, we then consider the economic performance of the apartment in terms of five different metrics that investors use to assess the attractiveness of investment options:

1. Cash-on-cash return (average annual returns)
2. Cash-on-cash return in the final year (2018)
3. Average annual change in value (appreciation)
4. Total change in value (appreciation)
5. Internal rate of return (IRR)

Our model provides measures of return to owners/investors in percentages that can be compared across different scales of properties. For example, this model can be scaled to any number of units. The returns as percentages would not change.

Many owners commented that, while they had concerns about how a rent stabilization program might impact income, profits, and capital reinvestment over time, they also do not raise rents at rates that would be subject to most of the example caps we shared with them. This part of the study supports those comments, illustrating that, based on historic rent data, the average apartment owner would not be affected by any other than the most restrictive rent caps (75% of CPI and CPI) that we considered and that the average property earns profits that reflect the minimum requirements of investors. This study does illustrate that for owners who increase rents at rates greater than the average, their profits grow more steeply in the form of annual cash-on-cash returns, appreciation, and IRR. In short, it appears that even the strictest rent stabilization programs would only affect a minority of Minneapolis apartment units.

## Rent Increases Under Different Rent Caps

### RENTS IN DOLLARS

Figure 3.2 illustrates what 2018 rents would be based on 2009 median rents raised at the rates of the various caps. The high cap examples (CPI + 7% and CPI + 3%) would have allowed for increases that would be at the high end of the market in 2018. For example, 2009 rents that were raised each year at the CPI + 3% level would result in a median rent in 2018 of $1,352. This is higher than what the 2018 rent would have been in Minneapolis had the median 2009 rent increased at the median level over



**Figure 3.2: Modeled Rent in 2018 Compared to Caps\***

Source: Authors' calculations using CoStar data

*\*Modeled rents in 2018 using median rents in 2009 as starting point.*

that 10-year period (which would have resulted in a 2018 rent of $940). The CPI + 7% rent increases would have resulted in a rent that is even higher than what the highest rent increases (those at the 90th percentile) would have produced by 2018, a rent of $2,042.

Figure 3.2 illustrates that only the lowest rent caps—75% of CPI and CPI—would have affected the average rent increases during this period and those caps would have produced a rent that is at or above what the median rent increases would have produced. Owners affected by the higher caps would have been those who raised rents at rates far greater than the market norm.

## Rent Caps and Investment Metrics

Rents are only one variable in apartment economics. As described in the summary of the interviews, rent stabilization has the potential to affect a number of apartment economic variables over time. In this section we combine 2000 and 2019 rent data and example rent caps with a model pro forma to create a series of scenarios that illustrate how apartment investment metrics could be affected by rent caps.

*Many owners commented that, while they had concerns about how a rent stabilization program might impact income, profits, and capital reinvestment over time, they also do not raise rents at rates that would be subject to most of the example caps we shared with them. This part of the study supports those comments, illustrating that, based on historic rent data, the average apartment owner would not be affected by any other than the most restrictive rent caps (75% of CPI and CPI) that we considered and that the average property earns profits that reflect the minimum requirements of investors. This study does illustrate that for owners who increase rents at rates greater than the average, their profits grow more steeply in the form of annual cash-on-cash returns, appreciation, and IRR. In short, it appears that even the strictest rent stabilization programs would only affect a minority of Minneapolis apartment units.*

In general, our analysis in this section indicates that these apartment metrics are only affected in cases where owners raise rents above the average level, duplicating the findings for rents that were shown in the previous section.

## QUALIFICATIONS

The model assumes continued occupancy by a tenant over the entire study period and thus does not contemplate the potential impact of vacancy decontrol. Moreover, the model does not incorporate any provisions for cost pass-throughs (for property taxes or utilities, for example) that are sometimes part of rent stabilization programs.

An industry standard for a real estate pro forma is used to model discounted cash flows over an assumed 10-year ownership period, based on the assumptions that one buys in year 0, owns for 10 full years (1–10), and sells in year 10 for a sale price based on estimated year 11 rents. Some apartment owners, however, are long-term owners and rather than selling, they refinance on a schedule (e.g., every 10 years). When they refinance, the new financing is based on a higher property value due to appreciation and the owner can use the gain to invest in major capital improvements and/or distribute profits (similar to a home equity loan). The models we constructed assumed one owner buying in year 0 (end of 2003 or 2008), owning from year 1 (2004 or 2009), through years 10 or 15 (2018), and selling in 2018 for a price based on estimated 2019 rents, and we did not include refinancing in either scenario.

We used similar levels of debt for the 10-year model as we did for the 15-year model to make them easier to compare. In reality, the market was different in those two years and financing would have been different too, but we applied an average level of debt service to both.

In summary, these models are examples that serve as a representation by which to compare different scenarios. Their greatest utility is in demonstrating differences across the scenarios, and they should not be considered predictions of actual outcomes.

## ANNUAL RETURN AS A PERCENTAGE OF EQUITY INVESTED OR "CASH-ON-CASH RETURN"

The buyer of a property must provide equity based on the lender's requirements for loan to value (LTV). For example, for a $400,000 property, if the lender is willing to lend at 75% LTV, then the loan will be for $300,000 and the buyer must provide $100,000 in equity to close. Annual cash returns or cash flows after financing (CFAF) are the cash remaining after all operating expenses, capital reserve, and debt service have been subtracted from income. Owners divide annual cash returns by the amount of their equity investment to determine cash-on-cash return, expressed as a percentage. An annual return of $10,000 in cash divided by equity of $100,000 = a 10% cash-on-cash return.

Cash-on-cash returns typically start lower and grow over time, as income grows while debt service payments remain flat. Cash-on-cash returns do not reflect increasing property value due to appreciation. Our interviews with market actors indicate that investors expect minimum returns of 7% to 10% and that "double digit" returns (returns that equal or exceed 10%) are preferred.



**Figure 3.3: Cash-on-Cash Return: Average Return 2009–2018**

Source: Authors' calculations using CoStar data

Figure 3.3 illustrates how the average cash-on-cash return would have grown for building owners under different caps. Our informants indicated that an average annual return of 7% to 10% is the minimum of what is desired by investors. The figure shows that landlords who increased rents at the average and the median of all units in Minneapolis over this 10-year period would have achieved those minimum returns (7.2% and 7.1%, respectively). More aggressive landlords who raised rents at the 90th percentile would have realized an average return of 12.6% in this time period. Had rent increases been capped at 75% of the CPI or at the CPI, landlords would have been able to achieve acceptable returns (7.5% and 8.0%, respectively). In fact, those returns would have been higher than what would have been achieved by the average and median rent increases over this period. A cap of CPI + 3% would have allowed average annual returns that essentially match what would have been achieved by the most aggressive landlords in the Minneapolis market. In sum, Figure 3.3 shows that average annual returns at the middle of the Minneapolis market would not have been constrained by any of the caps we modeled.

Figure 3.4 shows the projected cash-on-cash return at the end of the 10-year period, in 2018. These returns are larger than what is seen in Figure 3.3 because these represent the return in the final year of the investment period. Annual returns grow over the course of an ownership period, and the figure shows what



**Figure 3.4: Cash-on-Cash Return, 2018**

Source: Authors' calculations using CoStar data



**Figure 3.5: Average Annual Increase in Value, 2009–2018**

Source: Authors' calculations using CoStar data

those returns would have been in the final year. The pattern in Figure 3.4 echoes that seen in Figure 3.3. The 2018 return under a 75% CPI and a CPI cap match what would have been achieved through the average and median rent hikes over the 10-year period. The 2018 return under a CPI + 3% cap is less than what the most aggressive owners would have achieved over that period (18% compared to 25%). A cap of CPI + 7% would have allowed a 2018 return well in excess of what the high end of the Minneapolis market would have produced during these years.

### INCREASE IN VALUE (APPRECIATION)

The value of a property is determined by dividing net operating income (NOI, income less expense) in the sale year by a "cap (cap-italization) rate," expressed as a percentage. For example, if an apartment earned an NOI of $7,000 in the sale year, if one divides that by a 6% cap rate, the result, $116,700, is the value in the sale year. Cap rates are established by the market at lower cap rates = higher values and vice versa. According to our informants, cap rates for new class A apartments are in the 4.0% range while class C apartments are closer to 5.5% or 6.0%. The more steeply rents increase, the higher the value at the end of the ownership period (at time of sale or refinance). Owners who raise rents aggressively benefit from both increased returns in future years and a higher sale price and gain on sale.

Figure 3.5 illustrates the modeled impact of different rent caps on the average annual increase in value. The model indicates that annual rent increases at the CPI would have produced apprecia-tion that matched or slightly exceeded both the average and the median in Minneapolis over this time period. The most restrictive cap we examined, one set at 75% of the CPI, would have con-strained the average annual increase in value compared to the average but would have allowed for greater increase in value

than what would have occurred at the median of the Minneapolis market. Higher rent caps would have allowed for greater appre-ciation than the market average and median.

Figure 3.6 illustrates the total increase in value from the time of purchase through the time of sale. These percentages reflect an increase over 10 years. Indeed, the total increase in value shown is simply 10 times what was shown in Figure 3.5. The relative pat-terns are the same. The two most restrictive caps would have allowed for total increases in value that matched the middle of the Minneapolis market, while the more lenient caps would have allowed for appreciation well above those levels.

**Figure 3.6: Total Increase in Value, 2009–2018**



Source: Authors' calculations using CoStar data

## INTERNAL RATE OF RETURN

In addition to annual returns (cash flows and cash-on-cash return as a percentage) and appreciation over the ownership period, owners also consider a property's IRR. Internal rate of return is an algebraic calculation that takes into account the initial equity invested, annual returns to that equity (above), and appreciation (also above) to determine an average rate of return over the entire ownership period. Because it considers both annual cash flows and long-term appreciation, IRR is typically higher than annual rates of return. So, for example, a project may earn annual returns of 7% to 10% and have an IRR of 15% or more.[34] According to respondents, investors expect to earn a minimum IRR of 15% or higher.

Figure 3.7 shows that the 15% threshold for IRR is achieved under all of the rent cap scenarios. The 75% CPI and the CPI caps would allow an IRR that matches or slightly exceeds what would have been achieved at the average and the median of the Minneapolis market from 2009 to 2018. A cap of CPI + 3% would have allowed an IRR that matches what the most aggressive owners would have achieved over this period. The most lenient cap (CPI + 7%) would have allowed an IRR far in excess of what would have been achieved at the top of the market.

**Figure 3.7: Internal Rate of Return, 2009–2018**



Source: Authors' calculations using CoStar data

---

34  IRR is affected by the rates of growth in income, because it integrates a property's value at the time of sale. That value is based on the last year of income divided by a cap rate. The higher the rate of increase over the ownership period, the higher the income in the last year, the higher the sale value, and the higher the IRR.

# PART 4: CONCLUSION

## The Form of Programs

Rent regulation programs have taken on many forms in cities across the United States. The variation in laws occurs across five dimensions:

1. Choice of rent increase cap.
2. Exceptions to the cap for costs such as major capital improvements, utilities increases, and property tax hikes, or more generally, on the basis of a "right to reasonable return."
3. Exemptions for certain portions of the housing stock, typically newly constructed units and in some cases exemptions for rentals in owner-occupied buildings.
4. The existence and terms of vacancy decontrol, which allows a landlord to exceed the rent cap when a tenant vacates the unit.
5. Compliance monitoring and public education.

## The Impact of Programs

Many studies have been done of existing rent stabilization programs. Outcomes in individual cities are dependent on the unique features of not only the rent regulations themselves but also the characteristics of the local housing market. The empirical research indicates that rent regulation has been effective at achieving two of its primary goals: maintaining below-market rent levels and moderating price appreciation. There is widespread agreement in the empirical literature that rent regulation increases housing stability for tenants who live in regulated units. There is little empirical evidence to show that rent control policies negatively impact new construction. Construction rates are highly dependent on localized economic cycles and credit markets, and most rent stabilization programs exclude new construction. Rent regulations have been shown to be related to an overall reduction in rental units as owners in rent-regulated markets remove units through condominium conversion, demolition, or other means. There is little evidence that rent regulations cause a reduction in housing quality. Some evidence exists that major capital improvements keep pace with need but that more aesthetic upkeep may suffer. There is considerable debate in the empirical literature about whether the majority of benefits from rent stabilization go to the neediest households.

## The Minneapolis Rental Market

In the years 2000 to 2007, a steady but modest increase in rents occurred annually in Minneapolis. Rents stagnated during the housing crisis of 2008 to 2012 but increased afterward. The years 2013 through 2018 saw steeper rent increases and a wider variation in rent increases across the Minneapolis market. Tenants in the bottom income quartile have suffered significantly, experiencing steep rent increases (44% increases from 2006 to 2019) and almost no growth in income (2.9% increase in the same period). BIPOC renters generally, and Black renter households in particular, saw a worsening of affordability for most of the study period. White households fared best.

Using actual rent trends in Minneapolis from 2001 to 2019 we see that a rent cap set at 75% of CPI and a rent cap at the CPI would have had a consistent but relatively small impact on the middle of the Minneapolis rental market. Rent caps at higher levels (CPI + 3% and CPI + 7%) would not have constrained rent increases in Minneapolis until the post-crash period. These caps would have limited the most aggressive rent increases in the city but would not have affected median increases.

## Building-Level Economics

Scenario modeling for a hypothetical, class C or NOAH unit indicated that rent caps at 75% of CPI and at CPI would have allowed for average annual returns and internal rates of return comparable to what was achieved at the middle (defined by both the average and median rent increases seen in Minneapolis since 2009) of the market. More lenient rent caps (CPI+) would have allowed returns equal to what would have been achieved by raising rents at the 90th percentile. There is no evidence in our modeling that any of the hypothetical rent caps we considered would have reduced investor income in Minneapolis during these years.



STEVE SCHNEIDER

# PART 5: SOURCES

## Sources

Ambrosius, J., Gilderbloom, J., Steele, W., Meares, W., Keating, D. (2015). "Forty Years of Rent Control: Reexamining New Jersey's Moderate Local Policies After the Great Recession." *Cities* 49: 121-133.

Appelbaum, R., Gilderbloom, J. (1990). "The Redistributional Impact of Modern Rent Control." *Environment and Planning A: Economy and Space* 22 (5): 601-614.

Arnott, R. (1995). "Time for Revisionism on Rent Control." *Journal of Economic Perspectives* 9 (1): 99-120.

Arnott, R., Shevyakhova, E. (2014). "Tenancy Rent Control and Credible Commitment in Maintenance." *Regional Science and Urban Economics* 47: 72-85.

Asquith, B. (2019). "Do Rent Increases Reduce the Housing Supply Under Rent Control? Evidence from Evictions in San Francisco." https://ssrn.com/abstract=3165599.

Ault, R., Jackson, J., Saba, R. (1992). "Effect of Long-Term Rent Control on Tenant Mobility." *Journal of Urban Economics* 35: 140-158.

Autor, D., Palmer, C., Pathak, P. (2014). "Housing Market Spillovers: Evidence from the End of Rent Control in Cambridge, Massachusetts." *Journal of Political Economy* 122 (3): 661-717.

Baar, K. (1983). "Guidelines for Drafting Rent Control Laws: Lessons of a Decade." *Rutgers Law Review* 35: 723-885.

Baar, K. (1998). "New Jersey's Rent Control Movement." In M. Teitz and others, eds. *Rent Control: Regulation and the Rental Housing Market*. New Brunswick, NJ: Center for Urban Policy Research, Rutgers.

Baar, K., Keating, D. (1981). "Fair Return Standards and Hardship Appeal Procedures: A Guide for New Jersey Rent Leveling Boards." Berkeley, CA: National Housing Law Project.

Barton, S. (1998). "The Success and Failure of Strong Rent Control in the City of Berkeley, 1978 to 1995." In M. Teitz and others, eds. Rent Control: Regulation and the Rental Housing Market. New Brunswick, NJ: Center for Urban Policy Research, Rutgers.

Barton, S. (2011). "Land Rent and Housing Policy." American *Journal of Economics and Sociology* 70 (4): 845-873.

Bartlett, S. (1997). "The Significance of Relocation for Chronically Poor Families in the USA." *Environment and Urbanization* 9 (1): 121-132.

Basu, K., Emerson, P. (2000). "The Economics of Tenancy Rent Control." *The Economic Journal* 110 (466): 939-962.

Been, V., Gould Ellen, I., & House, S. (2019). Laboratories of Regulation: Understanding the Diversity of Rent Regulation Laws. *Fordham Urban Law Journal* 46(5), 1041-1080.

Brennan, M. (2011). "The Impacts of Affordable Housing on Education: A Research Summary." Washington, DC: The Center for Housing Policy.

Cash, A., Zuk, M., Federico, A. (2018). "Proposition 10: Estimating the Scale of Expanded Rent Control in the Bay Area. A Policy Brief." *Urban Displacement Project, University of California, Berkeley.*

Chew, A., Treuhaft, S. (2019). "Our Homes, Our Future: How Rent Control Can Build Stable, Healthy Communities." *Right to the City Alliance, PolicyLink, The Center for Popular Democracy.*

City of Berkeley. (2021). "Guide to Berkeley's Rent Stabilization Program" *Fact Sheet #40.* https://www.cityofberkeley. info/uploadedFiles/Rent_Stabilization_Board/Level_3_-_General/2020%20Guide%20with%202021%20Insert%20Included.pdf.

Clark, W., Heskin, A. (1982). "The Impact of Rent Control on Tenure Discounts and Residential Mobility." *Land Economics* 58 (1): 109-117.

Damiano, A., Frenier, C. (Updated Oct. 2020). "Build Baby Build?: Housing Submarkets and the Effects of New Construction on Existing Rents." Center for Urban and Regional Affairs (CURA) Working Paper.

Diamond, R., McQuade, T., Qian, F. (2019). "The Effects of Rent Control Expansion on Tenants, Landlords, and Inequality: Evidence from San Francisco." *American Economic Review* 109 (9): 3365-3394.

Early, D. (2000). "Rent Control, Rental Housing, and the Distribution of Tenant Benefits." *Journal of Urban Economics* 48 (2): 185-204.

Fallis, G., Smith, L. (1984). "Uncontrolled Prices in a Controlled Market: The Case of Rent Controls." *American Economic Review* 74 (1): 193-200.

Fetter, D. (2016). "The Home Front: Rent Control and the Rapid Wartime Increase in Home Ownership." *The Journal of Economic History* 76 (4): 1001-1043.

Flaming, D., Burns, P., Matsunaga, M., Ponce, M., Baar, K., Bostic, R., Bennet, M. (2009). *Economic Study of the Rent Stabilization Ordinance (RSO) and the Los Angeles Housing Market.* City of Los Angeles Housing Department.

Frankena, M. (1975). "Alternative Models of Rent Control." *Urban Studies* 12 (3): 303-308.

Freeman, L., Braconi, F. (2004). "Gentrification and Displacement: New York City in the 1990s." *Journal of the American Planning Association* 70 (1): 39-52.

Gilderbloom, J., Ye, L. (2007). "Thirty Years of Rent Control: A Survey of New Jersey Cities." *Journal of Urban Affairs* 29 (2): 207-220.

Glaeser, E., Luttmer, E. (2003). "The Misallocation of Housing under Rent Control." *The American Economic Review* 93 (4): 1027-46.

Goetz, E. (1995). "A Little Pregnant: The Impact of Rent Control in San Francisco." *Urban Affairs Review* 30 (4): 604-612.

Gorska, K., Crispell, M. (2016). "Condominium Conversion Policy Brief." *Urban Displacement Project, University of California, Berkeley.*

Grebler, L. (1952). "Implications of Rent Control-Experience in the United States." *International Labour Review* 65 (4): 462-85.

Guzman, C., Bhatia, R., Durazo, C. (2005). *Anticipated Effects of Residential Displacement on Health: Results from Qualitative Research.* San Francisco Department of Public Health and South of Market Community Action Network.

Gyourko, J., Linneman, P. (1989). "Equity and Efficiency Aspects of Rent Control: An Empirical Study of New York City." *Journal of Urban Economics* 26 (1): 54-74.

Harkness, J., Newman, S. (2005). "Housing Affordability and Children's Well-being: Evidence from the National Survey of America's Families. *Housing Policy Debate* 16 (2): 223-255.

Heskin, C., Levine, N., Garrett, M. (2000). "The Effects of Vacancy Decontrol: A Spatial Analysis of Four California Cities." *Journal of the American Planning Association* 66 (2): 162-176.

Keating, D. (1998). "Rent Control: its Origins, History, and Consequences." In M. Teitz and others, eds. *Rent Control: Regulation and the Rental Housing Market.* New Brunswick, NJ: Center for Urban Policy Research, Rutgers.

