## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Woodstone Limited Partnership;
Lofts at Farmers Market LLC,

               Plaintiffs,

    v.

City of Saint Paul, Minnesota, a Minnesota
Charter City; City Council of the City of
Saint Paul; Angie Wiese, in her official
capacity as the Director of the Department
of Safety and Inspections of the City of
Saint Paul; Mayor Melvin Carter, in his
official capacity as Mayor of the City of
Saint Paul; and John Doe,

               Defendants.

Case No. 22-CV-1589 NEB-JFD

**PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND REPLY IN
FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

## INTRODUCTION

In its summary judgment brief, the City of Saint Paul ignores the patent

irrationality of its Residential Rent Stabilization Ordinance (the "Ordinance"). The

Ordinance restricts rent increases <u>only</u> in older properties that are not legally designated

as "affordable housing" for low- and moderate-income tenants. Landlords of these

properties did not even arguably cause – and are not responsible for solving – the societal

problems the Ordinance supposedly seeks to address. Landlords with older properties and

higher income tenants did not cause a shortage of affordable housing, do anything to

depress tenant incomes, and have not been shown to engage in abusive rent increases.

Landlords of older properties did nothing to be treated more strictly than landlords of

newer buildings who are now exempted from the Ordinance. From tenants' perspective, the most vulnerable tenants have no protection under the Ordinance because properties legally designated as "affordable housing" for low- and moderate-income residents are exempted. The Ordinance benefits tenants who can pay market rent, including middle- and upper-income tenants who were never the intended beneficiaries of the Ordinance and do not need protection against rent increases.

Plaintiffs' opening summary judgment brief highlighted multiple aspects of the Ordinance that make it unconstitutionally irrational, including:

- The Ordinance exempts properties legally designated as "affordable housing" for low- and moderate-income tenants, meaning the Ordinance illogically protects tenants with higher incomes but not the lowest income tenants whom the Ordinance was supposedly enacted to protect.

- The City recognized that the Ordinance, as originally written, had the effect of reducing the creation of new affordable housing.

- When the City amended the Ordinance to add a 20-year exemption for new construction, the City had no basis to conclude this exemption would spur development of more affordable housing, considering (a) developers openly stated a 20-year exemption would not encourage them to build in Saint Paul, and (b) the Ordinance provides no incentive for developers to choose affordable housing over higher-rent alternatives.

- The City's procedures for reviewing landlord applications to increase rent by more than 3%, and the procedures for considering tenant appeals of those applications, create inherent delays that make it inevitable landlords will be forced to charge less rent than they need to generate a reasonable rate of return.

- The Ordinance provides no guidance to enable landlords to predict the amount of rent increase the City will approve (if any), and no assurance that increases will be approved or denied consistently.

2

- The Ordinance effectively prohibits rent increases for short-term leases and appears to prohibit late fees that enable landlords to recoup the administrative costs and lost time value of money caused by defaulting tenants.

The City does not address these issues in its response brief. The Court should consider these points to be unrebutted and refuse to hear any arguments the City tries to make for the first time in its upcoming reply. *See Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d 871, 878 (D. Minn. 2007) ("[F]ederal courts do not, as a rule, entertain arguments made by a party for the first time in a reply brief.").

The illogical and discriminatory aspects of the Ordinance, which the City ignores, make the Ordinance unconstitutional. The Court should grant Plaintiffs' motion for partial summary judgment and deny Defendants' cross-motion for summary judgment on Counts I (Due Process Clause), IV (Contract Clause), V (Minn. Stat. § 471.9996), and VI (42 U.S.C. § 1983) of Plaintiffs' Complaint. The Court should also deny Defendants' cross-motion for summary judgment on Counts II and III (Takings Clause) because there are genuine disputes of material fact as to whether a taking has occurred that should be resolved at trial, not on summary judgment.

ARGUMENT[1]

I.   **The Court should grant Plaintiffs' motion for summary judgment and deny the City's cross-motion for summary judgment on Plaintiffs' Due Process claim.**

As explained more fully in Plaintiffs' opening brief, the Ordinance violates the Due Process Clause of both the United States and Minnesota constitutions. The Court should grant Plaintiffs' motion for summary judgment on this claim, deny the City's cross-motion, and strike down the Ordinance on Due Process grounds.

   a.   **The Ordinance must "substantially advance" its purpose to survive Due Process scrutiny**

Under existing precedent, the Ordinance satisfies the Due Process Clause only if it "substantially advances" its purpose. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005).[2] "The 'substantially advances' formula suggests a means-ends test: It asks, in

---

[1] Plaintiffs stand on their opening brief with respect to Count V of their Complaint for violation of Minn. Stat. § 471.9996. Plaintiffs will address the remaining claims below.

[2] Plaintiffs reserve the right to argue to the Supreme Court that heightened scrutiny should apply to Saint Paul's rent control Ordinance. A property owner's right to determine who can and cannot be on their property is "fundamental" to property ownership. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077 (2021); *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 728 (8th Cir. 2022); *Lamplighter Village Apartments LLP v. City of St. Paul*, 534 F. Supp. 3d 1029, 1036 (D. Minn. 2021). This right should be considered a fundamental right for the purposes of substantive due process. *See id.*; *cf. 301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27 F.4th 1377, 1385 (8th Cir. 2022) ("This court need not address whether the right to exclude is a fundamental right under substantive due process."). And this fundamental right to decide who can and cannot stay on an owner's property should include the owner's right to dictate the rent to be paid by people allowed on the property. If the Supreme Court agrees with Plaintiffs that the right to set the rental rate is a fundamental right under the Due Process Clause, then the City will need to show its rent control Ordinance is "narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). The City cannot meet this standard because, as explained below, the

essence, whether a regulation of private property is *effective* in achieving some legitimate public purpose." *Id.* (emphasis in original).

Although this test does not apply to takings claims, it does apply to substantive due process claims. *Id.* As the Supreme Court explained in *Lingle*, "An inquiry of this nature has some logic in the context of a due process challenge, for a regulation that fails to serve any legitimate governmental objective may be so arbitrary and irrational that it runs afoul of the Due Process Clause." *Id.* Justice Kennedy, in his concurrence, made clear that "[t]he failure of a regulation to accomplish a stated or obvious objective would be relevant to [whether a regulation might be so arbitrary or irrational as to violate due process]." *Id.* at 548-59 (Kennedy, J., concurring); *see also Pietsch v. Ward County*, 991 F.3d 907, 910 (8th Cir. 2021) (citing *Lingle*, 544 U.S. at 548-49).

