UNITED STATES DISTRICT COURT
*for* THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **WOODSTONE LIMITED PARTNERSHIP; LOFTS AT FARMERS MARKET LLC;** | Court File No. 22-CV-1589 NEB-JFD |
| *Plaintiffs,* | |
| *vs.* | |
| **CITY OF SAINT PAUL, MINNESOTA, A MINNESOTA CHARTER CITY; CITY COUNCIL OF THE CITY OF SAINT PAUL; ANGIE WIESE, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE DEPARTMENT OF SAFETY AND INSPECTIONS OF THE CITY OF SAINT PAUL; MAYOR MELVIN CARTER, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF SAINT PAUL; AND JOHN DOE,** | **CITY OF SAINT PAUL DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR  SUMMARY JUDGMENT** |
| *Defendants.* | |

## INTRODUCTION

Plaintiffs' opposition to Defendants' motion for summary judgment, offers numerous jumbled, but unavailing, arguments.  None of Plaintiffs' arguments-- which alternatively misstate the applicable law, rely on non-existent or conclusory and speculative facts, and require the court to act legislatively and weigh policy considerations-- can overcome the long history of legal precedent finding rent control constitutional.

In fact, it is undisputed that the City's Rent Stabilization Ordinance, which limits the amount of a rental rate increase on residential housing, is constitutional under existing law.  The Ordinance easily meets the rational basis standard to survive Plaintiffs' due process claim because rent control in the form of capping rental increases has consistently been held to be rationally related to protecting consumer welfare and ensuring access to affordable housing.  Similarly, the ordinance does not constitute a regulatory taking under either the federal or Minnesota constitutions as it is an economic regulation adjusting the burdens and benefits of economic life, not a regulation that is functionally equivalent to a traditional taking where the government directly appropriates private property or ousts the owner.  Finally, Plaintiffs' claim for contractual impairment under the Contracts Clause fails because the ordinance only impacts future contracts, and to the extent it could be stretched to possibly cover terms in an existing contract, any impairment is not substantial enough to be unconstitutional.  Indeed at various points throughout their opposition, Plaintiffs' concede that rent control which acts as a price control is constitutional under existing law and they would be required to overturn multiple U.S. Supreme Court decisions to prevail on their claims.  For all of these reasons, this Court can and should grant summary judgment to Defendants.

## ARGUMENT

**A.    Plaintiffs' Due Process claim fails because the City's RSO is constitutional under existing law, meets the rational basis standard, and because Plaintiffs' claim requires this Court weigh policy consideration and act legislatively, which the court cannot do.**

Plaintiffs make several arguments against the City's Rent Stabilization Ordinance ("RSO") and its amendments in their claim that the RSO violates due process, but they ultimately concede that under existing U.S. Supreme Court precedent, rent control, as a form of price control, is constitutional.  (Pltffs.  Memo, p. 10.)  For this Court, the current United States and Eighth Circuit precedent control for our analysis.  Thus, *Pennell* and *Yee* and related cases govern, and this Court's analysis can end here.

Regardless, even if this Court reviews Plaintiffs' arguments alleging a violation of due process, they are unpersuasive for several reasons: Plaintiffs misstate the law, fail to provide evidentiary support for their arguments (or base them on speculative, conclusory assertions), and ask this Court to act as legislators weighing the relative benefits and efficacy of ordinances adopted by the City.

Plaintiffs' misstate the applicable standard of review for their due-process claim when they insist that under *Lingle v. Chevron*, the standard is whether the City's ordinance "substantially advances" its purpose as though this is a higher standard than the rational basis test.

(Doc. 63, pp. 4-5, *citing Lingle v. Chevron*, 540 U.S. at 542.)  Although the Court in *Lingle* noted that a substantially advances test may have "[s]ome logic in the context of a due process challenge," the court was not stating a new heightened standard of review for due process claims.  *Id.* at 542.  As it applies to due process claim, the substantially advances test is in essence the rational basis test.  *See e.g. Kentner v. City of Sanibel*, 750 F.3d 1274, 1280–81 (11th Cir. 2014) (holding that substantive due process claims not involving fundamental rights are reviewed under the "rational basis" standard and refusing to create a new heightened standard of review based on the substantially advances language in *Lingle*); *Iowa Assurance Corp. v. City of Indianola, Iowa*, No. 4:07-CV-000581-RAW, 2009 WL 10666377, at *12 (S.D. Iowa Dec. 4, 2009) (recognizing that substantive due process claims are reviewed under the rational basis standard, which is "akin to the 'substantially advances' formula discussed by the U.S. Supreme Court in *Agins* and *Lingle*").

