# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| WOODSTONE LIMITED PARTNERSHIP and LOFTS AT FARMERS MARKET LLC, | Case No. 22-CV-1589 (NEB/DLM) |
| Plaintiffs, | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| CITY OF SAINT PAUL, MINNESOTA, a Minnesota Charter City, CITY COUNCIL OF THE CITY OF SAINT PAUL, ANGIE WIESE, in her official capacity as the Director of the Department of Safety and Inspections of the City of Saint Paul, MAYOR MELVIN CARTER, in his official capacity as Mayor of the City of Saint Paul, and JOHN DOE, | |
| Defendants. | |

In the November 2021 general election, voters in the City of St. Paul (the "City") approved a rent-stabilization ordinance, the first of its kind in the Midwest. The ordinance limited annual residential rent increases to 3% but permitted exceptions for property owners to earn a reasonable return on investment. Plaintiffs Woodstone Limited Partnership and the Lofts at Farmers Market LLC are residential property owners in the City that are subject to the ordinance. They sue the City and the other above-captioned defendants (collectively, "Defendants") claiming that the law is unconstitutional under

the United States and Minnesota Constitutions. The parties, with the Court's permission, agreed to file expedited cross-motions for summary judgment. This matter is accordingly before the Court on Plaintiffs' motion for partial summary judgment and Defendants' motion for full summary judgment. For the reasons below, the Court grants summary judgment to Defendants on all claims.

## BACKGROUND

### I.    The City's voters approve rent stabilization.

In 1984, the Minnesota legislature enacted a statute permitting cities to pass rent-stabilization[1] ordinances in a general election. *See* Minn. Stat. § 471.9996. No city in Minnesota had taken advantage of this law until St. Paul in 2021. That summer, a group of voters drafted a rent-stabilization ordinance and petitioned the City to put it on the November ballot. (*See* ECF No. 37 at 60.) The petition satisfied the City's Chapter 8 requirements for ballot initiatives, which meant that the City Council was required to put it to voters as written by the authors. *See* St. Paul, Minn., City Charter § 8.04. The following question was asked of the voters in the general election:

> Should the City adopt the proposed Ordinance limiting rent increases? The Ordinance limits residential rent increases to no more than 3% in a 12-month period, regardless of whether there is a change of occupancy. The Ordinance also directs the City to create a process for landlords to request

---

[1] Some scholars distinguish between "rent control" and "rent stabilization." (ECF No. 53-1 at 309.) The difference is sometimes based on the strength and scope of the regulation. (*Id.*) Other times it is a "stand-in for the historical distinction between first-generation and second-generation regulations." (*Id.*) The Court uses the terms interchangeably.

an exception to the 3% limit based on the right to a reasonable return on investment.

(ECF No. 37 at 60.) A narrow majority of voters—52.8%—passed the ordinance. (*See id.* at 58.) In so doing, the City became the first in the Midwest to approve rent stabilization.

As the ballot initiative explains, the ordinance permitted property owners[2] to increase rent up to 3% annually, and it directed the City to establish a process for property owners to request exceptions for increases above 3%. The ordinance instructed the City to consider many factors in determining exceptions, including changes in property taxes, unavoidable changes in maintenance or operating expenses, costs of certain capital improvements, changes in the number of tenants, substantial deterioration of the rental unit, compliance with state and local housing and health and safety codes, and the pattern of recent rent increases or decreases. (*Id.* at 70.) The ordinance exempted some forms of affordable housing, (*id.*), but those exemptions affected only "a very small number of housing units." (ECF No. 53-1 at 35.)

## II.    The City implements the voter-initiated ordinance.

The voter-initiated ordinance went into effect on May 1, 2022. (ECF No. 37 at 70.) After it passed and before it went into effect, the City altered the ordinance slightly to "define certain terms contained therein and ensure consistency of language used throughout." (*Id.* at 73–79.) It made no substantive changes. (*See id.*) The City also

---

[2] The Court uses the term "property owner" in place of "landlord."

amended its legislative code to task its Department of Safety and Inspections ("DSI") with implementing the ordinance. (*Id.* at 106.) After reviewing the roughly 200 comments that the public submitted, DSI issued its final administrative rules a few days before the ordinance's May 1 effective date. (*Id.* at 119.)

In its administrative rules, DSI created two paths for property owners to request rent increases above 3%, each of which requires the completion of a Rent Increase Exception Request Form. (ECF No. 53-1 at 445.) First, if a property owner wants to increase rent above 3% but less than 8%, they must submit a "self-certification" application explaining why the increase is necessary. (*Id.*) Property owners are "strongly encouraged" to complete a Maintenance of Net Operating Income ("MNOI") Worksheet as well, (*id.*), which is a 22-page form that asks about the property owner's property, income, and expenses. (*See generally* ECF No. 37 at 452–73 (sample worksheet).) DSI may audit any self-certification application, but pre-approval is not required before property owners implement the rent increase. (*See* ECF No. 53-1 at 445–46.)

Second, for requested increases greater than 8%, property owners must follow DSI's "staff-determination" process. (*Id.* at 446.) Here the property owner must complete the MNOI Worksheet, and DSI must approve the increase before a property owner implements it. (*See id.*) Under each process, property owners are entitled to a reasonable return on investment. (*Id.* at 445.) But DSI's rules set a maximum 15% annual limit on rent increases, with increases above 15% deferred into the next year. (ECF No. 37 at 125.)

4

### III.    The City substantially amends the ordinance.

Throughout the process of drafting, voting, amendments, and DSI rulemaking, various members of the City's leadership expressed concerns about the voter-initiated ordinance. Mayor Melvin Carter, for example, shared reservations about aspects of the voters' proposal in the leadup to the November 2021 election. (ECF No. 53-1 at 6.) Soon after his victory, Mayor Carter signaled his desire for an amendment exempting new housing, and in February 2022, he announced his proposal for a 15-year "rolling" exemption for newly-constructed residential properties. (*Id.* at 6–7; *see also* ECF No. 38 at 11 (describing Mayor Carter's pitch in his State of the City address for a 15-year new-construction exemption).)

It is easy to see the reasons for concern. In the first few months after voters approved the ordinance, the City's residential housing supply took a hit. New multifamily building permits decreased over 80% in a three-month period relative to the previous year. (ECF No. 38 at 6.) The ordinance increased risk for new-housing developers, which dried up their financing pipeline. (*Id.* at 8–9.) Many developers, large and small, paused their projects in the City. (ECF No. 33 ¶¶ 2–7.) Those stoppages included affordable-housing developments. (ECF No. 38 at 16.)

Mayor Carter convened a 41-person rent-stabilization stakeholder group ("RSSG") to analyze the voters' ordinance and consider "the medium to long-term perspective about how rent stabilization should operate in Saint Paul and to balance critical goals of

equity and growth." (ECF No. 53-1 at 4.) The RSSG's members included tenant advocates, real estate developers, and property owners. (*Id.*) The City contracted with the Center for Urban and Regional Affairs ("CURA") at the University of Minnesota to facilitate the group's deliberations. (*Id.* at 9.) The RSSG reviewed information about rent-stabilization programs nationwide, heard from the public and experts, and ultimately negotiated and delivered a set of recommendations to the City. (*Id.* at 4.) In the summer of 2022, the RSSG issued its report and presented to the City Council. (*Id.* at 2, 394.)

The RSSG made two recommendations. First, 60% of the group's members approved a package of proposals: an annual rent-increase cap of 3%, a provision for a reasonable rate of return on investment, a provision for the banking of preferential rents in some form,[3] a new-construction exemption of 15 years, and just-cause eviction protection for tenants. (*Id.* at 39.) Second, 83% of the RSSG approved "some form of partial vacancy decontrol."[4] (*Id.*) But the group did not endorse a specific partial-decontrol policy. (*Id.*)

---

[3] A banking-of-preferential-rates provision permits property owners to offer lower rents and lower rent increases to certain tenants, and then make up that difference at some point in the future, even though that later increase will necessarily involve rent increases above the cap. (ECF No. 53-1 at 34.)

[4] Vacancy decontrol allows property owners to raise rents above the cap when a vacancy occurs. (ECF No. 53-1 at 31.) "Full" decontrol sets no limit on the amount of a rent increase a property owner may implement upon a vacancy. (*Id.* at 32.) "Partial" decontrol imposes an upper limit on how large the rent increase may be, "essentially substitut[ing] a new and higher cap at the time of a vacancy for any rent stabilized unit." (*Id.*)

While the RSSG completed its work, the City entertained amendments to the voters' ordinance, holding numerous hearings throughout the summer and fall of 2022. (*Id.* at 453.) The City approved a second set of amendments by a five to two vote in September 2022, and the amended version of the ordinance (the "Amended Ordinance") went into effect on January 1, 2023. (*See generally* ECF No. 69-1.) The Amended Ordinance is operative today, and it is the basis of this dispute.