Kelekian, J., Barton, S. (2013). "Rent Stabilization and the Berkeley Rental Housing Market 15 Years after Vacancy Decontrol." *City of Berkeley Rent Stabilization Board.*

Kerbow, D. (1996). *Patterns of Urban Student Mobility and Local School Reform.* Technical Report. Chicago, IL: University of Chicago Center for Research on the Education of Students Placed At Risk, Report No. 5.

Kutty, NK. (1996). "The Impact of Rent Control on Housing Maintenance: A Dynamic Analysis Incorporating European and North American Rent Regulations." *Housing Studies* 11 (1): 69-88.

Levine, N., Grigsby III, E., Heskin, A. (1990). "Who Benefits from Rent Control? Effects on Tenants in Santa Monica, California." *Journal of the American Planning Association* 56 (2): 140-152.

Montojo, N., Barton, S., Moore, E. (2018). *Opening the Door for Rent Control: Toward a Comprehensive Approach to Protecting California's Renters.* Berkeley, CA: Haas Institute for a Fair and Inclusive Society.

Moon, C., Stotsky, J. (1993). "The Effect of Rent Control on Housing Quality Change: A Longitudinal Analysis." *Journal of Political Economy* 101 (6): 1114-1148.

Newman, S., Holupka, C. (2014). "Housing Affordability and Investments in Children." *Journal of Housing Economics* 24: 89-100.

NY Office of Rent Administration. (2019). "Preferential Rents." *Fact Sheet #40.*

Olsen, E. (1988). "What Do Economists Know About the Effect of Rent Control on Housing Maintenance?" *Journal of Real Estate Finance and Economics* 1: 295-307.

Olsen, E. (1991). "Is Rent Control Good Social Policy." *Chicago-Kent Law Review* 67 (3): 931-945.

Pastor, M., Carter, V., Abood, M. (2018). "Rent Matters: What Are the Impacts of Rent Stabilization Measures?" *USC Dornsife Program for Environmental and Regional Equity.*

PolicyLink. (2001). "Equitable Development Toolkit: Rent Control." *PolicyLink.*

Rosen, K. (2018). "The Case for Preserving Costa-Hawkins: Three Ways Rent Control Reduces the Supply of Rental Housing." Berkeley, CA: *Fisher Center for Real Estate and Urban Economics Working Papers*: 11.

Scanlon, E., Devine, K. (2001). "Residential Mobility and Youth Well-Being: Research, Policy, and Practice Issues." *Journal of Sociology and Social Welfare* 28 (1): 119-138.

Schulman, D. (1981). "Real Estate Valuation Under Rent Control: The Case of Santa Monica." *Real Estate Economics* 9 (1): 38-53.

Sims, D. (2007). "Out of Control: What Can We Learn from the End of Massachusetts Rent Control?" J*ournal of Urban Economics* 61 (1): 129-151.

Smith, S.J., Easterlow, D., Munro, M., Turner, K.M. (2003). "Housing as Health Capital: How Health Trajectories and Housing Paths Are Linked." *Journal of Social Issues* 59 (3): 501-525.

Sturtevant, L. (2018). "The Impact of Rent Control: A Research Review and Synthesis." *National Multifamily Housing Council Research Foundation*.

Teitz, M. (1998). "Rent Stabilization in Los Angeles: A Moderate Approach to Regulation" In M. Teitz and others, eds. *Rent Control: Regulation and the Rental Housing Market*. New Brunswick, NJ: Center for Urban Policy Research, Rutgers.

Turner, M. (1998). "Moderating Market Pressures for Washington, D.C., Rental Housing." In M. Teitz and others, eds. *Rent Control: Regulation and the Rental Housing Market*. New Brunswick, NJ: Center for Urban Policy Research, Rutgers.

Weich, S., Lewis, G. (1998). "Poverty, Unemployment, and Common Mental Disorders: Population Based Cohort Study." *British Medical Journal* 317: 115-119.

Exhibit 3

Creating Chapter 193A of the Legislative Code (Title XIX) pertaining to Residential Rent Stabilization

Sec 193A.01 Findings

In order to retain or find adequate rental housing, many residents of the City of Saint Paul pay a substantial amount of their monthly income for Rent; that the present shortage of residential Rental Units and the prevailing Rent levels have a detrimental effect on the health, safety, and welfare of a substantial number of Saint Paul residents, particularly persons in low and moderate income households, and persons on fixed incomes who reside in the City; that residential Tenants constitute over 50% of the residents in Saint Paul; that residential Tenants suffer great and serious hardship when forced to move from their homes; that the community is impacted by housing instability when rent increases outpace incomes; and that the welfare of all persons who live, work, or own Property in the City of Saint Paul depends in part ensuring that Saint Paul residents have access to affordable housing.

Sec 193A.02 Authority

Pursuant to Minn. Stat. § 471.9996 sub.2 the City of Saint Paul shall establish a policy limiting rent increases on residential rental properties as approved in a general election.

Sec 193A.03 Limitation on rent increases.

No landlord shall demand, charge, or accept from a tenant a rent increase within a 12 month period that is in excess of 3% of the existing monthly rent for any residential rental property except as otherwise allowed under section 193A.05 or 193A.06.

Sec. 193A.04 Vacancy

Limitation on the amount of annual rent increase shall apply regardless of change of occupancy in a residential rental unit except as otherwise allowed under section 193A.05 or 193A.06.

Sec 193A.05 Reasonable Return on Investment.

(a) The city shall establish a process by which landlords can request exceptions to the limitation on rent increases based on the right to a reasonable return on investment. Rationale for deviations from the limitation on rent increases must take into account the following factors:

(1)  Increases or decreases in property taxes

(2)  Unavoidable increases or any decreases in maintenance and operating expenses

(3) The cost of planned or completed capital improvements to the rental unit (as distinguished from ordinary repair, replacement and maintenance) where such capital improvements are necessary to bring the property into compliance or maintain compliance with applicable local code requirements affecting health and safety, and where such capital improvement costs are properly amortized over the life of the improvement

(4) Increases or decreases in the number of tenants occupying the rental unit, living space, furniture, furnishings; equipment, or other housing services provided, or occupancy rules

(5) Substantial deterioration of the rental unit other than as a result of normal wear and tear

(6) Failure on the part of the Landlord to provide adequate housing services, or to comply substantially with applicable state rental housing laws, local housing, health and safety codes, or the rental agreement

(7)  The pattern of recent rent increases or decreases

(b) It is the intent of this chapter that exception to limitation on rent increases be made only when the Landlord demonstrates that such adjustments are necessary to provide the landlord with a fair return on investment.

(c) The city will not grant an exception to the limitation on rent increases for any unit where the landlord has failed to bring the rental unit into compliance with the implied warranty of habitability.

Sec. 193A.06 Exceptions

(a)  The limitation on rent increases shall not apply to the amount that a housing service provider can be reimbursed by a government entity under the Housing Support Act, Minn. Stat. § 256I.

(b)  The limitation on rent increases shall not apply to changes in the tenant obligation for income based payments where the renter obligation is established as a share of income.

Sec. 193A.07 Enforcement, penalties, and prohibitions

(a)  Penalties for violation. In addition to any other remedy available at equity or law, failure to comply with the provisions of this Chapter may result in criminal prosecution and/or administrative fines as provided by Sec. 1.05 of the Legislative Code.

(b)  Private right of action. Any tenant aggrieved by a landlord's noncompliance with this Chapter may seek equitable relief in any court of competent jurisdiction to the extent permitted by law.

(c)  Prohibition of waiver.  Any lease provision which waives or purports to waive any right, benefit or entitlement created in this Chapter shall be deemed void and of no lawful force or effect.

Sec 193A.08 Severability.

If any of the parts or provisions of this section or the application thereof to any person or circumstance is held invalid or unconstitutional by a decision of a court of competent jurisdiction, the remainder of this section, including the application of such part or provisions to persons or circumstances other than those to which it is held invalid, shall not be affected thereby and shall continue in full force and effect. To this end, the provisions of this section are severable.

Sec 193A.09 Effective date.

This section shall become effective May 1, 2022.

Exhibit 4



# City of Saint Paul

### Signature Copy

### Ordinance: Ord 22-16

City Hall and Court House
15 West Kellogg Boulevard
Phone: 651-266-8560

---

**File Number:   Ord 22-16**

Amending Chapter 193A of the Legislative Code to define certain terms contained therein and ensure consistency of language used throughout. (Public hearing continued from March 23.)

**AMENDED 3/23/2022**

SECTION 1

WHEREAS, on November 2, 2021, a majority of voters in the City of Saint Paul voted in favor of adopting the residential rent stabilization ordinance; and

WHEREAS, the ordinance, as approved by voters, does not contain a definitions section; and

WHEREAS, since the ordinance was approved on November 2, 2021, the lack of a definitions section has been a source of confusion for Saint Paul landlords and tenants alike, which has made it necessary to amend the ordinance to include a definitions section; and

WHEREAS, in the course of drafting definitions, it was necessary to renumber the ordinance approved by voters, but, in doing so, no substantive changes were made to the original language except the addition of section 193A.03; now, therefore, be it

RESOLVED, that the Council of the City of Saint Paul does hereby ordain:

SECTION 2

Section 193A.01 of the Saint Paul Legislative Code is hereby amended as follows:

Sec. 193A.01 . - Findings.

In order to retain or find adequate rental housing, many residents of the City of Saint Paul pay a substantial amount of their monthly income for Rent; that the present shortage of residential Rental Units and the prevailing Rent levels have a detrimental effect on the health, safety, and welfare of a substantial number of Saint Paul residents, particularly persons in low and moderate income households, and persons on fixed incomes who reside in the City; that residential Tenants constitute over 50% of the residents in Saint Paul; that residential Tenants suffer great and serious hardship when forced to move from their homes; that the community is impacted by housing instability when rent increases outpace incomes; and that the welfare of all persons who live, work, or own Property in the City of Saint Paul depends in part on ensuring that Saint Paul residents have access to affordable housing.

SECTION 3

Section 193A.02 of the Saint Paul Legislative Code is hereby amended as follows:

---

Sec. 193A.02. - Authority.

Pursuant to Minnesota. Statutes. §section 471.9996, subdivision. 2, the City of Saint Paul shall establish a policy limiting rent increases on rResidential rRental pProperties as approved in a general election.

SECTION 4

Section 193A.03 of the Saint Paul Legislative Code is hereby amended as follows:

Sec 193A.03 Limitation on rent increases.

No landlord shall demand, charge, or accept from a tenant a rent increase within a 12 month period that is in excess of 3% of the existing monthly rent for any residential rental property except as otherwise allowed under section 193A.05 or 193A.06.

Sec. 193A.03. - Definitions.

Unless otherwise expressly stated, the following terms shall, for the purposes of this chapter, have the meanings indicated in this section:

(a)   *Change of Occupancy*. A change in occupation of the Rental Unit from one Tenant to another Tenant.

(b)   *City*. The City of Saint Paul.

(c)   *Code*. The Saint Paul Legislative Code.

(d)   *Housing Services*. Housing Services include but are not limited to repairs, maintenance, painting, light, hot and cold water, elevator service, window shades and screens, storage units, kitchen, bath, and laundry facilities and privileges, janitorial services, utilities that are paid by the landlord, refuse removal, furnishings, telephone services, vehicle parking spaces, the right to have a specified number of occupants, and any other benefit, privilege, or facility connected with the use or occupancy of any rental unit. Housing Services to a Rental Unit shall include a proportionate part of services provided to common facilities of the building in which the Unit is contained.

(e)   *Landlord*. An owner of real property, a contract for deed vendee, receiver, executor, trustee, lessee, agent, or other person directly or indirectly in control of rental property.

(f)   *Local Housing, Health, and Safety Codes*. Any building, fire, housing, health, safety, or other similar code, law, or ordinance promulgated or enacted by the County of Ramsey and/or the City of Saint Paul, or any lawful agency or department thereof, which is applicable to a building in such city. Housing, health, and safety codes include, without any limitation on the foregoing sentence as a result of this specification, the provisions of chapters 33, 34, 43, 45, 49, 55, and 58 of the Code.

(g)   *Rent*. All monetary consideration charged or received by a Landlord concerning the use or occupancy of a Rental Unit pursuant to a Rental Agreement. All periodic payments and all nonmonetary consideration, including but not limited to the fair market value of goods or services rendered to or for the benefit of the Landlord under a Rental Agreement concerning the use or occupancy of a Rental Unit and premises and attendant Housing Services.

(h)   *Rental Agreement*. An agreement, oral, written, or implied, between a Landlord and a Tenant for the use or occupancy of any Rental Unit.

(i) *Residential Rental Unit, Rental Unit, or Unit*. Any dwelling unit, or portion of a dwelling unit, that is rented or otherwise made available for rent for residential use or occupancy, together with all Housing Services connected with the use or occupancy of

such property. This term shall not include the following:

    (1)    Rental Units which a government unit, agency, or authority owns, operates, or otherwise manages;

    (2)    Rental Units in hotels, motels, inns, tourist homes, or other similar establishment which are rented primarily to transient guests for a period of fewer than thirty (30) days;

    (3)    Rental Units or other accommodations provided by a church, chapel, synagogue, temple or other similar place of worship; and

    (4)    Hospitals, long-term care facilities or nursing homes licensed under Minnesota Statutes sections 144A.02 to 144A.10, boarding care homes licensed under sections 144.50 to 144.56, assisted living facilities or assisted living facilities with dementia care licensed under chapter 144G, or licensed or registered residential settings that provide or arrange for the provision of home care services.

*(j) Residential Rental Property.* Residential Rental Property shall have the same meaning as Residential Rental Unit, Rental Unit, or Unit as defined in section 193A.03(i) of the Code.

*(k)*    *Tenancy.* The right or entitlement of a Tenant to use or occupy a Rental Unit under the terms of a Rental Agreement.

*(l) Tenant.* A person who is occupying a Rental Unit in a residential building under a Rental Agreement that requires the payment of money or exchange of services, as well as other regular occupants of that Unit.


SECTION 5


Section 193A.04 of the Saint Paul Legislative Code is hereby amended as follows:


~~Sec. 193A.04 Vacancy~~

~~Limitation on the amount of annual rent increase shall apply regardless of change of occupancy in a residential rental unit except as otherwise allowed under section 193A.05 or 193A.06.~~


Sec. 193A.04. - Limitation on rent increases.


No Landlord shall demand, charge, or accept from a Tenant a Rent increase within a 12 month period that is in excess of 3% of the existing monthly Rent for any Residential Rental Property except as otherwise allowed under sections 193A.06 or 193A.07.


SECTION 6


Section 193A.05 of the Saint Paul Legislative Code is hereby amended as follows:


~~Sec 193A.05 Reasonable Return on Investment.~~

~~(a) The city shall establish a process by which landlords can request exceptions to the limitation on rent increases based on the right to a reasonable return on investment. Rationale for deviations from the limitation on rent increases must take into account the following factors:~~

    ~~(1)~~    ~~Increases or decreases in property taxes~~

    ~~(2)~~    ~~Unavoidable increases or any decreases in maintenance and operating expenses~~

    ~~(3)~~    ~~The cost of planned or completed capital improvements to the rental unit (as distinguished from ordinary repair, replacement and maintenance) where such capital improvements are necessary to bring the property into compliance or maintain compliance with applicable local code requirements affecting health and safety, and~~

~~where such capital improvement costs are properly amortized over the life of the improvement~~

(4)    ~~Increases or decreases in the number of tenants occupying the rental unit, living space, furniture, furnishings; equipment, or other housing services provided, or occupancy rules~~

(5)    ~~Substantial deterioration of the rental unit other than as a result of normal wear and tear~~

(6)    ~~Failure on the part of the Landlord to provide adequate housing services, or to comply substantially with applicable state rental housing laws, local housing, health and safety codes, or the rental agreement~~

(7)    ~~The pattern of recent rent increases or decreases~~

~~(b) It is the intent of this chapter that exception to limitation on rent increases be made only when the Landlord demonstrates that such adjustments are necessary to provide the landlord with a fair return on investment.~~

~~(c) The city will not grant an exception to the limitation on rent increases for any unit where the landlord has failed to bring the rental unit into compliance with the implied warranty of habitability.~~


Sec. 193A.05. - Vacancy.

The limitation on the amount of annual Rent increase shall apply regardless of Change of Occupancy in a Residential Rental Unit except as otherwise allowed under sections 193A.06 or 193A.07.


SECTION 7


Section 193A.06 of the Saint Paul Legislative Code is hereby amended as follows:


~~Sec. 193A.06 Exceptions~~

~~(a) The limitation on rent increases shall not apply to the amount that a housing service provider can be reimbursed by a government entity under the Housing Support Act, Minn. Stat. § 256I.~~

~~(b) The limitation on rent increases shall not apply to changes in the tenant obligation for income-based payments where the renter obligation is established as a share of income.~~

Sec. 193A.06. - Reasonable return on investment.


(a) The City shall establish a process by which Landlords can request exceptions to the limitation on Rent increases based on the right to a reasonable return on investment. Rationale for deviations from the limitation on Rent increases must take into account the following factors:

(1)    Increases or decreases in property taxes;

(2)    Unavoidable increases or any decreases in maintenance and operating expenses;

(3)    The cost of planned or completed capital improvements to the Rental Unit (as distinguished from ordinary repair, replacement and maintenance) where such capital improvements are necessary to bring the property into compliance or maintain compliance with applicable local code requirements affecting health and safety, and where such capital improvement costs are properly amortized over the life of the improvement;

(4)    Increases or decreases in the number of Tenants occupying the Rental Unit, living space, furniture, furnishings, equipment, or other Housing Services provided, or occupancy rules;

(5)    Substantial deterioration of the Rental Unit other than as a result of normal wear and

tear;

(6)     Failure on the part of the Landlord to provide adequate Housing Services, or to comply substantially with applicable state rental housing laws, Local Housing, Health, and Safety Codes, or the Rental Agreement; and

(7)     The pattern of recent rent increases or decreases.

(b) It is the intent of this chapter that exception to limitation on Rent increases be made only when the Landlord demonstrates that such adjustments are necessary to provide the Landlord with a fair return on investment.

(c) The City will not grant an exception to the limitation on Rent increases for any unit where the Landlord has failed to bring the rental unit into compliance with the implied warranty of habitability.


SECTION 8


Section 193A.07 of the Saint Paul Legislative Code is hereby amended as follows:

~~Sec. 193A.07 Enforcement, penalties, and prohibitions~~
~~(a) Penalties for violation. In addition to any other remedy available at equity or law, failure to comply with the provisions of this Chapter may result in criminal prosecution and/or administrative fines as provided by Sec. 1.05 of the Legislative Code.~~
~~(b) Private right of action. Any tenant aggrieved by a landlord's noncompliance with this Chapter may seek equitable relief in any court of competent jurisdiction to the extent permitted by law.~~
~~(c) Prohibition of waiver. Any lease provision which waives or purports to waive any right, benefit or entitlement created in this Chapter shall be deemed void and of no lawful force or effect.~~


Sec. 193A.07. - Exceptions.

(a) The limitation on Rent increases shall not apply to the amount that a housing service provider can be reimbursed by a government entity under the Housing Support Act, Minnesota Statutes chapter 256I.

(b) The limitation on Rent increases shall not apply to changes in the Tenant obligation for income based payments where the renter obligation is established as a share of income.


SECTION 9


Section 193A.08 of the Saint Paul Legislative Code is hereby amended as follows:


~~Sec 193A.08 Severability.~~
~~If any of the parts or provisions of this section or the application thereof to any person or circumstance is held invalid or unconstitutional by a decision of a court of competent jurisdiction, the remainder of this section, including the application of such part or provisions to persons or circumstances other than those to which it is held invalid, shall not be affected thereby and shall continue in full force and effect. To this end, the provisions of this section are severable.~~


Sec. 193A.08. - Enforcement, penalties, and prohibitions.
(a) Penalties for violation. In addition to any other remedy available at equity or law, failure to comply with the provisions of this chapter may result in criminal prosecution and/or administrative fines as

provided by section 1.05 of the Code.
(b) Private right of action. Any Tenant aggrieved by a Landlord's noncompliance with this chapter may seek equitable relief in any court of competent jurisdiction to the extent permitted by law.
(c) Prohibition of waiver. Any lease provision which waives or purports to waive any right, benefit, or entitlement created in this chapter shall be deemed void and of no lawful force or effect.

SECTION 10

Section 193A.09 of the Saint Paul Legislative Code is hereby amended as follows:

~~Sec 193A.09 Effective date.~~
~~This section shall become effective May 1, 2022.~~

Sec. 193A.09. - Severability.