The City's Ordinance is subject to the "substantially advances" test. The Court is required to consider whether the Ordinance "substantially advances" its stated purpose because the Supreme Court has decided that inquiry is relevant to determining the constitutionality of the Ordinance under the Due Process Clause. Applying this "mean-ends" test, the question before the Court is whether the Ordinance "is *effective* in achieving some legitimate public purpose." *Lingle*, 544 U.S. at 542 (emphasis added).

---

Ordinance is not narrowly tailored, and in fact reaches well beyond the interests it is supposed to serve.

### b. The Ordinance violates the Due Process Clause because it fails to substantially advance a legitimate purpose

The Ordinance fails this constitutional test. The Ordinance does not substantially advance a legitimate purpose. The patent ineffectiveness and illogic of the Ordinance make it "arbitrary, discriminatory and demonstrably irrelevant" to the City's purported policy goals. *Nebbia v. New York*, 291 U.S. 502, 539 (1934); *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988).

According to the City, the overarching purposes of the Ordinance are to (1) "alleviate excessive rents that outpace incomes," and (2) "ensure access to affordable housing given the present shortage of residential rental units in Saint Paul." (Dkt. #52 at 17.) But the Ordinance does not alleviate the perceived burden of tenants whose rents outpace their incomes. And the Ordinance does not increase the availability of "affordable housing."

Rent control cannot solve the society-wide problems that make housing unaffordable for certain individuals. Rent control discourages new construction, as the City admitted immediately after the Ordinance was enacted, so it does not increase the supply of housing. (Dkt. #36, Ex. 32.) Nor does rent control decrease the demand for housing. Demand for housing is driven by population growth, not rental rates, and capping rent does nothing to limit the number of people who need homes.

The theory behind rent control is that it could reduce the cost of housing, independent of supply and demand forces, but even there it misses the mark. The goal of rent control is not to limit rental rates across the board. A goal of that type would not be a

legitimate public interest. The supposed end goal of rent control is to make housing "affordable."[3] But whether housing is "affordable" depends on the financial wherewithal of a given tenant. Rent control does not increase any tenants' income. Rent control does not accelerate the growth of incomes that are being "outpace[d]" by increases in market rent. Rent control cannot impact the income side of the equation because landlords do not depress renters' incomes and have no power to increase renters' incomes such that they are better able to afford rent or any other living expense. On the expense side of the equation, landlords have a market incentive to keep rental rates "affordable." Charging rent that nobody can afford means no revenue for the landlord. Thus, landlords naturally charge rents that at least some individuals can afford. When a landlord charges rates that its renters can afford, there is no problem for the government to solve. Rent control at such properties simply puts more money in the pockets of renters who do not need it.

The unfortunate reality is that certain renters do not have enough income to afford even a modest amount of rent. This reality, however, is a society-wide income-disparity problem that landlords (especially landlords who do not house low-income renters) did

---

[3] The City cites a study from the University of Minnesota's Center for Urban and Regional Affairs ("CURA"), in which the authors found evidence that rent control can be effective in "maintaining below-market rent levels and moderating price appreciation." (Dkt. #53, Ex. 2 at 1.) But again, decreasing rent for everyone, including those who can already afford it, is not the City's goal. The City's goal is to increase the availability of "affordable" housing for those in need. The CURA study openly questions whether rent control in other cities has helped the neediest tenants. (*Id.* at 1, 24.) And Saint Paul's Ordinance is even further removed from its goals because it exempts properties legally designated as "affordable housing" for low- and moderate-income tenants. Amended Ordinance § 193A.08(a)(2). The City also refers to a stakeholder group that discussed the original Ordinance and some potential amendments. (Dkt. #53, Ex. 1.) The mere fact that the Ordinance was discussed does not make it rational or constitutional.

not cause and cannot be responsible for solving. If the City wants to address the income-disparity problem, then the City should bear the burden of any solution it enacts, rather than passing this responsibility onto landlords. The proper solution is not to limit landlords' rights to increase rent for tenants who can afford it. The City should instead spend its tax dollars to help specific renters whose incomes are too low or too stagnant. *See Pennell*, 485 U.S. at 21 (Scalia, dissenting) ("The traditional manner in which American government has met the problem of those who cannot pay reasonable prices for privately sold necessities – a problem caused by the society at large – has been the distribution to such persons of funds raised from the public at large through taxes, either in cash (welfare payments) or in goods (public housing, publicly subsidized housing, and food stamps).").

The rent control Ordinance at issue here does not rationally assist the renters in need of more "affordable" housing. The City conceded that the Ordinance will not rationally assist these renters when it wrote them out of the Ordinance. The Ordinance explicitly exempts properties legally designated as "affordable housing" for low- and moderate-income tenants, a fact the City completely ignores in its brief. Amended Ordinance § 193A.08(a)(2). Tenants in legally-designated "affordable housing" are the tenants who are most likely to have incomes that are "outpace[d]" by increases in market rent. Yet, they are illogically excluded from the protections of the Ordinance.

The Ordinance also exempts newly constructed properties for 20 years. The exemption covers properties that will be built in the future and properties that were built in the last 20 years. Thus, if a building is new or less than 20 years old, there is no cap on

8

what the landlord can charge its tenants. The landlord of such a building can increase rent as much as it wants, even if its tenants cannot afford the increased rate. *See* Amended Ordinance § 193A.08(a)(3). The City's supposed reason for amending the Ordinance to add this exemption was to spur development of housing that halted due to the original Ordinance. But the City had no basis to conclude that this exemption would encourage the development of any housing, much less <u>affordable</u> housing, beyond what would have occurred without the Ordinance. (*See, e.g.*, Dkt. #36, Exs. 31 and 33 (STP00133).)

The new construction exemption is also non-sensical because it applies to housing built up to 20 years <u>before</u> the Ordinance was enacted. Logically, exempting buildings that already exist will not encourage new construction. Exempting these buildings will serve only to provide one subset of landlords (those with newer buildings) an advantage over another set of landlords (those with older buildings) on a purely arbitrary basis that is untethered to any legitimate economic, safety or welfare interest of the City.