Indeed, *Lingle* reiterated that the rational-basis standard of review applies to due-process claims.  *Id.* at 545.  The Court found that the lower court had erred when it considered whether a regulation capping rental rates for gas stations would "actually achieve its objectives" and reiterated that it has "long eschewed such heightened scrutiny when addressing substantive due process challenges to government

4

regulation." *Id.*  In reaching this conclusion, the Court cited to its prior decisions in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978)[1] and *Ferguson v. Skrupa*, 372 U.S. 726 (1963)[2] and emphasized that the "reasons for deference to legislative judgments about the need for, and likely effectiveness of, regulatory actions are by now well established." Thus, it is clear that the standard applicable to a due process claim is the well-established, most-deferential, rational basis standard.  *Id.* at 545.

Under the rational basis standard, a court's consideration of a substantive due process challenge ends when there are plausible reasons for the governmental action.  *Birchansky v. Clabaugh*, 955 F.3d 751, 757 (8th Cir. 2020) "The law's rational relation to a state interest need only be conceivable, and supporting empirical evidence is unnecessary." *Id.* Moreover, "courts [a]re not required to consider the legislature's stated purpose as long as the law could rationally further some legitimate government purpose[.]" *Id.*   It is undisputed that the City's RSO which

---

[1] *Exxon*, 437 U.S. at 124 (finding substantive due process claim merited little discussion because, although evidence presented may cast some doubt on the economic wisdom of the statute, it was "absolutely clear that the Due Process Clause does not empower the judiciary to sit as a 'superlegislature to weigh the wisdom of legislation'").

[2] *Ferguson*, 372 U.S. at 731 (recognizing that it has long been the law that "courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws" and reiterating that courts are not concerned "with the wisdom, need, or appropriateness of the legislation [and] Legislative bodies have broad scope to experiment with economic problems").

seeks to cap residential rental rate increases is rationally related to the legitimate government interest of protecting consumer welfare and "preventing excessive and unreasonable rent increases caused by the growing shortage of and increasing demand for housing[.]" *Pennell*, 485 U.S. at 11; *see also 301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 1386 (8th Cir. 2022) ("ensuring that citizens have access to affordable housing is undoubtedly a legitimate governmental objective").

For these same reasons, Plaintiffs' lengthy discussion of the "goals" of rent control and their unsupported opinions as to the efficacy of rent control do not establish the lack of a rational basis for the City's RSO.[3] On the contrary, Plaintiffs' arguments support that there is a rational relationship between the RSO and the legitimate government purpose of limiting excessive rents and ensuring access to affordable housing. Plaintiffs arguments make it clear that they are asking this Court to consider the economic wisdom of the RSO and act as a "superlegislature."

Similarly, Plaintiffs mischaracterize the law when they assert that a subsequent amendment to the RSO, which exempts affordable housing

---

[3] *See e.g.* Doc. 63, p. 6: "Demand for housing is driven by population growth, not rental rates, and capping rent does nothing to limit the number of people who need homes.  The theory behind rent control is that it could reduce the cost of housing,
independent of supply and demand forces, but even there it misses the mark."

units from the ordinance, is unconstitutional because it does not "rationally assist" the goal of rent control. Plaintiffs are using the term "rational," not in the legal definition of being "rationally related," but instead in the general meaning of not being logical or reasonable (in their opinion). First, as discussed above, legally and constitutionally, rent control is "rationally related" to the legitimate purpose of protecting consumer welfare and ensuring access to affordable housing. Second, although it is not determinative of constitutionality, it does "make sense" and is "rational" that the City exempted affordable housing from the RSO ordinance because affordable housing units already have their rental rate increases capped via other federal, state and contractual regulations. (193A.08(a)(2); 24 C.F.R. § 982 subp. K (outlining federal obligations to pay a certain percentage of rent for low-income renters); *Thompson v. St. Anthony Leased Housing Associates II, LP*, 979 N.W.2d 1 (Minn. 2022) (discussing Bond Allocation Act, which restricts the maximum rent that a developer may charge for 20 percent of the units as established by the federal Department of Housing and Urban Development).