In the September 2022 amendments, the City acknowledged several problems with the voters' program. The City recognized that it issued only 200 residential building permits in the first four months of 2022, a substantial drop from the 1,391 permits it issued over the same period in 2021. (*Id.* at 2.) It warned that developers may pull out of existing development agreements, which would decrease the availability of Tax-Increment Financing that fuels the City's affordable housing. (*Id.*) And the City noted that it had "forecasted a loss of capital investment, relocation of developers and builders to more predictable locations and asset types, negative impacts on housing supply, and long term increases to housing costs" because of the voter-initiated ordinance. (*Id.* at 2–3.)

To combat these issues, the September 2022 amendments altered the voter-initiated ordinance in several respects. Relevant here, the City added new exemptions from its annual 3% rent-increase limit. First, it created a 20-year exemption for newly constructed buildings. (*Id.* at 16.) Second, it exempted units with a change in tenancy when the vacancy is supported by "Just Cause." (*Id.* at 7.) A "Just Cause Vacancy"

includes a tenant's refusal to renew a lease, among other situations. (*Id.* at 8.) In the event of a just-cause vacancy, property owners may raise rent up to the Consumer Price Index ("CPI") plus 8%. (*Id.* at 7.) Third, the City exempted housing that is designated "as affordable housing for persons and families of very low, low, or moderate income, as defined by State or federal law." (*Id.* at 16.)

Still, many aspects of the voters' original ordinance remain unchanged. The City kept its presumed 3% limit on annual rent increases. (*Id.* at 7.) It also kept the processes for property owners to request exceptions to the limit. (*Id.* at 9.)

Along with the new exemptions, the City altered its appeals process for DSI determinations on requests for increases over 3%. After DSI makes its initial determination on a property owner's rent-increase application, each party has a 45-day window to appeal. (*Id.* at 15.) DSI then makes its "Final Determination." (*Id.*) As the parties wait for that final ruling, property owners may not impose the rent increase. (*Id.*)

## IV. This litigation.

A few months before the September 2022 amendments, Plaintiffs sued, challenging the constitutionality of the voter-initiated ordinance. (ECF No. 1 ("Compl.").) Woodstone is a residential rental property owner in the City. (ECF No. 34 ¶ 3.) Over 30 years ago, it bought its property and developed a residential rental building. (*Id.*) When Woodstone bought its building, the property was not subject to rent control, and Woodstone did not expect that there would future limits to the prices that it could set.

8

(*Id.* ¶ 4.) Woodstone's standard lease agreement includes provisions contemplating rent increases. (*See generally* ECF No. 35 ¶¶ 14–15.) The Lofts also owns residential rental property in the City. (ECF No. 41 ¶ 3.) The Lofts' building was built and developed in 2012, and the Lofts has raised rents every year since then because of increases in its property taxes. (*Id.* ¶¶ 4, 8.)

Plaintiffs allege that the voter-initiated ordinance is unconstitutional under various provisions of the United States and Minnesota Constitutions, as well as in violation of federal and state statutes. (Compl. ¶¶ 236–344.) As discussed, the parties agreed to an early summary-judgment procedure, which the Court approved.[5] (ECF No. 23.) Roughly a month before Plaintiffs moved for partial summary judgment, the City approved the September 2022 amendments. The parties agree that the Court must review the Amended Ordinance, not the voter-initiated version. The briefing and the parties' arguments at the hearing focused on the Amended Ordinance.

Plaintiffs move for partial summary judgment on four counts: (1) violation of the Due Process Clauses of the United States and Minnesota Constitutions; (2) violation of the Contract Clauses of the United States and Minnesota Constitutions; (3) a 42 U.S.C.

---

[5] In the middle of summary-judgment briefing, Katherine Banbury, Angela Wilhight, Westside Community Organization, Alliance for Metropolitan Stability, and HOME Line moved to intervene. (ECF No. 45.) Given the late stage of this litigation, the Court denied the motion, but it reserved its decision whether to permit intervention for the limited purpose of an appeal. (ECF No. 55.) The same parties, minus Wilhight, then requested leave to file an *amicus* memorandum. (ECF No. 57.) The Court granted that request. (ECF No. 70; *see also* ECF No. 57-1 ("Amicus Mem.").)

Section 1983 claim premised on the federal violations; and (4) violation of Article XII, Section 5 of the Minnesota Constitution and Minnesota Statutes Section 471.9996. (ECF No. 30.) Defendants move for summary judgment on those four counts, too, along with (5) Plaintiffs' remaining count for violation of the Takings Clauses of the United States and Minnesota Constitutions. (ECF No. 51.)

## ANALYSIS

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact dispute is "genuine" if a factfinder could reasonably determine the issue in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis omitted). The Court must view the evidence, and any reasonable inferences that may be drawn from the evidence, in the light most favorable to the non-moving party. *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013). Although it is the movant's burden to show that the material facts in the case are undisputed, *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019), the non-moving party must still present admissible evidence that specific facts create a genuine issue for trial. *Anderson*, 477 U.S. at 256.

In cases involving cross-motions for summary judgment, the Court's approach is slightly modified. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). When considering Plaintiffs' motion, the Court views the record in the light most

favorable to Defendants. *Id.* When considering Defendants' motion, the Court views the record in the light most favorable to Plaintiffs. *Id.* "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." *Id.* (citation omitted).

The Court begins by addressing the parties' competing motions for summary judgment on the Due Process Clause, Contract Clause, Section 1983, and Minnesota state-law claims. It then turns to Defendants' motion for summary judgment on Plaintiffs' Takings Clause claims.[6]

## I.   Due Process Clause

Plaintiffs argue that the Amended Ordinance offends due process by arbitrarily depriving them of their property rights. They seek a declaratory judgment stating that it is unconstitutional as well as an injunction barring its enforcement. Defendants press that

---

[6] As a threshold matter, *amici* argue that the Lofts lacks Article III standing because the Amended Ordinance exempts properties built within the last 20 years. (Amicus Mem. at 3.) To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Pocketbook harms "readily qualify" as concrete injuries. *Id.* at 2204. Plaintiffs present evidence that property values in the City decreased 6% to 12% after voters approved the original ordinance. (ECF No. 64 at 6.) They also suggest that the Lofts' value has decreased 56% since its original purchase in 2012. (ECF No. 41 ¶ 11.) The Court hesitates to fully credit the 56% estimate because it is without supporting documentation and does not isolate the effect of the Amended Ordinance, but at minimum, some decrease in the Lofts' property value is enough to establish an injury-in-fact for purposes of constitutional standing.

Plaintiffs' due-process claims must be dismissed as a matter of law because they overlap with their Takings and Contract Clause claims. The Court begins there.

### A.   Actionability

"Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 266 (1994) (plurality opinion) (quotation marks and citation omitted); *see also id.* at 281 (Kennedy, J., concurring) (agreeing). Defendants argue that Plaintiffs' due-process claims are not actionable because they also bring Takings and Contract Clause claims, and it is those amendments that safeguard against the alleged unconstitutional interference with Plaintiffs' property rights.

There appears to be a growing circuit split on this issue. On one hand, when an amendment shields against a particular government intrusion, courts must look to that amendment's protections, not substantive due process. *Id.* at 266. For example, in a four-justice plurality opinion, the Supreme Court explained that substantive due process may not "do the work of the Takings Clause." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 721 (2010) (plurality opinion). The Eighth Circuit has cited *Stop the Beach Renourishment* favorably, dismissing state and federal due-process claims in a challenge to an indefinite eviction moratorium that also involved the Takings and

Contract Clauses. *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 735–36 (8th Cir. 2022) (citing *Stop the Beach Renourishment*, 560 U.S. at 721). And in recent actions involving New York City's rent-stabilization ordinance, the Second Circuit dismissed due-process claims on this basis. *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 556–57 (2d Cir. 2023) (applying *Stop the Beach Renourishment* to hold that a due-process challenge was not actionable); *74 Pinehurst LLC v. New York*, 59 F.4th 557, 569 (2d Cir. 2023) (same).

On the other hand, the Ninth Circuit has analyzed due-process challenges to rent-control ordinances without summarily dismissing on actionability. *See, e.g., Guggenheim v. City of Goleta*, 638 F.3d 1111, 1122 (9th Cir. 2010) (en banc) ("Due process claims can succeed when a rent control ordinance fails to substantially further a legitimate government interest."). That makes sense. The various constitutional provisions at issue shield against different government actions. The Takings Clause does not prohibit the government from interfering with property rights; rather, it requires compensation if an otherwise proper interference amounts to a taking. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). The Due Process Clause is different. It prohibits the government from interfering with property rights if a law is arbitrary, discriminatory, or demonstrably irrelevant. *See id.*; *Nebbia v. People of New York*, 291 U.S. 502, 539 (1934). As for the Contract Clause, its reach is limited to preexisting contracts, unlike due process, which extends to future contracts as well. *See Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 436 (8th Cir. 2007); *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984)

("We have never held, however, that the principles embodied in the Fifth Amendment's Due Process Clause are coextensive with prohibitions existing against state impairments of pre-existing contracts.")