If any of the parts or provisions of this chapter or the application thereof to any person or circumstance is held invalid or unconstitutional by a decision of a court of competent jurisdiction, the remainder of this chapter, including the application of such part or provisions to persons or circumstances other than those to which it is held invalid, shall not be affected thereby and shall continue in full force and effect. To this end, the provisions of this chapter are severable.

SECTION 11

Section 193A.10 of the Saint Paul Legislative Code is hereby created as follows:

Sec. 193A.11. - Effective date.
This chapter shall become effective May 1, 2022.

SECTION 12

This Ordinance shall take effect and be in force thirty (30) days following passage, approval, and publication.

At a meeting of the City Council on 4/6/2022, this Ordinance was Passed.

|  |  |  |
|---|---|---|
| **Yea:** | 5 | Councilmember Tolbert, Councilmember Noecker, Councilmember Prince, Councilmember Jalali, and Councilmember Yang |
| **Nay:** | 0 | |
| **Absent:** | 2 | Councilmember Brendmoen, and Councilmember Thao |

**Vote Attested by**
**Council Secretary**   Shari Moore

**Date**   4/6/2022

*File Number:  Ord 22-16*

**Approved by the Mayor**

Melvin Carter III

**Date**   4/8/2022

**Clerk**

Shari Moore

**Date**

**Test Signature**

Shari Moore

**Date**

# Exhibit 5



# City of Saint Paul

City Hall and Court House
15 West Kellogg Boulevard
Phone: 651-266-8560

### Signature Copy

### Ordinance: Ord 22-37

---

**File Number:   Ord 22-37**

Amending Chapter 193A of the Legislative Code pertaining to rent stabilization.

SECTION 1

WHEREAS, on November 2, 2021, a majority of voters in the City of Saint Paul voted in favor of adopting the residential rent stabilization ordinance; and

WHEREAS, the purpose of the ordinance is to ensure affordability of rental housing in Saint Paul; address detrimental health, safety and welfare impacts resulting from a shortage of residential rental units; address the hardship tenants face when being forced to move from their homes; and stabilize rents in Saint Paul where rents outpace incomes; and

WHEREAS, according to data from the Department of Housing and Urban Development, there have been only two hundred (200) residential building permits in Saint Paul through April of 2022, compared to 1,391 at the same point in 2021; and

WHEREAS, according to census and forecast data published by the Metropolitan Council, the population in Saint Paul is since the year 2000 is outpacing the increase in new housing; and

WHEREAS, according to the Metropolitan Council Affordable Housing Production Survey, only 370 out of 2,073 new housing units in 2020 are affordable housing units; and

WHEREAS, according to American Community Survey data from 2015-2019, 36.8% of Saint Paul residents live below 185% of the federal poverty level; and

WHEREAS, prior to adoption, city partners expressed that passage of rent stabilization could increase the future financial risk on loans for executed redevelopment agreements which, in turn, could lead to developers pulling out of existing executed redevelopment agreements; and

WHEREAS, the development of new affordable housing in the City depends, in part, on Tax-Increment Financing (TIF) produced by the development of new market rate housing in general; and

WHEREAS, a decrease in development of new housing will decrease the availability of TIF and thus decrease the development of new affordable housing; and

WHEREAS, city partners have forecasted a loss of capital investment, relocation of developers and builders to more predictable locations and asset types, negative impacts on housing supply, and long term increases to housing costs due to the rent stabilization ordinance; and

WHEREAS, a local bank has reported that a Naturally Occurring Affordable Housing development will not proceed because of passage of the rent stabilization ordinance, which reportedly caused a

reduction in value of approximately $1.1 million to the development; and

WHEREAS, a large non-profit affordable housing developer has reported over 500 affordable housing units will not be constructed as they are predicated on TIF funding from market rate projects which are indefinitely on hold due to the limitations of the current rent stabilization ordinance; and

WHEREAS, rent stabilization ordinances across the country include exemptions for new construction, including ordinances in effect in Berkeley, Oakland, and others; and

WHEREAS, the purpose of new construction exemptions in other jurisdictions is to address challenges similar to those faced by the City of Saint Paul, specifically housing shortages and accessibility to affordable housing; and

WHEREAS, the text of the rent stabilization ordinance finds that "that the welfare of all persons who live, work, or own Property in the City of Saint Paul depends in part ensuring that Saint Paul residents have access to affordable housing"; and

WHEREAS, consistent with the rent stabilization ordinance's stated goal of ensuring access to affordable housing, the City Council finds it necessary and reasonable to amend the Chapter to exempt new construction; and

WHEREAS, exempting new construction will help to ensure that city partners can continue to construct new affordable housing units in the City of Saint Paul; and

WHEREAS, the City has received numerous inquiries and complaints from residential tenants since the passage of the ordinance; and

WHEREAS, the ordinance, in its current form, does not specify a process by which tenants may file Complaints with the City; and

WHEREAS, the City Council desires to clarify the process by which tenants may seek redress of improper rent increases which exceed the cap increase in the ordinance, subject to exceptions and exemptions outlined in the ordinance; and

WHEREAS, the City Council desires to ensure that the rent stabilization ordinance does not dissuade the construction of new housing; and

WHEREAS, the City Council desires to balance tenant interests in housing security with the interests of landlords to adjust vacant units to competitive rates; and

WHEREAS, Complaints, Applications, and appeals filed with the City since the passage of the rent stabilization ordinance have demonstrated difficulties with implementing the rent stabilization ordinance; and

WHEREAS, Complaints, Applications and Appeals filed with the City since the passage of the rent stabilization ordinance have demonstrated that allowing rental increases above the ordinance cap can, in limited circumstances, increase the likelihood that landlords will invest in their property and make improvements; and

WHEREAS, the Council may amend ordinances pursuant to Saint Paul charter; now, therefore, be it

RESOLVED, that the Council of the City of Saint Paul does hereby ordain:


SECTION 2

Section 193A.01 of the Saint Paul Legislative Code is hereby amended as follows:

Sec. 193A.01. Findings.

In order to retain or find adequate rental housing, many residents of the City of Saint Paul pay a substantial amount of their monthly income for rRent; that the present shortage of rResidential rRental uUnits and the prevailing rRent levels have a detrimental effect on the health, safety, and welfare of a substantial number of Saint Paul residents, particularly persons in low and moderate income households, and persons on fixed incomes who reside in the cCity; that residential tTenants constitute over fifty (50) percent of the residents in Saint Paul; that residential tTenants suffer great and serious hardship when forced to move from their homes; that the community is impacted by housing instability when rent increases outpace incomes; and that the welfare of all persons who live, work, or own pProperty in the cCity depends in part on ensuring that Saint Paul residents have access to affordable housing.


SECTION 3

Section 193A.02 of the Saint Paul Legislative Code is hereby amended as follows:

Sec. 193A.02. Authority.
Pursuant to Minn. Stat. § 471.9996, subd. 2, the cCity shall establish a policy limiting rent increases on rResidential rRental pProperties as approved in a general election.


SECTION 4

Section 193A.03 of the Saint Paul Legislative Code is hereby amended as follows:

Sec. 193A.03. Definitions.

Unless otherwise expressly stated, the following terms shall, for the purposes of this chapter, have the meanings indicated in this section:

> (a) *Building Certificate of Occupancy.* The certificate of occupancy issued under the Minnesota State Building Code, including temporary certificates of occupancy.

> (a)(b)  *Change of Tenancy.* A change in occupation of the Rental Unit from one tTenant to another tTenant.

> (b)(c)  *City.* The City of Saint Paul.

> I(d)  *Code.* The Saint Paul Code of Ordinances.

> (e) *Complaint.* The process by which a Tenant requests the City to review a rent increase the Tenant believes is above an amount permitted by this chapter.

> (f) *Consumer Price Index.* The measure of changes over time in prices for consumers of

goods and services as published by the United States Department of Labor, Bureau of Labor Statistics.

(g) *Cure the Deficiency.* Cure the Deficiency means that a Tenant pays all monies rightfully owed to the Landlord, or fully complies with an order to correct a lease violation or notice to cease an activity that is in violation of a lease.

(h) ~~*Deferred Rent Increase.* Deferred Rent Increase refers to a circumstance wherein a Landlord opts not to increase rent by up to three (3) percent in a given year, in accordance with Part II of the Code, Chapter 193A.04. Deferred Rent Increase is not limited to a deferral in one year.~~

~~(i)~~ (h) *Department.* The Saint Paul Department of Safety and Inspections.

~~(j)~~ (i)  *Department Determination.* The City's determination by the Department of Safety and Inspections of whether a Landlord's RROI Application has demonstrated justification for a Reasonable Return on Investment increase in rent of more than 3%.

~~(k)~~ (j) *Family Member.* A person's child, stepchild, adopted child, foster child, adult child, spouse, sibling, parent, step-parent, mother-in-law, father-in-law, grandchild, grandparent, or registered domestic partner as defined in section 186.02 of the Code or any individual related by blood or affinity whose close association with the property owner is the equivalent of a family relationship.

~~(f)(l)~~ (k) *Final Determination.* A Final Determination follows a Department Determination on an RROI Application or Complaint once the time has elapsed for the Tenant or Landlord to appeal to the Legislative Hearing Officer, or the Council has issued a decision following a recommendation from the Legislative Hearing Officer.

~~(d)(m)~~ (l) *Housing sServices.* Housing sServices include but are not limited to repairs, maintenance, painting, light, hot and cold water, elevator service, window shades and screens, storage units, kitchen, bath, and laundry facilities and privileges, janitorial services, utilities that are paid by the lLandlord, refuse removal, furnishings, telephone services, vehicle parking spaces, the right to have a specified number of occupants, and any other benefit, privilege, or facility connected with the use or occupancy of any rental unit. Housing sServices to a rRental uUnit shall include a proportionate part of services provided to common facilities of the building in which the Unit is contained.

~~(n)~~ (m) *Just Cause Vacancy.* Just Cause Vacancy means any of the bases listed in Section 193A.0~~5~~6 ~~(a)(9)(b)(iii)~~ (b)(2) upon which a Landlord may terminate tenancy.

~~l(o)~~ (n)    *Landlord.* An owner of real property, a contract for deed vendee, receiver, executor, trustee, lessee, agent, or other person directly or indirectly in control of rental property.

~~(p)~~ (o) *Legislative Hearing Officer.* The individual who hears appeals pursuant to chapter 18 of the Code.

~~(f)(q)~~ (p)  *Local hHousing, hHealth, and sSafety cCodes.* Any building, fire, housing, health, safety, or other similar code, law, or ordinance promulgated or enacted by the County of Ramsey and/or the City ~~of Saint Paul~~, or any lawful agency or department thereof, which is applicable to a building in such city. Local hHousing, hHealth, and sSafety cCodes include, without any limitation on the foregoing sentence as a result of this specification, the provisions of chapters 33, 34, 43, 45, 49, 55, and 58 of the Code.

~~(r)~~ (q) *Newly Constructed.* Newly Constructed means that the Residential Rental Property was built from the ground up and was not classified for occupancy under the Minnesota State Building Code or Minnesota Residential Code prior to issuance of the first Building Certificate of Occupancy.

~~(s)~~ (r) *Non-residential.* Any Property or portion of Property that has an occupancy classification other than residential under the Minnesota State Building Code or Minnesota Residential Code.

(t) (s) *Pass Through Expense.* Expenses that a Landlord may recover from the Tenant on a pass through basis when the expense is directly attributable to the Tenant as approved in this Chapter. A Pass Through Expense shall not be considered Rent and the Landlord may not consider the Pass Through Expense as rental income or as an operating expense.  –

(u) (t) *Property or Properties.* Property or Properties shall have the same meanings as the terms "building(s)" or "structure(s)" as defined in the Minnesota State Building Code and Minnesota Residential Building Code.

(v) (u) *Reasonable Return on Investment (RROI) Application* or *Application* . The document(s) submitted by Landlords to receive a reasonable return on investment, as set forth in section 193A.06 of the Code. The RROI Application template shall be drafted and published by the City.

(g)(w) (v) *Rent.* All monetary consideration charged or received by a lLandlord concerning the use or occupancy of a rRental uUnit pursuant to a Rental Agreement, except for Pass Through Expenses authorized by this Chapter.

(h)(x) (w) *Rental aAgreement.* An agreement, oral, written, or implied, between a Landlord and a Tenant for the use or occupancy of any Rental Unit.

(i)(y) (x) *Residential rRental uUnit, rRental uUnit, or uUnit.* Any dwelling unit, or portion of a dwelling unit, that is rented or otherwise made available for rRent for residential use or occupancy, together with all hHousing sServices connected with the use or occupancy of such property. This term shall not include the following:

    (1)    Rental uUnits which a government unit, agency, or authority owns, operates, or otherwise manages;

    (2)    Rental uUnits in hotels, motels, inns, tourist homes, or other similar establishment which are rented primarily to transient guests for a period of fewer than thirty (30) days;

    (3)    Rental uUnits or other accommodations provided by a church, chapel, synagogue, temple or other similar place of worship; and

    (4)    Hospitals, long-term care facilities or nursing homes licensed under Minnesota Statutes sections 144A.02 to 144A.10, boarding care homes licensed under sections 144.50 to 144.56, assisted living facilities or assisted living facilities with dementia care licensed under chapter 144G, or licensed or registered residential settings that provide or arrange for the provision of home care services.

(j)(z) (y) *Residential rRental pProperty* means a Property or a portion of a Property that is classified for occupancy as residential under the Minnesota State Building Code or Minnesota Residential Code . Residential Rental Property shall have the same meaning as Residential Rental Unit, Rental Unit, or Unit as defined in section 193A.03(i) of the Code.

(aa) (z) *Single Metered Multiunit Residential Building.* A multiunit Residential Rental Property with one or more separate Rental Units where a utility service is measured through a single meter and provides service to an individual unit and to all or parts of common areas or other units.

(bb) (aa) *Sub Metered Residential Building.* A Residential Rental Property with one or more separate Rental Units where a utility service has a separate meter which accurately measures the Rental Unit's use only.

(cc) (bb) *State.* The State of Minnesota.

(dd) (cc) *Substantially Equivalent Replacement Unit.* A dwelling unit which is decent, safe and sanitary, contains at least the same number of bedrooms and other living areas as the displacement dwelling unit, and is available at a Substantially Similar Rental Rate within the neighborhood district of the displacement dwelling unit. Perfect comparability is not required.

(ee) (dd) *Substantially Similar Rental Rate.* The Rent that is no more than three (3) percent

greater than or ten (10) percent less than a single month's Rent.

(k)(ff) (ee) *Tenancy*. The right or entitlement of a tTenant to use or occupy a rRental uUnit under the terms of a rRental aAgreement.

(l)(gg) (ff) *Tenant*. A person who is occupying a rRental uUnit in a residential building under a rRental aAgreement that requires the payment of money or exchange of services, as well as other regular occupants of that uUnit.

(hh) (gg) *Termination of Tenancy*. The end of a tenancy following a written notice given by a Landlord to a Tenant requiring the Tenant to move, including nonrenewal of lease.

(ii) (hh) *Utilities*. Utilities shall include, but are not limited to natural gas, electricity, water service, and refuse and recycling removal.


SECTION 5

Section 193A.04 of the Saint Paul Legislative Code is hereby amended as follows:


Sec. 193A.04. Limitation on rent increases.

No lLandlord shall demand, charge, or accept from a tTenant a rRent increase within a 12 month period that is in excess of three (3) percent of the existing monthly rRent for any rResidential rRental pProperty except as otherwise allowed under sections 193A.06 or 193A.08. Any Rent increase over three (3) percent made pursuant to section 193A.06 of the Code shall not take effect until a Final Determination is issued.


SECTION 6

Section 193A.05 of the Saint Paul Legislative Code is hereby amended as follows:


Sec. 193A.05. - Vacancy.

(a) Vacancy not for just cause. The limitation on the amount of annual rRent increase shall apply -if there is a regardless of cChange of oTenancy in a rResidential rRental uUnit -and the vacancy is not supported by just cause, except as otherwise allowed under sections 193A.06 or 193A.08.

(b) Just Cause Vacancy. Nothing in this subsection shall be interpreted or enforced to prevent a Landlord from refusing tenancy to a Tenant for a reason other than for just cause. The Just Cause provisions of this subsection apply only to Landlords seeking to increase Rent following a Just Cause Vacancy.

   (1) If the Landlord demonstrates to the Department that there is a Just Cause Vacancy, the limitation on a Rent increase set forth in 193A.04 shall not apply, and the Landlord may increase Rent in an amount not to exceet eight (8) percent plus the Consumer Price Index above the existing Rent.

   (2) The following reasons shall constitute a Just Cause Vacancy:

      a. *Non-payment of Rent*. The Tenant fails to Cure the Deficiency after receiving a non-payment notice from the Landlord, and the Landlord does not pursue a valid non-payment eviction action under Minn. Stat. § 504B.291, subd. 1(a), but decides to terminate the tenancy at the end of the lease.

      b. *Repeated late payment of Rent*. The Tenant repeatedly makes *late* payments of Rent, no fewer than three (3) times in a twelve (12) month

period. The Landlord must provide the Tenant with notice following a late payment that a subsequent late payment may be grounds for Termination of Tenancy. If the Tenant continues to make a late payment on no fewer than three (3) occasions per year, the Landlord must give the Tenant notice to vacate at least equal to the notice period outlined in the original Rental Agreement.

c.    *Material non-compliance.* After receiving a written notice to cease from the Landlord, the Tenant continues a material breach of the lease. This subsection shall not diminish the rights of a Landlord, if any, to terminate a lease for actions permitted under Minn. Stat. § 504B.281, et seq.

d.    *Substantial damage.* The Tenant has willfully caused or allowed substantial damage to the premises beyond normal wear and tear and has refused, after written notice, to pay the reasonable costs of repairing such damage and cease damaging the premises.

~~e. *Disorderly conduct.* The Tenant has continued, following written notice to cease, to be so disorderly as to destroy the peace and quiet of other Tenants or occupants of the premises or the Tenant is otherwise subject to eviction under Minn. Stat. 504B.281, et seq.~~

e.    *Refusal to renew.* The Tenant refuses to renew or extend the lease after the Landlord requests in writing that the Tenant do so. The Landlord shall give the Tenant notice to vacate at least equal to the notice period outlined in the original Rental Agreement following the Tenant's refusal to renew or extend the lease. This subsection shall in no way diminish the fifteen (15) to thirty (30) day notice period as required by Minn. Stat. 504B.145 for leases with automatic renewal provisions.

f.    *Occupancy by property owner or Family Member.* The property owner, in good faith, seeks to recover possession of the dwelling unit so that the property owner or a Family Member may occupy the unit as that person's principal residence. The property owner or Family Member must move into the unit within ninety (90) days from the Tenant's vacation. If a Substantially Equivalent Replacement Unit is vacant and available, that unit must be made available to the Tenant at a Substantially Similar Rental Rate as the Tenant's current lease.

g.    *Building demolition and dwelling unit conversion.*

   a.    The Landlord elects to demolish the building, convert it to a cooperative, provided the Landlord complies with the provisions of Minn. Stat. Ch. 515B, or convert it to nonresidential use, provided that, the Landlord must obtain a permit necessary to demolish or change the use before terminating any tenancy;

   b.    The Landlord seeks, in good faith, to recover the unit to sell it in accordance with a condominium conversion, provided the Landlord complies with the provisions of Minn. Stat. Ch. 515B; or

   c.    The dwelling unit is being converted to a unit subsidized under a local, state or federal housing program and the Tenant does not qualify to rent the unit under that program.

h.    *Rehabilitation and renovation.* The Landlord seeks, in good faith, to recover possession of the dwelling unit that will render the unit uninhabitable for the duration of the rehabilitation or renovation. The Landlord must provide 90 days' written notice to the Tenant. If a Substantially Equivalent Replacement Unit is vacant and available in the building, that unit must be

made available to the Tenant at a Substantially Similar Rental Rate as the Tenant's current lease.

 *i.* <u>*Complying with a government order to vacate.* The Landlord is complying with a government agency's order to vacate, order to abate, or any other order that necessitates the vacating of the dwelling unit as a result of a violation of Saint Paul city codes or any other provision of law. If a Substantially Equivalent Replacement Unit is vacant and available in the building, that unit must be made available to the Tenant at a Substantially Similar Rental Rate as the Tenant's current lease.</u>

 *j.* <u>*Occupancy conditioned on employment at the Landlord's Property.* The Tenant's occupancy is conditioned upon employment by the Landlord on the Landlord's property and that employment relationship is terminated.</u>

## SECTION 7

Section 193A.06 of the Saint Paul Legislative Code is hereby amended as follows:

Sec. 193A.06. Reasonable return on investment.