Limiting rent increases for older buildings, but not newer buildings, is especially irrational considering older buildings have higher expenses. The older a building gets, the more it costs to maintain the building. (Supplemental Declaration of Lisa Moe, submitted herewith ("Supp. Moe Dec."), ¶ 3.) When older buildings conduct significant renovations, they need to simultaneously pay for updates to comply with new building codes. (*Id.*) Although older buildings are more costly to own than newer buildings, the Ordinance makes it harder for owners of older buildings to recoup their costs through rental increases. Again, there is no rational basis to force owners of older buildings to shoulder such a disproportionate burden.

On its face, the Ordinance restricts rent increases <u>only</u> in older properties that are not designated as "affordable housing" for low- and moderate-income tenants. The bizarre distinctions the Ordinance draws – between new and old buildings and between lower and higher income tenants – make the Ordinance not only irrational, but discriminatory. *See Nebbia*, 291 U.S. at 539 (noting that a "discriminatory" law violates the Due Process Clause); *Pennell*, 485 U.S. at 11 (same). There is no rational reason, and the City identifies none, to distinguish between the rent that can be charged at a building constructed in the 1990's versus one constructed in the 2000's. There is no rational reason, and the City identifies none, to limit rent increases on middle- and upper-income tenants who can afford them, while not providing the same limits for low- and moderate-income tenants of legally-designated "affordable housing" who are the most in need.

The decisions in *Pennell v. City of San Jose*, 485 U.S. 1 (1988) and the other cases cited by Defendants do not save the Ordinance. None of those cases held that rent control is *per se* constitutional. *See id.* at 12 n.6 ("[W]e see no need to reconsider the constitutionality of rent control per se."). None of those cases dealt with a rent control ordinance that was as illogical and discriminatory as Saint Paul's Ordinance. Although the Ordinance is unconstitutional under existing case law, if the Court concludes that *Pennell* or any other binding precedent forces the Court to uphold the Ordinance, then Plaintiffs reserve the right to ask the Supreme Court to overturn those cases and strike down the Ordinance.

### c. The Ordinance also fails because the process for requesting a rent increase violates Due Process

A separate, independent reason to invalidate the Ordinance is that the procedures for landlords to request rent increases beyond 3% are prohibitively burdensome and destined to created unreasonable delay for landlords. *See Smith v. Illinois Bell Telephone Co.*, 270 U.S. 587, 591 (1926) ("Property may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them."). For similar reasons, in *Birkenfeld v. City of Berkeley*, 550 P.2d 1001 (Cal. 1976), the California Supreme Court followed United States Supreme Court precedent to strike down a rent control ordinance as unconstitutional under the Due Process Clause.

The City fails to identify any meaningful distinction between this case and *Birkenfeld*. The City lists differences between specific terms of the two ordinances and differences between the makeup of the governing bodies in charge of reviewing rent increases, but the City misses the big picture. The overarching issue in *Birkenfeld* was that the rent control ordinance at issue built in inherent delays to the resolution of requested rental increases. 550 P.2d at 1030-31. The Saint Paul Ordinance does the same thing.

As explained in Plaintiffs' opening brief, the Ordinance does not allow landlords to increase rents above 3% unless and until their application is finally resolved after all audit and appeal processes have been exhausted. Even if the City initially approves a rent increase, a tenant may appeal within 45 days, and the landlord cannot implement any rent

11

increase above 3% in the meantime. Amended Ordinance § 193A.07(g). Between the application and appeal process, it can take weeks or even months for the landlord to receive a final determination on its application. As the landlord waits for a resolution, the economic bases for the landlord's application may become moot. The City's final determination may no longer represent the landlord's current financial circumstances, yet the landlord will need to wait another 12 months to start the process all over again. During all these waiting periods, the landlord must sacrifice rent revenue and charge no more than 3% higher than last year's rent, even if the City ultimately concludes that a higher rate was necessary for the landlord to make a "reasonable rate of return."

In its brief, the City ignores the inherent delays and unpredictability built into the Ordinance. The City does not even try to address the fact that the Ordinance necessarily forces a landlord to charge less than a reasonable rental rate for months as they await the City's final determination. These unrebutted facts make the Ordinance unconstitutional under the Due Process Clause.

### d. Plaintiff's Due Process claim is actionable along with their other constitutional claims.

Plaintiffs can pursue their Due Process claim along with their other constitutional claims. The Supreme Court has held that the Due Process Clause and the Takings Clause provide different protections. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005). In *Lingle*, the Court considered the proper standard for reviewing a statute under the Takings Clause. The Court contemplated the possibility that the same statute could be scrutinized under the Due Process Clause, albeit under different standards and with

different results. In fact, the Court concluded that the Due Process analysis would

necessarily come first. As the Court explained,

> Instead of addressing a challenged regulation's effect on private property,
> the "substantially advances" inquiry [for Due Process claims] probes the
> regulation's underlying validity. But <u>such an inquiry is logically prior to
> and distinct from the question of whether a regulation effects a taking</u> . . . .
> [The Takings Clause] does not bar government from interfering with
> property rights, but rather requires compensation "in the event of otherwise
> proper interference amount to a taking." Conversely, if a government action
> is found to be impermissible – for instance because it fails to meet the
> "public use" requirement or <u>is so arbitrary as to violate due process – that is
> the end of the inquiry</u>. No amount of compensation can authorize such
> action.

*Id.* at 543 (italics in original; underlining added; citation omitted).

Here, the Court should first determine if the Ordinance violates the Due Process

Clause, which would result in invalidating the Ordinance entirely. If the Ordinance

survives that test, then the Court should decide if the Ordinance is subject to the Takings

Clause. If the Ordinance constitutes a taking, then the Ordinance will remain in place, but

Plaintiffs will be entitled to compensation. Plaintiffs' takings claim is an alternative claim

for which Plaintiffs seek alternative relief in the form of monetary compensation.

Plaintiffs' takings claim does not somehow preclude them from seeking to invalidate the

Ordinance under the separate Due Process Clause. *See Bettendorf v. St. Croix County*,

631 F.3d 421, 426 (7th Cir. 2011) (addressing both Takings Clause and Due Process

Clause claims on the merits); *Garlasco v. Stuart*, 602 F. Supp. 2d 396, 414 (D. Conn.