Finally, it is worth noting that Plaintiffs fundamentally misunderstand the issue to be decided by this Court as it pertains to the RSO when they confuse the "right to exclude" persons from property with rental price control which caps rental rate increases for the use of property. For example, Plaintiffs argue that the right to exclude is a

7

fundamental property right and that "this fundamental right to decide who can and cannot stay on an owner's property should include the owner's right to dictate the rent to be paid by people allowed on the property." (Doc. 63, p. 4, n. 2.)  In addition, Plaintiffs further rely on the dissent in a U.S. Supreme Court case from 1983 to claim that "rent control" infringes on property owner's fundamental property rights and should now be overturned by the Supreme Court.  (Pltffs Mem., p. 30 discussing *Fresh Pond Shopping Ctr., Inc. v. Callahan*, 464 U.S. 875 (1983)).  In *Fresh Pond*, however, the rent control provision being discussed by the dissent involved the City's regulation prohibiting landlords from evicting tenants.  *Fresh Pond* 464 U.S. 875 at 876–77.  In fact, the eviction prohibition was the aspect Justice Rehnquist was criticizing when he "questioned the constitutionality of rent control" as discussed in Plaintiffs' memorandum.  The U.S. Supreme Court has recently confirmed that the right to exclude is a fundamental element of property rights that can amount to a physical taking of property in certain situations.  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077 (2021).  Rent control limiting the right to exclude, however, is wholly separate from rent control that caps rental rate increases—restricting the amount of yearly rent increases is merely price control which has been repeatedly recognized as constitutional.  *See Yee v. City of Escondido, Cal.*, 503 U.S. 519, 529 (1992) (citing *Pennell*, 485 U.S. at 12, n. 6)

("When a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge").[4]  For these reasons, the RSO does not violate due process and the City is entitled to summary judgment.

## B.   Plaintiffs' Contracts Clause claim fails because they have failed to establish substantial impairment.

### 1. Plaintiffs Contracts Clause claim fails because there is no substantial impairment where they rely on speculative *possible* future-facts to trigger a violation.

In our previous *Memo*, the City explained that the Contracts Clause did not apply to the Plaintiffs' because the Clause only applies to current—not future—leases. Since the City's rent-control ordinance would only impact Plaintiffs' future leases, the was no Contracts Clause claim here. *Greene v. Dayton*, 81 F. Supp. 3d 747, 752 (D. Minn.), *aff'd*, 806 F.3d 1146 (8th Cir. 2015). Plaintiffs do not argue this point; instead their only argument is to offer a possible hypothetical situation where their current leases may be impacted. They write, "If the lease is extended or renewed after the initial term, the rental rate can increase, without requiring a completely new lease agreement to be executed." (Doc. 63, p. 15).

---

[4] It is also worth noting that the *Fresh Pond* dissent was done well before the decisions in *Yee* and *Pennell*.

First, this is a place where Plaintiffs' imprecision about whether their case is a facial or an as-applied challenge causes serious confusion. The City assumes Plaintiffs are leveling a facial challenge based on the wording in their pleadings. *See, e.g.*, (Doc. 1 at ¶ 249) ("The Ordinance is therefore on its face unconstitutional."); (*Id.* at ¶ 290) ("Pursuant to 28 U.S.C. § 2201, the Court should issue a binding declaration that the Ordinance constitutes an unconstitutional taking in violation of the Takings Clause of the United States Constitution and enjoin the Ordinance."); (*Id.* at ¶ 323) ("Accordingly, the Ordinance violates the Contracts Clause and Article I, Section 11 of the United States and Minnesota Constitutions, respectively."); (*Id.* at ¶ 340).

But a facial challenge means the City's rent-control ordinance is unconstitutional in *every single* situation—that is, there is no factual scenario where the law is constitutional. *Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442, 449, (2008) (explaining "a plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which" a law "would be valid, *i.e.,* that the law is unconstitutional in all of its applications"). Even if we assume that a provision allowing a landlord to increase rents by proving written notice is an "existing contract," Plaintiffs' argument concedes that there are leases without such a provision that would be constitutional.

They write that although the ordinance does not necessarily affect all current leases, it could affect *some* current leases "[i]f the lease is extended or removed…" (Doc. 63, p. 15). But the possibility of affecting *some* current leases *if* those leases are renewed necessarily means there is at least one current lease that would not be affected by the ordinance. Plaintiffs have not shown that the RSO is unconstitutional in all of its applications.

Even if we ignore Plaintiffs' facial-challenge language and humor their case as an as-applied challenge, Plaintiffs still do not prove any current leases are affected by the City's rent-control law. The nature of their claim rests on an uncertain hypothetical speculating that "[i]f the lease is extended or removed," then there *might* be a Contracts Clause claim. *Id.* But as-applied challenges require something more than these kind of "speculative or indeterminate factual issues." *In re Bender*, 368 F.3d 846, 847-48 (8th Cir. 2004) (citations and quotations omitted). Plaintiffs' insistence that their current leases are being rewritten rests on a hypothetical situation they haven't proved happened or will happen. Ripeness requires this Court to dismiss their Contracts Clause claim because it does not clearly affect a current lease.