Adding to this analysis is the Supreme Court's decision in *Pennell v. City of San Jose*, which reached the merits of a due-process challenge to a rent-stabilization ordinance. 485 U.S. 1, 11–14 (1988). *Pennell* addressed the due-process claim alongside a challenge under the Takings Clause, suggesting that property owners may challenge rent stabilization under the Due Process Clause. *See id.* The four-justice plurality in *Stop the Beach Renourishment* did not mention *Pennell*, let alone overrule it. *See* 560 U.S. at 721.

Still, this Court and the Eighth Circuit recently applied *Stop the Beach Renourishment* somewhat similarly to the manner requested by Defendants here. *See Heights Apartments*, 30 F.4th at 735. But in *Heights Apartments*, the Eighth Circuit emphasized that Minnesota Governor Tim Walz's COVID-19 eviction moratorium was unique because it had no end date, and neither Minnesota law nor Supreme Court precedent had dealt with an indefinite moratorium before. *Id.* at 729–30. The appellate court was "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Id.* at 735 (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

The Eighth Circuit's reluctance to expand substantive-due-process to eviction moratorium cases does not apply here, when the issue is rent stabilization. In *Pennell*, the

Supreme Court reached the merits in a due-process challenge to rent stabilization, and as discussed in the next section, it instructed courts to apply rational-basis review. *See* 485 U.S. at 11–14. This Court must follow *Pennell,* and therefore concludes that the overlap with other constitutional provisions does not bar Plaintiffs' due-process claims. The Court thus proceeds to the merits.[7]

### B.    Merits

Under the Due Process Clauses of the United States and Minnesota Constitutions, no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. amend. V; *see also* Minn. Const. art. I, § 7 (same). The United States and Minnesota Constitutions provide "identical" due-process protections, *Sartori v. Harnischfeger Corp.*, 432 N.W.2d 448, 453 (Minn. 1988), so the Court reviews Plaintiffs' federal and state claims under the same analysis.

Rent stabilization is "unconstitutional . . . if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt." *Pennell*, 485 U.S. at 11 (citation omitted). Put another way, if laws regulating price have "a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied." *Nebbia*, 291 U.S. at 537. Rational basis is not a particularly high bar: "The law's rational relation to a state interest need only be

---

[7] At any rate, for the reasons below, the Amended Ordinance does not violate the Due Process Clause. The Court's answer on actionability is not dispositive.

conceivable, and supporting empirical evidence is unnecessary." *Birchansky v. Clabaugh*, 955 F.3d 751, 757 (8th Cir. 2020).

Plaintiffs insist that this Court apply a heightened version of rational-basis review. They argue that the proper question is whether the Amended Ordinance "substantially advances" its stated purposes, citing *Lingle*.[8] According to Plaintiffs, *Lingle* requires a means-end test tethered to the Amended Ordinance's enumerated purposes, under which it must substantially advance those goals to pass constitutional muster.

Plaintiffs misread *Lingle*. The Supreme Court did not import a new "substantially advances" test into substantive-due-process analyses. *Kentner v. City of Sanibel*, 750 F.3d 1274, 1280–81 (11th Cir. 2014) ("We reject plaintiffs' invitation to create a new standard of review . . . [because] *Lingle* did not create a new substantive due process test for property rights-based claims."). *Lingle* involved the Takings Clause. 544 U.S. at 531–32. Twenty-five years before it was decided, the Court had embraced the substantially-advances test in its takings inquiries. *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980). The issue in *Lingle* was whether that test was still appropriate. 544 U.S. at 532. It is true that when explaining the test's origins, the Court linked it to its due-process jurisprudence from the 1920s. *Id.* at 540–41 (citing *Nectow v. Cambridge*, 277 U.S. 183 (1928); *Vill. of Euclid v. Amber Realty Co.*, 272 U.S. 365 (1926)). But *Lingle* did not displace modern due-process

---

[8] 544 U.S. 528.

16

rational-basis review.[9] If anything, the Court lamented the workability of the substantially-advances test when it cautioned that it "can be read to demand heightened means-end review of virtually any regulation of private property." *Id.* at 544. So too when the Court warned that the test would "empower—and might often require—courts to substitute their predictive judgments for those of elected legislatures and expert agencies." *Id.*

Plaintiffs have not identified a single case that applied the substantially-advances test in a due-process challenge to a rent-stabilization ordinance, let alone to a property-rights-based claim more generally. Nor has this Court been able to locate one. Rather, courts universally apply rational-basis review to economic legislation like rent stabilization. *See, e.g., Pennell*, 485 U.S. at 11–14 (applying rational-basis review to uphold a rent-control ordinance's constitutionality); *Guggenheim*, 638 F.3d at 1123 (same); *Schnuck v. City of Santa Monica*, 934 F.2d 171, 174–75 (9th Cir. 1991) (same). The question before the Court, then, is whether the Amended Ordinance is rationally related to a legitimate government purpose.

---

[9] In *Pietsch v. Ward County*, 991 F.3d 907 (8th Cir. 2021), the Eighth Circuit cited *Lingle* favorably when evaluating a due-process claim, but the court did not embrace—let alone address—the substantially-advances test. *See id.* at 910. The Eighth Circuit reasoned that "[d]ue process claims involving local land use decisions must demonstrate the government action complained of is truly irrational, that is something more than arbitrary, capricious, or in violation of state law." *Id.* (citing *Koscielski v. City of Minneapolis*, 435 F.3d 898, 902 (8th Cir. 2006)). The court observed that *Lingle* "implicitly approved this test for due process challenges to zoning ordinances," emphasizing that due-process review for arbitrariness survives *Lingle. Id.*

When arguing under this test, Plaintiffs make two assertions: first, that the Amended Ordinance is irrational and will not advance its stated goals; and second, that its process for requesting rent increases above 3% is overly burdensome. The Court applies rational-basis review to each argument.

1.      *Challenge to Amended Ordinance as Irrational*

The Supreme Court has "long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare," including the alleviation of tenant hardship. *Pennell*, 485 U.S. at 13; *see also 301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27 F.4th 1377, 1385 (8th Cir. 2022) ("Ensuring that citizens have access to affordable housing is undoubtedly a legitimate government objective . . . ." (alteration omitted)). The Amended Ordinance's purposes are to ensure housing affordability; address detrimental health, safety, and welfare impacts from a housing shortage; address the hardship tenants face when forced to move; and stabilize rents in the City when rents outpace incomes. St. Paul, Minn., Leg. Code § 193A.01. These are undoubtedly legitimate objectives. The Court must therefore ask whether the Amended Ordinance is rationally related to those goals.

In *Pennell*, the challenged rent-control ordinance permitted tenants to object to rent increases over 8%. 485 U.S. at 4. The parties would appear before a hearing officer, who considered "hardship to [the] tenant" when deciding whether to approve the increase. *Id.* The Supreme Court determined that procedure was "a rational attempt to accommodate

the conflicting interests of protecting tenants from burdensome rent increases while at the same time ensuring that landlords [were] guaranteed a fair return on their investment." *Id.* at 13. Applying rational-basis review, the Court held that the ordinance did not offend due process. 485 U.S. at 13–14.

Several circuits have concluded similarly in due-process challenges to rent-stabilization laws. In *Community Housing Improvement Program*, the Second Circuit dismissed a due-process claim on actionability but reasoned in the alternative that the law would survive rational-basis review. 59 F.4th at 556–57. The court noted that rational-basis review "is a deferential standard that allows a law to survive if *any* of its justifications is valid." *Id.* at 557 (emphasis in original). It explained that New York City's rent-stabilization law was enacted to help low- and moderate-income people afford housing they otherwise would not be able to, and it was "beyond dispute" that those were valid bases for the law's enactment. *Id.*; *see also 74 Pinehurst LLC*, 59 F.4th at 569 (same). The Ninth Circuit in *Schnuck* concluded that a rent-control ordinance survived rational-basis review because "[c]ontrolling rents to a reasonable level . . . alleviates[s] hardships to Santa Monica tenants." 935 F.2d at 175. Whether rent stabilization may "unduly disadvantage" some, or "exert adverse long-term effects on the housing market, are matters for political argument and resolution; they do not affect the constitutionality" of the ordinance. *Id.*

The Amended Ordinance is neither arbitrary nor demonstrably irrelevant to its stated purposes. When Plaintiffs filed this lawsuit, the voter-initiated version was operative, and that version might have been a closer call. But in the September 2022 amendments, the City—as Plaintiffs' counsel put it at the hearing—"substantially gut[ted]" the law. Those changes significantly benefitted property owners. Plaintiffs nevertheless insist that the Amended Ordinance, even with its substantial new protections for property owners, is unconstitutional because the changes were arbitrary. The Court disagrees. This Court is not to determine whether the Amended Ordinance is sound or unsound policy. The amendments show a rational attempt by the City to tailor the Amended Ordinance to better advance its stated purposes, and for these reasons, it survives rational-basis review.