(a) The <s>c</s>City shall establish a process by which <s>l</s>Landlords can request exceptions to the limitation on <s>r</s>Rent increases based on the right to a reasonable return on investment. Rationale for deviations from the limitation on <s>r</s>Rent increases must take into account the following factors:

 (1) Increases or decreases in property taxes;
 (2) Unavoidable increases or any decreases in maintenance and operating expenses <u>, including fluctuations in the Consumer Price Index (CPI)</u>;

  a. <u>Utilities. The Rental Agreement shall establish whether the Landlord or Tenant is responsible for paying each Utility.</u>

   i. <u>Single Metered Multiunit Residential Buildings. For Single Metered Mulitunit Residential Buildings, a Landlord seeking to impose utility payments as a Pass Through Expense under this Chapter must follow all conditions established in Minnesota Statutes section 504B.215, subdivision 2a.</u>

    A. <u>If the Landlord previously paid the Tenant's Utilities and the Landlord changes the Rental Agreement to require the Tenant to pay Utilities as a Pass Through Expense, the Landlord must decrease the Rent to account for the reduction of the utility operating expense.</u>

   ii. <u>Sub Metered Residential Buildings. For Sub Metered Residential Buildings, the lease agreement may require the Tenant to contract with the utility service provider directly. If the Tenant pays the utility provider directly, the payment to the utility provider shall not be considered Rent.</u>

    A. <u>A Landlord in a Sub Metered Residential Building who pays a utility provider directly may impose utility payments as a Pass Through Expense to Tenants when the utility costs are directly attributable to the Tenant.</u>

B.  If the Landlord previously paid the Tenant's Utilities and the Landlord changes the Rental Agreement to require the Tenant to pay Utilities directly to a provider, the Landlord must decrease the Rent to account for the reduction of the utility operating expense.

(3) The cost of planned or completed capital improvements to the rRental uUnit (as distinguished from ordinary repair, replacement and maintenance) including but not limited to where such capital improvements are necessary to bring the property into compliance or maintain compliance with applicable local code requirements affecting health and safety, and where such capital improvement costs are properly amortized over the life of the improvement;

(4) Increases or decreases in the number of tenants occupying the rRental uUnit, living space, furniture, furnishings, equipment, other housing services provided, or occupancy rules;

(5) Increases or decreases in living space, furniture, furnishings, equipment;

(6) Increases or decreases in other Housing Services provided, or occupancy rules;

(5) (7) Substantial deterioration of the rRental uUnit other than as a result of normal wear and tear;

(6) (8) Failure on the part of the lLandlord to provide adequate hHousing sServices, or to comply substantially with applicable state rental housing laws, lLocal hHousing, hHealth, and sSafety cCodes, or the rRental aAgreement; and

(7) (9) The pattern of recent rRent increases or decreases.

    a.   Patterns of Recent Rent Increases and Just Cause Vacancy. Nothing in this subsection shall be interpreted or enforced to prevent a Landlord from refusing tenancy to a Tenant for a reason other than for just cause. The just cause provisions of this subsection apply only to Landlords seeking to reset Rent following Deferred Rent Increases and a Just Cause Vacancy. The Landlord may apply to increase Rent pursuant to this section in an RROI Application and the RROI Application shall be approved, subject to sections b and c below.

    b.   When determining the pattern of recent Rent increases or decreases and Just Cause Vacancy, a Landlord may apply to increase rents subject to each of the following conditions:

        i.   The Landlord demonstrates Deferred Rent Increase over a period of time. Deferred Rent Increase may equal the maximum amount of increase a Landlord would have been entitled to had the Landlord increased Rent by three (3) percent each year;

        ii.   Upon demonstrating Deferred Rent Increase, the Landlord may, subject to subsection iii., below, increase rents to an amount not to exceed the total demonstrated Deferred Rent Increase.

        i.   Approval of RROI Applications based on the pattern of Rent increases or decreases for a Deferred Rent Increase shall be provided only when the Landlord can demonstrate that a Tenant has vacated a unit for just cause. The following reasons for vacancy constitute just cause:

            A.   *Non-payment of Rent.* The Tenant fails to Cure the Deficiency after receiving a non-payment notice from the Landlord, and the

Landlord does not pursue a valid non-payment eviction action under Minn. Stat. § 504B.291, subd. 1(a), but decides to terminate the tenancy at the end of the lease.

B.  *Repeated late payment of Rent.* The Tenant repeatedly makes *late* payments of Rent, no fewer than three (3) times in a twelve (12) month period. The Landlord must provide the Tenant with notice following a late payment that a subsequent late payment may be grounds for Termination of Tenancy. If the Tenant continues to make a late payment on no fewer than three (3) occasions per year, the Landlord must give the Tenant notice to vacate at least equal to the notice period outlined in the original Rental Agreement.

C.  *Material non-compliance.* After receiving a written notice to cease from the Landlord, the Tenant continues a material breach of the lease. This subsection shall not diminish the rights of a Landlord, if any, to terminate a lease for actions permitted under Minn. Stat. § 504B.281, et seq.

D.  *Substantial damage.* The Tenant has willfully caused or allowed substantial damage to the premises beyond normal wear and tear and has refused, after written notice, to pay the reasonable costs of repairing such damage and cease damaging the premises.

E.  *Disorderly conduct.* The Tenant has continued, following written notice to cease, to be so disorderly as to destroy the peace and quiet of other Tenants or occupants of the premises or the Tenant is otherwise subject to eviction under Minn. Stat. 504B.281, et seq.

F.  *Refusal to renew.* The Tenant refuses to renew or extend the lease after the Landlord requests in writing that the Tenant do so. The Landlord shall give the Tenant notice to vacate at least equal to the notice period outlined in the original Rental Agreement following the Tenant's refusal to renew or extend the lease. This subsection shall in no way diminish the fifteen (15) to thirty (30) day notice period as required by Minn. Stat. 504B.145 for leases with automatic renewal provisions.

G.  *Occupancy by property owner or Family Member.* The property owner, in good faith, seeks to recover possession of the dwelling unit so that the property owner or a Family Member may occupy the unit as that person's principal residence. The property owner or Family Member must move into the unit within ninety (90) days from the Tenant's vacation. If a Substantially Equivalent Replacement Unit is vacant and available, that unit must be made available to the Tenant at a Substantially Similar Rental Rate as the Tenant's current lease.

H.  *Building demolition and dwelling unit conversion.*
   1.  The Landlord elects to demolish the building, convert it to a cooperative, provided the Landlord complies with the provisions of Minn. Stat. Ch. 515B, or convert it to nonresidential use, provided that, the Landlord must obtain a permit necessary to demolish or change the use before terminating any tenancy;
   2.  The Landlord seeks, in good faith, to recover the unit to sell it in accordance with a condominium conversion, provided the Landlord complies with the provisions of Minn. Stat. Ch. 515B; or

File Number:   Ord 22-37

3. ~~The dwelling unit is being converted to a unit subsidized under a local, state or federal housing program and the Tenant does not qualify to rent the unit under that program.~~

I. ~~*Rehabilitation and renovation.* The Landlord seeks, in good faith, to recover possession of the dwelling unit that will render the unit uninhabitable for the duration of the rehabilitation or renovation. The Landlord must provide 90 days' written notice to the Tenant. If a Substantially Equivalent Replacement Unit is vacant and available in the building, that unit must be made available to the Tenant at a Substantially Similar Rental Rate as the Tenant's current lease.~~

J. ~~*Complying with a government order to vacate.* The Landlord is complying with a government agency's order to vacate, order to abate, or any other order that necessitates the vacating of the dwelling unit as a result of a violation of Saint Paul city codes or any other provision of law. If a Substantially Equivalent Replacement Unit is vacant and available in the building, that unit must be made available to the Tenant at a Substantially Similar Rental Rate as the Tenant's current lease.~~

K. ~~*Occupancy conditioned on employment at the Landlord's Property.* The Tenant's occupancy is conditioned upon employment by the Landlord on the Landlord's property and that employment relationship is terminated.~~

c. ~~For purposes of application approvals under this subsection:~~

i. ~~A facial showing of both 1) Deferred Rent Increase, and 2) a subsequent Just Cause Vacancy of a Rental Unit is sufficient to approve the application absent any other factors considered in reasonable return on investment;~~

ii. ~~A non-incumbent Tenant signing a lease after the Final Determination of the application has no right to contest the City's Final Determination. Nothing in this subsection shall preclude the right of an incumbent Tenant/Tenants renting a unit from a Landlord from contesting a claim of their own just cause vacancy or approval of an RROI Application increasing the Tenant's Rent.~~

a. For purposes of determining recent patterns of increases or decreases in rent in other circumstances, the City shall utilize the Consumer Price Index as the basis for determining a pattern of rent increase.

(a) It is the intent of this chapter that exception to limitation on ~~r~~Rent increases be made only when the ~~l~~Landlord demonstrates that such adjustments are necessary to provide the ~~l~~Landlord with a fair return on investment.

(b) The ~~c~~City will not grant an exception to the limitation on ~~r~~Rent increases for any unit where the ~~l~~Landlord has failed to bring the ~~r~~Rental ~~u~~Unit into compliance with the implied warranty of habitability in accordance with Minnesota Statutes section 504B.16

At a meeting of the City Council on 9/21/2022, this Ordinance was Passed.

**Yea:**   5   Councilmember Brendmoen, Councilmember Tolbert, Councilmember Noecker, Councilmember Prince, and Councilmember Balenger

**Nay:**   2   Councilmember Jalali, and Councilmember Yang

**Vote Attested by**
**Council Secretary**

Shari Moore

**Date**   9/21/2022

**Approved by the Mayor**

Melvin Carter III

**Date**   9/23/2022

**Clerk**

Shari Moore

**Date**

**Test Signature**

Shari Moore

**Date**

# Exhibit 6



# City of Saint Paul

### Signature Copy

### Resolution: RES 21-1625

City Hall and Court
House
15 West Kellogg
Boulevard
Phone: 651-266-8560

---

**File Number:   RES 21-1625**

Canvassing the returns and declaring the results of the City General Election held November 2, 2021.

WHEREAS, the Council of the City of Saint Paul, together with its City Clerk, has duly canvassed the returns and votes at the City General Election held Tuesday, November 2, 2021, and

WHEREAS, it appears from said returns and the canvass thereof that the following number of votes were cast for the following office:

MAYOR (4 Year Term)
Melvin Carter  36,426
 Scott Evans Wergin  355
 Miki Frost  2,069
 Dino Guerin  7,454
 Bill Hosko  3,423
 Dora Jones-Robinson  2,357
 Paul Langenfeld  5,298
 Abu Nayeem  1,516
 Write-In  192

WHEREAS, it appears from said returns and the canvass thereof that the following named persons received more votes than any other candidate for election for:

MAYOR
Melvin Carter  36,426

WHEREAS, the Council of the City of Saint Paul, together with its City Clerk, has duly canvassed the returns and votes at the City General Election held Tuesday, November 5, 2019, to determine whether to adopt the proposed Residential Rent Stabilization Ordinance; and

WHEREAS, it appears from said returns and canvass thereof that a majority of those voting on the ballot question voted in its favor, 30,965 electors voted in favor of the ordinance and 27,581 voted against the question; and

THEREFORE, BE IT RESOLVED, that Melvin Carter is hereby declared elected to the Office of the Mayor and the Ramsey County Office of Elections is instructed and directed to notify him of his election and to issue and deliver to him the proper certificates of election.

AND BE IT FURTHER RESOLVED, that based on the results of the ballot question, the ordinance will go into effect.

At a meeting of the City Council on 11/10/2021, this Resolution was Passed.

---

*File Number:  RES 21-1625*

**Yea:** 7   Councilmember Brendmoen, Councilmember Thao, Councilmember
Tolbert, Councilmember Noecker, Councilmember Prince,
Councilmember Jalali, and Councilmember Yang

**Nay:** 0

**Vote Attested by
Council Secretary**   *Shari Moore*      **Date**   11/10/2021

Shari Moore

**Approved by the Mayor**   *MW. C+ E*      **Date**   11/12/2021

Melvin Carter III

**Clerk**   *Shari Moore*      **Date**  _____

Shari Moore

**Test Signature**   *Shari Moore*      **Date**  _____

Shari Moore

# Exhibit 7



# City of Saint Paul

### Signature Copy

### Public Hearing-Misc.: PH 22-2

City Hall and Court
House
15 West Kellogg
Boulevard
Phone: 651-266-8560

---

**File Number:   PH 22-2**

Hearing on the Rent Stabilization Stakeholder Group final report.

At a meeting of the City Council on 7/13/2022, this Public Hearing-Misc. was Archived.

**Vote Attested by Council Secretary**
Shari Moore

**Date**   7/13/2022

**Approved by the Mayor**
Melvin Carter III

**Date**

**Clerk**
Shari Moore

**Date**

**Test Signature**
Shari Moore

**Date**

Exhibit 8

CHAPTER 8. - INITIATIVE, REFERENDUM, AND RECALL

Sec. 8.01. - Initiative, referendum and recall.

The people shall have the right to propose ordinances, to require ordinances to be submitted to a vote, and to recall elective officials by processes known respectively as initiative, referendum and recall.

Sec. 8.02. - Petition.

Initiative, referendum or recall shall be initiated by a petition

(1)  signed by registered voters of the city equal in number to eight (8) percent of those who voted for the office of mayor in the last preceding city election in the case of initiative or referendum, or

(2)  signed by registered voters of the city equal in number to twenty (20) percent of those who voted for the office of mayor in the last preceding city election in the case of recall of the office of mayor, or

(3)  signed by registered voters of the relevant council ward equal in number to twenty (20) percent of those who voted for the relevant office of councilmember in the last preceding city election or fifteen (15) percent of the registered voters in the relevant council ward, whichever number is greater.

(C.F. No. 10-635, § 2, 7-21-10; Ord. No. 12-9, § 2, 3-28-12)

Sec. 8.02.1.

A petition may consist of one or more papers, but each paper circulated separately shall contain at its head or attached to it the statement required by Section 8.04, Section 8.05 or Section 8.07, as the case may be.

Sec. 8.02.2.

Each signer of the petition shall write thereon the petitioner's name and the street number and council ward or legislative district and precinct designation of the petitioner's residence.

(Ord. No. 17665, § 6, 6-29-89; Ord. No. 12-9, § 2, 3-28-12)

Sec. 8.02.3.

Each separate page of the petition shall have appended thereto a certificate, verified by oath, that each signature was affixed by the person purporting to have signed the same in the presence of the person making the certificate. The person making the certificate shall be a resident of the city.

Sec. 8.02.4.

Any person whose name appears on a petition may withdraw his or her name by a statement in writing filed with the city clerk before the clerk advises the council as to the sufficiency of the petition. Any name appearing on any petition which does not comply with the foregoing requirements, except as to council ward or legislative district and precinct designation, shall be stricken, and no names shall be counted which have not been verified.

(Ord. No. 17665, § 6, 6-29-89; Ord. No. 12-9, § 2, 3-28-12)

Sec. 8.03. - Determination of sufficiency.

Any petition seeking initiative, referendum and recall hereunder shall be deemed received by the council when it is filed with the city clerk, for which filing there shall be no fee. Immediately upon receipt of the petition the city clerk shall examine the petition as to its sufficiently and report to the council within twenty (20) calendar days, except that in the case of a recall petition it shall be thirty (30) calendar days. Upon receiving the report, the council shall determine by resolution the sufficiency of the petition.

Sec. 8.04. - Initiative.

Any ordinance may be proposed by a petition which shall state at the head of each page or attached thereto the exact text of the ordinance sought to be proposed. If the council fails to enact the ordinance without change within sixty (60) days after the filing of the petition with the city clerk, it shall be placed on the ballot at the next general election in the city which occurs on or after the 120th day from the filing of the petition with the city clerk. If a majority of those voting on the ordinance vote in its favor, it shall become effective immediately.

**Editor's note—** Section 8.04 amended by Ord. No. 17339, C.F. 86-320, adopted by city council April 10, 1986, pursuant to Minnesota Statutes, Section 410.12.

Sec. 8.05. - Referendum.

Any ordinance or resolution passed pursuant to subdivisions (5) or (6) of Section 6.03.3 of this Charter may be subjected to referendum by a petition filed within forty-five (45) days after its publication. The petition shall state, at the head of each page or in an attached paper, a description of the ordinance or resolution involved. Any ordinance or resolution upon which a petition is filed, other than an emergency

ordinance, shall be suspended in its operation as soon as the petition is found sufficient. If the ordinance or resolution is not thereafter entirely repealed, it shall be placed on the ballot at the next election, or at a special election called for that purpose, as the council shall determine. The ordinance or resolution shall not become operative until a majority of those voting on the ordinance or resolution vote in its favor.

If a petition is filed against an emergency ordinance, the ordinance shall remain in effect, but shall be placed on the ballot at the next election or a special election called for that purpose, and shall repealed if a majority of those voting on the ordinance vote to repeal it.

**Editor's note—** Section 8.05 amended by Ord. No. 16213, C.F. 26813, C.F. 268534, adopted by the city council Mar. 24, 1977, pursuant to Minnesota Statutes, Section 410.12.

Sec. 8.06. - Repeal of ordinances or resolutions submitted to voters.

No ordinance adopted by the voters on initiative or ordinance or resolution approved by referendum shall be repealed within one year after its approval.

**Editor's note—** Section 8.06 amended by Ord. No. 16213, C.F. 268534, adopted by the city council March 24, 1977, pursuant to Minnesota Statutes, Section 410.12.

Sec. 8.07. - Recall.

Any person holding an elective office, other than an office created by special law, may be removed by recall. The petition shall state at the head of each page a demand for the removal of the officer, the office held, and a brief description of the grounds for recall.

(Ord. No. 17665, § 6, 6-29-89)

Sec. 8.07.1.

If the council finds a recall petition to be sufficient, it shall notify the officer involved and announce the same at its next meeting. Any officer so named may resign within five (5) calendar days after being notified as to the sufficiency of the petition. If the officer does not resign, a recall election shall be held.

(Ord. No. 17665, § 6, 6-29-89)

Sec. 8.07.2.

Within ten (10) days after the council has found the petition to be sufficient, it shall order a special election to be held within sixty (60) days to determine whether the officer shall be removed. If a majority of those voting on the question shall vote in favor of removal, the office shall be deemed vacant and filled as provided in this Charter.

(Ord. No. 17665, § 6, 6-29-89)

Sec. 8.07.3.

If any election is to be held within ninety (90) days and not less than thirty (30) days after filing of the petition, the council shall postpone the recall election until that time.

Sec. 8.07.4.

No recall petition shall be filed against any officer during the first or the last six (6) months of the officer's term.

(Ord. No. 17665, § 6, 6-29-89)

Sec. 8.07.5.

In the published notice of any recall election there shall be printed in not more than two hundred (200) words the grounds for recall stated in the petition, and the officer sought to be recalled may respond in not more than two hundred (200) words.

Sec. 8.08. - Disposition of insufficient petitions.

If the council determines that the petition is insufficient or irregular, the city clerk shall deliver a copy of the petition to the person or persons therein named to receive it, together with a written statement of its defects. The persons circulating the petition shall be given thirty (30) days in which to file additional signature papers and to correct the petition in all other particulars. If at the end of that period the council finds that the petition is still insufficient or irregular, the city clerk shall file the petition in the clerk's office and notify the persons previously notified of the defects. The final finding of insufficiency or irregularity shall not prejudice the filing of a new petition for the same purpose nor, in the case of an initiated or referred ordinance or resolution, shall it prevent the council from referring the ordinance or resolution to the voters at the next regular or special election at its option.

(Ord. No. 17665, § 6, 6-29-89)

**Editor's note—** Section 8.08 amended by Ord. No. 16213, C.F. 268534, adopted by the city council March 24, 1977, pursuant to Minnesota Statutes, Section 410.12.

# Exhibit 9



**SAINT PAUL**
SAFETY & INSPECTIONS

DEPARTMENT OF SAFETY & INSPECTIONS
ANGIE WIESE, DIRECTOR

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

April 29, 2022

### *Notice of Final Rules*

WHEREAS, on November 2, 2021, Saint Paul voters approved a Rent Stabilization Ordinance for the City of Saint Paul; and

WHEREAS, the Ordinance limits residential rent increases to no more than 3% in a 12-month period, regardless of whether there is a change of occupancy; and

WHEREAS, the Ordinance also directs the City to create a process for landlords to request an exception to the 3% limit based on the right to a reasonable return on investment; and

WHEREAS, after the Rent Stabilization Ordinance became law, the Department of Safety and Inspections ("DSI") was tasked with working toward a May 1, 2022 implementation date; and

WHEREAS, on March 31, 2022, DSI posted rules to clarify and implement Saint Paul's Rent Stabilization Ordinance; and

WHEREAS, the rules were posted and open for public comment from April 7 to April 22, 2022, along with proposed processes and definitions by which landlords would request an exception to the 3% limit; and

WHEREAS, DSI fielded over two hundred comments during the public comment period; and

WHEREAS, upon careful review of all of the comments, DSI found it necessary and reasonable to amend the proposed rules, as described in its *Summary of Comments and DSI Responses* document, which is published concurrently with this Notice of Final Rules and hereby incorporated by reference; and

WHEREAS, the Department found it necessary to make other amendments to the Rules, as further indicated below; now, therefore, DSI does hereby issues notice of the following final rules, which are effective immediately.