2009) ("[T]he Takings Clause does not subsume all substantive due process claims

[regarding real property]."). The same is true for Plaintiffs' Contract Clause claim. As the

City points out, the Contract Clause does not prohibit the Ordinance from impacting

future contracts that do not currently exist. By contrast, the Due Process Clause has no

such temporal limitation. The Due Process Clause can invalidate a regulation in all its

applications. The law does not force Plaintiffs to forego the broader protections of the

Due Process Clause in favor of the narrower protections of the Contracts Clause or

Takings Clause.

The Supreme Court did not foreclose Plaintiffs' Due Process claim in *Stop the*

*Beach Renourishment, Inc. v. Fla. Dep't of Ent. Prot.*, 560 U.S. 702 (2010). The decision

in that case was a plurality opinion, not a holding. *See generally id.* In his concurrence,

Justice Kennedy recognized that, regardless of whether a government action could

constitute a "taking," it "could be set aside as a deprivation of property without due

process of law." *Id.* at 548-49; *see also TZ Manor, LLC v. Daines*, 815 F. Supp. 2d 726,

735 n.5 (S.D.N.Y. 2011) (analyzing *Stop the Beach*).

This is the type of case Justice Kennedy described in *Stop the Beach* and *Lingle*.

Plaintiffs have a viable claim to invalidate the Ordinance under the Due Process Clause,

independent of their claims under other constitutional provisions. The Court should enter

summary judgment in Plaintiffs' favor, and against Defendants, on Plaintiffs' Due

Process claim (Count I).

## II.   The Court should grant Plaintiffs' motion for summary judgment and deny the City's cross-motion for summary judgment on Plaintiffs' Contracts Clause claim.

The Court should also grant Plaintiffs' motion for summary judgment and deny

the City's cross-motion on Plaintiffs' claim that the Ordinance violates the Contracts

Clause. As explained more fully in Plaintiffs' opening brief, courts currently apply a two-

prong test when reviewing legislation under the Contracts Clause: (1) whether the law "substantially impairs a contractual relationship"; and (2) whether the law "is drawn in an appropriate and reasonable way to advance a significant public purpose." *Heights Apartments*, 30 F.4th at 728. The Ordinance fails on both prongs.

### a. The Ordinance substantially impairs Plaintiffs' current leases with their tenants.

Despite what the City argues, the Ordinance impairs Plaintiffs' current leases, not just future leases. Plaintiffs' current lease agreements contemplate renewals and extensions when the initial lease term ends. (*See* Dkt. #34, Ex. A, § 1 (noting that payments are due on the first day of the month "while this Lease is in effect and during an extensions or renewals of this Lease"); Dkt. #41, Ex. B. at 4 (noting that the handbook and all addenda are executable "as part of this Lease Agreement and all future renewals of the Apartment Lease Agreement").) If the lease is extended or renewed after the initial term, the rental rate can increase, without requiring a completely new lease agreement to be executed. One Plaintiff's short-term leases, in particular, expressly allow for rent increases while the leases are still in effect. (*See* Dkt. #34, Ex. A, § 15 ("Management can change any terms of a bi-monthly Lease, **including the amount of rent**, by giving Resident written notice at least equal to the notice period." (emphasis added)).) Thus, the Ordinance impacts existing leases that provide for future rent increases.

In addition, the Ordinance appears to prohibit Plaintiffs from charging late fees under their current leases. As discussed in Plaintiffs' opening memorandum, because "rent" is defined broadly under the Ordinance, it could encompass late fees. If late fees

are included in "rent," then Plaintiffs are precluded from charging late fees on units for which they have already raised the rent at or above 3% since the enactment of the Ordinance. To use Defendants' own verbiage, the Ordinance "rewrote the terms of the existing leases" between Plaintiffs and their tenants by eliminating late fees.

These impairments go beyond "filling out paperwork," as the City sarcastically describes it. (Dkt. #52 at 48.) Rent is perhaps the most important aspect of any lease. Restricting Plaintiffs' rights to negotiate rent is a substantial impairment of their contracts. In addition, assuming late fees are covered by the Ordinance, eliminating them is a substantial impairment. Late fees are important because they encourage tenants to pay on time, and timely rent collections enable Plaintiffs to meet their own financial obligations. Late fees also compensate landlords for the lost time value of money and for the administrative cost of pursuing defaulting tenants. The City provides no counterargument to this point in its brief. The City simply ignores the late fee issue, as well as the short-term lease issue, conceding these are substantial impairments to Plaintiffs' leases.[4]

### b. The impairments to Plaintiffs' leases were not reasonably foreseeable.

The contractual impairments caused by the Ordinance were not reasonably foreseeable. The City tries to downplay the impairments by arguing that Plaintiffs operate in a "highly regulated market" and should have expected rent control, given the existence

---

[4] In its brief, the City did not take a position on whether "rent," as defined under the Ordinance, includes late fees. It would help for the City to clarify its position on this issue, both for the purposes of this case and for the edification of all landlords in Saint Paul.

of Minn. Stat. § 471.9996. But the City is rewriting Minnesota history and comparing our state to completely different markets.

Defendants rely on cases from East and West Coast states with large, densely populated cities, where some form of rent control has existed for several decades. (Dkt. #52 at 44-48 (citing cases)). These cases indicate that a landlord's expectations regarding regulation depend on the location. *See Kraebel v. New York City Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 403 (2d Cir. 1992) ("[W]e note that Kraebel is involved in a heavily regulated industry—rental of residential property *in New York City*—and cannot claim surprise that her relationships with certain tenants are affected by governmental action." (emphasis added)); *Southern Cal. Rental Hous. Assoc. v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 861-62 (S.D. Cal. 2021) (noting that "San Diego County landlords operate in a highly regulated industry" governed by "state and federal law," and that while the regulations halting evictions "could not have been predicted by landlords . . . [the regulations] followed the issuance of many similar regulations"); *Gallo v. Dist. of Columbia*, __ F. Supp. 3d __, 2022 WL 2208934, at *7 (D.D.C. June 21, 2022) (noting that "rent control laws have existed in the District [of Columbia] since 1974"); *Baptist v. Kennealy*, 490 F. Supp. 3d 353, 390 (D. Mass. 2020) ("[Landlord tenant relations have historically been heavily regulated *in Massachusetts*[.]" (emphasis added)); *Brontel, Ltd. v. City of New York*, 571 F. Supp. 1065, 1072 (S.D.N.Y. 1983), *aff'd sub nom. Rent*

17

*Control Mem. Corp. v. City of New York*, 742 F.2d 1439 (2d Cir. 1984) (discussing the foreseeability of rent control *in New York City*).[5]

While landlords in New York, California, Massachusetts or the District of Columbia may expect some form of rent control, the same cannot be said of landlords in Saint Paul, Minnesota. No Minnesota city <u>ever</u> had rent control before 2022. In fact, Saint Paul is the first city in the entire Midwest to adopt rent control.