At the very least, Plaintiff Lofts at Farmers Market LLC's claim must be dismissed. In their Complaint, Plaintiffs admit the Lofts building was constructed between 2011-2012. (Doc. 1 at ¶ 68). Plaintiffs also

admit the recent amendments to the City's rent-control ordinance include an exemption for all buildings constructed in the last 20 years. (Doc. 32, p. 13; Doc. 63, p. 2). Since Plaintiff Lofts' building will not fall under the rent-control ordinance until 2032, their current leases will not be affected, and they cannot allege a Contracts Clause claim in this case.

**2. Plaintiffs insist it is impossible for *any* rent-control law to exist in the Midwest, but there is no legal basis in statute or caselaw to support geographic restrictions on this type of law.**

The City also argued that the first prong of the Contracts Clause test looks at the Plaintiffs' reasonable expectations about their contracts and the foreseeability of the City's rent-stabilization ordinance affecting those contracts. (*See* Doc. 52, pp. 43-49). The legal standard says there is generally no Contract Clause claim when the industry is highly regulated to begin with, and the plaintiff could reasonably expect this kind of regulation to occur. *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 437-38 (8th Cir. 2007). The City then cited a laundry list of cases that all concluded rent-control laws do not violate the Contracts Clause because these laws are reasonably foreseeable possibilities for the average landlord. (Doc. 52, pp. 43-49).

Plaintiffs concede the caselaw the City cited is against them but argue that these cases only apply to "East and West Coast states." (Doc. 63, p. 17). Plaintiffs write, "While landlords in New York, California,

12

Massachusetts or the District of Columbia may expect some form of rent control, the same cannot be said of landlords in Saint Paul, Minnesota." (*Id.* at 18). They argue the only way to have a reasonable expectation under the Contracts Clause is to have a nearby city do it first. (ECF # 63 at 17-18.).  This logic is nonsensical—creating an infinite loop where the only way to enact rent-control is by being first, but nobody is allowed to be first. Following Plaintiffs' reasoning, no law that could affect their business—not just rent control—would be allowed unless there's a first pioneer who enacted that law, but nobody's allowed to be this proto-pioneer, meaning the law can never occur.

Plaintiffs also incorrectly apply the legal standard here. This reasonable-expectations prong of the Contracts Clause test looks at how regulated the landlord-tenant industry is (which is highly regulated) and then asks: Is this regulation so far out of left field, that no reasonable landlord would have expected it to affect their leases? *Hawkeye Commodity Promotions*, 486 F.3d at 437-38. As we explained in our initial *Memo*, Plaintiffs exist in one of the most highly regulated industries where rent control has been ubiquitous throughout the country for almost 100 years, and caselaw throughout this time have upheld these rent-control laws. (ECF # 52 at 44-40). Plus, a 40-year-old Minnesota statute has warned Plaintiffs that any city could enact rent-control in a general election—which is exactly what happened here. (*Id.*).

13

Plaintiffs provide no support for limiting the reach of rent-control laws to certain geographic pockets of the country because there is no such support.[5] Based on decades of precedent upholding rent-control laws (which, Plaintiffs concede undermines their case) and the highly regulated nature of the landlord-tenant industry, it cannot be said Plaintiffs' reasonable expectations were frustrated by the City's rent-control ordinance in a way that "substantially impairs" their leases. *Heights Apartments*, 30 F.4th at 728.

### 3. The City is allowed to create a new-construction exemption under rational basis and the Contracts Clause.

Plaintiffs also argue the City's rent-control ordinance violates the second prong of the Contracts Clause analysis, which asks if the law is drafted in an appropriate and reasonable way to address its legitimate purpose. *Heights Apartments,* 30 F.4th at 728. Plaintiffs insist the rent-control ordinance is not tightly drafted enough to achieve its purpose of ensuring residents have access to adequate rental housing. (ECF # 63 at

---

[5] In addition, as discussed in more detail in the City's initial memorandum, Plaintiffs were on notice of Minnesota Statute sections 471.9996 which expressly allows rent control.  Plaintiffs' arguments against rent control would require this Court to rewrite § 471.996 to include an expiration date is if it's not used for some undefined amount of time.  But courts do not rewrite statutes.  *In re Civ. Commitment of Stone*, 711 N.W.2d 831, 837 (Minn. App. 2006) (noting that Minnesota's appellate courts have long said they insert language "that is not there" into a state or local law).

20-21). They also argue the ordinance's exemption for buildings constructed within the last 20 years unconstitutionally discriminates against them, since it pits landlords of newer buildings against those of older buildings. (*Id.*).