First, the Amended Ordinance exempts new residential buildings for 20 years. St. Paul, Minn., Leg. Code § 193A.08(a)(3). This exemption is designed to spur new housing development, given the many developers who backed out of planned construction after the City's voters first approved the ordinance. A study on nationwide rent-stabilization policies by CURA found that the "most common" exemption to rent-stabilization laws "is an exemption for new construction," with "most" jurisdictions instituting one. (ECF No. 53-1 at 307.) Oregon and California, for example, exempt new construction for 15 years, and New Jersey's exemption is for 30 years. (*Id.* at 313.)

Rather than arguing that a new-construction exemption is unwarranted, Plaintiffs contend that the City arbitrarily selected 20 years instead of 15 or 30 years. The Court cannot locate a reason by the City for its selection of 20 years, but the CURA study suggests that exemptions anywhere from 15 to 30 years are common. The Court also notes that the RSSG recommended a 15-year exemption, (*id.* at 39), while developers had lobbied for 30 years. (ECF No. 40 at 39.) The City's selection of 20 years varies upwardly from the RSSG's proposal and in Plaintiffs' favor.

The new-construction exemption also applies retroactively to properties built within the last 20 years. St. Paul, Minn., Leg. Code § 193A.08(a)(3). Setting aside that this change benefits the Lofts, Plaintiffs argue that retroactivity is irrelevant to the Amended Ordinance's goals because it does not incentivize new housing. At the hearing, Defendants represented that the exemption is retroactive to allow new buildings time to adjust prices freely so the financial information they later submit on MNOI Worksheets will be more robust. That is rational. To calculate a reasonable return on investment, the Amended Ordinance generally uses 2019 as a property owner's "base year," which assumes that a property owner's operating income that annum was reasonable. *See id.* § 193A.07(c)(3). Reasonable return on investment in future years is then "calculated in a manner to ensure a Landlord maintains their operating income in the base year." *Id.* If 2019 did not provide a reasonable return, property owners may present evidence that its income or expenses that year were "unusually" or "disproportionately" high or low. *Id.*

§ 193A.07(e)(1)–(2). It is understandable that the City would temporarily exempt recently constructed buildings from this process to wait until they have more accurate operating-income data. In addition, roughly 89% of non-homestead housing units in the City were built before 2005, (ECF No. 53-1 at 48), so the exemption's reach is likely limited.

The City's policy does not stand alone; the recently enacted Sacramento Tenant Protection Act ("STPA") effectively includes a retroactive new-construction exemption. In 2019, Sacramento capped rent increases at 5% plus inflation in the STPA. (*Id.* at 324.) But all rent-stabilization programs in California are subject to the Costa-Hawkins Act, which exempts units constructed after 1995. (*Id.* at 325.) The STPA therefore effectively retroactively exempts new construction in Sacramento. (*See id.* at 324–25.)

Second, the Amended Ordinance carves out affordable housing from its annual rent-increase limits. Plaintiffs make the point that government housing programs do not cap rent, because as incomes increase, so do rent rates. According to Plaintiffs, the Amended Ordinance therefore excepts the very tenants it was most designed to help. At one of its early meetings, the RSSG overwhelmingly supported exempting publicly subsidized housing in which a tenant's share of the rent is determined as a percentage of income, with 92% in approval.[10] (*Id.* at 36.) Such exemptions are often included in rent-stabilization programs across the country. (*Id.*) For example, the CURA study observed

---

[10] The RSSG ultimately did not reach a consensus on how to define or delimit a publicly-subsidized-housing exemption, so this exemption did not make its way into the RSSG's final recommendations. (ECF No. 53-1 at 36, 39.)

that the programs in Oakland and Sacramento, California; Portland, Oregon; and Newark, New Jersey each exempt government-subsidized housing. (*Id.* at 320, 322–23, 325.) The Court therefore cannot conclude that the Amended Ordinance's affordable-housing exemption is arbitrary, given the many examples nationwide of similar exemptions and the support within the RSSG for its inclusion.

Finally, the Amended Ordinance added a partial-vacancy-decontrol provision, swinging the law's pendulum back in favor of property owners. Under this provision, in the event of a just-cause vacancy, property owners may increase rent by the CPI plus 8%. St. Paul, Minn., Leg. Code § 193A.05(b)(1). Just-cause vacancies include nonpayment of rent, repeated late payment of rent, material non-compliance with lease agreements, substantial damage to the property, and the refusal to renew or extend a lease, among other situations. *Id.* § 193A.05(b)(2). According to CURA, "[t]he regulation of vacancies can have critical impacts upon the outcomes of rent stabilization programs." (ECF No. 53-1 at 314.) Vacancy decontrol "ease[s] anxieties of property owners as it allows them to recoup some of their foregone profits," but it "severely undermines the long-term effectiveness of rent control programs." (*Id.*) After the rent-stabilization program in Berkeley, California switched from vacancy control to decontrol in 1995, over the next two decades "85% of all rent-stabilized apartments in the city had turned over at least once." (*Id.*) Berkeley tenants now pay roughly $100 million more in rent per year than they would have without vacancy decontrol. (*Id.*) The Court recognizes that California

23

chose full decontrol, not partial, but the point stands that Plaintiffs will benefit from this change.

All told, Defendants did not pick the property owners subject to the Amended Ordinance at random. All residential properties are subject to the Amended Ordinance, save the rational exemptions discussed above that were designed to spur new housing development or balance tenants' housing security with property owners' interests. (ECF No. 69-1 at 2–3.)

Plaintiffs' remaining arguments address the efficacy of rent control generally. Essentially, Plaintiffs contend that the Amended Ordinance will not work and will not meet its stated objectives. These predictions may come true, but a poor policy decision is not a due-process violation. For example, Plaintiffs argue that the Amended Ordinance will not increase the supply of affordable housing, and so it cannot improve the health, safety, and welfare impacts from the existing shortage. They assert that there is no evidence that it will ameliorate the hardship tenants face when they are forced to move homes. And they claim that the Amended Ordinance does nothing for low-income tenants, meaning that it will not stabilize the finances of residents whose rents are most outpacing their incomes. As support, Plaintiffs cite various economic reports on the ineffectiveness of rent control. They also insist that the fact the ordinance was amended amounts to an admission by Defendants that it will not achieve its stated goals.

Again, Plaintiffs misunderstand the constitutional standard at play. The question is not whether the Amended Ordinance is good policy. It is not whether the City has identified evidence that the Amended Ordinance will accomplish its purposes. And it is not even whether the Amended Ordinance will realize those purposes. *301, 712, 2103 & 3151 LLC*, 27 F.4th at 1385–86 ("Even if the ordinance fails to serve its purposes—or has the unintended effect of reducing affordable rental housing—ensuring that citizens have access to affordable housing is undoubtedly a legitimate government objective, and the ordinance is directed at ameliorating problems that often prevent people from finding housing." (citation omitted) (cleaned up)). The proper question before the Court is whether the Amended Ordinance has "a reasonable relation to a proper legislative purpose, and [is] neither arbitrary nor discriminatory." *Nebbia*, 291 U.S. at 537. The answer is yes, and the Amended Ordinance therefore withstands rational-basis review.

2.      *Challenge to Amended Ordinance as Overly Burdensome*

Plaintiffs also contend that the Amended Ordinance violates due process because the process to request exceptions for rent increases above 3% is prohibitively burdensome. For requested increases above 8%, they assert the appeals process is fraught with delay. For self-certification of rent increases between 3% and 8%, they argue that the process is time-consuming, the MNOI Worksheets are publicly available, and property owners are subject to civil and criminal liability for mistakes.

Plaintiffs' theory stems from *Birkenfeld v. City of Berkeley*, in which the Supreme Court of California struck down a rent-control charter amendment because its procedures for adjusting rent ceilings imposed "heavy burdens upon landlords not reasonably related to the accomplishment" of its objectives. 550 P.2d 1001, 1006 (Cal. 1976); *see also Richardson v. City & Cnty. of Honolulu*, 802 F. Supp. 326, 335 (D. Haw. 1992) (citing *Birkenfeld* favorably), *certified question answered*, 868 P.2d 1193 (1994), *and aff'd*, 124 F.3d 1150 (9th Cir. 1997). Berkeley's program called for a "blanket rollback" of rents to their values five years before. *Id.* at 1006–07. It then created a "unit-by-unit procedure" for adjustments to that price ceiling. *Id.* at 1007.