### <u>FINAL RULES</u>

### Maintenance of Net Operating Income (MNOI) Reasonable Return Standard

A. Reasonable Return Standard

(1) <u>Presumption of Fair Base Year Net Operating Income</u>. It shall be presumed that the net operating income received by the Landlord in the Base Year provided a reasonable return.

DEPARTMENT OF SAFETY & INSPECTIONS
ANGIE WIESE, FIRE DIRECTOR

**SAINT PAUL**
SAFETY & INSPECTIONS

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

(2) <u>Reasonable Return</u>. A Landlord has the right to obtain a net operating income equal to the BaseYear net operating income adjusted by 100% of the percentage increase in the Consumer Price Index (CPI), since the Base Year. It shall be presumed this standard provides a reasonable return.

(3) <u>Base Year</u>.

    a.  For the purposes of making reasonable return determinations pursuant to this section, the calendar year 2019 is the Base Year. The Base Year CPI shall be 2019, unless subsection (b) or (c) is applicable.

    b.  In the event that a determination of the allowable Rent is made pursuant to this section, if a subsequent petition is filed, the Base Year shall be the year that was considered as the "current year" in the prior petition.

    c.  Unless otherwise exempted from the limitation on rent increases by local, state or federal laws or regulations, if a Rental Unit enters the marketplace for the first time after 2019, the Base Year shall be the year the Unit entered the marketplace.

(4) <u>Adjustment of Base Year Net Operating Income</u>.

Landlords or Tenants may present evidence to rebut the presumption that the Base Year net operating income provided a Reasonable return. Grounds for rebuttal of the presumption shall be based on at least one of the following findings:

    a. <u>Exceptional Expenses in the Base Year</u>. The Landlord's operating expenses in the Base Year were unusually high or low in comparisonto other years. In such instances, adjustments may be made in calculating operating expenses in order that the Base Year operating expenses reflect average expenses for the property over a reasonableperiod of time. The following factors shall be considered in making such a finding:

        i.  Extraordinary amounts were expended for necessary maintenance and repairs.

        ii.  Maintenance and repair expenditures were exceptionally low so asto cause inadequate maintenance or significant deterioration in the

2

**STP 00152**

**DEPARTMENT OF SAFETY & INSPECTIONS**
RICARDO X. CERVANTES, DIRECTOR

**SAINT PAUL**
SAFETY & INSPECTIONS

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

quality of services provided.

   iii. Other expenses were unreasonably high or low notwithstanding the application of prudent business practices.

  b. <u>Exceptional Circumstances in the Base Year.</u> The gross income during the Base Year was disproportionately low due to exceptional circumstances. In such instances, adjustments may be made in calculating Base Year gross rental income consistent with the purposes of this chapter. The following factors shall be considered in making such a finding:

   i. The gross income during the Base Year was lower than it might have been because some residents were charged reduced rent.

   ii. The gross income during the Base Year was significantly lower than normal because of the destruction of the premises and/or temporary eviction for construction or repairs.

   iii. The pattern of rent increases in the years prior to the Base Year and whether those increases reflected increases in the CPI.

   iv. Other exceptional circumstances.

(5) <u>Calculation of Net Operating Income.</u> Net operating income shall be calculated by subtracting operating expenses from gross rental income.

  a. <u>Gross Rental Income.</u>

   i. Gross rental income shall include:

Gross rents calculated as gross scheduled rental income at one hundred percent occupancy and all other income or consideration received or receivable in connection with the use or occupancy of the Rental Unit, except as provided in Subparagraph (B) of this section.

If there is a difference in the number of rental units between the Base Year and the current year, in making calculations of net operating income in the

3

**STP 00153**

**SAINT PAUL**
SAFETY & INSPECTIONS

DEPARTMENT OF SAFETY & INSPECTIONS
RICARDO X. CERVANTES, DIRECTOR

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

Base Year and the current year, the rental income and expenses for the same number of units shall be used in calculating the net operating income for both periods.

The purpose of this provision is to ensure that a petitioner is not requesting that the current fair net operating income reach a level which was provided in the Base Year by a larger number of units or is limited to a net operating income which was formerly provided by a smaller number of units.

If there are units that are vacant or owner-occupied at the time a petition is filed which were rented in the Base Year, for the purposes of the MNOI analysis a rental income for the unit shall be calculated on the basis of average rents for comparable units in the building. If there are no comparable units in the property rental income for the vacant or owner-occupied units, the rent shall be calculated on the basis of recently established initial rents for comparable units in the City. If there are units that were rented in the current year, which were vacant or owner-occupied in the Base Year, for the purposes of the MNOI analysis a rental income for the unit for the Base Year shall be calculated on the basis of average rents for comparable units in the building in the Base Year. If there are no comparable units in the property, rental income for the vacant or owner-occupied units in the Base Year shall be calculated on the basis of Base Year rents for comparable units in the City. If a staff determination is appealed to the City Council, a Legislative, Hearing Officer may use another reasonable methodology to ensure compliance with the purposes of this subsection.

ii.   Gross rental income shall <u>not</u> include:

Utility Charges for sub-metered gas, electricity or water which are paid directly by the tenant; or

Charges for refuse disposal, sewer service, and, or other services which are either provided solely on a cost pass-through basis and/or are regulated by state or local law.

b.   <u>Operating Expenses</u>**.** Operating expenses include the following:

i.   <u>Reasonable costs of operation and maintenance of the Rental Unit</u>.

ii.   <u>Management expenses</u>. It must be presumed that management expenses have increased between the Base Year and the current year by the percentage increase in rents or CPI, whichever is greater, unless the level of management services has either increased or decreased significantly

4

**STP 00154**

DEPARTMENT OF SAFETY & INSPECTIONS

**SAINT PAUL**

SAFETY & INSPECTIONS

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

between the Base Year and the current year. This presumption must also be applied in the event that management expenses changed from owner managed to managed by a third party or vice versa.

iii.   <u>Utility costs</u> except a utility where the consideration of the income associated with the provision of the utility service is regulated by state law and consideration of the costs associated with the provision of the utility service is preempted by state law or the income associated with the provision of the utility is not considered because it is recouped from the Tenants on a cost pass-through basis.

iv.   <u>Real property taxes and insurance</u>, subject to the limitation that property taxes attributable to an assessment in a year other than the Base Year or current year may not be considered in calculating Base Year and/or current year operating expenses.

v.   Property taxes assessed and paid.

vi.   <u>License, registration and other public fees</u> required by law to the extent these expenses are not otherwise paid or reimbursed by Tenants.

vii.   <u>Landlord-performed labor</u> compensated at reasonable hourly rates. However, no Landlord-performed labor shall be included as an operating expense unless the Landlord submits documentation showing the date, time, and nature of the work performed. There shall be a maximum allowed under this provision of five percent (5%) of gross income unless the Landlord shows greater services were performed for the benefit of the residents.

viii.   <u>Legal expenses</u>. Reasonable attorneys' fees and costs incurred in connection with successful good faith attempts to recover rents owing, successful good faith unlawful detainer actions not in derogation of applicable law, legal expenses necessarily incurred in dealings with respect to the normal operation of the Property, and reasonable costs incurred in obtaining a rent increase pursuant to SPLC 193A.

To the extent allowable legal expenses are not annually reoccurring and are substantial they shall be amortized over a five-year period, unless the City concludes that a different period is more reasonable. At the end of the amortization period, the allowable monthly rent shall be decreased by any

5

**SAINT PAUL**

SAFETY & INSPECTIONS

DEPARTMENT OF SAFETY & INSPECTIONS

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

amount it was increased because of the application of this provision.

ix.    <u>Adjustments to Operating Expenses</u>. Base Year and/or current year operating expenses may be averaged with other expense levels for other years or amortizedor adjusted by the CPI or to reflect levels that are normal for residential Rental Units or may otherwise be adjusted, in order to establish an expense amount for that item which most reasonably serves the objectives of obtaining a reasonable comparison of Base Year and current year expenses and providing a reasonable return.If the claimed operating expense levels are exceptionally high compared to prior expense levels and/or industry standards the Landlord shall have the burden of proof of demonstrating that they are reasonable and/or reflect recurring expenselevels. Expenses which are exceptional and reasonable must be amortized in order to achieve the objectives of this section.

c.    <u>Projections of Base Year Operating Expenses in the Absence of Actual Data</u>

If the Landlord does not have Base Year operating expense data, it shall be presumed that operating expenses increased by the percentage increase in the CPI between the Base Year and the current year. This presumption  is subject to the exception that specific operating expenses must be adjusted by other amounts when alternate percentage adjustments are supported by a preponderance of evidence (such as data on changes in the rates of particular utilities or limitations on increases in property taxes.)

(6)  <u>Allocation of Rent Increases</u>

Rent increases authorized pursuant to this section must be allocated as follows:

a.  Rent increases for unit-specific capital improvements must be allocated to that unit;

b.  Rent increases for building-wide or common area capital improvements must be allocated equally among all units;

c.  Rent increases resulting from the Net Operating Income analysis must be allocated equally among all units;

d.  Notwithstanding the subsections above, the City, in theinterests of justice, shall have the discretion to apportion the rent increases in a manner and to the degree

6

STP 00156

**SAINT PAUL**

SAFETY & INSPECTIONS

375 Jackson Street, Suite 220
Saint Paul, MN 55101–1806
Tel: 651-266-8953 | Fax: 651-266-9124

necessary to ensure fairness. Such circumstances include, but are not limited to, units that are vacant or owner occupied.

(7)  Relationship of Individual Rent Adjustment to Annual General Adjustment

Any Individual Increase Adjustment established pursuant to this Section must take into account the extent of any Annual General Adjustments the Landlord may be implementing,or otherwise be entitled to, at and during the time for which the Individual Adjustment is sought regarding the petitioning year, and the Individual Adjustment may be limited or conditioned accordingly.

If it is determined that the Landlord is not entitled to an Individual Adjustment, the Landlord may implement the full upcoming General Adjustment.

(8)  Limits to Annual Rent Adjustments Based on Maintenance of Net Operating Income Standard

   a.  Purpose. The purpose of this subsection (a) is to protect Tenants from substantial rent increases which are not affordable, and which may force such Tenants to vacate their homes and result in consequences contrary to the stated purposes of the Ordinance, namely, to maintain the diversity of the Saint Paul community, to preserve the public peace, health and safety, and advance the housing policies of the City.

   b.  Rent Increase Limit

   Notwithstanding any other provision of this regulation, the implementation of a Maximum Allowable Rent increase must be limited each year to fifteen percent (15%) of the Maximum Allowable Rent on the date the petition is filed.

   If the amount of any rent increase granted under these regulations exceeds this limit, any portion in excess of the annual must be deferred.

   In subsequent years deferred amounts of the allowable rent increase may be implemented.

   At the end of each year the deferred amount of the increase must be calculated and an interest allowance shall be calculated based on the standard set forth in this regulation. One twelfth (1/12) of the interest allowance must be added on to full monthly increase authorized under the MNOIstandard.

7

STP 00157

**SAINT PAUL**

SAFETY & INSPECTIONS

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

(9)   <u>Constitutional Right to a Reasonable Return.</u>

No provision of this regulation shall be applied so as to prohibit the Rent Administrator or Hearing Officer from granting anindividual rent adjustment that is demonstrated by the Landlord to be necessary to meet therequirements of this ordinance and/or constitutional reasonable return requirements.

**Planned or Completed Capital Improvements**

B. Capital Improvement Standard

(1)   <u>The Amortized Costs of Capital Improvements.</u>

Operating expenses include the amortized costs of capital improvements plus an interest allowance to cover the amortization of those costs. For purposes of this section a capital improvement shall be any improvement to a unit or property which materially adds to the value of the property, appreciably prolongs its useful life or adapts it to new use and has a useful life of more than one year and a direct cost of $250.00 or more per unit affected.

Allowances for capital improvements shall be subject to the followingconditions:

The costs are amortized over the period set forth in this regulation and in no event over a period ofless than thirty-six (36) months.

The costs do not include costs incurred to bring the Rental Unitinto compliance with a provision of the Saint Paul Legislative Code or state law where the original installation of the improvement was not in compliance with code or state law.

At the end of the amortization period, the allowable monthly rentshall be decreased by any amount it has increased due to the application of this provision.

The improvement is not an ordinary repair, replacement, and/or maintenance, and is necessary to bring the property into compliance or maintain compliance with applicable local code requirements affecting health and safety in accordance with Saint Paul Legislative Code Chapter 34.

The amortization period shall be in conformance with the following schedule adopted by the City unless it is determined that an alternate period is justified based on theevidence presented in appeal hearing.

STP 00158



**SAINT PAUL**
SAFETY & INSPECTIONS

| Amortization of Capital Improvements and Expenses | |
|---|---|
| In amortizing capital improvements, and/or expenses, the following schedule shall be used to determine the amortization period of the capital improvements and/or expenses | Years |
| *Appliances* | |
| Air Conditioners | 10 |
| Refrigerator | 5 |
| Stove | 5 |
| Garbage Disposal | 5 |
| Water Heater | 5 |
| Dishwasher | 5 |
| Microwave Oven | 5 |
| Washer/Dryer | 5 |
| Fans | 5 |

| | |
|---|---|
| Cabinets | 10 |
| Carpentry | 10 |
| Counters | 10 |
| Doors | 10 |
| Knobs | 5 |
| Screen Doors | 5 |
| Fencing and Security | 5 |
| Management | 5 |
| Tenant Assistance | 5 |
| | |
| *Structural Repair and Retrofitting* | |
| Foundation Repair | 10 |
| Foundation Replacement | 20 |
| Foundation Bolting | 20 |
| Iron or Steel Work | 20 |
| Masonry-Chimney Repair | 20 |
| Shear Wall Installation | 10 |
| Electrical Wiring | 10 |
| Elevator | 20 |
| | |
| *Fencing* | |

9

STP 00159



| Chain | 10 |
|---|---|
| Block | 10 |
| Wood | 10 |
|  |  |
| *Fire Systems* |  |
| Fire Alarm System | 10 |
| Fire Sprinkler System | 20 |
| Fire Escape | 10 |
|  |  |
| *Flooring/Floor Covering* |  |
| Hardwood | 10 |
| Tile and Linoleum | 5 |
| Carpet | 5 |
| Carpet Pad | 5 |
| Subfloor | 10 |
|  |  |
| Fumigation Tenting | 5 |
| Furniture | 5 |
| Automatic Garage Door Openers | 10 |
|  |  |

| *Gates* |  |
|---|---|
| Chain Link | 10 |
| Wrought Iron | 10 |
| Wood | 10 |
|  |  |
| *Glass* |  |
| Windows | 5 |
| Doors | 5 |
| Mirrors | 5 |
|  |  |
| *Heating* |  |
| Central | 10 |
| Gas | 10 |
| Electric | 10 |
| Solar | 10 |
| Insulation | 10 |
|  |  |
| *Landscaping* |  |

10



| | |
|---|---|
| Planting | 10 |
| Sprinklers | 10 |
| Tree Replacement | 10 |
| | |
| *Lighting* | |
| Interior | 10 |
| Exterior | 5 |
| | |
| Locks | 10 |
| Mailboxes | 10 |
| Meters | 10 |
| | |
| *Plumbing* | |
| Fixtures | 10 |
| Pipe Replacement | 10 |
| Re-Pipe Entire Building | 20 |
| Shower Doors | 5 |
| | |
| *Painting* | |
| Interior | 5 |
| Exterior | 5 |
| | |
| *Paving* | |

| | |
|---|---|
| Asphalt | 10 |
| Cement | 10 |
| Decking | 10 |
| Plastering | 10 |
| Sump Pumps | 10 |
| Railings | 10 |
| | |
| *Roofing* | |
| Shingle/Asphalt | 10 |
| Built-up, Tar and Gravel | 10 |
| Tile | 10 |
| Gutters/Downspouts | 10 |
| | |
| *Security* | |
| Entry Telephone Intercom | 10 |

11

**STP 00161**



**SAINT PAUL**
SAFETY & INSPECTIONS

DEPARTMENT OF SAFETY & INSPECTIONS
ANGIE WIESE, INTERIM DIRECTOR

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

| | |
|---|---|
| Gates/Doors | 10 |
| Fencing | 10 |
| Alarms | 10 |
| | |
| Sidewalks/Walkways | 10 |
| Stairs | 10 |
| Stucco | 10 |
| Tilework | 10 |
| Wallpaper | 5 |
| | |
| *Window Coverings* | |
| Drapes | 5 |
| Shades | 5 |
| Screens | 5 |
| Awnings | 5 |
| Blinds/Miniblinds | 5 |
| Shutters | 5 |

 (2) <u>Interest Allowance for Expenses that Are Amortized</u>.

An interest allowance shall be allowed on the cost of amortized expenses. The allowance shall be the interest rate on the cost of the amortized expense equal to the "average rate" for thirty-year fixed rate on home mortgages plus two percent. The "average rate" shall be the rate Freddie Mac last published in its weekly Primary Mortgage Market Survey (PMMS) as of the date of the initial submission of the petition. In the event that this rate is no longer published, the Rent Administrator shall designate by regulation an index which is most comparable to the PMMS index.

 a. <u>Exclusions from Operating Expenses.</u> Operating expenses shall <u>not</u> include the following:

  i. Mortgage principal or interest payments or other debt service costs and costs of obtaining financing.

  ii. Any penalties, fees or interest assessed or awarded for violation of any provision of this chapter or of any other provision of law.

  iii. Land lease expenses.

  iv. Political contributions and payments to organizations or individuals which are



substantially devoted to legislative lobbying purposes.

   v.  Depreciation.

   vi.  Any expenses for which the Landlord has been reimbursed by any utilityrebate or discount, Security Deposit, insurance settlement, judgment for damages, settlement or any other method or device.

   vii.  Unreasonable increases in expenses since the Base Year.

   viii.  Expenses associated with the provision of master-metered gas and electricityservices.

   ix.  Expenses which are attributable to unreasonable delays in performing necessary maintenance or repair work or the failure to complete necessary replacements, which are not Tenant caused. (For example, if a roof replacement is unreasonably delayed,the full cost of the roof replacement would be allowed; however, if interiorwater damage occurred as a result of the unreasonable delay.

b.  <u>Adjustments to Operating Expenses</u>**.** Base Year and/or current year operating expenses may be averaged with other expense levels for other years or amortizedor adjusted by CPI or to reflect levels that are normal for residential Rental Units or may otherwise be adjusted, in order to establish an expense amount for that item which most reasonably serves the objectives of obtaining a reasonable comparison of Base Year and current year expenses and providing a reasonable return.If the claimed operating expense levels are exceptionally high compared to prior expense levels and/or industry standards the Landlord shall have the burden of proof of demonstrating that they are reasonable and/or reflect recurring expenselevels. Expenses which are exceptional and reasonable shall be amortized in order to achieve the objectives of this section.

c.  <u>Projections of Base Year Operating Expenses in the Absence of Actual Data</u>

If the Landlord does not have Base Year operating expense data, it shall be presumed that operating expenses increased by the percentage increase of CPI between the Base Year and the current year. This presumption is subject to the exception that specific operating expenses shall be adjusted by other amounts when alternate percentage adjustments are supported by a preponderance of evidence (such as data on changes in the rates of particular utilities or limitations on increases in property taxes.)

(3)   <u>Allocation of Rent Increases</u>



**DEPARTMENT OF SAFETY & INSPECTIONS**
**ANGIE WIESE, INTERIM DIRECTOR**

375 Jackson Street, Suite 220
Saint Paul, MN 55101–1806
Tel: 651-266-8953 | Fax: 651-266-9124

Rent increases authorized pursuant to this section shall be allocated as follows:

a.   Rent increases for unit-specific capital improvements shall be allocated to that unit;

b.   Rent increases for building-wide or common area capital improvements shall beallocated equally among all units;

c.   Rent increases resulting from the Net Operating Income analysis shall beallocated equally among all units;

d.   Notwithstanding the subsections above, the Rent Administrator or Hearing Officer, in the interests of justice, shall have the discretion to apportion the rent increases in a manner and to the degree necessary to ensure fairness. Such circumstances include, but are not limited to, units that are vacant or owner occupied.