Minnesota's rent control statute, Minn. Stat. § 471.9996, did not make rent control "reasonably foreseeable" in Saint Paul. The statute <u>prohibits</u> cities from enacting rent control <u>except</u> when voters of a home charter city approve it in a general election. For 38 years after this statute was passed in 1984, no rent control existed in Minnesota because no city invoked the exception for a voter-approved ballot measure. With that backdrop, the question is not whether Plaintiffs knew rent control was theoretically possible in Saint Paul. The question is whether such an ordinance, which had never previously passed in

---

[5] The cases Defendants cite are factually distinguishable for other reasons as well. (Dkt. #52 at 47-48.) For example, in *Interstate Marina Dev. Co. v. Cnty. of Los Angeles*, the court found that a Los Angeles rent control law did not substantially impair contracts because it "applie[d] to all residential landlords uniformly," and "[s]imilar treatment for those similarly situated is sufficient." 155 Cal. App. 3d 435, 449 (Cal. Ct. App. 1984). By contrast, the Saint Paul Ordinance does not explicitly "appl[y] to all residential landlords uniformly." The Ordinance exempts newer buildings and properties legally designated as "affordable housing" for low- and moderate-income tenants, but the Ordinance restricts all other residential rental properties. For the landlords who are subject to rent control, the Ordinance does not provide a predictable rent increase formula to ensure "similar treatment" for "similarly situated" landlords. Another inapposite case, *Kargman v. Sullivan*, involved a law that arose from an emergency housing situation during wartime. 582 F.2d 131, 133-34 (1st Cir. 1974) (citing *Block v. Hirsh*, 256 U.S. 135 (1921); *Marcus Brown Co. v. Feldman*, 256 U.S. 170 (1921)). Saint Paul was not experiencing a similar emergency when it passed the Ordinance.

any city in the Midwest, was "reasonably foreseeable." *See Assoc. of Equip. Manuf. v. Burgum*, 832 F.3d 727, 730-31 (8th Cir. 2019). There is no evidence Plaintiffs or any other landlords reasonably foresaw an unprecedented rent control measure in Saint Paul.

Defendants' reliance on *Heights Apartments* in this context is misplaced. *Heights Apartments* refers generally to the foreseeability of "regulations in the residential housing industry," but it does not address rent control specifically. Nothing in the opinion indicates that landlords should "expect new [rent control] laws to impact their contracts"—especially when rent control is preempted by Minnesota statute except in very narrow circumstances that had not occurred before Saint Paul implemented the Ordinance in 2022. *See Heights Apartments*, 30 F.4th at 729.

### c. The Ordinance is not appropriately drawn.

The Ordinance is not appropriately drawn for purposes of the Contracts Clause. The Contracts Clause provides "greater protection for contractual rights" than the "less searching" rational basis review standard. *Burgum*, 932 F.3d at 734. Since the Ordinance does not even survive rational basis review, as explained above, the Ordinance cannot comply with the Contracts Clause.

Moreover, even if the Ordinance satisfied rational basis review, the Ordinance still fails the second prong of the Contracts Clause analysis. The City's authority "to impose restrictions is not unlimited and judicial deference, even in an emergency or crisis . . ., does not mean wholesale judicial abdication." *Heights Apartments*, 30 F.4th at 730 (internal citations and quotations omitted). The City's "recitation of an important public interest, alone, may not necessarily be sufficient to overcome the Contracts Clause's

limitation." *Id.* at 731. Rather, to meet the requirements of the Contracts Clause, the City must show the Ordinance is "reasonably tailored" to the City's stated interest. *Id.*

The Ordinance is unconstitutional because it goes beyond what is "reasonable" or "appropriate" to address the City's goal of increasing the availability of affordable housing. *See id.* (deciding plaintiff pled a viable Contracts Clause challenge to an eviction moratorium because it protected behaviors that undermined the purpose of the moratorium). For example, the Ordinance is not targeted at tenants of "affordable housing." The Ordinance limits rent increases for middle- and upper-income tenants who can afford market rent increases and do not need protection. This is another fact the City ignores in its brief.

The Ordinance also unconstitutionally discriminates between landlords. While the Contracts Clause does not forbid the State from "regulating health, safety, and morals," the line has been drawn at "efforts to redistribute resources in violation of a vested contractual right." *Burgum*, 932 F.3d at 731-32 (internal citations and quotations omitted). Indeed, legislation that "applied only to certain employers" has been found in violation of the Contracts Clause. *Id.* (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 324, 248 (1978)). Here, the Ordinance applies only to certain landlords – those with older buildings not legally designated as "affordable housing." Landlords who own newer buildings (built up to 20 years before they apply for a rent increase) or legally-designated "affordable housing" for low- and moderate-income tenants are exempt from the Ordinance and do not experience the same contractual impairment. The City cannot seriously argue that its Ordinance is "reasonably" tailored when it applies to landlords

with the highest income tenants, but not landlords with the lowest income tenants who are the most in need of "affordable housing." The City also cannot seriously argue that its Ordinance is "appropriately" tailored when it applies to a landlord with a building constructed in 2001, but not to a similar landlord with a building constructed in 2003.

The Ordinance crosses the boundaries set by the Contracts Clause and should be declared unconstitutional. The Court should grant summary judgment in Plaintiffs' favor, and against Defendants, on Count IV of Plaintiffs' Complaint.

## III. The Court should grant Plaintiffs' motion for summary judgment and deny the City's cross-motion for summary judgment on Plaintiffs' Section 1983 claim.

The Court should also enter summary judgment for Plaintiffs and against Defendants on Plaintiffs' claim under 42 U.S.C. § 1983 (Count VI). The City does not dispute that Section 1983 covers Plaintiffs' Due Process challenge to the Ordinance. The City argues only that Plaintiffs may not pursue a Section 1983 claim based on the Contracts Clause. But the City is wrong.