First, on the question of whether the City's rent-control ordinance is tightly drafted to achieve its purpose, the Contracts Clause only requires a purpose that addresses "a broad and general social or economic problem" under the City's police powers for protecting the health, safety, and welfare of its citizens. *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983). In our opening *Memo*, the City explained that the purpose behind the ordinance is to help residents "retain or find adequate rental housing," and then took great pains to show how the ordinance addressed that purpose. *Saint Paul Leg. Code* § 193A.01; (ECF # 52 at 16-23).

Plaintiffs disagree, insisting the ordinance is so unreasonably drafted, it misses the mark entirely because it only limits rent for "middle- and upper-income tenants," but not for "tenants of 'affordable housing.'" (ECF # 63 at 20). This is untrue. The ordinance simply says,

> No landlord shall demand, charge, or accept from a tenant a rent increase within a 12-month period that is in excess of three (3) percent of the existing monthly rent for any residential rental property except as otherwise allowed under sections 193A.06 or 193A.07.

*Saint Paul Leg. Code* § 193A.04 (2022). Nowhere does this ordinance alleviate rental obligations on middle- and upper-income tenants while burdening lower-income tenants with aggressive rent hikes. The rent-control ordinance applies to *all* renters—regardless of income.

Plaintiffs also claim the rent-control ordinance is unconstitutional because it does more harm than good in their opinion and is unlikely to be a panacea for the problems of affordable housing. (ECF # 63 at 20-21). This exact same argument was tried and rejected in *Schnuck v. City of Santa Monica* where the Ninth Circuit correctly saw it for what it was: a policy disagreement. "That rent control may unduly disadvantage others, or that it may exert adverse long-term effects on the housing market," the court wrote, "are matters for political argument and resolution; they do not affect the constitutionality of the Rent Control Law." 935 F.2d 171, 176 (9th Cir. 1991). Plaintiffs' argument against the ordinance belongs in the legislative process—not here.

As for Plaintiffs' argument that the rent-control ordinance unconstitutionally discriminates against landlords because it contains a 20-year new-construction exemption, this also fails. In constitutional analysis, landlords are not considered a protected class. *Kraebel v. New York City Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 402 (2d Cir. 1992) (noting that plaintiff-landlord "is not a member of a suspect class"); *Schnuck*, 935 F.2d at 176 (writing that "landlords are not a suspect

class"). This means only the deferential rational-basis test applies to distinctions between the Plaintiffs and other landlords. *Id.* And if there are "any combination of legitimate purposes" for those distinctions, the law will be upheld. *Shnuck*, 935 F.2d at 175-76.

There are several reasons for these distinctions and there is a clear rational basis for this exemption. The point of exempting new construction is to encourage continued addition of new housing development, assist in its financing and not dissuade new construction. (Ex. 13, Ord 22-7, Hafner Supp. Decl.) (explaining the point of the new-construction exemption is to "help ensure that city partners can continue to construct new affordable housing units"). This should not surprise the Plaintiffs since this kind of new-construction exemption is ubiquitous in almost every rent-control law across the country—all designed to keep developers building more units. *See, e.g.*, Or. Rev. Stat. § 90.323(7)(a) (2022) (containing a 15-year new-construction exemption to Oregon's statewide rent-control law); Cal. Civ. Code § 1947.12(d)(4) (2022) (creating a 15-year new-construction exemption to California's statewide rent-control statute); Newark City Code § 19:2-18.1 (2022) (creating a 30-year new-construction exemption in Newark, New Jersey's rent-control law).

Finally, caselaw only confirms that certain landlords may be treated differently without triggering constitutional concerns. For

17

instance, in *Hilton v. San Francisco City and County*, a rent-control law only affecting residential—but not commercial—landlords was held constitutional. No. C-01-01095 CRB, 2001 WL 1180704, at *4 (N.D. Cal. Sept. 28, 2001). The court noted that landlords are not a suspect classification, and there was a legitimate reason to only impact residential landlords for rent-control purposes. *Id.* Similarly, in *Kraebel v. New York City*, the Second Circuit upheld that a law targeting only landlords with senior-citizen tenants. 959 F.2d at 401-02. Again, the court first noted that landlords are not a protected class for constitutional analysis, and then easily determined that the law burdening landlords with elderly tenants had a legitimate purpose behind it. *Id.*

Plaintiffs throw a veritable kitchen-sink at this Court to insist their contract-rights were violated by the City's rent-control ordinance. But the law is clear: Plaintiffs cannot show us how their current leases would be affected by the rent-control ordinance besides inventing an imaginary hypothetical; they cannot reasonably claim every rent-control law is geographically squeezed out of the Midwest, they cannot credibly claim to be surprised rent-control passed when Minnesota had a statute warning them it could happen; and they cannot wage a war over policy disagreements in this Court. For all these reasons, Plaintiffs' Contracts Clause claim must be dismissed.