Berkeley's procedure was indeed complex. Under it, a five-person board needed to conduct a hearing before approving an increase to a unit's rent. *Id.* at 1008. The board had "no power" to increase rents until it received a petition from a unit's property owner or tenant and considered that petition at a hearing. *Id.* at 1030. That meant that the board could not order "general rental adjustments for all or any class of rental units based on generally applicable factors." *Id.* at 1031. And the board still had to conduct its hearing even if the non-petitioning party did not request to be heard. *Id.* Consolidation of hearings was permitted only for units in the same building, so long as a majority of tenants provided written consent. *Id.* at 1030–31. Along with their petition, property owners also had to submit a certificate from Berkeley's building inspection service verifying that the unit was code-compliant in an inspection completed within the

previous six months. *Id.* at 1030. At least three board members had to approve each petition, they could not delegate their authority to staff, and their annual compensation was capped at $2,400. *Id.* at 1031. Finally, before approving any rent increase, the hearing record had to include all the evidence, findings of fact, rulings on exceptions or objections, and the reasons behind the board's final decision. *Id.*

The *Birkenfeld* court concluded that the totality of these procedures amounted to a "procedural strait jacket." *Id.* Berkeley had denied the board "the means of reducing its job to manageable proportions through the formulation and application of general rules, the appropriate delegation of responsibility, and the focusing of the adjudicative process upon issues which cannot fairly be resolved in any other way." *Id.* As a result, the imposition of a rent ceiling was "virtually automatic" because of the rent rollback and an adjustment procedure "that inherently and unnecessarily preclude[d] reasonably prompt action except perhaps for a lucky few." *Id.* at 1032.

The Amended Ordinance is a far cry from the rent-control initiative in *Birkenfeld*. To start, there is no five-year rollback of rent prices. Each petition for a rent increase in *Birkenfeld* also had to be considered individually by the board at a hearing. But under the Amended Ordinance, increases up to 3% are automatic, and increases up to 8% may be self-certified by property owners. The volume of appeals has been low, too. From May 1 to August 23, 2022, the City received 152 applications from property owners for rent increases above 3%. (ECF No. 37 at 111.) Of that total, 121 were self-certification requests

that were automatically approved, and the other 31 were handled by DSI's staff-determination process. (*Id.* at 111-12.) Out of all 152 applications, there were only five appeals. (*Id.* at 112.) And unlike *Birkenfeld,* the Amended Ordinance does not require a hearing until a tenant or property owner appeals a DSI determination. *See* St. Paul, Minn., Leg. Code § 193A.07(a)(8). These differences are meaningful.

Plaintiffs emphasize that the Amended Ordinance does not allow property owners to increase rent above 3% until their application is finally resolved, including any appeals. If DSI approves a rent increase in its initial determination, tenants may appeal within 45 days, and the property owner may not raise rent in the interim. *See id.* § 193A.07(g)(4). As property owners wait for a final determination, Plaintiffs warn that the economic rationales behind property owners' initial applications may grow stale, requiring yet another bite at the rent-increase-application apple. Plaintiffs are correct that these delays are possible under the Amended Ordinance's appeals process. But they have not presented evidence that such delays have actually occurred, or even that they are likely to occur. As discussed, there were only five appeals in the first few months of the voter-initiated ordinance's rollout. (ECF No. 37 at 112.) The Court cannot conclude that the Amended Ordinance's process for requesting exceptions for rent increases above 3% is so burdensome that the law is unconstitutional. Defendants are therefore entitled to summary judgment on Plaintiffs' due-process claims.

28

II.    **Contract Clause**

Plaintiffs next claim that the Amended Ordinance violates the Contract Clauses of the United States and Minnesota Constitutions. As before, they seek a declaratory judgment that the Amended Ordinance is unconstitutional and an injunction barring its enforcement. (Compl. ¶ 324.) The federal and state Contract Clause inquiries are the same, so the Court addresses the two claims together. *State ex rel. Hatch v. Emps. Ins. of Wausau*, 644 N.W.2d 820, 833 (Minn. Ct. App. 2002).

"No state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I § 10, cl. 1; *see also* Minn. Const. art. I, § 11 ("No . . . law impairing the obligations of contracts shall be passed . . . ."). "Although it once was an absolute ban on state interference, . . . the prohibition has since diminished and [the Contract Clause] is no longer the Draconian provision that its words might seem to imply." *Heights Apartments*, 30 F.4th at 728 (quotation marks and citations omitted).

Courts apply a two-prong test to determine whether a law unconstitutionally interferes with a contract. *Id.* First, courts ask "whether the state law substantially impairs a contractual relationship, which takes into consideration 'the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.'" *Id.* (citing *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018)). If the first prong is met, then second, courts ask "whether the state law is drawn in an appropriate and reasonable way to advance a

significant and legitimate public purpose." *Id.* (quotation marks and citation omitted). The Contract Clause's protections are limited to inference only with pre-existing contracts, not future agreements. *Hawkeye Commodity Promotions*, 486 F.3d at 436.

As a threshold matter, Defendants argue that Plaintiffs' preexisting leases are unaffected by the Amended Ordinance, and so the Contract Clause's protections do not apply. That is true about the Lofts, as it was constructed within the last 20 years, and it is therefore still exempted from the Amended Ordinance's rent-increase limits. *See* St. Paul, Minn., Leg. Code § 193A.08(a)(3). But Woodstone is not exempted, and its existing agreements envision possible rent increases for short-term extensions. (ECF No. 35 ¶¶ 14–15.) Defendants are therefore correct that the Contract Clause does not impact the Lofts' preexisting lease agreements, but they are wrong about Woodstone. The Court must ask whether the Amended Ordinance's interference with Woodstone's preexisting lease agreements is substantial—the first prong of the inquiry.

### A.    *Substantial Impairment*

"A state's interference with a minor contractual provision is not a substantial impairment under the Contract Clause," and "interference with a crucial contractual right may constitute a substantial impairment." *Heights Apartments*, 30 F.4th at 728. As discussed, when assessing substantial impairment, courts consider multiple factors: "the extent to which the law undermines the contractual bargain, interferes with a party's

reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. The Court addresses these factors in turn.

*Extent to which the law undermines the contractual bargain*. Woodstone's standard lease agreement contemplates rent increases, but only in two limited contexts.[11] First, if a resident fails to give notice at the end of their lease, Woodstone may "a) extend the Lease for one notice period and b) raise the rent." (ECF No. 35 ¶ 14.) The notice period is two months. (*Id.* at 1.) Second, if a tenant stays in their unit after their lease date ends, the agreement automatically turns into a "bi-monthly" extension, which extends the lease "under its original terms except a) the duration shall be changed to two (2) months with two (2) full calendar months' notice required for termination . . . and b) Management may raise the rent." (*Id.* ¶ 14.)

Rent is undoubtedly an important lease term, making the Amended Ordinance's limit on rent increases affect the existing bargains between Woodstone and its tenants. *See Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*, 563 F. Supp. 3d 428, 450 (D. Md. 2021) ("The rent obligation to which the parties agreed under a lease

---

[11] Plaintiffs also argue that the Amended Ordinance's definition of "Rent" is broad enough to encompass late fees, so the law impairs Woodstone's existing agreements in a third way. *See* St. Paul, Minn., Leg. Code § 193A.03(v) ("*Rent*. All monetary consideration charged or received by a Landlord concerning the use or occupancy of a Rental Unit pursuant to a Rental Agreement . . . ."). On its website, the City has clarified that it does not consider late fees to be rent "because late fees are a penalty for late payment, rather than related to the use or occupancy of the unit." (ECF No. 71-1 at 26.) The Court agrees, and it therefore does not consider late fees when evaluating substantial impairment.

agreement is unquestionably a material term.").[12] The Amended Ordinance's rent-increase limits will not come into play unless one of Woodstone's tenants opts for a short-term extension. In other words, the Amended Ordinance's impact on Woodstone's existing agreements is conditional, not certain. Its effect may also be small, considering that each short-term extension option defaults at two months, and the Amended Ordinance permits increases up to 3%. It is also noteworthy that Plaintiffs have never applied for a rent increase. But property owners often increase rent on short-term leases to adjust for their inherent instability, *see Velez v. Cuyahoga Metro. Hous. Auth.*, 795 F.3d 578 (6th Cir. 2015), with Woodstone ordinarily increasing its monthly rents between $100 to $150 over base rent to cover its costs associated with short-term rentals. (ECF No. 34

---

[12] The *Willowbrook* court concluded that three rent-control laws in Maryland substantially impaired property owners' existing lease agreements, 563 F. Supp. 3d at 450–51, but there are several meaningful differences between those laws and the Amended Ordinance. Unlike here, the Maryland laws barred property owners from increasing rent during the COVID-19 pandemic, with no exceptions, even for tenants who had already agreed to renew their lease at a higher price. *Id.* at 437–38. The plaintiffs had argued that the laws created a substantial impairment because they undid rent increases that were previously agreed to before the laws' enactment. *Id.* at 450. The court agreed that the laws "clearly undermine[d]" those bargains "[b]ecause the contracts were premised on the increased rent amount . . . ." *Id.* On reasonable expectations, the court determined that "private rental housing providers do not reasonably expect to be prohibited—completely and with no exceptions—from increasing their tenants' rent obligations from year to year." *Id.* And on the ability for property owners to safeguard their rights, the court emphasized that the laws "contain[ed] no exceptions, nor d[id] they create any mechanisms through which Plaintiffs can seek individualized relief." *Id.* By contrast, Woodstone has not previously agreed to rent increases with its tenants. The Amended Ordinance also permits rent increases up to 3%, includes numerous exemptions to its restrictions, and creates an exception process to allow property owners a reasonable return on investment.