(4)   <u>Conditional Rent Adjustments for Proposed Capital Improvements</u>

a.   In order to encourage necessary capital improvements, the Rent Administrator allows a Landlord to petition for an upward rent adjustment based upon anticipated future expenses for capital improvements. The purpose of this procedure is to permit Landlords to seek advanced authorization for future rent adjustments based upon anticipated capital improvements. A petition under this Section should only be made for anticipated expenses that the Landlord intends to incur during the twelve-month period following the date of final Rent Administrator or Hearing Officer decision. This procedure should not be used for anticipated expenses for ordinary repairs and maintenance.

b.   If the petition is granted in whole or in part, the rent increase shall be postponeduntil such time as the capital improvements are made and an Addendum authorizing the increases is issued.

c.   No addendum shall be issued for such proposed capital improvements unless theyare completed within twenty-four (24) months from the date of final decision granting the conditional rent adjustment, unless the Landlord obtains an additional addenda authorizing an extension of the time period to complete the capital improvement. Extensions may be granted due to reasonable delays in the completion of capital improvements as determined by the Hearing Officer.

**Changes in the Number of Tenants**

*Nothing in this section is intended to direct or alter the screening methods of landlords.*

C. Changes in the Number of Tenants



**DEPARTMENT OF SAFETY & INSPECTIONS**
**ANGIE WIESE, INTERIM DIRECTOR**

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

(1)  Base Occupancy Level: The Base Occupancy Level for a Rental Unit, as used in this Chapter, shall be the number of Tenants allowed by the Rental Agreement as defined in 193A of the Ordinance for the unit effective May 1, 2022, or at the beginning of any tenancy established after May 1, 2022 (ie a new rental unit).

(2)  Increase in Tenants:

    a.  If the number of Tenants allowed by the Rental Agreement actually occupying aunit as the Tenants' principal residence has increased above the Base Occupancy Level for that unit, then the Maximum Allowable Rent for the unit may be increased by up to fifteen percent (15%) for each additional tenant above the base occupancy level, in addition to any Maximum Allowable Rent adjustment to which the Landlord is otherwiseentitled.

    b.  Notwithstanding Regulation (2) a., no increase in the Maximum Allowable Rent for additional Tenants shall be granted for any additional Tenant who is a spouse, domestic partner, child, grandchild, parent, grandparent, legal guardian of a child, parent of any of the Tenants, other resident children, or caretaker/attendant as required for a reasonable accommodationfor a person with a disability, unless the Tenants agree in writing to the specific Maximum Allowable Rent increase.

    c.  If the number of Tenants actually occupying a Rental Unit as a principal residence decreases subsequent to any Maximum Allowable Rent increase for additional Tenants granted pursuant to subsection (2) a., then the Maximum Allowable Rent increase for that Rental Unit shall automatically decrease by the amount of the Maximum AllowableRent increase that is no longer justified, as a result in the decrease in the number of Tenants, unless the Tenant and Landlord agree in writing to permanently increase the Base Occupancy Level.

    d.  Increases in the Maximum Allowable Rent due to an increase in the Base Occupancy Level shall remain permanent. As such, if the number of Tenants actually occupying aRental Unit as the Tenants' principal residence decreases subsequent to any MaximumAllowable Rent increase for additional Tenants granted pursuant to subsection (2) a., then the Tenants may replace the departing Tenant with another Tenant (subject to theLandlord's standard screening methods).

(3)  Decrease in Number of Tenants Allowed:

If any policy or policies imposed by the Landlord unreasonably prevent the Tenant from maintaining the Base Occupancy Level for that unit, then the Maximum Allowable Rent for thatunit shall be decreased by an amount equal to the percentage by which the number of allowable Tenants has been reduced. As used in this regulation, "policy" or "policies" means any rule, course of conduct, act or actions by a Landlord.

    a.  A policy shall be deemed unreasonable if it is different from and more restrictive thanthe policies originally used to screen the current Tenant(s).



**DEPARTMENT OF SAFETY & INSPECTIONS**
**ANGIE WIESE, INTERIM DIRECTOR**

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

   b.   Refusal based on the proposed additional occupant's lack of creditworthiness shall be deemed unreasonable if that person will not be legally obligated to pay some or all of therent to the Landlord.

   c.   Refusal shall be deemed reasonable if the increase would bring the total number of occupants above the maximum allowable under SPLC Chapter 34, Chapter 60, Minnesota State Building Code or Minnesota State Fire Code.

(4)  <u>Grounds for Objections:</u>

Tenants responding to petitions under subsection (B) (l) may file objections with the Hearing Officer on one or more of the following grounds:

   a.   The base occupancy level alleged by the landlord is incorrect; however, a tenant may notcontest a base occupancy level that was established in a prior decision;

   b.   The number of tenants alleged by the landlord as being currently allowed by the lease and actually occupying the unit as a principal residence is incorrect;

   c.   An additional tenant claimed by the landlord as justifying a rent increase is a spouse, registered domestic partner, child, grandchild, parent, grandparent, legal guardian of achild or caretaker/attendant as required for a reasonable accommodation for a person with a disability and the original tenant(s) did not agree in writing to an increase for such person(s);

   d.   The unit is not eligible to receive annual general adjustments for any period since its rent was last certified or individually adjusted by the City. Any such objection shall identify each challenged annual general adjustment and the reason for the alleged ineligibility; or

   e.   The landlord is collecting rent in excess of the Maximum Allowable Rent.


**Changes in Space or Services**

D. Changes in Space or Services

(1)  <u>Increase in Space:</u>


The Maximum Allowable Rent may be adjusted upward when, with the written agreement of the Tenant(s), there is an increase in the usable space or in the Housing Services beyond that which was provided to a unit on May 1, 2022, or when the Base Rent was first established.

   a.   <u>Additional or reconfigured space</u>: Where a Landlord adds habitable living space to a unitor reconfigures it, the Maximum Allowable Rent for such unit must be permanently increased as provided under Capital Improvements.

**STP 00166**



**DEPARTMENT OF SAFETY & INSPECTIONS**
**ANGIE WIESE, INTERIM DIRECTOR**

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel:  651-266-8953 | Fax: 651-266-9124

b.  Additional services: Where a Landlord adds non-habitable space or increases the services provided to a unit, the Maximum Allowable Rent for such unit may be increased by an amount representing the commercially reasonable value of the additional space or increased services. If the additional or reconfigured space or the services are subsequently reduced or eliminated, the rent increase authorized herein must be reduced or terminated. Any increase for an additional bedroom may result in an increase to the Base Occupancy Level for an additional occupant.

c.  Increases may be denied if the added or reconfigured space or services do not clearly benefit a majority of the affected Tenants and a Tenant objects.

d.  If the added or reconfigured space or services clearly benefit a majority of the affected Tenants, then increases may be denied if a majority of the affected Tenants object.

(2)  Decrease in Space or Services; Substantial Deterioration; Failure to Provide Adequate Services; Failure to Comply with Codes, the Warranty of Habitability or the Rental Agreement:

*It is not the Department's intent to enforce rent decreases to the provisions below.  The rules below are to be considered wholistically with the other factors justifying an increase in Rent.*

Decreases in Space or Services. The Maximum Allowable Rent must be adjusted downward where a Landlord is aware of and causes a Tenant to suffer a decrease in housing services or living space from the services and space that were provided on May 1, 2022, or from any services or space provided at the beginning of the tenancy. The amount of the rent decrease must be calculated by multiplying the percentage of impairment of the Tenant's use of and benefit from the unit (as a result of the reduction in living space or housing services) by the Maximum Allowable Rent in effect at the time ofthe impairment, and for past decreases, multiplied by the period of time the impairment existed. In determining the amount of the downward rent adjustment by the percentage ofimpairment of use/benefit method, the City may consider the reasonable replacement cost of the space or service in question. Decreases in the Maximum Allowable Rent must not be granted due to a decrease in space or services that is a direct result of intentional actions on the part of the Tenant to purposefully cause a decrease in space or services.

a.  Denial of Petitions for Unilateral Removal: The City will not accept petitions from Landlords who seek a Maximum Allowable Rent decrease for the unilateral removal or reduction of space or services from a Tenant's base level space or services. Landlord petitions shall be accepted only when a Tenant has expressly agreed in writing to the removal of such space or services. "Base level space or services" are the housing servicesor living space that was provided at the unit on May 1, 2022, or at the beginning of the tenancy.



**DEPARTMENT OF SAFETY & INSPECTIONS**
**ANGIE WIESE, INTERIM DIRECTOR**

375 Jackson Street, Suite 220
Saint Paul, MN 55101-1806
Tel: 651-266-8953 | Fax: 651-266-9124

b. <u>Inadequate Services & Substantial Deterioration:</u> The Maximum Allowable Rent must be adjusted downward for any substantial deterioration in a Rental Unit and/or for any failure to provide adequate Housing Services occurring during the petitioner's tenancy. For purposes of this subsection, a substantial deterioration means a noticeable decline in the physical quality of the Rental Unit resulting from a failure to perform reasonable or timely maintenance and adequate Housing Services means all services necessary to operate and maintain a Rental Unit in compliance with all applicable state and local laws and with the terms of the Rental Housing Agreement. The amount of the rent decrease must be calculated by multiplying the percentage of impairment of the Tenant's use of and benefit from the unit (as a result of the deterioration or failure to provide adequate service, violation, breach or failure to comply) by the Maximum Allowable Rent in effectat the time of the impairment.

c. <u>Code Violations & Breach of the Warranty of Habitability</u>:

    i. Where a condition at the Rental Unit threatens the health or safety of the occupants but does not actually impair the use of the unit, the Maximum Allowable Rent decrease shall be in an amount that reflects the reduction in value of the Rental Unitdue to the unsafe or unhealthy condition.

    ii. The rent decrease authorized under this subsection for a violation of the warranty ofhabitability or for a code violation that poses a significant threat to the health or safety of Tenants (e.g., dangerous window bars, missing smoke detector) shall be automatically doubled prospectively if proof of correction of the violation is not submitted to the Rent Administrator within thirty-five (35) calendar days of mailing of the City's decision unless the Landlord establishes that the violation cannotbe corrected within that time due to circumstances beyond the Landlord 's control.

    iii. For purposes of this subsection, a breach of the warranty of habitability occurs whenthe Rental Unit is not in substantial compliance with applicable building and housingcode standards, which materially affect health and safety. Minor housing code violations which do not interfere with normal living requirements do not constitute abreach of the warranty of habitability.

d. Maximum Allowable Rent reductions pursuant to this Section shall be effective from the date the Landlord first had notice of the space or service reduction, deteriorated condition, service inadequacy, or code or habitability violation in question and shall terminate on the date of the first rent payment due after adequate proof has been submitted to the Rent

STP 00168



**SAINT PAUL**
SAFETY & INSPECTIONS

DEPARTMENT OF SAFETY & INSPECTIONS
ANGIE WIESE, INTERIM DIRECTOR

375 Jackson Street, Suite 220
Saint Paul, MN 55101–1806
Tel: 651-266-8953 | Fax: 651-266-9124

Administrator that the condition for which the reduction was granted no longer exists.

e.  A Tenant who files a petition pursuant to this regulation must be able to establish the basis for the reduction and when the Landlord first received notice of the decreased service, deterioration, code violation or habitability violation. Notice may be actual or constructive. A Landlord is deemed to have notice of any condition existing at the inception of a tenancy that would have been disclosed by a reasonable inspection of the Rental Unit. A copy of a housing code inspection report from the City of Saint Paul should be submitted with the petition.

**Pattern of Recent Increases or Decreases in Rent**

For the purposes of determining reasonable return on investment, the pattern of recent rent increases or decreases will be determined by the annual Consumer Price Index (CPI) of the current year for All Urban Consumers for the Minneapolis-St. Paul-Bloomington area (All Items) provided by the U.S. Bureau of Labor Statistics.

# Exhibit 10

Thanks for trying out Immersive Reader. Share your feedback with us.   

# Rent Stabilization Rules and Processes

## Rules and Processes Overview

- The Residential Rent Stabilization Ordinance, approved by Saint Paul voters in November 2021, limits monthly rent increases to 3% in any 12-month period, even when tenant(s) move out.  The Ordinance is intended to ensure that Saint Paul residents have access to affordable housing, while also acknowledging  property owners' right to a "reasonable return on investment."

- The Ordinance also directs the City to create a process for landlords to request an exception to the rent cap based on the right to a reasonable return on investment, and to consider seven factors when determining if an exception is justified. Some of those factors include increases or decreases in property taxes,  substantial deterioration of a unit, and failure to provide adequate housing services; the full list may be found in the law.

- Beginning on May 1, 2022, landlords must limit residential rent increases to 3% in a 12-month period or request an exception using the process described below. For more background on Saint Paul's rent stabilization law, visit Rent Stabilization.

- LEP Language Support: For assistance translating rules and ordinance, please contact the City of Saint Paul by email at rent-stabilization@ci.stpaul.mn.us, or by phone at 651-266-8553.

Reasonable Return

## Reasonable Return on Investment

To enforce the Ordinance, rules have been designed to clarify how requests for an exception to the 3% rent cap will be considered, including the types of information needed to make a determination on a landlord's request for an exception. The criteria seek to  balance the interests of stabilizing residential rents while providing landlords the right to a reasonable profit. City Council also approved definitions for key words, to help clarify terms used in the Ordinance.

### Rules

Section 193A.05 of Ordinance lays out seven factors that the City will consider when determining whether a landlord's request should be granted.

The following rules specify how landlord requests will be evaluated. Landlords may apply for an exception under any one of the issues listed below; however, all factors must be considered when making a final determination.

**All rental units must be considered safe and habitable in order to be considered for an exception**

STP 00009

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-stabil…    1/28

**for rent increase.**

- **Reasonable return standard:** Maintenance of Net Operating Income (MNOI) will be used as the means to evaluate a reasonable return, considering increases in property taxes, insurance and operating costs, and other factors, relying upon a base year of 2019.
- **Planned or completed capital improvements:** Certain improvements add to a property's value and prolong its useful life over more than one year. This includes costs beyond ordinary maintenance or repair but not repairs needed for the property to meet local property code standards. Amortized costs of capital improvements will be considered subject to certain conditions listed in the rule.
- **Changes in the number of tenants:** Increases or decreases in the number of people living in a rental unit, permitted by the rental agreement in effect on May 1, 2022, may affect the rent allowable for a unit. Grounds for tenant objections to the accuracy of the information submitted are also found in this rule.
- **Changes in space or services:** Clarifies how the City will evaluate requests when a landlord adds or reduces space or services; if the property has deteriorated; any failures to provide adequate services and more.
- **Pattern of increases or decreases in rent:** Consumer Price Index (CPI) as the basis for determining a pattern of rent increases or decreases. Learn how the Bureau of Labor Statistics makes this determination.

Rules & Definitions

# Rules & Definitions

The rules specify how landlord requests will be evaluated. Landlords may apply for an exception under any one of the issues listed below; however, all factors included in the law must be considered when making a final determination.

Review the Final Rules

1. Maintenance of Net Operating Income (MNOI) will be used as the means to evaluate a reasonable return considering increases in property taxes, insurance and operating costs, and other factors over a base year of 2019.

    A. **Reasonable Return Standard**

    1. Presumption of Fair Base Year Net Operating Income. It shall be presumed that the net operating income received by the Landlord in the Base Year provided a reasonable return.

    2. Reasonable Return. A Landlord has the right to obtain a net operating income equal to the Base Year net operating income adjusted by 100% of the percentage increase in the Consumer Price Index (CPI), since the Base Year. It shall be presumed this standard provides a reasonable return.

    3. Base Year.

        a. For the purposes of making reasonable return determinations pursuant to this section, the calendar year

**STP 00010**

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-stabil…  2/28

determinations pursuant to this section, the calendar year 2019 is the Base Year. The Base Year CPI shall be 2019, unless subsection (b) or (c) is applicable.

b. In the event that a determination of the allowable Rent is made pursuant to this section, if a subsequent petition is filed, the Base Year shall be the year that was considered as the "current year" in the prior petition.

c. Unless otherwise exempted from the limitation on rent increases by local, state or federal laws or regulations, if a Rental Unit enters the marketplace for the first time after 2019, the Base Year shall be the year the Unit entered the marketplace.

4. <u>Adjustment of Base Year Net Operating Income.</u> Landlords or Tenants may present evidence to rebut the presumption that the Base Year net operating income provided a Reasonable return. Grounds for rebuttal of the presumption shall be based on at least one of the following findings:

a. <u>Exceptional Expenses in the Base Year.</u> The Landlord's operating expenses in the Base Year were unusually high or low in comparison to other years. In such instances, adjustments may be made in calculating operating expenses in order that the Base Year operating expenses reflect average expenses for the property over a reasonable period of time. The following factors shall be considered in making such a finding:

i. Extraordinary amounts were expended for necessary maintenance and repairs.

ii. Maintenance and repair expenditures were exceptionally low so as to cause inadequate maintenance or significant deterioration in the quality of services provided.

iii. Other expenses were unreasonably high or low notwithstanding the application of prudent business practices.

b. <u>Exceptional Circumstances in the Base Year.</u> The gross income during the Base Year was disproportionately low due to exceptional circumstances. In such instances, adjustments may be made in calculating Base Year gross rental income consistent with the purposes of this chapter. The following factors shall be considered in making such a finding:

i. The gross income during the Base Year was

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-stabil…   3/28

**STP 00011**

lower than it might have been because some residents were charged reduced rent.

   ii. The gross income during the Base Year was significantly lower than normal because of the destruction of the premises and/or temporary eviction for construction or repairs.

   iii. The pattern of rent increases in the years prior to the Base Year and whether those increases reflected increases in the CPI.

   iv. Other exceptional circumstances.

5. <u>Calculation of Net Operating Income.</u> Net operating income shall be calculated by subtracting operating expenses from gross rental income.

   a. <u>Gross Rental Income.</u>

      i. Gross rental income shall include:

Gross rents calculated as gross scheduled rental income at one hundred percent occupancy and all other income or consideration received or receivable in connection with the use or occupancy of the Rental Unit, except as provided in Subparagraph (B) of this section.

If there is a difference in the number of rental units between the Base Year and the current year, in making calculations of net operating income in the Base Year and the current year, the rental income and expenses for the same number of units shall be used in calculating the net operating income for both periods.

The purpose of this provision is to ensure that a petitioner is not requesting that the current fair net operating income reach a level which was provided in the Base Year by a larger number of units or is limited to a net operating income which was formerly provided by a smaller number of units.

If there are units that are vacant or owner-occupied at the time a petition is filed which were rented in the Base Year, for the purposes of the MNOI analysis a rental income for the unit shall be calculated on the basis of average rents for comparable units in the building . If

**STP 00012**

there are no comparable units in the property rental income for the vacant or owner-occupied units, the rent shall be calculated on

the basis of recently established initial rents for comparable units in the City. If there are units that were rented in the current year, which were vacant or owner-occupied in the Base Year, for the purposes of the MNOI analysis a rental income for the unit for the Base Year shall be calculated on the basis of average rents for comparable units in the building in the Base Year. If there are no comparable units in the property, rental income for the vacant or owner-occupied units in the Base Year shall be calculated on the basis of Base Year rents for comparable units in the City. If a staff determination is appealed to the City Council, a Legislative, Hearing Officer may use another reasonable methodology to ensure compliance with the purposes of this subsection.

    ii. Gross rental income shall <u>not</u> include:

        Utility Charges for sub-metered gas, electricity or water which are paid directly by the tenant; or

        Charges for refuse disposal, sewer service, and, or other services which are either provided solely on a cost pass-through basis and/or are regulated by state or local law.;

  b. <u>Operating Expenses.</u> Operating expenses include the following:

    i. <u>Reasonable costs of operation and maintenance of the Rental Unit.</u>

    ii. <u>Management expenses.</u> It must be presumed that management expenses have increased between the Base Year and the current year by the percentage increase in rents or CPI, whichever is greater, unless the level of management services has either increased or decreased significantly between the Base Year and the current year. This presumption must also be applied in the event that management expenses changed from owner managed to managed by a third party or vice versa.

    iii. <u>Utility costs</u> except a utility where the

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-stabil…    5/28

**STP 00013**

consideration of the income associated with the provision of the utility service is regulated by state law and consideration of the costs

associated with the provision of the utility service is preempted by state law or the income associated with the provision of the utility is not considered because it is recouped from the Tenants on a cost pass-through basis.

iv. <u>Real property taxes and insurance</u>, subject to the limitation that property taxes attributable to an assessment in a year other than the Base Year or current year may not be considered in calculating Base Year and/or current year operating expenses.

v. <u>Property taxes assessed and paid.</u>

vi. <u>License, registration and other public fees</u> required by law to the extent these expenses are not otherwise paid or reimbursed by Tenants.

vii. <u>Landlord-performed labor</u> compensated at reasonable hourly rates. However, no Landlord-performed labor shall be included as an operating expense unless the Landlord submits documentation showing the date, time, and nature of the work performed. There shall be a maximum allowed under this provision of five percent (5%) of gross income unless the Landlord shows greater services were performed for the benefit of the residents.

viii. <u>Legal expenses</u>. Reasonable attorneys' fees and costs incurred in connection with successful good faith attempts to recover rents owing, successful good faith unlawful detainer actions not in derogation of applicable law, legal expenses necessarily incurred in dealings with respect to the normal operation of the Property, and reasonable costs incurred in obtaining a rent increase pursuant to SPLC 193A.