Although the Eighth Circuit has not explicitly decided this question, "there have been cases in this circuit in which such a cause of action has been asserted." *Heights Apartments*, 30 F.4th at 727-28 (citing *Justice Network Inc. v. Craighead Cnty.*, 931 F.3d 753, 758 (8th Cir. 2019); *Int'l Ass'n of Fire Fighters, Local 2665 v. City of Clayton*, 320 F.3d 849, 850 (8th Cir. 2003)). The Court should follow this line of cases and conclude

Plaintiffs have a valid Section 1983 claim based on the Contracts Clause, as well as the Due Process Clause.[6]

## IV. Genuine issues of material fact exist that prevent the Court from entering summary judgment on Plaintiffs' Takings Clause claims.

While the Court should enter summary judgment in Plaintiffs' favor and against Defendants on most of Plaintiffs' claims, Plaintiffs' takings claims (Counts II and III) are the exceptions. Genuine disputes of material fact (e.g., the diminution in value of Plaintiffs' properties) preclude summary judgment on Plaintiffs' takings claims. The Court should deny Defendants' motion for summary judgment on these two claims and allow them to proceed to discovery and trial.

### a. The Ordinance constitutes a regulatory taking under the *Penn Central* factors.

The Ordinance is an unconstitutional regulatory taking under both federal law and Minnesota state law. Under federal law, regulatory takings occur in two instances: (1) when the regulation "denies all economically beneficial or productive use of the land"; or (2) when the regulation does not result in a complete deprivation of economic use of the land, but still "goes too far." *See Comm. Housing Improv. Program v. City of New York*, 492 F. Supp. 3d 33, 46 (E.D.N.Y. 2020) (citing *Palazzolo v. Rhodes Island*, 533 U.S.

---

[6] The City cites *Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017), a case outside the Eighth Circuit, but that decision relies on a 137-year-old Supreme Court case that involved "a question about pleading and not about whether the plaintiff could bring a claim under the Contract Clause." *Heights Apartments*, 30 F.4th at 727-28 (citing *Dennis v. Higgins*, 498 U.S. 439, 541 n.9 (1991); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 n.29 (1979).)

606, 617 (2001); *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). The Ordinance fits

the second category of regulatory takings.

To determine whether a regulation "goes too far" such that it amounts to a taking,

courts typically apply the factors established in *Penn Cent. Transp. Co. v. City of New*

*York*, 438 U.S. 104 (1978). The *Penn Central* factors examine: (1) the economic impact

of the regulation on the landowner; (2) the extent to which the regulation has interfered

with reasonable investment-backed expectations; and (3) the character of the

governmental action in question. 438 U.S. at 124. The *Penn Central* test is designed to

"prevent the government from 'forcing some people alone to bear public burdens which,

in all fairness and justice, should be borne by the public as a whole.'" *Heights*

*Apartments*, 30 F.4th at 734 (citing *Palazzolo*, 533 U.S. at 618.)

"Whether a particular restriction amounts to a taking depends on the

circumstances of each case." *Outdoor Graphics, Inc. v. City of Burlington*, 103 F.3d 690,

694 (8th Cir. 1996). As noted by Defendants, a *Penn Central* analysis involves an "ad

hoc, factual inquiry." (Defs' Mem. at 32 (citing *Hawkeye Commodity Promotions, Inc. v.*

*Vilsack*, 485 F.3d 430, 441 (8th Cir. 2007). Here, application of the *Penn Central* factors

demonstrate that the Ordinance constitutes a regulatory taking.

As to the first *Penn Central* factor, the Ordinance has adverse economic impacts

on Plaintiffs. For example, the value of Plaintiffs' properties in Saint Paul have

drastically decreased due to the Ordinance. Courts measure diminution in value by

"compar[ing] the value that has been taken from the property with the value that remains

in the property" through consideration of "the parcel as a whole." *Keystone Bituminous*

*Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) (citing *Penn Cent.*, 438 U.S. at 130-31). One study shows that, citywide, Saint Paul property values have dropped by 6-12% because of the Ordinance. (Supplemental Declaration of Kathryn E. Campbell ("Campbell Supp. Dec."), Ex. 39.) And Plaintiffs have suffered more than the average property owner. By one Plaintiff's calculation, its property value has decreased by 56%. (Dkt. #41, ¶ 11.) Expert analysis, which is not yet due under the Court's Scheduling Order or Rule 26, will further refine the calculation of Plaintiffs' lost property values. (Declaration of Robert Strachota, submitted herewith ("Strachota Dec."); Supp. Moe Dec., ¶ 4.)[7]

While decreased property values are important, they are not the only economic impacts Plaintiffs have felt from the Ordinance. For example:

- The Ordinance makes Plaintiffs' properties more difficult to sell. (Dkt. #34, ¶ 9 (referring to the negative impact on "marketability"); Dkt. #41, ¶ 11 (same).) Real estate brokers have told one Plaintiff that they would not recommend selling rental properties in Saint Paul as long as the Ordinance remains in place. (Dkt. #34, ¶ 9.)

- The Ordinance appears to prohibit Plaintiffs from charging late fees, which encourage timely payment of rent and compensate landlords for delayed payments. (Dkt. #34, ¶¶ 18-22; Dkt. #41, ¶¶ 18-20.)

- The Ordinance prohibits Plaintiffs from increasing rent more than once per year on short-term rental units, or charging a premium rate on those units, as Plaintiffs would otherwise do. (Dkt. #34, ¶¶ 12-17; Dkt. #41, ¶¶ 14-17.)

---

[7] The parties have not engaged in any discovery about the economic impacts Plaintiffs have suffered from the Ordinance. In fact, Defendants chose not to request any discovery at all before moving for summary judgment. Additional discovery and expert review will be necessary to reveal the full economic impact of the Ordinance. Until that discovery and expert analysis is complete, the Court should not even consider Defendants' summary judgment motion on Plaintiffs' takings claims. *See* FRCP 56(d).

- The Ordinance restricts Plaintiffs' ability to freely negotiate rent based on the changing needs of Plaintiffs and their tenants, and exposes Plaintiffs to <u>criminal liability</u> if they increase rent in a manner that is not approved by the City, even if the increase is acceptable and affordable to the tenants.