**C.   The City's RSO does not violate the Takings Clause of either the Minnesota or U.S. Constitutions under existing law and Plaintiffs cannot show a taking under the *Penn Central* test.**

As they did with their Due Process Claim, Plaintiffs ultimately concede that rent control which caps rental rate increases is not a violation of the Takings Clause under existing precedent.  (Doc. 63, p. 29.)  Because this court is bound to follow existing precedent, this case should end here, and the City is entitled to summary judgment.

As for Plaintiffs' specific arguments on their Takings claim, each argument fails for the following reasons:

There is no genuine issue of material fact precluding summary judgment.  Plaintiff vaguely asserts that "the diminution in value of Plaintiffs' properties" as a dispute of fact the precludes summary judgment.  (Doc. 63, p. 22.)  But, as a matter of law, diminution in value is not enough to establish a taking.  As discussed in greater detail in the City's initial memorandum, the "[d]iminution in value of property, however serious, is insufficient to demonstrate a taking."  *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 645 (1993) (citations omitted); and *Andrus v. Allard,* 444 U.S. 51, 66 (1979).  Thus, disputes about diminution in value do not constitute a genuine issue of material fact precluding summary judgment.

19

1.     **The RSO does not constitute a Taking under *Penn Central.***

Moreover, the RSO does not constitute a regulatory taking under the *Penn Central* Factors.  It is well-established that the test in *Penn Central* is designed to determine whether the regulation "goes too far" and is "[f]unctionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner[.]" *Lingle,* 544 U.S. at 539; *301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27 F.4th 1377, 1381 (8th Cir. 2022).  The RSO, which caps rental increases to 3% within a 12-month period and allows for higher increases if necessary to provide a reasonable return on investment to property owners, does not "go too far" and does not constitute a Taking under the U.S. or Minnesota Constitutions.  As addressed in more detail in the City's initial memorandum, analysis of the commonly considered factors under Penn Central, the economic impacts, the investment back expectations and the character of the regulation do not establish a Taking.

a.     *Any economic impacts of the RSO do not establish a Taking.*

As for economic impacts, Plaintiffs broadly assert that they may be able to show loss of rents or loss of value in their properties, but Plaintiffs' assertions are unpersuasive for several reasons.

First, Plaintiffs completely ignore that the RSO, as amended, will not apply to the Lofts' property until 2032.  Second, Plaintiffs misstate the terms of the ordinance. For example, they claim that RSO does not guarantee that that Plaintiffs will be able to charge rent to cover their expenses such as property taxes.  (Doc. 63, p. 25.)  However, the Rules and the standard applicable to a reasonable rate of return (the MNOI standard) specifically account for operating expenses including property taxes.[6]  Similarly, they assert that the RSO "restricts" their ability to sell their properties. (Doc. 63, p. 25.)  This is not true, there is no restriction on selling properties in the RSO and there is no restriction on who landlords may or may not rent to.  (Ex. 13, 193A.05(b), attached to the Supplemental Declaration of Megan D. Hafner.)

Third, Plaintiffs' assertions are also highly speculative and include anecdotal hearsay such as, claiming some brokers have said "they would not  recommend selling rental properties in Saint Paul with the Ordinance in place" and claiming the Lofts' building has "an estimated 56% drop in value since the purchase of the Lofts and based on the cap

---

[6] (*See* April 29, 2022, Final Rules, No. A.(5)b.iv., *Maintenance of Net Operating Income (MNOI) Reasonable Return Standard*, Ex. 9, Doc. 53, p. 405; *see also Colony Cove Properties, LLC v. City of Carson*, 163 Cal. Rptr. 3d 499, 521 (Cal. Ct. App. 2013), *as modified on denial of reh'g* (Nov. 18, 2013) (discussing that "numerous courts" have recognized that "MNOI approach is constitutionally valid even though it ignores certain expenses" incurred by landlords.)

CASE 0:22-cv-01589-NEB-JFD   Doc. 68   Filed 12/12/22   Page 22 of 28

rate[7] at which the Lofts purchased the Lofts building."  Given that the Lofts purchased the building in 2015 and affirmatively alleges it had higher operating costs than it expected for the next 5-6 years,[8] it hardly seems proper to attribute a decrease in value to the RSO (instituted in 2022) when the calculation is based on the cap rate the Lofts expected "at the time the property **was purchased**" in 2015.  (Doc. 63, p. 24.)