¶¶ 16–17.) And Woodstone stopped offering short-term extensions after the voter-initiated ordinance went into effect. (*Id.* ¶ 14.) On balance, the Court concludes that the first factor weighs slightly in favor of substantial impairment.

*Extent to which the law interferes with Woodstone's reasonable expectations*. The second factor in the substantial-impairment inquiry may be the most important. The "governing rule" when assessing substantial impairment "is akin to a question of reasonable foreseeability: if the party to the contract who is complaining could have seen it coming, it cannot claim that its expectations were disappointed." *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019) (quotation marks and citation omitted). It is the "expectations at the time of contracting" that matter. *Sveen*, 138 S. Ct. at 1823. "Reasonable expectations are affected by the regulated nature of an industry in which a party is contracting." *Hawkeye Commodity Promotions*, 486 F.3d at 438 (citation omitted). The more regulated, the more foreseeable. *Id.*

In the recent eviction-moratorium case of *Heights Apartments*, the Eighth Circuit determined that a property owner had pleaded a plausible Contract Clause claim. 30 F.4th at 723–24. On the issue of reasonable expectations, the court acknowledged that housing in Minnesota is a heavily regulated industry, but it concluded that "nothing in Minnesota law or Supreme Court precedent would have made the extent and reach of the [indefinite moratorium] foreseeable to Heights." *Id.* at 729. None of the statutes that Governor Walz relied on provided reasonable notice that a property owner might be

33

prohibited indefinitely from evicting tenants. *Id.* at 729–30. And no Supreme Court decision provided reasonable notice that an indefinite eviction moratorium was lawful. *Id.* at 730.

By contrast, at the time of contracting, Woodstone could have reasonably expected that the City's voters may enact a lawful rent-stabilization ordinance. Minnesota law expressly permits cities to enact rent-stabilization ordinances through general elections. Minn. Stat. § 471.9996 subdivs. (1)–(2) ("No statutory or home rule charter city . . . may adopt or renew by ordinance or otherwise any law to control rents on private residential property except . . . if the ordinance . . . is approved in a general election.") That alone distinguishes this case from *Heights Apartments*, as none of the statutes Governor Walz relied on provided notice of the possibility of an indefinite eviction moratorium.

Woodstone also should have reasonably known that courts have long upheld the constitutionality of rent-stabilization policies that guarantee a reasonable return on investment. For decades, cities have enacted rent-stabilization policies like the Amended Ordinance in response to economic crises, (*see* ECF No. 53-1 at 309–10), unlike in *Heights Apartments* when "the extent and reach of" Governor Walz's indefinite eviction moratorium was unforeseeable. 30 F.4th at 729. The Supreme Court first affirmed the constitutionality of rent control in response to a Contract Clause challenge more than 100 years ago. *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 198 (1921). Since then, rent control has long survived Takings Clause challenges. *See, e.g., Yee v. City of Escondido*, 503

34

U.S. 519, 532 (1992). And it has long survived Due Process Clause challenges. *See Pennell*, 485 U.S. at 11–14. Indeed, at the time Woodstone was contracting with its tenants, numerous lower courts were upholding similar rent-stabilization laws in the face of constitutional attacks. *See, e.g.*, *Schnuck*, 923 F.2d at 176; *Guggenheim*, 935 F.2d at 1123; *Hotop v. City of San Jose*, 982 F.3d 710, 719 (9th Cir. 2020); *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 54 (E.D.N.Y. 2020), *aff'd*, 59 F.4th 540 (2d Cir. 2023); *cf. Birkenfeld*, 550 P.2d at 1023, 1031 (holding that cities may generally impose rent control but that the specific processes in Berkeley's program were unconstitutionally burdensome).

It is also important to this analysis that the housing industry is heavily regulated. State authority to regulate economic issues is well established. *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 412–13 (1983) ("As is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." (citation omitted) (cleaned up)). The City may not have regulated rent prices before, but its oversight of the housing industry is extensive. *See generally* St. Paul, Minn., Leg. Code §§ 32–54, 192. As discussed, Minnesota law gives the City authority to adopt rent control through ballot initiatives. Minn. Stat. § 471.9996. Voters also passed the ordinance in November 2021, and it did not go into effect until May 2022, so around the time Woodstone was contracting with its then-existing tenants, it likely knew about the possibility of rent stabilization.

Plaintiffs underscore that rent stabilization has never happened in the Midwest and therefore they were blindsided by the City's general election. (*See* ECF No. 53-1 at 319–26.) The Court is sympathetic to this argument, but it cannot carry the day as a matter of constitutional law. Plaintiffs go too far to suggest that the City cannot constitutionally enact rent stabilization simply because it was the first to do so in this part of the country. Once more: Woodstone is a sophisticated party; the Minnesota housing market is highly regulated; Woodstone was on notice from Minnesota Statutes Section 471.9996 that rent control is possible; and courts have long held that comparable rent-stabilization policies are constitutional. Woodstone cannot claim that its expectations were disappointed; it was reasonably foreseeable that the City may interfere with its existing leases. The reasonable-expectations factor weighs against substantial impairment.

*Extent to which the law prevents a party from safeguarding or reinstating his rights*. "[M]inimal paperwork burdens do not violate the Contracts Clause." *Sveen*, 138 S. Ct. at 1823. In *Sveen*, the contracting party was able to reverse the effect of the challenged law "with the stroke of a pen." *Id*. The law at issue created a presumption in an insurance contract, but the insured could change that presumption by submitting a form. *Id*. By contrast, the Amended Ordinance sets a presumed 3% limit on rent increases. Property owners may petition the City for greater increases but requests up to 8% are subject to audit and requests above 8% require pre-approval. That is more than mere paperwork, and so the Court views the final factor as supporting substantial impairment.

*Conclusion*. Given that foreseeability is the "governing rule" of a substantial-impairment analysis, the Court concludes that this factor outweighs the other two, and determines that the challenged ordinance does not, under current law, substantially impair the rights of Plaintiffs. *Burgum*, 932 F.3d at 730. The Court nevertheless proceeds to the second step, because even if there is substantial impairment, the Amended Ordinance is appropriately and reasonably drawn to advance significant and legitimate public purposes.

**B.    *Appropriately and Reasonably Advance a Significant and Legitimate Purpose***

"[T]he Contract Clause provides greater protection for contractual rights than the 'less searching' rational basis standard applied under the Due Process Clauses." *Burgum*, 932 F.3d at 734 (citation omitted). "To avoid collapsing the specific prohibition of the Contract Clause into the more general Due Process Clause, a reviewing court must require the State to demonstrate more than a conceivable or incidental public purpose for impairing the obligation of contracts." *Id.* The government must show a "significant and legitimate public purpose" for its laws. *Id.* (citation omitted). If it does, "the court considers whether the law is drawn in an 'appropriate' and 'reasonable' way to advance that purpose." *Id.* (citation omitted). "At this last step, the Supreme Court has directed courts to defer to the legislative judgment as to necessity and reasonableness, 'as is customary in reviewing economic and social regulation.'" *Id.* (citing *Energy Rsrvs. Grp.*, 459 U.S. at 412–13).

Significant and legitimate public purposes animate the Amended Ordinance. In its findings, the ordinance outlines its rationales:

> In order to retain or find adequate housing, many residents of the City of Saint Paul pay a substantial amount of their monthly income for Rent; that the present shortage of Residential Rental Units and the prevailing Rent levels have a detrimental effect on the health, safety, and welfare of a substantial number of Saint Paul residents, particularly persons in low and moderate income households, and persons on fixed incomes who reside in the City; that residential Tenants constitute over fifty (50) percent of the residents in Saint Paul; that residential Tenants suffer great and serious hardship when forced to move from their homes; that the community is impacted by housing instability when rent increases outpace incomes; and that the welfare of all persons who live, work, or own Property in the City depends in part on ensuring that Saint Paul residents have access to affordable housing.

St. Paul, Minn., Leg. Code § 193A.01. In the September 2022 amendments, the City recognized these purposes again. (ECF No. 69-1 at 2.) These are undoubtedly legitimate public objectives that advance a "broad societal interest rather than a narrow class." *Burgum*, 932 F.3d at 733 (citation omitted); *see also id.* at 732–33 ("In short, the inherent pro-consumer nature of the Kansas law . . . made it self-evident to the Court that the law had a broad public purpose and was not special-interest legislation." (summarizing the Supreme Court's holding in *Energy Reserves*)).

With substantial and legitimate public purposes animating the Amended Ordinance, the Court must defer to the City's legislative judgment on necessity and reasonableness of the specific provisions in the City's rent-stabilization program. *Burgum*, 932 F.3d at 734. No doubt, Plaintiffs raise valid concerns about the Amended Ordinance.