To the extent allowable legal expenses are not annually reoccurring and are substantial they shall be amortized over a five-year period, unless the City concludes that a different period is more reasonable. At the end of the amortization period, the allowable monthly rent shall be decreased by any amount it was increased because of the application of this provision.

**STP 00014**

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-stabil…   6/28

ix. <u>Adjustments to Operating Expenses.</u> Base Year and/or current year operating expenses

may be averaged with other expense levels for other years or amortized or adjusted by the CPI or to reflect levels that are normal for residential Rental Units or may otherwise be adjusted, in order to establish an expense amount for that item which most reasonably serves the objectives of obtaining a reasonable comparison of Base Year and current year expenses and providing a reasonable return. If the claimed operating expense levels are exceptionally high compared to prior expense levels and/or industry standards the Landlord shall have the burden of proof of demonstrating that they are reasonable and/or reflect recurring expense levels. Expenses which are exceptional and reasonable must be amortized in order to achieve the objectives of this section.

c. <u>Projections of Base Year Operating Expenses in the Absence of Actual Data</u>

If the Landlord does not have Base Year operating expense data, it shall be presumed that operating expenses increased by the percentage increase in the CPI between the Base Year and the current year. This presumption is subject to the exception that specific operating expenses must be adjusted by other amounts when alternate percentage adjustments are supported by a preponderance of evidence (such as data on changes in the rates of particular utilities or limitations on increases in property taxes.)

6. <u>Allocation of Rent Increases</u>

Rent increases authorized pursuant to this section must be allocated as follows:

a. Rent increases for unit-specific capital improvements must be allocated to that unit;

b. Rent increases for building-wide or common area capital improvements must be allocated equally among all units;

c. Rent increases resulting from the Net Operating Income analysis must be allocated equally among all units;

d. Notwithstanding the subsections above, the City, in the interests of justice, shall have the discretion to apportion the rent increases in a manner and to the degree necessary to ensure fairness. Such circumstances include, but are

**STP 00015**

not limited to, units that are vacant or owner occupied.

7. <u>Relationship of Individual Rent Adjustment to Annual General Adjustment</u>

Any Individual Increase Adjustment established pursuant to this Section must take into account the extent of any Annual General Adjustments the Landlord may be implementing, or otherwise be entitled to, at and during the time for which the Individual Adjustment is sought regarding the petitioning year, and the Individual Adjustment may be limited or conditioned accordingly.

If it is determined that the Landlord is not entitled to an Individual Adjustment, the Landlord may implement the full upcoming General Adjustment.

8. <u>Limits to Annual Rent Adjustments Based on Maintenance of Net Operating Income Standard</u>

a. <u>Purpose.</u> The purpose of this subsection (a) is to protect Tenants from substantial rent increases which are not affordable, and which may force such Tenants to vacate their homes and result in consequences contrary to the stated purposes of the Ordinance, namely, to maintain the diversity of the Saint Paul community, to preserve the public peace, health and safety, and advance the housing policies of the City.

b. <u>Rent Increase Limit</u>

Notwithstanding any other provision of this regulation, the implementation of a Maximum Allowable Rent increase must be limited each year to fifteen percent (15%) of the Maximum Allowable Rent on the date the petition is filed.

If the amount of any rent increase granted under these regulations exceeds this limit, any portion in excess of the annual must be deferred.

In subsequent years deferred amounts of the allowable rent increase may be implemented.

At the end of each year the deferred amount of the increase must be calculated and an interest allowance shall be calculated based on the standard set forth in this regulation. One twelfth (1/12) of the interest allowance must be added on to full monthly increase authorized under the MNOI standard.

9. <u>Constitutional Right to a Reasonable Return.</u>

No provision of this regulation shall be applied so as to prohibit the

**STP 00016**

Rent Administrator or Hearing Officer from granting an individual rent adjustment that is demonstrated by the Landlord to be necessary

to meet the requirements of this ordinance and/or constitutional reasonable return requirements.

2. Certain improvements add to a property's value and prolong its useful life over more than one year. This includes costs beyond ordinary maintenance or repair. Amortized costs of capital improvements will be considered subject to certain conditions listed here.

B. **Capital Improvement Standard**

1. The Amortized Costs of Capital Improvements.

Operating expenses include the amortized costs of capital improvements plus an interest allowance to cover the amortization of those costs. For purposes of this section a capital improvement shall be any improvement to a unit or property which materially adds to the value of the property, appreciably prolongs its useful life or adapts it to new use and has a useful life of more than one year and a direct cost of $250.00 or more per unit affected.

Allowances for capital improvements shall be subject to the following conditions:

The costs are amortized over the period set forth in this regulation and in no event over a period of less than thirty-six (36) months.

The costs do not include costs incurred to bring the Rental Unit into compliance with a provision of the Saint Paul Legislative Code or state law where the original installation of the improvement was not in compliance with code or state law.

At the end of the amortization period, the allowable monthly rent shall be decreased by any amount it has increased due to the application of this provision.

The improvement is not an ordinary repair, replacement, and/or maintenance, and is necessary to bring the property into compliance or maintain compliance with applicable local code requirements affecting health and safety in accordance with Saint Paul Legislative Code Chapter 34.

The amortization period shall be in conformance with the following schedule adopted by the City unless it is determined that an alternate period is justified based on the evidence presented in appeal hearing.

**Amortization of Capital Improvements and Expenses**

**STP 00017**

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-stabil…    9/28

| | Years |
|---|---|
| **In amorting capital improvements, and/or** ~~expenses, the following schedule shall be used to~~ **determine the amortization period of the capital** ~~improvements and/or expenses~~ | Years |
| **In amorting capital improvements, and/or expenses, the following schedule shall be used to determine the amortization period of the capital improvements and/or expenses** | |
| *Appliances* | |
| Air Conditioners | 10 |
| Refrigerator | 5 |
| Stove | 5 |
| Garbage Disposal | 5 |
| Water Heater | 5 |
| Dishwasher | 5 |
| Microwave Oven | 5 |
| Washer/Dryer | 5 |
| Fans | 5 |
| Cabinets | 10 |
| Carpentry | 10 |
| Counters | 10 |
| Doors | 10 |
| Knobs | 5 |
| Screen Doors | 5 |
| Fencing and Security | 5 |
| Management | 5 |
| Tenant Assistance | 5 |

**STP 00018**

| Structural Repair and Retrofitting In amortizing capital improvements, and/or expenses, the following schedule shall be used to determine the amortization period of the capital improvements and/or expenses | Years |
|---|---|

| | |
|---|---|
| Foundation Repair | 10 |
| Foundation Replacement | 20 |
| Foundation Bolting | 20 |
| Iron or Steel Work | 20 |
| Masonry-Chimney Repair | 20 |
| Shear Wall Installation | 10 |
| Electrical Wiring | 10 |
| Elevator | 20 |
| *Fencing* | |
| Chain | 10 |
| Block | 10 |
| Wood | 10 |
| *Fire Systems* | |
| Fire Alarm System | 10 |
| Fire Sprinkler System | 20 |
| Fire Escape | 10 |
| *Flooring/Floor Covering* | |
| Hardwood | 10 |
| Tile and Linoleum | 5 |

**STP 00019**

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-stab…   11/28

| Carpet **In amortizing capital improvements, and/or expenses, the following schedule shall be used to determine the amortization period of the capital improvements and/or expenses** | **Years** |
|---|---|

| | |
|---|---|
| Carpet Pad | 5 |
| Subfloor | 10 |
| | |
| Fumigation Tenting | 5 |
| Furniture | 5 |
| Automatic Garage Door Openers | 10 |
| | |
| *Gates* | |
| Chain Link | 10 |
| Wrought Iron | 10 |
| Wood | 10 |
| | |
| *Glass* | |
| Windows | 5 |
| Doors | 5 |
| Mirrors | 5 |
| | |
| *Heating* | |
| Central | 10 |

**STP 00020**

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-sta…    12/28

| Gas **In amortizing capital improvements, and/or expenses, the following schedule shall be used to determine the amortization period of the capital improvements and/or expenses** | **Years** |
|---|---|

| | |
|---|---|
| Electric | 10 |
| Solar | 10 |
| Insulation | 10 |
| | |
| *Landscaping* | |
| Planting | 10 |
| Sprinklers | 10 |
| Tree Replacement | 10 |
| | |
| *Lighting* | |
| Interior | 10 |
| Exterior | 5 |
| | |
| Locks | 10 |
| Mailboxes | 10 |
| Meters | 10 |
| | |
| *Plumbing* | |
| Fixtures | 10 |

**STP 00021**

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-sta…    13/28

| Pipe Replacement | Years |
|---|---|
| In amortizing capital improvements, and/or expenses, the following schedule shall be used to determine the amortization period of the capital improvements and/or expenses | |

| | |
|---|---|
| Re-Pipe Entire Building | 20 |
| Shower Doors | 5 |
| | |
| *Painting* | |
| Interior | 5 |
| Exterior | 5 |
| | |
| *Paving* | |
| Asphalt | 10 |
| Cement | 10 |
| Decking | 10 |
| Plastering | 10 |
| Sump Pumps | 10 |
| Railings | 10 |
| | |
| *Roofing* | |
| Shingle/Asphalt | 10 |
| Built-up, Tar, and Gravel | 10 |
| Tile | 10 |

**STP 00022**

| Gutters/Downspouts | 10 |
|---|---|
| **In amortizing capital improvements, and/or expenses, the following schedule shall be used to determine the amortization period of the capital improvements and/or expenses** | |

|  |  |
|---|---|
| ***Security*** | |
| Entry Telephone Intercom | 10 |
| Gates/Doors | 10 |
| Fencing | 10 |
| Alarms | 10 |
|  |  |
| Sidewalks/Walkways | 10 |
| Stairs | 10 |
| Stucco | 10 |
| Tilework | 10 |
| Wallpaper | 5 |
|  |  |
| ***Window Coverings*** | |
| Drapes | 5 |
| Shades | 5 |
| Screens | 5 |
| Awnings | 5 |
| Blings/Miniblinds | 5 |

**STP 00023**

| Shutters | Years |
|---|---|

**In amortizing capital improvements, and/or expenses, the following schedule shall be used to determine the amortization period of the capital improvements and/or expenses**

2. Interest Allowance for Expenses that Are Amortized. An interest allowance shall be allowed on the cost of amortized expenses. The allowance shall be the interest rate on the cost of the amortized expense equal to the "average rate" for thirty-year fixed rate on home mortgages plus two percent. The "average rate" shall be the rate Freddie Mac last published in its weekly Primary Mortgage Market Survey (PMMS) as of the date of the initial submission of the petition. In the event that this rate is no longer published, the Rent Administrator shall designate by regulation an index which is most comparable to the PMMS index.

    a. Exclusions from Operating Expenses. Operating expenses shall not include the following:

        i. Mortgage principal or interest payments or other debt service costs and costs of obtaining financing.

        ii. Any penalties, fees or interest assessed or awarded for violation of any provision of this chapter or of any other provision of law.

        iii. Land lease expenses.

        iv. Political contributions and payments to organizations or individuals which are substantially devoted to legislative lobbying purposes.

        v. Depreciation.

        vi. Any expenses for which the Landlord has been reimbursed by any utility rebate or discount, Security Deposit, insurance settlement, judgment for damages, settlement or any other method or device.

        vii. Unreasonable increases in expenses since the Base Year.

        viii. Expenses associated with the provision of master-metered gas and electricity services.

        ix. Expenses which are attributable to unreasonable delays in performing necessary maintenance or repair work or the failure to complete necessary replacements, which are not Tenant caused. (For example if a roof replacement is unreasonably delayed, the full cost of the roof replacement would be allowed;

**STP 00024**

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-sta…    16/28

however, if interior water damage occurred as a result of the unreasonable delay.

b. <u>Adjustments to Operating Expenses.</u> Base Year and/or current year operating expenses may be averaged with other expense levels for other years or amortized or adjusted by CPI or to reflect levels that are normal for residential Rental Units or may otherwise be adjusted, in order to establish an expense amount for that item which most reasonably serves the objectives of obtaining a reasonable comparison of Base Year and current year expenses and providing a reasonable return. If the claimed operating expense levels are exceptionally high compared to prior expense levels and/or industry standards the Landlord shall have the burden of proof of demonstrating that they are reasonable and/or reflect recurring expense levels. Expenses which are exceptional and reasonable shall be amortized in order to achieve the objectives of this section.

c. <u>Projections of Base Year Operating Expenses in the Absence of Actual Data</u>

If the Landlord does not have Base Year operating expense data, it shall be presumed that operating expenses increased by the percentage increase of CPI between the Base Year and the current year. This presumptionis subject to the exception that specific operating expenses shall be adjusted by other amounts when alternate percentage adjustments are supported by a preponderance of evidence (such as data on changes in the rates of particular utilities or limitations on increases in property taxes.)

3. <u>Allocation of Rent Increases</u>

Rent increases authorized pursuant to this section shall be allocated as follows:

a. Rent increases for unit-specific capital improvements shall be allocated to that unit;

b. Rent increases for building-wide or common area capital improvements shall be allocated equally among all units;

c. Rent increases resulting from the Net Operating Income analysis shall be allocated equally among all units;

d. Notwithstanding the subsections above, the Rent Administrator or Hearing Officer, in the interests of justice, shall have the discretion to apportion the rent increases in a manner and to the degree necessary to ensure fairness. Such circumstances include, but are not limited to, units that are vacant or owner occupied.

**STP 00025**

4. Conditional Rent Adjustments for Proposed Capital Improvements

    a. In order to encourage necessary capital improvements, the Rent Administrator allows a Landlord to petition for an upward rent adjustment based upon anticipated future expenses for capital improvements. The purpose of this procedure is to permit Landlords to seek advanced authorization for future rent adjustments based upon anticipated capital improvements. A petition under this Section should only be made for anticipated expenses that the Landlord intends to incur during the twelve-month period following the date of final Rent Administrator or Hearing Officer decision. This procedure should not be used for anticipated expenses for ordinary repairs and maintenance.

    b. If the petition is granted in whole or in part, the rent increase shall be postponed until such time as the capital improvements are made and an Addendum authorizing the increases is issued.

    c. No addendum shall be issued for such proposed capital improvements unless they are completed within twenty-four (24) months from the date of final decision granting the conditional rent adjustment, unless the Landlord obtains an additional addenda authorizing an extension of the time period to complete the capital improvement. Extensions may be granted due to reasonable delays in the completion of capital improvements as determined by the Hearing Officer.

3. Increases or decreases in the number of tenants living in a rental unit permitted by the rental agreement in effect on May 1, 2022 may affect the rent allowable for a unit. Grounds for tenant objections to the accuracy of this information are also found here.

*Nothing in this section is intended to direct or alter the screening methods of landlords.*

C. **Changes in the Number of Tenants**

1. Base Occupancy Level: The Base Occupancy Level for a Rental Unit, as used in this Chapter, shall be the number of Tenants allowed by the Rental Agreement as defined in 193A of the Ordinance for the unit effective May 1, 2022, or at the beginning of any tenancy established after May 1, 2022 (ie a new rental unit).

2. Increase in Tenants:

    a. If the number of Tenants allowed by the Rental Agreement actually occupying a unit as the Tenants' principal residence has increased above the Base Occupancy Level for that unit, then the Maximum Allowable Rent for the unit may be increased by up to fifteen percent (15%) for each additional tenant above the base occupancy level, in addition to any Maximum

**STP 00026**

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-sta…    18/28

Allowable Rent adjustment to which the Landlord is
otherwise entitled.

    b. Notwithstanding Regulation (2) a., no increase in the
Maximum Allowable Rent for additional Tenants shall be
granted for any additional Tenant who is a spouse,
domestic partner, child, grandchild, parent, grandparent,
legal guardian of a child, parent of any of the Tenants,
other resident child, or caretaker/attendant as required for
a reasonable accommodation for a person with a
disability, unless the Tenants agree in writing to the
specific Maximum Allowable Rent increase.

    c. If the number of Tenants actually occupying a Rental Unit
as a principal residence decreases subsequent to any
Maximum Allowable Rent increase for additional Tenants
granted pursuant to subsection (2) a., then the Maximum
Allowable Rent increase for that Rental Unit shall
automatically decrease by the amount of the Maximum
Allowable Rent increase that is no longer justified, as a
result in the decrease in the number of Tenants, unless the
Tenant and Landlord agree in writing to permanently
increase the Base Occupancy Level.

    d. Increases in the Maximum Allowable Rent due to an
increase in the Base Occupancy Level shall remain
permanent. As such, if the number of Tenants actually
occupying a Rental Unit as the Tenants' principal
residence decreases subsequent to any Maximum
Allowable Rent increase for additional Tenants granted
pursuant to subsection (2) a., then the Tenants may
replace the departing Tenant with another Tenant (subject
to the Landlord's standard screening methods).

3. <u>Decrease in Number of Tenants Allowed:</u>

If any policy or policies imposed by the Landlord unreasonably
prevent the Tenant from maintaining the Base Occupancy Level for
that unit, then the Maximum Allowable Rent for that unit shall be
decreased by an amount equal to the percentage by which the number
of allowable Tenants has been reduced. As used in this regulation,
"policy" or "policies" means any rule, course of conduct, act or
actions by a Landlord.

    a. A policy shall be deemed unreasonable if it is different
from and more restrictive than the policies originally used
to screen the current Tenant(s).

    b. Refusal based on the proposed additional occupant's lack
of creditworthiness shall be deemed unreasonable if that
person will not be legally obligated to pay some or all of
the rent to the Landlord.

    c. Refusal shall be deemed reasonable if the increase would
bring the total number of occupants above the maximum

**STP 00027**

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-sta…    19/28

allowable under SPLC Chapter 34, Chapter 60, Minnesota State Building Code or Minnesota State Fire Code.

4. Grounds for Objections:

Tenants responding to petitions under subsection (B) (l) may file objections with the Hearing Officer on one or more of the following grounds:

a. The base occupancy level alleged by the landlord is incorrect; however, a tenant may not contest a base occupancy level that was established in a prior decision;
b. The number of tenants alleged by the landlord as being currently allowed by the lease and actually occupying the unit as a principal residence is incorrect;
c. An additional tenant claimed by the landlord as justifying a rent increase is a spouse, registered domestic partner, child, grandchild, parent, grandparent, legal guardian of a child or caretaker/attendant as required for a reasonable accommodation for a person with a disability and the original tenant(s) did not agree in writing to an increase for such person(s);
d. The unit is not eligible to receive annual general adjustments for any period since its rent was last certified or individually adjusted by the City. Any such objection shall identify each challenged annual general adjustment and the reason for the alleged ineligibility; or
e. The landlord is collecting rent in excess of the Maximum Allowable Rent.

4. Clarifies how the City will evaluate requests when a landlord adds or reduces space or services to properties; if the property has deteriorated; any failures to provide adequate housing services; and how the City may address failures by a landlord to comply with "applicable state rental housing laws, local housing, health and safety codes, or the rental agreement."

D. **Changes in Space or Services**

1. Increase in Space:

The Maximum Allowable Rent may be adjusted upward when, with the written agreement of the Tenant(s), there is an increase in the usable space or in the Housing Services beyond that which was provided to a unit on May 1, 2022, or when the Base Rent was first established.

a. Additional or reconfigured space: Where a Landlord adds habitable living space to a unit or reconfigures it, the Maximum Allowable Rent for such unit must be permanently increased as provided under Capital Improvements.

STP 00028

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-sta…    20/28

b. <u>Additional services:</u> Where a Landlord adds non-habitable space or increases the services provided to a unit, the Maximum Allowable Rent for such unit may be

increased by an amount representing the commercially reasonable value of the additional space or increased services. If the additional or reconfigured space or the services are subsequently reduced or eliminated, the rent increase authorized herein must be reduced or terminated. Any increase for an additional bedroom may result in an increase to the Base Occupancy Level for an additional occupant.

c. Increases may be denied if the added or reconfigured space or services do not clearly benefit a majority of the affected Tenants and a Tenant objects.

d. If the added or reconfigured space or services clearly benefit a majority of the affected Tenants, then increases may be denied if a majority of the affected Tenants object.