- The Ordinance does not guarantee Plaintiffs will be able to charge rent to cover their expenses. For example, property taxes in Saint Paul for residential apartment buildings are expected to increase on average by 6.5% in 2023. (Campbell Supp. Dec., Ex. 40.) But the Ordinance prohibits Plaintiffs from implementing a corresponding rent increase to help them meet their growing tax burdens, without the City's approval. At best, the Ordinance allows the City to consider Plaintiffs' costs when reviewing an application for a rent increase, but Plaintiffs cannot be assured the City will approve a rent increase sufficient to meet Plaintiffs' added expenses, especially if their expenses increase by significantly more than 3%.

In short, the Ordinance restricts Plaintiffs' ability to collect rent, cover their costs, manage their properties according to their existing lease agreements, or sell their properties. These economic harms, standing alone or in combination with the diminution in Plaintiffs' property values, satisfy the first *Penn Central* factor.

As to the second *Penn Central* factor, the Ordinance has interfered with Plaintiffs' investment-backed expectations. When Plaintiffs bought their respective properties, there was no rent control legislation in place that would limit Plaintiffs' abilities to freely raise rents in accordance with market and other financial conditions. Plaintiffs did not expect such legislation to be implemented in Saint Paul, in particular because rent control had never been passed anywhere in the Midwest. The possibility of Saint Paul becoming the first city in the region to impose rent control was not factored into Plaintiffs' investment decisions or the purchase prices Plaintiffs paid for their properties. (Dkt. #41 ¶ 9; Dkt. #34 ¶ 4.) Plaintiffs' situation is nothing like landlords in, for example, New York, who bought rental properties "against a backdrop of New York law that suggested the [rent

control legislation] could change." *Community Housing*, 492 F. Supp. 3d at 51 (internal

citations and quotations omitted).

As to the third *Penn Central* factor, the character of the Ordinance supports a

finding that it constitutes a regulatory taking. Although the first two factors are "primary"

to the analysis, this third factor "may be relevant in determining whether a taking has

occurred." *Lingle*, 544 U.S. at 538-39. Applying the third factor here, the Ordinance has

the character of a taking because it severely constricts a fundamental aspect of owning

rental properties: the ability to negotiate and adjust rent. The Ordinance is more than just

a "public program adjusting the benefits and burdens of economic life to promote the

common good." *See Penn Centr.* 438 U.S. at 124. As explained in the Due Process

argument above, the Ordinance does not promote the "common" good, and it does not

apply equally to all landlords or all tenants. Rather, the Ordinance forces certain

landlords "'alone to bear public burdens which, in all fairness and justice, should be

borne by the public as a whole.'" *Heights Apartments*, 30 F.4th at 734 (citing *Palazzolo*,

533 U.S. at 618.) That makes the Ordinance a regulatory taking under the United States

Constitution.

### b. Defendants do not address Plaintiffs' Takings Clause claim under the Minnesota Constitution.

In addition to bringing a Takings Clause claim under the United States

Constitution, Plaintiffs have brought a separate Takings Clause claim under the

Minnesota Constitution. The two claims require their own analyses, but Defendants do

not address Plaintiffs' state law takings claim in their brief. That is reason enough to deny Defendants' motion as to this claim.

Article 1, Section 13 of the Minnesota Constitution provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation therefore, first paid or secured." Minn. Const. art. I, § 13. The Minnesota Constitution provides broader protections than the United States Constitution regarding the taking of private property. *DeCook v. Rochester Int'l Airport Joint Zoning Bd.*, 796 N.W.2d 299, 301 (Minn. 2011). "[E]ven if a takings claim fails under the United States Constitution based on a *Penn Central* analysis, the property owner may be entitled to compensation under the Minnesota Constitution, based on its more restrictive language." *Interstate Cos., Inc. v. City of Bloomington*, 790 N.W.2d 409, 413 (Minn. Ct. App. 2010) (citing *Johnson v. City of Minneapolis*, 667 N.W.2d 109, 115 (Minn. 2003)).

While Minnesota law recognizes the principles of the *Penn Central* factors, Minnesota courts apply them differently. *See McShane v. City of Faribault*, 292 N.W.2d 253, 258-59 (Minn. 1980), *abrogated on other grounds by DeCook v. Rochester Int'l Airport Joint Zoning Bd.*, 811 N.W.2d 610 (Minn. 2012). In *McShane*, Minnesota Supreme Court "distinguished between general zoning regulations (arbitration regulations) and regulations to benefit a specific public of governmental enterprise (enterprise regulations)." *See Interstate Cos.*, 790 N.W.2d at 413 (citing *McShane*, 292 N.W.2d at 258). The court concluded that "where land use regulations . . . are designed to benefit a specific public or governmental enterprise, there must be compensation to landowners whose property has suffered a substantial and measurable decline in market

value as a result of the regulations." *McShane*, 292 N.W.2d at 258-59. Here, Plaintiffs have demonstrated a substantial decline in the market value of their properties as a result of the Ordinance. (Dkt. #41 ¶ 11.) At a minimum, this valuation issue requires further expert analysis and presents a question of fact more suitable for trial than summary judgment. (*See* Moe Supp. Dec. ¶ 4; Strachota Dec.)

Regarding investment-backed expectations, the Minnesota Supreme Court has held that, although not conclusive, "existing and permitted uses of the property when the land was acquired generally constitute the primary expectation of the landowners regarding the property." *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 637 (Minn. 2007). As discussed above, at the time Plaintiffs purchased their respective properties, Plaintiffs reasonably expected to be able to freely negotiate and set rents.

As for the character of the regulation, the Minnesota Supreme Court has held that "an important consideration involves whether the regulation is general in application or whether the burden of the regulation falls disproportionately on relatively few property owners." *Wensmann*, 734 N.W.2d at 639. Here, the burdens of the Ordinance fall on some, but not all, Saint Paul landlords. Notably, and as discussed in-depth throughout this memorandum, the Ordinance excludes landlords of newly-constructed rental properties and landlords of properties legally designated as "affordable housing." *See id.* 734 N.W.2d at 640 ("This is not a situation where numerous property owners are subject to the same kind of a land use restrictions, and a single property owner is asking the city to allow a new, different use. Instead, it appears that only a few private property owners in the city are subject to the [regulation].").

28

On the balance, these factors weigh in favor of Plaintiffs' regulatory takings claim under Minnesota law. The fact-specific nature of these factors also demonstrates that summary judgment is inappropriate. The Court should therefore deny Defendants' motion for summary judgment on Plaintiffs' Takings Clause claims.