More importantly, even if the RSO limits the amount of rent that can be charged and/or Plaintiffs' property suffers a diminution in value, that is not enough to show that a regulation "goes too far" and constitutes a taking under *Penn Central*.  As long as a rent control cap regulation allows a reasonable rate of return on investment, it is not confiscatory and does not amount to a taking.  *See Yee*, 503 U.S at 528; *F.C.C. v. Fla. Power Corp.*, 480 U.S. 245, 254 (1987); *see also CCA Assocs.*, 667 F.3d at 1259 (Dyk, J., concurring in part) (stating that "The Supreme Court in *Yee* recognized the legitimacy of rent control and expressed concern with such regulations only if the statute 'compel[s] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy' ").  Nowhere do Plaintiffs suggest the City's RSO obliterates the way-of-life in their investment-properties. Instead,

---

[7] "Cap rate," or "Capitalization Rate" is a percentage rate representing annual net operating income divided by the value of a building. "Capitalization Rate = Net Operating Income / Current Market Value" (https://www.investopedia.com/terms/c/capitalizationrate.asp)
[8] Pltffs' Compl., ¶¶ 71-73.)

they simply allege the ordinance *might* mean they are limited in the amount of rental increases they can institute per year than they would be without the ordinance. But collecting less than the maximum possible rent is not slashing all economically viable uses of the property sufficient to trigger a constitutional takings claim.  The economic impacts do not suggest a taking under *Penn Central*.

> b. *The investment backed expectations do not show that the RSO constitutes a Taking.*

As for the second *Penn Central* factor, Plaintiffs offer nothing more than a subjective, conclusory assertion that there was no rent control ordinance in place when they bought their properties, and they did not "expect such legislation to be implemented." (Doc. 63, p. 25.)  This is insufficient to create a genuine issue of fact as to the second factor of *Penn Central* and does not support that a taking occurred.  *See e.g. 301*, 27 F.4th at 1384 (finding no support for a takings claim under the second factor in *Penn Central* where plaintiff landlords "offered nothing but conclusory assertions" of interference with investment-backed expectations).  Importantly, Plaintiffs completely ignore the fact that there is a Minnesota statute which expressly allows for the public to initiate a rent control ordinance in a city, which is exactly what occurred in this case.  Moreover, rent control in the form of caps on rental rate increases has long been used by various cities throughout the country and is a known issue in the residential landlord-tenant industry.

23

   c. *The character of the government action shows that the*
    *RSO does not constitute a Taking.*

  Likewise, the less important third factor under *Penn Central* weighs

in favor of the City's RSO.  As established in the City's initial

memorandum, while the RSO may impact the value of property or cap

the rate of rental increases; it allows landlords to obtain a "reasonable

return on their investment" and is a "public program adjusting the

benefits and burdens of economic life to promote the common good,"

therefore it is not a taking.  Regulations of this character or type have

consistently been held to involve proper areas of governmental concern

and do not constitute takings.  *Pennell,* 485 U.S. at 11; *Lingle*, 540 U.S.

at 545; *see also CCA Assocs. v. United States*, 667 F.3d 1239 (Fed. Cir.

2011) ("Rent control and rent stabilization laws have been almost

invariably held to represent legitimate government acts and not to

support either physical or regulatory takings challenges.")

**2. The same Takings analysis applies under the Minnesota**
  **Constitution.**

  Finally, Plaintiffs again misstate the law and apply terms in their

non-legal meaning to claim incorrectly that this Court's analysis of a

takings claim should be different under the Minnesota Constitution.

(Doc. 63, p. 27.)  While the Minnesota Constitution has been held to

provide broader protection than under the Takings clause in the federal

constitution, this has meant that in certain situations, Minnesota Courts

do not utilize the *Penn Central* test; not that they apply the *Penn Central*

factors differently.  *See e.g. Johnson v. City of Minneapolis*, 667 N.W.2d

109, 115 (Minn. 2003) (finding that, even if not a taking under *Penn*

*Central*, under the Minnesota constitution, "an abuse of power of

eminent domain... may be tantamount to a regulatory control,

constituting a de facto taking when that abuse is 'specifically directed

against a particular parcel.'")

Plaintiffs reliance on *McShane v. City of Fairbault* to support their

assertion that a taking has occurred under the Minnesota constitution

because they have "demonstrated a substantial decline in the market

value of their properties as a result" of the RSO is wrong.  (Doc. 63,

pp. 27-28.)  *McShane* and the other cases cited by Plaintiff for this

proposition applied an "enterprise" analysis to the takings claims in

those cases, but that analysis only applies to regulations related to

"government enterprises" which serve the public, such as airport zoning

regulations. *DeCook v. Rochester Int'l Airport Joint Zoning Bd.*, 796

N.W.2d 299, 306 (Minn. 2011); *McShane v. City of Faribault*, 292 N.W.2d

253, 257 (Minn. 1980); *Zweber v. Credit River Twp.*, No. A18-1607, 2019

WL 2416025, at *4 (Minn. Ct. App. June 10, 2019) (recognizing that

Minnesota uses two tests, *Penn Central* or an enterprise test and

"enterprise analysis is triggered only when a specific governmental

enterprise takes an effective easement on private property").