But for the reasons above, under the Constitution, the Amended Ordinance is at minimum an appropriate and reasonable attempt by the City to advance its objectives. Defendants are therefore entitled to summary judgment on Plaintiffs' federal and state Contract Clause claims. And the Court's conclusion fits squarely within the long history of federal courts upholding rent-control laws in the face of Contract Clause challenges. *See, e.g.*, *Marcus Brown Holding*, 256 U.S. at 198; *Kargman v. Sullivan*, 582 F.2d 131, 134 (1st Cir. 1978) ("[I]t is not for the courts to second-guess the necessity of this specific application of Boston's rental control law."); *Willowbrook*, 563 F. Supp. 3d at 451–52 (concluding rent control "easily pass[ed]" the necessity-and-reasonableness test because it was "unquestionably meant to further 'significant and legitimate public purpose[s]'" and was not "irrational or illegitimate" (second alteration in original) (citation omitted)).

## III.    Section 1983

Plaintiffs bring a Section 1983 claim premised on Defendants' alleged violations of the Due Process and Contract Clauses. (Compl. ¶¶ 341–44.) Circuits are split on whether Section 1983 provides a private right of action for a Contract Clause violation. *Compare Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017) (holding that there is no private right of action), *and Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011) (same), *with S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (per curiam) (holding that there is a private right of action). The Eighth Circuit has declined to weigh in on this issue. *Heights Apartments*, 30 F.4th at 728. This Court need not wade into the dispute either

because Plaintiffs have not established that the Amended Ordinance violates the Contract Clause (or the Due Process Clause). Defendants are therefore entitled to summary judgment on Plaintiffs' Section 1983 claim.

## IV.     Article XII, Section 5 of the Minnesota Constitution and Minnesota Statutes Section 471.9996

The City's rules implementing the Amended Ordinance set a 15% per year cap on residential rent increases. (ECF No. 37 at 125.) After the close of briefing, the City amended its rules to eliminate that cap. (*See generally* ECF No. 71-1.) Plaintiffs sought a declaratory judgment that the previous 15% limit violated Article XII, Section 5 of the Minnesota Constitution and was preempted by Minnesota Statutes Section 471.9996. (Compl. ¶¶ 325–40.) The parties agree this claim is now moot. The Court therefore denies as moot Plaintiffs' motion for summary judgment on the Minnesota law issue, and it grants summary judgment to Defendants.

## V.     Takings Clause

Defendants move for summary judgment on Plaintiffs' remaining federal and state takings claims. Plaintiffs argue that a genuine dispute of material fact exists and that its claims should proceed to trial. The Court begins with Plaintiffs' federal claim, and then it addresses Plaintiffs' related claim under Minnesota law.

### A.     Federal Takings Claim

"The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, . . . prohibits the government from taking private property for

public use without just compensation." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). "It is axiomatic that the Fifth Amendment's just compensation provision is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Pennell*, 485 U.S. at 9 (citations omitted) (cleaned up). The overarching question is whether "'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (citation omitted).

In the rent-stabilization context, the Supreme Court has "consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982); *see also Yee*, 503 U.S. at 529 ("When a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge . . . without automatically having to pay compensation."); *Pennell*, 485 U.S. at 12 n.6 (declining to reconsider whether rent control is necessarily a taking because the Court has repeatedly held that "statutes regulating the economic conditions of landlords and tenants are not *per se* takings" (citing *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987)).[13]

---

[13] Plaintiffs reserve the right to ask the Supreme Court to overturn its prior cases upholding rent-control laws. They press that the Supreme Court's modern Fifth Amendment jurisprudence on rent control has extended beyond its origins in *Block v.*

As a threshold matter, Defendants argue that Plaintiffs bring only a facial takings challenge to the Amended Ordinance, not an as-applied challenge. The distinction between facial versus as-applied is important, as the Court's inquiry depends on which type of challenge Plaintiffs prosecute. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494 (1987). Plaintiffs' opposition brief is silent on this issue, but at the hearing, they explained that they are bringing a facial challenge. The Court agrees, given that the Complaint asks for a declaration stating that the voter-initiated ordinance is an unconstitutional taking as well as an injunction. (Compl. ¶ 290.) Thus, Plaintiffs must meet the heavy burden of "establish[ing] that no set of circumstances exists under which the [Amended Ordinance] would be valid." *United States v. Salerno*, 481 U.S. 739, 745

_____

*Hirsch*, which limited rent control to temporary emergencies. 256 U.S. 135, 156–57 (1921) (upholding a rent-control law enacted during World War I). Plaintiffs cite two dissents that would have curtailed that expansion. *See Fresh Pond Shopping Ctr. v. Callahan*, 464 U.S. 875, 878 (1985) (Rehnquist, C.J., dissenting) (reasoning that a city's rent-control law was distinguishable from the one in *Block* because there was no foreseeable end to the city's housing emergency); *Pennell*, 485 U.S. at 21–24 (Scalia, J., concurring in part and dissenting in part) (reasoning that when deciding whether to approve a rent increase that is otherwise reasonable, considering "hardship to the tenant" effects a taking because that hardship is not attributable to a property owner). For this Court's purposes, those dissents are not the law, and they are "in tension (if not conflict) with well established Fifth Amendment doctrine granting government broad power to determine the proper subjects of and purposes for regulatory schemes." *See Cmty. Hous. Improvement Program*, 59 F.4th at 553 n.25 (citation omitted). Numerous district and appellate courts nationwide have accordingly dismissed takings claims challenging rent-stabilization laws or granted summary judgment to the government. *See, e.g.*, *id.* at 553–56; *74 Pinehurst LLC*, 59 F.4th at 564–68; *Willowbrook*, 563 F. Supp. 3d at 441–44; *Hotop*, 982 F.3d at 716–17; *Guggenheim*, 638 F.3d at 1118–22; *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47–48 (2d Cir. 1996); *335-7 LLC v. City of New York*, 524 F. Supp. 3d 316, 331–34 (S.D.N.Y. 2021), *aff'd*, No. 21-823, 2023 WL 2291511 (2d Cir. Mar. 1, 2023).

(1987); *see also Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442, 449 (2008) (explaining that the law must be "unconstitutional in all of its applications").

Plaintiffs' theory is that the Amended Ordinance amounts to a non-categorical regulatory taking. "[W]hile property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). "To determine whether a use restriction effects a taking," courts have "generally applied the flexible test developed in *Penn Central*, balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).[14] The *Penn Central* test is an "ad hoc, factual inquiry" that "depends on the circumstances of each case." *Hawkeye Commodity Promotions*, 486 F.3d at 441 (citations omitted). The first two factors—economic impact and interference with reasonable investment-backed expectations—are "primary." *Id.* at 441 (citing *Lingle*, 544

---

[14] The Court recognizes that there is some ambiguity whether the *Penn Central* test is workable in facial takings challenges. *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1126 n.3 (9th Cir. 2013) ("It is not clear that a facial challenge can be made under *Penn Central*." (citation omitted)); *see also 335-7 LLC v. City of New York*, 524 F. Supp. 3d 316, 332 (S.D.N.Y. 2021) (explaining that some courts in the Second Circuit have applied *Penn Central* when rejecting facial challenges even though courts have suggested that it is ill-suited to facial challenges). The Second Circuit recently applied *Penn Central* in a facial takings challenge to New York City's rent-stabilization law. *See Cmty. Housing Improvement Program*, 59 F.4th at 553–56. The Court assumes without deciding that *Penn Central* applies in facial challenges, given that the *Penn Central* test is more robust than the one proposed by Defendants.

U.S. at 538–39). The third—the character of the government action—may be "relevant." *Id.* (citing *Lingle*, 544 U.S. at 538–39).

As the Court addresses the *Penn Central* factors, it is persuaded by the Second Circuit's recent analysis in *Community Housing Improvement Program*. In that case, the Second Circuit upheld the dismissal of a facial regulatory takings challenge to New York City's rent-stabilization law. 59 F.4th at 553–56. All three *Penn Central* factors weighed against a taking. On economic impact, the law decreased rent-stabilized property values by 25% to 50% on average. *Id.* at 554. The Second Circuit determined that average effects do not show that all property owners have suffered an adverse economic impact—the requirement in a facial challenge. *Id.* On investment-backed expectations, the court noted that some property owners would have their expectations disrupted by the law and others would not, depending on when they bought their property. *Id.* at 554–55. That again did not support a facial challenge. *Id.* at 555. And on the character of the government action, the court reasoned that rent stabilization is a comprehensive attempt to advance important public interests, so this final factor cut against a taking as well. *Id.* at 555–56.