2. <u>Decrease in Space or Services; Substantial Deterioration; Failure to Provide Adequate Services; Failure to Comply with Codes, the Warranty of Habitability or the Rental Agreement:</u>

*It is not the Department's intent to enforce rent decreases to the provisions below. The rules below are to be considered holistically with the other factors justifying an increase in Rent.*

Decreases in Space or Services. The Maximum Allowable Rent must be adjusted downward where a Landlord is aware of and causes a Tenant to suffer a decrease in housing services or living space from the services and space that were provided on May 1, 2022, or from any services or space provided at the beginning of the tenancy. The amount of the rent decrease must be calculated by multiplying the percentage of impairment of the Tenant's use of and benefit from the unit (as a result of the reduction in living space or housing services) by the Maximum Allowable Rent in effect at the time of the impairment, and for past decreases, multiplied by the period of time the impairment existed. In determining the amount of the downward rent adjustment by the percentage of impairment of use/benefit method, the City may consider the reasonable replacement cost of the space or service in question. Decreases in the Maximum Allowable Rent must not be granted due to a decrease in space or services that is a direct result of intentional actions on the part of the Tenant to purposefully cause a decrease in space or services.

a. <u>Denial of Petitions for Unilateral Removal:</u> The City will not accept petitions from Landlords who seek a Maximum Allowable Rent decrease for the unilateral removal or reduction of space or services from a Tenant's base level space or services. Landlord petitions shall be accepted only when a Tenant has expressly agreed in

STP 00029

writing to the removal of such space or services. "Base level space or services" are the housing services or living space that was provided at the unit on May 1, 2022, or at the beginning of the tenancy.

b. <u>Inadequate Services & Substantial Deterioration:</u> The Maximum Allowable Rent must be adjusted downward for any substantial deterioration in a Rental Unit and/or for any failure to provide adequate Housing Services occurring during the petitioner's tenancy. For purposes of this subsection, a substantial deterioration means a noticeable decline in the physical quality of the Rental Unit resulting from a failure to perform reasonable or timely maintenance and adequate Housing Services means all services necessary to operate and maintain a Rental Unit in compliance with all applicable state and local laws and with the terms of the Rental Housing Agreement. The amount of the rent decrease must be calculated by multiplying the percentage of impairment of the Tenant's use of and benefit from the unit (as a result of the deterioration or failure to provide adequate service, violation, breach or failure to comply) by the Maximum Allowable Rent in effect at the time of the impairment.

c. <u>Code Violations & Breach of the Warranty of Habitability:</u>

   i. Where a condition at the Rental Unit threatens the health or safety of the occupants but does not actually impair the use of the unit, the Maximum Allowable Rent decrease shall be in an amount that reflects the reduction in value of the Rental Unit due to the unsafe or unhealthy condition.

   ii. The rent decrease authorized under this subsection for a violation of the warranty of habitability or for a code violation that poses a significant threat to the health or safety of Tenants (e.g., dangerous window bars, missing smoke detector) shall be automatically doubled prospectively if proof of correction of the violation is not submitted to the Rent Administrator within thirty-five (35) calendar days of mailing of the City's decision unless the Landlord establishes that the violation cannot be corrected within that time due to circumstances beyond the Landlord 's control.

   iii. For purposes of this subsection, a breach of the warranty of habitability occurs when the Rental Unit is not in substantial compliance with applicable building and housing code standards, which materially affect health and

STP 00030

Rent Stabilization Rules and Processes

safety. Minor housing code violations which
do not interfere with normal living

requirements do not constitute a breach of the
warranty of habitability.

d. Maximum Allowable Rent reductions pursuant to this
   Section shall be effective from the date the Landlord first
   had notice of the space or service reduction, deteriorated
   condition, service inadequacy, or code or habitability
   violation in question and shall terminate on the date of the
   first rent payment due after adequate proof has been
   submitted to the Rent Administrator that the condition for
   which the reduction was granted no longer exists.

e. A Tenant who files a petition pursuant to this regulation
   must be able to establish the basis for the reduction and
   when the Landlord first received notice of the decreased
   service, deterioration, code violation or habitability
   violation. Notice may be actual or constructive. A
   Landlord is deemed to have notice of any condition
   existing at the inception of a tenancy that would have
   been disclosed by a reasonable inspection of the Rental
   Unit. A copy of a housing code inspection report from the
   City of Saint Paul should be submitted with the petition.

5. The City will use the Consumer Price Index (CPI) as the basis for determining a pattern of
   rent increase.The CPI is published by the U.S. Bureau for Labor Statistics.

   For the purposes of determining reasonable return on investment, the pattern of recent rent
   increases or decreases will be determined by the annual Consumer Price Index (CPI) for the
   current year for All Urban Consumers for the Minneapolis-St. Paul-Bloomington area (All
   Items) provided by the U.S. Bureau of Labor Statistics.

6. # Definitions

   City Council approved the definitions below on April 6, 2022. These definitions are final
   upon mayoral approval and publication. The definitions are listed here to provide context to
   the rules, process, and forms.

   ## Sec. 193A.03. - Definitions

   Unless otherwise expressly stated, the following terms shall, for the purposes of this
   chapter, have the meanings indicated in this section.

   a. *Change of Occupancy*. A change in occupation of the Rental Unit from one
      Tenant to another Tenant.
   b. *City*. The City of Saint Paul.
   c. *Code*. The Saint Paul Legislative Code.
   d. *Housing Services*. Housing Services include but are not limited to repairs,
      maintenance, painting, light, hot and cold water, elevator service, window

STP 00031

shades and screens, storage units, kitchen, bath, and laundry facilities and privileges, janitorial services, utilities that are paid by the landlord, refuse removal, furnishings, telephone services, vehicle parking spaces, the right to

have a specified number of occupants, and any other benefit, privilege, or facility connected with the use or occupancy of any rental unit. Housing Services to a Rental Unit shall include a proportionate part of services provided to common facilities of the building in which the Unit is contained.

e. *Landlord*. An owner of real property, a contract for deed vendee, receiver, executor, trustee, lessee, agent, or other person directly or indirectly in control of rental property.

f. *Local Housing, Health, and Safety Codes*. Any building, fire, housing, health, safety, or other similar code, law, or ordinance promulgated or enacted by the County of Ramsey and/or the City of Saint Paul, or any lawful agency or department thereof, which is applicable to a building in such city. Housing, health, and safety codes include, without any limitation on the foregoing sentence as a result of this specification, the provisions of chapters 33, 34, 43, 45, 49, 55, and 58 of the Code.

g. *Rent*. All monetary consideration charged or received by a Landlord concerning the use or occupancy of a Rental Unit pursuant to a Rental Agreement.

h. *Rental Agreement*. An agreement, oral, written, or implied, between a Landlord and a Tenant for the use or occupancy of any Rental Unit.

i. *Residential Rental Unit, Rental Unit, or Unit*. Any dwelling unit, or portion of a dwelling unit, that is rented or otherwise made available for rent for residential use or occupancy, together with all Housing Services connected with the use or occupancy of such property. This term shall not include the following:

   1. Rental Units which a government unit, agency, or authority owns, operates, or otherwise manages;
   2. Rental Units in hotels, motels, inns, tourist homes, or other similar establishment which are rented primarily to transient guests for a period of fewer than thirty (30) days;
   3. Rental Units or other accommodations provided by a church, chapel, synagogue, temple or other similar place of worship; and
   4. Hospitals, long-term care facilities or nursing homes licensed under Minnesota Statutes sections 144A.02 to 144A.10, boarding care homes licensed under sections 144.50 to 144.56, assisted living facilities or assisted living care facilities with dementia care licensed under chapter 144G, or licensed or registered residential settings that provide or arrange for the provision of home care services.

j. *Residential Rental Property*. Residential Rental Property shall have the same meaning as Residential Rental Unit, Rental Unit, or Unit as defined in section 193A.03(i) of the Code.

k. *Tenancy*. The right or entitlement of a Tenant to use or occupy a Rental Unit under the terms of a Rental Agreement.

l. *Tenant*. A person who is occupying a Rental Unit in a residential building under a Rental Agreement that requires the payment of money or exchange of services, as well as other regular occupants of that Unit

Requests for Exceptions

STP 00032

# Requests for Exceptions: Two Paths

Effective May 1, 2022, increases in rent are capped at 3% unless an owner requests an exception to the cap. As directed in the Ordinance, the City has created a process for landlords to request an exception to the limit on rent increases, offering two methods for landlords to make such requests. In either case, a landlord must demonstrate that an exception is needed to provide a reasonable return.

The two methods, "self-certification" and "staff determination," are described below.

- The self-certification process is intended only for requests for increases between 3% and 8%.

- Landlords may choose to use the staff-determination process for any request for an exception above the 3% cap. If they are seeking an increase for more than 8% , however, they must use this process. Staff will evaluate supporting documentation submitted using this process.

- All requests for an exception start with a landlord submitting the Rent Increase Exception Request form, which requires landlord  and property information, the percent increase requested, for what specific portions of a building, and the factor(s) selected.

- All landlords are strongly encouraged to fill out the Maintenance of Net Operating Income worksheet before submitting an Exception Request to support the rationale for their request.

- When the Rent Increase Exception Request form is submitted, landlords are encouraged to send notice to any residential tenants who may be impacted.

Rent Increase Exception Request
Self-Certification Steps

# Steps for Self-Certification

**The self-certification process is intended only for requests for increases between 3% and 8%.**
1

## Fill out the Maintenance of Net Operating Income Worksheet

All self-certification requests are subject to city audit. The worksheet provides a convenient way to capture  and save the  required income and expense records related to the property and may be used to document reasons for the exception request. The worksheet, and any other forms related to the factors selected in the Exception Request form, will not be sent to the City. Keep the worksheet and any completed forms for your records and any possible city audit. Find the worksheets and forms at the bottom of this page.
2

## Fill out and submit the Rent Increase Exception Request

Successfully submitted forms will generate an email reply with a notice that may be used to inform

read://https_www.stpaul.gov/?url=https%3A%2F%2Fwww.stpaul.gov%2Fdepartments%2Fsafety-inspections%2Frent-buy-sell-property%2Frent-sta…     25/28

**STP 00033**

CASE 0:22-cv-01589-NEB-JFD Doc. 53-1 Filed 11/07/22 Page 446 of 455

residential tenants of the increase requested.
3

## City Confirmation

City will send confirmation that self-certification has been received; the confirmation will serve as an approval of the request.
4

## Keep back-up documentation

Landlord keeps all back-up documentation in the event of a city audit.
Staff Determination Steps

# Steps for Staff Determination

**Requests for increases greater than 8% must follow this process, which requires review by City staff.**
1

## Fill out the Maintenance of Net Operating Income worksheet

The worksheet provides complete income and expense record related to the property and may be used to document reasons for the exception request. Find the worksheet at the bottom of this page. Retain this for your records.
2

## Fill out and submit the Rent Increase Exception Request

Fill out and submit the Rent Increase Exception Request, and any forms related to the factors being used to support the request. Find the correct forms at the bottom of this page.
3

## City will make a decision to grant or deny the request for exception

Landlords are encouraged to send notice to any residential tenants impacted.

Staff determinations can be appealed to the Legislative Hearing Officer within 21 days.
Appeals Process

# Appeal Rent Increase Determination

- Legislative Hearings provide the forum for reviewing appeals of City-issued determinations. The hearings are conducted by the Hearing Officer who makes a recommendation to the City Council. Individuals not satisfied with a Hearing Officer's recommendation also have an opportunity to be heard before City Council if they wish to appeal further.

**STP 00034**

appeal further.

- For each appeal City staff will give a report and those appealing are given time to present information, photos or documents. To learn more about the City's appeal process and find the Application for Appeal, visit Legislative Hearings.

- Appeals by either landlords or tenants must be submitted within 21 business days of the determination notification.

Appeals Process
Tenant Rights

# Tenant Rights

The Ordinance aims to address a shortage of residential rental housing in the City of Saint Paul and ensure all residents have access to affordable housing.  If your landlord is not following the rent stabilization ordinance, check out these legal, dispute resolution, and education resources for tenants. Tenants may also file a complaint using the Rent Stabilization Ordinance Complaint form below.

## State and Federal Protections

The rights and responsibilities of landlords and tenants are protected in state and federal law in addition to local ordinances. Learn more from The Office of Minnesota Attorney General's Landlords and Tenants Handbook, including the requirement that landlords provide notice of a rent increase.

## Tenant Notifications

While the Ordinance did not address when or how tenants should be notified, this is a valuable step in the process. The Rent Stabilization Stakeholder Group has identified this issue for discussion and consideration.
Submit a Complaint

# Submit a Complaint

Submit a complaint for failure to comply with the Residential Rent Stabilization Ordinance.

The City is committed to making its services, programs, and activities available to all. The interactive webform on this page is available in English and Spanish. For additional assistance translating the rules, process steps, and the ordinance, in various languages please contact the Department of Safety and Inspections by email at rent-stabilization@ci.stpaul.mn.us or by phone at 651-266-8553.

La ciudad se compromete a poner sus servicios, programas y actividades a disposición de todos. El formulario interactivo de esta página está actualmente disponible en inglés y español. Para obtener ayuda adicional en la traducción de las normas, los pasos del proceso y la ordenanza, póngase en contacto con el Departamento de Seguridad e Inspecciones por correo electrónico en rent-stabilization@ci.stpaul.mn.us, o por teléfono al 651-266-8553.
 Submit a Complaint

STP 00035

STP 00036

# Exhibit 11

**MENU**

**SEARCH**

TRANSLATE

**IN THIS SECTION**

**RENT STABILIZATION RULES AND PROCESSES**

# Overview

On November 2, 2021, Saint Paul voters approved a Residential Rent Stabilization Ordinance for the City of Saint Paul.

**View text of the ordinance**

**View results of the ballot measure**

The Ordinance limits residential rent increases to 3% in any 12-month period even if there is a change of occupancy. It also directs the City to create a process for landlords to request an exception to the rent cap based on the right to a reasonable return on investment.

The voter-approved initiative is based upon several findings, some of which include: More than 50 percent of those who live in Saint Paul are residential tenants; in order to hold onto or find adequate rental housing, many residents pay a significant percentage of their monthly income on rent; and the current shortage of rental units combined with rent levels have a negative effect on the health, safety and welfare of a substantial number of residents, particularly in low- and moderate-income households and those on fixed incomes. (Find the full list of findings in **ordinance text**.) The Ordinance did not address whether newly constructed rental units would be covered.

# Planning For Implementation

Following passage by Saint Paul voters in 2021 and building on a preliminary assessment conducted by the Office of Financial Empowerment, the City has been focusing on three core areas: Exempting new construction, convening members of our community, and drafting the rules and processes needed to administer the law.

## New Construction Exemption

The Residential Rent Stabilization Ordinance approved by Saint Paul voters centers a policy goal of ensuring Saint Paul residents have access to affordable housing. Exempting new construction from the rent ordinance is a key part of ensuring we continue to provide new housing growth in Saint Paul, and is consistent with the policy goal of ensuring Saint Paul residents have access to affordable housing.

## Convening Members of Our Community

The second area of focus is convening members of our community to collectively explore how to balance our critical goals of equity and growth. The Rent Stabilization Stakeholder Group, which has been meeting since February 2022, includes representatives from impacted groups including renters, homeowners, advocates, experts, owners and landlords of various

scales and configurations of rental properties, real estate finance and legal professionals, staff and others. This group will make recommendations toward improving and enhancing the rent ordinance by fostering a community conversation that carefully balances the interconnected needs of renters and landlords, while continuing to address our housing needs, advancing our economic growth goals, and our equity and affordability goals.

**Read more about this group**, and view Rent Stabilization Stakeholder Group meetings **here**.

## Administering the Law

The Mayor directed staff to look at the many factors needed to consider in order to implement the Rent Stabilization Ordinance. The preliminary assessment, conducted by the Office of Financial Empowerment, researched and considered several areas, ranging from the development of rules, policies and procedures for governance and enforcement, to the systems that jurisdictions across the country have in place related to rent ordinances.

The Mayor also tasked the Department of Safety and Inspections to lead a cross-departmental group focused on implementation, which was charged with proposing rules and processes based on ordinance language and overseeing the production of educational materials.

Draft rules and forms were **published** in early April and a formal public comment period was established, from April 7-22.

- Public comments **received**
- Supporting documents **submitted**
- **Response to comments**
- **Final rules**

## Questions

Check back here for updates. For questions or inquiries, please contact us by email at **rent-stabilization@ci.stpaul.mn.us**, or by phone at 651-266-8553.

**Last Edited:** July 19, 2022

### CONTACT THE CITY

**Email Us**

Contact the City's Call Center by **sending an email**.

**Call 651-266-8989**

For non-emergency information. Available weekdays, 7:30 a.m. - 4:30 p.m.

**Home | Translate Website | Website Policies | Local Tax Notification | Photo Credits**
**15 Kellogg Blvd. West | Saint Paul, MN 55102 | General Information: 651-266-8989**

Exhibit 12



# SAINT PAUL
## MINNESOTA

Live Meetings    City Home    Research    Legislation    Calendar    City Council    Boards or Commissions

Share   RSS

List View    Calendar View

Search: stabilization    2022    City Council    ☐ notes ☐ closed captions

Search Calendar    Help

14 records    Group    Export

| Name | Meeting Date | | Meeting Time | Meeting Location | Meeting Details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
|------|-------------|---|-------------|-----------------|----------------|--------|-------------------|---------|--------------------|-------|
| City Council | 11/9/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Not available | Not available | Not available |
| City Council | 11/2/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 10/19/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 9/21/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 9/14/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor *Public Hearing on Highland Area Commercial Development District at 10:00 AM at 1978 Ford Parkway Regular Council Meeting at 3:30 PM in Council Chambers* | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 9/7/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 8/24/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 8/10/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 8/3/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 7/20/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 7/13/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 4/6/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 3/23/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
| City Council | 3/16/2022 | 📅 | 3:30 PM | Council Chambers - 3rd Floor | Meeting details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |



Sign In

Live Meetings · City Home · Research · Legislation · Calendar · City Council · Boards or Commissions



List View · Calendar View

Search: [stabilization]   2021   City Council   ☐ notes ☐ closed captions

[Search Calendar]  Help

8 records · Group · Export

| Name | Meeting Date | | Meeting Time | Meeting Location | Meeting Details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
|------|--------------|---|--------------|------------------|-----------------|--------|-------------------|---------|-------------------|-------|
| City Council | 12/22/2021 | 📅 | 3:30 PM | Council Chambers - 3rd Floor *Please see below for meeting guidelines due to the COVID-19 pandemic emergency.* | Meeting details | Agenda | Accessible Agenda | Minutes | Not available | Video |
| City Council | 12/8/2021 | 📅 | 3:30 PM | Council Chambers - 3rd Floor *Please see below for meeting guidelines due to the COVID-19 pandemic emergency.* | Meeting details | Agenda | Accessible Agenda | Minutes | Not available | Video |
| City Council | 11/10/2021 | 📅 | 3:30 PM | Council Chambers - 3rd Floor *Please see below for meeting guidelines due to the COVID-19 pandemic emergency* | Meeting details | Agenda | Not available | Minutes | Accessible Minutes | Video |
| City Council | 11/3/2021 | 📅 | 3:30 PM | Council Chambers - 3rd Floor *Please see below for meeting guidelines due to the COVID-19 pandemic emergency* | Meeting details | Agenda | Not available | Minutes | Accessible Minutes | Video |
| City Council | 10/27/2021 | 📅 | 3:30 PM | Council Chambers - 3rd Floor *Please see below for meeting guidelines due to the COVID-19 pandemic emergency* | Meeting details | Agenda | Not available | Minutes | Accessible Minutes | Video |
| City Council | 10/20/2021 | 📅 | 3:30 PM | Council Chambers - 3rd Floor *Please see below for meeting guidelines due to the COVID-19 pandemic emergency* | Meeting details | Agenda | Not available | Minutes | Not available | Video |

| Name | Meeting Date | | Meeting Time | Meeting Location | Meeting Details | Agenda | Accessible Agenda | Minutes | Accessible Minutes | Video |
|------|--------------|---|--------------|------------------|-----------------|--------|-------------------|---------|--------------------|-------|
| City Council | 9/8/2021 | | 3:30 PM | Council Chambers - 3rd Floor *Please see the meeting guidelines due to the COVID-19 health pandemic emergency.* | Meeting details | Agenda | Not available | Minutes | Accessible Minutes | Video |
| City Council | 8/18/2021 | | 3:30 PM | Council Chambers - 3rd Floor *Please see the meeting guidelines due to the COVID-19 health pandemic emergency.* | Meeting details | Agenda | Not available | Minutes | Accessible Minutes | Video |