### c.   Prior cases upholding rent control legislation should be overturned.

Although Plaintiffs' takings claims are supported by existing precedent, Plaintiffs contend that prior cases upholding rent control were wrongly decided. If the Court concludes that any of these cases preclude Plaintiffs' takings claims here, Plaintiffs reserve the right to ask the Supreme Court to overturn them.

In *Block v. Hirsh*, 256 U.S. 135 (1921), the Supreme Court reviewed rent regulation in the District of Columbia that was passed during World War I. 256 U.S. at 154. The rent control legislation was held constitutional because it was enacted to deal with a wartime emergency housing shortage. *Id.* at 156-57. While the Supreme Court upheld a rent control measure in that narrow context, the court noted that such legislation could go too far: "For just as there comes a point at which the police power ceases and leaves only that of eminent domain, it may be conceded that regulations of the present sort pressed to a certain height might amount to a taking without due process of law." *Id.* at 156. The Supreme Court distinguished between permanent and temporary regulations, noting that "[a] limit in time, to tide over passing trouble, well may justify a law that could not be upheld as a permanent change." *Id.* at 157. The Supreme Court's analysis suggests that, absent an emergency and absent a time limit, rent control may not have been constitutional. *See id.*

In the century since *Block* was decided, rent control legislation has crossed the "point at which the police power ceases and leaves only that of eminent domain." *Id.* It is time to revisit the constitutional boundaries of rent control. Rent control should be considered unconstitutional except as necessary to provide temporary relief during wartime or other imminent housing emergencies. Dissenting opinions from more recent cases provide guidance on how to analyze rent control from this standpoint.

In *Fresh Pond Shopping Serv., Inc. v. Callahan*, 464 U.S. 875 (1983), Justice Rehnquist questioned the constitutionality of rent control in his dissent. *Id.* at 875-78 (Rehnquist, J., dissenting). Specifically, Justice Rehnquist questioned the "emergency" warranting the rent control legislation in Massachusetts, noting that "the very fact that there is no foreseeable end to the emergency takes this case outside the Court's holding in *Block v. Hirsh*, 256 U.S. 135 (1921)." *Id.* at 878. As discussed by Justice Rehnquist, the rent control statute in *Block* was held constitutional because it "was enacted to deal with a wartime emergency housing shortage." *Id.* (citing *Block*, 256 U.S. at 157). With respect to peacetime rent control legislation, Justice Rehnquist concluded that "although we upheld a regulatory scheme in *Block* that is remarkably similar to that presently in force in the City of Cambridge, we reserved judgment as to whether such a regulatory scheme would be unconstitutional if it were made part of a permanent scheme. The Cambridge rent control ordinance presents the question thus reserved." *Id.*

Justice Rehnquist also considered the rent control legislation at issue to infringe on a landlord's fundamental property rights. As Justice Rehnquist wrote:

> In previous decisions we have recognized that property ownership carries with it a bundle of rights, including the right "to possess, use, and dispose of it." Though no issue is raised here, that the rent paid by the tenant is insufficient, that fact does not end the inquiry. What has taken place is a transfer of control over the revisionary interest retained by appellant. This power to exclude is "one of the most treasured strands in an owner's bundle of property rights, . . . [because] even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger that would ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property." . . . Nothing in the rent control provision requires the Board to compensate appellant for the loss of control over the use of its property.

*Id.* at 878 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 485 U.S. 419, 435-36

(1982).

Several years later, in *Pennell v. San Jose*, 485 U.S. 1 (1988), Justice Scalia and

Justice O'Connor further questioned the general constitutionality of rent control in the

context of a Takings claim. In their dissent, Justice Scalia wrote:

> The traditional manner in which American government has met the problem of those who cannot pay reasonable prices for privately sold necessities—a problem caused by the society at large—has been the distribution to such persons of funds raise from the public at large through taxes, either in cash (welfare payments) or in goods (public housing, publicly subsidized housing, and food stamps). Unless we are to abandon the guiding principles of the Takings Clause that public burdens . . . should be borne by the public as a whole, . . . this is the only manner that our Constitution permits. The fact that government acts through the landlord-tenant relationship does not magically transform general public welfare, which must be supported by all the public, into mere "economic regulation," which can disproportionately burden particular individuals.

*Id.* at 21-22 (Scalia, J., dissenting). Justice Scalia considered the "unfairness of making

one citizen pay, in same fashion other than taxes, to remedy a social problem that is none

of his creation." *Id.* at 23. Justice Scalia also emphasized that price regulations are only

warranted in extreme circumstances of free-market abuse; under this theory, the abuse of

some landlords of the free-market system would not justify the imposition of regulations on all landlords. *Id.* at 20-22.

Throughout their brief, Defendants have taken the position that rent control legislation, like the Ordinance, is *per se* constitutional based on precedent establishing the constitutionality of rent control. But such a position runs contrary not only to the foundation of a Takings analysis—namely, that the government should be barred from forcing some people to bear public burdens which, in all fairness and justice, should be borne by the public as a whole—but also to the original idea that rent control legislation was <u>temporarily</u> warranted during times of war, rather than permanently warranted during times of peace. Plaintiffs reserve the right to request that the Supreme Court, in line with the dissents in *Fresh Pond* and *Pennell* and otherwise, overturn precedent upholding rent control legislation that in any way resembles Saint Paul's Ordinance.

## CONCLUSION

Plaintiffs are not asking the Court to act as a "super-legislature," as Defendants put it. Plaintiffs are asking the Court to enforce the boundaries created by the Constitution. The Ordinance falls outside those constitutional boundaries. The Court should grant Plaintiffs' motion for partial summary judgment, deny Defendants' cross-motion, and declare the Ordinance unconstitutional.

Dated:  November 28, 2022

**ANTHONY OSTLUND LOUWAGIE
DRESSEN & BOYLAN P.A.**

 *s/ Philip J. Kaplan*
Joseph W. Anthony (#2872)
janthony@anthonyostlund.com
Philip J. Kaplan (#389351)
pkaplan@anthonyostlund.com
Kathryn E. Campbell (#402631)
kcampbell@anthonyostund.com
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone:  (612) 349-6969

**ATTORNEYS FOR PLAINTIFFS**