The RSO does not involve a "government enterprise" and a review of

cases in Minnesota establishes that courts do utilize U.S. Supreme Court

decisions, including *Penn Central*, when considering takings claims

under the Minnesota Constitution.  *See e.g. DeCook*, 796 N.W.2d at 305

(stating that "[w]e have often applied *Penn Central* to decide

a regulatory takings case under the Minnesota Constitution"); *Wensmann*

*Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 633 (Minn. 2007)

(identifying cases in which court used *Penn Central* factors to

analyze takings claims under federal and Minnesota constitutions).

Thus, the *Penn Central* analysis set forth in the City's initial

memorandum, and discussed above, establishes that the City's RSO does

not constitute a taking under either the federal or Minnesota

Constitutions.[9]

---

[9] Moreover, Plaintiffs entire complaint and case is based on an attack on the application of any type of rent control.  Plaintiffs do not argue that rent control of a different design is constitutional; instead they argue that rent control in general is unconstitutional because it does not achieve is stated aims, restricts the ability to collect maximum rents, and diminishes the value of property.  Plaintiffs claim that the RSO might be a taking under the Minnesota Constitution, even of its not a taking under the federal constitution, fails given the existence of Minnesota Statute section 471.9996, which expressly allows rent control in Minnesota.  *See* Matter of J.M.M. o/b/o Minors for a Change of Name, 937 N.W.2d 743, 752 (Minn. 2020) ("Minnesota statutes are presumed to be constitutional and the party challenging the constitutionality of a statute must meet a very heavy burden").  The fact that  Minnesota law allows rent control to be enacted in cities is fatal to Plaintiffs' attack on the RSO under the Minnesota Constitution.

**D.    Plaintiffs § 1983 Claims fail as a matter of law because the RSO is constitutional, and Plaintiffs failed to meet their burden.**

In opposing Defendants' motion, Plaintiffs cite to cases where a cause of action under the Contracts clause has been asserted and survived a challenge on a motion to dismiss.  *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 733 (8th Cir. 2022) (assuming without deciding that a cause of action exists under § 1983).  The issue is before this Court on a motion for summary judgment and Plaintiffs have failed to establish an actionable § 1983 claim under the Contracts clause.  Moreover, the City continues to dispute that Plaintiffs have a viable claim under § 1983 against the City for their substantive due process claim as well. (Doc. 53, pp. 13 and 54.)  In fact, the very case cited by Plaintiffs in their opposition (*Heights Apartments*) found that dismissal of a substantive due process claim asserted under § 1983 was proper because the U.S. Supreme Court has instructed courts "[t]o be reluctant to expand the concept of substantive due process, especially where plaintiffs allege violations of various rights that trigger protections under other Amendments to the Constitution," such as the Takings and Contract clauses.  30 F.4th at 735-736.  In addition, as discussed in the City's initial memorandum, Plaintiffs' § 1983 claims fail because the RSO is not unconstitutional.  Thus, the City is entitled to summary judgment on Plaintiffs' entire cause of action under § 1983.

## **CONCLUSION**

For the reasons discussed above, Defendants City of Saint Paul, Minnesota, City Council of the City of Saint Paul, Angie Wiese, In her official capacity, and Mayor Melvin Carter, in his official capacity, respectfully request this Court grant their motion for summary judgment and dismiss each of Plaintiffs' claims with prejudice.

LYNDSEY M. OLSON
SAINT PAUL CITY ATTORNEY

Dated:  December 12, 2022      *s/ Megan D. Hafner*
                                            Megan D. Hafner, # 293751
                                            Kyle Citta, #0397000
                                            Assistant City Attorneys

                                            *Attorneys for Defendants City of Saint Paul, Minnesota, City Council of the City of Saint Paul; Angie Wiese; and Mayor Melvin Carter*
                                            750 City Hall and Court House
                                            15 West Kellogg Boulevard
                                            Saint Paul, MN 55102

                                            Telephone: (651) 266-8756
                                            Fax: (651) 266-8787
                                            *megan.hafner@ci.stpaul.mn.us*
                                            *kyle.citta@ci.stpaul.mn.us*