Just as in *Community Housing Improvement Program*, for the reasons below, each of the *Penn Central* factors here weigh against a facial regulatory taking.[15]

---

[15] As Justice Scalia acknowledged in his *Pennell* dissent, a claim "that a law applicable to the plaintiffs is, root and branch, invalid" can be rejected on the merits "by merely noting

44

*Economic Impact*. When considering economic impact, courts "compare the value that has been taken from the property with the value that remains in the property . . . as a whole." *Keystone*, 480 U.S. at 497 (emphasis omitted) (citation omitted). Plaintiffs' best evidence of property-value diminution is a National Bureau of Economic Research study that found an average 6% to 12% reduction in property values in the City because of the voter-initiated ordinance. (ECF No. 64 at 6.) The study, however, was conducted on the original ordinance, not the Amended Ordinance with its September 2022 changes. (*See id.* at 3 (listing the publication date as May 2022).) As for the Lofts, Plaintiffs present evidence that the building's property value has dropped 56% since 2012. (ECF No. 41 ¶ 11.) Defendants contest these figures, but the dispute need not be resolved. Even viewing the evidence in the light most favorable to Plaintiffs, the "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) (first citing *Euclid*, 272 U.S. at 384 (about 75% diminution in value), and then citing *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (about 92.5% diminution in value)).

As for lost rental income, at the motion-to-dismiss stage, the Eighth Circuit has reasoned that such loss is an adverse economic impact. *Heights Apartments*, 30 F.4th at 734 ("Heights alleged the EOs deprived it of receiving rental income," so it "sufficiently

---

that at least some of its applications may be lawful." 485 U.S. at 16 (Scalia, J., concurring in part and dissenting in part).

pleaded the first *Penn Central* factor: economic harm." (cleaned up)). Plaintiffs here assert that the Amended Ordinance will cause them to lose rent. It may be true that the Amended Ordinance has reduced the profitability of residential rental buildings in the City, even with its guarantee of a reasonable rate of return. But Plaintiffs have not established that "every owner of a rent-stabilized property has suffered an adverse economic impact that would support their facial regulatory takings claims." *Cmty. Hous. Improvement Program*, 59 F.4th at 554. "Some landlords might have been harmed while others might not have been. It is not possible to generalize as to who was harmed, when, and to what extent." *74 Pinehurst LLC*, 59 F.4th at 564–65. This "necessarily means" that Plaintiffs cannot establish that the Amended Ordinance "can never be applied constitutionally." *Id.* at 565. The first *Penn Central* factor therefore weighs strongly in favor of Defendants.

*Investment-Backed Expectations.* "A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (quotation marks and citation omitted). The "heavily regulated nature" of an industry discounts a plaintiff's reasonable expectations. *Hawkeye Commodity Promotions*, 486 F.3d at 442; *see also Concrete Pipe*, 508 U.S. at 645 ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." (alteration and citation omitted)). As in *Community Housing Improvement Program*, Woodstone cannot establish

that the Amended Ordinance has interfered "with *every* property owner's investment-backed expectations, which is required on a facial challenge, because such expectations can only be assessed on a case-by-case basis." 59 F.4th at 554 (emphasis in original).[16] The second *Penn Central* factor does not support a regulatory taking.

*Character of Government Action.* The last *Penn Central* factor also weighs heavily in Defendants' favor. "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124. In *Heights Apartments*, the Eighth Circuit concluded that the third factor supported a taking because "the EOs affected more than the collection of rent from tenants"—they "intrude[d] on one of the most fundamental elements of property ownership—the right to exclude." 30 F.4th at 735 (citation omitted). Such a concern does not exist here: the Amended

---

[16] The rent-stabilization law in *Community Housing Improvement Program* differs from St. Paul because New York City has been regulating rent for decades. 59 F.4th at 543. Part of the Second Circuit's reasoning was that some property owners would have bought their properties when previous, more tenant-friendly versions of the law were in effect. *Id.* at 554–55. The court determined that it would be "impracticable to assess a class of owners' expectations without analysis on an individualized basis," and so the investment-backed-expectations factor did not support a facial regulatory taking. *Id.* at 555. Although the Amended Ordinance has not been around for decades, the Second Circuit's reasoning is still persuasive. Facial challenges require laws to be unconstitutional in all their applications, which would include property owners in the City who purchased residential rental buildings very recently. Investment-backed expectations must be considered on an individual basis here, too.

Ordinance does not restrict Plaintiffs' ability to evict tenants. Plaintiffs still have the right to "possess, lease and sell" its properties. *Hawkeye Commodity Promotions*, 486 F.3d at 442 (citation omitted). The Amended Ordinance is therefore "not a physical invasion"—"[i]t is more akin to some public program adjusting the benefits of economic life." *See 301, 712, 2103 & 3151 LLC*, 27 F.4th at 1384 (quotation marks and citation omitted). Indeed, as the Second Circuit reasoned in *Community Housing Improvement Program*, "[n]o one can seriously contend that" addressing health, safety, and welfare impacts from a housing shortage "are not important public interests and courts are not in the business of second-guessing legislative determinations such as this one." 59 F.4th at 555.

*Conclusion*. None of the *Penn Central* factors supports a regulatory taking, and so the Court grants summary judgment to Defendants on Plaintiffs' federal claim.

## B.   *Minnesota Takings Claim*

Plaintiffs bring a takings claim under the Minnesota Constitution as well, (Compl. ¶ 296), which provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minn. Const. art. I, § 13. The language of the Takings Clause in the Minnesota Constitution is "broader" than the Fifth Amendment. *State by Humphrey v. Strom*, 493 N.W.2d 554, 558 (Minn. 1992); *compare* Minn. Const. art. I, § 13 ("Private property shall not be taken, destroyed or damaged . . . ."), *with* U.S. Const. amend. V ("nor shall private property be taken").

It is true that "even if a takings claim fails under the United States Constitution based on a *Penn Central* analysis, the property owner may be entitled to compensation under the Minnesota Constitution, based on its more restrictive language." *Interstate Cos. v. City of Bloomington*, 790 N.W.2d 409, 413 (Minn. Ct. App. 2010). But as far as this Court is aware, those added protections involve Minnesota courts in select circumstances electing not to apply *Penn Central*—as opposed to applying its test differently. *See Johnson v. City of Minneapolis*, 667 N.W.2d 109, 115–16 (Minn. 2003) (evaluating whether an abuse of eminent domain amounted to a regulatory taking by asking if the abuse was "specifically directed against a particular parcel" (citation omitted)); *McShane v. City of Faribault*, 292 N.W.2d 253, 258–59 (Minn. 1980) (applying an "enterprise" analysis to zoning regulations that were designed to benefit a specific public or governmental enterprise). Neither of those circumstances cited by Plaintiffs—abuse directed at a particular parcel nor enterprise analysis—applies here.

Outside of those exceptions, Minnesota courts "rel[y] on cases interpreting the U.S. Constitution's Takings Clause in interpreting this clause in the Minnesota Constitution." *Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 631–32 (Minn. 2007). For regulatory non-categorical takings, they apply *Penn Central*. *Id.* at 633 (collecting cases); *see also DeCook v. Rochester Int'l Airport Zoning Bd.*, 796 N.W.2d 299, 305 (Minn. 2011) ("We have often applied *Penn Central* to decide a regulatory takings case under the Minnesota Constitution."). In *Wensmann*, for example, the Minnesota Supreme Court relied on

federal precedent to support its state-law takings analysis. *See* 734 N.W.2d at 634–42 (citing *Penn Central*, *Keystone*, and *Lingle*, among others).[17] So too in *Zeman v. City of Minneapolis*, in which the Minnesota Supreme Court held that the revocation of the respondent's rental-dwelling license for public safety purposes was not a taking. 552 N.W.2d 548, 552–55 (Minn. 1996). Thus, for the reasons above, Defendants are entitled to summary judgment on Plaintiffs' state-law takings claim as well.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.   Plaintiffs' Motion for Partial Summary Judgment (ECF No. 30) is DENIED and DENIED AS MOOT; and

2.   Defendants' Motion for Summary Judgment (ECF No. 51) is GRANTED.

---

[17] Plaintiffs are correct that on investment-backed expectations, the *Wensmann* court focused on existing and permitted uses as the "primary expectation" of the landowner. 734 N.W.2d at 637. But the court caveated that existing-and-permitted-uses is "generally" the inquiry, and it relied on federal law for this proposition. *Id. Wensmann* also involved a city's denial of an amendment to its comprehensive plan that would have permitted the appellants to turn a golf course into a rental dwelling. *Id.* at 627. By contrast, the Amended Ordinance does not stop landlords from operating rental properties—it limits only their ability to increase rent. Plaintiffs are also correct that on the nature of the government action, the *Wensmann* court focused on whether the regulation was general in its application or disproportionately fell on a few property owners. *Id.* at 639. But citing federal law, the court noted that this is only an "important consideration," not that it is dispositive. *Id.* And regardless, unlike in *Wensmann*, the Amended Ordinance does not fall disproportionately on relatively few property owners, as it applies generally in the City—subject to the exemptions discussed above. *See id.* at 640.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: May 22, 2023                    BY THE COURT:

                                       s/Nancy E. Brasel
                                       Nancy E. Brasel
                                       United States District Judge